**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al., ) <br> ) <br> *Plaintiffs*, ) <br> ) <br> v. ) <br> ) <br> PETER T. GAYNOR, Acting Secretary of Homeland ) <br> Security, in his official capacity, et al., ) <br> ) <br> *Defendants*. ) <br> ) | No. 21-cv-00100 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR STAY OF REMOVAL**

**INTRODUCTION**

Plaintiffs are asylum seekers who fled to the United States and were apprehended by U.S. Customs and Border Protection ("CBP"). Under longstanding safeguards in the immigration statutes, they were entitled to seek humanitarian protection pursuant to specific procedures enshrined by Congress in recognition of the life-and-death stakes and our international commitments. Instead, Defendants are moving to summarily deport them based on an unprecedented and unlawful new expulsion process, invoking the public health powers of the Centers for Disease Control and Prevention ("CDC"), specifically 42 U.S.C. § 265 (the "Title 42 Process"). Under this system, Plaintiffs—children and their parents fleeing for their lives—face expulsion without any hearing, even where, as here, they have no symptoms of COVID-19.

Three Judges in this District have already considered the core legal issues in this case. A certified class of unaccompanied children previously challenged this Title 42 Process. The Process has been enjoined as to unaccompanied children, with all three Judges to have examined the issue

agreeing that it is likely unlawful. *See P.J.E.S. by & through Escobar Francisco v. Wolf*, \_\_ F. Supp. 3d. \_\_\_, No. CV 20-2245 (EGS), 2020 WL 6770508 (D.D.C. Nov. 18, 2020) (Sullivan, J., adopting report and recommendation of Harvey, J.); *J.B.B.C. v. Wolf*, No. 1:20-CV-01509-CJN, 2020 WL 6041870 (D.D.C. June 26, 2020) (Nichols, J.). As the Court held in *P.J.E.S.*, § 265 does not authorize deportations at all; but even if it did authorize some deportations, it would not override the specific asylum protections for vulnerable noncitizens like Plaintiffs. 2020 WL 6770508 at *8-13, 27-32. Those conclusions apply equally here; Plaintiffs thus have demonstrated likelihood of success on their claims.

The equities also strongly support the issuance of a stay of removal pending the resolution of this case. Plaintiffs are asylum seekers fleeing for their lives, and face summary expulsion back to danger. On the other side of the ledger, Defendants can point to no significant harm they will suffer as a result of staying Plaintiffs' expulsion from the United States pending resolution of this case; indeed, one of the Plaintiff families has already been quarantined for weeks, and all three Plaintiff families have been tested for COVID-19 without any report of a positive result.[1]

## BACKGROUND

The following facts are set forth in the declarations accompanying this motion.

Plaintiffs Josiane Pereira-De Souza and her children H.N.D.S., E.R.P.D.S., M.E.S.D.S., and H.T.D.S.D.S. are a Brazilian family detained in Department of Homeland Security ("DHS") custody and subject to expulsion under the Title 42 Process. Ms. Pereira-De Souza's children are respectively sixteen, thirteen, eleven, and seven years old. The family fled sexual violence and threats of kidnapping in Brazil, and face severe persecution, torture, or death if expelled. Plaintiffs Nancy Gimena Huisha-Huisha and her one-year-old child I.M.C.H. are an Ecuadorian family also

---

[1] Plaintiffs' suit is a putative class action, but this motion seeks relief only for the individual named Plaintiffs.

detained in DHS custody and subject to expulsion under the Title 42 Process. Ms. Huisha-Huisha and her child are indigenous, and fled threats of kidnapping and violence in Ecuador due to Ms. Huisha-Huisha's gender and their indigenous Kichwa identity. Ms. Huisha-Huisha and I.M.C.H. face serious violence, torture, or death in Ecuador if they are expelled. Plaintiffs Valeria Marancela Bermejo and her four-year old daughter B.A.M.M. are also Ecuadorian, and fled to the United States to escape extensive gender-based physical and sexual persecution. They both face further persecution, torture, or death if expelled.

As explained more fully in Plaintiffs' Complaint, the Title 42 Process is a new immigration system that, for the first time ever, seeks to use the government's public health powers codified in Title 42 of the U.S. Code as an expulsion power. Specifically, in a series of agency documents the CDC and UCBP have invoked 42 U.S.C. § 265 to bar and expel noncitizens who come to the border or enter the country without documents.[2] Defendants have implemented this Title 42 Process as an alternative immigration system, ignoring various statutory protections for vulnerable noncitizens.

