# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NANCY GIMENA HUISHA-HUISHA, et al.,

      *Plaintiffs*,

  v.

ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity, et al.,

      *Defendants*.

Civil Action No. 1:21-CV-00100-EGS

## BRIEF OF HISTORIANS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION

Raymond P. Tolentino
  (D.C. Bar No. 1028781)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
rtolentino@kaplanhecker.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

      PAGE

TABLE OF AUTHORITIES ................................................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 2

ARGUMENT ................................................................................................................................ 2

    I.    Congress Feared That Infectious Diseases Like Cholera Would Spread to the United States via Ship in the Late Nineteenth Century ........................................ 2

    II.    Congress Enacted Section 7 of the 1893 Act To Regulate Steamships and Transportation Companies ................................................................................................ 4

    III.    Past Practice Confirms That the 1893 Act Was Meant To Regulate Transportation ................................................................................................................ 6

    IV.    The 1944 Recodification of the 1893 Act Did Not Materially Alter the Statute ................................................................................................................................ 7

CONCLUSION ............................................................................................................................. 9

APPENDIX A

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Util. Air Regul. Grp. v. E.P.A.*,
   573 U.S. 302 (2014) ............................................................................................................. 5

**Statutes**

42 U.S.C. § 265 ................................................................................................................... 1, 2, 7

Act of Feb. 15, 1893, ch. 114,
   27 Stat. 449 (1893) ............................................................................................. 2, 4, 5, 6, 7

Act of Mar. 3, 1891, ch. 551,
   26 Stat. 1084 (1891) ............................................................................................................ 3

**Rules & Regulations**

Control of Communicable Diseases,
   82 Fed. Reg. 6890 (Jan. 19, 2017) ...................................................................................... 7

Local Civil Rule 7(o)(5) .......................................................................................................... 1

**Other Authorities**

24 Cong. Rec. 359-92 (1893) ............................................................................................... 3, 6

Exec. Order No. 5143 (June 21, 1929) .................................................................................. 7

*Hearing on H.R. 3379 Before the Subcomm. of the H. Comm. on Interstate & Foreign Commerce*,
   78th Cong. 28 (1944) ........................................................................................................... 8

Howard Markel, *"Knocking out the Cholera": Cholera, Class, and Quarantines in New York City, 1892*, 69 Bulletin of the History of Medicine 420 (1995) ....................... 3

*Twenty Days Quarantine*, N.Y Times (Sept. 2, 1892),
   https://www.nytimes.com/1892/09/02/archives/twenty-days-quarantine-the-government-takes-decisive-action-a.html. ......................................................................... 4

U.S. Dep't of Treasury, Quarantine restrictions upon immigration to aid in the prevention of the introduction of cholera into the United States (Sept. 1, 1892) ......................... 3

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici* are distinguished scholars with expertise in the history of immigration, medicine, and public health in the United States. They have substantial academic, pedagogical, and professional experience bearing on the legal questions presented for this Court's review. In particular, *amici* submit this brief to offer an accurate historical understanding of 42 U.S.C. § 265, which forms the basis of the government's unprecedented policy of barring and expelling families at the border under the guise of protecting public health. Based on their expertise and knowledge of the relevant history, *amici* urge the Court to grant Plaintiffs' motion for classwide preliminary injunction.

A full list of *amici* is attached as Appendix A.

---

[1] Pursuant to Local Civil Rule 7(o)(5), *amici* state that no party's counsel authored this brief in whole or in part; no party's counsel contributed money that was intended to fund the preparation or submission of the brief; and no person—other than *amici* and their counsel—contributed money that was intended to fund the preparation or submission of the brief.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In the nineteenth and twentieth centuries, Congress enacted landmark public health laws aimed at preventing the spread of infectious diseases from foreign countries to the United States. To achieve that end, Congress chose a very specific and targeted approach. Instead of granting public health officials sweeping immigration powers to summarily deport all individuals deemed a public health risk, Congress chose to regulate the primary method by which those individuals were transported (or, in statutory terms, "introduce[d]") into the country—which, at the time, was steamships. *See* Act of Feb. 15, 1893, ch. 114, 27 Stat. 449, 452 (1893) (the "1893 Act"), 20 Civ. 2245, ECF No. 15-5 at 5 (Ex. A).[2]

As *amici* explain in this brief, the historical record is replete with evidence showing that section 7 of the 1893 Act—which was later reenacted as 42 U.S.C. § 265 without material change—was intended to give the President authority to regulate *transportation* of individuals rather than to deport or expel the individuals themselves. Because the government's deportation policy rests on an atextual and ahistorical understanding of the relevant public health statutes, this Court should grant Plaintiffs' motion for classwide preliminary injunction.

