**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.,* | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )  No. 21-cv-00100-EGS |
| | ) |
| ALEJANDRO MAYORKAS*, Secretary of | ) |
| Homeland Security, in his official capacity, *et al.,* | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASSWIDE**
**PRELIMINARY INJUNCTION**

*Automatically substituted pursuant to Federal Rule of Civil Procedure 25(d).

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    A. The Immigration Laws' Protections for Asylum Seekers ...................................... 2

    B. Immigration Laws' Treatment of Communicable Diseases ........................................ 4

    C. The Title 42 Process ................................................................................ 5

    D. The Proposed Class ................................................................................. 8

LEGAL STANDARD ...................................................................................................... 9

ARGUMENT .............................................................................................................. 9

    I. THE PROPOSED CLASS IS LIKELY TO SUCCEED ON THE MERITS. ...................... 9

        A. Title 42 Does Not Authorize Deportation .................................................. 10

            1. The text, context, and structure of § 265 demonstrate that it does not
authorize deportations. ........................................................................ 10

            2. Section 265 was designed to regulate transportation ................................. 13

        B. Plaintiffs' Expulsion Also Violates The Specific Protections Established By
Congress For Noncitizens Seeking Humanitarian Protections. .......................... 19

    II. SUBJECTING IMMIGRANT FAMILIES TO THE TITLE 42 PROCESS HAS
CAUSED AND WILL CONTINUE TO CAUSE THEM IRREPARABLE HARM. ........ 23

    III. THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH WEIGH
DECIDEDLY IN FAVOR OF INJUNCTIVE RELIEF FOR CLASS MEMBERS ......... 26

CONCLUSION ............................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Air All. Houston v. EPA*,
　906 F.3d 1049 (D.C. Cir. 2018) ................................................................................ 22

*Brown v. GSA*,
　425 U.S. 820 (1976) ................................................................................................... 22

*Clark v. Martinez*,
　543 U.S. 371 (2005) ................................................................................................... 12

*Damus v. Nielsen*,
　313 F. Supp. 3d 317 (D.D.C. 2018) ............................................................................ 9

*Demjanjuk v. Holder*,
　563 F.3d 565 (6th Cir. 2009) .................................................................................... 26

*Devitri v. Cronen*,
　289 F. Supp. 3d 287 (D. Mass. 2018) ....................................................................... 26

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry
Dock Co.*,
　514 U.S. 122 (1995) ................................................................................................... 19

*Epic Sys. v. Lewis*,
　138 S. Ct. 1612 (2018) ........................................................................................ 22, 23

*FDA v. Brown & Williamson Tobacco Corp.*,
　529 U.S. 120 (2000) ................................................................................................... 22

*Fong Yue Ting v. United States*,
　149 U.S. 698 (1893) ................................................................................................... 11

*Grace v. Barr*,
　965 F.3d 883 (D.C. Cir. 2020) ...................................................................... 20, 26, 27

*Grace v. Whitaker*,
　344 F. Supp. 3d 96 (D.D.C. 2018) ............................................................................ 26

*Indep. Ins. Agents of Am., Inc. v. Hawke*,
　211 F.3d 638 (D.C. Cir. 2000) .................................................................................. 22

*Innovation Law Lab v. Wolf*,
　141 S. Ct. 617 (2020) .................................................................................................. 3

*Innovation Law Lab v. Wolf*,
　951 F.3d 1073 (9th Cir. 2020) .................................................................................... 3

*INS v. Aguirre-Aguirre*,
　526 U.S. 415 (1999) .................................................................................................... 3

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ................................................................................................. 3

*INS v. Stevic*,
   467 U.S. 407 (1984) ................................................................................................. 3

*J.B.B.C. v. Wolf*,
   No. 20-CV-01509-CJN, 2020 WL 6041870 (D.D.C. June 26, 2020) ...................... 1, 2, 26

*J.D. v. Azar*,
   925 F.3d 1291 (D.C. Cir. 2019) ............................................................................... 9

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ..................................................................................... 25

*Merck & Co. v. U.S. Dep't of Health & Human Servs.*,
   962 F.3d 531 (D.C. Cir. 2020) ................................................................................. 14, 18

*Nasrallah v. Barr*,
   140 S. Ct. 1683 (2020) ............................................................................................ 15

*Negusie v. Holder*,
   555 U.S. 511 (2009) ................................................................................................. 4, 20

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................. 9, 29

*Orantes-Hernandez v. Meese*,
   685 F. Supp. 1488 (C.D. Cal. 1988) ....................................................................... 26

*P.J.E.S. v. Pekoske*,
   No. 20-5357 (D.C. Cir. Jan. 29, 2021) .................................................................... 29

*P.J.E.S. v. Wolf*,
   __ F. Supp. 3d. ___, No. 20-CV-02245-EGS, 2020 WL 6770508 (D.D.C. Nov. 18, 2020)
   .................................................................................................................................. passim

*Padilla v. Kentucky*,
   559 U.S. 356 (2010) ................................................................................................. 11

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*,
   ___ F. Supp. 3d._____, No. 20-CV-9253-JD, 2021 WL 75756 (N.D. Cal. Jan. 8, 2021)............ 11

*Radzanower v. Touche Ross & Co.*,
   426 U.S. 148 (1976) ................................................................................................. 23

*Sottera, Inc. v. FDA*,
   627 F.3d 891 (D.C. Cir. 2010) ................................................................................. 9

*United States v. Juvenile Male*,
   670 F.3d 999 (9th Cir. 2012) ................................................................................... 23

*Util. Air Reg. Group v. EPA*,
   573 U.S. 302 (2014) ................................................................................................. 10, 11

*Valentine v. U.S. ex rel. Neidecker*,
  299 U.S. 5 (1936) .......................................................................................... 11

*Walsh v. Preston*,
  109 U.S. 297 (1883) ....................................................................................... 14

*Wisc. Cent. Ltd. v. United States*,
  138 S. Ct. 2067 (2018) .................................................................................. 12

**Statutes and Legislative History**

8 U.S.C. § 1158 ................................................................................................ 3, 19

8 U.S.C. § 1158(a)(1) ....................................................................................... 3, 19

8 U.S.C. § 1182(a)(1) ....................................................................................... 4, 12

8 U.S.C. § 1182(a)(1)(i) .................................................................................... 4, 5

8 U.S.C. § 1222 ................................................................................................ 12

8 U.S.C. § 1222(a) ........................................................................................... 4, 5

8 U.S.C. § 1222(b) ........................................................................................... 5

8 U.S.C. § 1225(b)(1) ....................................................................................... 20

8 U.S.C. § 1225(b)(1)(A)(ii) ........................................................................... 20

8 U.S.C. § 1225(b)(1)(B) ................................................................................. 20

8 U.S.C. § 1225(b)(2)(c) .................................................................................. 11

8 U.S.C. § 1229a .............................................................................................. 20

8 U.S.C. § 1231 ................................................................................................ 4, 11

8 U.S.C. § 1231(b)(3) ...................................................................................... 3, 20

8 U.S.C. § 1231(b)(3)(B) ................................................................................. 3

18 U.S.C. § 3185 .............................................................................................. 11

18 U.S.C. § 3186 .............................................................................................. 11

18 U.S.C. § 3196 .............................................................................................. 11

24 Cong. Rec. 359 (1893) ............................................................................... 16

24 Cong. Rec. 378 (1893) ............................................................................... 15

42 Cong. Rec. 25,347 (1996) .......................................................................... 20

42 U.S.C. § 265 .......................................................................................... passim

42 U.S.C. § 271 ............................................................................................... 10

42 U.S.C. § 271(a) ............................................................................................ 6

Act of February 15, 1893, ch. 114 ............................................................. passim

Act of March 3, 1891, ch. 551 ........................................................... 4, 12, 15

Act of March 3, 1903, ch. 1012 ................................................................... 15

Chinese Exclusion Act of May 6, 1882, ch. 126 .......................................... 15

Foreign Affairs Reform and Restructuring Act of 1998 Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 ................................................................................................ 4

Public Health Service Act, Pub. L. 78-410, 58 Stat. 682 (1944). ....................... 5, 6, 13

