Exhibit A

FIFTY-SECOND CONGRESS. Sess. II. Chs. 108, 114. 1893. **449**

kinds, for the transit of animals, foot passengers, and all kinds of commerce, travel, or communication, and said corporation may charge and receive reasonable tolls therefor, subject to the approval of the Secretary of War.

Tolls.

Sec. 3. That any bridge built under this act and subject to its limitations shall be a lawful structure, and shall be recognized and known as a post road, and it shall enjoy the rights and privileges of other post roads in the United States: *Provided*, That the United States may construct a postal telegraph over said bridge without charge therefor.

Lawful structure and post route.

*Proviso.*
Postal telegraph.

Sec. 4. That said bridge shall be built and located under and subject to such regulations for the security of navigation of said river as the Secretary of War shall prescribe; and to secure that object, the said corporation shall submit to the Secretary of War, for his examination and approval, a design and drawings of the said bridge and a map of the proposed location, giving, for the space of one mile above and one mile below the proposed location, the topography of the banks of the river and the shore lines at high and low water, the direction and strength of the current at all stages, and the soundings, accurately showing the bed of the stream, the location of any other bridge or bridges, and shall furnish such other information as may be required for a full and satisfactory understanding of the subject, and until the plan and location of said bridge have been approved by the Secretary of War, the bridge shall not be commenced or built.

Secretary of War to approve plans, etc.

Sec. 5. That all railroad companies desiring the use of any bridge constructed under this act shall have and be entitled to equal rights and privileges relative to the passage of railway trains or cars over the same and over the approaches thereto, upon payment of reasonable compensation for such use; and in case the owner or owners of said bridge and the several railroad companies, or any of them, desiring such use shall fail to agree upon the sum or sums to be paid, and upon rules and conditions to which each shall conform in using said bridge, all matters at issue between them shall be decided by the Secretary of War upon a hearing of the allegations and proof of the parties.

Use by railroad companies.

Compensation.

Sec. 6. That said bridge herein authorized to be constructed shall be so kept and managed at all times as to afford proper means and ways for the passage of vessels, barges, or rafts, both by day and by night, and there shall be displayed on said bridge by the owners thereof, from sunset to sunrise, such lights or other signals as the Light-House Board may prescribe; and such changes shall be made from time to time in the structure of said bridge as the Secretary of War may direct, at the expense of said bridge company, in order the more effectually to preserve the free navigation of said river.

Aids to navigation.

Lights, etc.
Changes.

Sec. 7. That the right to alter, amend, or repeal this act is hereby expressly reserved, and the right to require any changes in said structure or its entire removal at the expense of the owners thereof, or the corporation or persons controlling the same, whenever public interest requires it, is also reserved.

Amendment, etc.

Sec. 8. That this act shall be null and void if actual construction of the bridge herein authorized be not commenced within one year and completed within three years from the date hereof.

Commencement and completion.

Approved, February 14, 1893.

---

**CHAP. 114.**—An act granting additional quarantine powers and imposing additional duties upon the Marine-Hospital Service.

February 15, 1893.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That it shall be unlawful for any merchant ship or other vessel from any foreign port or place to enter any port of the United States except in accordance with the provisions of this act and with such rules and regulations of State and

Quarantine.

Entry of vessels violating health rules unlawful.

450

Case 1:21-cv-00119-HSO-CRO Document 65-15 Filed 02/05/21 Page 3 of 53

FIFTY-SECOND CONGRESS. Sess. II. Ch. 114. 1893.

' Penalty.

municipal health authorities as may be made in pursuance of, or consistent with, this act; and any such vessel which shall enter, or attempt to enter, a port of the United States in violation thereof shall forfeit to the United States a sum, to be awarded in the discretion of the court, not exceeding five thousand dollars, which shall be a lien upon said vessel, to be recovered by proceedings in the proper district court of the United States. In all such proceedings the United States district attorney for such district shall appear on behalf of the United States; and all such proceedings shall be conducted in accordance with the rules and laws governing cases of seizure of vessels for violation of the revenue laws of the United States.

**Proceedings**

**Consular bill of health required.**

SEC. 2. That any vessel at any foreign port clearing for any port or place in the United States shall be required to obtain from the consul, vice-consul, or other consular officer of the United States at the port of departure, or from the medical officer where such officer has been detailed by the President for that purpose, a bill of health, in duplicate, in the form prescribed by the Secretary of the Treasury, setting forth the sanitary history and condition of said vessel, and that it has in all respects complied with the rules and regulations in such cases prescribed for securing the best sanitary condition of the said vessel, its cargo, passengers, and crew; and said consular or medical officer is required, before granting such duplicate bill of health, to be satisfied that the matters and things therein stated are true; and for his services in that behalf he shall be entitled to demand and receive such fees as shall by lawful regulation be allowed, to be accounted for as is required in other cases.

**Contents.**

**Fees.**

**Detail of medical officer at consulate.**

The President, in his discretion, is authorized to detail any medical officer of the Government to serve in the office of the consul at any foreign port for the purpose of furnishing information and making the inspection and giving the bills of health hereinbefore mentioned. Any vessel clearing and sailing from any such port without such bill of health, and entering any port of the United States, shall forfeit to the United States not more than five thousand dollars, the amount to be determined by the court, which shall be a lien on the same, to be recovered by proceedings in the proper district court of the United States. In all such proceedings the United States district attorney for such district shall appear on behalf of the United States; and all such proceedings shall be conducted in accordance with the rules and laws governing cases of seizure of vessels for violation of the revenue laws of the United States.

**Penalty for vessel violating.**

**Proceedings.**

**Marine-Hospital Service to assist local health boards to enforce rules, etc.**

SEC. 3. That the Supervising Surgeon-General of the Marine Hospital Service shall, immediately after this act takes effect, examine the quarantine regulations of all State and municipal boards of health, and shall, under the direction of the Secretary of the Treasury, co-operate with and aid State and municipal boards of health in the execution and enforcement of the rules and regulations of such boards and in the execution and enforcement of the rules and regulations made by the Secretary of the Treasury to prevent the introduction of contagious or infectious diseases into the United States from foreign countries, and into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia; and all rules and regulations made by the Secretary of the Treasury shall operate uniformly and in no manner discriminate against any port or place; and at such ports and places within the United States as have no quarantine regulations under State or municipal authority, where such regulations are, in the opinion of the Secretary of the Treasury, necessary to prevent the introduction of contagious or infectious diseases into the United States from foreign countries, or into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia, and at such ports and places within the United States where quarantine regulations exist under the authority of the State or municipality which, in the opinion of the Secretary of the Treasury, are not

**Rules to operate uniformly.**

**Additional rules, etc., by Secretary of the Treasury where local regulations are inadequate.**

Case 1:21-cv-00100-EGS   Document 57-5   Filed 02/05/21   Page 4 of 53

FIFTY-SECOND CONGRESS. Sess. II. Ch. 114. 1893.                 451

sufficient to prevent the introduction of such diseases into the United States, or into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia, the Secretary of the Treasury shall, if in his judgment it is necessary and proper, make such additional rules and regulations as are necessary to prevent the introduction of such diseases into the United States from foreign countries, or into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia, and when said rules and regulations have been made they shall be promulgated by the Secretary of the Treasury and enforced by the sanitary authorities of the States and municipalities, where the State or municipal health authorities will undertake to execute and enforce them; but if the State or municipal authorities shall fail or refuse to enforce said rules and regulations the President shall execute and enforce the same and adopt such measures as in his judgment shall be necessary to prevent the introduction or spread of such diseases, and may detail or appoint officers for that purpose. The Secretary of the Treasury shall make such rules and regulations as are necessary to be observed by vessels at the port of departure and on the voyage, where such vessels sail from any foreign port or place to any port or place in the United States, to secure the best sanitary condition of such vessel, her cargo, passengers, and crew; which shall be published and communicated to and enforced by the consular officers of the United States. None of the penalties herein imposed shall attach to any vessel or owner or officer thereof until a copy of this act, with the rules and regulations made in pursuance thereof, has been posted up in the office of the consul or other consular officer of the United States for ten days, in the port from which said vessel sailed; and the certificate of such consul or consular officer over his official signature shall be competent evidence of such posting in any court of the United States.

*Enforcement.*

*Rules for vessels from foreign ports.*

*Rules to be posted in consulate.*

Sec. 4. That it shall be the duty of the supervising Surgeon-General of the Marine Hospital Service, under the direction of the Secretary of the Treasury, to perform all the duties in respect to quarantine and quarantine regulations which are provided for by this act, and to obtain information of the sanitary condition of foreign ports and places from which contagious and infectious diseases are or may be imported into the United States, and to this end the consular officer of the United States at such ports and places as shall be designated by the Secretary of the Treasury shall make to the Secretary of the Treasury weekly reports of the sanitary condition of the ports and places at which they are respectively stationed, according to such forms as the Secretary of the Treasury shall prescribe; and the Secretary of the Treasury shall also obtain, through all sources accessible, including State and municipal sanitary authorities throughout the United States, weekly reports of the sanitary condition of ports and places within the United States, and shall prepare, publish, and transmit to collectors of customs and to State and municipal health officers and other sanitarians weekly abstracts of the consular sanitary reports and other pertinent information received by him, and shall also, as far as he may be able, by means of the voluntary co-operation of State and municipal authorities, of public associations, and private persons, procure information relating to the climatic and other conditions affecting the public health, and shall make an annual report of his operations to Congress, with such recommendations as he may deem important to the public interest.

*Duties of Marine-Hospital Service.*

*Sanitary reports to be made by consuls.*

*Weekly domestic sanitary reports.*

*Publication and distribution.*

*Annual report.*

Sec. 5. That the Secretary of the Treasury shall from time to time issue to the consular officers of the United States and to the medical officers serving at any foreign port, and otherwise make publicly known, the rules and regulations made by him, to be used and complied with by vessels in foreign ports, for securing the best sanitary conditions of such vessels, their cargoes, passengers, and crew, before their departure for any port in the United States, and in the course of

*Rules to secure sanitary conditions of vessels, etc.*

Case 1:21-cv-00100 Document 46-35 Filed 02/05/24 Page 5 of 53

**Inspection, etc., on arrival.**

the voyage; and all such other rules and regulations as shall be observed in the inspection of the same on the arrival thereof at any quarantine station at the port of destination, and for the disinfection and isolation of the same, and the treatment of cargo and persons on board, so as to prevent the introduction of cholera, yellow fever, or other contagious or infectious diseases; and it shall not be lawful for any vessel to enter said port to discharge its cargo, or land its passengers, except upon a certificate of the health officer at such quarantine station certifying that said rules and regulations have in all respects been observed and complied with, as well on his part as on the part of the said vessel and its master, in respect to the same and to its cargo, passengers, and crew; and the master of every such vessel shall produce and deliver to the collector of customs at said port of entry, together with the other papers of the vessel, the said bills of health required to be obtained at the port of departure and the certificate herein required to be obtained from the health officer at the port of entry; and that the bills of health herein prescribed shall be considered as part of the ship's papers, and when duly certified to by the proper consular or other officer of the United States, over his official signature and seal, shall be accepted as evidence of the statements therein contained in any court of the United States.

**Vessels not to enter unless upon health officer's certificate.**

**Delivery of papers to customs officer.**

**Infected vessel to be sent to nearest quarantine station.**

SEC. 6. That on the arrival of an infected vessel at any port not provided with proper facilities for treatment of the same, the Secretary of the Treasury may remand said vessel, at its own expense, to the nearest national or other quarantine station, where accommodations and appliances are provided for the necessary disinfection and treatment of the vessel, passengers, and cargo; and after treatment of any infected vessel at a national quarantine station, and after certificate shall have been given by the United States quarantine officer at said station that the vessel, cargo, and passengers are each and all free from infectious disease, or danger of conveying the same, said vessel shall be admitted to entry to any port of the United States named within the certificate. But at any ports where sufficient quarantine provision has been made by State or local authorities the Secretary of the Treasury may direct vessels bound for said ports to undergo quarantine at said State or local station

**Certificate after treatment.**

**Local quarantine.**

**Suspension of immigration during existence of contagious diseases.**

SEC. 7. That whenever it shall be shown to the satisfaction of the President that by reason of the existence of cholera or other infectious or contagious diseases in a foreign country there is serious danger of the introduction of the same into the United States, and that notwithstanding the quarantine defense this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce the same is demanded in the interest of the public health, the President shall have power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate and for such period of time as he may deem necessary.

**Compensation for use of State buildings, etc.**

SEC. 8. That whenever the proper authorities of a State shall surrender to the United States the use of the buildings and disinfecting apparatus at a State quarantine station, the Secretary of the Treasury shall be authorized to receive them and to pay a reasonable compensation to the State for their use, if, in his opinion, they are necessary to the United States.

**National board of health abolished.**

**Vol. 20, p. 484.**

**Disposition of property.**

SEC. 9. That the act entitled "An act to prevent the introduction of infectious or contagious diseases in the United States, and to establish a national board of health," approved March third, eighteen hundred and seventy-nine, be, and the same is hereby, repealed. And the Secretary of the Treasury is directed to obtain possession of any property, furniture, books, paper, or records belonging to the United States which are not in the possession of an officer of the United States under the Treasury Department which were formerly in the use of the National Board of Health or any officer or employee thereof.

