**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al. | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of | ) No. 20-cv-00100-EGS |
| Homeland Security, in his official capacity, et al., | ) |
| | ) |
| *Defendants*. | ) |

**DECLARATION OF TAYLOR LEVY IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION**

I, Taylor Levy, hereby declare:

1. I am an attorney admitted to practice in Texas. I became licensed in 2019. I am in good standing with the State Bar of Texas (State Bar No. 24113588). I specialize in immigration law, and run a private law firm called Taylor Levy Law through which I provide primarily pro bono legal services to individuals along the U.S.-Mexico border.

2. Since 2009, I have worked as an attorney and advocate in various capacities for noncitizens at or near the border. Among other roles, I have worked as Legal Coordinator for Annunciation House in El Paso, Texas, where I coordinated volunteers who represent and advocate for immigrants in the El Paso area. Before I became licensed as an attorney, I worked for five years as a Department of Justice Accredited Representative representing individuals in immigration court in the El Paso, Texas area.

3. Beginning in March 2020 I began going to the Mexican side of the Paso del Norte Port of Entry in Ciudad Juarez, Mexico to provide free legal advice to migrants presenting for their (cancelled) Migrant Protection Protocols ("MPP") hearings. From March 2020 through August 2020, I went to the Paso del Norte Port of Entry almost every weekday from approximately 4 am to 10 am and provided free legal advice and free consultations. From March 2020 through November 2020, I also frequently visited migrant shelters to give free legal advice and consultations to families who had been expelled under Title 42. In addition to my work in Juarez, I serve as a free mentor to immigration attorneys from across the country. Since March 2020, I have consulted on numerous cases involving asylum-seeking families expelled across the southern border.

4. Since the Title 42 Process went into effect in March, I have worked with dozens of families subjected to expulsion under Title 42. Many of these families include very

young children, some of whom are infants or toddlers.  Most of the families I have worked with come from El Salvador, Guatemala, Honduras, and Venezuela.

5. Between March and August 2020, I personally observed hundreds of Title 42 expulsions, which included a number of families with parents and their children.  The children who I observed being expelled ranged from infants held in their mothers' arms who were too young to walk, to four-year-old toddlers, to teenagers.  Many of the children I saw being expelled were in wet and muddy clothes.  They told me that they were hungry and thirsty.

6. When I observed people who I thought had been expelled, I would approach them and try to explain that I was an immigration lawyer and there to help if they needed help. They were often too scared to speak with me, as they did not know who I was or if I was going to hurt them or trick them.  However, during this period I spoke with dozens of people who were expelled, including many families with minor children, both at the bridge and in migrant shelters.

7. The families I have worked with were frequently fleeing grave persecution and threats in their countries of origin.  I would ask families if they had asked US border agents for asylum prior to their expulsions.  Many said they had asked for asylum but that US immigration agents had told them that asylum had been cancelled and that it was impossible to ask for asylum.  Many would break down crying, sobbing, shaking, saying they had nowhere to go in Mexico, they did not know where they were, and that they could not return to their home countries.  They would often tell me that they had told immigration agents details about the violence and persecution they were fleeing in their home countries and were ignored. The most common refrain from people was, "what am I supposed to do, where am I supposed to go."

8. People were scared of being in Juarez because they did not know how to navigate the area or where they could go to stay safe, and they were scared they would be kidnapped. They were too scared and uninformed to know who was there to help them and who was there to hurt them, so there was no way for them to learn about the (few) resources that exist in Juarez for migrants, like migrant shelters.  Some expelled migrants told me that they attempted to turn themselves in to Mexican immigration officials, but the officials told the migrants that they could not help because of the pandemic.  Some even asked Mexican officials to deport them back to their home countries because they felt safer hiding there than trying to survive on the streets of Juarez, but that Mexican officials declined because there were no deportations happening due to the pandemic.

9. On one occasion I spoke with a family from Central America.  The family consisted of a mom and her school-aged son who were originally too scared to talk to me.  After they had been at the bridge for several hours, observing me speak with other migrants, they finally trusted me enough to talk to me.  They told me that they had been expelled after being apprehended at a Border Patrol checkpoint, trying to leave El Paso.  The mother was despondent and told me she told the agents she wanted to seek asylum.  She said they told her that no asylum was available.  She did not know what she was going to do and did not know where to go in Juarez and was scared they would be harmed in Juarez.  This

family was emblematic of many other families I observed and spoke with, who similarly were fleeing persecution and were told by U.S. officials that asylum was no longer available.

10. On another occasion I saw a mom with a little boy who was 4 or 5 years old. I saw them at 4 am, right when I got to the bridge. I knew she was a migrant because of the hour and because she had a small child with her. She was an asylum seeker from Honduras who was too traumatized to tell me why she was fleeing, she just kept saying "asylum, asylum," when I asked. The mom was very upset because when she was picked up, Border Patrol had taken her passport and her son's birth certificate. When she was expelled, Border Patrol had not returned these documents to her. Like other people who were expelled under Title 42, she had been taken to the middle of the bridge by Border Patrol and told to walk south. She told me that once she understood she was being expelled, she asked the officers repeatedly to return her documents to her. Now that she was in Juarez without these documents, she was terrified that someone would take her child from her since, without her son's birth certificate, she could not prove that her son was her son. I immediately took her back to the middle of the bridge and asked the officers for her documents. The officers I spoke with initially denied that Border Patrol agents had taken her documents, saying Border Patrol did not do that. I then called Border Patrol Station 1 and begged them to listen to me. After several phone calls and being bounced around to different officers, I was finally told that Border Patrol agents did have her documents and would return them. Approximately one hour later, a Border Patrol officer came to the middle of the bridge where we were waiting and returned her passport and her son's birth certificate to her. I feel confident that she would not have been able to recover her documents without my advocacy.

11. I have also consulted on numerous cases involving kidnapped Central American asylum-seeking families. In many of these cases, the families were kidnapped immediately upon being expelled from the United States. Because the families are not Mexican, and lack connections and resources in that country, they are frequently preyed upon and victimized by gang members, the cartels, or others seeking to take advantage of their vulnerable circumstances. The families are easily-recognizable in Mexico because of the locations where they are returned, their clothing, and their accents.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in Hallandale Beach, Florida.

Dated: February 5, 2021                              /s/ *Taylor Levy*
                                                     TAYLOR LEVY