UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NANCY GIMENA HUISHA-HUISHA, on
behalf of herself and others similarly situated,

Plaintiffs,

v.

ALEJANDRO MAYORKAS, Secretary of
Homeland Security, et al.,

Defendants.

Civ. A. No. 21-100 (EGS)

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS
CERTIFICATION AND FOR CLASSWIDE PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

I.     FACTUAL BACKGROUND ........................................................................................ 3

     A.    The COVID-19 Pandemic ................................................................................. 3

     B.    COVID-19 in Canada and Mexico ................................................................... 4

     C.    CBP's Operations at or Near the U.S.-Canada and U.S.-Mexico Borders ............ 4

II.    STATUTORY AND REGULATORY BACKGROUND .................................................. 5

     A.    The Public Health Service Act ......................................................................... 5

     B.    The Interim Final Rule ..................................................................................... 7

     C.    The CDC's Section 265 Order .......................................................................... 7

     D.    The Final Rule and October 2020 Section 265 Order ........................................ 9

     E.    General Immigration Processing of Aliens at the Border .................................. 10

III.   Plaintiffs and Their Request for Emergency Relief ......................................................... 11

ARGUMENT ........................................................................................................................ 12

I.     THE CLASS DEFINITION IS FATALLY INDEFINITE ............................................... 12

II.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ............................. 14

     A.    Section 265 Authorizes the CDC Director to Expel Aliens Like Plaintiffs Who Are Apprehended After Crossing Illegally Between the Ports of Entry ............................................................................................................. 15

          1.    The language of Section 265 plainly authorizes expulsion, and the HHS Secretary's interpretation is reasonable ................................................ 15

          2.    Plaintiffs' argument that Section 265 is limited to the regulation of transportation companies has no merit or historical basis ............................ 20

     B.    Section 265 Authorizes the HHS Secretary to Temporarily Suspend Immigration Laws That Might Otherwise Allow the Introduction of Persons into the United States ........................................................................ 24

          1.    Section 265 plainly takes precedence over the identified immigration provisions ................................................................................................ 24

2.   The CDC's interpretation of Section 265 as temporarily suspending the effect of immigration laws which may allow the introduction of covered aliens is reasonable ...........................................................................................................30

III.   THE REMAINING FACTORS WEIGH AGAINST A PRELIMINARY INJUNCTION.................................................................................................... 31

IV.   THIS COURT SHOULD STAY ANY PRELIMINARY INJUNCTION TO ALLOW DEFENDANTS TO CONSIDER THEIR APPELLATE OPTIONS .............................. 36

CONCLUSION.................................................................................................................. 37

**INTRODUCTION**

Facing an historic, unprecedented outbreak of the Coronavirus Disease 2019 ("COVID-19")—which has now claimed the lives of nearly 500,000 people in this country—the U.S. Centers for Disease Control & Prevention ("CDC") exercised its long-standing statutory authority and applied its scientific and technical expertise to protect the health and safety of the United States population, migrants in U.S. Customs and Border Protection ("CBP") facilities, and CBP personnel.  Although this public health strategy has proven effective in mitigating COVID-19 transmission risks at the U.S. border, Plaintiffs request the Court halt this statutorily authorized action taken to protect public health during one of the worst pandemics the country has ever faced.  Specifically, Plaintiffs are six families that unlawfully crossed the U.S.-Mexico border into the United States and who now bring a putative class action to challenge the use of that authority to temporarily prohibit the introduction of certain aliens traveling from Mexico and Canada into the United States.

To help avert the serious danger of COVID-19 further spreading into the United States, the CDC Director invoked his authority under Section 362 of the Public Health Service Act, 42 U.S.C. § 265 [hereinafter "Section 265"], to issue an Order temporarily prohibiting the introduction of certain aliens who are without valid travel documents into the United States from Canada and Mexico.  Based on his expert judgment, the CDC Director found that a suspension of the right to introduce such aliens is necessary because aliens covered by the Order are potential carriers of COVID-19 and are typically held for hours or days in congregate settings at border facilities for immigration processing.  The border facilities' holding areas were not designed, and are not equipped, to quarantine, isolate, or enable social distancing of detainees, and to use them for such purposes would present a significant risk of transmitting COVID-19 to CBP personnel, other detained aliens, and the American public.  Given such public health risks, the CDC Director determined that it is imperative to prohibit entry and expel covered aliens as quickly as possible.  Plaintiffs call this a "backdoor immigration policy" while ignoring the fact that countries across the world have implemented emergency measures to help curb the spread of COVID-19, including closing their borders and imposing severe travel restrictions.

The instant Motion for Classwide Preliminary Injunction (ECF No. 57) seeks to preliminarily enjoin this application of Section 265 to the putative class, arguing that (1) Section 265 does not authorize the expulsion of individuals after they have crossed the border into the United States; and (2) such expulsion would violate certain immigration laws.[1]  Plaintiffs are unlikely to succeed on these arguments.

*First*, Section 265 evinces Congress's intent to authorize the expulsion of aliens subject to a Section 265 order by the CDC Director when required in the interest of the public health.  The statute grants the Executive Branch "the power to prohibit, in whole or in part, the introduction of persons" into the United States during an outbreak of a communicable disease in order to avert the danger of the disease spreading into the United States.  42 U.S.C. § 265.  By granting that broad power, Congress necessarily gave the Executive Branch the authority to take actions needed to exercise that power.  That includes not only the power to prevent persons from entering the country who might further the spread of a communicable disease, but also the power to promptly expel persons who manage to cross surreptitiously over the U.S. border from a designated foreign country in violation of the Section 265 order and then are halted while in the process of moving into the interior of the United States.

*Second*, Section 265 makes clear that an order issued under the statute would suspend the effect of other laws that might otherwise permit introduction of persons into the country.  Section 265 provides for "a suspension of the right to introduce [] persons and property" from designated foreign countries or places "[as] required in the interest of the public health."  *Id*.  The term "suspend" means temporarily ceasing the effect of laws, a meaning that has been well understood since the Founding.  *See, e.g.*, U.S. Const. art. I, § 9, cl. 2 (the Suspension Clause).  The phrase "suspension of the right to introduce" thus naturally means the temporary cessation of the effect of any laws, including immigration laws, pursuant to which a person might otherwise claim a right to be introduced into the

---

[1]  Plaintiffs have asserted in their First Amended Complaint (ECF No. 22) six claims under the Administrative Procedure Act, five of which contend that the use of Title 42 of the U.S. Code to expel alien families is either *ultra vires* or contrary to other immigration statutes.  The sixth claim asserts that the CDC Director's Order was arbitrary and capricious, although Plaintiffs do not move for preliminary injunction based on that claim.

United States.  The legislative history similarly indicates a clear congressional intent to grant the Executive Branch the broad power to temporarily suspend the introduction of persons from specified countries and places, including suspending immigration, if the United States is faced with an invasion of a communicable disease.  The immigration statutes are of general applicability, and their effects are suspended temporarily by Section 265 only when the CDC Director determines there is a serious danger of the introduction of a communicable disease into the United States.

Plaintiffs have also moved to certify a class of all noncitizen family units who are or will come to the United States and are or will be subject to the "Title 42 Process."  *See* Motion for Class Certification (ECF No. 23).  Class certification should be denied because, by failing to define the "Title 42 Process" as part of its class definition, Plaintiffs have failed to demonstrate that the proposed class satisfies the requirements of Federal Rule of Civil Procedure ("Rule") 23(a)(3) and 23(b)(2).  Plaintiffs acknowledge that Title 42, and specifically the authority granted in 42 U.S.C. § 265, lawfully authorizes certain efforts to prohibit the introduction of persons into the United States.  Therefore, the class definition appears to be impermissibly broader than the conduct Plaintiffs seek to challenge as unlawful.

## BACKGROUND

## I.    FACTUAL BACKGROUND

### A.    The COVID-19 Pandemic

COVID-19 is a communicable disease that spreads easily and rapidly without regard to national borders.  Notice of Order Under Sections 362 & 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where A Communicable Disease Exists, 85 Fed. Reg. 17,060 (Mar. 26, 2020) ["March Order"] at 3 (attached as Exhibit A).  To curb the spread of COVID-19, countries have imposed sweeping travel restrictions.  *See* Interim Final Rule, Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into The United States From Designated Foreign Countries of Places for Public Health Purposes, 85 Fed. Reg. 16,559 (Mar. 24, 2020) ["IFR"] at 9-10 (attached as Exhibit B).  In addition to restricting the entry of certain aliens from certain countries, *see id.* at 10, since March 20, 2020,

the United States has temporarily limited any non-essential travel from Mexico and Canada into the United States at land ports of entry along the U.S.-Mexico and U.S.-Canada borders.[2]

By February 14, 2021, there were over 27 million confirmed COVID-19 cases and over 482,000 deaths in the United States.[3]  Although vaccines have been approved and are beginning to be distributed, new variants of the virus that causes COVID-19 have been detected in the United States.  These variants seem to spread more easily and quickly than other variants, which may lead to more cases of COVID-19.[4]

### B.      COVID-19 in Canada and Mexico

The pandemic has severely impacted, and continues to impact, Canada and Mexico.  As of February 15, 2021, the World Health Organization ("WHO") reported that Mexico had the third highest total number of deaths from COVID-19 in the world.[5]  Some observers postulate that the actual numbers of COVID-19 infections and deaths are multiples of reported data, as Mexico has the lowest diagnostic testing per capita of any country in the Organization for Economic Co-operation and Development.  Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 16, 2020) ["October Order"] at 8 (attached as Exhibit C).

