IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NANCY GIMENA HUISHA-HUISHA, *et al.*,
on behalf of herself and others similarly
situated,

    Plaintiffs,

v.

ALEJANDRO MAYORKAS, Secretary of
Department of Homeland Security, *et al.*,

    Defendants.

Civil Docket No. 1:21-cv-00100-EGS

## DECLARATION OF TROY A. MILLER

I, Troy A. Miller, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

*Background*

1. I am the Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection (CBP), and have been in this role since January 20, 2021. Prior to this role, I served as Director, Field Operations of CBP's New York Field Office from October 28, 2018 to January 19, 2021, and served as Executive Director, National Targeting Center from June 5, 2011 to October 27, 2018. From June 2013 to January 2015, I also served as Acting Assistant Commissioner, Office of Intelligence and Investigative Liaison, following a 20-year career with CBP and its predecessor, the U.S. Customs Service, as a Customs Inspector.

2. The CBP mission is to protect the American people, safeguard our borders, and enhance the Nation's economic prosperity while maintaining the core values of vigilance, service, and integrity. In my capacity as the Senior Official Performing the Duties of the Commissioner, I oversee and direct five core missions -- counterterrorism, combating transnational crime, securing the border, facilitating lawful trade and protecting revenue, and facilitating lawful travel. I am responsible for overseeing over 63,000 employees, managing an annual budget of over $13 billion, and ensuring the effective operations of CBP's mission to protect national security while promoting economic prosperity. CBP annually facilitates $4 trillion in trade and processes over 410 million travelers through Ports of Entry (POEs). In addition, in FY2019, U.S. Border Patrol (USBP) apprehended 859,501 aliens not lawfully in the U.S.

3. I am familiar with the Centers for Disease Control and Prevention (CDC) *Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists* (Mar. 20, 2020) (CDC Order) and subsequent extensions and amendments, as well as CBP's role in assisting with implementing this Order. Specifically, I am aware that CDC has determined that transmission of COVID-19 at CBP facilities could lead to the infection of aliens in CBP custody, infection of CBP officers, agents, and others who are exposed to such aliens in custody, as well as increasing exposure risk to already challenged local health systems and local communities. I am also aware that because of the continued prevalence of COVID-19 in both Mexico and Canada, the CDC has determined that the entry of aliens crossing the northern and southern borders into the United States (regardless of their country of

origin) continues to present a serious danger of introducing COVID-19 into POEs and USBP stations at or near the U.S-Mexico and U.S.-Canada borders.

4. I am familiar with *Huisha-Huisha, et al., v. Mayorkas, et al.*, No. 1:21-cv-00100 (D.D.C.), in which plaintiffs ask the court to certify a class defined as "[a]ll noncitizens who (1) are or will be in the United States; (2) come to the United States as a family unit composed of at least one child under 18 years old and that child's parent or legal guardian; and (3) are or will be subjected to the Title 42 Process." Generally, Plaintiffs are requesting the court issue a class-wide preliminary injunction on behalf of the proposed class, and enjoin defendants from applying what it calls the "Title 42 process" to the members of the proposed class. I submit this declaration in support of CBP's assertion of the harm that CBP anticipates would occur if the district court issues a preliminary injunction enjoining the government from expelling class members from the United States. As set forth further below, it is my judgment that if the district court issues a preliminary injunction enjoining the government from expelling class members from the United States, it could be expected to cause harm to national security and substantial negative impacts on lawful trade and travel throughout the country.

5. From March 1, 2020 to February 8, 2021, CBP encountered 38,029 family units along the southwest border. CBP encountered 738 family units in April 2020; 1,052 in May 2020; 1,679 in June 2020; 2,050 in July 2020; 2,715 in August 2020; 3,894 in September 2020; 4,756 in October 2020; 4,370 in November 2020; 4,650 in December 2020; and 7,490 in January 2021. This represents a 915 percent increase from April 2020 to January 2021 (the last full month for which we have complete data).

6. Based on CBP's average encounter data from similar time periods in FY2018 and FY2019, CBP anticipates that the number of individuals in family units apprehended by CBP will increase from the end of February 2021 (estimated 8,998 family units) to the end of May 2021 (estimated 18,365 family units). Therefore, CBP is planning for an increase of 104 percent in family units in the next few months. In the event of a preliminary injunction enjoining the government from expelling family units from the United States under Title 42, and with CDC COVID-19 protocols remaining in effect for holding facilities, USBP predicts they will exceed maximum holding capacity across the southwest border within one week.

