UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

HUISHA-HUISHA, et al.,

              Plaintiffs,

   v.

ALEJANDRO MAYORKAS,
Secretary of Homeland Security, et al.,

              Defendants.
_____

Civ. Action No. 21-00100 (EGS)

DECLARATION OF RUSSELL HOTT

    I, Russell Hott, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

**I.**     <u>**Personal Background**</u>

    1.     I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Assistant Director for the Custody Management Division (CMD). I was acting in this position beginning February 2020 until January 2021 when I was permanently named. CMD provides policy and oversight for the administrative custody of ICE's highly transient and diverse population of immigration detainees. CMD is composed of three divisions led by three Deputy Assistant Directors under my direct supervision: (1) the Alternatives to Detention Division; (2) the Detention Management Division; and (3) the Custody Programs Division.

2.	As the Assistant Director, I am responsible for the effective and proficient performance of these three Divisions and their various units, including the oversight of compliance with ICE's detention standards and conditions of confinement at ICE detention facilities generally. I am further responsible for managing ICE detention operations efficiently and effectively to provide for the safety, security, and care of an average of about 34,000 detainees daily and roughly 183,000 detainees annually in Fiscal Year 2020, at over 200 facilities nationwide, including three family residential shelters located in Texas and Pennsylvania.

3.	From May 2017 to January 2021, I served as the Field Office Director for the Washington, DC ERO Field Office, responsible for the District of Columbia, Virginia, and West Virginia. In my role as Field Office Director, I provided operational and policy oversight for ERO's interior enforcement efforts within the local area of responsibility, spanning 43,000 square miles, three district courts, with an operating budget of $53 million dollars, a cadre of nearly 200 employees, and 1,400 detention beds.

4.	I began my career with the U.S. Government as a detention enforcement officer with the former Immigration and Naturalization Service in New York, NY. I advanced through a variety of positions including Immigration Enforcement Agent, Deportation Officer, Instructor at the Federal Law Enforcement Training Center, Supervisory Detention and Deportation Officer, acting Assistant Field office Director, National Program Manager, Unit Chief, acting Deputy Chief of Staff for ERO, Chief of Staff for the ICE Deputy Director, Deputy Field Office Director for both the Boston and Washington field offices, Field Office Director, and acting Deputy Assistant Director.

**II.     ERO Overview**

5.      Following the enactment of the Homeland Security Act of 2002, ICE was created from elements of several legacy agencies, including the U.S. Immigration and Naturalization Service and the U.S. Customs Service. ICE is the principal investigative arm of DHS, and its primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade and immigration. Within ICE, ERO oversees programs and conducts operations to identify and apprehend removable noncitizens, to detain these individuals when necessary, and to remove noncitizens with final orders of removal from the United States. ERO manages and oversees all aspects of the removal process within ICE, including domestic transportation, detention, alternatives to detention programs, bond management, and supervised release, and removal to more than 170 countries around the world. As part of the removal process, ERO manages a non-detained noncitizen docket of more than 3.3 million cases, which is comprised of noncitizens currently in removal proceedings and those who have already received removal orders and are pending physical removal from the United States.

6.      ERO's detention network includes over 200 detention facilities nationwide. In normal conditions, ERO generally detains short-term cases apprehended at the border (for example, those who are detained pending credible fear interviews) near the border and transfers longer-term cases (for example, those who are detained for removal proceedings) into the interior. ERO removes noncitizens from the United States who are subject to a final order of removal issued by an immigration court or following an administrative removability review. Removals can require a combination of significant resources and the process varies depending on the destination country. ERO must ensure that the noncitizen to be removed has the appropriate paperwork and/or travel

documents required by the destination country; in some instances, this requires an in-person interview at the destination country's consulate. To execute the removal, ERO contracts or charters flights or uses commercial airlines for escorted and unescorted removals. ERO also conducts routine domestic transfer and removal missions utilizing a Commercial Aviation Services contract with an air charter provider commonly referred to as ICE Air. In addition to noncitizen removals by air, ERO also removes noncitizens via ground transportation to contiguous countries. This process involves planning and coordinating removals across the country and developing and implementing strategies to support the return of all removable noncitizens to their country of origin.

