UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DAVID PEKOSKE, Acting Secretary of Department of Homeland Security, et al.,<br><br>*Defendants*. | Civil Action No. 1:21-cv-00100 (EGS) |

**BRIEF FOR SCHOLARS OF REFUGEE AND IMMIGRATION LAW
AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASSWIDE
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................ ii

INTEREST OF AMICI ................................................................................................................... 1

STATEMENT ................................................................................................................................. 2

ARGUMENT .................................................................................................................................. 3

I.      THE CDC ORDERS VIOLATE STATUTES PROVIDING FOR ASYLUM, WITHHOLDING OF REMOVAL, AND PROTECTION AGAINST TORTURE ................................................................. 3

      A.      United States Statutes Protect From Removal Noncitizens Facing Persecution Or Torture In Their Home Countries ........................................................................... 3

      B.      Section 362 Of The 1944 Public Health Service Act Does Not Override The Specific Protections From Removal That Congress Has Enacted In The Intervening Decades ................................................................................................ 5

CONCLUSION ............................................................................................................................... 9

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) .................................................................... 5

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ......................................... 8

*INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999) ........................................................................... 4

*United States v. Fausto*, 484 U.S. 439 (1988) .......................................................................... 8

### STATUTES, RULES, AND REGULATIONS

8 C.F.R.
 § 208.16 ............................................................................................................................ 4
 § 208.17 ............................................................................................................................ 5
 § 235.3 .............................................................................................................................. 7

42 C.F.R.
 Part 71 .............................................................................................................................. 8

85 Fed. Reg.
 17,061 (Mar. 26, 2020) ..................................................................................................... 2
 56,424 (Sept. 11, 2020) ..................................................................................................... 2

8 U.S.C.
 § 1101 ............................................................................................................................... 3
 § 1158 ............................................................................................................................... 4
 § 1182 ............................................................................................................................... 6
 § 1225 ....................................................................................................................... 2, 3, 7
 § 1229a ......................................................................................................................... 4, 6
 § 1231 ............................................................................................................................... 4

42 U.S.C.
 § 265 .................................................................................................................. 5, 6, 7, 8, 9
 Part G ............................................................................................................................... 8

Act of Mar. 3, 1891, 26 Stat. 1084 ............................................................................................ 6

Foreign Affairs Reform and Restructuring Act of 1998,
 Pub. L. No. 105-277, 112 Stat. 2681 ............................................................................... 4

**INTEREST OF AMICI**[1]

Amici curiae are scholars with expertise in United States and international law governing refugees and United States immigration law.

- T. Alexander Aleinikoff is University Professor at The New School and Director of the Zolberg Institute on Migration and Mobility; from 2010 to 2015, served as United Nations Deputy High Commissioner for Refugees; and is co-author of a leading textbook, *Immigration and Citizenship: Process and Policy*.

- Deborah Anker is Clinical Professor of Law at Harvard Law School; Founder, Harvard Immigration and Refugee Clinical Program; and author of a leading treatise, *Law of Asylum in the United States*.

- James C. Hathaway is the James E. and Sarah A. Degan Professor of Law at Michigan Law, University of Michigan; founding director of Michigan Law's Program in Refugee and Asylum Law; and the author of *The Rights of Refugees under International Law*.

- Gerald L. Neuman is the J. Sinclair Armstrong Professor of International, Foreign, and Comparative Law at Harvard Law School; a Co-Director of the Human Rights Program at Harvard Law School; and the author of *Strangers to the Constitution: Immigrants, Borders and Fundamental Law*.

Amici have collectively spent decades researching and writing about refugee and immigration law. This brief is submitted to provide an overview of the protections that Congress has enacted into United States law for refugees, often to effectuate principles of international law and United States treaty obligations.

---

[1] No counsel for a party authored this brief in whole or in part, and no entity or person other than amici and its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

## STATEMENT

This case concerns an attempt by the Executive Branch to circumvent statutory protections against removal by creating a surrogate system of removal, assertedly in reliance on public health considerations arising from COVID-19.  The Centers for Disease Control and Prevention ("CDC") issued a final rule authorizing the CDC Director to suspend "the introduction into the United States of persons from designated foreign countries" if necessary to address the danger of introducing "communicable disease into the United States."  85 Fed. Reg. 56,424, 56,425 (Sept. 11, 2020).  Purporting to act pursuant to authority under a previous interim version of the rule, the CDC Director issued an order "suspend[ing] the introduction" of persons traveling across the land borders with Mexico or Canada who otherwise would enter a "congregate setting" in a land port of entry or Border Patrol station.  85 Fed. Reg. 17,061, 17,067 (Mar. 26, 2020) ("CDC Order" or "Order").  The Order does not apply to (1) United States citizens, lawful permanent residents, and their spouses or children; (2) members of the U.S. military, and their spouses or children; or (3) persons who arrive at a port of entry who have valid travel documents or are in the visa waiver program and not otherwise subject to travel restrictions.  *Id*. at 17,061.  Those persons who remain covered after these exceptions are denominated "covered aliens," *id*., and subject to removal by the Department of Homeland Security immediately or as rapidly as possible, *id*. at 17,067.

