**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al., *Plaintiffs*, v. DAVID PEKOSKE, Acting Secretary of Homeland Security, in his official capacity, et al., *Defendants*. | No. 21-cv-100-EGS |

**BRIEF OF *AMICUS CURIAE* THE INTERNATIONAL REFUGEE ASSISTANCE PROJECT, INC. IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION**

Kathryn Austin (D.D.C. Bar No. NY0331)
Geroline Castillo (D.D.C. Bar No. NY0336)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 4th Floor
New York, N.Y. 10004
Tel: (516) 296-0688

*Counsel for Amicus Curiae*

Dated:  February 5, 2021

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Local Civil Rule 7(o)(5) and Federal Rules of Appellate Procedure 29(a)(4)(A) and 26.1, *amicus curiae* submits the following corporate disclosure statement:

The International Refugee Assistance Project, Inc. is a private, non-profit organization. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................................................... 1
INTRODUCTION .......................................................................................................................... 1
ARGUMENT .................................................................................................................................. 2
   I.    DEFENDANTS' EXPULSION POLICY CONTRAVENES THE TEXT OF THE REFUGEE ACT AND RELATED HUMANITARIAN PROTECTION LAWS .............. 2
        A.    Congress requires the Executive to follow specific procedures to identify and evaluate humanitarian protection claims ............................................................... 3
        B.    Congress has prohibited the Executive from blocking access to the humanitarian protection system on health-related grounds ......................................................... 4
   II.   DEFENDANTS' EXPULSION POLICY CONTRAVENES CONGRESS'S INTENT ... 7
        A.    Congress understood our obligations to asylum seekers in stark moral terms ....... 8
        B.    Congress required the Executive to follow specific procedures so that the Executive would not undercut the rights of asylum seekers ................................ 11
CONCLUSION ............................................................................................................................. 13

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Grace v. Barr*,
   965 F. 3d 883 (D.C. Cir. 2020)……………………………………………………......10

*Grace v. Whitaker*,
   344 F. Supp. 3d 96 (D.D.C. 2018) ........................................................................... 10

*I.N.S. v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ................................................................................................... 9

**Statutes**

8 U.S.C. § 1101 ................................................................................................................ 3

\* 8 U.S.C. § 1158 ................................................................................................... 2, 3, 5, 6

8 U.S.C. § 1159 ................................................................................................................ 3

\* 8 U.S.C. § 1182 ............................................................................................................ 6, 7

8 U.S.C. § 1222 ................................................................................................................ 7

\* 8 U.S.C. § 1225 .......................................................................................................... 4, 13

\* 8 U.S.C. § 1229a ......................................................................................................... 3, 4

\* 8 U.S.C. § 1231 ........................................................................................................ 2, 3, 5

8 U.S.C. § 1252 ............................................................................................................ 4, 13

8 U.S.C. § 1427 ................................................................................................................ 3

\* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(a),
   112 Stat. 2681 ................................................................................................. 5, 11, 13

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ........................... 9, 10

**Regulations**

8 C.F.R. § 34.5 ................................................................................................................. 7

8 C.F.R. § 108.1 ............................................................................................................. 11

8 C.F.R. § 208.16 ............................................................................................................. 2

8 C.F.R. § 208.17 .......................................................................................................... 2, 5

8 C.F.R. § 208.30 ................................................................................................................... 4

8 C.F.R. § 1208.16 ................................................................................................................. 3

8 C.F.R. § 1208.17 ................................................................................................................. 3

42 C.F.R. § 34.3 ..................................................................................................................... 7

42 C.F.R. § 71.1 ..................................................................................................................... 7

42 C.F.R. § 71.20 ................................................................................................................... 7

42 C.F.R. § 71.36 ................................................................................................................... 7

**Rules**

Local Civil Rule 7 .................................................................................................................. 1

Federal Rule of Appellate Procedure 29 ............................................................................... 1

**Agency Materials**

Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 16, 2020) ....................................... 4

Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999)... 11

Security Bars and Processing, 85 Fed. Reg. 84,160 (Dec. 23, 2020) ………………………………5

Security Bars and Processing; Delay of Effective Date, 86 Fed. Reg. 6847 (Jan. 25, 2021)…..….5

USCIS Policy Manual Vol. 7, Part M, Ch. 3 (2020), *available at* https://www.uscis.gov/policy-manual/volume-7-part-m-chapter-3 .................................................................................. 6

