UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al., <br><br> Defendants. | Civ. A. No. 21-100 (EGS) |

## NOTICE OF CDC PUBLIC HEALTH ORDER

Defendants in the above-captioned action, by and through undersigned counsel, file this Notice of CDC Public Health Order to advise the Court that the Centers for Disease Control and Prevention ("CDC"), a component of the U.S. Department of Health and Human Services ("HHS"), issued on August 2, 2021, a Public Health Assessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists ("August 2021 Order"). *See* Attachment A. The August 2021 Order replaces and supersedes the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (the "October 2020 Order"), which is discussed in Defendants' Combined Opposition to Plaintiffs' Motions for Class Certification and for Classwide Preliminary Injunction (ECF No. 76).

The August 2021 Order states that "CDC has determined that an Order under 42 U.S.C. § 265 remains necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States during the COVID-19 public health emergency."

Order at 1.  Consequently, the August 2021 Order continues to prohibit the introduction of "covered noncitizens" into the United States along the U.S. land and adjacent coastal borders.  As relevant to this litigation, the definition of "covered noncitizens" includes "family units."

The CDC made its determination, and issued the updated Order, after an updated public health assessment that evaluated numerous considerations, including the particular risks of COVID-19 transmission in U.S. Department of Homeland Security ("DHS") congregate settings (*id*. at 8), the limited ability to maintain physical distancing and cohorting at DHS facilities given capacity constraints (*id*. at 12-13), the significant increase in CBP encounters that has caused DHS facilities to exceed COVID-constrained capacity and to routinely exceed even non-COVID capacity (*id*. at 13), the emergence of the highly transmissible B.1.617.2 (Delta) variant (*id*. at 7), and the uptick in community transmission and hospitalizations along the U.S.-Mexico border (*id*. at 4, 11-12).

The August 2021 Order continues to authorize exceptions made by DHS on a case-by-case basis, based on the totality of the circumstances, for humanitarian, law enforcement, and public health, among other, reasons, and pursuant to consultation with CDC.  It also includes a broader exception for those who enter the United States as part of a DHS-approved process, where the process has been documented and shared with CDC, and includes appropriate COVID-19 mitigation protocols, per CDC guidance.  *Id*. at 23.  These exceptions will enable the processing of some family units under Title 8 of the U.S. Code, consistent with appropriate COVID-19 mitigation health and safety protocols and DHS's operational demands.

Although the August CDC order supersedes the October Order challenged in this case, its conclusion merely bolsters Defendants' position that a preliminary injunction enjoining the CDC's exercise of authority under Title 42 during this global pandemic would harm public health.

Defendants respectfully request that the Court consider the new CDC Order and the public health assessment reflected therein when evaluating Plaintiffs' pending motions.

Dated:  August 2, 2021           Respectfully submitted,

                    CHANNING D. PHILLIPS
                    D.C. Bar #415793
                    Acting United States Attorney

                    BRIAN P. HUDAK
                    Acting Chief, Civil Division

                    */s/ Sean M. Tepe*
                    SEAN M. TEPE, DC Bar #1001323
                    Assistant United States Attorney
                    555 Fourth St., N.W.
                    Washington, D.C. 20530
                    Phone: (202) 252-2533
                    Email: sean.tepe@usdoj.gov

                    *Counsel for Defendants*

# ATTACHMENT A

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC)**

**ORDER UNDER SECTIONS 362 & 365 OF THE PUBLIC HEALTH SERVICE ACT**
**(42 U.S.C. §§ 265, 268) and 42 CFR 71.40**

**PUBLIC HEALTH REASSESSMENT**
**AND**
**ORDER SUSPENDING THE RIGHT TO INTRODUCE**
**CERTAIN PERSONS FROM COUNTRIES**
**WHERE A QUARANTINABLE COMMUNICABLE DISEASE EXISTS**

## Executive Summary

The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), is hereby replacing and superseding the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order). The instant Order continues the suspension of the right to introduce "covered noncitizens," as defined herein,[1] into the United States along the U.S. land and adjacent coastal borders. In recognition of the specific COVID-19 mitigation measures available in facilities providing care for Unaccompanied Noncitizen Children (UC), CDC excepted UC from the October Order on July 16, 2021 (July Exception) and continues that exception herein.[2] Following an assessment of the current status of the COVID-19 public health emergency and the situation in congregate settings where noncitizens seeking to enter the United States are processed and held, CDC has determined that an Order remains appropriate at this time for all other covered noncitizens as described herein. As outlined below, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID-19 mitigation protocols as recommended by CDC.

CDC has determined that an Order under 42 U.S.C. § 265 remains necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States during the COVID-19 public health emergency. This Order reflects the current, highly dynamic conditions regarding COVID-19, including variants of concern and levels of vaccination, as well as evolving circumstances specific to the U.S. borders. As facts change, CDC may further modify the Order. This Order will remain in place until either the expiration of the Secretary of HHS' declaration that COVID-19 constitutes a public health emergency, or the CDC Director determines that the danger of further introduction of COVID-19 into the United States has declined such that continuation of the Order is no longer necessary to protect public health, whichever occurs first. The circumstances necessitating the Order will be reassessed at least every 60 days.

---

[1] *See infra* Section III.A.
[2] Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf (July 16, 2021); *see* 86 Fed. Reg. 38717 (July 22, 2021). The July Exception relating to UC is hereby made a part of this Order and incorporated by reference as if fully set forth herein.

**Outline of Reassessment and Order**

I.   Background

    A.  Current Status of COVID-19 Public Health Emergency

    B.  Public Health Factors Related to COVID-19

        1.  Manner of COVID-19 Transmission

        2.  Emerging Variants of the SARS-CoV-2 Virus

        3.  Risks of COVID-19 Transmission Specific to Congregate Settings

        4.  Availability of Testing, Vaccines, and Other Mitigation Measures

        5.  Impact on U.S. Communities and Healthcare Resources

II. Public Health Reassessment

    A.  Immigration Processing and Public Health Impacts

    B.  Public Health Assessment of Single Adults and Family Units

    C.  Comparison to Unaccompanied Noncitizen Children

    D.  Summary of Findings

III. Legal Basis for the Order

IV. Issuance and Implementation of the Order

    A.  Covered Noncitizens

    B.  Exceptions

    C.  APA, Review, and Termination

**I.        Background**

Coronavirus disease 2019 (COVID-19) is a quarantinable communicable disease[3] caused by the SARS-CoV-2 virus. As part of U.S. government efforts to mitigate the introduction, transmission, and spread of COVID-19, CDC issued an Order on October 13, 2020 (October Order), replacing an Order

---

[3] Quarantinable communicable diseases are any of the communicable diseases listed in Executive Order, as provided under § 361 of the Public Health Service Act (42 U.S.C. § 264). 42 CFR 71.1. The list of quarantinable communicable diseases currently includes cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow fever, viral hemorrhagic fevers (Lassa, Marburg, Ebola, Crimean-Congo, South American, and others not yet isolated or named), severe acute respiratory syndromes (including Middle East respiratory syndrome and COVID-19), and influenza caused by novel or reemergent influenza viruses that are causing, or have the potential to cause, a pandemic. *See* Exec. Order 13295, 68 Fed. Reg. 17255 (Apr. 4, 2003), as amended by Exec. Order 13375, 70 Fed. Reg. 17299 (Apr. 1, 2005) and Exec. Order 13674, 79 Fed. Reg. 45671 (July 31, 2014).

initially issued on March 20, 2020 (March Order),[4] suspending the right to introduce[5] certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increase in risk of the introduction of COVID-19. The October Order applied specifically to covered noncitizens who would otherwise be introduced into a congregate setting in land or coastal POE or U.S. Border Patrol stations at or near the U.S. borders[6] with Canada and Mexico. On February 17, 2021, CDC published a notice announcing the temporary exception of unaccompanied noncitizen children (UC)[7] encountered in the United States from the October Order.[8] The exception of UC from the October Order was confirmed with the publication of the July Exception.[9]

POE and U.S. Border Patrol stations are operated by U.S. Customs and Border Protection (CBP), an agency within DHS. The March and October Orders were intended to reduce the risk of COVID-19 introduction, transmission, and spread in POE and U.S. Border Patrol stations by significantly reducing the number and density of covered noncitizens held in these congregate settings, thereby reducing risks to U.S. citizens and residents, DHS/CBP personnel and noncitizens at the facilities, and the healthcare systems in local communities overall. Because of the congregate nature of these facilities and the sustained community transmission of COVID-19, including the highly transmissible B.1.617.2 (Delta) variant, in both the United States and migrants' countries of origin and transit, at this time, there continues to be a high risk of COVID-19 outbreaks in these facilities following the introduction of an infected person. Upon reassessment of the current situation with respect to the pandemic and the situation at the U.S. borders, CDC finds an Order under 42 U.S.C. § 265 for Single Adults (SA)[10] and Family Units (FMU)[11] remains necessary at this time, as discussed in detail below. CDC also recognizes the availability of testing, vaccines, and other mitigation protocols can minimize risk in this area. As the ability of DHS facilities to employ mitigation measures to address the COVID-19 public health emergency increases, CDC anticipates additional lifting of restrictions.

---

[4] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order), and subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503 (May 26, 2020).

[5] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[6] When U.S. Customs and Border Protection (CBP) or the U.S. Department of Homeland Security (DHS) partner agencies encounter noncitizens off the coast closely adjacent to the land borders, it transfers the noncitizens for processing in POE or U.S. Border Patrol stations closest to the encounter. Absent the October Order, such noncitizens would be held in the same congregate settings and holding facilities as any encounters along the land border, resulting in similar public health concerns related to the introduction, transmission, and spread of COVID-19.

