UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.,<br><br>Defendants. | Civ. A. No. 21-100 (EGS) |

**DECLARATION OF DAVID SHAHOULIAN**

I, David Shahoulian, pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, as well as documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am the Assistant Secretary for Border and Immigration Policy at the Department of Homeland Security (DHS or Department) and have been in this role since January 20, 2021. I previously served as Deputy General Counsel at DHS from June 29, 2014 to January 19, 2017.

2. I submit this declaration to alert the Court to the adverse consequences of a preliminary injunction prohibiting the Government from applying the Centers for Disease Control and Prevention's (CDC) Order Suspending the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists ["CDC Order"], 85 Fed. Reg. 65806 (Oct. 16, 2020), or any similar order, to the putative class in this case.

3. As explained in more detail below, the United States is currently encountering record numbers of noncitizens, including families, at the border. These encounter rates have strained DHS operations and caused border facilities to be filled beyond their normal operating capacity,

impacting the ability to employ social distancing in these congregate settings. At the same time, DHS is also experiencing significantly increased rates of noncitizens testing positive for COVID-19. In light of these and other considerations, enjoining the application of the CDC Order to families would exacerbate overcrowding at DHS facilities and create significant public health risks.

4. Since January 2021, the Department has engaged in extensive efforts to increase its capacity to safely process asylum seekers and other noncitizens. Among other things, DHS has worked tirelessly to build capacity and to create innovative new approaches to allow asylum seekers and other noncitizens to be processed in a manner that ensures their health and safety, and that of DHS officers and the American public. Those efforts—which are the product of extensive collaboration with other U.S. Government agencies, foreign governments, and non-governmental organization (NGO) partners—have been successful in significant respects as detailed below.

5. The Department lacks sufficient capacity to safely hold and process all individuals seeking to enter the United States during the global pandemic if the U.S. Government were restricted in its ability to implement the CDC Order. These capacity challenges are particularly acute with respect to families. DHS continues to have severely limited capacity to hold and process families, and the current migrant surge and ongoing pandemic have only compounded these issues.

6. If the CDC Order is enjoined with respect to families, the increased number of families seeking to enter the United States would each require additional processing related to admissibility, which would in turn require them to be held for longer periods in increasingly crowded conditions. Moreover, due to such conditions and other capacity constraints, DHS would effectively need to release a growing number of families into border communities, which risks overwhelming the local testing, isolation, and quarantine infrastructure DHS has worked to create and will thus burden

local healthcare systems and strain healthcare resources. An injunction restricting implementation of the current CDC Order as to families will result in an immediate increased risk of harm from COVID-19 for noncitizens in DHS custody, DHS personnel, and potentially the public.

### I. The U.S. Government's Efforts to Build Capacity and Improve Processing

7. Since January 2021, the U.S. Government has engaged in extensive and varied efforts to improve the immigration processing systems at the border, while also dealing with challenges presented by the COVID-19 pandemic and the current influx of noncitizens seeking refuge in the United States.

8. First, the Government has worked to significantly increase its ability to safely process and house individuals encountered between ports of entry after crossing into the United States. U.S. Customs and Border Protection (CBP) and the Department of Health and Human Services, for example, have stood up numerous emergency facilities in the United States (and retrofitted existing ones) to increase their ability to safely hold and process individuals—particularly unaccompanied children (UCs) and families—encountered after crossing between ports of entry. U.S. Immigration and Customs Enforcement (ICE) has transitioned existing facilities for the processing and testing of families, and it has entered into a contract with a non-profit social service organization to add over 1,200 additional beds to ICE's family housing capacity. And the Department has transferred hundreds of personnel from various component agencies around the country to the southwest border to assist with the processing and care of individuals encountered at the border.

9. Second, the Department has also taken significant steps to develop systems to facilitate testing, isolation, and quarantine of those individuals who are not immediately returned to their home countries after encounter. Across most of the southwest border, these systems were developed by DHS in coordination with state and local jurisdictions, non-governmental

organizations, and other private entities. In the Del Rio sector, where there is limited non-governmental organization capacity, the Department set up a system for testing and non-congregate sheltering involving private contractors and ICE family facilities. Due to infrastructure and resource limitations, it is not feasible to replicate this latter system across the border.

10. Third, the U.S. Government also engaged in several lines of effort to improve its capacity to safely process asylum seekers and other individuals through U.S. ports of entry. For example, the U.S. Government—in collaboration with international organizations and domestic non-governmental organizations—rapidly developed an innovative system to register, test, and transport certain individuals previously returned to Mexico pursuant to the Migrant Protection Protocols (MPP) for safe and orderly processing into the United States through various ports of entry at the southwest border. To date, the U.S. Government has processed approximately 13,000 individuals, including many families, pursuant to its Title 8 authorities through this program.