---

[2] *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559 (Mar. 24, 2020) (interim final rule) (effective date Mar. 20, 2020); Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56,424 (Sept. 11, 2020) (final rule) (effective date Oct. 13, 2020); Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060 (Mar. 26, 2020) (effective date Mar. 20, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective date Apr. 20, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020) (effective date May 21, 2020); Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806, 65,807-08 (Oct. 16, 2020) (effective date Oct. 13, 2020); U.S. Customs and Border Protection and U.S. Border Patrol, "Operation Capio" Memo ("CBP Memo"), *available at* https://www.documentcloud.org/documents/6824221-COVID-19-CAPIO.html.

**LEGAL STANDARD**

Courts deciding whether to grant a stay of removal weigh four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

**ARGUMENT**

**I.   PLAINTIFFS FACE IMMINENT IRREPARABLE INJURY IF EXPELLED.**

There can be no real dispute that the harms facing Plaintiffs are imminent and irreparable. As explained above, Plaintiffs face severe persecution in their countries of origin—Brazil and Ecuador—if they are summarily expelled pursuant to the Title 42 Process.

Plaintiff Ms. Pereira-De Souza fled Brazil with her four children due to persecution including sexual violence and threats that her children would be kidnapped. She fears even worse violence against herself and her children if they are expelled. Brazil is "among the most dangerous places on earth to be female." Helen Cavendish de Moura, *Four girls are raped every hour in Brazil, study finds*, CNN (Sep. 11, 2019), https://www.cnn.com/2019/09/11/americas/brazil-women-girls-domestic-violence-rape-intl-hnk/index.html. The country consistently has one of the world's highest rates of femicide (the killing of a woman because of her sex). *See, e.g.*, Will Carless, *Brazil's shocking violence against women, in five charts*, The World (Nov. 18, 2015), https://www.pri.org/stories/2015-11-18/brazils-shocking-violence-against-women-five-charts.

Plaintiff Ms. Huicha-Huicha fled Ecuador due to threats that her children would be kidnapped due to her gender and their indigenous Kichwa ethnicity, and she fears that she and her daughter, Plaintiff I.M.C.H., will suffer violence, torture, or death if expelled. In Ecuador,

indigenous peoples are marginalized and targeted for discrimination, exploitation, and trafficking. In 2019, "[t]raffickers often recruited children from impoverished indigenous families [in Ecuador]," and indigenous "children were exploited in forced labor and sex trafficking abroad." U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Ecuador*, https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/ecuador/.

Plaintiff Ms. Macancela Bermejo fled repeated, severe, gender-based physical and sexual violence in Ecuador and fears that she will be killed if she is expelled. There are "high levels of overall violence against women" in Ecuador. United Nations Special Rapporteur on Violence Against Women, Preliminary Observations & Recommendations (Ecuador), Dec. 9, 2019, https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25405&LangID=E. Nearly six out of ten women in Ecuador have experienced violence, one out of four has experienced sexual violence, and nine out of ten divorced women have experienced violence. U.N. Women, Ecuador, https://lac.unwomen.org/en/donde-estamos/ecuador.

These facts satisfy the stay standard at this stage, which requires "*only a likelihood* of irreparable injury." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016) (preliminary injunction request) (emphasis added). Nor is there any doubt that the harms Plaintiffs face are *irreparable*; indeed, they would be "beyond remediation." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 342 (D.D.C. 2018).

For one thing, as the court held in *P.J.E.S.*, the threatened expulsion of Plaintiffs in violation of their statutory rights to "apply for asylum or withholding of removal" is itself irreparable, as "[o]nce expelled from the United States and outside the jurisdiction of the Court, it is not clear that a remedy can be provided." 2020 WL 6770508 at *13 (quoting report and recommendation). Moreover, they face grave harms if expelled back to the danger from which

they fled. *See id.*; *J.B.B.C.*, 2020 WL 6041870 at *2 (granting stay for noncitizen subjected to Title 42 Process facing imminent expulsion); *Demjanjuk v. Holder*, 563 F.3d 565 (6th Cir. 2009) (granting stay for noncitizen who asserted removal would violate CAT); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018) (finding fear of "domestic violence, beatings, shootings, and death in their countries of origin" constitute irreparable injury); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 296–97 (D. Mass. 2018) (risk of persecution if removed is irreparable harm).