**ARGUMENT**

I. **Congress Feared That Infectious Diseases Like Cholera Would Spread to the United States via Ship in the Late Nineteenth Century**

Before turning to the 1893 Act itself, it is critical to understand the historical context in which Congress was legislating. During the late nineteenth century, two interrelated historical developments were unfolding in the United States and Europe. First, the United States was experiencing a great wave of immigration that brought a steady stream of newcomers to the United

---

[2] Citations to "20 Civ. 2245, ECF No. __" refer to docket entries in the district court proceedings in the case *P.J.E.S. v. Wolf et al.*, No. 20 Civ. 2245 (D.D.C.).

States from across the Atlantic. *See* Howard Markel, *"Knocking out the Cholera": Cholera, Class, and Quarantines in New York City, 1892*, 69 Bull. Hist. Med. 420, 423 (1995). And second, many of those immigrants were coming from countries (mainly in Europe) that were experiencing deadly outbreaks of infectious diseases—including cholera in the 1880s. Federal officials and members of Congress quickly realized that this heavy volume of maritime transportation and influx of immigrants from infected countries heightened the risk of an epidemic in the United States. *See, e.g.*, 24 Cong. Rec. 360 (1893) (statement of Senator Chandler noting that "90 or 95 per cent of the immigration into the United States comes into" New York City, and that "the most danger of cholera is to be apprehended from vessels arriving at that port"); *see also id.* at 359 (letter from physician stating that "the extent of th[e] danger" of a cholera outbreak from Europe was "very considerable").

By 1891, Congress had already implemented immigration legislation empowering the federal government to inspect noncitizens before admission and deport them based on public health concerns. *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1084-86 (1891). But, with cholera at the nation's doorstep, President Benjamin Harrison took an extraordinary step in September 1892: rather than invoke his statutory authority under the Immigration Act of 1891 to expel individual immigrants from infected countries, he cut off their primary mode of transportation into the United States. He therefore instructed Surgeon General Walter Wyman to issue a "circular" order to "[f]oreign [s]teamship [c]ompanies." U.S. Dep't of Treasury, Quarantine restrictions upon immigration to aid in the prevention of the introduction of cholera into the United States (Sept. 1, 1892), 20 Civ. 2245, ECF No. 15-5 at 13 (Ex. D). The circular order recognized that "immigrants in large numbers" were "coming into the United States" from "infected districts" in "Russia, Germany and France, and at certain ports in Great Britain, as well as in Asia." *Id.* Notably,

however, it did not ban those immigrants from entry or otherwise impose restrictions on them. *Id.* Instead, it mandated that "no *vessel* from any foreign port carrying immigrants shall be admitted to enter at any port of the United States until said vessel shall have undergone a quarantine detention of twenty days." *Id.* (emphasis added). This quarantine requirement imposed severe (and often prohibitive) costs on steamship companies; as the New York Times predicted at the time, the circular order would "practically put a stop to immigration, for no steamship company will continue to transport people to this country" given the high costs of quarantine. *Twenty Days Quarantine*, N.Y Times (Sept. 2, 1892), https://www.nytimes.com/1892/09/02/archives/twenty-days-quarantine-the-government-takes-decisive-action-a.html. Reportedly, several Harrison administration officials initially questioned whether they had the statutory authority to impose such drastic quarantine procedures. *See id.*

## II. Congress Enacted Section 7 of the 1893 Act To Regulate Steamships and Transportation Companies

A few months later, in February 1893, Congress enacted the 1893 Act, which expressly armed the federal government with additional powers to protect the nation's public health from the looming threat of contagion. One of the arrows in that new quiver was section 7, which gave the President clear statutory authority to issue orders like the one issued by President Harrison in 1892. In particular, section 7 granted the President the "power to prohibit, in whole or in part, the introduction of persons and property" from foreign countries experiencing outbreaks of "cholera or other infectious or contagious diseases." *See* 1893 Act § 7. Congress's deliberate use of the word "introduction" shows that section 7 was designed to regulate the steamships or other third parties that were transporting or "bringing in" infected immigrants to the country. *See* 20 Civ. 2245, ECF No. 15-1 at 16-17 (collecting contemporaneous sources defining the term "introduce" to mean to "bring" in).