**Rules and Regulations**

8 C.F.R. § 1208.16 ......................................................................................... 4

8 C.F.R. § 1208.16(a) ................................................................................... 20

8 C.F.R. § 1208.17 ......................................................................................... 4

8 C.F.R. § 1208.18 ......................................................................................... 4

8 C.F.R. § 1208.2(b) ..................................................................................... 20

42 C.F.R. § 71.40(a) ....................................................................................... 6

70 Fed. Reg. 71,891 (Nov. 30, 2005) ............................................................ 17

80 Fed. Reg. 16,400 (Mar. 27, 2015) ............................................................ 17

81 Fed. Reg. 54,230 (Aug. 15, 2016) ............................................................ 17

84 Fed. Reg. 84,160 (Dec. 23, 2020) .............................................................. 3

85 Fed. Reg. 7,874 (Feb. 12, 2020) ............................................................... 17

85 Fed. Reg. 16,559 (Mar. 24, 2020) ........................................................... 5, 6

85 Fed. Reg. 17,060 (Mar. 26, 2020) ....................................................... 5, 6, 29

85 Fed. Reg. 22,424 (Apr. 22, 2020) ........................................................... 5, 6

85 Fed. Reg. 31,503 (May 26, 2020) ........................................................... 5, 6

85 Fed. Reg. 56,424 (Sept. 11, 2020) ......................................................... 5, 6

85 Fed. Reg. 65,806 (Oct. 16, 2020) ........................................................... 5, 6

86 Fed. Reg. 6,847  (Jan. 25, 2021) .............................................................. 3

D.C. Cir. Rule 36(e)(2) ............................................................................................... 29

**Other Authorities**

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) ................... 19

Camilo Montoya-Galvez, *Only 2 Migrants Allowed to Seek Humanitarian Protection Under Trump's Coronavirus Border Order*, CBS News (May 13, 2020), *available at* https://www.cbsnews.com/news/only-2-migrants-allowed-to-seek-humanitarian-protection-under-trumps-coronavirus-border-order/ .................................................................................. 21

*CDC Officials Objected to Order Turning Away Migrants at Border*, The Wall Street Journal (Oct. 3, 2020), *available at* https://www.wsj.com/articles/cdc-officials-objected-to-order-turning-away-migrants-at-border-11601733601 .......................................................................... 7

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988) .......................................................... 4

Exec. Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, Sec. 4(a)(ii)(A) (Feb. 2, 2021), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-on-creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/ .............................................. 7, 8

*Inside the Fall of the CDC*, ProPublica (Oct. 15, 2020), *available at* https://www.propublica.org/article/inside-the-fall-of-the-cdc .................................................. 7

*How Trump officials used COVID-19 to shut U.S. borders to migrant children*, CBS News (Nov. 2, 2020), *available at* https://www.cbsnews.com/news/trump-administration-closed-borders-migrant-children-covid-19/ ........................................................................................................ 7

*Letter to HHS Secretary Azar and CDC Director Redfield Signed by Leaders of Public Health Schools*, Medical Schools, Hospitals, and Other U.S. Institutions, Columbia Mailman School of Public Health (May 18, 2020), *avaiable at* https://tinyurl.com/y8q3asun .......................... 28

Nick Miroff, *Under Trump Border Rules, U.S. Has Granted Refuge to Just Two People Since Late March, Records Show*, Wash. Post (May 13, 2020), *available at* https://www.washingtonpost.com/immigration/border-refuge-trump-records/2020/05/13/93ea9ed6-951c-11ea-8107-acde2f7a8d6e_story.html ............................. 21

*Pence Ordered Borders Closed After CDC Experts Refused*, AP News (Oct. 3, 2020), *available at* https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae ....................................................................................... 7

*Twenty Days Quarantine*, N.Y. Times (Sept. 2, 1892), *available at* https://www.nytimes.com/1892/09/02/archives/twenty-days-quarantine-the-government-takes-decisive-action-a.html ......................................................................................................... 18

U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Ecuador*, *available at* https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/ecuador/ ...... 24

U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Guatemala*, *available at* https://www.state.gov/wp-content/uploads/2020/02/GUATEMALA-2019-HUMAN-RIGHTS-REPORT.pdf ................................................................................................................................ 24

U.S. Dep't of State, Haiti 2019 Human Rights Report, *available at* https://www.state.gov/wp-content/uploads/2020/03/HAITI-2019-HUMAN-RIGHTS-REPORT-REVISED-3.13.2020.pdf ................................................................................................................................. 25

U.S. Dep't of State, Haiti Travel Advisory, *available at* https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html ............................................................................................................... 25

U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: El Salvador*, *available at* https://www.state.gov/wp-content/uploads/2020/02/EL-SALVADOR-2019-HUMAN-RIGHTS-REPORT.pdf (similar) ...................................................................................... 24

U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Honduras*, *available at* https://www.state.gov/wp-content/uploads/2020/02/HONDURAS-2019-HUMAN-RIGHTS-REPORT.pdf ........................................................................................................... 24

*Universal English Dictionary* 1067 (John Craig ed. 1861) .......................................... 14

US Citizenship and Immigration Service, *Credible Fear Workload Report Summary*, *available at* https://www.uscis.gov/sites/default/files/document/data/Credible_Fear_Stats_FY19.pdf. ..... 21

*Webster's Collegiate Dictionary* 453 (1st ed. 1898) ................................................. 14

Will Carless, *Brazil's shocking violence against women, in five charts*, The World (Nov. 18, 2015), *available at* https://www.pri.org/stories/2015-11-18/brazils-shocking-violence-against-women-five-charts ................................................................................................. 25

## INTRODUCTION

Plaintiffs are asylum-seeking families who fled to the United States and were apprehended by U.S. Customs and Border Protection ("CBP").   Under longstanding safeguards in the immigration statutes, they are entitled to seek humanitarian protection pursuant to specific procedures enshrined by Congress in recognition of the life-and-death stakes that are involved, as well as our international commitments.   Instead, Defendants moved to summarily deport them based on an unprecedented and unlawful expulsion process, invoking the public health powers of the Centers for Disease Control and Prevention ("CDC"), specifically 42 U.S.C. § 265 (the "Title 42 Process").   Under this system, Plaintiffs—children and their parents fleeing for their lives—face expulsion without any hearing, even where, as here, they have tested negative for COVID-19, completed quarantine, or displayed no symptoms of COVID-19.

The Title 42 Process was previously preliminarily enjoined as to a certified class of unaccompanied children.  *See P.J.E.S. v. Wolf*, __ F. Supp. 3d. ___, No. 20-CV-02245-EGS, 2020 WL 6770508, at *1 (D.D.C. Nov. 18, 2020) (Sullivan, J., adopting report and recommendation of Harvey, J.); *see also J.B.B.C. v. Wolf*, No. 20-CV-01509-CJN, 2020 WL 6041870 (D.D.C. June 26, 2020) (Nichols, J.). In *P.J.E.S.*, this Court held that Title 42 does not permit expulsions and that even if it did authorize some deportations, it would not override the specific asylum protections for applicable to vulnerable noncitizens seeking protection from persecution and torture.   2020 WL 6770508 at *8-13, 27-32.[1]  The merits analysis in *P.J.E.S.* applies here with equal force: In both cases Defendants are relying on § 265 of the public health laws and in both cases the statutory provisions protecting asylum-seekers apply.   Insofar as there are any difference on the merits between the two cases, it is that in *P.J.E.S.* there was a separate basis to find the Title 42 Process

---

[1] Plaintiff cites to the version of Magistrate Judge Harvey's report and recommendation in *P.J.E.S.* that is attached to this Court's preliminary injunction opinion in that case.

unlawful on the ground that it violated a statute that applies only to unaccompanied children.  But that statute was only an *additional* reason why the Court in *P.J.E.S.* held that § 265 does not authorize expulsions.[2]

The remaining equitable factors also strongly favor a preliminary injunction here.  As the declarations of Plaintiffs and proposed class members describe, these families are fleeing dangerous and difficult circumstances in their origin countries, including grave threats and persecution.  Some family members have suffered physical violence at the hands of their persecutors.  Many of these families include very small children, who are at particular risk of danger upon return.  And as Plaintiffs' experts describe, there is no public health justification for barring these families from entering the United States, while keeping the borders open to transport drivers and tens of thousands of others who cross the southwest border every day.

The new Administration has not rescinded this unlawful backdoor immigration policy, meaning that vulnerable families are still being denied access to the asylum system that Congress so carefully enshrined.  Because numerous families continue to face summary deportations, Plaintiffs respectfully move this Court, in conjunction with their previously filed motion for class certification, for a preliminary injunction barring the expulsion of families under the Title 42 Process.