Approved, February 15, 1893.

Exhibit B

EO 5143                    *Executive Orders*

Executive Order 5143.   June 21, 1929

# Executive Order

---◆•◆---

## Restricting for the time being the transportation of passengers from certain ports in the Orient to a United States port.

---◆•◆---

Whereas there have arrived periodically at Pacific Coast ports since November 1928, a total of 17 trans-pacific passenger-carrying vessels with epidemic cerebrospinal meningitis infection existing on board among Oriental steerage passengers;

And Whereas the continued arrival of vessels having epidemic cerebrospinal meningitis infection on board has overtaxed the combined available quarantine facilities of federal and local health authorities and that notwithstanding the quarantine defense, there exists danger of introducing this disease into the United States;

Therefore in order to prevent the further introduction of epidemic cerebrospinal meningitis from foreign ports into the United States, by virtue of the authority vested in me by Section 7 of the Act of Congress approved February 15, 1893, entitled "An Act granting additional quarantine powers and imposing additional duties upon the Marine Hospital Service", it is ordered that no persons may be introduced directly or indirectly by transshipment or otherwise into the United States or any of its possessions or dependencies from any port in China (including Hong Kong) or the Philippine Islands for such period of time as may be deemed necessary, except under such conditions as may be prescribed by the Secretary of the Treasury.

This order shall take effect from and after this date.

**HERBERT HOOVER**

THE WHITE HOUSE
        *June 21, 1929.*

[No. 5143]

Exhibit C

# PRESIDENT HOOVER'S ORDER FOR
## CONTROL OF MENINGITIS

### EXECUTIVE ORDER

**Restricting for the Time Being the Transportation of Passengers From Certain Ports in the Orient to a United States Port.**

Whereas, there have arrived periodically at Pacific Coast ports since November, 1928, a total of 17 trans-Pacific passenger-carrying vessels with epidemic cerebrospinal meningitis infection existing on board among Oriental steerage passengers; and

Whereas, the continued arrival of vessels having epidemic cerebrospinal meningitis infection on board has overtaxed the combined available quarantine facilities of federal and local health authorities, and that notwithstanding the quarantine defense, there exists danger of introducing this disease into the United States;

Therefore, in order to prevent the further introduction of epidemic cerebrospinal meningitis from foreign ports into the United States, by virtue of the authority vested in me by section 7 of the act of congress approved February 15, 1893, entitled "An act granting additional quarantine powers and imposing additional duties upon the Marine Hospital Service", it is ordered that no persons may be introduced directly or indirectly by transshipment or otherwise into the United States or any of its possessions or dependencies from any port in China (including Hongkong) or the Philippine Islands for such period of time as may be deemed necessary, except under such conditions as may be described by the Secretary of the Treasury.

This order shall take effect from and after this date.

**HERBERT HOOVER**

The White House,
June 21, 1929.

### No. 5143

REGULATIONS GOVERNING THE EMBARKATION OF PASSENGERS AND CREW AT PORTS IN CHINA AND THE PHILIPPINE ISLANDS AND THEIR TRANSPORTATION TO UNITED STATES PORTS PRESCRIBED IN ACCORDANCE WITH THE PROVISIONS OF EXECUTIVE ORDER APPROVED JUNE 21, 1929.

## A.   REGULATIONS GOVERNING EMBARKATION.

1.   Persons will be permitted to embark for United States ports only under the supervision of a medical officer of the United States Public Health Service and only from the ports of Shanghai and Hongkong in China, and Manila in the Philippine Islands; provided that approved facilities for preembark-

324


Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

ation detention and official observation, as prescribed herein, are available and are satisfactorily used.

2.   Cabin passengers and ships' officers will be permitted to only embark from such ports upon presentation of acceptable evidence that:

(a)   Official medical inspection determines such person to be without rise of temperature and free from communicable or quarantinable disease;

(b)   The person has not lived within two weeks prior to embarkation in premises infected with epidemic cerebrospinal meningitis, nor in a district in which such disease is prevalent.

3.   Steerage passengers and crew will be permitted to embark only in such ports following:

(a)   Presentation of acceptable evidence that competent bacteriological examinations of nose and throat for meningococci has been made with negative results within three days of embarkation.

(b)   Detention in small isolated groups in an approved quarantine camp or compound under conditions satisfactory to a medical officer of the United States Public Health Service for not less than fourteen days prior to embarkation, during which period medical inspections shall have been made twice daily and no case of cerebrospinal meningitis shall have been detected in the quarantined group under observation.

4.   No persons other than the ships' officers and cabin passengers shall be allowed to go ashore in ports in China except for disembarkation, and intercommunication between those on board and persons from shore will not be permitted.

## B.   REGULATIONS GOVERNING TRANSPORTATION.

1.   Cabin passengers may be transported in accordance with the provisions of the Navigation Act of 1882.

2.   Steerage passengers may be transported in numbers not to exceed 25 per cent of the total number allowed under the provisions of the Navigation Act of 1882, provided that:

(a)   Steerage passengers embarked at each port shall be maintaining respectively in noncommunicating groups;

(b)   Separate mess gear shall be used for each group, and shall be sterilized in an approved manner after each use. The use of common drinking cups and common towels is prohibited.

325


Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

Personal cleanliness of steerage passengers shall be enforced for the entire voyage, and adequate soap and bathing water shall be provided as approved;

(c)   Medical inspection shall be made twice daily en route by the ship's doctor, who shall immediately isolate in the ship's hospital or other suitable quarters any persons suspected of having a communicable disease;

(d)   All measures practicable shall be taken on board to reduce individual contacts to a minimum, and especially attention shall be given to avoiding chilling exposure and to providing ample ventilation.

## C.   REGULATIONS GOVERNING VESSELS ARRIVING AT UNITED STATES PORTS UPON WHICH CASES OF MENINGITIS HAVE OCCURRED EN ROUTE.

1.   All cases of meningitis shall be removed from the vessel and detained in quarantine for a period of not less than three weeks from the beginning of the disease and may be discharged following such period only when bacteriological examination of the nose and throat is negative for meningococci.

2.   The immediate contacts of cases occurring among the cabin passengers, ships' officers and crew shall be removed from the vessel and detained in quarantine for not less than 14 days, and may be discharged following such period only when bacteriological examination of the nose and throat is negative for meningococci.

3.   When any case occurs among the steerage passengers, all the steerage passengers shall be considered contacts and shall be removed from the vessel and held in quarantine detention for a period of not less than 14 days and may be discharged following such period only when bacteriological examination of the nose and throat is negative for meningococci; provided that in the discretion of the quarantine officer only the steerage passengers comprising the group in which the case occurs may be treated as contacts, and the other separate groups of steerage passengers may be released without detention.

Approved: July 11, 1929.

OGDEN L. MILLS,
Acting Secretary of the Treasury.

326

Digitized by 

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

Exhibit D

Case 1:21-cv-00100-EGS   Document 57-5   Filed 02/05/21   Page 13 of 53

# ABSTRACT OF SANITARY REPORTS.

VOL. VII.     WASHINGTON, D. C., SEPTEMBER 2, 1892.     No. 36.

Published at the Marine-Hospital Bureau in accordance with act of Congress of April 29, 1878.]

## UNITED STATES.

### CIRCULAR.

*Quarantine restrictions upon immigration to aid in the prevention of the introduction of cholera into the United States.*

TREASURY DEPARTMENT.
*Office of the Supervising Surgeon-General,*
*U. S. Marine-Hospital Service,*
*Washington, D. C., September 1, 1892.*

*To Collectors of Customs, Medical Officers of the Marine-Hospital Service, Foreign Steamship Companies, State and local Boards of Health:*

It having been officially declared that cholera is prevailing in various portions of Russia, Germany and France, and at certain ports in Great Britain, as well as in Asia, and it having been made to appear that immigrants in large numbers are coming into the United States from the infected districts aforesaid, and that they and their personal effects are liable to introduce cholera into the United States, and that vessels conveying them are thereby a direct menace to the public health, and it having been further shown that under the laws of the several States quarantine detentions may be imposed upon these vessels a sufficient length of time to insure against the introduction of contagious diseases, it is hereby ordered that no vessel from any foreign port carrying immigrants shall be admitted to enter at any port of the United States until said vessel shall have undergone a quarantine detention of twenty days (unless such detention is forbidden by the laws of the State or the regulations made thereunder) and of such greater number of days as may be fixed in each special case by the State authorities.

This circular to take immediate effect except in cases of vessels afloat at this date, which will be made the subject of special consideration upon due application to the Department.

WALTER WYMAN,
*Supervising Surgeon-General, U. S. Marine-Hospital Service.*

Approved:
    CHARLES FOSTER,
       *Secretary of the Treasury.*
Approved:
    BENJ. HARRISON.

Digitized by Google

Exhibit E

**COVID-19 CAPIO**

U.S. Customs and Border Protection (CBP) and specifically the United States Border Patrol (USBP) is supporting the U.S. Government's response to the coronavirus disease (abbreviated "COVID-19")

The Director of the Centers for Disease Control and Prevention (CDC) under the Authority of the Public Health Service Act has directed CBP to prohibit the introduction of certain persons into the United States who, due to the existence of COVID-19 in countries or places from which persons are traveling, create a serious danger of the introduction of such disease into the United States.

When implementing the order, USBP is not operating pursuant to its authorities under Titles 8 or 19. However, Border Patrol agents may rely on their training and experience in detecting, apprehending and determining whether persons are subject to the CDC order, including but not limited to the following considerations: physical observation, use of sensors and technology, physical indicators and tracking techniques, information from third-parties, and deductive techniques.

### *Encounter*
- Enforcement efforts on the SWB and NB will be conducted as close to the physical border as practical with the objective to intercept aliens that are potentially infected with COVID-19 before further exposing or contaminating the U.S. public.
- Determine if individual encountered is a U.S. Citizen or an alien.
- U.S. Citizens and Lawful Permanent Residents are not subject to the CDC order and will be processed under existing CBP authorities.

### *Determine whether an alien is subject to the CDC order*
- Based on training, experience, physical observation, technology, questioning and other considerations, if an agent believes that it is more likely than not that a person is an alien seeking to enter the United States, without proper travel documentation or otherwise subject to travel restrictions at or between a POE, coming from or transiting through Canada or Mexico (regardless of their country of origin), and if such a person was encountered within the area of operation of a Border Patrol station or POE operated by CBP, the CBP officer or agent shall apply the CDC order to the person in accordance with the procedures below.
- Domiciled aliens encountered within the US will be processed under existing Title 8 authorities and processes. To the extent practical, USBP will leverage field deployed mobile biometric devices to perform immigration and criminal history checks in real-time for officer safety.

### *Processing*
- To the maximum extent possible all processing will be done in the field. Only in exigent circumstances will aliens be taken into permanent CBP facilities.
- Once USBP determines an alien is subject to the CDC order, in the field and to the extent practical, USBP will capture a subject's biographical information and archive data appropriately.

- Agents are not to place subjects in assigned vehicles
- Property is not to be taken into custody

### *The following recommendation will apply for guidance to the field:*

At any time a subject is determined to no longer be amenable under Title 42 CDC Order agents will process under existing statutory authorities found in Title 8 of the US code. The authority to make this determination resides with the Chief Patrol Agent and cannot be delegated below the Watch Commander position. Subjects taken into custody under Title 8 must be processed under normal Title 8 guidelines (e.g., ER, NTA, etc…)

- Agents are to consider officer safety and safety to the general public at all times.
- The appropriate PPE will be utilized
- Subjects will only be placed in a designated transport vehicle and/or a designated staging area

Upon initial encounter the agent will determine if subject is amenable to expulsion under Title 42 CDC Order

- Contact TOC/Radio Room or utilize **e3 Mobile device** to create a **TSM Event #** under **'Operation Capio'** and initiate **e3 Event** from **TSM**
- Include the number of subjects encountered and verify that **'Operation Capio'** is associated with designated **e3 Event** and obtain both **TSM/e3 Event #'s**
- Record both **TSM/e3 #'s** on **Field Intake Form** and fill in the necessary information required
- Utilize **e3 Mobile** device to enter biographical information and role fingerprints for **Search Only**
- Based on results, should subject still be amenable to being expelled, subject will be transported to the designated Port of Entry – Should an agent determine a subject is not amenable to expulsion refer to **NON DEPORTABLE/IN CUSTODY**
- **Field Intake Forms** will be required to be brought back to station or designated processing areas for data entry into **TSM/e3** Intake **(Note:  Ensure that ALL required information is entered on the Field Intake Form)**

Data Entry of **Field Intake Form** information

- Designated processing personnel will input information from the **Field Intake Form** into the appropriate **e3 Event #**
- Generate an **I-44** under the appropriate **e3 Event #** in accordance to provided information below (Note:  Efforts to keep Family Units together should be considered at all times)
- For the purpose of Title 42 the following definitions will apply in regard to Family Units and Unaccompanied Juveniles:
    - **Family Units:**  A person or persons accompanied by **ANY** relative
    - **Unaccompanied Juvenile:**  A minor under the age of 18 and **NOT** accompanied by a relative
        - Dispositions for all subjects amenable to immediate expulsion

## NON DEPORTABLE/NOT IN CUSTODY

I-44 Narrative Required Information:

*Subject is **one of total number in group**, encountered in **CITY, STATE**. Subject appeared to have no illness or injuries. Subject was removed through the **POE Name** under "Operation CAPIO", in accordance with Title 42 U.S.C Section 265.*

**Subject is member of a Family Unit:**

**FAMILY MEMBER 1: Subjects Name**
**FAMILY MEMBER 2:**
**FAMILY MEMBER 3**

## NON DEPORTABLE/IN CUSTODY

The following disposition of **NON DEPORTABLE/IN CUSTODY** will apply to all subjects who cannot be expelled in an expeditious manner and are required to be transferred to a facility. This is necessary in order to comply with Transport, Escort, Detention, Search (TEDS) & e3 Detention Module (e3 DM).