### C.      CBP's Operations at or Near the U.S.-Canada and U.S.-Mexico Borders

The U.S.-Canada border spans nearly 4,000 miles, and the U.S.-Mexico border runs approximately 2,000 miles.  March Order at 7, 10.  CBP operates land ports of entry along the borders where it processes aliens to determine their admissibility.  CBP also operates 136 Border Patrol stations, which it uses to process and temporarily hold aliens who are apprehended after seeking to unlawfully enter the country between ports of entry.  *Id.* at 12.

---

[2]      *See* Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexico, 86 Fed. Reg. 4967 (extending the restriction through February 21, 2021); Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Canada, 86 Fed. Reg. 4969 (same).

[3]      *See* CDC, COVID Data Tracker, *at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Feb. 15, 2021).

[4]      *See* CDC, New Variants of the Virus that Causes COVID-19, *at* https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last visited Feb. 15, 2021).

[5]      *See* WHO Coronavirus Disease (COVID-19) Dashboard, *at* https://covid19.who.int/table.

From March through August 2020, 28,841 inadmissible aliens were processed at ports of entry at the U.S.-Canada border, and 2,014 aliens were apprehended attempting to unlawfully enter between ports of entry from Canada.  October Order at 7.  The number of inadmissible aliens CBP processed along the U.S.-Mexico border is much higher.   From March through August 2020, 54,503 inadmissible aliens were processed at ports of entry, and 345,267 aliens were apprehended attempting to unlawfully enter the United States from Mexico between ports of entry.  *Id*. at 9.  Thousands of these individuals were nationals of countries other than Mexico that have been experiencing sustained human-to-human COVID-19 transmission.  *Id.*

Aliens who lack proper travel documents would typically be deemed inadmissible and therefore generally take longer to process at ports of entry than aliens with valid travel documents. March Order at 11.  During the time that aliens lacking proper documents must be processed and held pending transfer to another agency—which may run from several hours to several days—they typically remain in close proximity to both CBP personnel and other travelers.  *Id.*  For aliens apprehended between ports of entry, who are then taken to a Border Patrol station, they too are held in close proximity to others during immigration processing, as well as during transfer to another agency.  Although Border Patrol stations vary significantly in size and layout, they generally have congregate holding areas that can temporarily hold only 150 to 300 people standing shoulder-to-shoulder. *Id.* at 12.  A typical station also has only two to five separate holding areas.  *Id.*  On average, an alien apprehended between ports of entry spends 78 hours in a Border Patrol station before being transferred to U.S. Immigration and Customs Enforcement ("ICE").  *Id.*  Only 46 of CBP's 136 Border Patrol stations offer any medical services at all, and those services are limited to basic emergency care, as well as testing for glucose, pregnancy, and influenza.  *Id.*

## II.       STATUTORY AND REGULATORY BACKGROUND

### A.       The Public Health Service Act

The federal government has long had the authority to take actions to prevent the spread of communicable diseases.  In 1893, Congress authorized the Executive Branch to enact rules and regulations to prevent the introduction of contagious or infectious diseases from foreign countries

into the United States.  *See* Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449, 452 (the "1893 Act").

The 1893 Act—which was the predecessor statute to the federal government's current authority under

Section 362 of the Public Health Service Act, 42 U.S.C. § 265—was enacted in response to a cholera

epidemic.  24 Cong. Rec. at 359.  Congress recognized the threat of cholera from Europe, Mexico,

and Canada, and sought to prevent cholera "from either entering the country or spreading after it has

made its entry."   *See id.* at 359, 363, 364, 370, 371.  Accordingly, the 1893 Act authorized the

President to "prohibit . . . the introduction of persons" into the United States, "whenever" the President

is satisfied that "by reason of the existence of cholera or other infectious or contagious diseases in a

foreign country there is a serious danger of the introduction of the same into the United States . . .

notwithstanding the quarantine defense," such that "a suspension of the right to introduce" is

"demanded in the interest of the public health[.]"  Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449,

452.

The 1893 Act was subsequently codified, as amended, at 42 U.S.C. § 111 (1925), where it

remained until its current recodification in 1944 as Section 362 of the Public Health Service Act, 42

U.S.C. § 265.  58 Stat. 682, 704 (1944).  The CDC Director acted under the authority found in Section

265, which provides:

> Whenever [the Secretary] determines that by reason of the existence of any
> communicable disease in a foreign country there is serious danger of the introduction
> of such disease into the United States, and that this danger is so increased by the
> introduction of persons or property from such country that a suspension of the right to
> introduce such persons and property is required in the interest of the public health, the
> [Secretary], in accordance with regulations approved by the President, shall have the
> power to prohibit, in whole or in part, the introduction of persons and property from
> such countries or places as he shall designate in order to avert such danger, and for
> such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265.[6]  Although authority under Section 265 was vested in the Secretary of Health and

Human Services (the "Secretary"), the Secretary in turn delegated his authority to the CDC Director.[7]

A separate provision of the Public Health Service Act authorizes "customs officers" to assist in

---

[6]    *See* HHS Memo., Delegation of Authority Under Title III of the Public Health Service Act,
As Amended, General Powers and Duties of the Public Health Service, dated Sept. 12, 1988.

[7]    *See* 31 Fed. Reg. 8855 (June 25, 1966), 80 Stat. 1610 (1966); *see also* Pub. L. No. 96-88,
§ 509(b), 93 Stat. 668, 695 (1979) (codified at 20 U.S.C. § 3508(b)).

implementing any Section 265 order.  *See* 42 U.S.C. § 268(b).  Pursuant to 19 U.S.C. § 1401(i), CBP agents and officers and ICE Enforcement and Removal Operations officers have been designated as "customs officers."

### B.     The Interim Final Rule

The COVID-19 pandemic highlighted the need for an efficient regulatory mechanism to suspend the right to introduce persons who would otherwise increase the serious danger of introducing a communicable disease into the United States.  *See* IFR at 11.  As the CDC found, "[i]nternational travel and migration play a significant role in the global transmission of infectious biological agents or their toxic products," as travelers can serve as carriers of pathogenic agents and potential sources of infection for others.  *Id.* at 5.  That risk increases when travelers are in congregate settings with shared sitting, sleeping, eating, or recreational areas.  *Id.* at 6.

Accordingly, on March 20, 2020, HHS issued an Interim Final Rule to allow the CDC Director to invoke the authority in Section 265.  The rule took effect immediately due to the national emergency, *see* 5 U.S.C. § 553(b)(B) and (d), and defined "introduction into the United States of persons from a foreign country" or place to mean "the movement of a person from a foreign country" or place into the United States (1) "so as to bring the person into contact with persons" in the United States or (2) to cause the contamination of property in the United States "in a manner that the Director determines to present a risk of transmission of a communicable disease to persons or property, even if the communicable disease has already been introduced, transmitted, or is spreading within the United States."  IFR at 27.  The CDC explained that "introduction" can encompass those who have physically crossed the U.S. border and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease.  *Id.* at 16.  Halting the travel of such persons and rapidly moving them outside the United States constitutes preventing their "introduction" into the United States.  *Id.*

### C.     The CDC's Section 265 Order

The same day the Interim Final Rule took effect the CDC Director issued an Order temporarily prohibiting the introduction of certain aliens traveling from Canada and Mexico into the United States because of the serious danger of the introduction of COVID-19 into the border facilities, as well as

the interior of the country through those aliens.  March Order at 15-16.  Consistent with 42 U.S.C. § 268(b), the CDC requested the assistance of the Department of Homeland Security ("DHS") in implementing the Order because the CDC lacks the capability and resources to do so.  *Id.* at 16.

Based on information provided by DHS and a U.S. Public Health Service Scientist Officer's visit to the El Paso Port of Entry, Paso del Norte Border Crossing, *see id.* at 13 and Ex. 1, the CDC Director determined that ports of entry and Border Patrol stations at or near the northern and southern borders are not structured or equipped to effectively mitigate the risks presented by COVID-19—*i.e.*, to implement quarantine, isolation, or social distancing protocols—for even small numbers of aliens. *Id.* at 14.  Rather, these facilities were designed for short-term holding in a congregate setting where aliens (typically those who lack valid travel documents and would therefore be found inadmissible) are held in the common areas in close proximity to one another for hours or days as they undergo immigration processing.  *Id.* at 1, 14.

The CDC Director also found CBP's then-existing screening protocol for COVID-19 to be unworkable for large numbers of individuals.  An influx of infected, asymptomatic aliens would present significant infection control challenges because the screening of such aliens might not trigger testing (to the extent that testing resources are available).  *Id.* at 12.  The aliens would remain in congregate areas while CBP completed screening and processing.  *Id.*  During that time, the alien could infect CBP personnel or other aliens with COVID-19.  *Id.*  Specifically, if CBP determined that an alien may have been exposed to or infected with COVID-19, it would notify the local health department and CDC personnel, if available, to determine whether the individual should be tested for COVID-19 and where that testing should occur.  *Id.*  If testing was to occur, CBP followed guidance from CDC and local health officials regarding transport to the testing site, including disinfecting the vehicles used for such transport.  *Id.*  And testing often required analyzing collected specimens in a laboratory setting with results available only after three to four days.  *Id.* at 4.

The CDC Director also found that, for those aliens who tested positive for COVID-19 under the above protocol, ports of entry and Border Patrol stations largely lacked the capacity to provide medical services, and even when they did, such services were relatively limited.  *Id.* at 35.  DHS must

rely on local and regional hospitals (which sometimes can be far away) and emergency medical resources. *Id*. But States along the southern border have some of the lowest numbers of hospital beds per 1,000 inhabitants in the United States. *Id.* Moreover, Arizona, California, and Texas also have some of the largest numbers of residents living in primary care shortage areas. *Id.* Shifting these limited medical resources to large numbers of infected aliens, the Director found, would divert them away from the general population, while increasing the risk of exposure to the virus for healthcare workers.[8] *Id*.