7. Additionally, a preliminary injunction enjoining the government from expelling family units from the United States under Title 42 may become a pull factor leading to additional numbers of family units apprehended by CBP. This would be consistent with my past experience with previous court orders that have similarly had an effect – or perceived effect – on CBP's processing or detention of certain individuals, as such orders have also served as a pull factor for those individuals entering the United States. For example, I am familiar with the U.S. District Court for the District of Columbia's November 18, 2020 order (District Court Order) in *P.J.E.S. v. Wolf, et al.*, No. 1:20-cv-02245 (D.D.C.), that, among other things, certified a class of unaccompanied noncitizen children who would be expelled consistent with the CDC Order, generally discussed above, and enjoined their expulsion from the United States. From November 18, 2020, through January 29, 2021, CBP encountered 12,430 unaccompanied noncitizen children. In the same span of time before the injunction, from September 5, 2020, through November 17, 2020, CBP encountered 10,675 unaccompanied noncitizen children. This

4

represents a 16.4 percent increase in such encounters after the District Court Order was issued.

8. USBP stations along the southwest border are already at or near operating capacity. In fact, in nearly half of the USBP sectors along the southwest border, certain stations and entire sectors have been over capacity at some point during the day as particular stations have to intake large groups of aliens that are encountered. Therefore, on multiple occasions, it has proved necessary to release covered aliens from custody due to capacity constraints—which is precisely the sort of danger that the CDC Order was meant to mitigate. *See* 85 Fed. Reg. 17060, 17067 (describing how release increases risks where many aliens lack places in the U.S. where they can self-isolate). This is due, in large part, to the diminished operating capacity necessitated by COVID-19 social distancing protocols and the significant influx of unaccompanied noncitizen children and family units that have been encountered in the United States since the November 18, 2020 *P.J.E.S.* preliminary injunction. Accordingly, a preliminary injunction enjoining the government from expelling any group of covered aliens from the United States, contrary to CDC's expert guidance, would likely prove extremely dangerous, and possibly deadly given the nature of COVID-19, to the CBP employees working in these facilities, the individuals in CBP custody, as well as those in local communities.

9. Should the District Court issue a preliminary injunction in *Huisha-Huisha* enjoining the government from expelling class members from the United States, the time it takes to process class members will be significantly prolonged, increasing the risk of exposure to COVID-19 for CBP personnel and other aliens in CBP custody. Under Title 42, family units who can be expelled directly back to Mexico would generally be processed in the

field without being brought back to a USBP station. With such an injunction, CBP will have to process class members who would otherwise be subject to the CDC Order under Title 8, which will generally require transporting the family unit to a USBP station/processing center, processing the family unit for a Title 8 removal pathway, and holding the family unit until Immigration and Customs Enforcement (ICE) can take custody, or the family is released. Since the implementation of the CDC Order, approximately 79 percent of family units expelled have been immediately expelled without entering a USBP facility, meaning only approximately 21 percent of family units expelled ever reach a USBP facility while awaiting a delayed expulsion. In relation to family unit expulsions from March 21, 2020 through February 8, 2021, 8,288 were immediately expelled by USBP and approximately 2,200 were delayed expulsions. Of those delayed expulsions, USBP expelled 380 and ICE expelled 1,820. Under Title 8, family units are generally taken back to a USBP facility for a more time intensive processing. Once that is complete, the family unit may be processed for a Title 8 removal pathway, such as being placed in 8 U.S.C. § 1229a proceedings or expedited removal pursuant to 8 U.S.C. § 1225(b)(1). Thus, a preliminary injunction will substantially increase the amount of time it takes to process class members, and the number of class members entering CBP facilities will increase dramatically, likely putting CBP personnel and other aliens in CBP custody at a greater risk of contracting COVID-19.

***Risks in Overflowing Border Facilities***

10. I would emphasize that generally, if a particular USBP station or POE, or even a particular USBP Sector or Office of Field Operations Field Office, is facing a significant influx of individuals apprehended or encountered, agents and officers in those locations