7. CMD is one of seven headquarters Divisions. The other six are: Enforcement, Removal, Field Operations, the ICE Health Service Corps (IHSC), Law Enforcement Systems and Analysis, and Operations Support.

8. CMD provides policy and oversight for the administrative custody of one of the most highly transient and diverse populations of any correctional or detention system in the world. CMD manages ICE detention operations efficiently and effectively to provide for the safety, security, and care of noncitizens detained in ICE custody. CMD oversees the Juvenile and Family Residential Management Unit (JFRMU) which addresses issues confronting unaccompanied alien children (UAC) and noncitizen family units who come into ERO custody, including those detained at a Family Residential Center (FRC). JFRMU develops policies sensitive to the various vulnerabilities and needs of these populations. JFRMU trains, monitors, and advises Field Office Juvenile Coordinators (FOJCs). These officers serve as subject matter experts on juvenile and family matters in their respective field offices. As JFRMU advises FOJCs, they in turn, advise

their fellow officers who encounter minors during enforcement activities. JFRMU oversees and monitors the implementation of nationwide court orders that impact this population.

9. CMD also oversees the Alternatives to Detention Unit. Alternatives to Detention (ATD) is a flight-mitigation tool that uses technology and case management to ensure compliance with release conditions and facilitate noncitizen compliance with court hearings and final orders of removal, while allowing noncitizens to remain in the community – contributing to their families and community organizations and, if necessary, concluding their affairs in the U.S. – as they move through immigration proceedings.

10. As a part of my official duties, I am familiar with how COVID-19 has impacted the operations of ICE FRCs. I submit this declaration to explain the extensive and continuing impact ICE will experience if Title 42 cannot be utilized in cases involving family units comprised of minor children traveling with their parent(s) or legal guardian(s). Title 42 permits the orderly and prompt expulsion of individuals from the United States to mitigate the risk of COVID-19 transmission in congregate settings such as border patrol stations or immigration detention facilities. The information in this declaration is based upon my personal knowledge and experience as a law enforcement officer and on information provided to me in my official capacity. Due to the constantly evolving nature of this crisis, operational realities are fluid with new decisions being required on a regular basis. The information in this declaration is current and accurate as of the time I signed below.

**III.    ICE's Role in Processing Title 42 Cases involving Family Units**

11. Upon receipt of a family unit processed under Title 42 by U.S. Customs and Border Protection (CBP), ICE is responsible for providing transportation to, and, if necessary, housing the family unit at an ICE FRC while awaiting an expulsion flight. In most cases, ICE provides

transportation directly from a CBP facility to an expulsion flight without booking individuals into an ICE FRC. ICE transports family units from CBP through a contract with MVM Inc. (MVM). MVM complies with all U.S. Centers for Disease Control & Prevention (CDC) guidelines to minimize the risk of COVID-19 transmission during transportation.

12.     If a member of the family unit claims a fear of torture while in ICE custody pending an expulsion flight, ICE refers the family unit to U.S. Citizenship and Immigration Services for screening to determine whether any members of the family unit have a colorable claim for protection under the Convention Against Torture (CAT).

### IV.     ICE Family Residential Centers

13.     ICE oversees the operations of three FRCs: The South Texas Family Residential Center ("STFRC" or "Dilley") in Dilley, Texas, the Karnes County Family Residential Center ("KCFRC" or "Karnes") in Karnes City, Texas, and the Berks Family Residential Center ("BFRC" or "Berks") in Leesport, Pennsylvania.  FRCs allow parents and children to move about the facility without restriction. Residents also receive medical and mental-health care as well as other developmentally and culturally supportive services. State-certified educators teach the school-aged children in on-site classrooms.