Before the CDC Order, the Immigration and Nationality Act ("INA") already authorized expedited removal of noncitizens who arrive at the border without valid entry documents or who are apprehended after having entered the country without inspection and cannot prove that they have been physically present in the country for two years.  *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii). Immigration officers may proceed immediately to remove such noncitizens unless they indicate an intention to apply for asylum, in which case asylum officers evaluate whether the noncitizens

have a credible fear of persecution.  *See id*. § 1225(b)(1)(B).  In light of this existing authority, the actual scope of new authority granted by the CDC Orders is targeted to a particular group—those "covered aliens" who would seek asylum or withholding of removal.

## ARGUMENT

### I. THE CDC ORDERS VIOLATE STATUTES PROVIDING FOR ASYLUM, WITHHOLDING OF REMOVAL, AND PROTECTION AGAINST TORTURE

#### A. United States Statutes Protect From Removal Noncitizens Facing Persecution Or Torture In Their Home Countries

Since 1980, Congress has enacted a series of protections for noncitizens arriving in, or physically present in, the United States who face persecution or torture in their home countries.  These statutes seek to effectuate fundamental principles of international law and international treaty obligations of the United States, including those enshrined in the 1951 United Nations Convention relating to the Status of Refugees and its 1967 Protocol.

The first of these protections is asylum.  Congress established the asylum process in the Refugee Act of 1980.  In that Act, Congress largely adopted the definition of refugee in the 1951 Convention and 1967 Protocol, the latter of which the United States had ratified in 1968.  As relevant to the "covered aliens" at issue in this case, United States law defines a "refugee" as "any person who is outside any country of such person's nationality … and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42); *compare* 1951 Convention art. 1(A)(2); 1967 Protocol art. 1(2).  With certain exceptions not relevant here, none of which concerns public health, the INA guarantees to "[a]ny alien who is physically present in the United States"—like Plaintiff here—the right to apply for

asylum protection as a refugee. *Id.* § 1158(a)(1), (b)(1)(A). While the determination of whether to grant such a person asylum is discretionary, the right to apply for asylum is not.

A second protection is withholding of removal on the basis of persecution. While the INA authorizes removal of noncitizens from the United States for specified reasons, *see, e.g.*, 8 U.S.C. § 1229a(a)(2), the INA prohibits such removal (again, with certain exceptions not relevant here that do not concern public health) to a country if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1231(b)(3)(A). In contrast with asylum, if the requirements for withholding of removal are satisfied, then withholding is mandatory. *See, e.g.*, *INS v. Aguirre-Aguirre*, 526 U.S. 415, 419-20 (1999). This prohibition on forcible return to a country where a person's life or freedom would be threatened derives from the international law principle of non-*refoulement*, which is set forth in, among other sources, the 1951 Convention. *See* 1951 Convention, Art. 33(1) ("No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.").

Yet a third protection provided to noncitizens is protection from torture, derived from the United States' implementation of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). *See* Foreign Affairs Reform and Restructuring Act of 1998. Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (codified at 8 U.S.C. § 1231 note). Under the regulations implementing that statute, withholding or deferral of removal is mandatory if the applicant shows that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. §§ 208.16(c)(2),

208.17(a). In contrast to asylum and withholding of deportation, the torture need not be on the grounds of the person's race, religion, nationality, membership in a particular social group, or political opinion.

> **B.     Section 362 Of The 1944 Public Health Service Act Does Not Override The Specific Protections From Removal That Congress Has Enacted In The Intervening Decades**

The CDC Orders' instruction that "covered aliens" be immediately or rapidly removed from the United States with no opportunity to invoke asylum or withholding of removal—and with no provision for the processing of CAT claims other than "affirmative, spontaneous" statements by the noncitizen—appears to rest on the proposition that an authority granted by section 362 of the Public Health Service Act, 42 U.S.C. § 265, overrides the statutory protections from removal described above. But there is no reason why section 265 need be, or should be, read to conflict with (or override) those statutes, for several reasons.

First, it is a longstanding rule of statutory construction that "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [a] Court is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (internal quotation marks and citation omitted). That is not only possible here, but doing so would give effect to the most natural construction of the text of the public health statute. Section 265 is about the prohibition of "the introduction of persons and property" into the United States. It is not about removal (or expulsion) of persons from the United States. Nor, importantly, does section 265 address in any way the myriad protections against the forcible return of persons to countries where they face persecution or torture. For these reasons, there is no reason why section 265 must, or should, be read to address a subject about which it says nothing—removal or expulsion of persons

- 5 -

physically present in the United States—or to negate fundamental, internationally recognized, and congressionally legislated protections that section 265 never mentions.