USCIS Policy Manual Vol. 8, Part B, Ch. 3 (2020), *available at* https://www.uscis.gov/policy-manual/volume-8-part-b-chapter-3 ................................................................................... 6

U.S. Customs and Border Protection, "FY 2020 Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions," https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics-fy2020 (last visited Feb. 5, 2021)………..1

U.S. Customs and Border Protection, "Nationwide Enforcement Encounters:  Title 8 Enforcement Actions and Title 42 Expulsions," https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (last visited Feb. 5, 2021) .......................... 1

U.S. Dep't of Justice, Executive Office for Immigration Review, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak, PM 20-10, at 1 n.1 (Mar. 18, 2020), *available at* https://www.justice.gov/eoir/file/1259226/download ........ 6

**Legislative History**

114 Cong. Rec. 27,758-59 (1968) ............................................................................................. 9

114 Cong. Rec. 29,391 (1968) ................................................................................................. 8

114 Cong. Rec. 29,607-08 (1968) ............................................................................................ 8

125 Cong. Rec. 11,973 (1979) ............................................................................................... 10

126 Cong. Rec. 4507 (1980) .................................................................................................. 12

142 Cong. Rec. 11,491 (1996) ......................................................................................... 10, 13

H.R. Rep. No. 96-608 (1979) ..................................................................................... 8, 9, 11, 12

H.R. Rep. No. 104-469 (1996) ............................................................................................... 10

S. Rep. No. 96-256 (1979) ..................................................................................................... 12

*Admission of Refugees into the United States, Hearings before the Subcomm. on Immigration, Citizenship, and Int'l Law, H. Comm. on the Judiciary*, 95th Cong. 126 (1977) ...................... 12

*The Refugee Act of 1979, S. 643: Hearing Before the S. Comm. on the Judiciary*, 96th Cong. 36 (1979). ................................................................................................................................. 10

**Other Authorities**

Affidavit of Louis Henkin, Resp'ts' Br.*, McNary v. Haitian Centers Council, Inc.*, 1992 WL 541267 (U.S. Dec. 21, 1992) ................................................................................... 8

Exec. Comm. of the High Commissioner's Programme, Note on International Protection, U.N. Doc. A/AC.96/815 (1993), *available at* https://www.refworld.org/docid/3ae68d5d10.html ..... 9

The Refugee Convention, 1951: The Travaux Preparatoires Analysed with a Commentary by Dr Paul Weis 235, *available at* https://www.unhcr.org/en-us/protection/travaux/4ca34be29/ refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul.html ........... 8, 9

Report of the Working Group on a Draft Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Doc. E/CN.4/L.1470, at ¶ 44 (Mar. 12, 1979), *available at* http://hr-travaux.law.virginia.edu/document/catcidtp/ecn4l1470/nid-159 ........... 11

**INTEREST OF AMICUS CURIAE**

*Amicus curiae* the International Refugee Assistance Project, Inc. ("IRAP") is a nonprofit organization dedicated to advancing and defending the rights of refugees and other displaced people through systemic litigation, direct representation, and policy and media advocacy. As counsel to hundreds of refugees and asylum seekers before administrative agencies and in the federal courts since its founding in 2008, IRAP has direct insight into the worldwide refugee crisis and a strong interest in ensuring that the Refugee Act and related laws are enforced in a manner that is consistent with Congress's humanitarian objectives.

IRAP files this brief pursuant to Local Civil Rule 7(o)(1). No counsel for a party authored this brief in whole or in part; no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amicus curiae*, its members, or its counsel made such a monetary contribution. *See* LCvR 7(o)(5); Fed. R. App. P. 29(a)(4)(E).

**INTRODUCTION**

Since March 2020, officers of U.S. Customs and Border Protection have been expelling thousands of people from the United States on asserted public health grounds without regard for the system Congress created to ensure protection for those fleeing persecution and torture.[1] Congress's system requires the executive branch to follow specific procedures to identify and

---

[1] *See* U.S. Customs and Border Protection, "Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions," https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (last visited Feb. 5, 2021) (reporting 191,276 people expelled under Title 42 policy during 2021 fiscal year); U.S. Customs and Border Protection, "FY 2020 Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions," https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics-fy2020 (last visited Feb. 5, 2021) (reporting 206,783 people expelled under Title 42 policy during 2020 fiscal year).

evaluate humanitarian protection claims whenever it seeks to expel, turn away, or otherwise remove someone from the United States. And it bars the executive branch from discounting the rights of people at or within our borders who seek humanitarian protection (or "asylum seekers") when providing for the public health.