[7] As stated in the July Exception, CDC's understanding is that UC are a class of individuals similar to or the same as those individuals who would be considered "unaccompanied alien children" (see 6 U.S.C. § 279) for purposes of HHS Office of Refugee Resettlement custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code. 86 Fed. Reg. 38717, 38718 at note 4.

[8] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Pending Forthcoming Public Health Determination, 86 Fed. Reg. 9942 (Feb. 17, 2021).

[9] *Supra* note 2.

[10] A single adult (SA) is any noncitizen adult 18 years or older who is not an individual in a "family unit," *see infra* note 11.

[11] An individual in a family unit (FMU) includes any individual in a group of two or more noncitizens consisting of a minor or minors accompanied by their adult parent(s) or legal guardian(s). Any statistics regarding FMU count the number of individuals in a family unit rather than counting the groups.

A.      **Current Status of COVID-19 Public Health Emergency**

Since late 2019, SARS-CoV-2, the virus that causes COVID-19, has spread throughout the world, resulting in a pandemic. As of July 28, 2021, there have been over 195 million confirmed cases of COVID-19 globally, resulting in over 4.1 million deaths.[12] The United States has reported over 34 million cases resulting in over 609,000 deaths due to the disease[13] and is currently averaging around 61,976 new cases of COVID-19 a day as of July 27, 2021 with high community transmission.[14] Although several of the key indicators of transmission and spread of COVID-19 in the United States improved during the first half of 2021, variants of concern, particularly the more transmissible Delta variant, have driven a stark increase in COVID-19 cases, hospitalizations, and deaths. COVID-19 cases increased approximately 400% between June 19 and July 28, 2021.[15]

Many countries have begun widespread vaccine administration; however, 78 countries continue to experience high or substantial incidence rates ($\geq$50 cases per 100,000 people in the last seven days) and 123 countries, including the United States, are experiencing an increasing incidence of reported new cases.[16] It is imperative that individuals and communities stay vigilant and that vaccination and other COVID-19 mitigation efforts are maintained. As the Delta variant continues to spread, both the United States and Mexico are experiencing high or substantial incidence rates with 137.9 and 68.6 daily cases per 100,000 persons over a seven-day average, respectively; in Canada, the incidence rate is 8.0. The United States saw a 91.0% increase in new cases over the past week, Mexico experienced a 30.2% increase in new cases. During the same time period, the incidence rate in Canada increased by 14.8%.[17]

COVID-19 was first declared a public health emergency in January 2020[18] and the U.S. government and CDC have implemented a number of COVID-19 mitigation and response measures since that time. Many of these mitigation measures have involved restrictions on international travel and migration.[19] Other measures have focused on recommending and enforcing COVID-19 mitigation

---

[12] *Coronavirus disease (COVID-19) pandemic*, World Health Organization, https://covid19.who.int/ (last visited July 28, 2021).

[13] *COVID Data Tracker*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited July 28, 2021).

[14] *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#cases_community (last visited July 28, 2021).

[15] Christie A, Brooks JT, Hicks LA, et al. Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage. MMWR Morb Mortal Wkly Rep. ePub: 27 July 2021. DOI: http://dx.doi.org/10.15585/mmwr.mm7030e2.

[16] *See Global Trends, Epidemic Curve trajectory Classification,* WHO, as reported at https://covid.cdc.gov/covid-data-tracker/#global-trends (last visited July 28, 2021).

[17] Low/Moderate incidence describes <50 cases per 100,000 people during the past 7 days. Increasing or Decreasing incidence is based on the percentage change in the number of cases reported in the past 7 days compared to the 7 days prior to that (Increasing: >0% change, Decreasing: <0% change).

[18] *Determination that a Public Health Emergency Exists*, U.S. Department of Health and Human Services (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (last visited July 21, 2021). The public health emergency determination has been subsequently renewed at 90-day intervals, most recently on July 28, 2021. *See* https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-19July2021.aspx (last visited July 28, 2021).

[19] The President issued proclamations suspending entry into the United States of immigrants or nonimmigrants who were physically present within a number of countries during the 14-day period preceding their entry or attempted entry into the U.S. *See* Proclamation 9984 (Jan. 31, 2020); Proclamation 9992 (Feb. 28, 2020); Proclamation 10143 (Jan. 25, 2021); and Proclamation 10199 (Apr. 30, 2021). Since March 2020, Canada and Mexico have joined with the U.S. to restrict non-essential travel along land borders to prevent the introduction and spread of the virus that causes COVID-19; these restrictions are in place until at least August 21, 2021. Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the U.S. and Canada, 86 Fed. Reg. 38556 (July 22, 2021); Notification of

efforts, including physical distancing and mask-wearing.[20] Recent concerns regarding the spread of the Delta variant prompted CDC to release updated guidance calling for vaccinated persons to wear a mask indoors in public when in an area of substantial or high transmission.[21] Furthermore, CDC recommends that all individuals, including those fully vaccinated, continue to wear a well-fitted face mask in correctional and detention facilities.[22]

## B.    Public Health Factors Related to COVID-19

As directed by Executive Order,[23] CDC conducted a comprehensive reassessment of the October Order to determine whether the suspension of the right to introduce certain persons into the United States remains necessary in light of the current circumstances, including the evolving understanding of the epidemiology of COVID-19 variants and available mitigation measures including testing and vaccination.[24] In conducting this reassessment, CDC examined a number of public health factors, and evaluated how these factors impact POE and U.S. Border Patrol stations and the personnel and noncitizens in those facilities. CDC also scrutinized whether the potential impacts varied by category of noncitizen: SA, FMU, and UC. In carrying out its reassessment, CDC evaluated the following public health factors: (1) the manner of COVID-19 transmission, including asymptomatic and pre-symptomatic transmission; (2) the emerging variants of the SARS-CoV-2 virus; (3) the risks specific to the type of facility or congregate setting; (4) the availability of testing and vaccines and the applicability of other mitigation efforts; and (5) the impact on U.S. communities and healthcare resources. CDC views this public health reassessment as setting forth a roadmap toward the safe resumption of normal processing of arriving noncitizens, taking into account COVID-19 concerns and immigration facilities' ability to implement mitigation measures.

---

Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the U.S. and Mexico, 86 Fed. Reg. 38554 (July 22, 2021). CDC has also issued orders to mitigate risk of further introducing and spreading SARS CoV-2 and its variants into the United States. *See* Framework for Conditional Sailing and Initial Phase COVID-19 Testing Requirements for Protection of Crew, 85 Fed. Reg. 70153 (Nov. 4, 2020) (outlining the process for the phased resumption of cruise ship passenger operations); Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery from COVID-19 for all Airline or Other Aircraft Passengers Arriving into the U.S. from Any Foreign Country, 86 Fed. Reg. 7387 (Jan. 28, 2021); and *COVID-19 Travel Recommendations by Destination*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html#travel-1 (last updated July 26, 2021) (COVID-19-related travel recommendations, including 62 Level 4 Travel Health Notices for countries with very high COVID-19 rates).

[20] CDC's Order requiring the wearing of face masks by travelers while on a conveyance entering, traveling within, or departing the United States and in U.S. transportation hubs remains in place for all travelers at indoor settings on public transportation conveyances and at transportation hubs, regardless of vaccination. Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs, 86 Fed. Reg. 8025 (Feb. 3, 2021). *See Requirement for Face Masks on Public Transportation Conveyances and at Transportation Hubs*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html (last updated June 10, 2021).

[21] *Supra* note 15 (CDC also recommends fully vaccinated persons consider wearing a mask regardless of transmission level if they or someone in their household is immunocompromised or at increased risk for severe disease, or if someone in their household is unvaccinated (including children currently ineligible for vaccination); *see also infra* page 11, section 5 (discussion of "high" and "substantial transmission").

[22] *Interim Public Health Recommendations for Fully Vaccinated People*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last updated May 28, 2021).

[23] Exec. Order 14010, "Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," 86 Fed. Reg. 8267 (Feb. 2, 2021).

[24] CDC's reassessment of the public health situation with respect to covered noncitizens and border facilities relies upon information and data provided by DHS, CBP, and HHS' Office of Refugee Resettlement, including information regarding those entities' policies and practices.

1.      **Manner of COVID-19 Transmission**

SARS-CoV-2, the virus that causes COVID-19, spreads mainly from person-to-person through respiratory fluids released during exhalation, such as when an infected person coughs, sneezes, or talks. Exposure to these respiratory fluids occurs in three principal ways: (1) inhalation of very fine respiratory droplets and aerosol particles, (2) deposition of respiratory droplets and particles on exposed mucous membranes in the mouth, nose, or eye by direct splashes and sprays, and (3) touching mucous membranes with hands that have been soiled either directly by virus-containing respiratory fluids or indirectly by touching surfaces with virus on them.[25] Spread is more likely when people are in close contact with one another (within about 6 feet), especially in crowded or poorly ventilated indoor settings. Unvaccinated persons with asymptomatic and pre-symptomatic infection are significant contributors to community SARS-CoV-2 transmission and occurrence of COVID-19.[26] Asymptomatic cases are currently believed to represent roughly 30% of all COVID-19 infections and the infectiousness of asymptomatic individuals is believed to be about 75% of the infectiousness of symptomatic individuals. CDC's current best estimate is that 50% of infections are transmitted prior to symptom onset (pre-symptomatic transmission).[27] Although rare, as discussed below, breakthrough infections may occur in vaccinated individuals. Due to the variety of source of spread – transmission by asymptomatic, pre-symptomatic, symptomatic, and vaccinated individuals – testing is critical to identify those infected with COVID-19.