11. The U.S. Government has also engaged with international humanitarian organizations and non-governmental organizations to establish similar streamlined systems for the U.S. processing of other individuals, particularly families, who may qualify for an exception to the CDC Order for humanitarian reasons. Under these systems, non-governmental organizations identify and refer families and other individuals in vulnerable situations in Mexico to DHS for possible exception from expulsion, based on the totality of the circumstances, on a case-by-case basis, as determined by DHS in accordance with the CDC Order. Once they test negative for COVID-19, such individuals may be processed pursuant to Title 8 authorities at designated ports of entry. To date, over 16,000 individuals have been processed into the United States through these CDC-authorized processes.

12. DHS is committed to continuing to use mechanisms like those described above to allow the safe processing of vulnerable families under Title 8 for as long as Title 42 remains applicable to families.

## II. An Injunction Would Result in Severe Capacity Limitations Endangering Non-Citizens, DHS Employees, and Others

13. Despite the U.S. Government's efforts to build safe processing capacity, DHS's application of the CDC Order remains necessary, while the pandemic continues, to prevent COVID-19 exposure risks to DHS personnel, individuals seeking entry to the United States, and border communities. This risk has recently increased due to the recent spread of the highly transmissible COVID-19 Delta variant. The rates at which encountered noncitizens are testing positive for COVID-19 have increased significantly in recent weeks. And although the rate of infection among CBP officers had been declining, this rate recently began increasing again, even though the percentage of officers and agents who have been fully vaccinated has grown significantly since January. This has led to increasing numbers of CBP personnel being isolated and hospitalized.

14. Unlike at ports of entry, where DHS can better manage the volume and rate at which individuals are processed, there is substantially less ability to manage or control the volume and rate of encounters that may occur between the ports. Without the CDC Order, DHS would likely encounter increased numbers of families crossing the border between the ports of entry. And the Department would be faced with processing all such families under Title 8—which is significantly more extensive and time consuming than Title 42 processing—regardless of the number of individuals encountered on a given day. DHS must often transport such noncitizens in passenger vehicles, including from remote locations, to U.S. Border Patrol stations or other CBP facilities for additional processing in congregate settings. Each of these interactions—encounter, custody,

transportation, and holding in congregate setting—increases the risks of COVID-19 exposure and transmission.

15. As noted in the CDC Order itself, CBP facilities are designed for short-term holding and initial processing, generally prior to transfer to another agency, such as ICE or the Office of Refugee Resettlement (ORR) within HHS, which houses UCs until they can safely be placed with sponsors. They are not designed to hold individuals for extended periods of time, particularly during a pandemic when social distancing and isolation are needed to limit the spread of disease. The congregate nature of these facilities restricts the ability to quarantine, isolate, and enable social distancing by persons who are or may be infected with COVID-19. As these CBP facilities become overcrowded during a surge, bottlenecks in immigration processing develop, along with bottlenecks in ICE transportation, detention capacity for families and single adults, and ORR capacity for UCs. As a result, noncitizens' length of stay in DHS custody extends significantly.

16. Moreover, CBP's already limited border processing capacity has been greatly reduced through the implementation of public-health protocols designed to mitigate COVID-19 transmission. Under current protocols, CBP aims to maintain 25 percent capacity at many of its facilities, and up to 50 percent capacity at specialized central processing centers and soft sided facilities. Loss of the ability to expel families pursuant to the CDC Order will directly contribute to the Department's inability to maintain critical COVID-19 capacity controls.

17. Importantly, the ability to expel certain covered noncitizens under the CDC Order does not result in the expulsion of every individual encountered at the border; DHS must still process noncitizens not covered by the Order, noncitizens excepted from the Order on a case-by-case basis, and noncitizens for whom expulsion is not available for other reasons. Due to a variety of factors, including an historic surge in southwest border encounters in recent months, CBP has been

encountering a significant and growing number of individuals who must be held for processing in congregate facilities.

18. In May and June 2021, for example, CBP recorded over 180,000 and 188,000 encounters, respectively, at the southwest border. During this period, CBP encountered over 6,000 individuals per day, including about 500 UCs and 1,650 individuals in family units. These constitute the highest numbers of monthly encounters recorded by CBP in more than twenty years, including during previous surges when the Department was not constrained by COVID-19 capacity considerations. As noted above, due to COVID-19-related guidance, border facilities are currently expected to operate at only 25 to 50 percent capacity, depending on individual facility infrastructure and facility type. Due to this combination of factors, many CBP facilities are already over that capacity—many significantly so, even with the CDC Order in place.

19. Based on preliminary data, the number of border encounters continued to increase in July 2021. Over the first 29 days of July, CBP encountered an average of 6,779 individuals per day, including 616 unaccompanied children and 2,583 individuals in family units. Overall, according to preliminary data, CBP is likely to have encountered about 210,000 individuals in July, the highest monthly encounter number since Fiscal Year 2000. July also likely included a record number of unaccompanied child encounters, exceeding 19,000, and the second-highest number of family unit encounters, at around 80,000.