Because of the severity of the injuries Plaintiffs face, the balance of harms weighs strongly in favor of granting a stay of deportation. The government has at most a weak interest in the immediate expulsion of this small set of individuals. *See J.B.B.C.*, 2020 WL 6041870 at *8. And the public interest weighs strongly in favor of the emergency relief Plaintiffs seek. The Supreme Court has recognized that the public interest lies "in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. Treating asylum seekers with basic fairness and dignity is among our nation's best traditions. *See, e.g.*, Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States."). The public interest is also served when the government complies with its legal obligations. *See O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992); *Damus*, 313 F. Supp. 3d at 342; *R.I.L-R*, 80 F. Supp. 3d at 191. The public thus "has an interest in ensuring that its government respects the rights of immigrants[.]" *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 124 (D.D.C. 2018) (enjoining immigration authorities from removing plaintiffs pursuant to expedited removal orders).

In short, the balance of harms and the public interest decisively favor staying Plaintiffs' removal to afford them with the statutory safeguards and access to humanitarian protections to which they are entitled.[3]

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are likely to succeed on the merits of their challenge to the government's novel efforts to deport them under the supposed authority of 42 U.S.C. § 265. As explained below, § 265 does not authorize deportation at all. But even if such deportations were otherwise permitted, Plaintiffs are entitled to statutory procedures and humanitarian protections, including the right to seek asylum. Those specific, later-enacted statutes must be applied here, regardless of whatever § 265 may authorize in general. That is precisely what all three Judges in this District to consider the question have concluded, underscoring that Plaintiffs have a strong likelihood of success.

### A. Title 42 Does Not Authorize Deportation.

The CDC Immigration Orders were issued under the purported authority of 42 U.S.C. § 265, a provision that has laid dormant and largely forgotten in the U.S. Code for over a hundred years. Defendants claim to have discovered in this statute a source of unlimited authority to execute summary deportations as they see fit, without regard for the carefully crafted policy judgments of the Nation's immigration laws. But when an agency claims to discover "an unheralded power" lying dormant "in a long-extant statute," courts "typically greet its announcement with a measure of skepticism." *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 324 (2014). And, indeed, this novel, sweeping assertion of Executive dominance in the realm of immigration exceeds the power granted by § 265. Nothing in § 265, or Title 42 more generally,

---

[3] The Plaintiff families are detained at the Karnes County Family Residential Center in Karnes City, Texas. Plaintiffs note that this motion does not seek an order that they be released from detention.

purports to authorize *any* deportations, much less deportations in violation of the specific protections described below.

Section 265 authorizes the CDC to prohibit the "introduction of persons" under certain circumstances. It says nothing about any power to physically remove people from the United States. Nor does a neighboring provision laying out the "penalties" for violation of "any regulation prescribed" under § 265 make any mention of such deportation or expulsion authority. *See* 42 U.S.C. § 271. Instead, § 271 provides for fines and imprisonment of individuals for violation of public health regulations. The newly asserted power to deport, in the name of public health and independent of Congress's carefully reticulated immigration scheme, is "nowhere mentioned in the statute," which contains "not a word" about any expulsion power. *P.J.E.S.*, 2020 WL 6770508, at *29; *see id.* at *9, 11.

That silence speaks volumes. The Supreme Court has "long recognized that deportation is a particularly severe 'penalty.'" *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (quoting *Fong Yue Ting v. United States,* 149 U.S. 698, 740 (1893)). Thus, the extreme exercise of governmental power involved in physically removing a person from the country is one that must be granted by Congress, as "the Constitution creates no executive prerogative to dispose of the liberty of the individual." *Valentine v. U.S. ex rel. Neidecker*, 299 U.S. 5, 9 (1936) (holding that extradition power "does not exist save as it is given by act of Congress or by the terms of a treaty").