4

The statutory context of the 1893 Act elucidates section 7's focus on regulating transportation, as opposed to authorizing deportation policies. Neighboring provisions in the statute show that Congress's concern in the 1893 Act was the regulation of steamships that were transporting individuals into the country. *See, e.g.*, 1893 Act § 1 (prohibiting "any merchant ship or other vessel from any foreign port" from entry into U.S. ports except in accordance with public health regulations); *id.* § 2 (requiring "any vessel" traveling to the United States to first obtain a bill of health at "port of departure"); *id.* § 3 (authorizing Secretary of the Treasury to regulate "vessels sail[ing] from any foreign port or place"); *id.* § 4 (charging the Surgeon General of the Marine Hospital Service with, among other things, "obtain[ing] information of the sanitary condition of foreign ports"); *id.* § 5 (directing Treasury Secretary to issue "rules and regulations" governing "vessels in foreign ports"); *id.* § 6 (providing for "an infected vessel" to be "remand[ed]" to "the nearest . . . quarantine station"). Moreover, the 1893 Act imposed penalties only on *ships* that violated the public health requirements established under the statute; no such penalties were imposed on individual immigrants. *See, e.g.*, *id.* § 1 (imposing penalty of up to $5,000 on any "vessel" that violated the Act).

Thus, read in context, section 7 (like its neighboring provisions) is properly understood as a provision that gives the federal government authority to regulate transportation. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 320-21 (2014) (noting the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," and stating that any "reasonable statutory interpretation must account for both the specific context in which . . . language is used and the broader context of the statute as a whole" (ellipsis in original) (internal quotation marks omitted)).

The legislative history confirms what the statutory text and context already make clear:

that section 7 was never meant to bestow upon the President wide-ranging deportation powers. For instance, Senator Chandler, a proponent of the 1893 Act, expressed the view that restricting travel by *ship* would protect the country from a cholera epidemic. *See* 24 Cong. Rec. at 360-63. And Senator Harris, one of the Act's sponsors, explained that the focus of section 7 was on "vessels" that were "sailing to this country" with "passengers, crews, and cargo," *id.* at 392, because the federal government already had the authority to quarantine and inspect individuals crossing land borders under a different statute, *id.* at 370 (referencing a preexisting "power to protect the Mexican and Canadian borders"). Congress's apparent fixation on the regulation of steamships in the 1893 Act was no surprise. As explained above, *see supra* Part I, Congress enacted the 1893 Act during a moment in history when it was widely understood that immigrants, especially those from Europe and Asia, overwhelmingly arrived by ship (rather than by land), and that transoceanic immigration by steamship from Europe posed a perilous threat to the nation's health.

### III. Past Practice Confirms That the 1893 Act Was Meant To Regulate Transportation

Past practice provides further historical evidence that section 7 of the 1893 Act does not supply the Executive with broad authority to expel or deport immigrants based on public health concerns. Section 7 of the 1893 Act has been invoked rarely throughout history as a basis to prohibit the introduction of persons.[3] And in those rare circumstances when it has, the federal government has used its section 7 authority to regulate the *transportation* of those persons to the United States. Take, for instance, the federal government's response to the meningitis outbreak of 1929. In response to that public health crisis, President Herbert Hoover, invoking his authority under section 7, issued an executive order restricting the "*transportation* of passengers from"

---

[3] The federal government did not invoke its authority under the 1893 Act during the devastating influenza pandemic of 1918.

6

China and the Philippines to the United States. Exec. Order No. 5143 (June 21, 1929), 20 Civ. 2245, ECF No. 15-5 at 7 (Ex. B) (emphasis added). The order observed that "the continued arrival of *vessels* having epidemic cerebrospinal meningitis infection on board ha[d] overtaxed the combined available quarantine facilities" in the United States. *Id.* (emphasis added).

Accordingly, the language of the 1929 executive order made abundantly clear that the President was invoking his section 7 authority to regulate the transportation of infected passengers from infected countries. In *amici*'s view, the limited usage of section 7 in the historical record strongly suggests that the provision was intended to give the President regulatory authority over steamships and transportation companies to protect public health—not to endow him with expansive deportation powers that have never been exercised in the history of the country.[4]

### IV.   The 1944 Recodification of the 1893 Act Did Not Materially Alter the Statute

In 1944, Congress passed the Public Health Service Act, which recodified section 7 of the 1893 Act as 42 U.S.C. § 265 without material change. Like its statutory forebear, section 265 was not intended to supply the federal government with statutory authority to expel noncitizens from the United States. As evidenced by the continued use of the term "introduction," the focus of section 265 remained the same: regulating transportation to protect against the spread of infectious diseases from other countries. *See* 42 U.S.C. § 265. To be sure, in 1944, Congress believed that the public health quarantine laws needed to be updated to account for modern air travel. *See*

---

[4] Subsequent invocations of 42 U.S.C. § 265, the successor provision of section 7, follow the same pattern. For example, in 2017, the Centers for Disease Control (CDC) promulgated regulations pursuant to 42 U.S.C. §§ 264 and 265 (among other provisions) in response to the largest outbreak of Ebola on record, an outbreak of Middle East Respiratory Syndrome (MERS), and repeated outbreaks of measles. *See* Control of Communicable Diseases, 82 Fed. Reg. 6890 (Jan. 19, 2017). The regulations enhanced and clarified the CDC's broad responsibilities with respect to preventing the introduction, transmission, and spread of communicable diseases into the United States and between states. But the regulations do not purport to authorize deportations.