## BACKGROUND

### A.  The Immigration Laws' Protections for Asylum Seekers

As this Court explained in *P.J.E.S.*, Congress has prescribed longstanding protections for noncitizens seeking protection from persecution and torture.  *See* 2020 WL 6770508, at *2.  First,

---

[2] While that injunction was stayed by the D.C. Circuit, this Court has already recognized, in its Minute Order dated February 1, 2021, that the D.C. Circuit's unreasoned and non-precedential order does nothing to undermine the merits analysis of *P.J.E.S.* (or the decision by Judge Nichols in *J.B.B.C.*).

the asylum statute, 8 U.S.C. § 1158, provides that any noncitizen arriving in the United States has a right to apply for asylum, regardless of the applicant's status. *See P.J.E.S.*, 2020 WL 6770508, at \*2; 8 U.S.C. § 1158(a)(1) ("[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such alien's status, may apply for asylum"). The asylum statute provides a narrow list of bars to asylum, none of which apply here. *See P.J.E.S.*, 2020 WL 6770508, at \*30; *see also* 8 U.S.C. § 1158.

Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that noncitizens "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground. *P.J.E.S.*, 2020 WL 6770508, at \*2. A grant of withholding is mandatory if the individual meets the statutory criteria. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). Congress enacted this statute to "conform[] it to the language of Article 33 [of the 1951 U.N. Convention of Refugees]," *INS v. Stevic*, 467 U.S. 407, 421 (1984), in several respects, including by making withholding "mandatory" where the eligibility criteria are satisfied, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 n.25 (1987), and by giving it broad application where the government seeks to return a noncitizen to a country where he fears persecution, *see Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1089 (9th Cir. 2020), *cert. granted*, 141 S. Ct. 617 (2020). Congress again outlined specific and narrow bars to withholding of removal; none apply here.[3] *See* 8 U.S.C. § 1231(b)(3)(B).

---

[3] DHS and DOJ recently issued a final rule purporting to establish bars to eligibility for asylum and withholding of removal based on health considerations. *Security Bars and Processing*, 85 Fed. Reg. 84160-01 (Dec. 23, 2020). That rule is unlawful, but in any event the agencies have delayed its effective date, and it is currently unclear whether it will ever go into effect. *See Security Bars and Processing; Delay of Effective Date*, 86 Fed. Reg. 6847-01 (Jan. 25, 2021). Indeed, the new bar "relies upon the framework for applying bars to asylum during credible fear processing" promulgated in a separate rule, which has since been enjoined. *Id*. at 6847; *see Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, ___ F.Supp.3d.____, No. 20-CV-9253-JD, 2021 WL 75756, at \*1 (N.D. Cal. Jan. 8, 2021) (preliminarily enjoining that separate rule).

Third, protections under Convention Against Torture ("CAT") prohibit returning a noncitizen to a country where it is more likely than not that he would face torture. *P.J.E.S.*, 2020 WL 6770508, at \*2. Article 3 of CAT provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988). Congress subsequently implemented Article 3 of CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18 (implementing regulations). There are no bars to eligibility for CAT protection. *See, e.g.*, *Negusie v. Holder*, 555 U.S. 511, 514 (2009).

### B.  Immigration Laws' Treatment of Communicable Diseases

Congress has specially addressed communicable diseases in the immigration laws and "has made clear when public health concerns merit disallowing a non-citizen to remain in the United States." *P.J.E.S.*, 2020 WL 6770508, at \*29. From the earliest days of immigration regulation, Congress has explicitly authorized the deportation of individuals based on public health concerns. *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1085. Similar statutes exist today. There are several "[h]ealth-related grounds" of inadmissibility that authorize the deportation of noncitizens based on specified public health concerns, 8 U.S.C. § 1182(a)(1), including if a noncitizen is determined to have "a communicable disease of public health significance," *id.* § 1182(a)(1)(i). Immigration statutes also provide for medical examination and detention as part of immigration processing. *See id.* § 1222(a) (authorizing detention of arriving noncitizens who might have a communicable disease or are "coming from a country or have embarked at a place where any of

such diseases are prevalent or epidemic," but only "for a sufficient time to . . . subject [them] to observation and an examination"); *id.* § 1222(b) (authorizing physical and mental examination of arriving noncitizens).  But, critically, these statutes do not permit summary deportation without a screening for persecution or torture.  *See also P.J.E.S.*, 2020 WL 6770508, at *29 n.13 ("[W]hile quarantined, the immigration process can go forward, including medical examination under 8 U.S.C. § 1222(a) . . . and application of 8 U.S.C § 1182(a)(1)(i).").

**C.  The Title 42 Process**

Announced by former President Trump on March 20, 2020, the Title 42 Process is a new immigration system purportedly established under the government's public health powers codified in Title 42 of the U.S. Code.  The CDC, in a series of agency documents, has invoked 42 U.S.C. § 265 to bar and expel noncitizens who arrive at the border or enter the country without documents.[4] *P.J.E.S* 2020 WL 6770508, at *3 (describing establishment of Title 42 Process).

Section 265 of Title 42 was first enacted in 1893 and was later reenacted without material change in the Public Health Service Act of 1944.  Act of February 15, 1893, § 7, ch. 114, 27 Stat.

---

[4] *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559 (Mar. 24, 2020) (interim final rule) (effective date Mar. 20, 2020); Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56,424 (Sept. 11, 2020) (final rule) (effective date Oct. 13, 2020); Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060 (Mar. 26, 2020) (effective date Mar. 20, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective date Apr. 20, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020) (effective date May 21, 2020); Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 16, 2020) (effective date Oct. 13, 2020); U.S. Customs and Border Protection and U.S. Border Patrol, "Operation Capio" Memo ("CBP Memo"), Cheung Decl., Ex. E.

449, 452; Public Health Service Act, Pub. L. 78-410, § 362, 58 Stat. 682, 704 (1944).  It provides

in relevant part that the Surgeon General may "prohibit . . . the introduction of persons or property"

from designated places where "by reason of the existence of any communicable disease in a foreign

country there is serious danger of the introduction of such disease into the United States."  42

U.S.C. § 265.[5]  The penalties for violating § 265 include "a fine of not more than $1,000 or . . .

imprisonment for not more than one year, or both."  *Id.* § 271(a).  Deportation is not an available

penalty.  *See id.*

    Shortly after former President Trump's announcement, the CDC published an interim final

rule providing that the CDC may prohibit the "introduction into the United States of persons" from

foreign countries.  85 Fed. Reg. 16,559, 16,563; *see* 42 C.F.R. § 71.40(a).  Pursuant to this new

regulation, the CDC issued an Order to forcibly return asylum seekers back to the country from

which they entered, their home country, or another location.  *See* 85 Fed. Reg. 17,060, 17,067.

The initial March 20 Order, which was set to expire in 30 days, was extended for an additional 30

days on April 20, 85 Fed. Reg. 22,424, and then extended indefinitely on May 20, 85 Fed. Reg.

31,503.  Effective October 13, 2020, CDC replaced the interim final rule with a materially identical

final rule (following a brief notice-and-comment period), and reissued the indefinite CDC Order

under this final regulation.  *See* 85 Fed. Reg. 56,424 (Final Rule); 85 Fed. Reg. 65,806 (CDC

Order); *P.J.E.S.*, 2020 WL 6770508, at *4 ("The Final Rule . . . makes no changes to its

determinations and findings as relevant for this action.").

    On April 2, 2020, CBP issued a memorandum describing the agency's implementation of

the Title 42 Process, an effort it calls "Operation Capio."  *See* CBP Memo at 2; *P.J.E.S.*, 2020 WL

6770508, at *4.  The CBP Memo makes clear that the only humanitarian protection provided under

---

[5] This authority of the Surgeon General has been transferred to HHS and delegated to the CDC.
*See* 85 Fed. Reg. 16,559, 16,560 n.1 (explaining reorganizations and transfers of authority).

the Title 42 Process is limited to an inadequate CAT screening, and the Process does not include screenings for persecution under the asylum and withholding statutes. CBP Memo at 4. The CAT screenings, moreover, are not conducted by immigration judges, and even these limited CAT screenings are not uniformly undertaken, and when they are, they lack the most rudimentary procedural safeguards. *See* Declaration of Javier Hidalgo ("Hidalgo Decl."), ¶ 7; *see also* ECF Nos. 43-2 ¶ 7, 47-2, ¶ 7, 47-5, ¶ 7; ECF No. 5-2, ¶ 12.