- Subjects not amenable to being expelled: TSDB, CIMT, Aggravated Felon, Injured Alien, Non-Immigration Felony Convictions, etc…. or otherwise determined by the Sector Chief Patrol Agent or designated official
- Subjects expelled via flights as appropriate or sent to designated Quarantine Facility
- Subjects non amenable to being expelled via a POE – agents will request an **ICAD Ticket #** and record on Field Intake Form and subjects will be transferred via local guidelines
- Based on available evidence and only for extenuating circumstances, agents may determine to process under existing statutory authorities found in Title 8 of the US code. The authority to make this determination resides with the Chief Patrol Agent and cannot be delegated below the Watch Commander position. Subjects taken into custody under Title 8 must be processed under normal Title 8 guidelines (e.g., ER, NTA, etc…)

### *Transportation*

USBP will have dedicated transportation vehicles with separation between agents and subjects encountered to minimize your exposure. At no time shall subjects be transported in USBP vehicles not designated as COVID-19 transportation vehicles unless exigent circumstances exist.
- Subjects will be transported to the nearest POE and immediately returned to Mexico or Canada, depending on their point of transit.
- Subjects encountered that are not amenable to immediate expulsion to Mexico or Canada, will be transported to a dedicated facility for limited holding prior to expulsion to the alien's country of citizenship. This varies by sector but should be a tent, soft-sided facility or predesignated CBP/USBP facility with dedicated space.
- ICE/ERO will take custody of any subject cleared by HHS or appropriate medical personnel and follow established procedures under Title 8 or Title 42 as applicable.

Vehicles utilized to temporarily hold subjects will undergo the appropriate sanitation procedures in place to minimize exposure and possible spread of virus

## Convention Against Torture Claim

Aliens that make an affirmative, spontaneous and reasonably believable claim that they fear being tortured in the country they are being sent back to, will be taken to the designated station and referred to USCIS. **Agents should seek Supervisory Guidance.**

- Notify USCIS
  - o USCIS determines positive, converted to Title 8, turn over to ERO and entered into 240 proceedings for an Asylum hearing based on Torture.
    - Interview by Asylum Officer while in our custody
    - Secondary review Supervisory Asylum Officer
  - o USCIS determines negative, continue under Title 42, expel to Mexico or Other.

Exhibit F



Official website of the Department of Homeland Security

(https://www.facebook.com/CBPgov/) (https://www.instagram.com/cbpgov/)

(https://www.flickr.com/photos/cbpphotos/) (https://twitter.com/cbp)

(https://www.linkedin.com/company/2997?trk=tyah) (https://www.youtube.com/user/customsborderprotect)

U.S. Customs and
Border Protection
(/)

(https://public.govdelivery.com/accounts/USDHSCBP/subscriber/new)

# Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions

On March 21, 2020 the President, in accordance with Title 42 of the United States Code Section 265, determined that by reason of existence of COVID-19 in Mexico and Canada, there is a serious danger of the further introduction of COVID-19 into the United States; that prohibition on the introduction of persons or property, in whole or in part, from Mexico and Canada is required in the interest of public health. Under this order, CBP is prohibiting the entry of certain persons who potentially pose a health risk, either by virtue of being subject to previously announced travel restrictions or because they unlawfully entered the country to bypass health screening measures. To help prevent the introduction of COVID-19 into border facilities and into the United States, persons subject to the order will not be held in congregate areas for processing and instead will immediately be expelled to their country of last transit. In the event a person cannot be returned to the country of last transit, CBP works with interagency partners to secure expulsion to the person's country of origin and hold the person for the shortest time possible. This order does not apply to persons who should be excepted based on considerations of law enforcement, officer and public safety, humanitarian, or public health interests. Expulsions under Title 42 are not based on immigration status and are tracked separately from immigration enforcement actions, such as apprehension or inadmissibility, that are regularly reported by CBP.

## U.S. Border Patrol Monthly Enforcement Encounters 2021: Title 42 Expulsions and Title 8 Apprehensions

| U.S. Border Patrol (USBP) | Enforcement Actions | OCT | NOV | DEC | YTD 21 TOTAL |
|---|---|---|---|---|---|
| **Southwest Border** | Title 42 Expulsions [2] | 62,788 | 60,636 | 60,010 | 183,434 |
| | Title 8 Apprehensions [1] | 6,038 | 7,876 | 10,620 | 24,534 |
| | **Total** | 68,826 | 68,512 | 70,630 | 207,968 |

Case 2:21-cv-00100-Z   Document 57-5   Filed 02/05/21   Page 21 of 53

| U.S. Border Patrol (USBP) | Enforcement Actions | OCT | NOV | DEC | YTD 21 TOTAL |
|---|---|---|---|---|---|
| **Northern Border** | Title 42 Expulsions[2] | 27 | 66 | 25 | 118 |
| | Title 8 Apprehensions[1] | 47 | 26 | 30 | 103 |
| | **Total** | 74 | 92 | 55 | 221 |
| **Land Border Total** | Title 42 Expulsions[2] | 62,815 | 60,702 | 60,035 | 183,552 |
| | Title 8 Apprehensions[1] | 6,085 | 7,902 | 10,650 | 24,637 |
| **USBP - Total Land Border Enforcement Encounters** | | 68,900 | 68,604 | 70,685 | 208,189 |

[1] Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe. Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

[2] Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265.

Back to **CBP Enforcement Statistics (/newsroom/stats/cbp-enforcement-statistics)**

## Office of Field Operations Monthly Enforcement Encounters 2021: Title 42 Expulsions and Title 8 Inadmissible Aliens

| Office of Field Operations (OFO) | Enforcement Actions | OCT | NOV | DEC | YTD 21 TOTAL |
|---|---|---|---|---|---|
| **Southwest Border** | Title 42 Expulsions[2] | 1,900 | 1,942 | 1,744 | 5,586 |
| | Title 8 Inadmissibles1 | 1,000 | 1,008 | 1,139 | 3,147 |
| | **Total** | 2,900 | 2,950 | 2,883 | 8,733 |
| **Northern Border** | Title 42 Expulsions[2] | 877 | 511 | 750 | 2,138 |
| | Title 8 Inadmissibles[1] | 1,706 | 1,051 | 1,399 | 4,156 |
| | **Total** | 2,583 | 1,562 | 2,149 | 6,294 |
| **Land Border Total** | Title 42 Expulsions[2] | 2,777 | 2,453 | 2,494 | 7,724 |
| | Title 8 Apprehensions[1] | 2,706 | 2,059 | 2,538 | 7,303 |

Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions | U.S. Customs and Border Protection

| Office of Field Operations (OFO) | Enforcement Actions | OCT | NOV | DEC | YTD 21 TOTAL |
|---|---|---|---|---|---|
| OFO - Total Land Border Enforcement Encounters | | 5,483 | 4,512 | 5,032 | 15,027 |

[1] Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe. Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

[2] Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265.

Back to **CBP Enforcement Statistics (/newsroom/stats/cbp-enforcement-statistics)**

**Last modified:** January 7, 2021

**Tags:** **Statistics**, **Port Security**, **U.S. Border Patrol**

 Share This Page.

Exhibit G

# JANUARY 19, 2021
## ICE JUVENILE
# COORDINATOR REPORT

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES, *et. al.*,    )    Case No.: CV 85-4544-DMG
                        )
       Plaintiffs,         )
                        )
v.                          )
                        )
JEFFREY A. ROSEN,        )
Acting Attorney General of the    )
United States, *et al.*,        )
                        )
       Defendants.       )
                        )

## JANUARY 2021 INTERIM REPORT
## OF JUVENILE COORDINATOR DEANE DOUGHERTY
## <u>SUBMITTED BY IMMIGRATION AND CUSTOMS ENFORCEMENT</u>

As required by the Court in its order issued on December 4, 2020, U.S. Immigration and Customs Enforcement (ICE) Juvenile Coordinator Deane Dougherty is submitting the following interim report to provide an update on the Class Members in the FRCs over 20 days, status of implementation of COVID-19 guidances, a census of positive COVID-19 cases at the family residential centers (FRCs), the status of compliance with respect to minors held in Title 42 custody, and confirmation that ICE continues to comply with requests for information and access to residents made by Ms. Ordin and Dr. Wise.

Due to the constantly evolving nature of the COVID-19 crisis, and the frequency of custody and discharge determinations, the information in this report is current and accurate as of the time of signature, or for the reported data, as of the date or time noted in conjunction with the information provided.

**I.** **Making and Recording Individualized Custody Determinations and Census of Minors at FRCs**

As of January 8, 2021, there were a total of 141 Class Members at ICE FRCs. The figures below breakdown these Class Members by age and country of origin.





ICE has been making continuous efforts to release Class Members under applicable standards throughout the course of this litigation and, where there are no impediments to removal, those that are subject to final orders of removal are repatriated in accordance with the law.[1] This includes the expeditious release of minors who received a positive credible fear finding by U.S. Citizenship and Immigration Services (USCIS) pursuant to a request for reconsideration, a process solely committed to and within the discretion of USCIS and with which ICE is not involved. The graph below portrays the book-outs by the FRCs from November 10, 2020 to January 8, 2021, which includes 260 Class Members released into the interior of the United States, 20 Class Members removed from the United States, and 80 Class Members returned to their country of origin pursuant to Title 42 authorities.



As of January 8, 2021, 37 Class Members have been detained at an FRC 20 days or more. Exhibit A. I have reviewed the data provided in Exhibit A, and it has been shared with the Special Monitor, as required by the December 4, 2020, Order. Because this list must be shared with the Special Monitor in advance of this filing, the information contained therein may have changed

---

[1] On January 11, 2012, the U.S. District Court for the Western District of Texas issued a stay of removal for named Plaintiffs in *S.L.V. v. Rosen*, No. 21-00017 (W.D. Tex. filed Jan 11, 2021). The stay prevented the imminent removal of at least five families detained at the STFRC. The stay expires 14 days' from issuance, and a hearing is set in the district court for January 25, 2021. Additionally, a stay of removal for named Plaintiffs in *Huisha-Huisha v. Gaynor, et al.*, No. 21-100 (D.D.C. filed Jan. 12, 2021), prevents the expulsion of three families at the KCFRC who are subject to Title 42.

since the date it was compiled. These individuals, and their accompanying parent(s) or legal guardian(s), may be subject to the *Flores* waiver process contemplated in this Court's September 18, 2020 Order. This process has two parts that remain in development: (1) the Notice of Rights, and (2) an updated policy or instruction regarding the process that flows from service of the Notice of Rights where a Class Member and parent or legal guardian consent to the Class Member's separate release (Directive). On January 12, 2021, the parties filed the latest court-ordered Joint Status Report regarding the proposed Notice of Rights and Directive. Once the Court issues a finalized Notice of Rights and Directive, ICE will update the specific explanations for continued detention over 20 days as outlined in paragraph 1, 4(c), and 4(d) of the Court's June 26 Order, in its interim reporting.

## II. <u>Status of ICE's Implementation of COVID-19 Guidances</u>

I have confirmed that the measures described in the declarations and the Juvenile Coordinator's reports, previously submitted to this Court, pertaining to the operational changes the FRCs have implemented to mitigate the introduction into, and spread of, COVID-19 are still in effect. As has been the case since the beginning of the pandemic, ICE FRCs are operating well below maximum capacity, as demonstrated in the chart below.

| Family Residential Center Occupancy 1/8/2021 | | | | | |
|---|---|---|---|---|---|
| Facility | Total # of Beds | # of Beds Occupied | % of Beds Occupied | # of Beds Not Occupied | % of Beds Not Occupied |
| Berks Family Residential Center | 96 | 11 | 11% | 85 | 89% |
| Karnes County Residential Center | 830 | 79 | 10% | 751 | 90% |
| South Texas Family Residential Center | 2,400 | 194 | 8% | 2,206 | 92% |
| Total | 3,326 | 284 | 9% | 3,042 | 91% |

I am actively monitoring the Department of Homeland Security and ICE guidance with respect to distributing the COVID-19 vaccination. Due to the limited initial vaccine doses, vaccinations have begun for law enforcement officers in prioritized phases and in accordance with U.S. Centers for Disease Control and Prevention (CDC) recommendations and in partnership with

the Veterans Health Administration. One of these prioritized locations is the San Antonio Field Office, in which both the Karnes and South Texas Family Residential Centers are located. Please note that the vaccination program is voluntary for ICE personnel. I will update this Court when more information about the vaccination rollout becomes available, particularly as it may relate to residents.