Based on the foregoing findings and to mitigate the risks presented by COVID-19, the CDC Order requires returning all "covered aliens" as rapidly as possible, and with the least amount of time spent in congregate settings as is feasible, to the country from which they entered the United States, their country of origin, or to another location as practicable and appropriate. *Id*. at 16. "Covered aliens" are those persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land (and, as amended, coastal) port of entry or Border Patrol station at or near the U.S. borders with Canada and Mexico, and excludes, among others, U.S. citizens, Lawful Permanent Residents, and those who arrive at a port of entry with valid travel documents. *Id*. at 2; May Order at 7. In addition, customs officers may, with supervisor approval, except otherwise covered aliens from the Order based on the totality of the circumstances, including considerations of significant law enforcement, officer and public safety, humanitarian, and public health interests. March Order at 2.

### D.    The Final Rule and October 2020 Section 265 Order

On September 11, 2020, HHS published the Final Rule in the Federal Register. *See* Final Rule, Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into The United States From Designated Foreign Countries of Places for Public Health Purposes, 85

---

[8]    The CDC Director later also determined that it would be inadvisable to structurally expand border facilities and to equip and train DHS personnel to contain COVID-19 because such an endeavor would consume a significant amount of scarce medical resources that could otherwise be used to meet the needs of the local communities. Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503-02 (May 26, 2020) ["May Order"] at 7 (attached as Exhibit E).

Fed. Reg. 56,424 ["Final Rule"] (attached as Exhibit D).  The Final Rule reiterated the findings of the IFR and previous CDC Orders.  The Final Rule explained how conditional release of aliens is not a viable alternative because there is significant uncertainty that covered aliens could effectively self-quarantine, self-isolate, or otherwise comply with existing social distancing guidelines, not to mention that the CDC lacks the resources and personnel necessary to effectively monitor a large number of people so released.  *Id*. at 56,452-53.  The Final Rule considered the impact of limited CBP capacity to handle COVID-19 on border states' healthcare systems, and on those of Arizona and California in particular, which had experienced a surge in cases.  *Id*. at 56,438-40.

On October 13, 2020, the CDC Director issued a new Order, which replaced the original Order issued on March 20, 2020, extended on April 20, 2020, and amended on May 19, 2020.  October Order at 1.  The CDC Director found that the March Order had reduced the number of covered aliens in congregate settings in border facilities, thereby reducing the danger of COVID-19 transmission into the United States.  *Id*. at 5-7.  The Director also found that the March Order reduced the utilization of local health care systems by covered aliens: in the 50 days preceding the March Order, for instance, CBP officers made over 1,600 trips to community hospitals to facilitate advanced medical care for detainees, but in the first 80 days after the March Order's implementation, CBP officers made only 400 trips for detainees to receive medical care from community hospitals, thereby preserving vital resources for local communities during the COVD-19 pandemic.  *Id*. at 6.

**E.      General Immigration Processing of Aliens at the Border**

DHS's infection control challenges must be assessed against the backdrop of immigration processes occurring at ports of entry and Border Patrol stations.  The Immigration and Nationality Act ("INA") establishes general procedures for DHS to process aliens who are "applicant[s] for admission" to the United States, whether they arrive at a port of entry or cross the border between ports of entry.  8 U.S.C. § 1225(a)(1), (3).  Under the INA, all such aliens must be inspected by immigration officers concerning their right to enter the United States.  *Id.* § 1225(a)(3).  A removal proceeding is authorized for any "applicant for admission" whom an immigration officer determines is "not clearly and beyond a doubt entitled to be admitted."  *Id.* § 1225(b)(2)(A); *see also id.* §§ 1229,

1229a; 8 C.F.R. § 1003.1.  In removal proceedings, an alien may seek asylum, withholding of removal, or any other form of relief or protection from removal from the United States.  *See* 8 U.S.C.§ 1229a(a)(2), (c)(4).  An immigration officer, however, may place certain aliens in expedited removal proceedings described in 8 U.S.C. § 1225(b)(1), in which the alien will be removed from the United States without further hearing or review, unless he claims a fear of persecution or torture, or expresses an intent to apply for asylum.  *Id.* § 1225(b)(1)(A)(i); 8 C.F.R. § 235.3(b)(4).

All of these immigration procedures affect an alien's length of stay at a port of entry or Border Patrol station, and more broadly, in the United States, and potentially present the public health concerns of further spread of COVID-19 into the United States.  Even expedited removal proceedings require examination by immigration officers and temporarily holding an alien in a congregate setting that could put both the alien and DHS personnel at risk of contracting COVID-19.

## III.   Plaintiffs and Their Request for Emergency Relief

Plaintiffs are six families apprehended after illegally crossing the U.S.-Mexico border into the United States.  They include:

- Nancy Gimena Huisha-Huisha and her one-year-old child I.M.C.H.  Am. Compl. ¶ 14.

- Josiane Pereira-De Souza and her children H.N.D.S., E.R.P.D.S., M.E.S.D., and H.T.D.S.D.S., ranging between ages seven and sixteen.  *Id.* ¶ 15.

- Valeria Macancela Bermejo and her four-year-old child B.A.M.M.  *Id.* ¶ 16.

- Martha Liliana Taday-Acosta, and her children D.J.Z. and J.A.Z.  *Id.* ¶ 17.

- Julien Thomas, Fidette Boute, and their children D.J.T.-B. and T.J.T.-B.  *Id.* ¶ 18.

- Romilus Valcourt, Bedapheca Alcante, and their three-year-old child B.V.-A.  *Id.* ¶ 19.

Plaintiffs seek on behalf of themselves and the Class an order staying their expulsion (which has already been granted for Plaintiffs[9]); removing them from "the Title 42 Process," and requiring Defendants "afford them the procedures guaranteed by the INA including access to asylum, withholding of removal, [and] [Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment] relief."  *See* Am. Compl. Prayer for Relief.

---

[9]    *See* Minute Orders dated Jan. 12, 2021; Jan. 19, 2021; Jan. 27, 2021.

## ARGUMENT

### I.  THE CLASS DEFINITION IS FATALLY INDEFINITE

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  To fall within the exception, "Plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.,* 134 S. Ct. 2398, 2412 (2014).  A court may certify a class only if plaintiffs present "evidentiary proof" sufficient to withstand a "rigorous analysis" of Rule 23's requirements. *Behrend,* 569 U.S. at 33.

Under this standard, a party seeking certification of a proposed class bears the burden of demonstrating that the required elements of Rule 23(a) exist: (1) the proposed class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the named plaintiffs are typical of the claims or defenses of the class ("typicality"); and (4) the named plaintiffs will fairly and adequately protect the interests of the class ("adequacy of representation").  In addition to meeting the requirements set forth in Rule 23(a), the proposed class must also qualify under Rule 23(b)(1), (2), or (3).  *See, e.g., Hartman v. Duffey*, 19 F.3d 1459, 1468 (D.C. Cir. 1994).

In this case, Plaintiffs seek certification under Rule 23(b)(2), which permits class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 360 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131–32 [2009]).

Courts in this District interpret Rule 23 as imposing a "requirement that a class be clearly defined." *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998).  Having an inadequately defined

12

class may implicate multiple Rule 23 requirements, from ascertainability, to Rule 23(a) typicality and commonality, to the standards of Rule 23(b)(2).  Here, Plaintiffs seek certification of a class defined as: "All noncitizens who (1) are or will be in the United States; (2) come to the United States as a family unit composed of at least one child under 18 years old and that child's parent or legal guardian; and (3) are or will be subjected to the Title 42 Process" (the "Class").  *Id.* ¶ 70; *see also* Mot. Class Cert. & Br. in Supp. ("Class Motion") at 1, ECF No. 23-1.  A significant flaw in this class definition is that it uses a term—"the Title 42 Process"—that is not defined.

In *Rahman v. Chertoff*, 530 F.3d 622, 625 (7th Cir. 2008), the Seventh Circuit reversed certification of two classes, one of which was defined as: "All United States citizens who now are and/or in the future will be subjected to detentions upon reentry to the United States as a result of defendants' contested policies, practices and customs."  The court observed that the "class definitions do not specify what 'defendants' contested policies, practices and customs' are," and that "every time plaintiffs file a brief or motion, membership in the classes may change."  *Id*.  Furthermore, the court reasoned that a "class of all persons now or in the future subject to unspecified practices may have nothing to do with the named representatives' injuries, or what caused them."  *Id*. at 626.  The court held "[c]lasses of the sort certified in this case are incompatible with Rule 23(a)(3), which says that a class may be certified only if 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'"  *Id*. at 627.  The Seventh Circuit also found it was "hard to evaluate" compliance with Rule 23(b)(2) as a consequence of the class definition's indefiniteness.

Plaintiffs' class definition suffers from similar infirmities.  Because the "Title 42 Process" is not defined in the class definition, Plaintiffs have not established that the conduct they seek to enjoin or declare unlawful will be "as to all of the class members or as to none of them." "Rule 23(b)(2) applies only when a *single* injunction or declaratory judgment would provide relief to each member of the class."  *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 206 (D.D.C. 2020) (quoting *Wal-Mart*, 564 U.S. at 360 (emphasis added)); *see also In re Navy Chaplaincy*, 306 F.R.D. 33, 56 (D.D.C. 2014) (holding class not maintainable under Rule 23(b)(2)).