must devote a significant portion of their time to processing those individuals, ensuring that those individuals receive appropriate treatment, and transporting those individuals to and out of CBP facilities. CBP has a finite number of employees. Thus, with more agents and officers focused on the individuals already in custody, this leaves fewer agents and officers available to actually patrol and secure the border, particularly in remote areas of the southwest border. Further, as the number of family units in USBP custody increases, the risk of the spread of COVID-19 in USBP facilities increases. This is because USBP facilities are congregate facilities that are not well equipped for social distancing, isolation, or quarantine. CDC Order at 1. USBP facilities are designed for short-term holding, and have limited capacity. They are not designed to hold individuals for more than a few days, generally for the purpose of transferring custody to another agency, such as ICE or ORR. Further, I would emphasize that USBP personnel have experienced difficulties with aliens in CBP custody, especially minors, including those in family units, not utilizing personal protective equipment, such as masks, and adhering to social distancing guidelines. USBP personnel routinely have to ask aliens in CBP custody, especially minors, to wear their masks and to wear them properly in order to protect themselves and others from possible exposure to COVID-19. Additionally, USBP personnel have to routinely ask aliens in CBP custody, especially young children, to sit apart from one another or keep their distance in order to comply with COVID-19 social distancing guidelines.

11. I am aware that under normal operating conditions, CBP officers and agents come into regular, sustained contact with aliens seeking to enter the United States at POEs, or between POEs. I am also aware that CBP must normally hold aliens longer for

immigration processing if they arrive without valid travel documents, and that such aliens may be in CBP custody, near CBP personnel and other aliens, for hours or days. In light of the current elevated COVID-19 risk, these circumstances create increased risk for CBP personnel, aliens in CBP custody, local health systems, and local communities.

12. The CDC Order has greatly reduced the number of persons CBP has in its custody, and accordingly reduced the COVID-19 risks described above. In the 75 day period preceding the March 20, 2020 Order (i.e., January 6, 2020, to March 20, 2020), there was a daily average of 3,292 aliens in CBP custody at POEs and USBP stations. From March 21, 2020, through February 10, 2021, the daily average declined to 760 aliens in CBP custody. This represents a 77 percent reduction in daily custody numbers and a 90 percent reduction from the same period in 2019, likely as a result of the issuance of the CDC Order. Despite decreases in daily custody numbers, CBP enforcement encounters continue to increase month over month: CBP encountered 17,106 aliens in April 2020; 22,237 aliens in May 2020; 33,049 aliens in June 2020; 40,929 in July 2020; 50,014 in August 2020; 57,674 in September 2020; 69,237 in October 2020; 72,091 in November 2020; 73,923 in December 2020; and 78,323 in January 2021. This represents an increase of 357 percent from April 2020 to January 2021. In relation to family units specifically, in the 75 day period preceding the March 20, 2020 CDC Order (i.e., January 6, 2020, to March 20, 2020), there was a daily average of 1,218 family units in CBP custody at POEs and USBP stations. From March 21, 2020 through February 10, 2021, the daily average declined to 166 family units in CBP custody. This represents an 86 percent reduction in daily custody numbers, likely as a result of the CDC Order.

13. CBP estimates that the agency will face significant challenges due to social distancing and space constraints after accounting for COVID-19 protocols. Prior to the COVID-19 pandemic, USBP's holding capacity for aliens apprehended along the southwest border was approximately 12,428. USBP's efforts to further mitigate the spread of COVID-19 necessitated the reduction of our holding capacity to approximately 25 percent to ensure social distancing protocols are maintained, to the extent possible. Despite these internal procedures, CBP continues to be wholly reliant on partner agencies to quickly assume custody of aliens apprehended by its agents and officers. Should the number of persons in custody increase, or transfer of custody to those agencies be delayed beyond 72 hours, USBP facilities may rapidly become overcrowded and the spread of COVID-19 to the population in CBP facilities, CBP employees, CBP contractors, and the general public is likely.

14. There are numerous scenarios under which CBP's limited holding capacity could more quickly be exceeded. For example, in my experience and as discussed above, should a preliminary injunction be issued, it will likely create a pull factor, leading to an increasing number of family units entering or attempting to enter the U.S. Rising apprehensions along the southwest border would decrease the amount of time it would take to reach CBP's COVID-19 reduced holding capacity. A significant influx, like the 2019 southwest border humanitarian crisis, could likewise lead to a substantially shorter timeframe. An influx of aliens apprehended while CBP is operating at a reduced capacity, which could risk infecting numerous agents and/or officers who may become sick and unable to perform their duties, could severely diminish CBP's ability to perform its functions and duties. Further, an outbreak within a CBP facility could quickly

handicap CBP's ability to utilize that facility's maximum capacity, further lowering the overall detention capacity along the southwest border. The need to quarantine subjects and deep clean/sanitize infected holding cells will also quickly deplete CBP's detention capacity. In addition, over-capacity conditions at CBP facilities, resulting from the loss of Title 42 authority would increase other humanitarian challenges and other public health concerns.