14.     Each FRC is operated consistent with ICE's strict Family Residential Standards (FRS), which are available at https://www.ice.gov/detain/detention-management/family-residential. The FRS promote a unique, non-secure, open-movement environment which permits parents and children to live in a dorm-like setting with access to education, recreational opportunities and health care on site. Family units have freedom of movement throughout FRCs during daytime hours. Residents have access to libraries, recreational facilities, playrooms. The focus of the FRC is to have an environment that encourages family health and safety by providing

child-friendly amenities and services in an environment that is conducive to healthy family interactions. Families interact with each other throughout the day. FRCs are staffed with contracted Resident Advisors in lieu of security officers. The FRS were developed with input from medical, psychological, and educational subject matter experts and various organizations such as the DHS Office of Civil Rights and Civil Liberties and many non-governmental organizations. Families interact with each other throughout the day.

15. Under the *Flores* Settlement Agreement, ICE must ensure the safety and well-being of all minors in its custody, including those housed with their parents at an FRC. *See Flores v. Reno*, No, CV 85-4544 (C.D. Cal. Dec. 7, 2001) (order entering Stipulated Settlement Agreement). The *Flores* court subsequently found that Title 42 minors in DHS and Office of Refugee Resettlement custody are *Flores* class members, which includes those minors temporarily held in hotels by DHS pending expulsion. *Flores v. Barr*, No. CV 85-4544, 2020 WL 5491445 (C.D. Cal. Sep. 4, 2020). The court further found that temporary hotel stays "are not adequately safe and do not sufficiently account for the vulnerability of unaccompanied minors in detention" and that the "hotel program is not safe with respect to preventing minors from contracting COVID-19 or providing the type of care and supervision suitable for unaccompanied minors" as is required by paragraph 12 of the *Flores* Settlement Agreement. *Id.* at 13-18. Therefore, DHS was ordered to cease placing minors in hotels with very limited exceptions. *Id.* at 17.

16. The total theoretical housing capacity at the three FRCs are as follows: Karnes can house up to 830 total individuals; Dilley can house up to 2,400 total individuals; Berks can house up to 96 total individuals. While these numbers represent the total number of beds at each facility, given the open nature of the facility, and the living spaces within the facility, factors including family unit composition, gender of parent, and ages and gender of children, will dictate which

families can be housed together in the living spaces. Additionally, given limitations related to the COVID-19 pandemic, including some court-imposed restrictions, the usable capacity of the FRCs has been further reduced, as further outlined below. In sum, the total numbers of individuals who may be housed at an FRC at any given time varies based on current population configurations and may ultimately be significantly less than the actual capacity of each facility.

### V.  Legal Obligations at ICE FRCs

17.   As facilities used to house noncitizen minors, ICE FRCs are subject to judicial oversight under the ongoing *Flores v. Wilkinson*, No. 85-4544 (C.D. Cal. filed July 11, 1985) case. The *Flores* court has issued specific orders pertaining to the health and safety of family units during the COVID-19 pandemic. On June 26, 2020, the court ordered the following:

> "Implementation of the CDC protocols, particularly in the following areas:
> a. Social distancing: More effective use of the available space in the FRCs should be implemented such that living quarters, bathroom facilities, eating areas, and other communal areas are compatible with optimal social distancing protocols. Spaced residential assignments, staggered bathing and eating schedules, and sequenced use of other facility locations should be implemented to permit greater distancing among residents.
> b. Masking: Recommended masking protocols need to be enforced at all times. Enhanced training regarding mask usage for all staff may be necessary and oversight and documentation of compliance with these protocols are indicated.
> c. Enhanced testing: Greater use of testing should be implemented for staff, new entrants, and residents as indicated by evolving CDC and local health department guidelines for congregate care facilities."

*Flores v. Barr*, No. 85-4544, 2020 WL 3488040, *3 (C.D. Cal. June 26, 2020).

18.   In addition to *Flores,* FRCs are also the subject of litigation in *O.M.G. v Wolf*, No. 20-0786 (D.D.C. filed Mar. 21, 2020). In a Minute Order dated March 30, 2020, the *O.M.G.* court ordered that the FRCs follow "the same protocols and procedures as ordered for the children in

*Flores*," and follow the CDC guidelines for detention centers. In this case ICE provides the court with reporting of all COVID-19 cases at FRCs.