Second, congressional action in the more-than-half century since the Public Health Service Act was enacted further confirms that Congress would not have understood that public health authority to have overridden the statutory protections described in Part I.A of this brief. To start, Congress has addressed communicable diseases in the immigration laws since 1891. *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1084 (excluding from admission "persons suffering from a loathsome or a dangerous contagious disease"). The current INA states that a noncitizen is inadmissible if he or she has "a communicable disease of public health significance," which determination is to be made "in accordance with regulations prescribed by the Secretary of Health and Human Services." 8 U.S.C. § 1182(a)(1)(A)(i). In making this an inadmissibility ground, Congress also made it a ground for removal of persons who have arrived at a port of entry or entered the country without inspection. *See id.* § 1229a(a)(2) (authorizing charging of "alien" in removal proceedings "with any applicable ground of inadmissibility under section 1182(a)"). Yet, having provided for removal on this communicable disease ground, Congress also subjected that removal power to the normal defenses to removal, *see id.* § 1229a(c)(4)—which include the protections of asylum, withholding of removal, and CAT. Given what Congress actually did do when it turned its attention to the issue of "communicable diseases" in the INA, it would be unreasonable to read section 265—a provision from an earlier public health law—to free the Executive Branch from the restrictions against removal in those later-enacted laws.

Congress also has specifically addressed the authority of the Executive Branch to conduct expedited removal of persons who arrive at the country's land borders or cross them without

inspection. It did so in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). And while those provisions purport to grant broad authority to the Attorney General and immigration officers, the provisions nevertheless require that noncitizens subject to expedited removal be given an opportunity to present any grounds they may have for asylum, withholding of deportation, or CAT protection. *See* 8 U.S.C. § 1225(b)(1) (authorizing removal without substantial hearing "unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution"); 8 C.F.R. § 235.3(b)(4) (providing for interview "[i]f an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country"). The CDC Orders deny these protections to the same persons covered by the INA's expedited removal procedures—the persons denominated "covered aliens" by those Orders. But Congress already considered the circumstances in which inadmissible noncitizens could be removed expeditiously, and it made clear that even in those circumstances, the noncitizen is entitled to a substantial hearing (at minimum, an asylum officer interview, subject to further review) on claims of persecution or torture giving rise to protection from removal. Again, given what Congress actually did do when it turned its attention to the issue of expedited removal in IIRIRA, it would be unreasonable to read section 265—a public health provision addressing the prohibition of introduction of persons into the United States—to free the Executive Branch from the restrictions enacted in expedited removal provisions themselves.

In sum, in the many decades after Congress enacted section 265, it developed, enacted, and repeatedly modified a comprehensive set of immigration laws that *both* address the issues at the heart of the CDC Orders—communicable diseases and expedited removal—*and* impose specific restrictions on the authority of the Executive Branch to remove noncitizens from the

United States in service of important broadly-recognized principles, including non-*refoulement*. That history is significant because, as courts recognize, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Given the substantial history of legislative action since Congress enacted section 265, that public health provision cannot be read as broadly as the CDC Director does in his Orders to simply negate the myriad statutory protections from removal that Congress subsequently enacted. As the Supreme Court has explained, the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988). That is, at minimum, the case here.

There is no reason why section 265 should be read, or needs to be read, to authorize the Executive Branch to remove persons seeking protection from persecution and torture without granting those persons the hearings to which Congress said they are entitled on such claims. The current legal structure provides the government with various public health tools to address communicable diseases without sacrificing the right of noncitizens to seek protection established by this Nation's laws. Testing and quarantine of noncitizens, including those seeking our protection, can be implemented in a manner consistent with our treaty obligations; indeed, Congress has provided for that power, *see* 42 U.S.C. Part G (Quarantine and Inspection), and the CDC has issued Foreign Quarantine Regulations pursuant to that authority, *see* 42 C.F.R. Part 71 (Foreign Quarantine).

In sum, section 265 is part of the larger legal landscape, and should not be read to free the Executive Branch from the asylum, withholding of removal, and CAT protections mandated by Congress.

## CONCLUSION

For the foregoing reasons, the Court should find that Plaintiffs may seek asylum, withholding of removal, and CAT protection.

Dated:  February 5, 2021

Respectfully submitted,

/s/ Paul R.Q. Wolfson
PAUL R.Q. WOLFSON (#414759)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Tel.:  (202) 663-6000
Fax:  (202) 663-6363

NOAH A. LEVINE (*pro hac vice pending*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.:  (212) 230-8875
Fax:  (212) 230-8888