Defendants purport to have authority under the Public Health Service Act to expel asylum seekers like Plaintiffs and the proposed class members—families who have fled their home countries and entered the United States—without these safeguards. Plaintiffs and the proposed class members are likely to succeed on the merits of their claims that Defendants' expulsion policy is in fact unlawful because, among other things, the U.S. humanitarian protection system that Defendants ignore is comprehensive, and its procedures are mandatory. IRAP agrees with Plaintiffs that the Court should grant their motion for classwide preliminary injunction for all the reasons set out in Plaintiffs' brief. It submits this brief to further detail how the expulsion policy is contrary to the laws Congress enacted to protect all asylum seekers. IRAP urges the Court to grant Plaintiffs' motion for classwide preliminary injunction.

## ARGUMENT

**I.  DEFENDANTS' EXPULSION POLICY CONTRAVENES THE TEXT OF THE REFUGEE ACT AND RELATED HUMANITARIAN PROTECTION LAWS**

Under U.S. law, the federal government is prohibited from returning people to places where they will be persecuted or tortured and is required to give people who reach our borders an opportunity to seek asylum. *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 208.16, 208.17; 8 U.S.C. § 1158(a)(1). To ensure that the Executive does not run afoul of these mandates, Congress requires it to follow specific procedures to identify and adjudicate humanitarian protection claims whenever it seeks to remove a person from the United States. This system is comprehensive, and there is no legal basis for the Executive to circumvent it on public health grounds.

### A. Congress requires the Executive to follow specific procedures to identify and evaluate humanitarian protection claims

Congress requires the Executive to follow specific procedures to protect the rights of asylum seekers at or within U.S. borders. When the government seeks to remove a person from the United States, it must provide a removal hearing with various procedural safeguards—including access to counsel (at no government expense) and opportunities to present evidence and cross-examine government witnesses—to afford that person, among other things, a fair opportunity to present claims for humanitarian protection. *See* 8 U.S.C. § 1229a. To make the case that the government must protect them from persecution, a person may apply for withholding of removal under 8 U.S.C. § 1231(b)(3), which, with limited exceptions, bars the government from removing someone to a place where their "life or freedom would be threatened . . . because of [their] race, religion, nationality, membership in a particular social group, or political opinion." To make the case that the government must protect them from torture, the person may apply for deferral or withholding of removal under law implementing the U.N. Convention Against Torture, which bars the government from removing anyone to any place where it is "more likely than not" that he or she would be tortured. 8 C.F.R. §§ 1208.16(c), 1208.17(a). In removal proceedings, a person may also apply for asylum status, which confers additional rights beyond protection from removal. A person is generally eligible for asylum if they are a "refugee"—that is, they cannot return to their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1101(a)(42). Asylum status, unlike withholding or deferral of removal, provides a pathway to lawful permanent resident status, *see* 8 U.S.C. § 1159(b), and, ultimately, U.S. citizenship, *see* 8 U.S.C. § 1427(a). A person who does not prevail in the

administrative removal hearing has the right to an appeal, *see* 8 U.S.C. § 1229a(c)(5), and ultimately has access to federal judicial review, *see* 8 U.S.C. § 1252(b).

Congress has also created an expedited removal process to permit quick removals of certain narrowly delineated classes of recent arrivals. *See* 8 U.S.C. § 1225(b)(1)(A) (applying to people arriving in the United States who are determined to lack valid entry documents or to be seeking admission through material misrepresentation, subject to limited expansion by the Attorney General). Yet even as to those people who are subject to expedited removal, Congress took care to ensure that any who might be eligible for asylum or entitled to withholding or deferral of removal would not be removed unlawfully: In the expedited removal system, a person who expresses a fear of persecution or torture is referred for a "credible fear" screening, *see* 8 U.S.C. § 1225(b)(1)(A), (b)(1)(B)(ii), where they are given an opportunity to consult with a person of their choosing, *see* 8 U.S.C. § 1225(b)(1)(B)(iv); to be interviewed by an asylum officer with specialized training and under proper supervision, *see* 8 U.S.C. § 1225(b)(1)(B), (E); 8 C.F.R. § 208.30(d); and, so long as their fear is deemed credible, to be placed in full removal proceedings, *see* 8 C.F.R. § 208.30(f). This initial screening process sets a low evidentiary threshold so that anyone who might possibly have a claim for humanitarian protection can present it in full removal proceedings with proper procedural protections.