Among those who are not vaccinated, serious COVID-19 illness necessitating treatment occurs with greater frequency in older adults and those with certain pre-existing conditions.[28] Although children can be infected with SARS-CoV-2, get sick from COVID-19, and spread the virus to others, when compared with adults, children and adolescents who have COVID-19 are more commonly asymptomatic or have mild, non-specific symptoms. Children are less likely to develop severe illness or die from COVID-19.[29] They typically present with mild symptoms, if any, and have a good prognosis, recovering within one to two weeks after disease onset.[30]

---

[25] *Scientific Brief: SARS-CoV-2 Transmission*, Centers for Disease Control and Prevention (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html; *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, Centers for Disease Control and Prevention (Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html.

[26] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID-19 outbreaks. *Proc Natl Acad Sci U S A.* 2020;117(30):17513-17515.10.1073/pnas.2008373117, available at https://www.ncbi.nlm.nih.gov/pubmed/32632012; Johansson MA, Quandelacy TM, Kada S, et al. SARS-CoV-2 Transmission From People Without COVID-19 Symptoms. Johansson MA, et al. JAMA Netw Open. 2021 January4;4(1):e2035057. doi: 10.1001/jamanetworkopen.2020.35057.

[27] *COVID-19 Pandemic Planning Scenarios*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited July 28, 2021).

[28] *People at Increased Risk and Other People Who Need to Take Extra Precautions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last updated Apr. 20, 2021).

[29] *Science Brief: Transmission of SARS-CoV-2 in K-12 Schools and Early Care and Education Programs – Updated*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/transmission_k_12_schools.html (last updated July 9, 2021).

[30] *See* Leeb RT, Price S, Sliwa S, et al. COVID-19 Trends Among School-Aged Children — United States, March 1–September 19, 2020. MMWR Morb Mortal Wkly Rep 2020;69:1410–1415. DOI: http://dx.doi.org/10.15585/mmwr.mm6939e2; Leidman E, Duca LM, Omura JD, Proia K, Stephens JW, Sauber-Schatz EK. COVID-19 Trends Among Persons Aged 0–24 Years — United States, March 1–December 12, 2020. MMWR Morb Mortal Wkly Rep 2021;70:88–94. DOI: http://dx.doi.org/10.15585/mmwr.mm7003e1; Rankin DA, Talj R, Howard LM, Halasa NB. Epidemiologic trends and characteristics of SARS-CoV-2 infections among children in the United States. Curr Opin Pediatr. 2021 Feb 1;33(1):114-121. doi: 10.1097/MOP.0000000000000971. PMID: 33278112; PMCID: PMC8011299; and Castagnoli R, Votto M, Licari A, et al. Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Infection in

## 2.    Emerging Variants of the SARS-CoV-2 Virus

Like all viruses, SARS-CoV-2 constantly changes through mutation as it circulates, resulting in new virus variants over time.[31] Unchecked transmission of SARS-CoV-2 may result in increased viral mutations and the emergence of new variants. New variants of SARS-CoV-2 have emerged globally,[32] several of which have been identified as variants of concern,[33] including the Alpha, Beta, Gamma, and Delta variants. These variants of concern have evidence of an increase in transmissibility and more severe disease, which may lead to higher incidence, hospitalization, and death rates among exposed persons.[34] Furthermore, findings suggest variants may reduce levels of neutralization by antibodies generated during previous infection or vaccination, resulting in reduced effectiveness of treatments or vaccines, or increased diagnostic detection failures.[35] The ultimate concern is a variant that substantially decreases the effectiveness of available vaccines against severe or deadly disease.

Currently, the Delta variant is the predominant SARS-CoV-2 strain circulating in the United States, accounting for over 82% of cases as of July 17, 2021.[36] Of critical significance for this Order, the Delta variant has demonstrated increased levels of transmissibility among unvaccinated persons and might increase the risk of vaccine breakthrough infections in the absence of other mitigation strategies.[37] For the unvaccinated, Delta remains a formidable threat and rates of infection of the Delta variant are growing more rapidly in U.S. counties with lower vaccination rates.[38] Available evidence suggests all three vaccines currently authorized for emergency use in the United States provide significant protection against variants circulating in the United States.[39] However, a small proportion of people who are fully vaccinated may become infected with the Delta variant (known as breakthrough infection); emerging evidence suggests that fully vaccinated persons who do become infected with the Delta variant are at risk for transmitting it to others.[40]

---

Children and Adolescents: A Systematic Review. JAMA Pediatr. 2020;174(9):882–889. doi:10.1001/jamapediatrics.2020.1467.

[31] *About Variants of the Virus that Causes COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last updated Apr. 2, 2021).

[32] Abdool Karim SS, de Oliveira T. New SARS-CoV-2 Variants - Clinical, Public Health, and Vaccine Implications [published online ahead of print, 2021 Mar 24]. *N Engl J Med*. 2021;10.1056/NEJMc2100362. doi:10.1056/NEJMc2100362

[33] *Id.*

[34] Dougherty K, Mannell M, Naqvi O, Matson D, Stone J. SARS-CoV-2 B.1.617.2 (Delta) Variant COVID-19 Outbreak Associated with a Gymnastics Facility — Oklahoma, April–May 2021. MMWR Morb Mortal Wkly Rep 2021;70:1004–1007. DOI: http://dx.doi.org/10.15585/mmwr.mm7028e2 (describing a B.1.617.2 (Delta) Variant COVID-19 outbreak associated with a gymnastics facility and finding that the Delta variant is highly transmissible in indoor sports settings and households, which might lead to increased incidence rates).

[35] *SARS-CoV-2 Variant Classifications and Definitions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-info.html#Concern (last updated June 29, 2021).

[36] *Variant Proportions*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (citing data for the two-week interval ending July 17, 2021).

[37] *About Variants of the Virus that Causes COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html (last updated June 28, 2021).

[38] COVID Data Tracker Weekly Review, Interpretive Summary for July 23, 2021, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (attributing rising numbers of COVID-19 cases in nearly 90% of U.S. jurisdictions to the rapid spread of the Delta variant).

[39] *Science Brief: COVID-19 Vaccines and Vaccination*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html (last updated May 27, 2021). Other vaccines, particularly the one manufactured by AstraZeneca, show reduced efficacy against infection with certain variants but may still protect against severe disease; at the time of the issuance of this Order, the FDA has not authorized the AstraZeneca COVID-19 vaccine for use in the United States.

[40] *Supra* note 15.

CDC continues to monitor the situation and may adapt recommendations based on the epidemiology of variants of concern. Given the transmissibility of variant strains and the continued emergence of new variants, ongoing monitoring of vaccine effectiveness is needed to identify mutations that could render vaccines most commonly used in the United States less effective against more transmissible variants.[41]

### 3.     Risks of COVID-19 Transmission Specific to Congregate Settings

Given the manner of transmission, including asymptomatic or pre-symptomatic transmission, the risk of spreading COVID-19 is particularly pronounced among those who are unvaccinated, partially vaccinated, or vaccinated with less effective vaccines.[42] This risk is acutely present in congregate settings, where a number of people reside, meet, or gather in close proximity for either a limited or extended period of time.[43] Facilities must often carefully weigh the risks of increased transmission not only in the facilities, but also in the local community, due to secondary transmission. These congregate facilities must also consider individual facility and community characteristics (e.g., ability to maintain physical distancing, compliance with universal mask-use policies, ability to properly ventilate, proportion of staff and occupants vaccinated, numbers of those who are at increased risk for severe illness from COVID-19, the availability of resources for broad-based vaccination, testing, and outbreak response, and level of community transmission).[44]

Congregate settings, particularly detention facilities with limited ability to provide adequate physical distancing and cohorting, have a heightened risk of COVID-19 outbreaks.[45] CDC has long recognized the risks specific to such settings, including homeless shelters, detention centers, schools, and workplaces and has provided a number of guidance documents to address the concerns in such spaces. Specifically, CDC developed interim guidance for law enforcement agencies that have custodial authority for detained populations, including civil and pre-trial detention settings. Among the recommendations are physical distancing strategies, isolation of individuals with confirmed or suspected COVID-19, quarantine of close contacts, cohorting of individuals when space is limited, testing, healthcare evaluations for individuals with suspected COVID-19, clinical care as needed for

---

[41] *See About Variants of the Virus that Causes COVID-19*, *supra* note 37.

[42] Vaccines with effectiveness of less than 50% against wildtype strains of COVID-19 are considered less effective.

[43] Notably, COVID-19 has disproportionately affected persons in congregate settings and high-density workplaces. Studies conducted prior to the availability of vaccines showed that a single introduction of SARS-CoV-2 into a facility can result in a widespread outbreak. Lehnertz NB, Wang X, Garfin J, Taylor J, Zipprich J, VonBank B, et al. Transmission Dynamics of Severe Acute Respiratory Syndrome Coronavirus 2 in High-Density Settings, Minnesota, USA, March–June 2020. Emerg Infect Dis. 2021;27(8):2052-2063. https://doi.org/10.3201/eid2708.204838. Whole genome sequencing of samples taken following an outbreak at a correctional facility demonstrated that 92.2% of the samples taken from patients were genetically related, indicating that a single case had likely led to the infection of 48 individuals. Similarly, phylogenetic analysis established that 29.6% of cases from an outbreak at a second correctional facility were closely related and genetically identical, indicating that the index case had led to the infection of approximately 60 others.

[44] *See Recommendations for Quarantine Duration in Correctional Facilities*, Centers for Disease Control and Prevention,, https://www.cdc.gov/coronavirus/2019-ncov/community/quarantine-duration-correctional-facilities.html (last visited July 28, 2021).