20. Moreover, these historic encounter levels have not been evenly distributed across the southwest border. Two Border Patrol sectors—Rio Grande Valley (RGV) and Del Rio—have experienced a disproportionate amount of these encounters. For example, the RGV sector alone saw over 51,000 and 59,000 encounters in May and June 2021, respectively; and based on preliminary data, there appear to have been about 78,000 RGV encounters in July. These two

sectors have also experienced a disproportionate amount—about 71 percent—of family encounters.  As a result, facilities in these two sectors have been significantly more over-capacity relative to others.

21. As of August 1, 2021, the U.S. Border Patrol was at 389 percent of its overall COVID-19 adjusted capacity along the southwest border.  On that date, the Border Patrol had 17,778 noncitizens in custody (2,233 of whom were UCs) at its Border Patrol facilities, despite a COVID-19 adjusted capacity of 4,706.  More specifically, the Border Patrol was over capacity in seven of its nine southwest border sectors.  As of August 1, the RGV sector—which has been the epicenter of the current surge—was holding 10,002 noncitizens and was thus 783 percent over its COVID-19 adjusted capacity of 1,278 and 287 percent over its normal, non-adjusted capacity of 3,485.  Within RGV, noncitizen families and UCs are primarily transferred to a temporary processing facility in Donna, Texas in the RGV, which has a normal operating capacity of 1,625 and a COVID-19 adjusted capacity of 813 based on CDC recommended guidelines.  Within nine days of this facility opening on February 9, 2021, it had already exceeded its normal non-COVID-19 operating capacity with more than 1,000 noncitizens in custody.  As of August 1, this facility was operating at 446 percent of its COVID-19 adjusted capacity, and 223 percent of its normal non-COVID-19 operating capacity, with 3,623 noncitizens in custody.

22. These capacity figures are extremely worrisome, particularly because of the continued spread of the highly transmissible Delta variant.  Overcrowding challenges DHS's ability to effectively execute many of its core public health mitigation and countermeasure activities.  Additionally, higher rates of COVID-19 transmission within a DHS facility could quickly impede the Department's ability to utilize that facility's maximum capacity, further lowering the overall processing and holding capacity along the southwest border.  Indeed, the Department's operations

have already been impacted by significantly increased positivity rates among individuals in its facilities, including families.

23. Monthly family encounter rates have generally been increasing since April 2020, rising 100-fold from 738 encounters in April 2020 to over 75,000 in July 2021.  Due to the impacts of the current pandemic, and the deteriorating economic conditions and increasing instability in the region from which the migrants originate, such encounters may increase further in the coming months.  Based on current trends, the Department expects that total encounters this fiscal year are likely to be the highest ever recorded.  The Department also expects that these numbers will climb even higher if the CDC Order is enjoined.

24. If an injunction is issued with respect to families, DHS will be required to process additional families under Title 8, requiring additional staff and space due to increased processing times.  Processing a family under Title 42 typically takes 10 to 15 minutes and is largely conducted outdoors, while processing a family for Title 8 can take 1.5 to 3 hours and is generally conducted indoors.  Processing all families under Title 8 will thus generally require DHS to hold significantly increased numbers of individuals in a variety of congregate settings, including during transportation to Border Patrol stations or other CBP facilities, and to process them at such facilities.  Because many Border Patrol stations and other CBP facilities along the southwest border are already over operating capacity, increasing the number of individuals required to be held at such facilities would further limit the ability to employ social distancing and other COVID-19 related countermeasures.

25. The CDC has determined that the expulsion of certain noncitizens is necessary to protect public health because DHS is simply unable to process all noncitizen families safely under current circumstances, and particularly in the event of a large-scale influx.  Enjoining DHS's

implementation of the CDC Order as to families would therefore endanger noncitizens in DHS facilities, DHS personnel, and ultimately the general public.

*     *     *

26. The United States has been built by generations of immigrants in search of refuge. In line with that tradition, the Department is committed to ensuring that asylum seekers and other noncitizens seeking protection are treated with dignity and compassion. At the same time, the ongoing COVID-19 pandemic presents complex and dynamic challenges relating to public health that limit the Department's ability to process all such individuals safely under normal procedures. These challenges have been greatly exacerbated by the rise in novel COVID-19 variants, including the Delta variant. The Department continues to work tirelessly to address those challenges as they emerge and implement procedures as needed to promote the health and safety of noncitizens, DHS personnel, border communities, and the American public. During this period and given the unique public health danger posed by the ongoing pandemic, implementation of the CDC Order is critical to preventing overcrowding and the spread of infection within DHS facilities.

Executed on August 2, 2021.

*David Shahoulian*
David Shahoulian
Assistant Secretary for Border and Immigration Policy
U.S. Department for Homeland Security