"[W]hen Congress wants to grant the power to expel individuals out of the United States, it does so plainly." *P.J.E.S.*, 2020 WL 6770508, at *9 (internal quotation marks omitted). Such powers of physical removal from the country—whether called deportation, removal, extradition, or expulsion—"in order to exist must be *affirmatively* granted" by Congress. *Valentine*, 299 U.S. at 12 (emphasis added) (rejecting argument that power to extradite U.S. citizens could be implied

from provision stating that United States was not bound to extradite them).  Accordingly, where Congress seeks to authorize that extraordinary physical control, it does so in explicit terms.  *P.J.E.S.*, 2020 WL 6770508, at *29; *see, e.g.*, 8 U.S.C. § 1231 (immigration removals); *id.* § 1225(b)(2)(c) ("may return the alien" to contiguous country); 18 U.S.C. §§ 3185, 3186, 3196 (extradition authority).  Courts do not—and, given the gravity of the asserted power, must not—lightly read an expulsion power into statutes that do not explicitly grant it.  *Valentine*, 299 U.S. at 12; *cf. Util. Air Regulatory Grp.*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.") (internal quotation marks omitted).  Nowhere in Title 42 has Congress granted that power.

Indeed, the context, structure, and history of § 265, and the original 1893 statute from which it derives, only underscore that Congress never authorized any deportations under the auspices of § 265.  *See* Memorandum in Support of Plaintiff's Motion for Classwide Preliminary Injunction, *P.J.E.S. v. Wolf*, No. 20-cv-2245, ECF No. 15-1 at 16-22 (explaining in detail the history and structure of Section 7 of the Act of February 15, 1893, ch. 114, 27 Stat. 449, 452, which became § 265 without material change in the Public Health Service Act, Pub. L. 78-410, § 362, 58 Stat. 682, 704 (1944)).  The statute was instead designed to regulate *transportation* entities that brought persons and goods to the United States, and it imposed fines and imprisonment on such transportation entities if they violated a public health order.  *Id.*  That is, furthermore, precisely how the statute was used the one time it was invoked to bar introduction of persons (by shipping companies) from abroad, in 1929.  *Id.*

That is not to say that Congress has ignored public health considerations in crafting immigration policy.  *See P.J.E.S.*, 2020 WL 6770508, at *11, 29.  To the contrary, from the earliest days of immigration regulation—predating the 1893 enactment of the predecessor to § 265—

Congress has explicitly authorized the deportation of individuals based on public health concerns. *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1085. And similar statutes exist today. *See* 8 U.S.C. § 1182(a)(1) ("[h]ealth-related grounds" of inadmissibility, including communicable diseases); 8 U.S.C. § 1222 (medical detention and examination as part of immigration processing). Because courts "presume differences in language like this convey differences in meaning[,]" particularly where contemporaneous statutes address related issues, Congress's decision to grant deportation power in the immigration statutes but not in Title 42 is conclusive. *See Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071-72 (2018) (internal quotation marks omitted).

Furthermore, § 265, the provision on which the Administration relies for its new power, could not be read to authorize expulsions because that section applies without differentiation to citizens and noncitizens alike. The government has previously conceded that, if it is correct that § 265 authorizes expulsions, it would therefore mean that Congress gave the executive branch the power to expel citizens as well as noncitizens. *P.J.E.S.*, 2020 WL 6770508, at *30 (Harvey, J.) ("the power the government claims under Section 265 is breathtakingly broad" and the government "admitted before Judge Nichols that the section authorizes the government to expel even U.S. citizens"). It is inconceivable that Congress would seek to give the executive branch that (plainly unconstitutional) power. *Clark v. Martinez*, 543 U.S. 371, 386 (2005) (rejecting "the dangerous principle that judges can give the same statutory text different meanings in different cases" even if only some applications raise constitutional concerns).

Had Congress sought to authorize the mass deportations on health-related grounds which are now underway, it would have needed to clearly say so. It has not, and these deportations are thus unlawful.

**B. Plaintiffs' Expulsion Also Violates The Specific Protections Established By Congress For Noncitizens Seeking Humanitarian Protections.**

Plaintiffs have statutory rights to seek protection from persecution and torture, as Congress has long prescribed. But the Title 42 Process unlawfully sidesteps these safeguards.

First, the asylum statute, 8 U.S.C. § 1158, provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that a noncitizen "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground. A grant of withholding is mandatory if the individual meets the statutory criteria. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). Congress drafted this statute to "conform[] it to the language of Article 33 [of the 1951 U.N. Convention of Refugees]," *INS v. Stevic*, 467 U.S. 407, 421 (1984), in several respects, including by making withholding "mandatory" where the eligibility criteria are satisfied, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 n.25 (1987), and by giving it broad application where a noncitizen fears return, *see Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1088 (9th Cir. 2020). Congress created specific and narrow bars to asylum and withholding of removal, but none of them apply to the Plaintiffs.[4]