7

*Hearing on H.R. 3379 Before the Subcomm. of the H. Comm. on Interstate & Foreign Commerce*, 78th Cong. 28, 45 (1944) ("[T]he revolution in travel brought about by the airplane has necessitated the revolution of our methods of control and our defense against disease."). But, if anything, this congressional focus on modes of transportation further reinforces the conclusion that section 265 (and section 7 before it) was designed to give the President the power to regulate transportation, not to create new deportation policies out of whole cloth.

\* \* \*

The history and application of the legislation in 1893 and 1944 is clear: neither section 7 of 1893 nor its successor provision (section 265) was intended to provide the President with the power to deport or expel individuals deemed to be a public health risk. Based on their expertise and knowledge, *amici* respectfully submit that the government's policy is flatly inconsistent with the statute and the historical record and must therefore be enjoined.

## CONCLUSION

For these reasons, and those set forth in Plaintiffs' brief, the Court should grant Plaintiffs' motion for classwide preliminary injunction.

Dated: February 5, 2021

        Respectfully Submitted,

        */s/ Raymond P. Tolentino*

        Raymond P. Tolentino
          (D.C. Bar No. 1028781)
        KAPLAN HECKER & FINK LLP
        350 Fifth Avenue | Suite 7110
        New York, NY 10118
        (212) 763-0883 (telephone)
        (212) 564-0883 (fax)
        rtolentino@kaplanhecker.com

        *Counsel for Amici Curiae*

# APPENDIX A

The *amici* listed below join this brief as individuals; institutional affiliation is noted for informational purposes only and does not indicate endorsement by institutional employers of the positions advocated in this brief.

**Alan Kraut, PhD**
Distinguished Professor of History
College of Arts & Sciences
American University
Washington, District of Columbia

**Carl Bon Tempo, PhD**
Associate Professor
Department of History
University at Albany, State University of New York
Albany, New York

**Nancy Foner, PhD**
Distinguished Professor of Sociology
Graduate Center and Hunter College
City University of New York
New York, New York

**Maria Cristina Garcia, PhD**
Howard A. Newman Professor of American Studies
College of Arts and Sciences
Cornell University
Ithaca, New York

**David A. Gerber, PhD**
Distinguished Professor of History Emeritus
Senior Fellow in History and in Disability Studies
University of Buffalo, State University of New York
Buffalo, New York

**Adam Goodman, PhD**
Assistant Professor of History and Latin American and Latino Studies
University of Illinois Chicago
Chicago, Illinois

**Torrie Hester, PhD**
Associate Professor of History
College of Arts and Sciences
Saint Louis University
St. Louis, Missouri

**Hidetaka Hirota, PhD**
Associate Professor
Department of English Studies
Sophia University
Tokyo, Japan

**Philip Kasinitz, PhD**
Presidential Professor of Sociology
Graduate Center
City University of New York
New York, New York

**S. Deborah Kang, PhD**
Anne Stark and Chester Watson Associate Professor of History
School of Arts and Humanities
University of Texas at Dallas
Dallas, Texas

**Julia Rose Kraut, JD, PhD**
Legal Historian
Author, *Threat of Dissent: A History of Ideological Exclusion and Deportation in the United States* (2020)
New York, New York

**Erika Lee, PhD**
Regents Professor of History and Asian American Studies
Director, Immigration History Research Center
University of Minnesota
Minneapolis, Minnesota

**Julian Lim, JD, PhD**
Associate Professor of History
School of Historical, Philosophical and Religious Studies
Arizona State University
Tempe, Arizona

**Maddalena Marinari, PhD**
Associate Professor of History
Gustavus Adolphus College
St. Peter, Minnesota

**Howard Markel, MD, PhD**
George E. Wantz Distinguished Professor of the History of Medicine
Director, Center for the History of Medicine
Professor of Pediatrics and Communicable Diseases
Professor of Health Management and Policy (Public Health)
Professor of History
The University of Michigan
Ann Arbor, Michigan

**Deirdre Moloney, PhD**
Historian
Author, *National Insecurities: Immigrants and U.S. Deportation Policy Since 1882* (2012)
Lawrenceville, New Jersey

**Lucy E. Salyer, PhD**
Professor of History
University of New Hampshire
Durham, New Hampshire

**Yael Schacher, PhD**
Senior U.S. Advocate
Refugees International
Washington, District of Columbia