Multiple news reports have indicated that Trump Administration officials—more interested in immigration restrictions than public health—forced the Title 42 Process onto CDC, over the objection of the agency's expert scientists. *See*, *e.g.*, *Pence Ordered Borders Closed After CDC Experts Refused*, AP News (Oct. 3, 2020), https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae; *CDC Officials Objected to Order Turning Away Migrants at Border*, The Wall Street Journal (Oct. 3, 2020), https://www.wsj.com/articles/cdc-officials-objected-to-order-turning-away-migrants-at-border-11601733601; *Inside the Fall of the CDC*, ProPublica (Oct. 15, 2020), https://www.propublica.org/article/inside-the-fall-of-the-cdc; *How Trump officials used COVID-19 to shut U.S. borders to migrant children*, CBS News (Nov. 2, 2020), https://www.cbsnews.com/news/trump-administration-closed-borders-migrant-children-covid-19/.

On February 2, 2021, the Biden Administration directed CDC to review the Title 42 Process, but did not rescind or pause its application to families like Plaintiffs. *See* Exec. Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, Sec. 4(a)(ii)(A) (Feb. 2, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-on-creating-a-comprehensive-regional-framework-to-

address-the-causes-of-migration-to-manage-migration-throughout-north-and-central-america-and-to-provide-safe-and-orderly-processing/.   No timetable was placed on that review, and the Biden administration has continued to expel families under Title 42 in the interim, *see* ECF No. 33 (reporting expulsions of two families), except where Plaintiffs have managed to file a stay motion in time with this Court.

### D.  The Proposed Class

Plaintiffs have sought class certification, *see* ECF No. 23, and now seek a preliminary injunction on behalf of a proposed class of immigrant families subjected to the unlawful Title 42 Process, defined as:

> All noncitizens who (1) are or will be in the United States; (2) come to the United States as a family unit composed of at least one child under 18 years old and that child's parent or legal guardian; and (3) are or will be subjected to the Title 42 Process ("Proposed Class Members").

*See* ECF No. 23-1 (Plaintiffs' Memorandum in Support of Class Certification).

All Plaintiff families are fleeing dire situations in their home countries, including threats of severe persecution, torture, or death.  If expelled, they and their children—some of whom are infants or toddlers—would be returned to danger.  *See* ECF Nos. 17, 24, 27 (sealed declarations of Plaintiffs and proposed Class Members).

As Plaintiffs' Motion to Certify Class explains, over 20,000 members of families have been subjected to Title 42 expulsion since the policy's inception.  *See* ECF No. 23-1 at 4.  But, as Plaintiffs' declarations describe, the government detains and tests at least some family members for COVID-19 before expelling them.  Hidalgo Decl., ¶ 4; Declaration of Allison Herre ("Herre Decl."), ¶¶ 12-14; Meza Decl., ECF No. 5-2, ¶ 9.  Many of those families test negative, and many families are sometimes kept detained for weeks, giving them sufficient time to complete quarantine before expulsion.  *See* Hidalgo Decl., ¶¶ 6, 8; *see also* ECF Nos. 17, 24, 27.

8

**LEGAL STANDARD**

On a motion for a preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks and citation omitted).  The first two prongs of the inquiry (likelihood of success and irreparable harm) are the "most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Where, as here, a plaintiff seeks preliminary relief on behalf of a proposed class, the Court may grant provisional certification of the class and issue classwide relief. *See P.J.E.S.*, 2020 WL 6770508, at *7; *Damus v. Nielsen*, 313 F. Supp. 3d 317, 328-35 (D.D.C. 2018) (provisionally certifying class of detained asylum seekers for purpose of granting preliminary injunction); *see also J.D. v. Azar*, 925 F.3d 1291, 1305-06 (D.C. Cir. 2019) (observing that district court had resolved pending motions for class certification and classwide preliminary injunction in tandem).

**ARGUMENT**

**I.     THE PROPOSED CLASS IS LIKELY TO SUCCEED ON THE MERITS.**

Plaintiffs are likely to succeed on the merits of their challenge to the government's novel efforts to deport them under the supposed authority of 42 U.S.C. § 265.  As the Court held in *P.J.E.S.*, § 265 does not authorize deportation at all.  2020 WL 6770508 at *8-13.  But even if such deportations were otherwise permitted, Plaintiffs are entitled to statutory procedures and humanitarian protections, including the right to seek asylum.  Those specific, later-enacted statutes must be applied here, regardless of what § 265 may authorize in general.  That is precisely what

all three Judges in this District to consider the question have concluded, underscoring that Plaintiffs have a strong likelihood of success.

### A.  Title 42 Does Not Authorize Deportation.

The CDC's Order was issued under the purported authority of 42 U.S.C. § 265, a provision that has laid dormant in the U.S. Code for over a hundred years.  Defendants claim to have discovered in this statute a source of unlimited authority to execute summary deportations as they see fit, without regard for the carefully crafted policy judgments of the Nation's immigration laws. But when an agency claims to discover "an unheralded power" lying dormant "in a long-extant statute," courts "typically greet its announcement with a measure of skepticism."  *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 324 (2014).  And, indeed, this novel, sweeping assertion of Executive dominance in the realm of immigration exceeds the power granted by § 265.  Nothing in § 265, or Title 42 more generally, purports to authorize *any* deportations, much less deportations in violation of the specific protections described below.

### 1.  The text, context, and structure of § 265 demonstrate that it does not authorize deportations.

Section 265 authorizes the CDC to prohibit the "introduction of persons" under certain circumstances.  It says nothing about any power to physically remove people from the United States.  Nor does a neighboring provision laying out the "penalties" for violation of "any regulation prescribed" under § 265 make any mention of such deportation or expulsion authority.  *See* 42 U.S.C. § 271.  Instead, § 271 provides for fines and imprisonment of individuals for violation of public health regulations.  The newly asserted power to deport, in the name of public health and independent of Congress's carefully reticulated immigration scheme, is "nowhere mentioned in the statute," which contains "not a word" about any expulsion power.  *P.J.E.S.*, 2020 WL 6770508, at *9, 11, 29.

That silence speaks volumes.  The Supreme Court has "long recognized that deportation is a particularly severe 'penalty.'"  *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (quoting *Fong Yue Ting v. United States,* 149 U.S. 698, 740 (1893)).  Thus, the extreme exercise of governmental power involved in physically removing a person from the country is one that must be granted by Congress, as "the Constitution creates no executive prerogative to dispose of the liberty of the individual."  *Valentine v. U.S. ex rel. Neidecker*, 299 U.S. 5, 9 (1936) (holding that extradition power "does not exist save as it is given by act of Congress" or treaty).

"[W]hen Congress wants to grant the power to expel individuals out of the United States, it does so plainly."  *P.J.E.S.*, 2020 WL 6770508, at *9 (internal quotation marks omitted).  Such powers of physical removal from the country—whether called deportation, removal, extradition, or expulsion—"in order to exist must be *affirmatively* granted" by Congress.  *Valentine*, 299 U.S. at 12 (emphasis added) (rejecting argument that power to extradite U.S. citizens could be implied from provision stating that United States was not bound to extradite them).  Accordingly, where Congress seeks to authorize that extraordinary physical control, it does so in explicit terms.  *P.J.E.S.*, 2020 WL 6770508, at *29; *see, e.g.*, 8 U.S.C. § 1231 (immigration removals); *id.* § 1225(b)(2)(c) ("may return the alien" to contiguous country); 18 U.S.C. §§ 3185, 3186, 3196 (extradition authority).  Courts do not—and, given the gravity of the asserted power, must not—lightly read an expulsion power into statutes that do not explicitly grant it.  *Valentine*, 299 U.S. at 12; *cf. Util. Air Regulatory Grp.*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.") (internal quotation marks omitted).  Nowhere in Title 42 has Congress granted that power.

That is not to say that Congress has ignored public health considerations in crafting immigration policy.  *See P.J.E.S.*, 2020 WL 6770508, at *11, 29.  To the contrary, from the earliest

11

days of immigration regulation—predating the 1893 enactment of the predecessor to § 265—Congress has explicitly authorized the deportation of individuals based on public health concerns. *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1085.  And similar statutes exist today.  *See* 8 U.S.C. § 1182(a)(1) ("[h]ealth-related grounds" of inadmissibility, including communicable diseases); 8 U.S.C. § 1222 (medical detention and examination as part of immigration processing). Because courts "presume differences in language like this convey differences in meaning[,]" particularly where contemporaneous statutes address related issues, Congress's decision to grant deportation power in the immigration statutes but not in Title 42 is conclusive.  *See Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071-72 (2018) (internal quotation marks omitted).