### III. Report of ICE Facilities Holding Minors and Number of COVID-19 Cases

ICE has been regularly reporting positive COVID-19 cases to the United States District Court for the District of Columbia, which is overseeing *O.M.G. v. Wolf*, and the notices of positive results are also submitted to this Court. The following charts describe the number of positive COVID-19 cases at the ICE FRCs as of January 8, 2021.

| COVID-19 Positive Cases at Family Residential Centers as of 1/8/2021 | | | | |
|---|---|---|---|---|
| Facilities | Minor | Adult | Staff | Total |
| Berks Family Residential Center | - | 1 | 10 | 11 |
| Karnes County Residential Center | 39 | 53 | 78 | 170 |
| South Texas Family Residential Center | 12 | 15 | 103 | 130 |
| Total | 51 | 69 | 191 | 311 |

| COVID-19 Positive Cases of Residents at Family Residential Centers as of 1/8/2021 | | | |
|---|---|---|---|
| Facilities | At Intake | In General Population | Total |
| Berks Family Residential Center | 1 | - | 1 |
| Karnes County Residential Center | 92 | - | 92 |
| South Texas Family Residential Center | 17 | 10 | 27 |
| Total | 110 | 10 | 120 |

| COVID-19 Positive Cases of Residents at Family Residential Centers as of 1/8/2021 | | | | |
|---|---|---|---|---|
| Facilities | Symptomatic | Asymptomatic | Hospitalized | Total |
| Berks Family Residential Center | 1 | - | - | 1 |
| Karnes County Residential Center | 3 | 89 | - | 92 |
| South Texas Family Residential Center | 6 | 21 | - | 27 |
| Total | 10 | 110 | - | 120 |

Pursuant to section 4(b)(iv) of this Court's April 24, 2020 Order, the minors who remain housed at the ICE FRCs have not been released or transferred to non-congregate settings for two

reasons: (1) because they are either in quarantine or cohorting based on CDC guidance as a result of testing positive for COVID-19 or they are a new intake and must undergo a 14-day observation period; and/or (2) because they are housed with their parent or legal guardian whose release is not appropriate and, as discussed previously, ICE will determine the minor's eligibility for release with the consent of a parent or legal guardian in accordance with any future remedy ordered by the Court.

As of January 8, 2021, Cowlitz County Juvenile Detention Center ("Cowlitz") has had no reported cases of COVID-19 by residents or staff.

## IV. Additional Policies and Practices Aimed at Identifying and Protecting Minors from COVID-19

Pursuant to section 5 of the Court's December 4, 2020 Order, I can confirm that I facilitated, and participated in a number of telephonic discussions with Ms. Ordin, Dr. Wise, Ms. Fabian and others to discuss Flores compliance with particular regard to COVID-19 precautions. Of note is one case in which Dr. Wise was particularly interested involving a four year old with a shoulder injury that occurred while enroute from Ecuador and was discovered while housed at the South Texas Family Residential Center (Dilley). While not directly related to Flores oversight, Dr. Wise acknowledged that the medical care and procedures provided to the child while housed at Dilley were excellent and followed accepted protocols. Dr. Wise, Ms. Ordin and ICE officials collaborated to ensure an expedited review of the child's Reasonable Fear claims which resulted in release from the facility. Additionally, the family was released with a detailed recommended medical care plan and referrals for possible future medical care in the local community in which the family planned to reside while continuing through their immigration proceedings. Ms. Ordin and I also conferred regarding the status of Title 42 families and UAC as well as the submission of this report. I have also telephonically provided Ms. Ordin with data and reports on the hoteling

of minors and families with regard to Title 42 compliance and families who exceeded 20 days in residence at a FRC.

**V. <u>Title 42 Compliance</u>**

Pursuant to section 6 of the Court's September 4, 2020 Order, ordering that the government maintain records and statistical information on minors held in Title 42 custody, to include an update regarding the number of minors held in Title 42 custody, and to monitor compliance with the Agreement with respect to minors held in Title 42 custody, I can confirm that ICE has included minors temporarily housed by ICE pursuant to Title 42 authorities over 72 hours pending expulsion in its monthly Paragraph 28A reporting shared with Plaintiffs' counsel since March 2020, and will continue to do so. Since the last interim report I filed, advising this Court that KCFRC was exclusively housing Title 42 families, as of November 22, 2020, KCFRC resumed housing both Title 42 and Title 8 families.

On November 18, 2020, the U.S. District Court for the District of Columbia issued an order granting a nationwide preliminary injunction prohibiting the expulsion of unaccompanied alien children under regulations issued by the Department of Health and Human Services, Centers for Disease Control and Prevention (CDC) implementing Title 42, Section 265 of the U.S. Code (Title 42). *P.J.E.S. v. Wolf*, No. 20-cv-02245, (D.D.C. filed Aug. 14, 2020). The district court invalidated these regulations as applied to a class defined as:

> all unaccompanied noncitizen children who (1) are or will be detained in U.S. government custody in the United States, and (2) are or will be subjected to expulsion from the United States under the CDC Order Process, whether pursuant to an Order issued by the Director of the Centers for Disease Control and Prevention

under the authority granted by the Interim Final Rule, 85 Fed. Reg 16559-01, or the

Final Rule, 85 Fed. Reg. 56,424-01.

*Id.*

Between November 10, 2020, and January 8, 2021, which includes nine days before the

preliminary injunction in *P.J.E.S.* was issued, ICE temporarily housed a total of 86 minors pending

expulsion under Title 42 processes.  Of those, ICE temporarily housed 5 minors at an FRC with

an average length of stay of 7 days; the chart below demonstrates the age categories:

| Age Category | # of minors |
|---|---|
| 0 -5 years old | 2 |
| 6 - 13 years old | 2 |
| 14 - 17 years old | 1 |
| **Total** | **5** |

ICE temporarily housed 81 minors in hotels, with an average length of stay of 1.4 days; the charts

below demonstrate the age categories and breakdowns by family composition[2]:

| Family Composition | # of minors |
|---|---|
| Family Unit | 2 |
| Family Group | 2 |
| Single Minor | 77 |
| **Total** | **81** |

---

[2] As a reminder, the reporting period for Title 42 data includes single minors processed under Title 42 authorities pre-*P.J.E.S.* preliminary injunction.

| Age Category | # of minors |
|---|---|
| 0 -5 years old | 1 |
| 6 - 13 years old | 6 |
| 14 - 17 years old | 74 |
| **Total** | **81** |

Of the 86 minors temporarily housed pursuant to Title 42 by ICE, no minors were held in hotels for more than 72 hours pending transfer to a licensed facility, and no minors were held in a hotel for more than 2 days pending an expulsion flight.

Signed on this 19th day of January 2021.

DEANE D DOUGHERTY
Digitally signed by DEANE D DOUGHERTY
Date: 2021.01.19 08:52:09 -05'00'