While it is no secret that Plaintiffs challenge the "practice of summary expulsion under the Title 42 Process" and the alleged lack of access to asylum, Class Motion at 2, the proposed class may be broader than this challenged conduct. Specifically, it appears from the Amended Complaint and the Class Motion that Plaintiffs' conception of a "Title 42 Process" is broader than expelling aliens from the United States. Plaintiffs "collectively refer to as the 'Title 42 Process'" a "system" "established in a set of agency documents—a new regulation, several orders, and an implementation memo." Am. Compl. ¶ 1. The Amended Complaint further states: "*Among other things*, the Title 42 Process authorizes the summary expulsion of noncitizens, including vulnerable families seeking asylum in this country, without any of the procedural protections guaranteed by Congress . . . ." *Id.* ¶ 3 (emphasis added).

Given the indefiniteness, the class definition might include practices that Plaintiffs do not challenge as unlawful. Plaintiffs recognize that Title 42 allows the Government to bar or prohibit entry beyond the border. *See* Class Motion at 10 ("Section 265 authorizes the CDC to prohibit the "introduction of persons" under certain circumstances."); *see also P.J.E.S. v. Wolf*, Civ. A. No. 20-02245, 2020 WL 6770508, at *32 (D.D.C. Nov. 18, 2020) ("Plaintiffs concede that the CDC Director has authority to bar entry into the country[.]"). Plaintiffs concede that Title 42 "authorizes various powers, such as testing and quarantines." Am. Compl. ¶ 6. Given the vague and ambiguous class definition through its inclusion of the undefined "Title 42 Process," Plaintiffs have failed to demonstrate that the proposed class satisfies the requirements of Rule 23(a)(3) and 23(b)(2).

## II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

This Court should also deny Plaintiffs' motion for a preliminary injunction. "A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). The movant must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Here, Plaintiffs fail to meet their burden.

A.  **Section 265 Authorizes the CDC Director to Expel Aliens Like Plaintiffs Who Are Apprehended After Crossing Illegally Between the Ports of Entry**

Plaintiffs argue that Section 265 does not allow the Government to expel aliens who are apprehended after they have physically crossed the border into the United States in violation of the CDC Order.  *See* Mem. in Supp. Mot. for Prelim. Inj. ("Mot.") at 10-12.  They are unlikely to succeed on that argument because the text and structure of Section 265 evince Congress's intent to provide the Executive Branch this authority in combating a public health crisis such as the current pandemic.

1.  **The language of Section 265 plainly authorizes expulsion, and the HHS Secretary's interpretation is reasonable**

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute" in the litigation.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).  Section 265 gives the CDC Director the broad authority to "prohibit, in whole or in part, the introduction of persons" from a foreign country "[w]henever" he "determines" that such an introduction presents a "serious danger" of introducing "any communicable disease . . . into the United States," and the prohibition "is required in the interest of the public health." 42 U.S.C. § 265.  The foregoing language plainly allows for the expulsion of persons who seek to introduce themselves into the United States notwithstanding an order under Section 265 temporarily suspending their entry.

Congress's use of the broad terms "prohibit[ing] . . . the introduction . . . to avert such danger" establishes that the Executive's authority under Section 265 is not limited to stopping a person precisely at the Nation's borders, as Plaintiffs would lead the Court to believe.  Rather, the term "introduction" refers to a continuing process and is most naturally read to extend beyond a person's immediate physical crossing of the border, particularly given that the border is merely an invisible line defined in cartographic terms.  *Cf. United States v. Steinfels*, 753 F.2d 373, 377 (5th Cir. 1985) (finding that "introduction into commerce commences upon the arrival of imported goods upon United States soil, but introduction does not necessarily end there").  And to "prohibit . . . the

15

introduction" naturally means to intercept or prevent such a process.  *See Universal English Dictionary* 458 (John Craig ed. 1869) (to "prohibit" meant "to forbid; to interdict by authority; to hinder; to debar; to prevent; [or] to preclude"); Prohibit, *Oxford English Dictionary* 1441 (1933) ("to forbid (an action or thing) by or as by a command or statute; to interdict").  The authority to prohibit the introduction of persons to avoid the spread of communicable disease does not evaporate simply because a person crosses the border without authorization.  Consistent with the foregoing, Section 265 refers to a "suspension of the right to introduce such persons" in the interest of the public health.  Thus, the Section 265 authority includes intercepting and halting persons who have already crossed the border—but who are in the process of being introduced—into the United States.

Even in the immigration context, it is understood that an "entry" into the United States is not completed the moment a person crosses the literal border.  An "alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.'"  *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).  Aliens who are "apprehended within hours of surreptitiously entering the United States" are still treated as "'alien[s] seeking initial admission to the United States.'"  *Castro v. Dep't of Homeland Sec.*, 835 F.3d 422, 445 (3d Cir. 2016) (quoting *Landon v. Plasencia*, 459 U.S. 21, 32, (1982)); *see also Cruz v. Dep't of Homeland Sec.*, Civ. A. No. 19-2727, 2019 WL 8139805, at *5 (D.D.C. Nov. 21, 2019) (fact that plaintiff was apprehended within the territorial bounds of the United States after crossing the U.S.-Mexico border does not overcome the fact that he has not "effected entry into this country").

Plaintiffs argue the fact that Section 265 does not speak specifically to expulsions of people who unlawfully cross the border of the United States "speaks volumes," Mot. at 11, but that argument simply ignores the purely public health purpose of the statute.  The absence of the terms "expel" or "removal" has no special significance in the public health context even if its absence might be meaningful in the immigration context.[10]  *See Russello v. United States*, 464 U.S. 16, 25 (1983)

---

[10]   It is irrelevant whether "deportation" is a "severe penalty" in the Title 8 immigration context as Plaintiff asserts, *see* Mot. at 14, because Plaintiffs' situations are unlike the cases they cite where the individual being extradited or deported is either a U.S. citizen or a Lawful Permanent Resident ("LPR") who was not in the process of being introduced into the United States, but was instead a

("Language in one statute usually sheds little light upon the meaning of different language in another statute.").

Importantly, rather than specifying that the power to prohibit the introduction of persons is limited to the Nation's borders, Congress specifically charged the Secretary with utilizing Section 265's capacious grant of authority in seeking to achieve the statutory purpose. *See* 42 U.S.C. § 265 ("the [Secretary], *in accordance with regulations* approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons . . . in order to avert such danger" (emphasis added)). This must be so because public health experts must be able to flexibly respond to the exigency posed by the spread of communicable diseases. Accordingly, the Final Rule interprets "the introduction into the United States" to mean "the movement of a person from a foreign country . . . into the United States so as to bring the person into contact with persons or property in the United States, in a manner that the Director determines to present a risk of transmission of a quarantinable communicable disease to persons, or a risk of contamination of property with a quarantinable communicable disease, even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States." 85 Fed. Reg. at 56,425. This definition clarifies that "introduction" "does not necessarily conclude the instant that a person first steps onto U.S. soil," rather, introduction encompasses when a person "moves further into the United States, and begins to come into contact with persons or property that increase the risk of transmitting the quarantinable communicable disease." *Id*. As the Secretary previously explained, "halt[ing] the travel of such persons and rapidly moving them outside the United States constitutes preventing their 'introduction' into the United States." IFR at 16. Consistent with this, the October Order "requires the movement of all [covered] aliens to the country from which they entered the United States, [ ] their country of origin, or another location as practicable, as rapidly as possible, with as little time spent in congregate settings as practicable under the circumstances." October Order at 10-11.

---

long-time resident here. *Id*. (citing *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 6 (1936) (extradition of native-born U.S. citizens charged with the commission of crimes in France), and *Padilla v. Kentucky*, 559 U.S. 356, 359 (2010) (LPR who lived in the United States for 40 years was being deported because of criminal conviction)).

Plaintiffs also argue that Congress could not possibly have intended to authorize "expulsion" because Section 265 applies to citizens and non-citizens alike.  Mot. at 15.  "It is inconceivable," Plaintiff asserts, "that Congress would seek to give the executive branch that (plainly unconstitutional) power[.]"  *Id.*  But neither the Interim Final Rule nor the Final Rule includes U.S. citizens within its scope.  Although Plaintiffs cite *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005), presumably for the proposition that the constitutional problem sought to be avoided need not pertain to the particular litigant before the Court, Mot. at 12, *Clark* does not suggest that a hypothetical constitutional issue could constitute a proper basis for invoking the constitutional avoidance doctrine. To the contrary, *Clark* stands for the proposition that "statutory language given a limiting construction in one context must be interpreted consistently in other contexts."  *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 140 (2005).[11]  Section 265's inclusion of U.S. citizens thus does not serve to limit the scope of the Secretary's authority under the provision.  To the contrary, the statute's use of the term "persons" was meant to give the Secretary broad powers to address outbreaks of communicable

---

[11]  *Clark* involved the interpretation of a statute that authorized the detention of aliens pending their removal.  In a prior case, *Zadvydas v. Davis*, 533 U.S. 678, 696–699 (2001), the Supreme Court had already interpreted that provision to impose time limits on detention of lawfully admitted aliens held after a final order of removal has been entered, because the alternative—allowing indefinite detention of such aliens—would raise grave constitutional doubts.  Given the determination in *Zadvydas*, the *Clark* Court was obliged to follow the same interpretation, even though the case, involving inadmissible aliens, did not present the same constitutional concern as *Zadvydas*.  *Clark*, 543 U.S. at 377-81.  *Clark*, therefore, does not support the Plaintiffs' reliance on hypothetical constitutional issues in invoking the avoidance doctrine.  *Cf. Bartlett v. Strickland*, 556 U.S. 1, 23 (2009) (doctrine inapplicable because it "invites the divisive constitutional questions that are both unnecessary and contrary to the purposes of our precedents under the [relevant statute]").  That Plaintiffs' argument is misplaced is particularly apparent in the context of judicial review of agency action under the Administrative Procedure Act.  As the Supreme Court explained in *FCC v. Fox Television Stations, Inc.*:

> We know of no precedent for applying [the constitutional avoidance doctrine] to limit the scope of authorized executive action. In the same section authorizing courts to set aside "arbitrary [or] capricious" agency action, the Administrative Procedure Act separately provides for setting aside agency action that is "unlawful," 5 U.S.C. § 706(2)(A), which of course includes unconstitutional action. We think that is the only context in which constitutionality bears upon judicial review of authorized agency action.