15. Separate and apart from CBP's overall detention capacity along the southwest border, a particular location's holding capacity could be overwhelmed almost immediately depending on the specific circumstances. For example, an apprehension of a large number of individuals, a significant number of CBP personnel becoming infected or quarantined, or an outbreak of COVID-19 amongst aliens in custody, etc., might lead to that location being overwhelmed within a number of hours or days. The same would be true if there were a surge in COVID-19 infections or quarantined CBP personnel.

16. Reducing the number of, and time spent by, persons in CBP custody lowers the risk that officers and agents will contract COVID-19 in carrying out their official responsibilities and fulfilling the CBP mission to protect the American people, safeguard our borders, and enhance the Nation's economic prosperity. It also reduces the risk that persons in CBP custody will contract COVID-19. I believe the CDC Order has greatly reduced the risk of CBP employees becoming infected with, or needing to self-quarantine because of their exposure to, COVID-19 in the course of carrying out their official duties.

17. CBP examined a hypothetical case study of what would happen if a COVID-19 positive subject apprehended in 2020 had been apprehended during the 2019 southwest border humanitarian crisis, the peak of which saw around 20,000 aliens in custody throughout

USBP's facilities. The case examined the typical processing lifecycle of an actual subject apprehended in 2020 in a group of 53 people who were brought into custody in El Paso, Texas's Centralized Processing Center. A subject positive with COVID-19 would have come into contact with, and potentially infected, anywhere from nearly 400 to over 1,800 other subjects, both aliens in CBP custody and CBP personnel. At most CBP facilities, without the CDC Order in place for all covered aliens, maintaining adequate social distancing may not be possible. As of February 13, 2021, USBP has encountered 372 aliens who tested positive for COVID-19 while in USBP custody. The first known encounter occurred in April 2020, and encounters increased rapidly through the summer of 2020 and have remained steady since then. On average, USBP encounters at least one verified COVID-19 positive alien per day. To date, each of those individuals have been encountered at the U.S.-Mexico border. To be clear, the number of aliens in CBP custody who were infected with COVID-19 is likely far larger. CBP does not test aliens in its custody for COVID-19; rather, the number of positive tests relate strictly to those aliens who were taken to the hospital, including for care not related to COVID-19 symptoms.

18. I am also aware of strained resource capacities at CBP's facilities caused by the effects of COVID-19. As of February 15, 2021, 7,845 CBP employees have tested positive for COVID-19, including 629 actively positive cases. There has been a steady increase in the number of CBP employee positive cases since September 2020. In September 2020, CBP had 218 positive employee cases; October 2020, had 616 positive cases; November 2020, had 1,199 positive cases; December 2020, had 1,726 positive cases; and January 2021, had 1,641 positive cases. This reflects a 752.7 percent increase in monthly new

positive CBP employee cases from September 2020 to January 2021 (the last full month for which we have complete data). As of February 15, 2021, of the 149 CBP employees positive with COVID-19 in the State of Texas, 54 work in El Paso (29) or Laredo (25) along the southwest border. As of February 15, 2021, CBP had a total of 7,845 COVID-19 cumulative positive employee cases, out of approximately 63,457 employees (reflecting employment data current as of January 30, 2021). Therefore, I estimate that CBP's COVID-19 infection rate is approximately 12.36 percent. As of February 12, 2021, the U.S. had a total of 27,127,858[1] positive COVID-19 cases, and a population of 332,215,274.[2] Therefore, I estimate that the U.S.'s COVID-19 infection rate is approximately 8.16 percent. As such, CBP's infection rate already exceeds the national rate, indicating that CBP employees are disproportionately affected by COVID-19, and it is likely that CBP's overall workforce infection rate will grow even faster if an injunction is issued in this case. Unfortunately, twenty-three CBP employees have died in the line of duty due to COVID-19, fifteen of whom were stationed along the southwest border. An additional two CBP employees and one contractor also died as a result of COVID-19. USBP Agent Enrique Rositas, Jr. died in the line of duty after serving over 23 years with USBP. Agent Rositas was a line officer in the McAllen Station part of the Rio Grande Valley Sector, which is consistently the busiest in the nation in terms of the apprehension of aliens crossing the border. By comparison, there was only one non-COVID-19 line of duty death since March 2020, and from FY2015 through FY2019 there were seven total line of duty deaths of CBP employees with no more than two line of duty deaths in a given year.