19. Although not limited to the three ICE FRCs, the U.S. District Court for the Central District of California provisionally certified two nationwide subclasses of individuals detained in ICE custody who may have one or more risk factors or disabilities placing them at heightened risk of severe illness and death upon contracting COVID-19 and granted a preliminary injunction. *Fraihat v. ICE*, 445 F. Supp. 3d 709 (Apr. 20, 2020). Among other requirements, the preliminary injunction requires that ICE identify all ICE detainees who have one or more of the court-identified "risk factors" within 5 days of a detainee's detention and make timely custody determinations for those individuals.

20. In order to comply with these and other legal obligations, FRCs maintain conditions consistent with what is described below.

## VI. Current Conditions at ICE FRCs

21. The health, welfare, and safety of ICE detainees is one of the agency's highest priorities. Since the initial reports of COVID-19, ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to ICE Health Services Corps (IHSC) staff for the prevention and management of potential exposure among detainees. ICE has undertaken significant efforts to keep detainees safe, including self-imposed and court-ordered operational changes.

22. On April 10, 2020, ERO released the COVID-19 Pandemic Response Requirements (PRR), a guidance document developed in consultation with the CDC that builds upon previously issued guidance. Specifically, the PRR sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees, including the three FRCs,

9

as well as best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this unprecedented public health crisis. The PRR has been revised several times since its initial release, most recently on October 27, 2020. The PRR is available at https://www.ice.gov/coronavirus/prr.

23. The FRCs have housed family units who were COVID-19 positive but they have largely been new intakes, not families already residing at the facilities. Between March 30, 2020 and February 10, 2021, Berks had 4 positive COVID-19 cases, Karnes had 103 cases and Dilley had 42 cases. Due to the strict quarantine conditions these cases did not result in COVID-19 outbreaks among residents at the facilities. As of February 10, 2021, there were 27 active cases of COVID-19 at the FRCs. There were no deaths or hospitalizations related to these cases.

24. Specifically, the FRCs have implemented the following measures, among others, to prevent the introduction and spread of COVID-19 in the facilities.

    a. All residents of the FRCs are screened and tested for COVID-19 at intake and are housed according to CDC and ICE PRR guidelines. In addition to testing at intake and irrespective of whether a member of the family unit tests positive or negative, new family units are housed in individual rooms for 14 days. Depending on population levels, a family unit may be housed with up to one other family once both family units complete the 14-day observation period, although this option has not been utilized throughout the COVID-19 pandemic.

    b. Staff members undergo a temperature check and symptom screening prior to entering the facility, and are directed to report symptoms, if they have been in close contact with someone who has tested positive for COVID-19, and

potential exposures prior to reporting for their shifts. Staff members who test positive for COVID-19 are directed to self-quarantine and contract tracing is promptly completed.

c. Each FRC provides residents and staff with personal protective equipment (PPE), which may include surgical masks (adult and pediatric), N-95 masks, surgical gowns, goggles, safety glasses, gloves, and face shields. The type of PPE worn by staff and residents depends on the function of the staff and the individual resident's situation. The FRCs have installed additional hand sanitizer pumps throughout the facility. PPE supplies levels are regularly monitored to ensure timely replenishment.

d. FRC residents receive COVID-19 education in a variety of ways and in multiple languages. Informing residents about COVID-19 and preventative measures taken and available to them at the FRC may be explained during intake orientation, daily public announcements, CDC videos, television news broadcasts, or individualized meetings with case managers or healthcare staff, as well as through signage displayed throughout the facility, and informational packets. The COVID-19 news and educational materials provided describe health standards/hygiene practices, proper cough and sneeze etiquette, and to inform staff and residents of symptoms of COVID-19, and if symptoms develop, the CDC recommendations.