### B. Congress has prohibited the Executive from blocking access to the humanitarian protection system on health-related grounds

Congress further requires the Executive to make public health decisions in a manner that respects the rights of people seeking humanitarian protection. Defendants suggest that guarding the public health requires them to overlook the specific rights of asylum seekers. *See, e.g.*, Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806, 65,808-12 (Oct. 16, 2020). But Congress

was clear that potential health concerns are not grounds for preventing asylum seekers from accessing humanitarian protection.

First, Congress drafted the humanitarian protection laws such that a person's health would be irrelevant to whether they could be granted asylum status, withholding of removal, or protection under the Convention Against Torture. Under the Convention Against Torture, the government is prohibited from returning a person to their torturers without exception. *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(a)-(c), 112 Stat. 2681, 2681-822; 8 C.F.R. § 208.17(a). With respect to withholding of removal under 8 U.S.C. § 1231(b)(3), a person facing persecution is ineligible for protection only if they have persecuted others; participated in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing; or pose a serious threat to the security of the United States. *See* 8 U.S.C. § 1231(b)(3)(B). A person is barred from asylum only for the narrow set of reasons set out in 8 U.S.C. § 1158(a)(2), (b)(2), which overlap in part with the exceptions for withholding of removal under 8 U.S.C. § 1231(b)(3) and similarly have nothing to do with health.[2]

Second, even though Congress created a mechanism in the immigration laws for the government to remove a person from the country on health-related grounds, it specifically declined to make such health-related grounds barriers to applying for and being granted humanitarian protection from removal. Ordinarily, a person who seeks to enter the country or to be granted

---

[2] In December 2020, the Department of Homeland Security and the Department of Justice issued a rule purporting to construe the national security bar to asylum and withholding of removal to allow agencies to exclude people "based on emergency public health concerns generated by communicable disease." Security Bars and Processing, 85 Fed. Reg. 84,160, 84,160, 84,193-98 (Dec. 23, 2020). The agencies have since delayed the effective date of this rule to March 22, 2021 to "allow the President's appointees and designees to review questions of fact, law, and policy, raised by the[] regulations," noting that "a permissible path to implementation of the rule is not apparent due to a preliminary injunction against a related rule." Security Bars and Processing; Delay of Effective Date, 86 Fed. Reg. 6847, 6847 (Jan. 25, 2021).

5

certain immigration statuses must be "admissible." This means that they must not fall within any of the grounds of exclusion specified in 8 U.S.C. § 1182(a), such as lacking valid entry documents, *see* 8 U.S.C. § 1182(a)(7)(A)(i), having crossed the border without inspection, *see* 8 U.S.C. § 1182(a)(6)(A)(i), or having been convicted of certain crimes, *see* 8 U.S.C. § 1182(a)(2)(A), (B). A person may also be inadmissible on "health-related grounds," including being "determined . . . to have a communicable disease of public health significance," 8 U.S.C. § 1182(a)(1)(A)(i); according to the government, COVID-19 is one such disease.[3] Yet Congress was clear that a person may apply for and be granted humanitarian relief regardless of whether there might be grounds, including a health-related inadmissibility ground, to remove them: A person may apply for and be granted asylum "irrespective" of whether they are admissible. 8 U.S.C. § 1158(a)(1). As the government itself has acknowledged: an individual seeking asylum is simply "not subject to inadmissibility grounds at the time of [an] asylum grant." USCIS Policy Manual Vol. 7, Part M, Ch. 3 (2020), *available at* https://www.uscis.gov/policy-manual/volume-7-part-m-chapter-3; *see also* USCIS Policy Manual Vol. 8, Part B, Ch. 3 (2020), *available at* https://www.uscis.gov/policy-manual/volume-8-part-b-chapter-3 (no specific medical examination or vaccination required for granting asylum). Withholding and deferral of removal, for their part, by definition are available when a person could otherwise be removed.