[45] Since March 31, 2020, the U.S. Federal Bureau of Prisons and state departments of corrections have together recorded 416,854 COVID-19 cases among residents and 108,945 cases among staff in correctional and detention facilities, resulting in 2,911 deaths. *Confirmed COVID-19 Cases and Deaths in U.S. Correctional and Detention Facilities by State*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#correctional-facilities (last visited July 28, 2021).

individuals with confirmed or suspected COVID-19, and addressing specific considerations for people who are at increased risk for severe illness.[46]

Vaccine coverage in congregate settings varies and infection risk is greater where there is sustained community transmission.[47] In light of this, CDC strongly recommends vaccination against COVID-19 for everyone who is eligible, including people who are incarcerated or detained and staff at correctional and detention facilities.[48] CDC is discussing additional guidance with DHS, highlighting the key metrics to consider before modifying COVID-19 prevention and mitigation measures in facilities that hold or detain migrants.[49]

### 4.    Availability of Testing, Vaccines, and Other Mitigation Measures

The potential for asymptomatic and pre-symptomatic transmission makes testing an essential part of COVID-19 mitigation protocols. With the additional testing capacity available through antigen tests, rapid testing can be implemented to identify infected persons so they can be isolated until they no longer pose a risk of spreading infections and their close contacts can be identified and quarantined.[50] Testing is especially important in congregate settings where even a single asymptomatic case can trigger an outbreak that may quickly exceed a facility's capacity to isolate and quarantine residents. Furthermore, if personnel are infected or exposed, the number of available staff members may be reduced, further stressing facility operations. Testing facility residents and personnel can help facilitate prompt mitigation actions.

COVID-19 vaccines are now widely available in the United States, and vaccination is recommended for all people 12 years of age and up. Three COVID-19 vaccines are currently authorized by the U.S. Food and Drug Administration (FDA) for emergency use: two mRNA vaccines (produced by Pfizer-BioNTech and Moderna) and one viral vector vaccine (produced by Johnson & Johnson/Janssen), each of which has been determined to be safe and effective against COVID-19. As of July 28, 2021, over 163 million people in the United States (57.6% of the population 12 years or older) have been fully vaccinated and over 189 million people in the United States (66.8% of the population 12 years or older) have received at least one dose.[51] After substantial vaccine uptake in the first months of

---

[46] *See* Guidance for Correctional & Detention Facilities, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated June 9, 2021).

[47] Falk A, Benda A, Falk P, Steffen S, Wallace Z, Høeg TB. *COVID-19 Cases and Transmission in 17 K–12 Schools — Wood County, Wisconsin, August 31–November 29, 2020*. MMWR Morb Mortal Wkly Rep 2021;70:136–140. DOI: http://dx.doi.org/10.15585/mmwr.mm7004e3. *See also* Link-Gelles R, DellaGrotta AL, Molina C, et al. *Limited Secondary Transmission of SARS-CoV-2 in Child Care Programs — Rhode Island, June 1–July 31, 2020*. MMWR Morb Mortal Wkly Rep 2020;69:1170–1172. DOI: http://dx.doi.org/10.15585/mmwr.mm6934e2.

[48] *COVID-19 Vaccine FAQs in Correctional and Detention Centers*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/vaccine-faqs.html (last updated June 1, 2021).

[49] *See* CDC memo to DHS "Considerations for modifying COVID-19 prevention and mitigation measures in Department of Homeland Security migrant holding facilities in response to declining transmission," Centers for Disease Control and Prevention (last updated June 11, 2021).

[50] *See* COVID-19 Testing and Diagnostics Working Group (TDWG). U.S. Department of Health and Human Services, https://www.hhs.gov/coronavirus/testing/testing-diagnostics-working-group/index.html (last visited July 28, 2021) (defining the role of the COVID-19 TDWG, which develops testing-related guidance and provides targeted investments to expand the available testing supply and maximize testing capacity).

[51] *COVID-19 Vaccinations in the United States*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations (last updated July 28, 2021).

2021, however, vaccination uptake has plateaued, particularly in those under the age of 65 years.[52] The combination of reduced vaccine uptake and the extreme transmissibility of the Delta variant has resulted in rising numbers of COVID-19 cases, primarily and disproportionately affecting the unvaccinated population.

The availability of COVID-19 vaccines is rising globally but still dwarfed by the rates of vaccination in the United States and a handful of other countries.[53] Countries of origin for the majority of incoming covered noncitizens have markedly lower vaccination rates.[54] Given this, the increased movement of typically unvaccinated covered noncitizens into the United States presents a heightened risk of morbidity and mortality to this population due to the congregate holding facilities at the border and the practical constraints on implementation of mitigation measures in such facilities. Outbreaks in these settings increase the serious danger of further introduction, transmission, and spread of COVID-19 and variants into the country.

CDC is aware of a rising number of breakthrough SARS-CoV-2 infections[55] in vaccinated individuals; even without variants of concern, more vaccine breakthroughs are to be expected due to the rising number of vaccinated individuals. While the vaccines currently authorized by the FDA are successful in mitigating severe illness from the highly transmissible Delta variant, infection and even mild to moderate illness has been documented in a small percentage of vaccinated persons.[56] The emergence of these more transmissible variants increases the urgency to expand vaccination coverage for everyone and especially those in densely populated congregate settings.[57] Public health agencies and other organizations must collaboratively monitor the status of the pandemic in their communities. As widespread vaccination efforts continue, ongoing use of the full panoply of mitigation measures is nevertheless especially important in congregate settings and remains key to slowing introduction, transmission, and spread of COVID-19.

---

[52] Diesel J, Sterrett N, Dasgupta S, et al. COVID-19 Vaccination Coverage Among Adults — United States, December 14, 2020–May 22, 2021. MMWR Morb Mortal Wkly Rep 2021;70: 922–927. DOI: http://dx.doi.org/10.15585/mmwr.mm7025e1. The study found that the lowest vaccination coverage and the intent to be vaccinated among adults aged 18–24 years, non-Hispanic Black adults, and individuals with less education, no insurance, and lower household incomes. Concerns about vaccine safety and effectiveness were commonly cited barriers to vaccination. *See also supra* note 15 (finding that vaccine uptake has slowed nationally with wide variation in coverage by state (range = 33.9%–67.2%) and by county (range = 8.8%–89.0%)).

[53] *See* "PAHO Director calls for fair and broad access to COVID-19 vaccines for Latin America and the Caribbean," Pan American Health Organization, https://www.paho.org/en/news/7-7-2021-paho-director-calls-fair-and-broad-access-covid-19-vaccines-latin-america-and (July 7, 2021) (noting the discrepancies in vaccine availability coverage among North, Central, and South American countries).

[54] Thus far in 2021, Ecuador, El Salvador, Guatemala, Honduras, and Mexico constitute the top five countries of origin for covered noncitizens. Rates of vaccination for each country are as follows: Ecuador: 11% fully vaccinated, 30% only partly vaccinated; El Salvador: 22% fully vaccinated, 17% only partly vaccinated; Guatemala: 1.6% fully vaccinated, 5.3% only partly vaccinated; Honduras: 1.8% fully vaccinated, 12% only partly vaccinated; Mexico: 18% fully vaccinated, 14% only partly vaccinated, https://ourworldindata.org/covid-vaccinations (last visited July 24, 2021).

[55] A vaccine breakthrough infection is defined as the detection of SARS-CoV-2 RNA or antigen in a respiratory specimen collected from a person ≥14 days after receipt of all recommended doses of an FDA-authorized COVID-19 vaccine. COVID-19 Vaccine Breakthrough Infections Reported to CDC — United States, January 1–April 30, 2021. MMWR Morb Mortal Wkly Rep 2021;70:792–793. DOI: http://dx.doi.org/10.15585/mmwr.mm7021e3.

[56] *COVID-19 Vaccine Breakthrough Case Investigation and Reporting*, Centers for Disease Control and Prevention, https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (last updated July 15, 2021).

[57] *Supra* at note 55.

5.      **Impact on U.S. Communities and Healthcare Resources**

COVID-19 cases are on the rise in nearly 90% of U.S. jurisdictions, and multiple outbreaks are occurring in parts of the country that have low vaccination coverage. A person's risk for SARS-CoV-2 infection is directly related to the risk for exposure to infectious persons, which is largely determined by the extent of SARS-CoV-2 circulation in the surrounding community. Emerging evidence regarding the Delta variant finds that it is more than two times as transmissible as the original strains of SARS-CoV-2 circulating at the start of the pandemic. In light of this, CDC recommends assessing the level of community transmission using, at a minimum, two metrics: new COVID-19 cases per 100,000 persons in the last 7 days and percentage of positive SARS-CoV-2 diagnostic nucleic acid amplification tests in the last 7 days. For each of these metrics, CDC classifies transmission values as low, moderate, substantial, or high. At the time of this Order's issuance, over 70% of the U.S. counties along the U.S.-Mexico border were classified as experiencing high or substantial levels of community transmission.[58] In areas of substantial or high transmission, CDC recommends community leaders encourage vaccination and universal masking in indoor public spaces in addition to other layered prevention strategies to prevent further spread.