---

[4] DHS and DOJ recently issued a final rule purporting to establish bars to eligibility for asylum and withholding of removal based on health considerations. *Security Bars and Processing*, 85 Fed. Reg. 84160-01 (Dec. 23, 2020). The Rule's effective date is January 22, 2021. That Rule is unlawful, but in any event does not affect the claims at issue here. While the Rule contemplates that it will be applied at the credible fear stage, it relies on regulations (which would permit the application of such bars in the credible fear process) promulgated in a separate rule, which has since been enjoined. *See id.* at 84,176 (noting that new bars rely on the "global" asylum rule for application at the credible fear stage); *Pangea Legal Services v. U.S. Dep't of Homeland Sec.*, No. 20-cv-9253 (JD), 2021 WL 75756 (N.D. Cal. Jan. 8, 2021) (preliminarily enjoining that global asylum rule). Thus, there is no mechanism to apply the new COVID bars at the credible fear stage; even if it eventually will apply to an asylum seeker, she is still entitled to all the procedures created by Congress in advancing her claim. Moreover, even if that injunction is lifted, the incoming Biden Administration has announced plans to stay and reconsider regulations with effective dates

Third, the Convention Against Torture ("CAT") prohibits returning a noncitizen to a country where it is more likely than not that she would face torture. Article 3 of CAT provides that "[n]o State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988). Congress has implemented Article 3 of CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18 (implementing regulations). There are no bars to eligibility for CAT protection. *See Negusie v. Holder*, 555 U.S. 511, 514 (2009).

Certain noncitizens who seek to enter the country without proper documents or by fraud may be placed in a summary "expedited removal" system (in lieu of full removal proceedings under 8 U.S.C. § 1229a). *See* 8 U.S.C. § 1225(b)(1). But even in those expedited proceedings, Congress took pains to guarantee procedural protections for asylum seekers. Specifically, if a noncitizen expresses fear of removal, she is entitled to a hearing with an asylum officer, subject to review by an Immigration Judge, to determine whether she has a "credible fear" of persecution or torture if removed. *Id*. §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B). Once the noncitizen shows a credible fear—a "low screening standard," 42 Cong. Rec. 25,347 (1996)—she is entitled to a full removal hearing with the attendant procedural protections, including the right to appeal, *see Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (explaining that one of the "important" goals of the expedited

---

after January 20. *See* CBS News, *Biden to halt or delay Trump's 'midnight regulations' on inauguration day*, Jan 1, 2021, https://www.cbsnews.com/news/joe-biden-halt-trump-midnight-regulations-inauguration-day/; *cf*. *Memorandum for Heads of Executive Departments and Agencies* (Jan. 20, 2017), https://www.whitehouse.gov/presidential-actions/memorandum-heads-executive-departments-agencies/.

removal statute was "ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution").

In short, Congress carefully crafted the statutory provisions governing asylum, withholding, and CAT protection to ensure that noncitizens within our country or at the border could seek relief from persecution and torture. In so doing, Congress sought to satisfy its domestic and international obligations to protect those fleeing persecution and torture. And, critically, Congress enshrined procedural access to these forms of protection before a person can be deported from the country, seeking to ensure a meaningful opportunity to present their claims.

The Title 42 Process jettisons all those protections and safeguards, subjecting these families to summary deportation back to persecution and torture.[5] Through their creation of an alternative immigration system, Defendants have circumvented the carefully crafted scheme Congress set forth for consideration of claims for humanitarian protections.

Whatever Title 42 authorizes in general, it cannot override the provisions of the immigration laws specifically designed to ensure that vulnerable people seeking protection would

---

[5] The only humanitarian protection provided under the Title 42 Process is limited to a CAT screening. Because the screening is limited to CAT, and offers no opportunity for asylum and withholding protection, it would not cure Title 42's legal defect even if the screening were adequate for CAT. But the screening is inadequate even for CAT protection: Noncitizens are only referred for a CAT screening if they "make an *affirmative, spontaneous and reasonably believable* claim that they fear being tortured in the country they are being sent back to." CBP Memo 4 (emphasis added). This means that families must know precisely what to say when they arrive in the U.S., and may be summarily returned to the countries they fled without the government ever even asking whether they would face torture in that country.