Critically, § 265, the provision on which Defendants rely for this asserted new power, could not be read to authorize expulsions because that section applies without differentiation to citizens and noncitizens alike.  The government has previously conceded that, if it is correct that § 265 authorizes expulsions, it would therefore mean that Congress gave the executive branch the power to expel citizens as well as noncitizens.  *P.J.E.S.*, 2020 WL 6770508, at *30 ("the power the government claims under Section 265 is breathtakingly broad" and the government "admitted before Judge Nichols that the section authorizes the government to expel even U.S. citizens").  It is inconceivable that Congress would seek to give the executive branch that plainly unconstitutional power.  *See Clark v. Martinez*, 543 U.S. 371, 386 (2005) (rejecting "the dangerous principle that judges can give the same statutory text different meanings in different cases" even if only some applications raise constitutional concerns).

Had Congress sought to authorize the mass deportations, which are now underway, on health-related grounds it would have needed to clearly say so.  It has not, and these expulsions are thus unlawful for the same reasons as in *P.J.E.S.*.

### 2.   Section 265 was designed to regulate transportation.

Section 265 also does not authorize expulsions because it applies only to the regulation of *transportation* entities, and does not apply to individuals at all.  In *P.J.E.S.*, the Court did not reach this alternative ground for holding that § 265 does not authorize expulsions, and the Court need not do so here either.  *See* 2020 WL 6770508, at *9 (rejecting government objections to Report and Recommendation without reaching alternative ground); *id.* at 27 n.8.  Plaintiffs nonetheless set forth the argument in the event the Court chooses to reach it here.  *See also* Historians' Amicus Brief (setting forth the history of § 265 and explaining why it applies only to transportation entities, and not individuals).

The omission of expulsion authority from § 265 was no mistake in light of its historical purpose.  To the contrary, it reflects Congress's design of that statute—as a means to stop travel from countries experiencing an outbreak of disease by regulating the *transportation* companies that bring people to the United States.  Section 7 of the Act of February 15, 1893, ch. 114, 27 Stat. 449, 452, which became § 265 without material change in the Public Health Service Act, Pub. L. 78-410, § 362, 58 Stat. 682, 704 (1944), was designed to regulate transportation entities that brought persons and goods to the United States, and it imposed fines and imprisonment on such transportation entities if they violated a public health order.  *See also* Cheung Decl., Ex. A (copy of 1893 Act).  If an individual's entry or presence was unlawful, the *immigration* system provided the sole mechanism for returning the individual to his home country.  Past practice bears out this design: When § 265 was used in 1929 to combat meningitis, another deadly disease transmitted by asymptomatic carriers via airborne respiratory droplets, deportation was not authorized.  It therefore makes sense that § 265 does not silently authorize a whole new deportation process, devoid of the procedural protections Congress created for noncitizens, including for those with

communicable diseases.  Defendants cannot now create such an unauthorized system out of whole cloth.  *See Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 962 F.3d 531, 536 (D.C. Cir. 2020) (agencies are "bound" by Congress's choice of "means").

**a.**  The text of the 1893 provision demonstrates that the "means" Congress chose was the regulation of *transportation*, not of individual travelers, and underscores that Congress never authorized expulsions.  Section 7 of the 1893 Act granted the "power to prohibit, in whole or in part, the *introduction* of persons and property" into the country.  27 Stat. 452 (emphasis added). That term—"introduction"—meant then, as now, "'the act of bringing into a country.'"  *Introduce*, *Universal English Dictionary* 1067 (John Craig ed. 1861); *see also Introduce*, *Webster's Collegiate Dictionary* 453 (1st ed. 1898) ("[t]o lead, bring, or usher in").  As a matter of ordinary language and usage, introducing a person into a country or place is an action taken by a *third party*—here, the shipping company.  *See, e.g.*, *Walsh v. Preston*, 109 U.S. 297, 298, 314, 315 (1883) ("colonization" contract requiring party to "introduce" immigrant families into Texas was unsatisfied, where there was no evidence individuals who came "were brought to Texas by [the party];" rather, "they came and settled of their own accord").

**b.**  The statutory context reinforces the plain text.  The 1893 Act was shot through with provisions specifically directed at the regulation of ships.  *See, e.g.*, Act of Feb. 15, 1893, ch. 114, § 1 (unlawful for ships to enter U.S. ports from abroad except in accordance with public health regulations); § 2 (requiring ships abroad to obtain a bill of health); § 3 (authorizing regulation of "vessels sail[ing] from any foreign port or place"); §§ 4, 5, 6 (similar).

Critically, the 1893 Act imposed penalties *only* against ships—and set them high enough to deter those vessels from sailing to this country in violation of the Act.  *See id.* § 1 ($5,000 fine for "vessel" violating the Act); *id.* § 2 (same for "vessel" entering United States without bill of

14

health); *see also id.* § 3 (conditioning penalties on "any vessel or owner or officer thereof" on posting of regulations in consular offices abroad); 24 Cong. Rec. 378 (raising penalties).

Furthermore, an examination of immigration statutes in force in 1893 makes plain that Congress knew exactly how to provide for the removal of individuals. Those statutes covered those coming by ship and individually by land, and *explicitly* authorized deportations, separate and apart from regulations they imposed on ships involved in transporting immigrants. *See, e.g.*, Chinese Exclusion Act of May 6, 1882, ch. 126, §§ 2, 12, 22 Stat. 58, 59, 61 (establishing penalties for vessels, and separately providing for unauthorized immigrants "to be removed . . . to the country whence [they] came"); Act of Mar. 3, 1891, ch. 551, §§ 10, 11, 26 Stat. 1084, 1086 (establishing penalties for "master, agent, consignee, or owner of" a "vessel" who violates the Act's provisions, and separately providing for unauthorized immigrants to "be immediately sent back on the vessel by which they were brought in" and that "any alien who shall come into the United States in violation of law may be returned"); *id.* § 8 (providing "the Secretary of the Treasury may prescribe rules for inspection along the borders of Canada, British Columbia, and Mexico"); Act of Mar. 3, 1903, ch. 1012, §§ 8, 9, 19, 20, 21, 32 Stat. 1213, 1215-16, 1218-19, 1221 (providing for noncitizens to "be immediately sent back . . . on the vessels bringing them," "deported," or "taken into custody and returned to the country whence he came").

It would have been "easy enough for Congress" to include the same kind of provisions in the 1893 Act. *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020). Instead, Congress imposed penalties *only* on those involved in transportation, and used the term "introduction" to refer to the penalty-triggering conduct of such third parties. But Congress said nothing about any power to deport individuals who came to our shores. The government nevertheless now seeks to read into

the statute's silence an implicit power to expel; but "it is not the proper role of the courts to rewrite [a law] passed by Congress and signed by the President." *Id.*

**c.**  The legislative history of the 1893 Act further confirms what is demonstrated by the text, context, and structure: Section 7 was a regulation of transportation entities.

The 1893 Act responded to a specific public health threat—a cholera epidemic in Europe. *See, e.g.*, 24 Cong. Rec. 359 (1893) (letter from physician explaining the  danger of an imminent cholera outbreak from Europe).  A principal proponent of the 1893 Act, Senator Chandler, explained that "90 or 95 percent of the immigration into the United States comes into the city of New York, and that the most danger of cholera is to be apprehended from vessels arriving at that port." *Id.* at 360.  He expressed confidence that controlling travel by ship would effectively protect the country.  *Id*. at 363 ("there will be no great danger of the introduction of cholera this year unless it comes in the steerages," a class of ship travel).

As one of the 1893 Act's sponsors, Senator Harris, further explained, Section 7 therefore allowed the President "to prevent the coming at all" of "vessels, passengers, crews, and cargo, which are sailing to this country." *Id*. at 392.  Congress expected that an invocation of Section 7 would cause shipping companies to refuse boarding, halting travel from designated locations at the source, thereby addressing the public health risk.

Indeed, when Senator Harris was asked about individuals crossing at *land* borders, he explained that an *earlier* law providing general authority to quarantine and inspect individuals— not the new 1893 legislation—"clothes the Marine Hospital Service with ample power to protect the Mexican and Canadian borders."  *Id*. at 370.  The new authority to regulate transportation entities was simply part of the larger framework already in place that included not just the immigration laws but also the public health quarantine powers.