Deane Dougherty
Juvenile Coordinator

9

# ATTACHMENT A
# TO JANUARY 15, 2021 ICE
# JUVENILE COORDINATOR REPORT

| Det Locat on | A-Numbe | Subject D | Last Name | F st Name | Count y of C t zensh p Code | Book-In Date | B th Date | Age | Age G oup | F nal O de Date ( as of 1/6/21) | Case Catego y | Spec f c explanat on fo detent on 20 Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CONGO | 9/30/2020 | [redacted] | 1 | 0 to 5 | 9/7/2020 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 08/0 20. On 08 11 20, the IJ affi med the nega ive decision. The family un t's atto ney f led a RFR on 08/12 20. The RFR was den ed on 08/13/20. The fam ly unit s attorney submit ed a 2nd RFR on 10/02/20. The RFR was den ed on 10/06/20. The minor had a final order of emoval but cou d not be removed because the minor/family unit was subject to an administrative stay of removal issued by the U.S. D strict Court for the Northern Distr ct of Cal fornia on Oc ober 17, 2020, in East Bay Sanctuary Covenant v. Barr, No. 19- 073 (N.D. Cal. Fi ed Jul. 16, 2019) PI appeal docketed, No. 19-16 87 (9th Cir. iled Jul. 29, 2019). This s ay has now been li ted. The minor is subject to a inal order of removal and there are no impediments to removal at th s time. Minor is in the process of being scheduled for removal, which includes working with the consula e o secure travel documents and being tested for COVID-19 as is required by country of or gin. The minor is from The Democra ic Republic of Congo and lights are occur ing frequen ly. The family un t is pending Travel documents and awaiting the next ava lable commerc al fl ght for repatria ion. The projected removal will be [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | BRAZIL | 12/16/2020 | [redacted] | 2 | 0 to 5 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The [redacted] ega ly ente ed on 12/08/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 22 20. An APSO rendered a pos tive decision on 12 23 20. The case of icer received the NTA on 12 23 20. The amily unit is pending release after the sponsor provides the travel arrangements. The fam ly unit in tially did not have a sponsor and was being prepared for intake at a shelter. Contact was made with Pas o [redacted] with [redacted] who wi l sponsor the fam ly |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CHILE | 3/18/2020 | [redacted] | 2 | 0 to 5 | 3/15 2020 | [8G] Expedited Removal - Credib e Fear Referral | The [redacted] a negative credible fear de ermination by an APSO on 03/26 20. On 0 08 20, the IJ affi med the decision set by the APSO. The amily un t's a torney f led for a RFR on 0 /10/20. The RFR was denied on 0 /15 20. The amily un t was schedu ed for removal on 05/05/20. The removal was cancel ed due to the amily un t's a torney f ling a stay of removal with the Circuit Court of the District of Columbia on 0 /28/20. The DC Circu t Court granted the stay of removal on 0 29 20. On 05 15/20, the administra ive stay was dissolved. The family un t was re-scheduled or removal on 05 26 20. The minor had a final order of removal but could not be emoved because the family un t was subject to multiple admin st ative s ays of removal issued in D.A.M v Barr and East Bay Sanctuary Covenant v. Barr. Whi e the stay was in p ace the family un t's attorney iled a 2nd RFR on 06 0 /20. The RFR was den ed on 07/01/20. A RFR was submitted for a 3rd time by the family un t's attorney on 09 23/20. Add tionally, the administrative stays were dissolved. The 3rd RFR was den ed on 12/17/20. The family unit s attorney submit ed a th RFR on 12/21/20. On 01/08/21, an APSO returned with a positive credib e ear determinat on. The family un t was re eased on 01/11/21 after the sponsor provided the t avel arrangemen s. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CHILE | 3/18/2020 | [redacted] | 3 | 0 to 5 | 3/1 2020 | [8G] Expedited Removal - Credib e Fear Referral | Th s minor may be el gible for indiv dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE will de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly received a negative credible fear determination by an APSO on 03/26 20. On 0 08 20, the IJ affirmed the decision set by the APSO. The amily un t's a torney f led for a RFR on 0 /10/20. The RFR was den ed on 0 /15/20. The fam ly unit s attorney fi ed a stay of removal w th the Circu t Court of the District of Columb a on 0 28 20. The DC Circuit Court granted the stay of removal on 0 /29/20. On 05/15/20, the admin st ative stay was d ssolved. The fam ly unit was scheduled for removal on 05/26 20. The minor had a final order of removal but cou d not be removed because the fam ly unit was subject to mul ip e administra ive stays of removal issued in D.A.M v Barr and East Bay Sanctuary Covenant v. Barr. While the stay was in place the family unit's at orney fi ed a 2nd RFR on 06 22/20. The RFR was denied on 06 25/20. A RFR was subm tted for a 3rd time by the amily unit's a torney on 09/23/20. Addit onally, the administrative stays we e dissolved. The 3rd RFR was den ed on 12/11/20. The family unit s attorney submitted a th RFR on 12 21/20. The RFR dec s on is pending. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 9/1 /2019 | [redacted] | 3 | 0 to 5 | 9/30 2019 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 09/23 19. On 09 30 19, the IJ affi med the decision set by the APSO. The amily un t's a torney f led for a RFR on 10/09/19. The RFR was denied on 10/09 19. The minor had a final order of removal but cou d not be removed because the family un t was subject to multiple admin strative stays of removal issued in M.M.V v Barr, D.A M v Barr and East Bay Sanctuary Covenant v. Barr. Wh le the stay was in place the fam ly un t s attorney iled a 2nd RFR on 09/2 /20. The RFR was denied on 10/20/20. The admin strative stays have been dissolved. The minor is subject to a final order of removal and there are no impediments to emoval at th s ime. Minor is in the process of being scheduled for removal, which includes working with the consulate to secure t avel documents and being tested or COVID 19 as is required by country of o igin. The next p ojec ed date of removal s 01 13/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | VENEZUELA | 12/19/2020 | [redacted] | | 0 to 5 | 10/15/2020 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly unit ordered removed on 10 15 20 by an IJ under MPP. The minor/fam ly unit il egally re-entered on 12/17/20. As per HQ-R O, the family unit removal has been denied. The fam ly unit was re eased on 01/08/21 after the sponsor provided the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 9/1/2019 | [redacted] | 5 | 0 to 5 | 8/30 2019 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 09/0 19. On 09 18 19, the IJ affi med the decision set by the APSO. The minor had a final order of emoval but cou d not be removed because the fam ly unit was subject to multiple admin st ative s ays of removal ssued in M M.V v Barr and D.A M v Barr. The fam ly unit s attorney filed for a RFR on 09/30/20. The RFR was den ed on 10/07/20. The administrative stays have been dissolved. The minor is subject to a final order of removal and there are no impediments to removal at this time. Minor is in the process of being scheduled or removal, which includes working with the consulate to secure t avel documents and being tested or COVID-19 as is required by country of origin. The minor family un t was schedu ed for removal on 11/11/2020. The fl ght was cancelled due to weather and airport damage. The next projec ed date of removal s 01/13/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CUBA | 11/19/2020 | [redacted] | 5 | 0 to 5 | 12/19/2019 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly init a ly il ega ly entered on 09 18 2019, processed as MPP and returned to Mexico. The amily un t was ordered removed o Cuba on 12/19/2019 by an IJ. On 11/18/20, the fam ly unit llegally re-entered. As per the Government of Cuba, the family un t was been approved for removal. The family un t was removed from the emoval fl ght to Cuba schedu ed for 12 29 2020 due to testing pos tive for Cov d-19. The pro ected removal wi l be [redacted] . |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | VENEZUELA | 12/19/2020 | [redacted] | 5 | 0 to 5 | 10/22/2020 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly unit ordered removed on 10 22 20 by an IJ under MPP. The [redacted] ll egally re-entered on 12/17/20. As per HQ-R O, the family unit removal has been denied. The fam ly unit was re eased on 01/08/21 after the sponsor provided the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | MEXICO | 12/8/2020 | [redacted] | 6 | 6 to 13 | 12/16/2020 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly unit c aimed fear returning to their country of cit zenship on 12/0 /20. The fam ly unit was scheduled for their asylum interview on 12/1 /20. The minor/fam ly was issued a negative decision by an APSO on 12/16/20. The fam ly unit did no request an IJ review of the nega ive determination. The fam ly unit changed their mind and requested an IJ rev ew of the nega ive decision. IJ hearing schedu ed for 01 06/21. The family un t's atto ney f led a RFR on 01/08 21. An APSO ssued a posi ive decision on 01/11/21. The family unit will be released after the sponsor provides the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | BRAZIL | 12/15/2020 | [redacted] | 6 | 6 to 13 | 3/12 2020 | [16] Reinstated Final Order | h s m nor may be el g ble for ind v dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE will de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly unit claimed fear returning o their country of c tizenship on 12/1 /20. The family un t was schedu ed for their asylum interview on 01/0 /21. The minor/fam ly was issued a nega ive decision by an APSO on 01/05/21. The fam ly unit did not request an IJ review of the negative determinat on. On 01 09/21, the amily unit changed their mind and is now requesting an IJ review of the negative dec s on set by the APSO. The decision s pending. |
| [redacted] | | [redacted] | [redacted] | [redacted] | BRAZIL | 12/18/2020 | [redacted] | 7 | 6 to 13 | N/A | Other - T tle 2 Return | T 2 return fl ght tentative for 01 1 21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/18/2020 | [redacted] | 7 | 6 to 13 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly i lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 28 20. An APSO ssued a NTA on 12 28/20. The case o ficer eceived the NTA on 01 03/21. The amily un t is pending release after the sponsor provides the travel arrangemen s. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CUBA | 11/26/2020 | [redacted] | 8 | 6 to 13 | 11/19/2019 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly init a ly il ega ly entered on 08 26 2019, processed as MPP and returned to Mexico. The amily un t was ordered removed in absentia to Cuba on 11/19 2019 by an IJ. On 11/2 /20, the amily un t i lega ly re-en ered. As per the Government of Cuba, the fam ly unit has been approved for removal. The family un t was removed from the CE cha ter o Cuba scheduled for 12/29/2020 due to the at orney submit ing an emergency stay. The stay was denied. The projected removal w ll be [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/1 /2020 | [redacted] | 8 | 6 to 13 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | [redacted] ly i lega ly ente ed on 12/11/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 29 20. An APSO ssued a NTA on 12 31/20. The case o ficer eceived the NTA on 12 31/20. The amily un t was released on 01 09/21 a ter the sponsor prov ded the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | GHANA | 12/9/2020 | [redacted] | 9 | 6 to 13 | In Proceedings | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly unit c aimed fear returning to their country of cit zenship on 12/05/20. The fam ly unit was scheduled for their asylum interview on 12/17/20. The minor/fam ly was issued a negative decision by an APSO on 12/22/20. The fam ly unit requested an IJ rev ew of the nega ive determination. The IJ hearing was scheduled or 12/31 20. The IJ vaca ed the dec s on set by the APSO on 12/31/2020. USCIS ssued the NTA on 01/05/2021. The fam ly unit was released on 01/09/21 after the sponsor prov ded the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | EL SALVADOR | 8/27/2019 | [redacted] | 9 | 6 to 13 | 9/18 2019 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 09/02 19. On 09 18 19, the IJ affi med the decision set by the APSO. The minor had a final order of emoval but cou d not be removed because the fam ly unit was subject to multiple admin st ative s ays of removal ssued in M M.V v Barr, D.A.M v Ba r, and M.D C v Wo f. The fam ly unit s attorney fi ed for a RFR on 09/2 /20. The RFR was den ed on 10/15/20. The administrative stays have been dissolved. The minor is subject to a inal order of removal and there are no impediments to removal at th s time. Minor is in the process of being scheduled for removal, which includes working with the consula e o secure travel documents and being tested for COVID-19 as is required by country of or gin. The projected removal date s 1/12/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 9/11/2019 | [redacted] | 10 | 6 to 13 | 10/17/2019 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 08/28 19. On 10 17 19, the IJ affi med the decision set by the APSO. The minor had a final order of emoval but cou d not be removed because the fam ly unit was subject to multiple admin st ative s ays of removal ssued in M M.V v Barr, D.A.M v Ba r, and M.D C v Wo f. The fam ly unit s attorney fi ed for a RFR on 09/22/20. The RFR was den ed on 10/07/20. The administrative stays have been dissolved. The minor s subject to a inal order of removal and there are no impediments to removal at th s time. Minor is in the process of being scheduled for removal, which includes working with the consula e o secure travel documents and being tested for COVID-19 as is required by country of or gin. The projected removal date s 1/13/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CONGO | 12/11/2020 | [redacted] | 11 | 6 to 13 | 12/31/2020 | [8G] Expedited Removal - Credib e Fear Referral | he minor fam ly i lega ly ente ed on 2 09 2020 and claimed fear of returning to their home country. he amily un t was scheduled for an asylum interv ew on 12 17 20. The minor/ amily unit received a negative CF decision from APSO on 12/18/20. IJ affirmed APSO's negative CF decision on 12/31/20. The minor is subject o a final o der of removal and there a e no impediments to removal at th s time. Minor is in the process of being scheduled for removal, which includes working with the consulate to secure travel documents and being tested or COV D 19 as is required by country of or gin. The fam ly unit s pending Travel documents and awai ing next ava lable commerc al fl ght for repatria ion. The next projected removal w ll be [redacted] . |
| [redacted] | | [redacted] | [redacted] | [redacted] | BRAZIL | 12/18/2020 | [redacted] | 11 | 6 to 13 | N/A | Other - T tle 2 Return | [redacted] 2 re urn fl ght tentative for 01 1 21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/19/2020 | [redacted] | 11 | 6 to 13 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly i lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 01 0 21. An APSO rendered a pos tive decision on 01 06 21. The case of icer received the NTA on 01 06 21. The amily unit was released on 01 09/21 af er the sponsor prov ded the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 8/27/2019 | [redacted] | 11 | 6 to 13 | 8/26 2019 | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 09/03 19. On 09 18 19, the IJ affi med the decision set by the APSO. The minor had a final order of emoval but cou d not be removed because the fam ly unit was subject to multiple admin st ative s ays of removal ssued in M M.V v Barr, D.A.M v Ba r, East Bay Sanctuary Covenant v. Barr, and M.D C v Wo f. The fam ly unit s attorney fi ed for a RFR on 09/23/20. The RFR was den ed on 10/19/20. The administrative stays have been dissolved. The minor s subject to a inal order of removal and there are no impediments to removal at this time Minor is in the process of being scheduled for removal, which includes working with the consulate to secure travel documents and being ested for COVID-19 as s required by country of origin. The projected removal date is 1/13/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | EL SALVADOR | 12/13/2020 | [redacted] | 12 | 6 to 13 | 9/18 2019 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | Th s minor may be el gible for indiv dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE will de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly init ally il egally en ered on 07/12/2019, processed as MPP and returned o Mexico. The amily unit was o dered removed in absent a on 12 18 2019 by an IJ. On 12 10/20, the amily unit i lega ly re-entered. The minor is subject o a final o der of removal and there a e no impedimen s o removal at th s ime. Minor is in the process of being scheduled for removal, which includes working with the consulate o secure travel documen s and being tes ed for COVID-19 as is required by count y of origin. On 12/31 2020, the fam ly unit en ered a motion o reopen. The decision s pending. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | CUBA | 11/26/2020 | [redacted] | 12 | 6 to 13 | 11/19/2019 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly init a ly il ega ly entered on 08 26 2019, processed as MPP and returned to Mexico. The amily un t was ordered removed in absentia to Cuba on 11/19 2019 by an IJ. On 11/2 /20, the amily un t i lega ly re-en ered. As per the Government of Cuba, the fam ly unit has been approved for removal. The family un t was removed from the CE cha ter o Cuba scheduled for 12/29/2020 due to the at orney submit ing an emergency stay. The stay was denied. The projected removal w ll be [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | UZBEKISTAN | 12/19/2020 | [redacted] | 12 | 6 to 13 | In Proceedings | [8G] Expedited Removal - Credib e Fear Referral | [redacted] ay be el gible for indiv dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE will de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly unit claimed fear returning o their country of c tizenship on 12/16/20. The family un t was schedu ed for their asylum interview on 12/29/20. The minor/fam ly was issued a nega ive decision by an APSO on 12/31/20. The fam ly unit requested an IJ rev ew of the negative determina ion. The IJ hearing s schedu ed for 01/08/21. The dec s on is pending. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 12/16/2020 | [redacted] | 13 | 6 to 13 | 9/25 2019 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | Th s minor may be el gible for indiv dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE w ll de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly unit in tially llegally entered on 02/16/2019. The family un t was ssued a NTA and released. On 09/25 2019, the fam ly unit was ordered removed in absentia by an IJ. The family un t fai ed to eport on mu tiple occasions. The amily unit was apprehended in Houston, TX on 12/15/2020. The minor s subject to a inal order of removal and there are no impediments to removal at th s time. Minor is in the process of being scheduled for removal, which includes working with the consula e o secure travel documents and being tested for COVID-19 as is required by country of or gin. On 01/0 /2021, the family un t entered a mo ion to reopen. The decision is pending. |
| [redacted] | | [redacted] | [redacted] | [redacted] | BRAZIL | 12/18/2020 | [redacted] | 1 | 1 to 17 | N/A | Other - T tle 2 Return | T 2 return fl ght tentative for 01 1 21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | GHANA | 12/9/2020 | [redacted] | 1 | 1 to 17 | In Proceedings | [8G] Expedited Removal - Credib e Fear Referral | The minor/fam ly unit c aimed fear returning to their country of cit zenship on 12/05/20. The fam ly unit was scheduled for their asylum interview on 12/17/20. The minor/fam ly was issued a negative decision by an APSO on 12/22/20. The fam ly unit requested an IJ rev ew of the nega ive determination. The IJ hearing was scheduled or 12/31 20. The IJ vaca ed the dec s on set by the APSO on 12/31/2020. USCIS ssued the NTA on 01/05/2021. The fam ly unit was released on 01/09/21 after the sponsor prov ded the travel arrangements. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | GUATEMALA | 12/3/2020 | [redacted] | 1 | 1 to 17 | 12/31/2020 | [8G] Expedited Removal - Credib e Fear Referral | Th s minor may be el gible for indiv dual elease f the parent des gnates a caregiver to whom the minor can be released. As of today, a parent has not des gnated a caregiver or requested that the minor be released separately from her or him. ICE will de ermine the minor's e igibi ity for release with the consent of a parent or guard an in accordance w th the process finalized and approved by the court as contemplated in the 09/18 20 order. The minor/fam ly unit claimed fear returning o their country of c tizenship on 12/01/20. The family un t was schedu ed for their asylum interview on 12/15/20. The minor/fam ly was issued a nega ive decision by an APSO on 12/15/20 and did not request a review from the IJ. On 12 21/20 the fam ly unit changed their mind and requested an IJ review of the negative determinat on. The IJ hearing was scheduled for 12/31/20. The IJ a firmed the nega ive decision on 12/31/20. The fam ly unit s at orney submit ed a request for RFR on 01 06/21. The decision is pending. The minor/fam ly is scheduled for a F G with USCIS on 01 11 21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/18/2020 | [redacted] | 1 | 1 to 17 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly i lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 28 20. An APSO ssued a NTA on 12 28/20. The case o ficer eceived the NTA on 01 03/21. The amily un t is pending release after the sponsor provides the travel arrangemen s. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/18/2020 | [redacted] | 1 | 1 to 17 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly i lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 28 20. An APSO ssued a NTA on 12 28/20. The case o ficer eceived the NTA on 01 03/21. The amily un t is pending release after the sponsor provides the travel arrangemen s. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | HONDURAS | 11/11/2020 | [redacted] | 15 | 1 to 17 | 2/25 2020 | [8C] Excludab e / Inadmissib e - Admin strative Final Order Issued | The minor/fam ly unit in tially l egally entered on 10/03/2018. The fam ly unit was issued a NTA and released. On 02/25/2019 the fam ly unit was ordered removed in absentia by an IJ. The fam ly unit was apprehended in Beaumont, TX on 11/10/2020. The minor is subject to a final order of removal and there are no impediments to emoval at th s ime. Minor is in the process of being scheduled for removal, which includes working with the consulate to secure t avel documents and being tested or COVID 19 as is required by country of o igin. The next p ojec ed date of removal s 01 13/21. |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | ROMANIA | 12/19/2020 | [redacted] | 15 | 1 to 17 | In Proceedings | [8K] Expedi ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly i lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 01 0 21. An APSO rendered a pos tive decision on 01 06 21. The case of icer received the NTA on 01 06 21. The amily unit was released on 01 09/21 af er the sponsor prov ded the travel arrangements |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ▉ ▉ ▉ ▉ | ▉ | 8/11/2019 | 15 | 1 to 17 | 10/3 2019 | [8G] Expedited Removal – Credit e Fear Referral | The minor/fam ly received a negative credible fear de ermination by an APSO on 09/23.19. On 10.03.19, the U aR met the decision set by the APSO. The minor had a final order of emoval but cou d not be removed because the fam ly unit was subject to multiple admin st ative s ays of emoval ssued in M M V v Barr, D.A.M v Ba r, and M.M.M V Wh f. The fam ly unit a attorney f led for a RFR on 10/07/19. The RFR was den ed on 10/17/19. A 2nd RFR was f led by the amily un l's a torney on 09/25/20. The RFR was den ed on 10/22 20. Addit onally, the admin strative stays have been dissolved. The minor is subject o a final order of removal and there are no impediments to removal at this time. Minor is in the process of being scheduled or removal, which includes working with the consulate to secure t avel documents and being tested or COVID-19 as is required by country of origin. The pro ected removal date is 1/13/21. |
| ▉ ▉ ▉ ▉ | ▉ | 12/18/2020 | 16 | 1 to 17 | N/A | Other – T tle  2 Return | T 2 return 6 pht tentative for 01 1 21 |
| ▉ ▉ ▉ ▉ | ▉ | 12/9/2020 | 16 | 1 to 17 | In Proceedings | [8G] Expedited Removal – Credit e Fear Referral | The minor/fam ly unit s aimed fear returning to their country of cit zenship on 12/05/20. The fam ly unit was scheduled for their asylum interview on 12/17/20. The minor/fam ly was issued a negative decision by an APSO on 12/22/20. The fam ly unit requested an Li rev ew of the nega ive determination. The LI hearing was scheduled on 12/31.20. The LI vaca ed the dec s on set by the APSO on 12/31/2020. USCIS issued the NTA on 01/05/2021. The fam ly unit was released on 01/09/21 after the sponsor prov ded the travel arrangements. |
| ▉ ▉ ▉ ▉ ▉ | ▉ | 12/18/2020 | 17 | 1 to 17 | In Proceedings | [8K] Exped ed Removal Termina ed due to Credible Fear Finding / NTA Issued | The minor/fam ly unit b /lega ly ente ed on 12/15/2020 and claimed fear of returning to their home country. The amily un t was scheduled for an asylum interv ew on 12 28 20. An APSO ssued a NTA on 12 28/20. The case o ficer eceived the NTA on 01.03/21. The amily un t is pending release after the sponsor provides the travel arrangement s |