556 U.S. 502, 516 (2009).  Here, the agency has taken no action that conceivably raises any constitutional issues.  Any invocation of the doctrine to limit the agency authority is therefore improper.

diseases. Indeed, as initially proposed, Section 265's predecessor statute would have given the President the power to suspend "immigration." *See* H.R. 9757, 52nd Cong., 2d Sess., Report No. 2210 at 3 (Jan. 9, 1893); 24 Cong. Rec. 470-71 (Jan. 10, 1893). But "immigration" was substituted with "persons" to give the President even broader authority. *See* 24 Cong. Rec. at 471 (Senator William Chandler: "A discretion to do an act of this kind in a great emergency certainly ought to have the authority coupled with it to act either in whole or in part according to the exigency.").

In the specific circumstance of COVID-19, the CDC Director found that the risk of transmission by aliens who have crossed the border unlawfully between ports of entry is no less than that posed by aliens without travel documents seeking admission at a port of entry. *See* March Order at 11-13. In both situations, the aliens without valid travel documents would be processed or otherwise held for hours or days in congregate settings during immigration processing. *Id.* These practicalities underscore the reasonableness of the Secretary's interpretation of Section 265 in the Final Rule that Congress did not intend to exempt aliens who are able to surreptitiously cross the border into the United States. Were it otherwise, the applicability of a Section 265 order would perversely turn on whether an alien is able to successfully cross the border, even when he or she poses the same risk as those who present at a port of entry. *See Kaseman v. District of Columbia.*, 444 F.3d 637, 642 (D.C. Cir. 2006) ("[S]tatutes should be interpreted to avoid . . . unreasonable results, or unjust or absurd consequences." (citation and internal quotation marks omitted)).

The Secretary's interpretation of Section 265 to authorize expulsion is also consistent with Congress's grant of powers in provisions that neighbor Section 265, which generally defer to the judgment of the public health officials to determine how best to protect the country from the dangers of a communicable disease. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[T]he words of a statute must be read . . . with a view to their place in the overall statutory scheme"). Specifically, like the language in Section 265, which grants significant discretion to the Secretary, the adjacent provision, section 264, empowers the Secretary to "make and enforce such regulations as *in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States." 42 U.S.C. § 264(a) (emphasis added). Subsections

19

264(b) through (d) further indicate that the Secretary's powers in this area are especially broad with respect to foreign travelers, authorizing the Secretary to use various public health measures—apprehension, detention, conditional release, and examination—to prevent the introduction, transmission, or spread of communicable diseases. And even as to the narrower apprehension and detention powers with respect to domestic travelers, *see id.* § 264(d)(1) (a domestic traveler may be apprehended only if he is "reasonably believed to be infected with a communicable disease in a qualifying stage," and detained only if he is determined to be infected), the subsection makes clear that an individual "reasonably believed to be infected" need only be "in a precommunicable stage, if the disease would be likely to cause a public health emergency if transmitted to other individuals." *Id.* § 264(d)(2). These provisions show that Congress gave the Secretary sweeping authority to protect the country from potentially devastating communicable diseases, and read together, Sections 264 and 265 give the Secretary a robust set of public health mitigation tools that include the power of expulsion if the Secretary determines that other mitigation measures are insufficient to offset the danger posed by an individual's introduction to the United States.

### 2. Plaintiffs' argument that Section 265 is limited to the regulation of transportation companies has no merit or historical basis

Plaintiffs additionally contend that Section 265 "does not authorize expulsion because it applies only to the regulation of transportation entities and does not apply to individuals at all." Mot. at 13. Plaintiffs are unlikely to succeed with this argument.

Plaintiffs rely on Section 7 of the 1893 Act and its use of the term "introduction." According to Plaintiffs, the term "introduction" necessarily means that "it is an action taken by a *third party*—here, the shipping company." Mot. at 14. But the ordinary meaning of the term is not so limited—a person may "introduce" himself or herself without relying on any third party. *See, e.g.*, Introduce, *Oxford English Dictionary* ("to lead or bring into a place"; "He used such mean[s] that he introduced himself[] into this Castle."), *available at* https://www.oed.com/view/Entry/98707?redirectedFrom=introduce#eid; *Ashley v. Bd. of Sup'rs of Presque Isle Cnty.*, 83 F. 534, 540 (6th Cir. 1897) (referring to a "party [who] introduces himself as a witness in his own behalf"); *Old Wagon Works v. Benedict*, 67 F. 1, 4 (8th Cir. 1895) (discussing

an "intervener who introduces himself into a pending action in a state court"); *cf. United States v. Trek Leather, Inc.*, 767 F.3d 1288, 1298 (Fed. Cir. 2014) ("introduce" as used in "introduce merchandise into the United States" is "a flexible and broad term").[12]   That is, the "introduction" of a person into the United States can include the person's bringing of himself or herself into the United States, which makes sense also in the context of Section 265's design to deny the introduction of all persons who possibly may carry a communicable disease into the United States.  And again, to the extent there is any ambiguity, Congress has charged the Secretary to interpret the term "introduction."

After forcing this strained interpretation on the word "introduction," Plaintiffs argue the 1893 Act "was shot through with provisions specifically directed at the regulation of ships" and "imposed penalties *only* against ships."  Mot. at 14.  But Plaintiffs fail to acknowledge that Section 265's predecessor statute was Section 7 of the 1893 Act, which contains no reference to vessels—unlike several other sections of that Act.  Even today, whereas the neighboring provisions of the Public Health Service Act explicitly refer to the regulation of "vessels," or "aircraft," *see* 42 U.S.C. §§ 267(b), 269, 270, 271(b), Section 265 refers (twice) to "the introduction of persons" without any textual limitation on the means of introduction, and without any reference to vessels or common carriers.  That omission therefore supports Defendants' interpretation of Section 265, as Congress clearly knew how to reference vessels in the Act, yet conspicuously chose not to do so in Section 265's predecessor.  *See Russello*, 464 U.S. at 23 ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)); *see also Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a

---

[12] The Supreme Court, in contemporaneously construing similar language in a state statute authorizing officials to "prohibit the introduction [of] persons" into certain areas of the State in light of a contagious or infectious disease, understood the statute to authorize the "exclu[sion of] persons from a locality" in order "to keep down, as far as possible, the number of persons to be brought within danger of contagion or infection," and not merely to regulate third-party transportation companies.  *Compagnie Francaise de Navigation a Vapeur v. Louisiana*, 186 U.S. 380, 385 (1902).

requirement manifest."). That is, when Congress wanted to control the spread of communicable disease by regulating common carriers it did so expressly, as it had three years before enacting Section 265's predecessor statute. *See* 26 Stat. 31, 32 (1890) (providing penalties for "any common carrier" that "willfully violate[s] any of the quarantine laws of the United States").

Plaintiffs then pivot to immigration statutes in force in 1893, arguing that because they used specific terms such as "return," "remove," or "send back" then "Congress knew exactly how to provide for the removal of individuals." Mot. at 15. This argument is unpersuasive, and similar efforts have been rejected by the Supreme Court. First, it is hardly surprising that Congress used specific terms such as "return" and the like in immigration statutes because the purpose of those statutes was to regulate, among other things, the disposition of "unauthorized immigrants," *id.*, whereas Section 265 has an entirely different aim—to protect public health in times of an outbreak. Second, the Supreme Court has rejected this type of approach, cautioning "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute, even when the two are enacted at or about the same time." *Russello*, 464 U.S. at 25.

In further support of Plaintiffs' contention that Section 265 is a transportation regulation, regardless of the provision's plain language, Plaintiffs refer to the impetus for Section 7 of the 1893 Act as expressed in selected legislative history. But that history does not aid Plaintiffs. Although Plaintiffs cite Senator Chandler as purportedly limiting the proposed Section 7 to vessels, the Senator later explained that "if the exigency demands," the President could "exclude all other passenger travel *as well as immigration*." 24 Cong. Rec. at 471 (emphasis added). Congress in fact rejected a proposal that would have confined the statute to the regulation of transportation entities. Congress considered an amendment to bar "passenger travel" or "all passenger travel," *id.* at 470, but it was objected "that something more would be necessary in order to protect the public interest than the mere restriction upon passenger travel," *id.*, and the proposal was defeated, *id.* at 471. Instead, Congress adopted the language prohibiting "the introduction of persons," *id.*, which was plainly intended to be broader than a mere restraint on passenger travel.

Plaintiffs also suggest that Senator Harris proposed Section 7 to be limited to prohibiting only "vessels, passengers, crews, and cargo," *see* Mot. at 16, when the Senator was merely contrasting the Treasury Secretary's power to make rules and regulations in respect to those categories with the President's power to prohibit the coming at all of vessels, passenger, crews, and cargo.  24 Cong. Rec. at 392.  Similarly, Plaintiffs' reference to Senator Harris's cryptic comment "suggest[ing] . . . that the act of 1890 clothes the Marine Health Service with ample power to protect the Mexican and Canadian borders," *id.* at 370, underscores that his cited legislative history sheds no light here.  The Senator apparently was referring to the Act of March 27, 1890 Act, ch. 51, Pub. L. No. 51-51, 26 Stat. 31, which states, in relevant part, that if the President thinks "cholera, yellow-fewer, small-pox, or plague exists in any State or Territory, or in the District of Columbia, and that there is danger of the spread of such disease into other States, Territories, or the District of Columbia," he may cause the Treasury Secretary "to promulgate such rules and regulations as in his judgment may be necessary to prevent the spread of such disease."  There is no reason to think that the Act applies to the borders with Canada or Mexico.