---

[1] https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days. (last viewed February 12, 2021).
[2] https://www.worldometers.info/world-population/us-population/. (last viewed February 12, 2021).

19. An outbreak of COVID-19 in a CBP facility could lead to further significant reductions in available personnel, which could lead to severe vulnerabilities and gaps in securing the border. CBP officers and agents are not readily replaceable, in part because their missions include complex immigration, customs, and national security functions that require specialized training. For example, gaps in the USBP's ability to patrol the border caused by personnel shortages and facility closures would create severe safety and national security risks for the United States, particularly in fulfillment of the core mission priorities involving counter terrorism, combatting transnational crime, securing the border, and impeding the further introduction of COVID-19 into the United States.

20. CBP also sees an increase in strained resources when more aliens need to be transported to hospitals for diagnosis, treatment, or care. In the 50 day period before implementation of the CDC Order, over 1,600 trips were made by USBP to community hospitals to provide aliens advanced medical care. In the 50 days preceding February 11, 2021, a significantly lower 1,058 trips have been made for aliens in CBP custody to receive medical care from community hospitals. Moreover, many CBP facilities, particularly along the southern land border, are located in remote locations distant from hospitals and other medical care and supplies.

21. CBP has policies and procedures in place to mitigate the threats posed by communicable diseases, but the unprecedented challenges posed by the COVID-19 pandemic cannot reliably be addressed by those policies and procedures. CBP is a law enforcement agency, not a medical/public health agency, and although CBP has basic contract medical support on location at certain CBP facilities to provide limited, focused medical support, even this contracted medical support is not sufficient to address a widespread COVID-19

13

outbreak or provide COVID-19 testing, diagnosis, and treatment, which requires local health resources. CDC Order at 12.

22. An outbreak of COVID-19 at a CBP facility could cause significant harm to individuals beyond just those in the facility. CBP is generally just the first entity to encounter a migrant in the United States. Normally, CBP would rapidly process and transfer persons in custody to ICE or the Department of Health and Human Services. If aliens in CBP custody or CBP personnel are exposed to COVID-19, this leads to the further spread of COVID-19, with spillover effects on local communities and throughout the nation. CDC Order at 2. The CDC Order protects CBP personnel and persons in CBP custody first, but it also protects against additional exposure throughout local communities and the nation.

23. An outbreak of COVID-19 in a CBP facility forces CBP to temporarily close that facility, which limits where CBP can hold aliens whom it apprehends. Aliens need to be transferred to another facility, which results in additional agent/officer and migrant exposure over longer transportation times and could further harm capacity issues at that facility. In an incident over the summer, after an alien tested positive while in a USBP facility in California in May 2020, other aliens in custody were transferred to another facility for custody hold pending cleaning and the potentially contaminated areas where the alien had been were closed for three days to allow for proper cleaning, reducing facility detention capacity during that time. On the day of exposure, 56 aliens were in the facility awaiting expulsion to Mexico.

24. Closing a facility would also limit how CBP conducts operations even beyond the scope of enforcing immigration law. For example, if the World Trade Bridge in Laredo, Texas

were to close due to limited staffing from COVID-19 positive exposures, approximately $514,478,446 (upwards of 7,000 trucks) of daily commercial goods that cross would be impacted, causing disruptions to the auto industry and other essential operations. Along the entire southwest border with Mexico, the daily average of cross border trade (imports and exports) includes over 18,000 commercial trucks carrying $1.6 billion in goods essential to the economies of both countries. Further, CBP processes all persons and cargo entering and departing the United States, and any substantial reduction in CBP staffing capacity at ports of entry, or need to divert resources to impacted areas, could have enormous consequences on facilitating lawful trade, protecting revenue, and the economy.

25. The effectiveness of CBP's mission to protect the American people, safeguard our borders, and enhance the Nation's economic prosperity is dependent on the ability of our officers and agents to properly perform their duties at the POEs and between the POEs. It would seriously compromise CBP's ability to perform its counter terrorism, law enforcement, and lawful trade and travel facilitation mission priorities if the number of officers and agents were diminished due to infections with COVID-19.

26. I have determined that should the district court grant the plaintiffs' requested injunctive relief, its restrictions on the use of the CDC Order as a tool available to CBP to manage the influx of proposed class members would have grave consequences to public safety and national security by diminishing the ability of CBP to effectively and efficiently perform its mission.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 17th day of February, 2021.

                                                  Troy A. Miller
Senior Official Performing the
Duties of Commissioner
U.S. Customs and Border Protection