e. ERO set a nationwide goal to reduce the capacity usage of all dedicated ICE facilities, which include the three FRCs, to under 70% to help mitigate the impact of COVID-19 and promote social distancing. This goal went further

than the CDC's guidance that congregate settings should be under 75% capacity. In addition to limiting the number of family units housed at each facility, the FRCs promote social distancing by implementing remote dining (providing residents with meals in their rooms rather than in the cafeteria) or by staggering meal times with dining tables spaced at least six feet apart; suspending certain organized recreational activities and certain in-person visitations; extending times and increasing resources for telephonic and tele-video visitations, interviews, and hearings; and utilizing educational packets and/or distance learning for school children in accordance with state mandates and guidelines.

f. The FRCs have augmented their sanitation schedules to increase the frequency of cleaning and disinfecting the facilities, including placing an emphasis on high-volume touchpoints and using CDC and EPA recommended products. In addition to the robust cleaning schedule provided by each facility, residents may elect to do further intermittent cleaning of their private spaces and are provided with cleaning supplies to do so.

g. Residents at all three FRCs continue to have access to on-site health services by licensed healthcare professionals, including sick call procedures, 24-hour emergency medical, dental, and mental health services, and non-emergency health care services requests. These services were available before the beginning of the COVID-19 pandemic.

h. In addition to frequent inspections (announced and unannounced) conducted internally, including monthly private inspections by Danya International,

LLC, and those performed by onsite compliance officers, inspections performed by the *Flores* Special Monitor, and those conducted by state authorities pursuant to pending licensing applications and litigation that were routine pre-pandemic, the FRCs are now also subject to onsite, in-person monthly spot checks to ensure that the facilities are comply with the requirements set forth in the ERO PRR.

**VII.    Number of Title 42 Families Transported or Temporarily Housed and Expelled by ICE**

25.    As mentioned above, ICE transports family units from CBP through a contract with MVM. In addition, MVM sometimes provides transportation from CBP to accomplish the safe transportation of this population to Title 42 outbound flights.  According to records[1] ICE has transported 1,423 individuals who are part of family units for expulsion out of the United States as of January 8, 2021. Of these expulsions, 211 occurred in Fiscal Year (FY) 2020. In FY 2021, ICE has expelled 1,212 individuals in family units. These numbers, however, do not represent the total number of family units expelled from the United States under the Title 42 program, but rather only account for the family units ICE transported to an expulsion flight. Family units may also be expelled under Title 42 without requiring domestic transportation by ICE.

26.    Of the 1,423 family unit member expulsions in FYs 2020 and 2021 noted above, only 394 individuals were housed at an ICE FRC (81 in FY 2020 and 313 in FY 2021).  The remaining 1,029 family unit members expelled by ICE during that timeframe were able to be expeditiously expelled directly from a CBP location.  In other words, these 1,029 individuals (130 in FY 2020 and 899 in FY 2021) never entered the congregate setting of an FRC, allowing ICE to

---

[1] These data do not account for transportation services that may have been provided by U.S. Customs and Border Protection so the numbers of expelled family units may be higher.

continue to maintain manageable populations levels at those facilities and prevent the spread of COVID-19 within them.

### VIII. Enforcement Against Family Units

27.   Beyond the health implications to ICE personnel and the noncitizens they care for in custody, Title 8 procedures have proven inadequate to address illegal migration by family units over the short term. Indeed, enforcing immigration laws against family units is complex and challenging, particularly in light of the limited capacity to house family units at the three FRCs and judicial decisions limiting the length of detention. As a result, family units are typically released into the interior of the United States with little or no oversight. Although ICE has sought to deal with the rapid increase in this population through multiple strategies over the years, such as Alternatives to Detention (ATD), this has proven ineffective in the management of arriving noncitizens, especially family units. While ICE utilizes ATD for certain qualified family units, there are significant challenges with using the program to manage members of this population, and failure and absconder rates[2] are much higher for this group because most have no existing ties to the community and may not know their final geographic destination.