Third, though it rejected the notion that asylum seekers might be barred from humanitarian protection on health-related grounds, Congress accounted for the public health by permitting the Executive to screen asylum seekers on arrival. Asylum seekers may be screened under the federal laws relating to quarantine, isolation, and contact-tracing that apply to citizens and noncitizens

---

[3] U.S. Dep't of Justice, Executive Office for Immigration Review, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak, PM 20-10, at 1 n.1 (Mar. 18, 2020), *available at* https://www.justice.gov/eoir/file/1259226/download.

6

alike. *See* 42 C.F.R. §§ 71.1, 71.20, 71.36. And under the immigration laws, asylum seekers, like other noncitizens, may be screened for inadmissibility grounds, including "communicable diseases of public health significance," according to procedures specified by Congress and the Department of Health and Human Services. *See* 8 U.S.C. § 1182(a)(1)(A)(i). These procedures permit the government to conduct medical exams and to detain for medical screening certain individuals arriving at ports of entry or from places "where any [relevant] diseases are prevalent or epidemic." *See, e.g.*, 8 U.S.C. § 1222; 42 C.F.R. § 34.3 (describing the scope of medical exams). And they specify that when a medical examiner cannot make a diagnosis, the government must postpone the medical examination until a diagnosis can be made and, in the meantime, refer the noncitizen for any medical care that might be necessary. *See* 8 C.F.R. § 34.5. The medical screening and its result may lead the government to charge an asylum seeker with a health-related inadmissibility ground in removal proceedings and, ultimately, to remove them—but only if they are not granted asylum or withholding or deferral of removal. Whatever the result of the screening, what the government may not do is bypass credible fear interviews or removal proceedings, deprive asylum seekers of the opportunity to apply for humanitarian protection from removal, or prevent asylum seekers from being granted such protection on health grounds.

In adopting the challenged policy, the Executive has upended Congress's carefully delineated system. Congress has accounted for the public health and taken care to ensure that health considerations will not prevent a person from applying for or being granted protection.

## II. DEFENDANTS' EXPULSION POLICY CONTRAVENES CONGRESS'S INTENT

That Congress did not give the Executive discretion to expel asylum seekers as Defendants are doing is also evident from the legislative history of the Refugee Act, the laws implementing the Convention Against Torture, and procedural reforms enacted in 1996. This legislative history

7

shows that Congress recognized an urgent, morally grounded need for strong protections for asylum seekers. And it shows that Congress anticipated that the Executive might attempt to circumvent its laws and specifically aimed to prevent the Executive from doing so.

### A. Congress understood our obligations to asylum seekers in stark moral terms

Congress was mindful of the dangers of returning people to their abusers and understood our obligation to protect asylum seekers in stark moral terms. The laws Congress enacted originated in the *non-refoulement* provision of the 1951 U.N. Convention Relating to the Status of Refugees, which had urgent moral underpinnings.[4] As Louis Henkin, an American framer of the treaty, explained: In the years following the Second World War, "there had been stories, and some evidence, that police of some countries had pushed refugees back into the hands of the pursuing Nazis." "[G]overnments," therefore, "were asked to commit themselves not to prevent a person from escaping oppression and not to become an accomplice to their oppression." Henkin Aff. ¶¶ 4, 6, Resp'ts' Br., *McNary v. Haitian Centers Council, Inc.*, 1992 WL 541267 (U.S. Dec. 21, 1992). Universal recognition of the *non-refoulement* principle was considered essential to an effective refugee protection system. *See* The Refugee Convention, 1951: The Travaux Preparatoires Analysed with a Commentary by Dr Paul Weis 235, *available at* https://www.unhcr.org/en-us/protection/travaux/4ca34be29/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul.html [hereinafter "Travaux"] ("The Chairman felt that if the work of the Committee resulted in the ratification of [the *non-refoulement* provision]

---

[4] Though the United States did not ultimately ratify the Refugee Convention, the Refugee Convention's provisions were carried through in relevant part to the U.N. Protocol Relating to the Status of Refugees, which the United States did ratify. 114 Cong. Rec. 29,391 (1968); 114 Cong. Rec. 29,607-08 (1968); *see also* H.R. Rep. No. 96-608, at 17 (1979) (noting that the enactment of asylum and *non-refoulement* provisions "conforms United States statutory law to our [Protocol] obligations").

alone, it would have been worth while."); *see also* Exec. Comm. of the High Commissioner's Programme, Note on International Protection ¶ 10, U.N. Doc. A/AC.96/815 (1993), *available at* https://www.refworld.org/docid/3ae68d5d10.html ("It would be patently impossible to provide international protection to refugees if States failed to respect this paramount principle of refugee law and human solidarity."). *See generally I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 436-39 (1987) (treating negotiating history and UNHCR material as persuasive authority).