Between March and June 2021, rates of hospitalization due to COVID-19 decreased dramatically, easing long endured pressures on the U.S. healthcare system. However, in July 2021, with the rise of the Delta variant, the seven-day average for new hospital admissions in the United States increased 35.8% over the prior seven-day period.[59] Rates of hospitalization are rising most sharply in areas with low vaccination coverage.[60] CDC recommends continuous monitoring of the availability of staffed inpatient and intensive care unit beds, as data on usage of clinical care resources to manage patients with COVID-19 reflect underlying community disease incidence. This information can signal when urgent implementation of layered prevention strategies might be necessary to prevent overloading local and regional health care systems. Strains on critical care capacity can increase COVID-19 mortality while decreasing the availability and use of health care resources for non-COVID-19 related medical care.[61] Increased hospital admissions are forecasted in the coming weeks as the Delta variant continues to predominate.[62]

The rapid spread of the highly transmissible Delta variant is leading to worrisome trends in healthcare and community resources. Signs of stress are already present in the southern regions of the

---

[58] Of the 22 U.S. counties along the U.S.-Mexico border, 13 counties are experiencing high levels of community transmission (San Diego County, CA; Hidalgo County, NM; Presidio County, TX; Brewster County, TX; Terrell County, TX; Val Verde County, TX; Kinney County, TX; Maverick County, TX; Webb County, TX; Zapata County, TX; Starr County, TX; Hidalgo County, TX; and Cameron County, TX) and four counties are experiencing substantial levels of community transmission (Imperial County, CA; Pima County, AZ; Santa Cruz County, AZ; and Luna County, NM;). Five counties are experiencing moderate levels of community transmission (Yuma County, AZ; Cochise County, AZ; Dona Ana County, NM; El Paso County, TX; and Hudspeth County, TX). No counties along the border are experiencing low levels of community transmission. *COVID-19 Integrated County View*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#county-view (last updated July 28, 2021).

[59] COVID Data Tracker Weekly Review, Interpretive Summary for July 16, 2021, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07162021.html (last visited July 28, 2021).

[60] COVID Data Tracker Weekly Review, Interpretive Summary for July 9, 2021, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07092021.html.

[61] *Supra* note 15.

[62] COVID-19 Forecasts: Hospitalizations, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/hospitalizations-forecasts.html (last updated July 21, 2021).

United States.[63] Ultimately, the flow of migration directly impacts not only border communities and regions, but also destination communities and the healthcare resources of both. In light of this, the totality of the U.S. community transmission, health system capacity, and public health capacity, as well as local capacity to implement mitigation protocols, are important considerations when reassessing the need for this Order.[64]

## II. Public Health Reassessment

### A.   Immigration Processing and Public Health Impacts

Noncitizens arriving in the United States who lack proper travel documents, whose entry is otherwise contrary to law, or who are apprehended at or near the border seeking to unlawfully enter the United States between POE are normally subject to initial immigration processing by CBP in POE facilities and U.S. Border Patrol stations. Absent CDC's issuance of an order under 42 U.S.C. § 265 directing otherwise, immigration processing takes place pursuant to Title 8 of the U.S. Code. Although some number of inadmissible noncitizens present at POE, the vast majority are encountered by CBP between POE.[65] Upon such encounters, Border Patrol agents conduct an initial field assessment and transport the individuals to a CBP facility for intake processing.[66]

CBP facilities are designed to provide this short-term intake processing and are thus space-constrained.[67] While undergoing intake processing under Title 8 at CBP facilities, noncitizens are regularly held in close proximity to one another anywhere from several hours to several days. Depending on the outcome of intake processing, a noncitizen is generally referred to the DHS' Immigration and Customs Enforcement (ICE), where they are often subject to longer-term detention[68].[69]

Compared to CBP facilities, ICE facilities have space allocations similar to traditional long-term correctional facilities. Still, during migratory surges, capacity constraints hinder CBP and ICE operations and facilities alike. If downstream ICE operations and facilities reach capacity limits, ICE may be unable to take custody of additional noncitizens in a timely manner. When this movement of noncitizens from CBP to ICE custody is impeded or delayed, noncitizens may remain in CBP's densely populated, short-term holding facilities for much longer periods. Of note, the United States is currently experiencing such a migratory surge of noncitizens attempting to enter the country at and between POE

---

[63] *See* COVID Data Tracker: New Hospital Admissions, https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions (last updated July 22, 2021) (showing HHS Regions 4, 6, and 9, encompassing all southern states, experiencing increased rates of new admissions of COVID-19-confirmed patients).

[64] *See Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/community-mitigation.html (last visited May 6, 2021).

[65] Fiscal year to date, 96% (1,076,242 of 1,119,204) of encounters of noncitizens occurred between POE.

[66] CBP facilities include POE, U.S. Border Patrol stations, and facilities managed by the Office of Field Operations.

[67] CBP facilities were designed for the immediate processing of persons and are statutorily designated as short-term (less than 72 hours) holding facilities. 6 U.S.C. § 211(m).

[68] FMU transferred to ICE custody are generally held at a Family Staging Center (FSC). Following intake processing, UC are referred to the Office of Refugee Resettlement (ORR) within HHS' Administration for Children and Families (ACF) for care.

[69] While CBP policies regarding transfer and release decisions are the same across the Southwest Border, implementation varies based on local CBP capacity, and ICE capacity.

at the southern border.[70] DHS has already recorded more encounters this fiscal year to date than the approximate 977,000 encounters in the whole of FY 2019.[71]

CBP has implemented a variety of mitigation efforts to prevent the spread of COVID-19 in POE and U.S. Border Patrol facilities based on the infection prevention strategy referred to as the hierarchy of controls.[72] CBP has invested in engineering upgrades, such as installing plexiglass dividers in facilities where physical distancing is not possible and enhancing ventilation systems. All CBP facilities adhere to CDC guidance for cleaning and disinfection. Surgical masks are provided to all persons in custody and are changed at least daily and if or when they become wet or soiled. Personal protective equipment (PPE) and guidance are regularly provided to CBP personnel. Recognizing the value of vaccination, CBP is encouraging vaccination among its workforce. All noncitizens brought into CBP custody are subject to health intake interviews, including COVID-19 screening questions and temperature checks. If a noncitizen in custody displays symptoms of COVID-19 or has a known exposure, CBP facilitates referral to the local healthcare system for testing. Finally, in the event CBP decides to release a noncitizen prior to removal proceedings, the agency has coordinated with local governments and non-governmental organizations to arrange COVID-19 testing at release.[73]

In addition to these mitigation measures, enhanced physical distancing and cohorting remain key to preventing transmission and spread of COVID-19, particularly in congregate settings. To address this, as the pandemic emerged, CBP greatly reduced capacity in their holding facilities. While U.S. Border Patrol facilities along the southern border currently have a non-pandemic total holding capacity of 14,553 individuals, implementation of mitigation measures led to a 50-75% reduction in holding capacity depending on the design of a given facility, resulting in COVID-constrained holding capacity of 4,706.[74] However, the current surge has caused CBP to exceed COVID-constrained capacity and routinely exceed its non-COVID capacity.[75] From July 3 to July 24, 2021, CBP encountered an average of 3,573 SA and 2,479 FMU daily, over a 21-day period, even with the CDC Order in place. This extreme population density and the resulting increased time spent in custody by noncitizens presents a serious risk of increased COVID-19 transmission in CBP facilities.

CBP faces unique challenges in implementing certain COVID-19 mitigation measures. All individuals encountered by U.S. Border Patrol must be processed in CBP facilities. Not only does this involve close and often continuing contact between CBP personnel and noncitizens, but CBP is further constrained by requirements separate noncitizens within its holding facilities according to specific

---

[70] According to data from DHS, encounters at the southern border have been rising since April 2020 due to several factors, including ongoing violence, insecurity, and famine in the Northern Triangle countries of Central America (El Salvador, Honduras, Guatemala).

[71] *Southwest Land Border Encounters*, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited July 28, 2021).

[72] *Hierarchy of Controls*, Centers for Disease Control and Prevention, available at https://www.cdc.gov/niosh/topics/hierarchy/default.html (last visited July 6, 2021). The hierarchy of controls is used as a means of determining how to implement feasible and effective control solutions. The hierarchy is outlined as: (1) Elimination (physically remove the hazard); (2) Substitution (replace the hazard); (3) Engineering Controls (isolate people from the hazard); (4) Administrative Controls (change the way people work); and (5) PPE (protect people with Personal Protective Equipment).

[73] This is also true of ICE facilities.

[74] Similarly, the operational holding capacity for SA in ICE facilities was reduced by 30% from a regular total capacity of 56,888 beds to 39,821 beds.

[75] Non-COVID-19 holding capacity was exceeded as recently as July 25, 2021.

permutations.[76] These cohorting requirements significantly complicate CBP's ability to address COVID-19-related risks, as CBP facility capacity to accommodate COVID-19 mitigation protocols may not always align with the makeup of the incoming population of noncitizens and the categorical separations required of DHS.

**Immigration Processing under Title 8 of the U.S. Code**

The vast majority of noncitizens attempting to enter the United States without proper travel documents are SA; SA account for 68% of overall CBP encounters this fiscal year as of July 26, 2021. Under normal Title 8 immigration processes, SA are transferred to ICE custody pending removal proceedings. As noted above, absent expulsions directed by an order under 42 U.S.C. § 265, SA presenting at POE or attempting entry between POE would be processed and held in CBP facilities while awaiting transfer to ICE. Generally, CBP only releases SA into U.S. communities as a last resort, due to severe overcrowding and when all possible detention options have been explored.

A smaller percentage, 23%, of noncitizens encountered by CBP are members of an FMU.[77] As with SA, CBP has limited capacity to hold FMU. Under Title 8, due to court-ordered restrictions that largely prohibit the long-term detention of families, FMU are generally released from DHS custody pending removal proceedings. Prior to release, some FMU are transferred from CBP custody to Family Staging Centers (FSC) operated by ICE. Only a limited number of FMU may be held in an FSC, and time in custody for an FMU is generally about 2-3 days before being released. FSC capacity is further limited by COVID-19 mitigation protocols.[78]

Releasing FMU to communities necessitates robust testing, vaccination where possible, and careful attention to consequence management (e.g., facilities for isolation and quarantine). DHS has partnered with state and local agencies and non-governmental organizations to facilitate COVID-19 testing of FMU upon release from CBP custody. Pursuant to these arrangements, CBP generally transports FMU to release locations where partner agencies and organizations are on-site to provide testing and facilitate consequence management. Although the implementing partners and their capacities (including for consequence management such as housing) vary, the objectives are constant. These resources, however, are limited. They are already stretched thin, and certainly not available for all FMU who would be processed under Title 8 in the absence of an order issued under 42 U.S.C. § 265. DHS has committed to supporting and, where possible, expanding these efforts, including exploring the incorporation of vaccination into this model. CDC strongly supports DHS efforts that include broad-based testing and vaccination.