Unsurprisingly, this screening offers essentially no protection: As of May 13, 2020, out of thousands of expulsions under Title 42, Defendants reportedly conducted a mere 59 screening interviews for CAT, of which only two applicants passed the screening stage. Nick Miroff, *Under Trump Border Rules, U.S. Has Granted Refuge to Just Two People Since Late March, Records Show*, Wash. Post (May 13, 2020), https://www.washingtonpost.com/immigration/border-refuge-trump-records/2020/05/13/93ea9ed6-951c-11ea-8107-acde2f7a8d6e_story.html; Camilo Montoya-Galvez, *Only 2 Migrants Allowed to Seek Humanitarian Protection Under Trump's Coronavirus Border Order*, CBS News (May 13, 2020), https://www.cbsnews.com/news/only-2-migrants-allowed-to-seek-humanitarian-protection-under-trumps-coronavirus-border-order/.

have access to a meaningful and robust system to assess their claims—even where such individuals are suspected of having a communicable disease.  As with all potential conflicts, the Court must read § 265 and the refugee protection statutes together, to make sense of all Congress's work without discarding any of it.  *See P.J.E.S.*, 2020 WL 6770508 at *30; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.") (internal quotation marks omitted).  Thus, as Judge Bybee explained in another asylum case, "the President may not 'override particular provisions of the INA' through the power granted him in" 8 U.S.C. § 1182(f), despite the breadth of language in that emergency provision.  *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 760 (9th Cir. 2018) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2411 (2018)).  So too with § 265.  Even if § 265 could be read to authorize some summary deportations (which it cannot), it must be read to accommodate Congress's subsequent specific legislative protections and commands.  *See Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000) ("A broad statute when passed 'may have a range of plausible meanings,' but subsequent acts can narrow those meanings . . . .") (quoting *Brown & Williamson*, 529 U.S. at 143).

To the extent there is any conflict, the specific provisions addressing the procedure for resolving humanitarian protection claims before any removal should be read to control over the general public health statute.  *See, e.g.*, *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[A]n agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority.").  The INA's humanitarian protections are "precisely drawn, detailed statute[s]," *Brown v. GSA*, 425 U.S. 820, 834 (1976), that comprehensively

delineate what the government must do before it seeks to remove an asylum seeker.  By contrast, § 265 says nothing at all about removal; or humanitarian protections; or steps the government must take or may skip.  The general terms of § 265 cannot be construed to bypass the specific provisions of the asylum, withholding of removal, and torture statutes.  *See P.J.E.S.*, 2020 WL 6770508 at \*12; *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 159 n.2 (1976) ("[T]he more specific legislation will usually take precedence over the more general."); *cf. Clinton v. City of New York*, 524 U.S. 417, 443 (1998) (holding Congress may not give the President "the power to cancel portions of a duly enacted statute").  This interpretive principle has particular force where the more specific statute is the later-enacted one; that is the case here, as § 265 was originally enacted in 1893 and last amended in 1944.  *See United States v. Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012) (explaining that "[w]here two statutes conflict, the later-enacted, more specific provision generally governs").  Recent Congresses have spoken clearly and explicitly regarding the required treatment of asylum seekers; the Executive is not at liberty to ignore those commands.

## CONCLUSION

This Court should stay the expulsion of Plaintiffs pending resolution of this case.


Dated: January 12, 2021                              Respectfully submitted,

                                                     /s/ Celso J. Perez_____
                                                     Celso J. Perez (D.C. Bar No. 1034959)
Stephen B. Kang\*                                    Lee Gelernt\*
Cody Wofsy\*                                         Daniel A. Galindo\*
Morgan Russell\*                                     Omar Jadwat\*
American Civil Liberties Union Foundation,           Ming Cheung\*
Immigrants' Rights Project                           American Civil Liberties Union Foundation,
39 Drumm Street                                      Immigrants' Rights Project
San Francisco, CA 94111                              125 Broad Street, 18th Floor
Tel: (415) 343-0770                                  New York, NY 10004
                                                     Tel: (212) 549-2600
Andre Segura
Kathryn Huddleston
Rochelle Garza                                       Robert Silverman\*

Brantley Shaw Drake
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel. (713) 942-8146

Tamara F. Goodlette*
Refugee and Immigrant Center for
Legal Education and Legal Services
(RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
Tel: (210) 960-3206

Irit Tamir*
Oxfam America
Boston, MA 02115, Suite 500
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

Jamie Crook (D.C. Bar No. 1002504)
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

*Attorneys for Plaintiff*

*\*Pro hac vice application forthcoming*