16

**d.**   The use of the statute since its enactment in 1893 reinforces the absence of any deportation power.  To Plaintiffs' knowledge, the only time the statute has been invoked to prohibit the introduction of persons was in 1929, and it did not authorize deportations.[6]  President Hoover, invoking Section 7 of the 1893 Act to address a meningitis outbreak, issued an Executive Order entitled: "Restricting for the time being the *transportation of passengers* from certain ports in the Orient to a United States port."  Exec. Order No. 5143 (June 21, 1929), Cheung Decl., Ex. B (emphasis added).  The Treasury Department also issued associated regulations "governing the embarkation of passengers and crew" at ports in those countries "and their transportation to United States ports."[7]  The regulations further addressed how to handle vessels which arrived in the United States when a meningitis case had occurred during the voyage, but, notably, only authorized detention, quarantine, and testing—not deportation.

**e.**   Finally, any suggestion that the correct interpretation of § 265 renders that statute ineffective would be seriously mistaken.  Congress vested the government with a significant power totally separate from any need to deport individuals from the country: shutting down all international transportation from a particular country by regulating those who made such travel

---

[6] Most invocations of § 265 have involved regulation of goods or delegation of authority to particular officers or agencies.  In addition to the 1929 use of § 265, the provision has been invoked, with additional statutory authorities, four other times to address persons.  None of the four purported to authorize deportations.  One addressed the Do Not Board list, a mechanism to control transportation access and the Public Health Lookout, a means to refer individuals at ports to CDC for isolation.  Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, 80 Fed. Reg. 16,400 (Mar. 27, 2015).  Another proposed, but unadopted, regulation repeated the language of § 265 without elaboration.  Control of Communicable Diseases, 70 Fed. Reg. 71,891, 71,910 (Nov. 30, 2005).  The two others addressed quarantine and information gathering.  Control of Communicable Diseases, 81 Fed. Reg. 54230 (Aug. 15, 2016); Control of Communicable Diseases; Foreign Quarantine, 85 Fed. Reg. 7874 (Feb. 12, 2020).

[7] Regulations Governing the Embarkation of Passengers and Crew at Ports in China and the Philippine Islands and Their Transportation to the United States Ports Prescribed in Accordance with Executive Order Approved June 21, 1929, Cheung Decl., Ex. C.

possible, the transportation companies.  And, despite the age of the statute, that tool remains powerful today: § 265 permits the government to halt the vast majority of international travel by barring ships, planes, trains, and other modes of transportation from bringing people to this country from designated places.

The efficacy of that approach was clear from the beginning.  The statute was passed against the backdrop of an extraordinary Executive action taken just months before, in September 1892. *See* U.S. Dep't of Treasury, Quarantine Restrictions Upon Immigration to Aid in the Prevention of the Introduction of Cholera into the United States (Sept. 1, 1892), Cheung Decl., Ex. D.  The Surgeon General explained that "vessels conveying" immigrants from certain countries experiencing cholera outbreaks were a "direct menace to the public health," and ordered that "no vessel from any foreign port carrying immigrants shall be admitted" to any U.S. port "until said vessel shall have undergone" 20 days of quarantine.  *Id.*  Contemporaneous media coverage explained this step would "practically put a stop to immigration, for no steamship company will continue to transport people to this country" given the costs of quarantine.  *Twenty Days Quarantine*, N.Y. Times (Sept. 2, 1892).[8]  The crisis triggered significant debate among the Cabinet as to the President's authority to take such a drastic step without clear statutory authority. *See id.*  Shortly afterward, Congress enacted the 1893 Act granting the authority to regulate vessels to prevent the spread of disease.

Thus, while Congress's *goal* was to keep out disease, the *means* it authorized was regulation of transportation entities, not the deportation of individuals outside of the extensive immigration system Congress has enacted and refined over the decades.  *Merck*, 962 F.3d at 536

---

[8]   https://www.nytimes.com/1892/09/02/archives/twenty-days-quarantine-the-government-takes-decisive-action-a.html

("[A]gencies are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.") (internal quotation marks omitted).  "The withholding of agency authority is as significant as the granting of it, and we have no right to play favorites between the two."  *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 136 (1995); *see also* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94 (2012) ("[A]n absent provision cannot be supplied by the courts.").

*      *      *

In sum, § 265 does not authorize expulsions, because it regulates only transportation entities, and even if the statute did apply to individuals, expulsion is not an authorized penalty.

### B. Plaintiffs' Expulsion Also Violates The Specific Protections Established By Congress For Noncitizens Seeking Humanitarian Protections.

Plaintiffs have statutory rights to seek protection from persecution and torture, as Congress has long prescribed.  The Title 42 Process unlawfully sidesteps these safeguards.  Consequently, as the Court in *P.J.E.S.* held, even assuming § 265 does permit the expulsion of some individuals, it cannot override the subsequently enacted statutes providing special protection for those seeking humanitarian relief, such as the asylum statutes.  2020 WL 6770508, at *12 ("[T]he language of Section 265 contains no 'clear intention' to authorize the suspension of the relevant provisions of Title 8.").  Accordingly, the application of Title 42 is unlawful as to the putative class not only because (as explained in the previous section) it exceeds the authority granted by Congress, but also—and independently—because it violates the immigration laws that protect the plaintiff class.

First, the asylum statute, 8 U.S.C. § 1158, provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum."  8 U.S.C. § 1158(a)(1).  Second, the withholding of removal statute,

19

8 U.S.C. § 1231(b)(3), provides that a noncitizen "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground.  Congress created specific and narrow bars to asylum and withholding of removal, but none of them apply to the Plaintiffs.  *See supra*, Background Part A.  Third, the CAT prohibits returning a noncitizen to a country where it is more likely than not that she would face torture.  There are no bars to eligibility for CAT protection.  *See Negusie*, 555 U.S. at 514.  These forms of relief are generally adjudicated by an immigration judge in full removal proceedings under 8 U.S.C. § 1229a.  *See* 8 C.F.R. §§ 1208.2(b), 1208.16(a).

Certain noncitizens may be placed in a summary "expedited removal" system (in lieu of full removal proceedings).  *See* 8 U.S.C. § 1225(b)(1).  But even in those expedited proceedings, Congress took pains to guarantee procedural protections for asylum seekers.  Specifically, if a noncitizen expresses fear of removal, they are entitled to a hearing with an asylum officer, subject to review by an Immigration Judge, to determine whether they have a "credible fear" of persecution or torture if removed.  *Id*. §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B).  Once the noncitizen shows a credible fear—a "low screening standard," 42 Cong. Rec. 25,347 (1996)—they are entitled to a full removal hearing with the attendant procedural protections, including the right to appeal, *see Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (explaining that one of the "important" goals of the expedited removal statute was "ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution").

In short, Congress carefully crafted the statutory provisions governing asylum, withholding, and CAT protection to ensure that noncitizens within our country or at the border could seek relief from persecution and torture.  In so doing, Congress sought to satisfy its domestic and international obligations to protect those fleeing persecution and torture.  *See supra*,

Background Part A.  And, critically, Congress enshrined procedural access to these forms of protection before a person can be deported from the country, seeking to ensure a meaningful opportunity to present their claims.

The Title 42 Process jettisons all those protections and safeguards, subjecting these families to summary deportation back to potential persecution and torture, including, for some, possible death.  Through their creation of an alternative immigration system, Defendants have circumvented the carefully crafted scheme Congress set forth for consideration of claims for humanitarian protections.[9]

Whatever Title 42 authorizes in general, it cannot override the provisions of the immigration laws specifically designed to ensure that vulnerable people seeking protection would

---

[9] The only humanitarian protection provided under the Title 42 Process is limited to a CAT screening.  Because the screening is limited to CAT, and offers no opportunity for asylum and withholding protection, it would not cure Title 42's legal defect even if the screening were adequate for CAT.  But the screening is patently inadequate even for CAT protection: Noncitizens are only referred for a CAT screening if they "make an *affirmative, spontaneous and reasonably believable* claim that they fear being tortured in the country they are being sent back to."  CBP Memo 4 (emphasis added).  This means that families must know precisely what to say when they arrive in the U.S., and may be summarily returned to the countries they fled without the government ever even asking whether they would face torture, including death, in that country.