Exhibit H

# JANUARY 15, 2021
# CBP JUVENILE
# COORDINATOR REPORT



1300 Pennsylvania Avenue NW
Washington, DC 20229

**U.S. Customs and Border Protection**

January 15, 2021

MEMORANDUM FOR:    The Honorable Judge Gee
District Judge
U.S. District Court, Central District of California

FROM:    Henry A. Moak, Jr.
Chief Accountability Officer
U.S. Customs and Border Protection

*1/15/2021*

X ~~signature~~

Signed by: HENRY A MOAK JR

SUBJECT:    CBP Juvenile Coordinator Interim Report

On December 4, 2020, this Court ordered the U.S. Customs and Border Protection (CBP) Juvenile Coordinator to file an interim report "providing a census of Class Members in CBP custody, describing COVID-19 guidances, and specifically addressing whether the conditions at the Weslaco Border Patrol Station [(WSL)] are safe and sanitary under [Flores Settlement Agreement (FSA)] Paragraph 12." The CBP Juvenile Coordinator submits the following report in response to this Court's December 4, 2020 Order. This report does not reflect all FSA monitoring activities conducted since filing the 2020 CBP Juvenile Coordinator report. A comprehensive account of FSA monitoring across the Southwest Border will be included in the annual CBP Juvenile Coordinator report to be filed on July 1, 2021. Based on my review of COVID-19 guidance issued and my team's observations of its implementation, I believe WSL was substantially compliant with the FSA, specifically the safe and sanitary conditions under FSA Paragraph 12.

<u>Background</u>

CBP continues to assist the Centers for Disease Control and Prevention (CDC) in enforcing its *Order Suspending Introduction Of Persons From A Country Where A Communicable Disease Exists* (March 20, 2020) as amended and extended.[1] On November 18, 2020, the U.S. District Court for the District of Columbia issued a preliminary injunction prohibiting the U.S. Department of Homeland Security (DHS) from expelling any minor in the U.S. pursuant to the CDC Order who would otherwise be an unaccompanied alien child (UAC) under Title 8.[2] As of the filing date of this report, the government may still expel single adults and family units in the United States traveling from Canada or Mexico (regardless of their country of origin) who would

---

[1] *See,* 85 Fed. Reg. 16567 (Mar. 24, 2020).
[2] *See, P.J.E.S. v. Wolf, et al., No. 1:20-cv-02245* (D.D.C. Nov. 18, 2020). *See also,* 6 U.S.C. § 297(g)(2) (defining unaccompanied alien child as a child who: (a) has no legal status in the U.S.; (b) has not attained 18 years of age; and (c) does not have a parent or legal guardian in the U.S. or whose parent or legal guardian is not able to provide care and physical custody).

CBP Juvenile Coordinator Interim Report
Page 2

otherwise be held in ports of entry or U.S. Border Patrol (USBP) stations for immigration processing.

Since filing my 2020 annual report, the USBP Rio Grande Valley (RGV) Sector has adapted to new operational tempos related to reduced numbers of individuals in custody and long-scheduled renovations of certain facilities. RGV Sector completed demobilizing the soft-sided facility in Donna, Texas in May 2020, and in September 2020, suspended operations at the Central Processing Center-Ursula (CPC-Ursula) in McAllen, Texas in order to complete renovations at the latter facility. As a result, WSL is currently operating as the primary processing hub for both UACs and family units apprehended in RGV Sector.

On November 18, 2020, Plaintiffs interviewed three class members in WSL and submitted declarations that included statements alleging lack of social distancing, crowded hold rooms, cold temperatures, no soap or hand sanitizer available for handwashing, limited or no facemasks provided to individuals in custody, and personnel not wearing facemasks inside the holding area. In response, I directed the Juvenile Coordinator's Office (JCO) to conduct inspections in the RGV Sector, and advise me of their findings. The results of the JCO inspection specifically related to WSL and the station's implementation of COVID-19 guidance are included in this report.

<u>Census of Class Members in Custody</u>

From October 1, 2020 through December 31, 2020, USBP reported 207,968 encounters along the Southwest land border, which is considerably higher than the encounters reported in Fiscal Year (FY) 2020 for the same period.[3] However, in FY2021 to date, the overwhelming majority of these encounters were with single adults.[4] USBP encounters with UACs and family units accounted for only 13% of all December 2020 enforcement encounters.[5] By comparison, in May 2019, the height of the 2019 surge, UAC and family units accounted for 72% of USBP Southwest land border enforcement encounters.[6] In RGV Sector specifically, there were 5,184 UAC enforcement encounters and 4,275 family unit enforcement encounters from October 1 to December 31, 2020.[7] These encounters represent a 55% increase in UAC enforcement encounters and a 35% decrease in family unit enforcement encounters compared to the same period in FY2020.[8]

---

[3] *See, Southwest Land Border Encounters,* U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters, (last visited January 14, 2021).
[4] *Id.*
[5] *Id.*
[6] *Id. See also, Stats and Summaries,* U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/media-resources/stats, (last visited January 15, 2021).
[7] *See, U.S. Border Patrol Southwest Border Apprehensions by Sector,* U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters/usbp-sw-border-apprehensions, (last visited January 14, 2021).
[8] *Id.*

CBP Juvenile Coordinator Interim Report
Page 3

For all USBP facilities along the Southwest Border, maximum facility capacity is approximately 11,200.[9] Maximum facility capacity assumes a homogenous population and full operating status at all facilities.[10] The actual holding capacity along the Southwest Border, and more specifically by facility, is constantly changing based on the characteristics of the in-custody population.[11] For example, a facility's actual holding capacity may change based on the demographics and genders of individuals in custody to ensure the safety of all individuals in custody.[12] In December 2020, there was an average daily population of 634 individuals in USBP custody along the Southwest Border.[13] The average daily population of individuals in RGV Sector was 120 in December 2020.[14]

To address COVID-19 concerns, to the maximum extent operationally feasible, CBP has a current targeted holding capacity of 25% of a facility's normal operational capacity. This target was developed for CBP planning purposes, taking into account COVID-19 considerations and precautions to minimize exposure risk as well as account for additional space requirements for social distancing and isolation/quarantine requirements. In facilities where class members are held, it is not always operationally feasible to stay below the 25% target, and there have been instances where class members were held in facilities with an in-custody population above this target. In these circumstances, CBP still makes every effort to minimize the risk of exposure, including wearing appropriate Personal Protective Equipment (PPE), distributing surgical facemasks to individuals in custody, and following CDC social distancing recommendations.

COVID-19 Guidance

CBP is committed to protecting the health of individuals in its custody and its workforce. As the pandemic unfolds, CBP continues to monitor on-the-ground conditions and respond accordingly to balance mission requirements and health considerations. CBP has coordinated closely and regularly with the CDC regarding COVID-19 guidance since the onset of the pandemic and continues to update, refine, and enhance guidance as appropriate. As with any dynamic operating environment, flexibility is crucial. CBP has issued agency-wide COVID-19 guidance, which establishes general guidelines. Sector and station leadership implement these guidelines consistent with their unique situational demands.

The CBP COVID Toolkit, developed by the CBP Chief Medical Officer and CBP Office of Human Resource Management/Occupational Safety and Health Division (OSH), in consultation with DHS Headquarters and the CDC, contains extensive guidance regarding COVID-19 practices, including COVID exposure risk assessment (contact tracing), isolation/quarantine guidance, and return-to-work guidance. The CBP Chief Medical Officer also engages regularly and directly with operational and medical leadership along the border regarding optimization of COVID-19 practices.

---

[9] *See, Custody and Transfer Statistics FY2021,* U.S. Department of Homeland Security, Customs and Border Protection, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, (last visited January 14, 2021).
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*

CBP Juvenile Coordinator Interim Report
Page 4

The CBP Job Hazard Analysis (JHA) is included in the CBP COVID Toolkit. The JHA was developed under the direction of the CBP Chief Medical Officer and OSH, and focuses on CBP-wide job-task specific COVID exposure risk and PPE guidance. The JHA outlines the recommended or required PPE all CBP personnel must wear during specific job-tasks. Depending on the situation, PPE required or recommended by the JHA may include any combination of the following items: nitrile gloves, N-95 respirator, protective outer garments, gowns, shoe coverings, face shields, or non-vented goggles. Per the JHA, USBP agents must wear an N-95 respirator when they are within six feet of anyone, gloves when touching potentially contaminated surfaces, and goggles or a face shield during any increased risk situations. In addition, agents must wear a face covering or surgical facemask if further than six feet but still in contact with individuals in custody or personnel.