Plaintiffs also refer to President Herbert Hoover's invocation of Section 7 in 1929 in response to a meningitis outbreak in Asia.  Mot. at 17.  President Hoover issued an Executive Order that prohibited any person from being "introduced directly or *indirectly* by transshipment or *otherwise* into the United States . . . from any port in China (including Hong Kong) or the Philippine Islands for such period of time as may be deemed necessary."  *See* Exec. Order 5143, Preface, ECF No. 57-5, Ex. B (noting that a total of 17 trans-pacific passenger-carrying vessels had epidemic cerebrospinal meningitis infection existing on board) (emphasis added). The mitigation measure imposed by the Executive Order focused on a discrete problem—a communicable disease was being transmitted into the United States by people who were traveling by ship.  Even so, the terms of the order would have barred individuals who introduced themselves into the United States by swimming or walking ashore, not simply those arriving at a port by ship.  And finally, neither the Executive Order nor the accompanying Treasury Department regulations (*see* Regulations, ECF No. 57-5, Ex. D) governed the legal boundaries of Section 7.

**B.    Section 265 Authorizes the HHS Secretary to Temporarily Suspend Immigration Laws That Might Otherwise Allow the Introduction of Persons into the United States**

Plaintiffs also contend that even if Section 265 authorizes expulsion, the application of the statute is unlawful "because it violates the immigration laws that protect the plaintiff class."  Mot. at 19. Plaintiffs are unlikely to succeed on this argument because their proffered interpretation ignores Section 265's clear text.

### 1.    Section 265 plainly takes precedence over the identified immigration provisions

Section 265 authorizes the "suspension of the right to introduce [] persons . . . in the interest of public health."  42 U.S.C. § 265.  This is an explicit indication that any immigration laws that might confer a "right" of introduction may be temporarily suspended by a Section 265 order.  The term "suspend" means temporarily ceasing the operation or effect of laws.  *See Universal English Dictionary* 815 (John Craig ed. 1869) (defining "suspend" in part as "to cause to cease for a time from operation or effect, as, to *suspend* the habeas corpus act"); *Oxford English Dictionary* 255 (1933) (defining "suspend" as to "cause (of a law or the like) to be for the time no longer in force; to abrogate or make inoperative temporarily").  The meaning of this term has been well understood since the Founding.  *See, e.g.*, U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."); 10 U.S.C. § 123(a) ("In time of war, or of national emergency . . . the President may suspend the operation of any provision of law relating to the promotion, involuntary retirement, or separation of commissioned officers[.]").  The phrase "suspension of the right to introduce" thus naturally means the temporary cessation of the effect of any laws pursuant to which a person might otherwise claim the right to be introduced into the United States.[13]  This includes the immigration laws Plaintiffs

---

[13]    Any consideration of "the right to introduce" in the immigration context should reflect the established principles governing the admission and exclusion of aliens.  With limited exception, aliens have no "claim of right" to enter the United States, *Knauff v. Shaughnessy*, 338 U.S. 537, 542-543 (1950), as "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments,'" *Trump*, 138 S. Ct. at 2418 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).  In reviewing immigration-related decisions, courts must exercise the "greatest caution" to avoid inhibiting the political branches'

identify, Mot. at 19-20, yet Plaintiffs disregard this language and presumably invite the Court to do so as well.  Because Section 265's language is plain, this Court should give effect to Congress's express statutory intent.

Notwithstanding that plain intent, Plaintiffs assert Section 265 "cannot override" provisions of the immigration laws.  Mot. at 21.  In support, Plaintiffs invoke the canon of "the specific governs the general."  Plaintiffs argue that to the extent there is a conflict between the statutes, the specific immigration provisions "should be read to control over the general public health authority under Title 42."  Mot. at 22.  It is true that this canon applies to disentangle the interplay between "laws of equivalent dignity," *Nitro-Lift Techs., LLC v. Howard*, 568 U.S. 17, 21 (2012), and resolves a perceived conflict by "carving out an exception from the more general enactment for the more specific statute."  *Stewart v. Smith*, 673 F.2d 485, 492 (D.C. Cir. 1982) (citing *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957)).  It does not matter that the specific statute was enacted earlier than the more general statute.  *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum."); *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) (same).

Plaintiffs' application of the canon, however, is backwards.  Section 265 applies only in a rare and specific circumstance—when the CDC Director determines that there is a serious danger of a communicable disease spreading into the United States from a foreign country and that a temporary suspension of the right to introduce persons from that country is necessary to protect public health.  The immigration laws, by contrast, apply in general circumstances when an alien seeks to enter the United States.  The fact that in the 127 years since its original enactment, the Government has invoked Section 265 to suspend the right to introduce persons into the United States only twice (the first time being the 1929 meningitis outbreak) underscores the specific, targeted nature of the provision.

---

"flexibility . . . to respond to changing world conditions."  *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *cf. Knauff*, 338 U.S. at 543 ("because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency").

Plaintiffs argue that the legislative history supports their view, but in fact the legislative history confirms Defendants' interpretation of Section 265.  As Plaintiffs recognize, Section 265's predecessor statute—section 7 of the 1893 Act—was enacted against the backdrop of a cholera epidemic in Europe.  Mot. at 16.  As originally proposed, the 1893 statutory predecessor to Section 265 expressly provided for the suspension of immigration:

> That whenever it shall be shown to the satisfaction of the President that by reason of the existence of cholera or yellow fever in a foreign country there is serious danger of the introduction of the same into the United States, and that notwithstanding the quarantine defense this danger is so increased *by immigration* that *a suspension of the same* is demanded in the interest of the public health, the President shall have power *to suspend immigration* from such countries or places and for such period of time as he may deem necessary.

24 Cong. Rec. at 358 (emphasis added).

Members of Congress, however, objected that this provision was too narrow because the serious danger of introducing cholera or yellow fever into the United States was not limited to immigrants, but extended as well to tourists and other temporary foreign visitors.  *See id.* at 361 (noting "passengers coming as tourists, or for pleasure, or temporarily"); *id.* at 363 ("[T]here would be just as much danger of bringing contagion into this country by permitting aliens to come in who do not come here to reside or to settle on lands, but simply come here as temporary visitors, as there would be from the other class."); *id.* at 374 ("Cholera is no respecter of persons. . . . It may be brought as well by the subject of a foreign country who comes to this country to visit the country.  It may be brought as well by vessels and those who come for a temporary sojourn in the United States as by those who come here to make their home in this country and become permanent residents.  So I have not a particle of faith, I repeat, in being able to protect this country against the coming of cholera by simply suspending immigration."); *id.* at 470 ("[T]here can be no possible discrimination between the immigrant who comes here to settle and make his home and those who happen to be abroad and wish to return to their native home.").

In response to that concern of under-inclusiveness, Congress amended the proposal, in relevant part, by changing the references from the danger resulting from "immigration" and the power to "suspend immigration" to a danger resulting from "the introduction of persons or property" and

Case 1:21-cv-00100-EGS   Document 76   Filed 02/17/21   Page 30 of 40

the "suspension of the right to introduce the same." 24 Cong. Rec. at 471. At the same time, Congress made it clear that the purpose of this amendment was "to provide that he [the President] may, if the exigency demands, exclude all other passenger travel *as well as immigration*." *Id*. at 471 (emphasis added). Congress could not have been clearer that the language it adopted subsumed and included the power to suspend immigration, though a prohibition in "the introduction of persons" was not limited to that end alone. In keeping with the understanding the statutory authority included the power to suspend immigration, Section 7 of the 1893 statute – what eventually became Section 265 – was entitled "Suspension of immigration during existence of contagious diseases," *see* 27 Stat. at 452, a title that remained until the law was re-codified as Section 265 in 1944, *see* 42 U.S.C. § 111 (1940) (entitled "Suspension of immigration").