28.   Historically, ICE has experienced high absconder rates when it comes to non-detained family units. This is true even where the family unit is released on ATD. Between March 2019 and February 2020, before Title 42 was implemented and family units were processed under Title 8, 33.5% family units failed to comply with ATD program policies and expectations or absconded from the program, whereas 16.9% of non-family unit noncitizens failed to comply or absconded from the program.  Between March 2020 and January 2021, while Title 42 has been in

---

[2] Failure rate is the percentage of terminated participants who were terminated due to failing to comply with program policies and expectations or due to absconding from the program.  Absconder rate is the percentage of terminated ATD participants who were terminated due to absconding from the program, which is a subset of the failure rate.

effect, 54.3% of families excepted from the CDC Order and processed under Title 8 and released on ATD failed to comply with ATD program policies and expectations or absconded from the program, whereas 33.4% of non-family unit noncitizens failed to comply or absconded from the program.

### IX. Potential Impact of Increased Intake

29. As of the time I signed this declaration, there has been no spread of COVID-19 among FRC residents. In addition, no resident of an FRC has required admission to a local hospital for treatment of COVID-19. This is due in part to the PRR and related mitigation efforts but is primarily due to the low population levels at the FRCs, which is a direct result of DHS's ability to utilize Title 42 expulsions (rather than Title 8 immigration removal processes) during the pandemic.

30. If CBP were unable to apply Title 42 authorities in cases involving family units, it is likely that ICE would see a significantly increased flow of new intakes at the FRCs, which would pose significant operational challenges and increase COVID-19 risks at the FRCs. COVID-19 protocols, including mandatory testing, cohorting, and social distancing requirements, are particularly complicated at the FRCs, which are designed to maximize freedom of movement and interaction among residents. The facilities are residential in nature and do not contain barriers that control the movement of residents. Rather, they are similar to dormitories or group homes where freedom of movement is the norm. Cohorting and even maintaining social distance is a challenge because the layout of the facilities is open. In addition, the *Flores* Settlement Agreement requires that minors be held in non-secure settings, which include exercise and outdoor activity. In order to comply with ICE's legal requirements pursuant to the *Flores* Settlement Agreement and other litigation, while also abiding by COVID-19 protocols, significant operational flexibilities must be

maintained at all times. As noted above, ICE's extraordinary efforts have been successful to date. However, an increase in the flow of new intakes is likely to significantly strain the FRCs beyond their operational capacity.

31.     If the Title 42 program is eliminated with respect to family units, some proportion of noncitizen family units encountered by CBP who are currently subject to Title 42 expulsion would be transferred to the FRCs for Title 8 immigration processing. This would necessarily increase the FRC population over current levels. Moreover, if prompt expulsion under Title 42 is no longer a prospect for noncitizen family units aspiring to enter the United States, then the number of such family units encountered by CBP may increase. That could compound and accelerate the surge in FRC population increases. Additionally, such increases could outstrip the FRCs' ability to maintain its COVID-19 protocols, which include mandatory testing and cohorting requirements.

32.     In addition, as the volume of family units referred to an FRC increases, so too does the risk of COVID-19 exposure to ERO employees and contractors involved in the transportation, processing, and housing of these families. In order to comply with CDC recommended mitigation strategies, ERO employees and contractors are increasingly likely to be subject to 14-day quarantine requirements upon either exposure to COVID-19 positive noncitizens or through contact tracing. As of February 17, 2021, 577 ICE employees have tested positive for COVID-19 as a result of potential exposure on the job. Regrettably, six ERO employees have died after contracting COVID-19 since the onset of the pandemic in February 2019. With increased personnel unavailable due to quarantine requirements, further delays and bottlenecks are likely to occur.

33.     Additionally, in the absence of Title 42 and due to FRC capacity limitations, it is likely that at least some proportion of apprehended family units will be released directly into the

United States without first being transferred to an FRC. These family units may not have been tested for COVID-19 or cohorted, isolated, or quarantined, and thus may present a public health risk to their transit and destination communities in the United States.

This declaration is based upon my personal and professional knowledge, information obtained from other individuals employed by ICE, and information obtained from various records and systems maintained by DHS. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

Signed on this 17th day of February 2021.

_____
Russell Hott
Assistant Director, Custody Management Division
ICE Enforcement and Removal Operations