Because of the strong interests at stake, the framers of the Refugee Convention specifically rejected the notion that people seeking humanitarian protection might be expelled on health-related grounds. The U.S. delegate maintained that "refugees should not be expelled . . . because they had been sick or indigent," and the treaty's Committee Notes reflect consensus around this position: the treaty "would not," the Committee explained, "permit the deportation of [refugees] on 'social grounds,' such as indigence or illness." Travaux 222, 225. When transmitting the U.N. Protocol Relating to the Status of Refugees—which incorporated the protections of the Refugee Convention—to President Johnson for ratification, Secretary of State Rusk echoed these sentiments: Since "refugees by definition are without a homeland, deportation of a refugee is a particularly serious measure, and it would not be humanitarian to deport a refugee for reasons of health or economic dependence." 114 Cong. Rec. 27,758-59 (1968).

When Congress codified the protections of the Refugee Convention and Protocol in the 1980 Refugee Act, Congress remained all too aware of the grave dangers asylum seekers would face were the United States to turn its back on them, and thus sought to conform statutory protections to the *non-refoulement* mandate. *See, e.g.*, H.R. Rep. No. 96-608, at 17 (1979) (noting that the asylum and *non-refoulement* provisions are designed to "conform[] United States statutory law to our obligations under [the Convention and Protocol]"); Refugee Act of 1980, Pub. L. No.

96-212, § 101(a), 94 Stat. 102, 102 ("declar[ing] that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands"). Senator Kennedy pointed to the "tragic results" of the country's lack, at the time, of a consistent asylum policy, including "instances where people came up to our embassies[,] were rejected, and were later shot." *The Refugee Act of 1979, S. 643: Hearing Before the S. Comm. on the Judiciary*, 96th Cong. 36 (1979). In the House debates, Representative Chisholm held up the "tragic plight" of thousands of Haitians who had sought asylum in Florida, citing evidence of "the arrest and indeed execution of Haitians deported by the Immigration and Naturalization Service." 125 Cong. Rec. 11,973 (1979).

When Congress enacted an expedited removal process in 1996, it remained attentive to the risks of removal. Even as it recognized some utility in permitting the Executive to remove certain people more quickly, Congress deliberately made the central, credible fear standard for avoiding expedited removal "a low screening standard for admission into the usual full asylum process," 142 Cong. Rec. 11,491 (1996) (statement of Sen. Hatch), to avoid the "danger that an alien with a genuine asylum claim w[ould] be returned to persecution," H.R. Rep. No. 104-469, at 158 (1996). *See also Grace v. Whitaker*, 344 F. Supp. 3d 96, 107 (D.D.C. 2018), *aff'd sub nom. Grace v. Barr*, 965 F. 3d 883, 902 (D.C. Cir. 2020) (acknowledging that Congress's purpose to ensure that "individuals with valid asylum claims are not returned to countries where they could face persecution" is evident in both the asylum system's design and legislative history).

When implementing the *non-refoulement* provision from the Convention Against Torture, Congress similarly recognized the dangers many asylum seekers faced outside the United States, announcing that it would be the policy of the United States "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for

believing the person would be in danger of being subjected to torture." Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681, 2681-822. At the direction of Congress, the Department of Justice promulgated regulations making protection mandatory, with no exceptions. *See* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8481 (Feb. 19, 1999). This was in keeping with the aim of the framers of the Convention Against Torture, who desired "to afford the greatest possible protection against torture." *See* Report of the Working Group on a Draft Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Doc. E/CN.4/L.1470, at ¶ 44 (Mar. 12, 1979), *available at* http://hr-travaux.law.virginia.edu/document/catcidtp/ecn4l1470/nid-159.