**Immigration Processing with an Order under 42 U.S.C. 265**

Following the issuance of the March and October Orders, covered noncitizens apprehended at or near U.S. borders, regardless of their country of origin, generally were expelled to Mexico or Canada, whichever they entered from, via the nearest POE, or to their country of origin. Where possible, SA and

---

[76] For example, criminal cases must be held separately from administrative cases, SA must be separated by gender identity, FMU and UC must be separated from SA, and all vulnerable individuals must be protected from harm.

[77] Thus far this fiscal year, as of July 26, 2021.

[78] The total capacity for these FSCs is 3,230. However, due to COVID-19 mitigation protocols and family composition limitations, current operational capacity for the FSCs is approximately 2,400. In July 2021, due to an influx of single adults at the SWB, ICE ceased intake of family units at one of the FSCs and began to transition the facility to hold single adults. With this transition, the remaining COVID-limited FSC capacity for family units is approximately 1,800. Additionally, ICE has procured 1,200 additional beds at Emergency Family Staging Centers (EFSCs); this bed space is not limited by family composition or COVID-19.

FMU eligible for expulsion based on the March and October Orders have been processed pursuant to the Title 42 authority, unless a case-by-case exception was made by DHS.[79]

Even with the March and October Orders in place, a significant percentage of FMU were unable to be expelled pursuant to the order, given a range of factors, including, most notably, restrictions imposed by foreign governments.[80] For example, the Mexican government has placed certain nationality- and demographic-specific restrictions on the individuals it will accept for return via the Title 42 expulsion process. With limited exceptions, the Mexican government will only accept the return of Mexican and Northern Triangle nationals. Moreover, along sections of the border, Mexican officials refuse to accept the return of any non-Mexican family with children under the age of seven, greatly reducing DHS' ability to expel FMU. In addition, many countries impose travel requirements, including COVID-19 testing, consular interviews, and identity verification that can delay repatriation. These added requirements often make prompt expulsion a practical impossibility. Conversely, DHS continues to be able to process the majority of SA under Title 42.[81] In those cases where Title 42 processing is not possible, SA and FMU are instead processed pursuant to Title 8. Processing noncitizens and issuing a Notice to Appear under Title 8 processes takes approximately an hour and a half to two hours per person. Conversely, processing an individual for expulsion under the CDC order takes roughly 15 minutes and generally happens outdoors.

The March and October Orders permitted noncitizens to be promptly returned to their country of origin, rather than being transferred to ICE custody or released into the United States, resulting in noncitizens spending shorter amounts of time in custody at CBP facilities. However, as the number of noncitizens attempting to enter the United States has surged and as individuals cannot be expelled pursuant to Title 42 given the restrictions in place, the time in custody at CBP facilities has increased for SA and FMU, even with the October Order in place. As of July 29, 2021, the current average time in custody at CBP facilities for SA not subject to expulsion under the October Order is 50 hours. FMU currently spend an average of 62 hours in CBP custody prior to release or transfer to ICE. If the CDC Order were not in place, both SA and FMU time in custody would likely increase significantly.

## B. Public Health Assessment of Single Adults and Family Units

Implementation of CDC's March and October Orders significantly reduced the length of time covered noncitizen SA and FMU are held in congregate settings at POE and U.S. Border Patrol stations, as well as in the ICE facilities that subsequently hold noncitizens.[82] By reducing congestion in these facilities, the Orders have helped lessen the introduction, transmission, and spread of COVID-19 among border facilities and into the United States while also decreasing the risk of exposure to COVID-19 for

---

[79] Some countries have put in place limitations that make expulsion pursuant to Title 42 inapplicable. The October Order excepted covered noncitizens "who must test negative for COVID-19 before they are expelled to their home country" and several countries refuse to accept the return of SA and FMU and other individuals unless DHS first secures a negative test result for each individual to be returned. These noncitizens are thus not covered by the prior Order and thus cannot be expelled pursuant to Title 42. See 85 Fed. Reg. at 65,807.

[80] Only 33% of FMU encountered fiscal year to date have been expelled under Title 42 and this percentage has fallen over time. In June 2021, only 14% of FMU were expelled under Title 42, an average of approximately 300 per day.

[81] Fiscal year to date, 89% of SA have been expelled under Title 42. This percentage has fallen slightly as the constraints on expelling individuals have increased. In June 2021, 82% of SA were expelled under Title 42, an average of over 3,000 per day.

[82] For example, when processing noncitizens under Title 8, prior to referral to ICE or release into the community, CBP generally issues the noncitizen a "Notice to Appear" (also called an I-862), which is a charging document that initiates removal proceedings against the noncitizen and may include a court date or direct the noncitizen to report to an ICE office to receive a court date.

DHS personnel and others in the facilities. Implementation of the Orders has mitigated the potential erosion of DHS operational capacity due to COVID-19 outbreaks. The reduction in the number of SA and FMU held in these congregate settings continues to be a necessary mitigation measure as DHS moves towards the resumption of normal border operations.

The availability of testing, vaccination, and other mitigation measures[83] at migrant holding facilities must also be considered. While downstream ICE facilities may have greater ability to provide these measures, CBP cannot appropriately execute consequence management measures to minimize spread or transmission of COVID-19 within its facilities. Space constraints, for example, preclude implementation of cohorting and consequence management such as quarantine and isolation. Covered noncitizens housed in congregate settings who may be infected with COVID-19 may ultimately increase community transmission rates in the United States, especially among susceptible populations (i.e., non-immune, under-vaccinated, and non-vaccinated persons). Mitigation measures, especially testing and vaccination, must be considered for the noncitizens being held, as well as for facility personnel. On-site COVID-19 testing for noncitizens at CBP holding facilities is very limited and the majority of testing takes place off-site. For example, if a noncitizen is transported to a community healthcare facility for medical care, testing is provided based on local protocols. Once transferred to ICE custody, testing for SA and FMU is more widely available.

Although COVID-19-related healthcare resources have substantially improved since the October Order was issued, emerging variants and the potential for a future vaccine-resistant variant mean the possible impacts on U.S. communities and local healthcare resources in the event of a COVID-19 outbreak at CBP facilities cannot be ignored. The introduction, transmission, and spread of SARS-CoV-2—including its variants—among covered noncitizens during processing and holding at congregate CBP settings remain a significant concern to the noncitizens, CBP personnel, as well as the community at large in light of transmission to unvaccinated individuals and the potential for breakthrough cases. Of particular note, POE and U.S. Border Patrol stations are ill-equipped to manage an outbreak and these facilities are heavily reliant on local healthcare systems for the provision of more extensive medical services to noncitizens.[84] Transfers to local healthcare systems for care could strain local or regional healthcare resources. Reliance on healthcare resources in border and destination communities may increase the pressure on the U.S. healthcare system and supply chain during the current public health emergency.[85] Of note, hospitalization rates are once again soaring nationally as the Delta variant spreads and the vaccination rate of the public lags. Ensuring the continued availability of healthcare resources is a critical component of the federal government's overall public health response to COVID-19.

Given the nature of COVID-19, there is no zero-risk scenario, particularly in congregate settings and with variants as transmissible as that of Delta in high circulation in the country. The ongoing pandemic presents complex and dynamic challenges relating to public health that limit DHS' ability to process noncitizens safely under normal Title 8 procedures. Processing a noncitizen under Title 8 can

---

[83] *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#correctional-facilities (last visited July 28, 2021).
[84] *See* CBP Directive No. 2210-004, U.S. Customs and Border Protection, https://www.cbp.gov/sites/default/files/assets/documents/2019-Dec/CBP_Final_Medical_Directive_123019.pdf (Dec. 30, 2019). Many of the U.S. Border Patrol stations and POE facilities are located in remote areas and do not have ready access to local healthcare systems (which typically serve small, rural populations and have limited resources). 85 Fed. Reg. 56424, 56433. *See also* Abubakar I, Aldridge RW, Devakumar D, et al. The UCL-Lancet Commission on Migration and Health: the health of a world on the move. *Lancet*. 2018;392(10164):2606-2654. doi:10.1016/S0140-6736(18)32114-7.
[85] *See COVID-19 State Profile Report - Combined Set*, HealthData.gov, https://healthdata.gov/Community/COVID-19-State-Profile-Report-Combined-Set/5mth-2h7d (last updated July 28, 2021).

take up to eight times as long as processing a noncitizen under Title 42. Importantly, longer processing times result in longer exposure times to a heightened risk of COVID-19 transmission for both noncitizens and CBP personnel. Amid the ongoing migrant surge, both the COVID-19-reduced capacity and higher non-COVID holding capacity limits have been exceeded in CBP facilities. Complete termination of any order under 42 U.S.C. § 265 would increase the number of noncitizens requiring processing under Title 8, resulting in severe overcrowding and a high risk of COVID-19 transmission among those held in the facilities and the CBP workforce, ultimately burdening the local healthcare system.[86]

All of this is of particular concern as the Delta variant continues to drive an increase in COVID-19 cases. While scientists learn more about Delta and other emerging variants, rigorous and increased compliance with public health mitigation strategies is essential to protect public health.[87] Reducing the further introduction, transmission, and spread of these variants and future variants of concern into the United States is key to defeating COVID-19. CDC has concluded that SA and FMU should continue to be subject to the Order at this time pending further improvements in the public health situation.