Unsurprisingly, this screening offers essentially no protection.  As of May 13, 2020, out of thousands of expulsions under Title 42, Defendants reportedly conducted a mere 59 screening interviews for CAT, of which only two applicants passed the screening stage.  Nick Miroff, *Under Trump Border Rules, U.S. Has Granted Refuge to Just Two People Since Late March, Records Show*, Wash. Post (May 13, 2020), https://www.washingtonpost.com/immigration/border-refuge-trump-records/2020/05/13/93ea9ed6-951c-11ea-8107-acde2f7a8d6e_story.html;   Camilo Montoya-Galvez, *Only 2 Migrants Allowed to Seek Humanitarian Protection Under Trump's Coronavirus Border Order*, CBS News (May 13, 2020), https://www.cbsnews.com/news/only-2-migrants-allowed-to-seek-humanitarian-protection-under-trumps-coronavirus-border-order/.   In comparison, during FY 2019 74% of individuals passed their credible fear screening.  USCIS, *Credible       Fear       Workload       Report       Summary*, https://www.uscis.gov/sites/default/files/document/data/Credible_Fear_Stats_FY19.pdf.
Lawyers for families subjected to Title 42 also report that they rarely, if ever, see noncitizens pass these CAT assessments.  *See* Hidalgo Decl., ¶ 7; *see also* Levy Decl., ¶¶ 7-8 (describing families who sought to express fear, but were told by DHS officers that asylum was no longer available in United States).

have access to a meaningful and robust system to assess their claims—even where such individuals are suspected of having a communicable disease.  As with all potential conflicts, the Court must read § 265 and the refugee protection statutes together, to make sense of all Congress's work without discarding any of it.  *See P.J.E.S.*, 2020 WL 6770508 at *30; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.") (internal quotation marks omitted).  Even if § 265 could be read to authorize some summary deportations (which it cannot), it must be read to accommodate Congress's subsequent specific legislative protections and commands.  *See Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000) ("A broad statute when passed 'may have a range of plausible meanings,' but subsequent acts can narrow those meanings ....") (quoting *Brown & Williamson*, 529 U.S. at 143).

Where an agency's interpretation of one statute "tramples the work done" by another statute—as Defendants' sweeping view of § 265 tramples the immigration laws—the agency "bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow."  *Epic Sys. v. Lewis*, 138 S. Ct. 1612, 1624, 27 (2018).  Defendants can show no such "clear and manifest" intention.  *Id.* at 1624; *P.J.E.S.*, 2020 WL 6770508 at *31.

To the extent there is any conflict, the specific provisions addressing the procedure for resolving humanitarian protection claims should be read to control over the general public health authority under Title 42.  *See, e.g.*, *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[A]n agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority.").  The INA's humanitarian protections are "precisely drawn, detailed statute[s]," *Brown v. GSA*, 425 U.S. 820, 834 (1976), that "speak[] directly" to "the

question before [the Court]," *Epic Sys.*, 138 S. Ct. at 1631, namely what the government must do before it seeks to remove an asylum seeker.  By contrast, § 265 says nothing at all about removal; or humanitarian protections; or steps the government must take or may skip.

The general terms of § 265 thus cannot be construed to bypass the specific provisions of the asylum, withholding of removal, and torture statutes.  *See P.J.E.S.*, 2020 WL 6770508 at *12 ("Since the Government concedes that 'Section 265 is not designed to target immigration at all' it clearly cannot be the more specific statute.") (citation omitted); *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 159 n.2 (1976) ("[T]he more specific legislation will usually take precedence over the more general.").

This specific-over-general interpretive principle has particular force where the more specific statute is the later-enacted one; that is the case here, as § 265 was originally enacted in 1893 and last amended in 1944.  *See United States v. Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012) (explaining that "[w]here two statutes conflict, the later-enacted, more specific provision generally governs").  Recent Congresses have spoken clearly and explicitly regarding the required treatment of asylum seekers; the Executive is not at liberty to ignore those commands.

## II.   SUBJECTING IMMIGRANT FAMILIES TO THE TITLE 42 PROCESS HAS CAUSED AND WILL CONTINUE TO CAUSE THEM IRREPARABLE HARM.

This Court has now granted stays of removal for a number of families, whose experiences are emblematic of the experiences of the families in the Proposed Class.  Their sealed declarations describe the danger they are fleeing, their experiences of persecution, and the harms they have suffered in greater detail.  *See* ECF Nos. 17, 24, 27; *see also* ECF Nos. 29, 43, 45 (motions for leave to file class member declarations under seal).  Many of these families include young children—some as young as infants or toddlers—who would face particularly grave harm if returned without the opportunity to seek humanitarian relief.

To cite one example, Plaintiff Huisha-Huisha fled Ecuador due to threats that her children would be kidnapped, and she fears that she and her daughter, Plaintiff I.M.C.H., will suffer violence, torture, or death if expelled.  In Ecuador, indigenous peoples are marginalized and targeted for discrimination, exploitation, and trafficking.  In 2019, "[t]raffickers often recruited children from impoverished indigenous families [in Ecuador]," and indigenous "children were exploited in forced labor and sex trafficking abroad."  U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Ecuador*, https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/ecuador/.

The Proposed Class Members come from other countries—such as El Salvador, Guatemala, and Honduras—that are among the most dangerous in the world due to gang, gender, family membership, and other identity-based violence.  *See* Declaration of Lisa Frydman ("Frydman Decl."), ¶¶ 4-16; Herre Decl., ¶¶ 8-10; Declaration of Taylor Levy ("Levy Decl."), ¶ 7.  The U.S. Department of State has itself acknowledged that extreme violence is prevalent in these countries, including homicide, torture, kidnapping, extortion, or other forms of persecution. *See, e.g.*, U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Guatemala* at 18, 28, https://www.state.gov/wp-content/uploads/2020/02/GUATEMALA-2019-HUMAN-RIGHTS-REPORT.pdf.[10]

Others are from countries like Haiti, where violence is widespread, political persecution is common and often deadly, and women and girls lack legal protections.  The U.S. State Department

---

[10] *See also* U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Honduras* at 1-2, https://www.state.gov/wp-content/uploads/2020/02/HONDURAS-2019-HUMAN-RIGHTS-REPORT.pdf (describing extreme gang violence directed at vulnerable populations, including "acts of homicide, torture, kidnapping, extortion, human trafficking, intimidation, and other threats"); U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: El Salvador* at 1, https://www.state.gov/wp-content/uploads/2020/02/EL-SALVADOR-2019-HUMAN-RIGHTS-REPORT.pdf (similar).

has issued its highest travel advisory for Haiti due to "crime, civil unrest, kidnapping, and COVID-19"; it notes that violent crime is "common" and "[k]idnapping is widespread," while "[e]mergency response . . . is limited or non-existent."  U.S. Dep't of State, Haiti Travel Advisory, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html.  The State Department also reports that Haitian police officers are credibly accused of committing as many as 22 extrajudicial killings of anti-corruption and anti-government protesters between September and November 2018 alone.  *See* U.S. Dep't of State, Haiti 2019 Human Rights Report at 2, https://www.state.gov/wp-content/uploads/2020/03/HAITI-2019-HUMAN-RIGHTS-REPORT-REVISED-3.13.2020.pdf; *see also id.* (discussing government officials implicated in supplying gang leaders with weapons and equipment used in an attack that resulted in 71 deaths, 11 rapes; no officers were criminally charged or arrested for their roles).[11]

Under the Title 42 process, many families—particularly those from El Salvador, Guatemala, and Honduras—are expelled to Mexico, where they are often victimized by criminal cartels and gang members and face numerous barriers to finding safe places to shelter.  *See* Declaration of Linda Corchado, ¶ 8 (father kidnapped after expulsion to Mexico, leaving 8-year-old child behind); Frydman Decl., ¶¶ 17-18; Levy Decl., ¶¶ 4-11. These facts more than satisfy the preliminary injunction standard, which requires "only a likelihood of irreparable injury."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016).  Numerous courts, including this Court in *P.J.E.S.,* have held that similar showings suffice to show irreparable injury.  *See, e.g.*, *P.J.E.S.*, 2020 WL 6770508, at *13 ("[T]he putative class members are being returned without any opportunity to apply for asylum or withholding of removal.  Once expelled from the United States

---

[11] *See also, e.g.*, Will Carless, *Brazil's shocking violence against women, in five charts*, The World (Nov. 18, 2015), https://www.pri.org/stories/2015-11-18/brazils-shocking-violence-against-women-five-charts.

and outside the jurisdiction of the Court, it is not clear that a remedy can be provided.") (citation omitted); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018), *aff'd in part, rev'd in part on other grounds sub nom., Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) (finding fear of "domestic violence, beatings, shootings, and death in their countries of origin" constitute irreparable injury); *Demjanjuk v. Holder*, 563 F.3d 565, 565 (6th Cir. 2009) (granting stay for noncitizen who asserted removal would violate CAT); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 296–97 (D. Mass. 2018) (risk of persecution if removed is irreparable harm); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1504–05 (C.D. Cal. 1988) (plaintiffs would suffer irreparable harm if they were summarily removed without being afforded opportunity to exercise their right to apply for asylum); *see also J.B.B.C.*, 2020 WL 6041870, at *2 (Judge Nichols finding that unaccompanied child had shown "he is likely to suffer irreparable harm in the absence of an order" staying his expulsion under Title 42).