In addition to the CBP-wide guidance, USBP issued field guidance reiterating the JHA requirements related to PPE and requiring agents to distribute PPE to individuals in custody as appropriate. Furthermore, the guidance requires agents to use only designated transport units equipped with appropriate PPE and sanitized per sector protocol. Additionally, USBP issued two COVID-19 checklists to facilitate contract tracing after a known exposure. Both have specific steps for supervisors and employees, depending on their responsibilities, to notify any individuals in custody of their potential exposure. Moreover, the medical checks conducted by contracted medical professionals or local health facilities for all juveniles entering USBP custody, described in my last report, now include targeted COVID-19 questions in addition to the standard medical questions. All juveniles receive an initial medical check, which includes a temperature check and COVID-19 questions as well as standard medical questions. Any juveniles needing further diagnosis and treatment are referred to the local health system as needed.

Specific to RGV Sector, Sector leadership issued the "Revised Rio Grande Valley Sector Guidelines for COVID-19 Spread Mitigation in the Workplace" memorandum on September 9, 2020 to re-emphasize existing CBP guidance and update Sector-specific requirements. This memorandum specifically requires agents to wear an N-95 respirator when processing, transporting, arresting, or performing any other duty that may require an agent to be in close and/or prolonged proximity to individuals in custody. It also requires that any individual in custody with known or potential COVID-19 receive a surgical facemask. While this memorandum specifically requires surgical facemasks for individuals in custody who are known or suspected of being positive for COVID-19, the current practice is to assume that any person in custody has potential COVID-19 exposure or infection and provide surgical facemasks. At WSL, JCO observed that surgical facemasks were provided to all individuals entering the facility. The juveniles my team interviewed confirmed that agents provided facemasks following apprehension in the field and that they had received new facemasks throughout their time in custody.

Weslaco Station (WSL)

On December 1, 2020 at 9:00 AM, JCO conducted an announced inspection at WSL. At the time of the inspection, there were 51 juveniles onsite, 49 UACs and two accompanied alien

CBP Juvenile Coordinator Interim Report
Page 5

children (AAC). WSL was operating below its targeted COVID-19 holding capacity of 25% of the station's total capacity.

Juveniles were in 11 hold rooms, and JCO inspected each one. All hold rooms had functioning toilets with toilet paper and functioning sinks with soap. One hold room had a malfunctioning sink; however, there were two other functioning sinks available in that hold room, and a work order had been submitted for the malfunctioning sink. The hold rooms and processing area were clean, and no sanitary issues were observed. Each hold room had a five-gallon water jug and cups available for drinking. All hold rooms measured within the temperature range of 66 to 80 degrees Fahrenheit. JCO observed a separate designated caregiver area, where the younger juveniles could play. Contracted caregivers were onsite, and JCO confirmed they worked seven days a week.

JCO observed the food and supplies available for agents to provide to juveniles. An agent explained that a food services contractor prepared and distributed meals three times a day. Baby formula, cookies, crackers, Pedialyte, milk, and juice were available and within the expiration date. Diapers, baby wipes, body soap, toothbrushes and toothpaste, shampoo, deodorant, and feminine hygiene products were also available. JCO observed various types of clothing available in multiple sizes for juveniles and adults.

JCO pulled a sample of six juveniles currently onsite and reviewed their custody logs. All six custody logs recorded receipt of a new surgical facemask mask. All six juveniles' custody logs recorded showers, clean clothes, and dental hygiene products provided. While five of the custody logs recorded welfare checks at regular intervals, showing adequate supervision to protect the juvenile from others, one had a four-hour gap around dinnertime. Although there was a gap in recordation, JCO observed agents moving through the processing area and caregivers onsite engaging with juveniles to provide consistent supervision. Three of the custody logs did not record that a mat and Mylar blanket had been provided, although JCO observed that all juveniles had both. While no juveniles were receiving medical care while JCO was onsite, all had the required medical checks recorded in their custody logs.

Throughout the inspection, my team paid special attention to how WSL implemented COVID-19 guidance and the measures taken to prevent the spread of COVID-19. JCO observed juveniles arriving to the station through the sally port. As the juveniles exited the vehicle, JCO observed that they were wearing surgical masks. In the sally port, medical contractors stood by to conduct medical checks and provide a new surgical facemask. Medical contractors asked specific questions from a COVID-19 questionnaire and completed the standard medical check, which included taking the juvenile's temperature. Medical contractors informed JCO that juveniles with possible COVID-19 symptoms remained in the sally port until being transported to a local hospital for further evaluation. If the hospital determined the juvenile was positive for COVID-19 or another contagious disease, the juvenile was taken to a different station for isolation. At the time of this inspection, Brownsville Station was designated as the medical isolation station. If the juveniles did not have possible COVID-19 symptoms, they received a more detailed medical check before entering the facility.

CBP Juvenile Coordinator Interim Report
Page 6

The Acting Watch Commander ((A) WC) informed JCO that agents provided surgical facemasks to juveniles upon apprehension and these surgical facemasks were routinely replaced throughout juveniles' time in custody. When briefing the WSL Acting Patrol Agent in Charge ((A) PAIC) after leaving RGV Sector, the (A) PAIC informed JCO that agents typically provided extra facemasks to families with young children each time facemasks were replaced because agents recognized younger children were more likely to drop the facemask or get it dirty before it was replaced next. Moreover, JCO observed caregivers handing out surgical facemasks at the time that juveniles received a shower, which reflected new COVID-19 protocols. The (A) WC informed JCO that on November 25, 2020, RGV Sector instructed WSL to have only six individuals shower at a single time to decrease the number of individuals queueing for a shower. JCO observed this practice at the time of the inspection. Moreover, JCO observed soap dispensers filled with soap in all hold rooms at WSL. JCO later learned that by the end of December, RGV Sector had installed soap dispensers in all hold rooms Sector-wide. JCO observed that surgical facemasks and gloves were stored on the exterior side of all hold room doors. My team observed agents wearing N-95s respirators at all times in the processing area and when interacting with individuals in custody.

JCO leveraged video conferencing technology to interview juveniles while onsite. The same team members who interviewed all juveniles during the 2020 reporting period continued the same general process of interviewing juveniles who volunteered to speak about their time in CBP custody. One team member onsite facilitated the interview process and solicited volunteers. The second team member, fluent in Spanish, used a video conferencing platform to interview juveniles and translate for the onsite team member. JCO conducted the interviews with the juveniles in a room separate from any agents or other individuals in custody. Both juveniles and the onsite team member wore facemasks and maintained, as best as possible, social distancing throughout the interview.

First, JCO interviewed C.T.S., a 15-year-old UAC female from Guatemala. At the time of the interview, C.T.S. had been in CBP custody for approximately 12 hours. C.T.S. explained that apprehending agents treated her with respect and provided a facemask for her to wear before she was transported to a station. At the first station she arrived at, C.T.S. explained that medical professionals took her temperature in the sally port and gave her a new facemask to wear. After, C.T.S. explained that she was brought inside the station for a medical check and processing. Custodial records noted that a medical check was completed when C.T.S. arrived at Rio Grande City Station. After the medical check, C.T.S. informed JCO she received a blue wristband, which the onsite interviewer observed on her wrist. After initial processing and fingerprinting was complete, C.T.S. told JCO she was placed in a hold room where there were approximately 25 individuals, including adult females with children. C.T.S. informed JCO that all individuals in the hold room were wearing facemasks and that there was space between them. Inside the hold room, C.T.S. confirmed there was a functioning toilet with toilet paper and a functioning sink with soap. She also confirmed that there was a five-gallon water jug with cups. C.T.S. stated the hold room temperature fluctuated, indicating sometimes it felt hot and sometimes it felt cold. C.T.S. estimated she was in this hold room for a half hour before she was transferred to WSL.

CBP Juvenile Coordinator Interim Report
Page 7

When she arrived at WSL, C.T.S. explained medical professionals also took her temperature in the sally port and gave her a new facemask. C.T.S. then explained the medical professionals conducted another medical check inside the station and gave her another blue wristband after it was complete. The JCO interviewer onsite observed C.T.S. was wearing two blue wristbands at the time of the interview. Next, C.T.S. explained that she received water, an apple, juice, and crackers. C.T.S. also stated she received a Mylar blanket and mat when she was placed in the WSL hold room with approximately 8 or 9 female juveniles who were all wearing facemasks. C.T.S. confirmed that this hold room also had a functioning toilet with toilet paper, a functioning sink with soap, and a five-gallon water jug with paper cups. Like at the first station, C.T.S. explained that the temperature in the WSL hold room also fluctuated between "hot" and "cold," but that she was still able to sleep. C.T.S. told JCO that the lights were not dimmed overnight. C.T.S. explained that the next morning, the day of the interview, she and the female juveniles in her hold room all woke up by themselves without anyone waking them up.

Next, she explained that she received breakfast, which included a warm egg and bean burrito, an apple, crackers, milk, and bottled water. C.T.S. told JCO that she ate breakfast, and it did not hurt her stomach. Custodial records noted that she was provided a hot breakfast and a new mask. After breakfast, C.T.S. stated she showered and brushed her teeth. She explained that caregivers facilitated the shower process and gave clear instructions about the hygiene items available and where to put her dirty clothes so that they could be washed and returned to her. At the time of the interview, C.T.S. was wearing a T-shirt and sweatpants she received before her shower and her own jacket over top of the T-shirt. C.T.S. told JCO the shower trailer was warm and that she was not rushed during the shower process. C.T.S. also told JCO that she received a new facemask before she took her shower. After showering, C.T.S. stated she returned to the hold room. Custodial records noted that she was provided with a shower, bodily cleansing product, dental hygiene product, feminine hygiene product, and clean clothing. She stated she moved to a different hold room before the interview because the one she was in was being cleaned. When she moved to the new hold room, C.T.S. stated she received a new Mylar blanket and mat. C.T.S. told JCO she and the other female juveniles in her hold room had been watching cartoons. She also told JCO she had not been hungry and that she had been treated with respect throughout her time in CBP custody. Before ending the interview, JCO reminded C.T.S. that medical professionals were available onsite if needed, and that she could ask for food, snacks, and hygiene items. Custodial records noted that she was shown the UAC video. Custodial records also noted that she received a hot lunch and that, later that afternoon, she was transported to a U.S. Health and Human Services, Office of Refugee and Resettlement (HHS/ORR) facility.

Next, JCO interviewed E.R.A., a 17-year-old UAC male from Guatemala. At the time of the interview, E.R.A. had also been in CBP custody for approximately 12 hours. E.R.A. told JCO that the apprehending agent was respectful, offered him water to drink, and gave him a facemask to wear. Like C.T.S., E.R.A. explained he was then transported to a station where medical professionals took his temperature in the sally port before he entered the station for a medical check. During the medical check, the medical professional asked E.R.A. if he was hungry and gave him water and crackers. After the medical check, E.R.A. received a blue wristband, which the onsite JCO interviewer observed him wearing. This medical check was not recorded in his custody log. E.R.A. explained that he then completed initial processing, which included fingerprinting, before he was placed in a hold room with one other male juvenile, who was also

CBP Juvenile Coordinator Interim Report
Page 8

wearing a facemask. E.R.A. confirmed there was a functioning toilet, a functioning sink with
soap, and a five-gallon water jug with cups. E.R.A. explained he was in the hold room very
briefly before being transferred to WSL.

Upon arriving at WSL, E.R.A. explained that medical professionals took his temperature in the
sally port and he received a new facemask. Then, medical professionals completed a medical
check inside the station. After this medical check, E.R.A. also received a blue wristband. The
onsite JCO interviewer observed he was wearing both wristbands at the time of the interview.
This medical check was recorded in E.R.A.'s custody log. After the medical check, E.R.A.
stated he was assigned a hold room, and received a mat and Mylar blanket. E.R.A. also told JCO
he was given an apple, crackers, milk, and water. Custodial records noted that he was provided
with snacks, bodily cleansing product, dental hygiene product, a mat, and a Mylar blanket.
E.R.A. stated that he shared the hold room with the same juvenile that was in his hold room at
the first station. He confirmed this hold room also had a functioning toilet with toilet paper, a
functioning sink with soap, and a five-gallon water jug with cups. E.R.A. said the hold room
was cold, but "not too bad." E.R.A. told JCO he had been able to sleep, but not well because he
was nervous about being in custody. When JCO asked whether there was anything specifically
making him nervous, he explained it was the new environment and the fact that he had never
been in CBP custody before. E.R.A. stated the lights were on overnight. E.R.A. explained that,
the next day, someone opened the hold room door and said, "Wake up," before handing out
breakfast, which included a warm burrito, apple, cookies, milk, juice, and bottled water.
Custodial records noted that he was provided a hot breakfast and a new mask. After breakfast,
E.R.A. told JCO he took a nap on his mat before he showered and brushed his teeth. E.R.A.
explained there were two male caregivers giving instructions in Spanish about the shower
process, including instructions about clean towels, clean clothes, and soap. E.R.A. stated he
received clean clothes to wear while his clothes were laundered. At the time of the interview,
E.R.A. was wearing the clothes provided by the station and his own jacket. Custodial records
noted that he was provided with a shower, bodily cleansing product, dental hygiene product, and
clean clothing. Prior to the interview, E.R.A. also told JCO he received lunch, which included a
warm burrito, two single-serving boxes of cereal, an apple, juice, and bottled water. Custodial
records noted that he received a hot lunch. E.R.A. stated he received a new facemask before the
interview. He informed JCO it was the third facemask he received while in CBP custody.
Before ending the interview JCO reminded E.R.A. that medical professionals were available
onsite if needed, and that he could ask for food, snacks, and hygiene items. Custodial records
noted that he was shown the UAC video. Custodial records also noted that, later that afternoon,
he was transported to a HHS/ORR facility.