The exigency of the cholera outbreak taught that it was necessary to convey a broad power to the Executive Branch to use in rare times of emergency to protect public health. Indeed, two years earlier Congress had enacted the Immigration Act of 1891, ch. 551, section 1, 26 Stat. 1084, which authorized the exclusion from admission into the United States aliens "suffering from a loathsome or a dangerous contagious disease." Despite the existence of the Immigration Act of 1891 that applied against individual aliens suffering from a communicable disease, Congress enacted Section 7 in response to the cholera outbreak, making it clear that it deemed Section 7 a necessary public health tool beyond the immigration laws.[14]

Moreover, the debates surrounding the passage of Section 7 of the 1893 Act showed a clear and consistent theme that the provision was intended to give the Executive the authority to suspend

---

[14]     Plaintiffs cite the fact that Congress has accounted for public health concerns about communicable diseases in the immigration laws, citing 8 U.S.C. § 1182(a)(1) ("[h]ealth-related grounds" of inadmissibility, including communicable diseases), and 8 U.S.C. § 1222 ("[d]etention of aliens for physical and mental examination"). *See* Mot. at 4, 12. But those provisions are focused on individual aliens' circumstances when assessing their eligibility for admission to the United States or immigration benefits. By contrast, Section 265 is specifically designed to address public health consequences of allowing large groups of persons to be introduced into the United States during an outbreak of a communicable disease when doing so would risk transmitting the disease into the United States. Applying the health-related grounds of inadmissibility under the INA would frustrate the purpose of Section 265 because to determine whether an alien has a communicable disease, the alien must be detained for a sufficient period of time for observation and examination. *See* 8 U.S.C. §§ 1182(a)(1)(A)(i); 1222.

any right to introduce persons into the United States under the immigration laws. *See, e.g.*, 24 Cong. Rec. 470 (Jan. 10, 1893) (statement of Senator George Gray explaining that the exigency posed by "invasion of contagious disease, is sufficient . . . to justify this extraordinary power of the entire suspension of immigration"); *id.* at 393 (statement of Senator George Hoar indicating that Section 7 would grant the "power to suspend immigration altogether, either temporarily or permanently as a health device"; "this section should be added, declaring in terms whenever the health or protection of the country from infection requires the total suspension of immigration"); *id.* at 393-94 (statement of Senator Chandler recognizing that Section 7 would give the President the power to suspend immigration in his discretion, whenever there is danger of infection); *see also* H.R. 9757, 52nd Cong., 2d Sess., Report No. 2210 at 4 (Jan. 9, 1893) (noting that "[t]housands of immigrants may pass through inspection at a port of entry, and still upon arriving at their destination . . . may disseminate the poison that has been slumbering in their midst and imperil the lives of any community in which they happen to locate").

Even those opposed to the enactment of Section 7 recognized that it would grant the President the authority to suspend immigration. *See, e.g.*, 24 Cong. Rec. 370–71 (1893) (Senator Roger Mills: "I shall vote very cheerfully against placing in the hands of the President of the United States, whether he be a Republican or a Democrat, any such extraordinary power as that, to suspend immigration to this country at his pleasure."). The specific reference to the "power to suspend immigration" ultimately was removed and replaced with the power to prohibit the introduction of all *persons*. *See* 24 Cong. Rec. 470-71. The change was not to limit the President's authority but to give him even broader power to respond to a public health crisis. *Id.*

Not only did Congress see fit to enact the 1893 Act after the enactment of the Immigration Act, but it re-codified the 1893 Act in the Public Health Service Act of 1944, fully aware of the existence of these health-related immigration law provisions. There is accordingly no reasonable basis to construe those immigration provisions as narrowing Section 265. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2415 (2018) (refusing to interpret anti-discrimination provision applicable to issuance of immigrant visas to constrain separate provision authorizing the President to suspend entry of classes

of aliens because the two provisions "operate in different spheres"; observing that if the interpretation were correct, "the President would not be permitted to suspend entry from particular foreign states in response to an epidemic" confined to a single region, among other possible actions, which is an illogical result).

Temporarily suspending the right of introduction that might otherwise be permitted under the immigration laws, on the other hand, would not frustrate those laws' general purpose of providing immigration benefits outside the context of a global pandemic (or other threat to public health of comparable magnitude). Section 265 fairly can be read to create an exception to the immigration laws' general application, which would still give effect to both sets of statutes. That is, such a reading would honor clearly expressed congressional intent in both the immigration and public health provisions, consistent with the Supreme Court's admonition that "[w]hen confronted with two Acts of Congress allegedly touching on the same topic," the Court "must . . . strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). And as a practical matter, the Government implemented the Order issued under Section 265 in a manner that preserves access to some humanitarian protections afforded by the immigration laws.[15]

---

[15] DHS's implementation of the CDC's Order is consistent with the United States' international obligations under Article 3 the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), as implemented through the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); *see also* 8 C.F.R. §§ 208.16-.18, 1208.16-.18. As Plaintiff acknowledges, *see* Mot. at 21 n.9, in implementing the CDC Order, DHS will refer an alien to U.S. Citizenship and Immigration Services for a CAT screening if the alien claims a fear of torture. An asylum officer will assess whether it is more likely than not that the alien would be tortured in the country to which he or she would be sent. *See* Draft CBP Memo ("Covid-19 CAPIO") at 4, ECF No. 57-5, Ex. E. If the alien meets the threshold screening standard, DHS will except him or her from the Order. *See id.*; October Order at 1 (allowing DHS to except otherwise covered aliens from the Order based on the totality of the circumstances, including humanitarian considerations). In any event, international treaties such as the CAT are not self-executing and, accordingly, the domestic statutes that implement these obligations and their corresponding regulations would control as a matter of domestic law. *See Medellin v. Texas*, 552 U.S. 491, 504–05, 505 n.2 (2008). Under the FARRA, if the process to determine whether alien will not be subject to torture has been applied, "the court's inquiry shall have reached its end." *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 957 (9th Cir. 2012) (en banc).

The above plain language and legislative history of Section 265 therefore clearly indicate that the Secretary has the authority to suspend temporarily the effect of immigration laws that otherwise may allow the introduction of persons into the United States.  Plaintiffs' contrary argument that they and the putative class members nevertheless are entitled to certain procedures afforded under the immigration laws is unlikely to succeed.

> ### 2. The CDC's interpretation of Section 265 as temporarily suspending the effect of immigration laws which may allow the introduction of covered aliens is reasonable

If this Court finds that Section 265 does not clearly authorize "a suspension of the right to introduce" covered aliens into the United States, the CDC's interpretation of Section 265 is permissible and entitled to deference under *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  "*Chevron* requires a federal court to accept the agency's [permissible] construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  In issuing the Final Rule, the CDC Director was interpreting a statutory provision that the CDC administers.  At a minimum, the CDC Director is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

Not only is the interpretation of "introduction" within the Secretary's statutory authority, but it is also within the Secretary's expertise.  In interpreting "introduction" within the statutory context, the Secretary necessarily is informed by his scientific and technical knowledge and experience regarding communicable diseases generally and the threat that such diseases can pose to public health.[16]  In issuing the Final Rule, the Secretary was also informed by the CDC's epidemiological expertise in how best to respond to a public health crisis presented by a pandemic.  As discussed before, the CDC Director determined in the CDC Order that the limited size and capacity of the

---

[16]   Courts routinely recognize the CDC's public health expertise.  *See, e.g.*, *In re Approval of Judicial Emergency Declared in Eastern District of California*, 956 F.3d 1175, 1181 (9th Cir. 2020) (determining that it would not be safe to resume normal court operations until "the CDC lifts its guidance regarding travel-associated risks and congregate settings and physical distancing"); *Hickox v. Christie*, 205 F. Supp. 3d 579, 598-99 (D.N.J. 2016) (relying on CDC recommendations to determine legality of state-mandated quarantine in light of the risk of Ebola posed by person entering the United States after treating Ebola patients).

congregate holding areas at ports of entry and Border Patrol stations—and the sheer number of covered aliens seeking to enter the United States—presented a serious public health risk during the COVID-19 outbreak. Moreover, an alien exposed to or infected with COVID-19 would most likely go to healthcare facilities for testing or medical care, increasing the risk of introducing COVID-19 to domestic healthcare workers as well as straining the domestic healthcare system. Thus, the CDC Director reasonably concluded, "the faster a covered alien is returned to the country from which [he] entered the United States, to [his] country of origin, or another location as practicable, the lower the risk the alien poses of introducing, transmitting, or spreading COVID-19 into [ports of entry], Border Patrol stations, other congregate settings, and the interior." October Order at 11. That is, the concurrent application of Section 265 and laws allowing the introduction of persons into the United States is unworkable and contrary to Section 265's authorization to temporarily suspend the effect of all laws that might otherwise allow introduction.

## III.   THE REMAINING FACTORS WEIGH AGAINST A PRELIMINARY INJUNCTION

Because Plaintiffs have failed to establish a likelihood of success on the merits, this Court need not consider the remaining factors for emergency injunctive relief. *See Winter*, 555 U.S. at 20; *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("we read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction") (internal quotation marks and citation omitted); *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 100 n.5 (D.D.C. 2014). But even if the Court does consider the remaining factors of irreparable injury, the balance of the equities, and the public interest,[17] those factors support the denial of Plaintiffs' request for emergency relief.

"[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is 'certain, great[,] and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The irreparable harm requirement "erects a very high bar for a movant." *Coal. for Common*

---

[17]   The balance of harms and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

*Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008).  Because Plaintiffs are seeking a classwide injunction, Plaintiffs' burden is to establish that the class will suffer irreparable harm, and Plaintiffs fail to meet their burden.

Plaintiffs claim irreparable harm based on the alleged "danger [Plaintiffs] are fleeing, their experiences of persecution" and the "grave harm" they would suffer "if returned without the opportunity to seek humanitarian relief."  Mot. at 23.  The potential harm, however, is of an inherently individualized nature, as is the asylum inquiry.  *Id*. at 24 (citing alleged threat that Plaintiff Huisha-Huisha's children would be kidnapped); *see Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998) (recognizing that "[m]ere generalized lawlessness and violence" without a particularized risk to the petitioner is generally insufficient to support a claim of asylum).  Plaintiffs' speculation about the putative class members' individual circumstances—some of whom have not even traveled yet to the United States—does not show that imminent "irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22.  In addition, the Government's implementation of the Order provides a process for determining a covered alien's claim for protection under the Convention Against Torture.  Thus, Plaintiffs would not be expelled without some opportunity to seek humanitarian relief.