### B. Congress required the Executive to follow specific procedures so that the Executive would not undercut the rights of asylum seekers

In creating the modern asylum system Congress mandated specific procedures for identifying and evaluating protection claims, *see supra* Part I.A., to prevent the Executive from undercutting asylum seekers' rights. Under the previous system, claims for asylum domestically were left completely to the discretion of the executive branch and did not require any particular procedure. *See* 8 C.F.R. § 108.1 (1979). Congress considered this system to be unfair and inadequate, and too susceptible to the whims of political climate and world events. *See, e.g.*, H.R. Rep. No. 96-608, at 1, 17-18 (1979) (seeking "to eliminate current discrimination on the basis of outmoded geographical and ideological considerations" and deeming a domestic asylum provision "necessary and desirable" for a "fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law"). Representative Holtzman, a House sponsor of the Refugee Act, explained the problem: "One of the matters that has concerned me greatly about the admission of . . . persons who seek asylum is the fact that there really are no specific procedures that would assure that due

11

process is granted when such persons are questioned in order [to] determine[] whether or not they meet the present statutory standards." *Admission of Refugees into the United States, Hearings before the Subcomm. on Immigration, Citizenship, and Int'l Law, H. Comm. on the Judiciary*, 95th Cong. 126 (1977). "[W]hen Congress creates a statutory scheme and does not really specify how that scheme is to be implemented," she continued, "it can be thwarted by the executive branch." *Id.* at 127; *see also id.* (statement of John E. McCarthy, Chairman, Comm. on Migration and Refugee Affs., Am. Council of Voluntary Agencies for Foreign Serv.) ("You're treading on very dangerous ground when you're examining these people because if you're wrong and the person is forced to return you have got a terrible problem. . . . We don't have the standards here which are so necessary."); *id.* (pointing to politicized denials of protection to Chilean refugees).

With the 1980 Refugee Act, which was designed to be comprehensive, Congress sought to remedy this problem. *See, e.g.*, H.R. Rep. No. 96-608, at 1 (1979) ("The purpose of the bill is to establish a coherent and comprehensive U.S. refugee policy. This objective is accomplished by creating a systematic and flexible procedure for the admission and resettlement of refugees."); S. Rep. No. 96-256, at 1 (1979) (proposed bill would "establish[] for the first time a comprehensive United States refugee resettlement and assistance policy"). It created a new, "specific statutory basis for United States asylum policy," and directed the Attorney General to establish uniform procedures that would bind the executive branch. H.R. Rep. No. 96-608, at 17-18 (1979); *see also* 126 Cong. Rec. 4507 (1980) (statement of Rep. Holtzman) (the bill "mandates a procedure for the consideration of asylum claims by people who are here on our shores"). And it amended the terms of the then-existing statutory withholding of removal provision to use mandatory language, to avoid any suggestion that whether to grant withholding might be within the Executive's discretion. *See* H.R. Rep. No. 96-608, at 18 (1979). When Congress created a threshold asylum screening

process in 1996, it again set limits on the Executive by, among other things, taking care to specify the training, supervision, and review to which the immigration officers conducting screenings would be required to be subjected. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III), (b)(1)(E); 8 U.S.C. § 1252(e)(3); *see also* 142 Cong. Rec. 11,491 (1996) (statement of Sen. Hatch) ("I feel very strongly that the appropriate, fully trained asylum officers conduct the screening in the summary exclusion process"). Congress similarly cabined the Executive's discretion in implementing the Convention Against Torture, making clear that its prohibitions applied notwithstanding any other government policy. *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681, 2681-822.

In short, understanding our humanitarian responsibilities to be urgent moral obligations, Congress acted deliberately to prevent them from being circumvented by the executive branch. Defendants' expulsion policy contravenes Congress's clear aim.

## CONCLUSION

Because Defendants are expelling people from our country without regard to Congress's carefully crafted system for identifying and protecting those who fear persecution and torture, IRAP urges the Court to grant Plaintiffs' motion for classwide preliminary injunction.

Dated: February 5, 2021  Respectfully submitted,
New York, N.Y.

*/s/ Kathryn Austin*
Kathryn Austin (D.D.C. Bar No. NY0331)
Geroline Castillo (D.D.C. Bar No. NY0336)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 4th Floor
New York, N.Y. 10004
Tel: (516) 296-0688

*Counsel for Amicus Curiae*