## C.    Comparison to Unaccompanied Noncitizen Children

As discussed in the July Exception, UC are differently situated than SA and FMU. The Government has greater ability to care for UC while implementing appropriate COVID-19 mitigation measures. ORR has established a robust network of care facilities that provide testing and medical care and institute COVID-19 mitigation protocols, including vaccination for personnel and eligible UC. In light of these considerations, there is very low likelihood that processing UC in accordance with existing Title 8 procedures will result in undue strain on the U.S. healthcare system or healthcare resources. Moreover, UC released to a vetted sponsor or placed in a temporary or licensed ORR shelter do not pose a significant level of risk for COVID-19 spread into the community. UC are released only after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction. CDC thus finds that, at this time,[88] there is appropriate infrastructure in place to protect the children, caregivers, and local and destination communities from elevated risk of COVID-19 transmission. CDC believes the COVID-19-related public health concerns associated with UC introduction can be adequately addressed without UC being subject to this Order. As outlined in the July Exception and incorporated herein, CDC is fully excepting UC from this Order. The number of UC entering the United States is smaller than both the number of SA[89] and of FMU. Whereas UC can be excepted from the Order without posing a significant public health risk, the same is not true of SA and FMU, as described above.

## D.    Summary of Findings

Upon review of the various public health factors outlined above and in consideration of the circumstances at DHS facilities, it is CDC's assessment that suspending the right to introduce covered noncitizen SA and FMU who would otherwise be held at POE and U.S. Border Patrol stations remains

---

[86] Throughout the course of the COVID-19 pandemic, CDC has observed numerous outbreaks in similar congregate settings. *See FAQs for Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html (last visited Apr. 15, 2021).

[87] *About Variants of the Virus that Causes COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last updated Apr. 2, 2021).

[88] This situation could change based on an increased influx of UC, changes in COVID-19 infection dynamics among UC, or unforeseen reductions in housing capacity.

[89] Note, the total number of SA encounters may include repeat encounters with SA who attempt entry again following expulsion.

necessary as the United States continues to combat the COVID-19 public health emergency. In making this determination, CDC has considered various possible alternatives (including but not limited to terminating the application of an order under 42 U.S.C. § 265 for some or all SA and FMU, modifying the availability of exceptions for individual SA and FMU in an order under 42 U.S.C. § 265, and reissuing an order under 42 U.S.C. § 265 for some or all UC); but for the reasons discussed herein, CDC finds that the continued suspension of the right to introduce SA and FMU under the terms set forth herein, combined with the exception for UC, is appropriate at this time. This temporary suspension pending further improvements in the public health situation and greater ability to implement COVID-19 mitigation measures in migrant holding facilities will slow the influx of noncitizens into environments at higher risk for COVID-19 transmission and spread.

DHS has indicated a commitment to restoring border operations in a manner that complies with applicable COVID-19 mitigation protocols while also accounting for other public health and humanitarian concerns. In light of available mitigation measures, and with DHS' pledge to expand capacity in a COVID-safe manner similar to expansions undertaken by HHS and ORR to address UC influx, CDC believes that the gradual resumption of normal border operations under Title 8 is feasible. With careful planning, this may be initiated in a stepwise manner that complies with COVID-19 mitigation protocols. HHS and CDC intend to support DHS in this effort and continues to work with DHS to provide technical guidance on COVID-19 mitigation strategies for their unique facilities and populations.[90] CDC understands that DHS intends to continue exercising case-by-case exceptions for individual SA and FMU based on a totality of the circumstances as CDC transitions away from this Order. CDC is also providing an additional exception to permit DHS to except noncitizens participating in a DHS-approved program that incorporates pre-processing COVID-19 testing in Mexico of the noncitizens, prior to their safe and orderly entry to the U.S. via ports of entry. Based on the incorporation of relevant COVID-19 mitigation measures in such programs, in consultation with CDC, CDC believes such an exception is consistent with its legal authorities and in the public health interest.

## II.    Legal Basis for this Order under Sections 362 and 365 of the Public Health Service Act and 42 C.F.R. § 71.40

CDC is issuing this Order pursuant to sections 362 and 365 of the Public Health Service Act (42 U.S.C. §§ 265, 268) and the implementing regulation at 42 C.F.R. § 71.40. In accordance with these authorities, the CDC Director is permitted to prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease, by issuing an Order in which the Director determines that:

(1) By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and

---

[90] CDC has advised DHS on best practices with regard to testing noncitizens at the point they are released to U.S. communities to await further immigration proceedings. In addition to enforcing physical distancing (as practicable), mask-wearing, and testing for both noncitizens and personnel alike in POE and U.S. Border Patrol stations, CDC advises vaccination of DHS/CBP personnel to further reduce the risk of COVID-19 introduction, transmission, and spread in facilities and communities and protect the federal workforce. Widespread vaccination of federal employees and other personnel in congregate settings at POE and U.S. Border Patrol stations is another layer of the strategy that will lead to the normalization of border operations.

(2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.[91]

CDC has authority under Section 362 and the implementing regulation to issue this Order to mitigate the further spread of COVID-19 disease, especially as the need to prevent proliferation of COVID-19 disease related to SARS-CoV-2 virus variants is heightened while vaccination efforts continue. Section 362 and the implementing regulation provide the Director with a public health tool to suspend introduction of persons not only to prevent the introduction of a quarantinable communicable disease, but also to aid in continued efforts to mitigate spread of that disease.[92]

The term "introduction into the United States" is defined in 42 C.F.R. § 71.40 as "the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons or property in the United States, in a manner that the Director determines to present a risk of transmission of a quarantinable communicable disease to persons, or a risk of contamination of property with a quarantinable communicable disease, even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States." 42 C.F.R. § 71.40(b)(1). Similarly, the term "serious danger of the introduction of such quarantinable communicable disease into the United States" is defined as, "the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease." 42 C.F.R. § 71.40(b)(3).

In promulgating § 71.40, CDC and HHS noted that "'introduction' does not necessarily conclude the instant that a person first steps onto U.S. soil. The introduction of a person into the United States can occur not only when a person first steps onto U.S. soil, but also when a person on U.S. soil moves further into the United States, and begins to come into contact with persons or property in ways that increase the risk of transmitting the quarantinable communicable disease."[93] This language recognizes that many quarantinable communicable diseases, including COVID-19, may be spread by infected individuals who are asymptomatic and therefore unaware that they are capable of transmitting the disease. Even when a communicable disease is already circulating within the United States, prevention and mitigation of continued transmission of the virus is nevertheless a key public health measure. In this case, although COVID-19 has already been introduced and is spreading within the United States, this Order serves as an important disease-mitigation tool to protect public health. This is particularly true as new variants of the virus continue to emerge. By continuing to suspend the introduction of persons from foreign countries into the United States, this Order will help minimize the spread of variants and their ability to accelerate disease transmission.

Section 71.40(b)(2) defines "[p]rohibit, in whole or in part, the introduction into the United States of persons" in Section 362 as "to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting movement into the United States, or physically expelling from the United States some or all of the persons." *See also* 42 U.S.C. § 265 (authorizing the prohibition when the danger posed by the communicable disease "is so increased by the introduction of persons from such country . . . or place that a suspension of the

---

[91] 42 U.S.C. § 265; 42 CFR 71.40.
[92] 85 Fed. Reg. 56424 at 56425-26.
[93] *Id*. at 56425.

right to introduce such persons into the United States is required in the interest of public health"). Pursuant to that provision, this Order permits expulsion of persons covered by it, as did the prior Orders issued under this authority.[94] CDC recognizes that expulsion is an extraordinary action but, as explained in the Final Rule, the power to expel is critical where neither HHS/CDC, nor other Federal agencies, nor state or local governments have the facilities and personnel necessary to quarantine, isolate, or conditionally release the number of persons who would otherwise increase the serious danger of the introduction of a quarantinable communicable disease into the United States.[95] In those situations, the rapid expulsion of persons from the United States may be the most effective public health measure that HHS/CDC can implement within the finite resources of HHS/CDC and its Federal, State, and local partners.[96]

As stated in the Final Rule for 42 C.F.R. § 71.40, CDC "may, in its discretion, consider a wide array of facts and circumstances when determining what is required in the interest of public health in a particular situation . . . includ[ing]: the overall number of cases of disease; any large increase in the number of cases over a short period of time; the geographic distribution of cases; any sustained (generational) transmission; the method of disease transmission; morbidity and mortality associated with the disease; the effectiveness of contact tracing; the adequacy of state and local healthcare systems; and the effectiveness of state and local public health systems and control measures."[97] Other factors noted in the Final Rule are the potential for disease spread among persons held in congregate settings, specifically during processing and holding at CBP facilities, and the potential for disease spread to the community at large.[98]

As stated in 42 C.F.R. § 71.40, this Order does not apply to U.S. citizens, U.S. nationals, lawful permanent residents, members of the armed forces of the United States and associated personnel if the Secretary of Defense provides assurance to the Director that the Secretary of Defense has taken or will take measures such as quarantine or isolation, or other measures maintaining control over such individuals, to prevent the risk of transmission of the quarantinable communicable disease into the United States, and U.S. government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, if the Director receives assurances from the relevant head of agency and determines that the head of the agency or department has taken or will take measures such as quarantine or isolation, to prevent the risk of transmission of a quarantinable communicable disease into the United States.[99]

In addition, this Order does not apply to those classes of persons excepted by the CDC Director. Including exceptions in the Order is consistent with Section 362 and 42 C.F.R. § 71.40, which permit the prohibition of introduction into the United States to be "in whole or in part." As explained in the Final Rule for section 71.40, this language is intended to allow the Director to narrowly tailor the use of the authority to what is required in the interest of public health.[100] Pursuant to this capability, CDC is therefore excepting specific categories of persons from the Order, as described herein.