## III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH WEIGH DECIDEDLY IN FAVOR OF INJUNCTIVE RELIEF FOR CLASS MEMBERS.

For several reasons, preventing Defendants from removing families until final disposition of this case would not substantially injure the government and would be consistent with public health.

First, families who come to the border are can be processed quickly by Border Patrol agents and released to sponsors in the interior, such as relatives or family friends.  There, they can quarantine as needed and will be subject to local health restrictions, much like the tens of thousands of travelers, transport drivers, and others who the government permits to cross the U.S-Mexico border every day.  *See* Declaration of Public Health Experts ("Pub. Health Expert Decl."), ¶ 26.

Second, insofar as Defendants choose to detain families upon their apprehension at the border, Defendants operate family detention facilities where the family can be housed together.

*See* ECF No. 5-2, ¶ 2; Hidalgo Decl., ¶¶ 3-5; Herre Decl., ¶¶ 1, 11-13.  Such families typically undergo the credible fear process, where they are interviewed by an asylum officer to determine whether they have bona fide claims for relief from persecution or torture.  *See generally Grace v. Barr*, 965 F.3d 883, 888 (D.C. Cir. 2020).  Because most of the families have legitimate claims, they pass these screening interviews and are processed for release into the interior.  But while they are in family detention centers, they are tested and quarantined, as has been the case for the families for which the Court has granted stays.  *See* Hidalgo Decl., ¶ 4; Herre Decl., ¶ 12; *see, e.g.*, ECF Nos. 27.  Family detention facilities have separate rooms where families can quarantine without spreading COVID-19 via air movement.  *See* Herre Decl., ¶ 13.  In addition, the family facilities are currently operating at a very small fraction of their total capacity, with less than 10 percent of their total beds filled.  *See* January 19, 2021 ICE Juvenile Coordinator Report at 4, Cheung Decl., Ex. G; *P.J.E.S.*, 2020 WL 6770508, at *35 ("The real issues are potential exposure to the virus at congregation points and operational costs—as the government admits—of mitigating that risk through effective quarantine and/or conditional release and monitoring of putative class members who enter the country unlawfully.").

Third, contrary to the CDC Orders' stated justifications, Defendants keep many families in custody for weeks before expulsion.  *See* Hidalgo Decl., ¶ 6; *see, e.g.*, ECF Nos. 4-2, 29-7.  During this time, the families are tested for COVID-19, and many of them test negative before expulsion. *See, e.g.*, ECF Nos. 17, 27.  Because families can be processed for regular immigration proceedings in a similar timeframe, there is no discernible rationale for expelling such families, rather than simply processing and releasing them.  *See* Hidalgo Decl., ¶¶ 6, 8; Herre Decl., ¶ 17.

Public health officials have overwhelmingly noted that Defendants can undertake numerous safety measures to avoid the spread of COVID-19, including vaccinations and

quarantines, and that summary expulsions are not necessary, particularly when facilities operate at a reduced capacity to allow for distancing and family-specific rooms.  *See* Public Health Experts Decl., ¶ 28.[12]  *See also* January 19, 2021 ICE Juvenile Coordinator Report at 4, Cheung Decl., Ex. G (ICE family detention facilities are 91% empty); January 15, 2021 CBP Juvenile Coordinator Report at 3 (634 average daily population in December 2020, in CBP facilities that could accommodate max of 11,200 individuals), Cheung Decl., Ex. H.  Placing families at facilities where employees and occupants are vaccinated and maintaining social distance poses minimal, if any, risk to the public.  *See* Public Health Experts Decl., ¶ 28.[13]

ICE's own statistics confirm that families can be safely processed under Title 8 during the pandemic, even prior to vaccination of staff and families.  As of January 8, 2021, no family held at an ICE family detention facility has required hospitalization for COVID-19 since the start of the pandemic.  *See* January 19, 2021 ICE Juvenile Coordinator Report at 5, Cheung Decl., Ex. G.[14] As Plaintiffs' experts point out, these families can be safely released and bear no more risk of spreading COVID-19 than the numerous other individuals already allowed to cross the Southwest border.  *See* Declaration of Public Health Experts, ¶¶ 23-24, 27.

Notably, the CDC Orders do not conclude that families cannot be safely processed, but note only that in the government's view it is not worth the resources to try to safely process asylum

---

[12] *Letter to HHS Secretary Azar and CDC Director Redfield Signed by Leaders of Public Health Schools, Medical Schools, Hospitals, and Other U.S. Institutions*, Columbia Mailman School of Public Health (May 18, 2020), https://tinyurl.com/y8q3asun.

[13] According to Defendants, ICE personnel working at family facilities have been prioritized for vaccinations.  *See* January 19, 2021 ICE Juvenile Coordinator Report at 4-5, Cheung Decl., Ex. G. Vaccinations are starting to be offered to families held at those facilities.  Herre Decl., ¶ 14.

[14] While the January 19, 2021 ICE Juvenile Coordinator Report is ambiguous as to whether the reported case count is cumulative over time, archived ICE statistics confirm that the 120 positive cases in January reflect *all* positive cases detected since testing began in February 2020.  *See* U.S. Immigration and Customs Enforcement, *COVID-19 ICE Detainee Statistics* (updated Jan. 11, 2021), Cheung Decl., Ex. I.

seekers.  *See, e.g.*, 85 Fed. Reg. at 17067 (speculating that brief detention of noncitizens in Border Patrol stations would "divert [healthcare] resources away from the domestic population"). Importantly, however, there is "a public interest in preventing aliens from being wrongfully removed . . . to countries where they are likely to face substantial harm."  *Nken v. Holder*, 556 U.S. 418, 436 (2009).

Finally, the D.C. Circuit's stay of the preliminary injunction in *P.J.E.S.* does not undermine Plaintiffs' argument.  *See* Order, *P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021), Doc. No. 1882899.  The D.C. Circuit in *P.J.E.S.* did not explain how it analyzed or weighed the merits or any other stay factors, *see Nken*, 556 U.S. at 434, and notably the government emphasized in its stay filings matters that have no bearing on this case or motion, including the capacity of the Office of Refugee Resettlement to house unaccompanied children.  *See P.J.E.S.*, No. 20-5357, Doc. No. 1874324 at 19-20; Doc. No. 1876197 at 10-11.  Because, as this Court previously noted, "the D.C. Circuit's order is not published and was issued without opinion or reasoning," Minute Order dated Feb. 1, 2021, it should have no bearing on this motion, *see* D.C. Cir. Rule 36(e)(2) ("[A] panel's decision to issue an unpublished disposition means that the panel sees no precedential value in that disposition.").

## CONCLUSION

For these reasons, the Court should issue a classwide preliminary injunction prohibiting Defendants from applying the Title 42 Process to the Class.[15]

---

[15] As it did in *P.J.E.S.*, the Court should waive the requirement of an injunction bond, as Plaintiffs are asylum seekers without the ability to post a bond, and this suit seeks to "vindicate important rights under the immigration laws."  2020 WL 6770508, at *16.  The Court should also certify the class, for the reasons given in Plaintiffs' pending motion for class certification, ECF No. 23.

Dated: February 5, 2021

Respectfully submitted,

/s/ Lee Gelernt_____

Stephen B. Kang**
Cody Wofsy**
Morgan Russell**
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770

Andre Segura
Kathryn Huddleston
Rochelle Garza
Brantley Shaw Drake
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel. (713) 942-8146

Tamara F. Goodlette*
Refugee and Immigrant Center for
Legal Education and Legal Services
(RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
Tel: (210) 960-3206

Karla M. Vargas**
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
Tel: (956) 787-8171

Lee Gelernt**
Celso J. Perez (D.C. Bar No. 1034959)
Daniel A. Galindo**
Omar Jadwat**
Ming Cheung**
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600

Robert Silverman*
Irit Tamir*
Oxfam America
Boston, MA 02115, Suite 500
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

Jamie Crook (D.C. Bar No. 1002504)
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

*Attorneys for Plaintiffs*
*\*Pro hac vice application forthcoming*
*\*\*Admitted pro hac vice*