Based on JCO's inspection, I believe WSL was substantially compliant with the FSA, and more
specifically, conditions were safe and sanitary as articulated under Paragraph 12A of the FSA.
WSL was operating below the targeted 25% COVID-19 capacity during the inspection.
Furthermore, JCO discussed with the (A) WC the safety measures implemented in response to
COVID-19. JCO's observations and interviews with juveniles demonstrated WSL followed
these enhanced safety measures, including agents wearing N-95 respirators in the processing
areas and while interacting with individuals in custody, temperature screenings conducted in the
sally port, routine distribution of surgical facemasks for individuals in custody, and soap for
handwashing available in all hold rooms.

CBP Juvenile Coordinator Interim Report
Page 9

The current operating environment, amidst the COVID-19 pandemic, places increased demands on CBP and adds additional variables to its comprehensive border security mission. USBP must accept and maintain custody of individuals until they can be transferred to another agency regardless of facility capacity. CBP generally relies on its inter-agency partners to transfer juveniles out of its custody. This coordination and expeditious transfer of juveniles out of CBP custody is even more critical during this period of reduced capacity to facilitate social distancing and prevent the spread of COVID-19. CBP recognizes this unique challenge as well as its responsibilities under the FSA to ensure safe and sanitary conditions for all juveniles in its custody. The Agency will continue to monitor on-the-ground conditions and adjust accordingly to minimize risk of COVID-19 exposure and protect the health of all individuals in custody.

Exhibit I

https://www.ice.gov/coronavirus   Go   DEC  JAN  FEB
1,682 captures                           ◀ 12 ▶
27 Mar 2020 - 4 Feb 2021                 2020 2021 2022


🇺🇸 Official Website of the Department of Homeland Security

 **ICE**

Report Crimes: Email or Call 1-866-DHS-2-ICE

NOTICE

Click here for the latest ICE guidance on COVID-19

# ICE Guidance on COVID-19

| Overview & FAQs | ICE Detainee Statistics | Judicial Releases | Previous Statements |

**Page information is recorded from a live database; data may change as the agency receives updated case information.**

| DETAINED POPULATION [1] | COVID-19 POSITIVE CASES CURRENTLY IN CUSTODY [2] | DETAINEES TESTED |
|---|---|---|
| AS OF 01/08/2021 | UNDER ISOLATION OR MONITORING AS OF 01/10/2021 | AS OF 01/08/2021 |
| 15,415 | 523 | 82,585 |

## COVID-19 ICE Detainee Statistics by Facility

### AS OF 01/10/2021

| Custody/AOR/Facility | Confirmed cases currently under isolation or monitoring | Detainee deaths [3] | Total confirmed COVID-19 cases [4] |
|---|---|---|---|
| **Atlanta Field Office** | | | |
| Charleston County Detention Center | 0 | 0 | 2 |
| Columbia Regional Care Center | 0 | 0 | 1 |
| Folkston ICE Processing Center (D. Ray James) | 7 | 0 | 91 |
| Irwin County Detention Center | 13 | 0 | 61 |
| Robert A. Deyton Detention Center | 1 | 0 | 5 |
| Sheriff Al Cannon Detention Center | 0 | 0 | 1 |
| Stewart Detention Center | 42 | 3 | 446 |
| **Baltimore Field Office** | | | |
| Howard County Detention Center | 1 | 0 | 2 |
| Worcester County Jail | 0 | 0 | 1 |
| **Boston Field Office** | | | |
| Bristol County Detention Center | 0 | 0 | 1 |
| Cumberland County Jail | 0 | 0 | 1 |
| Franklin County House of Corrections | 1 | 0 | 9 |



https://www.ice.gov/coronavirus   Go   DEC **JAN** FEB

1,682 captures
27 Mar 2020 - 4 Feb 2021

◀ **12** ▶
2020 **2021** 2022

About this capture

| | | | |
|---|---|---|---|
| Plymouth County Correctional Facility | 2 | 0 | 2 |
| Strafford County Corrections | 6 | 0 | 16 |
| Wyatt Detention Center | 1 | 0 | 5 |
| **Buffalo Field Office** | | | |
| Buffalo (Batavia) Service Processing Center | 2 | 0 | 52 |
| **Chicago Field Office** | | | |
| Chase County Detention Facility | 0 | 0 | 82 |
| Clay County Justice Center | 1 | 0 | 18 |
| Dodge County Jail | 0 | 0 | 4 |
| Kankakee County Detention Center | 2 | 0 | 2 |
| Lincoln County Detention Center | 0 | 0 | 1 |
| McHenry County Adult Correctional Facility | 0 | 0 | 6 |
| Montgomery County Jail | 0 | 0 | 1 |
| Morgan County Detention Center | 0 | 0 | 1 |
| Pulaski County Detention Center | 2 | 0 | 110 |
| **Dallas Field Office** | | | |
| Bluebonnet Detention Facility | 1 | 0 | 391 |
| Eden Detention Center | 0 | 0 | 62 |
| Johnson County Law Enforcement Center | 0 | 0 | 4 |
| Kay County Detention Center | 0 | 0 | 1 |
| Moore Detention Center | 0 | 0 | 35 |
| Prairieland Detention Facility | 2 | 0 | 133 |
| Rolling Plains Detention Center | 0 | 0 | 59 |
| **Denver Field Office** | | | |
| Aurora Contract Detention Facility | 38 | 0 | 167 |
| **Detroit Field Office** | | | |
| Butler County Jail | 1 | 0 | 1 |
| Calhoun County Correctional Center | 4 | 0 | 55 |
| Geauga County Jail | 0 | 0 | 1 |
| Monroe County Jail | 0 | 0 | 1 |
| Morrow County Correctional Facility | 0 | 0 | 51 |
| Saint Clair County Jail | 3 | 0 | 15 |
| **El Paso Field Office** | | | |
| Cibola County Correctional Center | 0 | 0 | 1 |
| El Paso Service Processing Center | 9 | 0 | 323 |
| Otero County Processing Center | 0 | 0 | 185 |
| Torrance County Detention Center | 0 | 0 | 55 |
| **Houston Field Office** | | | |

| https://www.ice.gov/coronavirus | Go |
|---|---|

1,682 captures
27 Mar 2020 - 4 Feb 2021

| | | | |
|---|---|---|---|
| Coastal Bend Detention Center | 0 | 0 | 12 |
| Houston Contract Detention Facility | 0 | 0 | 159 |
| IAH Polk Adult Detention Center | 0 | 0 | 31 |
| Joe Corley Detention Center | 0 | 1 | 51 |
| Montgomery Processing Center (Houston) | 12 | 0 | 245 |
| **Los Angeles Field Office** | | | |
| Adelanto ICE Processing Center | 4 | 0 | 270 |
| **Miami Field Office** | | | |
| Baker County Detention Center | 1 | 0 | 13 |
| Broward Transitional Center | 58 | 0 | 218 |
| Glades County Detention Center | 3 | 1 | 182 |
| Krome North Service Processing Center | 4 | 0 | 221 |
| Larkin Behavioral Health Center | 0 | 0 | 2 |
| San Juan Staging Facility | 0 | 0 | 1 |
| Wakulla County Jail | 1 | 0 | 42 |
| **Newark Field Office** | | | |
| Elizabeth Detention Center | 1 | 0 | 38 |
| Essex County Jail | 9 | 0 | 23 |
| **New Orleans Field Office** | | | |
| Adams County Correctional Center | 3 | 0 | 109 |
| Alexandria Staging Facility | 16 | 0 | 220 |
| Allen Parish Detention Center | 0 | 0 | 12 |
| Catahoula Correctional Center | 0 | 0 | 119 |
| Etowah County Jail | 6 | 0 | 30 |
| Hancock County Jail | 0 | 0 | 1 |
| Jackson Parish Correctional | 1 | 0 | 114 |
| LaSalle ICE Processing Center - Jena | 0 | 0 | 83 |
| LaSalle ICE Processing Center - Olla | 1 | 0 | 25 |
| Pine Prairie ICE Processing Center | 8 | 0 | 73 |
| Richwood Correctional Center | 0 | 0 | 127 |
| River Correctional Center | 0 | 0 | 56 |
| South Louisiana Correctional Center | 4 | 0 | 29 |
| Winn Correctional Center | 10 | 1 | 284 |
| **New York City Field Office** | | | |
| Bergen County Jail | 0 | 0 | 7 |
| Hudson County Jail | 0 | 0 | 14 |
| Orange County Jail | 1 | 0 | 1 |
| **Philadelphia Field Office** | | | |
| Berks Family Residential Center | 0 | 0 | 1 |



| | | | |
|---|---|---|---|
| Cambria County Prison | 0 | 0 | 12 |
| Clinton County Correctional Facility | 6 | 0 | 62 |
| Pike County Correctional Facility | 3 | 0 | 36 |
| South Central Regional Jail | 1 | 0 | 1 |
| York County Prison | 108 | 0 | 235 |
| **Phoenix Field Office** | | | |
| CCA Florence Correctional Center | 12 | 0 | 103 |
| Eloy Federal Contract Facility | 4 | 0 | 280 |
| Florence Detention Center | 6 | 0 | 95 |
| La Palma Correctional Facility | 16 | 0 | 531 |
| **Salt Lake City Field Office** | | | |
| Cache County Jail | 0 | 0 | 15 |
| Henderson Detention Center | 2 | 0 | 28 |
| Nevada Southern Detention Center | 0 | 0 | 13 |
| Nye County Jail | 1 | 0 | 60 |
| Washington County Jail | 0 | 0 | 6 |
| **San Antonio Field Office** | | | |
| El Valle Detention Facility | 11 | 0 | 117 |
| Karnes County Family Residential Center | 5 | 0 | 95 |
| Laredo Processing Center | 0 | 0 | 7 |
| LaSalle County Regional Detention Center | 0 | 0 | 11 |
| Limestone County Detention Center | 3 | 0 | 92 |
| Port Isabel Detention Center | 10 | 0 | 242 |
| Rio Grande Detention Center | 14 | 0 | 183 |
| South Texas Family Residential Center (Dilley) | 2 | 0 | 27 |
| South Texas ICE Processing Center (Pearsall) | 4 | 0 | 284 |
| T. Don Hutto Residental Center | 1 | 0 | 3 |
| Webb County Detention Center (CCA) | 7 | 0 | 101 |
| **San Diego Field Office** | | | |
| Imperial Regional Detention Facility | 9 | 0 | 19 |
| Otay Mesa Detention Center (San Diego CDF) | 0 | 1 | 201 |
| San Luis Regional Detention Center | 0 | 0 | 21 |
| **San Francisco Field Office** | | | |
| Golden State Annex Facility | 2 | 0 | 5 |
| Mesa Verde ICE Processing Center | 0 | 0 | 59 |
| Yuba County Jail | 6 | 0 | 7 |
| **Seattle Field Office** | | | |



| | | | |
|---|---|---|---|
| Northwest ICE Processing Center (NWIPC) | 1 | 0 | 29 |
| **St. Paul Field Office** | | | |
| Douglas County Corrections | 0 | 0 | 1 |
| Freeborn County Adult Detention Center | 0 | 0 | 5 |
| Hardin County Jail | 0 | 0 | 7 |
| Kandiyoh County Jail | 1 | 0 | 41 |
| Linn County Jail | 0 | 0 | 2 |
| Nobles County Jail | 0 | 0 | 2 |
| Phelps County Jail | 0 | 0 | 2 |
| Polk County Jail | 0 | 0 | 15 |
| Sherburne County Jail | 0 | 0 | 2 |
| **Washington D.C. Field Office** | | | |
| Caroline Detention Facility | 9 | 0 | 65 |
| Immigration Centers of America - Farmville | 0 | 1 | 339 |
| TOTAL | 523 | 8 | 8,735 |

*Updated 01/11/2021 5:00pm*

[1] ICE's FY 2019 Average Daily Population was 50,165.

[2] "Currently under isolation or monitoring" includes detainees who tested positive for COVID-19 and are currently in ICE custody under isolation or monitoring. This number excludes detainees who previously tested positive for COVID-19 and were either returned to the general population after a discontinuation of medical monitoring/isolation or are no longer in ICE custody.

[3] "Detainee deaths" includes detainees who have died after testing positive for COVID-19 while in ICE custody; COVID-19 may not be the official cause of death.

[4] "Total confirmed COVID-19 cases" is the cumulative total of detainees who have tested positive for COVID-19 while in ICE custody since testing began in February 2020. Some detainees may no longer be in ICE custody or may have since tested negative for the virus.

↑ Return to top

Last Reviewed/Updated: 01/11/2021