On the other side of the balance, "[i]t goes almost without saying, of course, that promoting public health—especially during a pandemic—is in the public interest."  *Nat'l Immigration Project of Nat'l Lawyers Guild*, 2020 WL 2026971, at *12.  Moreover, the health of the general public as well as detained populations is impacted by the actions the Government is taking to combat COVID-19.  *See Banks v. Booth*, 459 F. Supp. 3d 143, 160 (D.D.C. 2020) (finding "[n]o man's health is an island" in that infected inmates risk infection of corrections personnel and the local community wherein the personnel live).  The Government and public have a significant interest in continuing to take action that the CDC Director—the Nation's designated public health expert—determines is necessary to protect the country during the worst pandemic since 1918.  *See* October Order at 2, 3, 11 (concluding Order is in public interest).  "It is in the public interest to avoid or reduce that risk" of COVID-19 exposure.  *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (ruling "petitioners'

deportation could potentially reduce their overall COVID exposure by removing them from congregate detention facilities" and actions "lowering the capacity of those facilities . . . is also in the public interest").

Actions that increase the risk of transmission of COVID-19 are clearly counter to the public interest.  Here, an injunction will increase the risk of COVID-19 transmission, which for some could have deadly consequences, and undoing the mitigation measures put in place by the Order is not in the public interest.  As the CDC Director explained, CBP facilities "are not structured or equipped for quarantine or isolation for COVID-19," and "[t]he numbers of aliens and the size and capacity of the congregate holding areas are not at all conducive to effective social distancing[.]"  March Order at 14.  And CBP is not equipped to provide on-site care to infected persons.  Final Rule, 85 Fed. Reg. at 56,433.  "The danger to the public health that results from the introduction of [aliens] into congregate setting at or near the borders is the touchstone of this order."  March Order at 1.  In this respect, the Order has been successful.  Since the March Order was issued, average daily number of aliens in CBP custody declined by 77% compared to the average daily number in custody during the 75 days prior to the Order.  Declaration of Troy A. Miller ("Miller Decl.") ¶ 12.  This is important because the agency's holding capacity is a quarter of what it once was in an attempt to ensure social distancing protocols are maintained.  *Id.* ¶ 13.  Without the Order in place, and given the recent increase in encounters, U.S. Border Patrol ("USBP") anticipates its facilities may rapidly become overcrowded.  *Id.*

Plaintiffs assert that "families who come to the border are (sic) can be processed quickly by Border Patrol agents and released to sponsors" in the absence of the Order.[18]  Mot. at 26.  The Miller Declaration dispels this unrealistic and factually unsupported statement.  If expulsions are enjoined, apprehended family units will generally require transportation to a USBP station, processing the family for immigration processing pursuant to Title 8 removal pathway, and holding the family until ICE can take custody or the family is released.  Miller Decl. ¶ 9.  Plaintiffs do not characterize what

---

[18]   Plaintiffs also state "the CDC Orders do not conclude that families cannot be safely processed, but note only that in the government's view it is not worth the resources to try to safely process asylum seekers."  Mot. at 28-29.  That is a patent mischaracterization of the Orders, as any reading of the Orders would demonstrate.

they believe constitutes "quickly," but typically aliens remain in CBP custody for several hours up to days.  *Id.* ¶ 11.  On average under Title 8, a covered alien apprehended between POEs will spend approximately 78 hours in a Border Patrol station before transfer to ICE.  March Order at 12.

The CDC Order has helped CBP mitigate risks to its personnel, to other aliens, and to local communities, at the same time encounters at the border have steadily increased.  Miller Decl. ¶ 16. There has been a 357% increase in CBP enforcement encounters from April 2020 to January 2021, with 78,323 aliens encountered in January 2021.  *Id.* ¶ 12.  CBP has experienced a 915% increase in family encounters from April 2020 to January 2021, with 7,490 family units encountered in this most recent month.  *Id.* ¶ 5.  On top of this increase, CBP anticipates enjoining the Order will create a "pull factor" leading to additional attempts to enter the United States and in turn more apprehensions.  *Id.* ¶ 7 (noting an increase in encounters with unaccompanied minors since *P.J.E.S.* injunction was issued).  CBP expects the increase in family unit encounters to continue to rise and is planning for such encounters to double in the next few months.  *Id.* ¶ 6.

Even with the Order reducing the number of interactions with CBP personnel and aliens in custody, the pandemic has taken a toll on the CBP workforce.  As of February 15, 2021, 7,845 CBP employees have tested positive during the pandemic, which is approximately 12% of the workforce.[19] Miller Decl. ¶ 18.  That is roughly 50% higher than the infection rate for the country as a whole.  *Id.* Unfortunately, twenty-three CBP employees have died in the line of duty due to COVID-19, fifteen of whom were stationed along the southwest border.  *Id.*   With personnel on sick leave or quarantining, the ability of CBP to perform its functions is diminished.  *Id.* ¶ 14.

Plaintiffs argue that, insofar as family units are detained under Title 8 and not released, family units can simply be housed in family detention facilities.  Mot. at 26-27.  The three Family Residential Centers ("FRC") operated by ICE, however, can house no more than 3,239 individuals, which is a fraction of the family unit encounters at the border.  Declaration of Russell Hott Decl. ("Hott Decl.") ¶ 16.  In reality, the maximum capacity of FRCs is lower because of the COVID-19 limitations, as

---

[19]    Approximately 5,000 CBP employees in States bordering Mexico have tested positive for COVID-19.  CBP COVID-19 Updates and Announcements, *at* https://www.cbp.gov/newsroom/coronavirus (last visited Feb. 9, 2021).

well as the fact that housing capacity depends on the compositions of family units (family size, genders, ages, etc.).  *Id*.  The issuance of an injunction would necessarily increase the number of FRC family units, straining ICE's ability to maintain its COVID-19 protocols and mitigate risks to families and ICE personnel.  *Id*. ¶¶ 31-32.

Plaintiffs' assessment of the equities of their requested injunction is skewed by their reliance on the very benefits of the Order to argue the Order is not necessary.  For example, Plaintiffs state that no family unit held at a family detention center has required hospitalization, Mot. at 28, but this is in part a function of the Order allowing swift expulsions and efforts to reduce capacity at family residential centers.  *See* Hott Decl. ¶ 29.  Plaintiffs also argue that "expulsions are not necessary, particularly when facilities operate at a reduced capacity to allow for social distancing."  Mot. at 28.  Yet the Order Plaintiffs seek to enjoin facilitated that reduced capacity.  Plaintiffs also rely on a declaration from "public health experts" that is built on a series of assumptions rather than facts ("[if] such families can be processed quickly . . . they would create little or no more risks"; "risks of infection can be substantially mitigated if such facilities operate at reduced capacity").  *See* ECF No. 57-6.  Plaintiffs' arguments that an injunction would not injure the Government or the public are based on the benefits of the Order and optimistic assumptions.

Finally, "[a]ny time [the government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (citation omitted); *see also Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008).  And with respect to Title 42 specifically, the D.C. Circuit stayed the preliminary injunction issued in *P.J.E.S.  See* Order, *P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021), Doc. No. 1882899.  Plaintiffs suggest that the stay pending expedited briefing and consideration "should have no bearing on this motion" because no opinion accompanied the stay decision.  Mot. at 29.  Though Plaintiffs are correct that no opinion was issued, it is also true that the propriety of a stay pending appeal turns on the same factors in determining a preliminary injunction.  *Nken*, 556 U.S. at 426.

At bottom, Plaintiffs would structure the Nation's response to this public health crisis differently.  But that is not a sufficient reason for this Court to substitute its judgment for that of Government officials tasked with ensuring the public health and safety of our Nation.  *See Jacobson*, 197 U.S. at 30 (explaining that "[i]t is no part of the function of a court or a jury to determine" how best to protect the public from a disease); *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring) (explaining that the latitude "to guard and protect" "[t]he safety and the health of the people" "must be especially broad" when acting "in areas fraught with medical and scientific uncertainties"); *Nat'l Immigration Project of Nat'l Lawyers Guild*, 2020 WL 2026971, at *12 ("where[, as here,] the Court is . . . certainly not well-positioned to second-guess" the CDC Director's health and safety determinations, "the public interest does not point in favor of granting injunctive relief"); *see also Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority").  Second-guessing the CDC's determination here risks increasing the transmission of COVID-19 to DHS personnel, migrants, and the American public, which, in turn, may overtax the limited healthcare resources and hamper DHS's operational capacity in performing its law enforcement, immigration, and other important functions.

For these reasons, the balance of equities tip against granting injunctive relief.

## IV.   THIS COURT SHOULD STAY ANY PRELIMINARY INJUNCTION TO ALLOW DEFENDANTS TO CONSIDER THEIR APPELLATE OPTIONS

To the extent that this Court grants Plaintiffs' motion for a preliminary injunction, Defendants respectfully request that this Court stay its order for 14 days to give Defendants sufficient time to explore their appellate options.

In addition, should Defendants seek further review, Defendants respectfully ask that this Court continue the stay pending appeal.  Federal Rule of Civil Procedure 62(d) provides in relevant part: "While an appeal is pending from an interlocutory order or final judgment that grants . . . an injunction, the court may suspend . . . an injunction" during the pendency of the appeal.  Courts in this Circuit weigh the same factors "before granting a stay or a preliminary injunction."  *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613 (D.C. Cir. 1980) (quoting *Virginia Petroleum*

*Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  As shown above, Defendants have demonstrated a likelihood of success on the merits.  Further, the equities weigh in favor of a stay, particularly in light of the stay issued by the D.C. Circuit in *P.J.E.S.*  The CDC Director has lawfully exercised his authority under Section 265 to mitigate the ongoing risks of the COVID-19 pandemic, and a stay during the pendency of any appeal is supported by the strong public interest in this effort to protect public health.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' motions for class certification and preliminary injunction.

Dated:  February 17, 2021

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

 */s/ Sean M. Tepe*
SEAN M. TEPE, DC Bar #1001323
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2533
Email: sean.tepe@usdoj.gov

*Counsel for Defendants*