---

[94] *See id*. at 56425, 56433.

[95] *Id*. at 56425, 56445-46.

[96] *Id*. at 56425.

[97] *Id*. at 56444.

[98] *Id*. at 56434. Strain on healthcare systems was also cited as a factor in the Final Rule, specifically the additional strain that noncitizen migrant healthcare needs may place on already overburdened systems; the Final Rule described the reduction of this strain as a result of CDC's previously issued orders. *Id*. at 56431.

[99] 42 CFR 71.40(e) and (f).

[100] 85 Fed. Reg. 56424, 56444.

As required by Section 362, this Order will be in effect only for as long as it is needed to avert the serious danger of the introduction, transmission, and spread of COVID-19 into the United States and will be terminated when the continuation of the Order is no longer necessary to protect the public health. Finally, as directed by 42 C.F.R. § 71.40(c), the Order sets out the following:

(1) The foreign countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited;

(2) The period of time or circumstances under which the introduction of any persons or class of persons into the United States is being prohibited;

(3) The conditions under which that prohibition on introduction will be effective, in whole or in part, including any relevant exceptions that the Director determines are appropriate;

(4) The means by which the prohibition will be implemented; and

(5) The serious danger posed by the introduction of the quarantinable communicable disease in the foreign country or countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited.

## III.     Issuance and Implementation of Order

Based on the foregoing public health reassessment, I hereby issue this Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. §§ 265, 268, and their implementing regulations under 42 CFR part 71,[101] which authorize the CDC Director to suspend the right to introduce persons into the United States when the Director determines that the existence of a quarantinable communicable disease in a foreign country or place creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of the right of such introduction is necessary to protect public health. This Order hereby replaces and supersedes the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order)[102] and affirms and incorporates the exception for UC published in the July Exception, such that UC are excepted from this Order.[103]

This Order addresses the current status of the COVID-19 public health emergency and ongoing public health concerns, including virus transmission dynamics, viral variants, mitigation efforts, the public health risks inherent to high migration volumes, low vaccination rates among migrants, and crowding of immigration facilities. In making this determination, I have considered myriad facts, including the congregate nature of border facilities and the high risk for COVID-19 outbreaks – especially now with the predominant, more transmissible Delta variant – presented following the introduction of an infected person, as well as the benefits of reducing such risks. I have also considered epidemiological information, including the viral transmissibility and asymptomatic transmission of COVID-19, the epidemiology and spread of SARS-CoV-2 variants, the morbidity and mortality associated with the disease for individuals in certain risk categories, as well as public health concerns with crowding at border facilities and resultant risk of transmission of additional quarantinable communicable diseases. I am issuing this Order to preserve the health and safety of U.S. citizens, U.S. nationals, and lawful permanent residents, and personnel and noncitizens in POE and U.S. Border Patrol

---

[101] Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56424 (Sept. 11, 2020); 42 CFR 71.40.

[102] *Supra* note 4.

[103] *Supra* note 3.

stations by reducing the introduction, transmission, and spread of the virus that causes COVID-19, including new and existing variants, in congregate settings where covered noncitizens would otherwise be held while undergoing immigration processing, including at POE and U.S. Border Patrol stations at or near the U.S. land and adjacent coastal borders.

Based on an assessment of the current COVID-19 epidemiologic landscape and the U.S. government's ongoing efforts to accommodate UC, CDC does not find public health justification for this Order to apply with respect to UC, as outlined in the July Exception. Although CDC finds that, at this time, this Order should be applicable to FMU, CDC notes that there are fewer FMU than SA unlawfully entering the United States and many FMU are already being processed pursuant to Title 8 versus Title 42 given a variety of practical and other limitations on immediately expelling FMU. DHS has indicated that it plans to continue to partner with state and local agencies and nongovernmental organizations to provide testing, consequence management, and eventually vaccination to FMU who are determined to be eligible for Title 8 processing. CDC considers these efforts to be a critical risk reduction measure and encourages DHS to evaluate the potential expansion of such COVID-19 mitigation programs for FMU such that they may be excepted from this Order in the future. Although vaccination programs are not available at this time, CDC encourages DHS to develop such programs as quickly as practicable. While the migration of SA and FMU into the United States during the COVID-19 public health emergency continues and given the inherent risks that accompany holding these groups in crowded congregate settings with insufficient options for effective mitigation, CDC finds the public health justification for this Order is sustained at this time.

DHS has indicated that it is committed to restoring border operations and facilitating arrivals to the United States in a manner that comports with CDC's recommended COVID-19 mitigation protocols. Given the recent migrant surge, DHS believes that an incremental approach is the best way to recommence normal border operations while ensuring health and safety concerns are addressed. To this end, DHS will work to establish safe, efficient, and orderly processes that are consistent with appropriate health and safety protocols and the epidemiology of the COVID-19 pandemic, in consultation with CDC.

CDC's expectation is that although this Order will continue with respect to SA and FMU, DHS will use case-by-case exceptions based on the totality of the circumstances where appropriate to except individual SA and FMU in a manner that gradually recommences normal migration operations as COVID-19 health and safety protocols and capacity allows. DHS will consult with CDC to ensure that the standards for such exceptions are consistent with current CDC guidance and public health recommendations. Based on this incorporation of relevant COVID-19 mitigation measures, CDC believes it is consistent with the legal authorities and in the public health interest to continue the use of case-by-case exceptions as a step towards the resumption of normal border operations under Title 8. Additionally, DHS is working in coordination with nongovernmental organizations, state and local health departments, and other relevant facilitating organizations and entities as appropriate to develop DHS-approved processes that include pre-entry COVID-19 testing. Additional public health mitigation measures, such as maintaining physical distancing and use of masks, testing, and isolation and quarantine as appropriate, are included in such processes. DHS has documented these processes and shared them with CDC. CDC has consulted with DHS to ensure that the processes appropriately address public health concerns and align with relevant CDC COVID-19 mitigation protocols. Based on these plans and processes, CDC believes it is consistent with legal authorities and in the public health interest to permit an exception for noncitizens in such DHS-approved processes to allow for safe and orderly entry into the United States.

A.      **Covered Noncitizens**

This Order applies to persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE. For purposes of this Order, I refer to persons covered by the Order as "covered noncitizens."

B.      **Exceptions**

This Order does <u>not</u> apply to the following:

- U.S. citizens, U.S. nationals, and lawful permanent residents;[104]
- Members of the armed forces of the United States and associated personnel, U.S. government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, subject to required assurances;[105]
- Noncitizens who hold valid travel documents and arrive at a POE;
- Noncitizens in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE;
- Unaccompanied Noncitizen Children;[106]
- Noncitizens who would otherwise be subject to this Order, who are permitted to enter the U.S. as part of a DHS-approved process, where the process approved by DHS has been documented and shared with CDC, and includes appropriate COVID-19 mitigation protocols, per CDC guidance; and
- Persons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS will consult with CDC regarding the standards for such exceptions to help ensure consistency with current CDC guidance and public health recommendations.

C.      **APA, Review, and Termination**

This Order shall be immediately effective. I consulted with DHS and other federal departments as needed before I issued this Order and requested that DHS continue to aid in the enforcement of this Order because CDC does not have the capability, resources, or personnel needed to do so.[107] As part of the consultation, DHS developed operational plans for implementing this Order. CDC has reviewed these plans and finds them to be consistent with the language of this Order directing that covered noncitizens spend as little time in congregate settings as practicable under the circumstances. In my view, DHS's assistance with implementing the Order is necessary, as CDC's other public health tools

---

[104] 42 CFR 71.40(f).
[105] 42 CFR 71.40(e)(1) and (3).
[106] As excepted pursuant to the Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists. 86 Fed. Reg. 38717 (July 22, 2021).
[107] 42 U.S.C. § 268; 42 CFR 71.40(d).

are not viable mechanisms given CDC resource and personnel constraints, the large numbers of covered noncitizens involved, and the likelihood that covered noncitizens do not have homes in the United States.[108]

This Order is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Even if it were, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Order and a delayed effective date. Given the public health emergency caused by COVID-19, it would be impracticable and contrary to public health practices and the public interest to delay the issuing and effective date of this Order with respect to all covered noncitizens. In addition, this Order concerns ongoing discussions with Canada and Mexico on how best to control COVID-19 transmission over our shared borders and therefore directly "involve[s] . . . a . . . foreign affairs function of the United States;"[109] thus, notice and comment and a delay in effective date are not required.

This Order shall remain effective until either the expiration of the Secretary of HHS' declaration that COVID-19 constitutes a public health emergency, or I determine that the danger of further introduction, transmission, or spread of COVID-19 into the United States has ceased to be a serious danger to the public health and continuation of this Order is no longer necessary to protect public health, whichever occurs first. At least every 60 days, the CDC shall review the latest information regarding the status of the COVID-19 public health emergency and associated public health risks, including migration patterns, sanitation concerns, and any improvement or deterioration of conditions at the U.S. border, to determine whether the Order remains necessary to protect public health. Upon determining that the further introduction of COVID-19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the Federal Register terminating this Order. I retain the authority to modify or terminate the Order, or its implementation, at any time as needed to protect public health.

In testimony whereof, the Director, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set her hand at Atlanta, Georgia, this 2nd day of August, 2021.

_____
Rochelle P. Walensky, MD, MPH
Director
Centers for Disease Control and Prevention

---

[108] CDC relies on the Department of Defense, other federal agencies, and state and local governments to provide both logistical support and facilities for federal quarantines. CDC lacks the resources, manpower, and facilities to quarantine covered noncitizens.
[109] 5 U.S.C. § 553(a)(1).