**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.,* | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) No. 1:21-cv-00100-EGS |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity, *et al.,* | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**PLAINTIFFS' COMBINED REPLY MEMORANDUM IN SUPPORT OF MOTIONS
FOR CLASSWIDE PRELIMINARY INJUNCTION AND CLASS CERTIFICATION**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

   I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ................................... 3

      A.  Section 265 Does Not Authorize Expulsions............................................................. 3

      B.  Even If § 265 Did Authorize Expulsions, It Would Not Override The Specific
         Statutory Provisions For Those Seeking Protection. ............................................. 8

      C. No Deference Is Warranted....................................................................................... 10

  II.  THE CLASS WILL SUFFER IRREPARABLE INJURY ABSENT A
      PRELIMINARY INJUNCTION. ..................................................................................... 12

  III.  THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH IN FAVOR OF
       INTERIM RELIEF. .......................................................................................................... 15

  IV.  DEFENDANTS' CHALLENGE TO PLAINTIFFS' MOTION FOR CLASS
       CERTIFICATION IS UNFOUNDED. ............................................................................ 24

  V.  SCOPE AND TIMING OF INJUNCTION. .................................................................... 24

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  141 S. Ct. 2320 (2021) ....................................................................... 1, 5, 6

*Alabama Ass'n of Realtors v. United States Dep't of Health & Hum. Servs.*,
  No. 21-5093, 2021 WL 2221646 (D.C. Cir. June 2, 2021) ...................... 5

*Alabama Ass'n of Realtors v. United States Dep't of Health & Hum. Servs.*,
  __ F. Supp. 3d. __, 2021 WL 1779282 (D.D.C. May 5, 2021) ................. 5

*Barron v. Burnside*,
  121 U.S. 186 (1887) ................................................................................ 9

*Chevron, U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ........................................................................... 10, 11

*Clark v. Martinez*,
  543 U.S. 371 (2005) ................................................................................ 6

*Compagnie Francaise de Navigation a Vapeur v. Louisiana*,
  186 U.S. 380 (1902) ................................................................................ 7

*District of Columbia v. Dep't of Labor*,
  819 F.3d 444 (D.C. Cir. 2016) ............................................................... 11

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ............................................................... 8, 9, 10, 11

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................ 6

*Flores v. Sessions*,
  No. 85-CV-4544-DMG-AGRX, 2018 WL 4945000 (C.D. Cal. July 9, 2018) ...................... 21

*Florida v. Becerra*,
  __F. Supp. 3d. __, 2021 WL 2514138 (M.D. Fla. June 18, 2021) ........... 5

*Hazeltine v. Miss. Valley Fire Ins. Co.*,
  55 F. 743 (C.C.W.D. Tenn. 1893) .......................................................... 9

*J.B.B.C. v. Wolf*,
  20-CV-01509-CJN, 2020 WL 6041870 (D.D.C. June 26, 2020) .......... 8, 10

*Loving v. I.R.S.*,
  742 F.3d 1013 (D.C. Cir. 2014) ........................................................ 10, 11

*Merck & Co. v. U.S. Dep't of Health & Human Servs.*,
   962 F.3d 531 (D.C. Cir. 2020) ................................................................................. 4, 6

*Ne. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. City of Jacksonville*,
   508 U.S. 656 (1993) ................................................................................................... 24

*NRDC v. Daley*,
   209 F.3d 747 (D.C. Cir. 2000) ................................................................................. 11

*P.J.E.S. v. Wolf*,
   502 F. Supp. 3d 492 (D.D.C. 2020) ............................................................... passim

*Russello v. United States*,
   464 U.S. 16 (1983) ..................................................................................................... 4

*SAS Inst., Inc. v. Iancu*,
   138 S. Ct. 1348 (2018) ............................................................................................. 11

*Skyworks, Ltd. v. Centers for Disease Control & Prevention*,
   __ F. Supp. 3d. __, 2021 WL 911720 (N.D. Ohio Mar. 10, 2021) ........................... 5

*Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*,
   __ F. 4th __, 2021 WL 3121373 (6th Cir. July 23, 2021) ........................................ 5

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) .................................................................................................. 11

*Walsh v. Preston*,
   109 U.S. 297 (1883) ................................................................................................... 7

**Statutes and Legislative History**

24 Cong. Rec (1893) .......................................................................................................... 8

42 U.S.C. § 264 ............................................................................................................... 4,5

42 U.S.C. § 264 (b) ............................................................................................................ 4

42 U.S.C. § 264 (c) ............................................................................................................ 4

42 U.S.C. § 264 (d) ............................................................................................................ 4

42 U.S.C. § 265 ........................................................................................................ passim

42 U.S.C. § 271 .................................................................................................................. 4

1835 Statutes at Large of South Carolina (Act No. 2653) ................................................ 7

1842 Code of Mississippi (Art. 17) ................................................................................... 7

Act of February 15, 1893, ch. 114 § 7 ........................................................................ 7, 8

**Other Authorities**

*CBP Announces Opening of Temporary Processing Facility in Donna, Texas, U.S. Customs and Border Protection* (Feb. 9, 2021), https://tinyurl.com/ftjcf64y ................................................ 22

*CBP to Open Temporary Facility in Response to Sustained Large Volumes of Family Units in Yuma, AZ*, U.S. Customs and Border Protection (June 28, 2019), https://tinyurl.com/24r8ecd ........................................................................................... 23

Christian von Preysing, *US Customs and Border Protection to Build Temporary Immigration Facility in Donna*, KRGV (Jan. 20, 2021), https://tinyurl.com/4psvvf6p. .............................. 22

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988).................................................... 10, 15

Department of Homeland Security, FY 2021 Budget in Brief, https://tinyurl.com/28byu8tx. ...... 3

Ingrid Eagly, Steven Shafer, & Jana Whalley, Detaining Families: A Study of Asylum Adjudication in Family Detention (2018), available at https://tinyurl.com/fewkn8wb........... 22

*New Temporary Facilities in Texas and Arizona Expand CBP Holding Capacity*, U.S. Customs and Border Protection (Aug. 6, 2019), https://tinyurl.com/ymzrptjb ...................................... 23

Robert Preidt & Robin Foster, *Biden Offers COVID Vaccines to Migrants In Custody Along Mexican Border*, U.S. News & World Report (Aug. 4, 2021). ................................................ 18

The Washington Post, *Mexico has pushed hundreds of migrants expelled from the U.S. on to Guatemala, stranding them in a remote village far from their homes* (Aug. 10, 2021), https://www.washingtonpost.com/world/2021/08/10/mexico-deport-guatemala/.................... 14

UNHCR, *Statement attributable to UN High Commissioner for Refugees Filippo Grandi on the need to end US COVID-19 asylum restrictions* (May 20, 2021), https://tinyurl.com/6498ba32.................................................................................................23

U.N. High Commissioner for Refugees, *COVID-19 Platform: Temporary Measures and Impact on Protection*, https://im.unhcr.org/covid19_platform (last updated Aug. 7, 2021) ............... 23

U.S. Customs & Border Protection, Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters ................................ 2

Valerie Gonzalez, *Border Patrol Deconstructing Soft-sided Facilities in RGV, Yuma and El Paso*, KRGV (May 19, 2020), https://tinyurl.com/4hewm8xn.................................................. 23

## INTRODUCTION

Since February, when the case was held for settlement discussions, circumstances have substantially further undercut Defendants' position that asylum-seeking families must be sent back to danger without procedures to determine whether they are entitled to protection under U.S. law.

**Likelihood of Success on the Merits.**  This prong of the preliminary injunction analysis has already been decided by this Court.  In *P.J.E.S. v. Wolf*, the Court held that Title 42 did not provide DHS with statutory authority to bar unaccompanied minors from seeking protection in the United States.  502 F. Supp. 3d 492, 511-16 (D.D.C. 2020).  Dispositive here, the Court did not rely primarily on statutes specific to minors, but rather on the lack of expulsion authority in Title 42 and the general protection statutes equally applicable to the families in this case.  Defendants simply rehash arguments already rejected in *P.J.E.S.*, particularly the "unsupported" and "unwarranted" position that the CDC wields an unprecedented power to expel people that is nowhere mentioned in the statute on which they rely.  *Id.* at 536.  *Cf. Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2320, 2320–21 (2021) (Kavanaugh, J., concurring) (stating that the CDC eviction moratorium "exceeded its existing statutory authority" under Section 264 of Title 42, but providing fifth vote to maintain stay of injunction because policy was scheduled to expire shortly).

**Irreparable Harm to Families.**  As the declarations in this case show, the government is literally pushing families, including those with very young children, into the hands of criminal cartels in Mexico.  "CBP expulsions of migrants occur in predictable locations at predictable times in areas where kidnappers and organized crime are rampant."  Supplemental Declaration of Taylor Levy ("Supp. Levy Decl.") ¶ 2.  Families are forced back over the bridges by our government while cartels stand waiting to kidnap, traffic, rape, and assault them.  *See, e.g.*, Declaration of Julia Neusner ("Neusner Decl."), ¶¶ 5-15; Declaration of Jennifer Harbury ("Harbury Decl."), ¶¶ 6-13; Declaration of Erika Pinheiro ("Pinheiro Decl."), ¶¶ 27-40.  One declarant testifies that more than one in five of the migrants she works with report that they were kidnapped in Mexico, with many of the women raped during their capture or after expulsion; another reported that 40% of her clients

in Nuevo Laredo suffered an actual or attempted kidnapping (or both).  Declaration of Savitri Arvey ("Arvey Decl.") ¶ 1; Levy Decl. ¶ 4.  The declarations describe in vivid detail the brutality that occurs on a regular basis. Not surprisingly, therefore, Defendants do not seriously dispute that families are subject to irreparable harm.

**Balance of Harms.**  Despite the horrific consequences of Title 42, and the lack of statutory authority, Defendants claim that DHS should be permitted to continuing expelling asylum-seeking families because of the potential risk of COVID-19 transmission.  But as this Court emphasized in *P.J.E.S.*, the government cannot avoid "acting within the bounds set by Congress" by refusing "to make difficult decisions about *allocation of resources* to mitigate the risks caused by COVID-19." 502 F. Supp. 3d at 519-20 (emphasis added).  Public health experts stress that ample risk mitigation steps are available if DHS would simply *choose* to take them, such as setting up outdoor processing centers, quarantine facilities, and proper testing protocols.  *See* Supplemental Declaration of Former CDC Officials ("Supp. Former CDC Off. Decl.")  ¶¶ 4, 18, 36; Declaration of 32 Medical and Public Health Experts ("Med. & Pub. Health Decl.") ¶¶ 4–8, 13–28.  Most importantly, highly effective vaccines are now universally available, for free, to anyone who wants one.  And DHS officers have had privileged access for many months, undercutting any claim of risk to them.

Defendants seek to create the misleading impression that an injunction barring the use of Title 42 for families would result in a sea change.  But Defendants have already reduced the percentage of families expelled at the Southern border under Title 42—from 62% in January to 14% in June—demonstrating that they can process families safely through the immigration system Congress established.[1]  Thus, even assuming that additional mitigation steps were still necessary, an injunction would require the government to take only those steps needed to accept the remaining 14% of families.  In contrast, in the absence of an injunction, the lives of these families, which include young children, are put at grave risk.

---

[1]   U.S. Customs & Border Protection, Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (select "FMUA" for "family unit aliens" in "Demographic" drown-down menu) (last visited Aug. 10, 2021).

Defendants seek cover from CDC, but CDC's analysis is squarely in line with this Court's view in *P.J.E.S.*  As public health experts emphasize, CDC's recent August 2 Order, ECF No. 114, Ex. A ("CDC Order"),[2] did *not* state that DHS was incapable of safely processing asylum-seeking families; rather, it says only that DHS must allocate the resources necessary to take the proper mitigation steps.  And it is hard to imagine how DHS lacks the resources, given the agency's *$81 billion budget* for FY 2021, almost a quarter of which is for CBP.[3]  Thus, as the public health experts pointedly state, the "CDC Order is an indictment of the DHS's yearlong failure to adopt reasonable mitigation steps in order to safely process asylum-seeking families, and not a conclusion by CDC that migrants present an unacceptable public health risk."  Med. & Pub. Health Decl. ¶ 4.  Notably, the experts also explain that "where the federal government has wanted to allocate resources toward mitigation protocols for migrants entering the United States, it can do so, as it did when it exempted unaccompanied minors from Title 42."  *Id.*

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

*P.J.E.S.* correctly held both that 42 U.S.C. § 265 grants no expulsion authority, and that in any event it cannot override the specific protections established in the immigration statutes.  502 F. Supp. 3d at 511-16, 534-44.  Defendants' opposition barely acknowledges (much less rebuts) those holdings.  Indeed, with only cosmetic changes, their same arguments were made and rejected in *P.J.E.S.*

### A.  Section 265 Does Not Authorize Expulsions.

**No Implied Expulsion Power.**  Defendants assert that § 265 "plainly allows for the expulsion of persons."  Opp. 15, ECF No. 76.  But this Court already rejected that argument, and all the tools of statutory construction underscore the absence of any expulsion power.  PI Mot. 10-12, ECF No. 57-1.  Defendants do not, and cannot, contest that Title 42 nowhere contains "the

---

[2] The Order is now published in the Federal Register.  86 Fed. Reg. 42828-02 (Aug. 5, 2021).
[3] Department of Homeland Security, FY 2021 Budget in Brief, https://tinyurl.com/28byu8tx.

word 'expel'" or synonyms thereof. *P.J.E.S.,* 502 F. Supp. 3d at 512. Rather, Defendants' central response is that the Court should read an *implied* power to expel into the statute. *See* Opp. 2, 15-16. As in *P.J.E.S.*, their argument is ultimately this: Because Congress's *goal* was to keep out disease, it implicitly authorized any and all *means* to do so. Opp. 2, 17; *see, e.g.*, Defs.' Objs. to R&R 12, *P.J.E.S.*, ECF No. 69 ("*P.J.E.S.* Obj."). But "agencies are 'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 962 F.3d 531, 536 (D.C. Cir. 2020); *see P.J.E.S.*, 502 F. Supp. 3d at 543; PI Mot. 18-19.

Defendants rehash various other statutory arguments made and rejected in *P.J.E.S.* For example, Congress established specific, non-expulsion penalties for violations of a § 265 order, *see* 42 U.S.C. § 271; if it had intended to address a threat to public health with an expulsion power, it could have said so—as it has in many statutes (even beyond immigration), PI Mot. 10-11, 15. Defendants' contrary suggestion that language in one statute "usually sheds little light" on others, Opp. 16-17 (quoting *Russello v. United States*, 464 U.S. 16, 25 (1983)), was properly rejected in *P.J.E.S.*: "[T]he Supreme Court routinely points to other statutes as evidence that Congress knows how to legislate in particular ways." 502 F. Supp. 3d at 514. The Court similarly dispensed with Defendants' reliance on the statutory requirement that orders issued under § 265 be "*in accordance with regulations.*" Opp. 17 (emphasis in original). "[I]f Section 265 does not provide the authority to expel persons; then it does not delegate the authority to issue regulations to expel persons." *P.J.E.S.,* 502 F. Supp. 3d at 513. Defendants also again rely on a neighboring provision, 42 U.S.C. § 264, arguing that its general rulemaking authority indicates deference to the Executive in this context. Opp. 19-20; *see P.J.E.S.* Obj. 14 (same). But, as *P.J.E.S.* concluded, insofar as it has any relevance, § 264 actually supports Plaintiffs' position. Even with regard to those traveling from abroad, the outer bounds of the Executive's public health powers under that statute are limited to the "apprehension, detention, [and] conditional release of individuals." 42 U.S.C. § 264 (b)-(d). "Tellingly, Section 264 does not contemplate regulations that authorize expulsion from the United States," *P.J.E.S.*, 502 F. Supp.

4

3d at 537, providing additional "contextual support for interpreting Section 265 to not provide authority to expel persons," *id*. at 513.[4]

Defendants likewise again argue that § 265 provides "the power to prevent persons from entering the country," so it must also provide the "power to . . . expel persons who manage to cross." Opp. 2; *id*. at 15-16, 19; *see P.J.E.S.* Obj. 10-11. The Court properly rejected this argument in *P.J.E.S.*, explaining that "as a matter of ordinary language" prohibiting introduction "does not encompass expulsion." 502 F. Supp. 3d at 511. Relatedly, Defendants again also seek to draw support from the use of the term "entry" in the immigration laws. Opp. 16; *see P.J.E.S.* Obj. 11-12. But, as the Court explained, Title 42 and the immigration laws are not the same. 502 F. Supp. 3d at 511 n.5 (declining to accept Defendants' reliance on "the meaning of entry as a matter of immigration law"). Whatever the immigration laws may or may not permit, Title 42 by its terms permits arrests, fine, and imprisonment.[5]

---

[4] Notably, the government's broad interpretation of § 264 has been repeatedly rejected this year in the context of CDC's eviction moratorium. *See, e.g., Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev*., __ F. 4th __, 2021 WL 3121373, at *2 (6th Cir. July 23, 2021); *Alabama Ass'n of Realtors v. United States Dep't of Health & Hum. Servs*., __ F. Supp. 3d. __, 2021 WL 1779282, at *6 (D.D.C. May 5, 2021); *Skyworks, Ltd. v. Centers for Disease Control & Prevention*, __ F. Supp. 3d. __, 2021 WL 911720, at *10 (N.D. Ohio Mar. 10, 2021); *see also Florida v. Becerra*, __ F. Supp. 3d. __, 2021 WL 2514138, at *27 (M.D. Fla. June 18, 2021), *stay denied*, No. 21-12243 (July 23, 2021) (concluding that cruise ship order exceeded CDC § 264 authority). The D.C. Circuit reached a different conclusion, holding (in a nonprecedential order) that CDC had a likelihood of success on its § 264 authority arguments. *Alabama Ass'n of Realtors v. United States Dep't of Health & Hum. Servs*., No. 21-5093, 2021 WL 2221646, at *1 (D.C. Cir. June 2, 2021) (per curiam). Five Supreme Court Justices disagreed: Four would have vacated the stay outright, and Justice Kavanaugh, while agreeing CDC "exceeded its existing statutory authority," voted to deny the motion to vacate the stay only because the program was ending in a few weeks and to allow an "orderly" process. *Alabama Ass'n of Realtors*, 141 S. Ct. at 2321.

[5] The government wrongly suggests that *P.J.E.S.* concluded Defendants do have the authority to physically bar entry. The Court merely stated that, even *assuming* for purposes of argument that the government's definitions of prohibiting "introduction," were correct, "[e]xpelling persons, as a matter of ordinary language, is entirely different from interrupting, intercepting, or halting the process of introduction." 502 F. Supp. 3d at 511. Defendants are also wrong to suggest that Plaintiffs conceded that Title 42 allows persons to be barred from entry. Opp. 14. No such concession was made. 502 F. Supp. 3d at 513 (noting Plaintiffs' concession *only* of the power to prohibit entry "through the regulation of vessels (including airplanes)").

Finally, Defendants again fail to grapple with the implications of their argument.  If expulsion could be implied as a power to effectuate § 265, that would be true for all "persons" covered by the statute—including U.S. citizens—as Defendants have conceded.  PI Mot. 12; *P.J.E.S.* 502 F. Supp. 3d at 539-40 (noting concession).  As Magistrate Judge Harvey observed, the implications of Defendants' position are thus "breathtakingly broad."  *Id.* at 539. Defendants contest whether the canon of constitutional avoidance applies here, emphasizing that the CDC has not acted to expel citizens in this instance.  *See* Opp. 18-19.  It does apply, but in any event this argument gets Defendants nowhere.[6]  They are claiming a sweeping implied expulsion power, applicable even to citizens, that appears nowhere in the terms of the statute.  "[T]he breadth of the [government's] asserted authority is measured not only by the specific application at issue, but also by the implications of the authority claimed."  *Merck*, 962 F.3d at 541.  In *Merck*, the D.C. Circuit explained that the government's "construction of the statute would seem to give it unbridled power," seriously undermining that interpretation even though such concerns were not presented by "*this* rule."  *Id.* at 540.  So too here.

Ultimately, all Defendants can offer is their claim that they *need* the expulsion power to "flexibly respond to the exigency posed by the spread of communicable diseases."  Opp. 17.  But that claimed need—even if credited—does not mean such power has been granted by Congress. *Cf. Alabama Ass'n of Realtors*, 141 S. Ct. at 2321 (Kavanaugh, J., concurring).

**Regulation of Transportation.**  Not only does § 265 not authorize expulsions, but it is also limited to the regulation of *transportation entities* that *introduce* people into the country. *See* Historians Amicus, ECF No. 79 (explaining history of statute).  As previously noted, the

---

[6] Though the Court need not reach the issue, *see P.J.E.S.* 502 F. Supp. 3d at 516 n.7, Defendants are wrong about constitutional avoidance.  "If one [proposed statutory construction] would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court."  *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).  The cases Defendants cite to the contrary are inapposite.  *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (rejecting "more stringent *arbitrary-and-capricious review* [for] agency actions that implicate constitutional liberties"— not the *statutory construction* canon) (emphasis added).

Court need not reach this argument, PI Mot. 13, but it provides an additional ground to enjoin these expulsions.

The text—especially Congress's use of the term "introduction" into the country—demonstrates that § 7 of the 1893 Act (predecessor to § 265) was directed at the regulation of transportation companies, not individuals.  PI Mot. 14-16.  Defendants contest the meaning of "introduction," insisting that "a person may 'introduce' himself or herself without relying on any third party."  Opp. 20.  "Introduce" is used that way in other contexts—to introduce oneself to a new neighbor, for example.  But the context here is that § 265 refers to introduction into a *place*.  In 1893, as today, that is an action taken by a third party.  PI Mot. 14.  Defendants cite a dictionary quote as contrary evidence, but the reference is so dated (1639) that they must resort to repeatedly modernizing its spelling.  *See* Introduce, *Oxford English Dictionary* ("He used such meanes that he introduced himselfe into this Castle.") (quote modified at Opp. 20).  Sources more contemporaneous with the enactment of the 1893 Act, however, paint a very different picture.  *See* PI Mot. 14 (citing *Walsh v. Preston*, 109 U.S. 297, 298, 314, 315 (1883)).  For example, nineteenth century state statutes made it unlawful "for any free . . . person of color to migrate into this State, or be brought or introduced into its limits."  1835 Statutes at Large of South Carolina, at 470-72 (Act No. 2653),, Ex. A; *see also* 1842 Code of Mississippi, at 538 (Art. 17) (similar), *id.*, Ex. B.  This contrast between *migrating* and being *introduced* into the state by someone else reflects the ordinary meaning of the term "introduce."[7]

Defendants' contextual arguments likewise fall short.  The 1893 Act was singularly focused on regulating ships transporting people to the United States.  PI Mot. 14-15.  Defendants argue, however, that because § 7 (the predecessor to § 265) does not use the term "vessels," the context actually supports Defendants' interpretation.  Opp. 21.  But Plaintiffs' interpretation already accounts for the use of the term "vessels" in other parts of the 1893 Act.  While the latter

---

[7] Defendants' reliance on *Compagnie Francaise de Navigation a Vapeur v. Louisiana*, 186 U.S. 380 (1902), is misplaced.  That case concerned a *transportation entity's* introduction of people into a state, *id.* at 381—entirely consistent with Plaintiffs' interpretation of § 265.

provisions are limited to ships, the terms of § 7 were broad enough to permit regulation of all manner of transportation, including trains (and, now, airplanes).  PI Mot. 17-18.

Defendants' legislative history arguments fare no better.  That Senator Chandler said that under § 7 "the President could 'exclude all other passenger travel *as well as immigration*,'" Opp. 22 (quoting 24 Cong. Rec. at 471), underscores Plaintiffs' point.  With the inclusion of the word "other," Senator Chandler's phrasing demonstrates that he understood "immigration" to be a *form* of passenger travel—of noncitizens intending to remain permanently.  Likewise, Defendants' reliance on a rejected proposal to bar "all passenger travel," *id.*, is misplaced.  The proposal was to authorize stopping "all passenger travel, *but not immigration alone*," in order to bar discrimination against certain travelers, again underscoring that "immigration" was being used as a subset of "passenger travel."  24 Cong. Rec. at 470 (emphasis added).  The word Congress ultimately settled on—"introduction"—refers, like "passenger travel" and "immigration" (in this context), to the transportation of people.  *See id.* at 471; Historians Amicus at 2-3, 5-6.

## B. Even If § 265 Did Authorize Expulsions, It Would Not Override The Specific Statutory Provisions For Those Seeking Protection.

Defendants do not dispute that Congress has carefully and repeatedly enacted special safeguards for persons fleeing persecution and torture.  Instead, they argue that § 265 permits the Executive to override all such protections.  *P.J.E.S.* squarely and correctly rejected that claim, and Defendants offer nothing to alter that conclusion.  502 F. Supp. 3d at 514-16, 540-43; *see also J.B.B.C. v. Wolf*, 20-CV-01509-CJN, 2020 WL 6041870, at *2 (D.D.C. June 26, 2020) (Nichols, J.) (same).  Thus, even assuming that § 265 implicitly authorized expulsions (which, as discussed above, it does not), Title 42 summary expulsions would still be unlawful to expel families entitled to seek protection.

Defendants again argue that "Section 265 plainly takes precedence" over the immigration laws' protections for asylum seekers.  Opp. 24.  But, as *P.J.E.S.* explained, a party asserting that Congress intended for one statute to "override[]" a separate regime "bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow."  *Epic Sys.*

*Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (internal quotation marks omitted).  And here, "the language of Section 265 contains no 'clear intention' to authorize the suspension of the relevant provisions of Title 8."  *P.J.E.S.*, 502 F. Supp. 3d at 515.  That is the end of the matter.

Defendants resist this conclusion by pointing, as they did in *P.J.E.S.*, to the requirement that a § 265 order be predicated upon a finding that "a *suspension of the right* to introduce . . . persons and property [from the designated country] is required in the interest of public health."  42 U.S.C. § 265 (emphasis added).  Defendants suggest that "suspension" refers to the suspension of *laws*, and that "the right to introduce . . . persons and property" should be read to "include[] the immigration laws."  Opp. 24-25.  *P.J.E.S.* correctly rejected this same argument.  502 F. Supp. 3d at 515.  Section 265 is clear about the substantive power it grants: "the power to prohibit, in whole or in part, the introduction of persons and property from [designated] countries."  42 U.S.C. § 265.  Defendants do not suggest that this grant of authority itself explicitly allows the Executive to override the immigration laws, and instead point to a subordinate clause describing a *finding* the agency must make before exercising that substantive power.  *See* Opp. 24-25.  It defies common sense that Congress would delegate authority to override all other federal statutes in a dependent clause describing a background finding the agency must make.  *See Epic Sys.*, 138 S. Ct. at 1626-27.

In fact, the "suspension of the right" language reinforces Plaintiffs' argument, *supra* Part I.A, that § 265 authorizes regulation of transportation entities, not expulsions.  That phrase most naturally refers to suspension of such entities' *licenses* conferring "the right" to ply certain routes.[8]  Indeed, Defendants betray their own deviation from the statutory text by seeking to transform § 265's reference to "the *right to introduce*" into a "cessation of . . . laws pursuant to which a

---

[8]  *See, e.g.*, *Barron v. Burnside*, 121 U.S. 186, 200 (1887) (discussing state license granting corporation the "right to carry on commerce"); *Hazeltine v. Miss. Valley Fire Ins. Co.*, 55 F. 743, 746 (C.C.W.D. Tenn. 1893) (statute authorized agency to "suspend the right of a licensed foreign insurance company 'to do business in the state'").

person might otherwise claim the *right to be introduced*."  Opp. 24 (emphasis added).  But the statute says nothing about a right to *be introduced*.[9]

Finally, Defendants again assert that the specific-over-general canon favors § 265 over immigration laws because the former applies only during health emergencies.  Opp. 25.  But that canon cuts the other way here.  As *P.J.E.S.* held, 502 F. Supp. 3d at 515, the later-enacted immigration laws "speak[] directly" to "the question before [the Court]," *Epic Sys.*, 138 S. Ct. at 1631, and these statutes do not permit summary deportation without a screening for persecution or torture.  By contrast, § 265 "doesn't mention [expulsion or asylum procedures] at all."  *Id*. at 1632.  Indeed, in 1996 Congress went out of its way to mandate special asylum procedures as part of the expedited removal process for the *precise* group designated as "covered aliens" subject to the Title 42 Process—those who arrive without documents.  *See* PI Mot. 20 (describing "credible fear" process).  As a group of leading scholars of immigration and refugee law explain, the "CDC Orders deny these protections to the same persons covered by the INA's expedited removal procedures," even though "Congress already considered" whether and how those people should be expelled from the country, and decided such noncitizens are "*entitled*" to the asylum hearings, procedures, and protections Congress enshrined.  Refugee Scholars Amicus Brief 2-3, 6-7, ECF No. 77 (emphasis added); *see also* IRAP Amicus Brief 4, 10, ECF No. 78.  Yet Defendants claim that § 265—which has nothing to say about any of these matters—allows them to cast aside those considered congressional judgments.  That claim is wrong and should again be rejected.[10]

**C. No Deference Is Warranted.**

Finally, Defendants fall back on a claim for deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).  Opp. 30.  As *P.J.E.S.* held, no deference is warranted here.  502 F. Supp. 3d at 516, 544 n.15; *see also J.B.B.C.*, 2020 WL 6041870, at *2.  Deference fails at

---

[9] Nothing in the legislative history indicates an intention to override all other laws, much less a clear and manifest intention.  *See* Opp. 26-29; *P.J.E.S.*, 502 F. Supp. 3d at 515.

[10] As previously explained, the Title 42 Process also violates the requirements of the Convention Against Torture. PI Mot. 21 n.9.  Plaintiffs preserve this argument but agree that the Court need not decide that issue at this time.  *See P.J.E.S.*, 502 F. Supp. 3d at 540 n.12.

*Chevron*'s first step because, as already explained, Defendants' asserted new expulsion power is at odds with "the traditional tools of statutory interpretation—including the statute's text, history, structure, and context." *Loving v. I.R.S.*, 742 F.3d 1013, 1021-22 (D.C. Cir. 2014); *see also SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (rejecting agency's argument that silence as to asserted authority created ambiguity). And for similar reasons, Defendants' interpretation would warrant no deference at *Chevron*'s second step "because it is unreasonable in light of the statute's text, history, structure, and context." *Loving*, 742 F.3d at 1022; *see also District of Columbia v. Dep't of Labor*, 819 F.3d 444, 454 (D.C. Cir. 2016) (rejecting "novel reading" that would "significantly enlarge" longstanding statute's effect). Moreover, no deference is due to the claim that § 265 overrides the immigration statutes for an additional reason: "The reconciliation of distinct statutory regimes is a matter for the courts, not agencies." *P.J.E.S.*, 502 F. Supp. 3d at 544 n.15 (quoting *Epic Sys.*, 138 S. Ct. at 1629) (cleaned up).[11]

Defendants offer no response to *P.J.E.S.*'s conclusions on these issues. Instead, they rely entirely on a claim to deference based on the CDC's "expertise." As *P.J.E.S.* held, however, the interpretative question here is purely legal—does § 265 authorize expulsions and override the immigration laws, or does it not? *See* 502 F. Supp. 3d at 516. The CDC's "epidemiological expertise in how best to respond to a public health crisis," Opp. 30, might impact what power it thinks is *needed*, but Defendants have "not explained how that scientific and technical expertise" meaningfully bears on the question *whether Congress granted that power*, *P.J.E.S.*, 502 F. Supp. 3d at 516; *see also NRDC v. Daley*, 209 F.3d 747, 755-56 (D.C. Cir. 2000) (refusing to defer to scientific expertise where agency never explained how it informs statutory interpretation).

---

[11] Defendants' alternative plea for *Skidmore* deference fails for the same reasons. *Skidmore* deference applies only "to an agency administering its own statute." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (emphasis added). And under *Skidmore*, an agency's interpretation is only "eligible to claim respect according to its persuasiveness." *Id.* at 221. For the reasons already given, Defendants' interpretation is not persuasive.

## II.   THE CLASS WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION.

Plaintiffs previously put forward substantial, unrebutted evidence regarding the irreparable injury that class members face upon expulsion, including persecution, physical harm (or even death), and the deprivation of the right to seek humanitarian relief.  PI Mot. 23-25 (describing evidence of harms and State Department reports documenting country conditions).  Advocates and attorneys now describe the grave harms faced by families across the border, who are sitting ducks for violent cartels upon expulsion by our government.  As one declarant describes, "CBP has routinely expelled my clients, including newborns, into the waiting arms of kidnappers biding their time next to the port."  Supp. Levy Decl. ¶ 30; *id.* ¶ 34 ("Others have reported being kidnapped by supposed taxi drivers who park near the ports and either kidnap the migrants directly or . . . hand them over to kidnappers."); Neusner Decl. ¶ 8. ("As of June 17, 2021, Human Rights First has tracked 3,250 kidnappings and other attacks, including rape, human trafficking, and violent armed assaults, against asylum seekers and migrants expelled to Mexico or blocked from crossing the U.S.-Mexico border since January 2021.").  To cite a few other examples of noncitizens preyed on by criminal elements after expulsion:

- "[A] Honduran woman I interviewed in a Juárez shelter told me that she and her seven-year-old daughter were kidnapped immediately after DHS expelled them to Juárez via a lateral expulsion flight from the Rio Grande Valley in April 2021. . . . . . [A]rmed men kidnapped the family and held them captive for two months in a house where they were forced to sleep on the floor with dozens of other kidnapping victims and deprived of sufficient food and clean drinking water . . . . . . They managed to escape while being transported to another location."  Neusner Decl. ¶ 8.

- "Over two thousand migrants are [at an encampment now], including elderly persons, pregnant women, injured persons and numerous small children. . . Not surprisingly, the gangs raid this small encampment every night, kidnapping many and dragging them away to awaiting vehicles. A local police car is parked there regularly, but the officers either look the other way or drive off when the kidnappers arrive."  Harbury Decl. ¶¶ 1, 10.

- "One Honduran woman I spoke with in April 2021 was expelled with her young daughter by CBP officials at night through the Hidalgo Port of Entry.  After she exited the international bridge into Reynosa, several armed men grabbed her and covered her face with a black hat and forced her in a car.  While being held, she was raped multiple times and she begged her captors not to harm her daughter.  Her daughter was released by herself

12

and crossed the border unaccompanied.  After a month, the woman was able to escape with
other women who were being held."  Arvey Decl. ¶ 16.

- "In Reynosa, one of our clients who had previously tried to seek asylum at the border but
  who was expelled under Title 42 was kidnapped shortly thereafter with her young son.  The
  mother and child were held for days without food until they finally escaped."  Pinheiro
  Decl. ¶ 37.

Other migrants describe horrendous stories of sexual assault and gender-based violence
they experienced after expulsion:

- In April 2021, I spoke with a Guatemalan Indigenous woman who was raped in the street
  in Tijuana after DHS expelled her there with her three young children in February 2021."
  Neusner Decl. ¶ 14.

- "One of my female clients from El Salvador . . . was kidnapped by two men who put a wet
  rag over her mouth, causing her to lose consciousness.  When she awoke, she was alone,
  mostly naked, dumped in the desert, and had been raped.  She walked until she found a
  woman who gave her pants and some money for a bus ride . . . . [T]he police officers told
  her that they were not going to accept her complaint because she was a migrant and
  'migrants liked to be raped.' She later realized that she was pregnant as a result of the rape
  and went to the public hospital for prenatal care.  At the hospital, a doctor, without
  informing my client or obtaining her consent, forcibly induced an abortion.  As a Christian,
  my client does not believe in abortion and wanted to keep her baby . . . despite being the
  product of rape."  Supp. Levy Decl. ¶ 16.

- "In one case received by our organization, a mother and her 5-year-old daughter were
  expelled to Mexico from the United States after fleeing sexual assault and domestic
  violence in Guatemala.  After being expelled to Ciudad Juarez this mother was raped.
  The family also faced ongoing extortion and death threats from smugglers in Mexico
  following their expulsion."  Rivas Decl. ¶ 16.

Still more migrants describe other forms of violence perpetrated on them and their family
members.

- "[A] father was approached by the cartel in Nuevo Laredo who demanded that he work
  for them.  He refused, and they beat him so badly that they broke his hip and told him
  that he was going to have to start working for him once he healed. The family was so
  terrified that they hid in the migrant shelter rather than try to seek medical care; as a
  result, the father can no longer walk unassisted."  Supp. Levy Decl. ¶ 37.

- "After DHS turned the family away, they tried to sleep in the tent encampment near the port of entry.  A man in the encampment charged her money to stay there, then a group of men assaulted the woman's teenage daughter."  Neusner Decl. ¶ 22.

Noncitizens subjected to expulsion or barred from coming to the United States have also experienced dire impacts on their health, or even death.  *See, e.g.*, Pinheiro Decl. ¶ 2 ("[T]hree . . . clients have died after being denied the ability to seek medical care in the U.S."); *id.* ¶ 30 (Haitian migrants describing discrimination by medical staff in Mexico); *id.* ¶ 32 (Haitian woman unable to access follow-up care or cleaning for third-degree burn); Neusner Decl. ¶ 25 (describing mother with kidney disease who "is experiencing severe abdominal pain, headaches, and back pain from sleeping on the ground"); *id.* ¶ 27 (mother was ovarian cyst who could not obtain treatment); Supp. Levy Decl. ¶ 21 (baby with Down's Syndrome and heart murmur denied medical care in Mexico); Harbury Decl. ¶ 12.C (grandmother with blindness who fell gravely ill after expulsion to Mexico, and passed away in hospital).  They are being forced to live in large tent encampments in unsanitary and horrendous living conditions, where gangs and criminal cartels prey upon them.  *See, e.g.*, Neusner Decl. ¶ 24 (describing tent encampment in Reynosa, Mexico, where thousands of migrants are living); Arvey Decl. ¶ 7 ("[M]any have been forced to sleep in abandoned houses, in the bus terminal, under bridges or on the streets . . . [F]amilies with young children have struggled to access the most basic necessities, such as food and water"). [12]

Some camps are so dangerous that even advocates are unwilling to go to them.  *See* Pinheiro Decl. ¶ 28 ("Aid workers [at the El Chaparral camp in Tijuana, Mexico] have received numerous threats from those controlling the camp.  Few groups are willing to provide in-person services, so there is a lack of food and supplies for those living at the camp.").  Others report that they tried to plead their situations to CBP, only to be turned away.  *See, e.g.*, Declaration of Astrid Dominguez ("Dominguez Decl.") ¶ 2 (describing father who "carried his visibly disabled daughter

---

[12] Recently, DHS has reportedly expelled hundreds of Honduran, Salvadoran, and Guatemalan migrants to southern Mexico, where they are sent to a remote village in Guatemala and stranded without housing or transportation.  The Washington Post, *Mexico has pushed hundreds of migrants expelled from the U.S. on to Guatemala, stranding them in a remote village far from their homes* (Aug. 10, 2021), https://www.washingtonpost.com/world/2021/08/10/mexico-deport-guatemala/.

[with spinal injuries] across the border but were nevertheless expelled"); Pinheiro Decl. ¶ 34 (describing expulsion of 19-year-old who "had lost his right arm and leg"); Declaration of Chelsea Sachau ("Sachau Decl.") ¶ 22 (describing expulsion of pregnant woman experiencing contractions despite her "detailing her kidnapping at the border" to CBP); Supp. Levy Decl. ¶ 45 (describing five new mothers expelled while bleeding and in pain from giving birth within last 48-72 hours); Rivas Decl. ¶ 14 (Haitian children expelled without their shoes to Mexico). This Court has also granted stays of removal for multiple families who fear return to countries they fled. *See*, *e.g.*, ECF Nos 25, 42, 46.

Defendants argue, as they unsuccessfully did in *P.J.E.S.*, that the "individualized nature" of the threats facing class members precludes a classwide finding of irreparable harm. Opp. 32. But they do not dispute that all class members face the same deprivation of statutory procedures to seek protection in the United States. *See P.J.E.S.,* 502 F. Supp. 3d at 517 ("[T]he putative class members are being returned without any opportunity to apply for asylum or withholding of removal. Once expelled from the United States and outside the jurisdiction of the Court, it is not clear that a remedy can be provided."). Moreover, Defendants offer no evidence that class members face materially disparate dangers once expelled. To the contrary, as described above, the proposed Class members are experiencing sadly all-too-common harms.[13]

## III.   THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH IN FAVOR OF INTERIM RELIEF.

**Border Processing Capacity.** The harm faced by families outweighs any burden on Defendants. Defendants, as before, broadly state that the CDC has determined that the Title 42 Process "is necessary to protect the country . . . ." Opp. 32. But, as noted above, the recent CDC Order does *not* say that accepting additional migrant families into the country cannot be done consistent with public health. Rather CDC's view is fully consistent with that of numerous former

---

[13] Defendants also argue that the Title 42 Process's procedure for assessing a noncitizen's claims under CAT mitigates such risks, Opp. 32, disregarding that this assessment does not screen for asylum or withholding claims (which are distinct from CAT and have different criteria), and is rife with deficiencies *even as to CAT*, PI Mot. 21 n.9; *supra* Part I.B.

CDC officials and public health experts who have explained the steps the federal government can take to reduce risks.  *See* Med. & Pub. Health Decl. ¶¶ 9, 13–32 ("By combining multiple strategies, including vaccinations, testing, masking, ventilation, and sanitizing, [CBP] can safely process asylum-seeking families while minimizing transmission of COVID-19."); Supp. Former CDC Off. Decl. ¶¶ 29–37; *see also* Declaration of Médecins Sans Frontières Medical Coordinator in Mexico ("MSF Decl.") ¶¶ 20–23.  Indeed, the recent CDC Order repeatedly states that this is a question of resource allocation and that asylum-seeking families can be safely processed as long as long as DHS is willing to take mitigation steps, precisely what this Court held in *P.J.E.S.*.  *See, e.g.*, CDC Order 3 ("recogniz[ing] the availability of testing, vaccines, and other mitigation protocols can minimize risk" of COVID-19 transmission during border processing), 22 (acknowledging that DHS can "partner with state and local agencies and nongovernmental organizations to provide testing, consequence management, and eventually vaccination to [family units]" and encouraging "expansion of such COVID-19 mitigation programs . . . as soon as practicable").  Defendants' own declarant does not dispute mitigation steps are available, stating that DHS has taken "significant steps to develop systems to facilitate testing, isolation, and quarantine of those individuals who are not immediately returned to their home countries after encounter."  Shahoulian Decl., ECF No. 116, ¶ 9.

As the experts pointedly observe: "The CDC Order is . . . not a conclusion by CDC that migrants present an unacceptable public health risk," but rather a push for DHS to take the necessary mitigation steps that the agency is plainly capable of taking and has taken in the past where it was pushed to do so.  Med. & Pub. Health Decl. ¶¶ 4–6.  Thus, far from supporting Defendants' litigation position, public health experts explain that the CDC Order is simply saying that DHS can safely process asylum seekers if it chooses to take the proper mitigation steps.  *Id.* ¶¶ 5 ("[T]he CDC 'recognizes [that] the availability of testing, vaccines, and other mitigation protocols can minimize risk' of COVID-19 transmission during border processing."), 6 ("The CDC further recognized that the federal government has successfully implemented those

mitigation steps in order to process unaccompanied children without posing 'a significant level of risk for COVID-19 spread into the community'—DHS simply has not done the same for families.").

Despite DHS's 81 billion dollar budget, about a quarter of which is CBP's, Defendants' claim that "infrastructure and resource limitations" prevent DHS from taking the necessary mitigation steps. Yet, as noted above, 86% of families arriving at the southwest border are *already* allowed into the United States and processed for regular removal proceedings, largely because the "Mexican government has placed certain nationality- and demographic-specific restrictions on the individuals it will accept" under Title 42, and large Mexican states are refusing to accept back families with young children. CDC Order 15. Thus, an injunction would only require the government to accept an additional 14% of families—about 362 individuals per day across the entire Southern border. Declaration of Aaron Reichlin-Melnick ("Reichlin-Melnick Decl.") ¶ 22. That is the equivalent of just 0.1% of the number of people allowed through ports of entry for other reasons. *Id*.

Relatedly, Defendants claim that the "historic" levels of immigration encounters at the border means they cannot safely process the 14% of families currently subject to expulsion under Title 42. Shahoulian Decl., ECF No. 16, ¶ 20. But given their budget, that position is untenable. In any event, Defendants' statistics are "misleading." Reichlin-Melnick Decl. ¶¶ 22. Title 42 itself "has artificially inflated the number of 'encounters'" between asylum seekers and CBP "as compared to the actual number of *people* seeking to cross the border and find protection in the United States." *Id*. ¶ 9. That is so because the policy has led desperate people seeking a hearing to attempt to cross multiple times, sometimes 10 times or more, and each attempt is counted as a new "encounter." *Id*.; *see id*. ¶ 11 (recidivism rate climbed from less than 7% to 40% under Title 42); *id*. ¶¶ 15-16 (CBP acknowledges this effect of Title 42 and that encounter statistics thus "overstate the number of unique individuals arriving at the border"). When it comes to how many individuals are actually coming to the United States, stripped of the inflated number of

17

"encounters," the first nine months of the current fiscal year are, in fact, comparable to Fiscal Year 2019. *Id.* ¶ 13.

Moreover, as explained in the declarations, shelter providers and advocates along the U.S.-Mexico border have developed systems (often without meaningful federal aid) to test asylum seekers, quarantine positive cases, and give them vaccines. *See* Declaration of Teresa Cavendish ("Cavendish Decl.") ¶ 2 ("Our organization and our partners [in Tucson, Arizona] have invested significant time and resources in building systems designed to receive migrants, [and] test them for COVID-19 and quarantine them when necessary . . . ."); Declaration of Kate Clark ("Clark Decl.") ¶¶ 6-16 (similar, in San Diego, California); Declaration of Marisa Limón Garza ("Limón Garza Decl."), ¶¶ 14 ("Despite our efforts, which we undertook at the encouragement of the federal government, much of our capacity [in El Paso and New Mexico] remains unused, while the government expels families back to Mexico."); *see also* Dominguez Decl. ¶¶ 5 (describing systems in Brownsville and Hidalgo).

Critically, these shelter providers and advocates state that they could accommodate more families if Title 42 were lifted—especially if the federal government devoted more financing to mitigation efforts. Limón Garza Decl. ¶ 13 (estimating that "as of July 2021, less than 10 percent of [El Paso area's receiving] capacity was currently in use"); Cavendish Decl. ¶ 13 (stating that existing reception programs "could [] be scaled up" with more government support); Clark Decl. ¶ 16 (recommending that federal government "channel money and resources to local agencies with proven track records, or even build[] up their own physical and other infrastructure"); MSF Decl. ¶¶ 9-13 (describing COVID-19 protocols in Matamoros camp). And the government could offer vaccines to migrants in border facilities, further mitigating risk.[14]  *See* Med. & Pub. Health Decl. ¶¶ 16–18; MSF Decl. ¶ 21(D) (describing excess vaccine doses that can be re-routed to migrants at the border).

---

[14] Robert Preidt & Robin Foster, *Biden Offers COVID Vaccines to Migrants In Custody Along Mexican Border*, U.S. News & World Report (Aug. 4, 2021).

Ultimately the issue boils down to what this Court emphatically emphasized in *PJES*: the government must allocate proper resources to comply with congressional mandates.

**Harm to DHS Personnel and the General Public.**   Defendants also suggest that a preliminary injunction would endanger DHS personnel and the U.S. population, but those assertions are equally unfounded.   *First*, whatever force the government's reliance on danger to DHS personnel once had, DHS personnel now have ready access to highly effective vaccines; those who have not gotten vaccinated have chosen not to do so.   Supp. Former CDC Off. Decl. ¶¶ 6-17 (describing how "[t]he widespread availability of vaccines has no doubt changed the course of the COVID-19 pandemic"), ¶¶ 38-41 ("Defendants do not disclose how many CBP employees have actually been vaccinated . . . As more CBP employees get vaccinated . . . infection and hospitalization rates should correspondingly decrease."), ¶¶ 42–44 ("The fact that CBP officers likely have a lower rate of infection compared to the American public . . . suggests that CBP is able to process immigrants safely . . . .").

*Second*, the government contends that the possibility of asylum seekers being infected threatens U.S. communities more broadly.   Opp. 34, 36.   And in its latest order, the CDC weakly concludes that asylum seekers "*may ultimately* increase community transmission rates in the United States."   Order at 16 (emphasis added).   But critically, Defendants do not claim that migrants present a greater risk than numerous activities sanctioned by CDC, including "in-person schooling, travel, religious practice, indoor sporting events and other regular activities."   Supp. Pub. Health Decl. ¶¶ 3, 8 ("The risks from allowing migrants fleeing persecution and danger into the United States are minimal considering the number of mitigation tools available, and certainly not greater than risks associated with many activities that the CDC currently sanctions.").   Defendants also fail to address that "[t]he number of people entering the United States lawfully at ports of entry," including "truck drivers, students, and people attending business meetings, is vastly larger than the number of family unit members apprehended and currently subject to Title 42."   Reichlin-Melnick Decl. ¶ 2; *id.* ¶ 22 (families subjected to Title 42 represent 0.1% of the average 361,976 people who enter at land ports from Mexico daily).

19

Evidence of COVID-19 tests administered to 5,340 asylum seekers in Mexico requesting exemptions from Title 42 show that only 1.14% tested positive.  Declaration of Luis Lizarraga Tolentino ¶ 3; Declaration of Samuel Bishop ¶ 3; Declaration of Alan E. Valdez Juárez ¶ 3; Declaration of Edgar Ramírez López ¶ 3; Sachau Decl. ¶ 10; Supp. Levy Decl. ¶ 8.  And more than 50% of adults in the five Mexican states on the border have received at least one vaccine dose, and in areas nearest the border in four of those states that figure is above 75%.  Pinheiro Decl. ¶ 11; *see also id.* ¶ 13 (citing 107 average cases/day in Tijuana Mexico in August, 2021 compared to 1,415 average cases/day in San Diego County).

And unvaccinated individuals in U.S. communities—who are the overwhelming majority of those at risk for serious disease and hospitalization—can protect themselves with free and widely available vaccines.  Supp. Former CDC Off. Decl. ¶¶ 11–17.  Denying statutory rights to asylum to vulnerable families will not address the central cause of the continuing risk of infection and hospitalization for those who choose not to get vaccinated.

*Third*, Defendants also claim concern for the health of the families themselves.  Opp. 34-35.  But this asserted concern rings hollow in light of the ways in which they implement expulsions.  "Defendants have irrationally sought to expel detained families who have been safely quarantined for weeks and are therefore known to be uninfected."  PI. Mot. 27.  Defendants have also placed families on crowded planes and buses from the Rio Grande Valley to other locations in Texas, or places as far away as Arizona and San Diego, and then expelled some while releasing others into the U.S ("lateral" transfers).  Plaintiffs' declarants report that these families are not being tested before boarding flights or buses by the dozens or hundreds.  Limón Garza Decl. ¶ 23 ("My understanding is that as many as 100 hundred noncitizens can be put on a single flight [and] that none of these noncitizens are tested before being put on a flight, or after they are designated for expulsion."); Pinheiro Decl. ¶¶ 18-19; Neusner Decl. ¶¶ 16-18; Supp. Levy Decl. ¶¶ 3, 30; Rivas Decl. ¶ 15.  A policy truly grounded in public health, rather than immigration concerns, would not cavalierly place these individuals on crowded buses or planes without first testing them and isolating those who test positive.  Supp. Former CDC Off. Decl. ¶¶ 23–26; Med. & Pub. Health

Decl. ¶ 33.  And as described above, these lateral flights put families directly into the hands of criminal organizations—a perverse result for a policy supposedly seeking to protect the health of those same families.  *See, e.g.*, Neusner Decl. ¶ 9 (describing Honduran woman with young child expelled via lateral flight, then kidnapped and held captive for two months by armed men).

**Effect on Future Migration.**  As they did in *P.J.E.S.*, Defendants again make dire predictions about overcapacity if the Title 42 Process were to be enjoined with respect to families, arguing that an injunction could serve as a "pull factor" attracting more families.  Opps. 34-35.  But, as in *P.J.E.S.*, "[t]he government has not established that the additional [arrivals] would actually overwhelm the . . . system."  502 F. Supp. 3d at 519 (citation omitted).  Defendants' only purported example of such an effect is a 16% increase in encounters of unaccompanied children in the weeks after entry of this Court's injunction in *P.J.E.S* in November 2020.  But that increase was part of a larger upward trend that predated the injunction by *many months*—and it was smaller than the percentage increase for each month from April to October 2020, when Title 42 was being enforced against unaccompanied children.  Declaration of Cecilia Menjívar, Ph.D. ("Menjívar Decl.") ¶ 15.  There is thus "no basis" for the suggestion that this continued uptick was "attributable to the injunction."  *Id.*  Migration levels of children and families are instead driven by dangerous conditions in the countries they flee, *id.* ¶¶ 16-32, as Defendants now appear to acknowledge, *see* CDC Order 13 n.70 ("According to data from DHS, encounters at the southern border have been rising since April 2020 due to several factors, including ongoing violence, insecurity, and famine in the Northern Triangle . . . .").  *See also, e.g.*, *Flores v. Sessions*, No. 85-CV-4544-DMG-AGRX, 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018) (rejecting similar "pull factor" theory as unfounded).

Defendants' portrayal of migration numbers also both conflates families with other groups, and omits critical facts.  First, much of Defendants' discussion deals with single adults, who are not at issue here and make up the "vast majority" of those apprehended and subjected to Title 42.  CDC Order 14.  Moreover, as explained above, the increased number of apprehensions along the southern border is partly attributable to the *Title 42 Process itself*, which has created a revolving

door whereby desperate asylum seekers are expelled without asylum hearings, and then re-cross in an effort to seek safety and obtain a hearing.  Reichlin-Melnick Decl. ¶¶ 1, 10-17; Menjívar Decl. ¶ 15.

Notably, shortly after the *P.J.E.S.* injunction was stayed by the D.C. Circuit, Defendants announced that they would voluntarily refrain from applying the Title 42 Process to unaccompanied children—despite their earlier dire warnings that the sky would fall.  And as CDC itself acknowledges, the government has developed systems—including testing, quarantine, and safe release procedures—that have minimized the danger to both unaccompanied children and the general public.  *See* CDC Order 22.  These circumstances show that when the government invests sufficient resources into developing infrastructure, it can accommodate many more migrants than its current statements suggest.[15]  As noted, that is consistent with the view of Plaintiffs' declarants on the ground, who similarly state that the systems they have been developed are scalable to accommodate additional asylum-seeking families if the government devotes the necessary resources.  Cavendish Decl. ¶ 13; Limón Garza Decl. ¶¶ 30-31; Clark Decl. ¶ 16; Pinheiro Decl. ¶¶ 20-26.

Indeed, past practice demonstrates that Defendants are capable of creating additional capacity, if need be, in as little as two to three weeks—thereby providing space while they swiftly process noncitizens out of custody.  For instance, between January 19 and February 9, 2021, CBP reactivated a 185,000-square-foot temporary facility in Donna, Texas.[16]  CBP also created multiple

---

[15] A government declarant claims that, "[h]istorically, ICE has experienced high absconder rates when it comes to non-detained family units," Declaration of Russell Hott, ECF No. 76-3, ¶ 28, but this is simply not true.  An analysis of fifteen years of data showed that *96% of families applying for asylum had attended all their immigration court hearings*.  Ingrid Eagly, Steven Shafer, & Jana Whalley, Detaining Families: A Study of Asylum Adjudication in Family Detention (2018), *available at* https://tinyurl.com/fewkn8wb.

[16] *CBP Announces Opening of Temporary Processing Facility in Donna, Texas*, U.S. Customs and Border Protection (Feb. 9, 2021), https://tinyurl.com/ftjcf64y; Christian von Preysing, *US Customs and Border Protection to Build Temporary Immigration Facility in Donna*, KRGV (Jan. 20, 2021), https://tinyurl.com/4psvvf6p.

temporary facilities in 2019, before removing them due to fewer immigrant arrivals in 2020.[17]  In the past, CBP has stated that temporary facilities are safe and acceptable to care for immigrant families.[18]

**Other Public Interest Considerations.**  Defendants' claim that an injunction would prevent the government "from effectuating statutes enacted by . . . its people," Opp. 35, gets it backwards.  Here, "government officials are not acting within the bounds set by Congress." *P.J.E.S.*, 502 F. Supp. 3d at 520.  Defendants also again ask this Court to defer to "Government officials tasked with ensuring the public health," Opp. 36.  But as the Court stated in *P.J.E.S.*, Defendants are not free to engage in actions beyond what Congress has authorized.  Moreover, to the extent Defendants are relying on CDC, it is CDC that is saying that migrants can be safely processed if only *DHS takes the available mitigation steps*.

Defendants further assert that "countries around the world" have issued travel restrictions to prevent the spread of COVID-19, Opp. 1, but they omit that many countries, including the United Kingdom and nearly all of Europe, have kept their doors open to *asylum seekers*, in recognition of the non-derogable nature of their treaty obligations.  *See* U.N. High Commissioner for Refugees, *COVID-19 Platform: Temporary Measures and Impact on Protection*, https://im.unhcr.org/covid19_platform (last updated Aug. 7, 2021) (identifying countries that exempt asylum seekers from COVID-based restrictions on entry).  Thus, rather than align their practices with those of other western democracies, Defendants have aimed their most onerous border restrictions at those most vulnerable.  Indeed, UNHCR has singled out the United States for criticism in this regard, explicitly calling for an end Title 42.[19]

---

[17] *New Temporary Facilities in Texas and Arizona Expand CBP Holding Capacity*, U.S. Customs and Border Protection (Aug. 6, 2019), https://tinyurl.com/ymzrptjb; Valerie Gonzalez, *Border Patrol Deconstructing Soft-sided Facilities in RGV, Yuma and El Paso*, KRGV (May 19, 2020), https://tinyurl.com/4hewm8xn.

[18] *CBP to Open Temporary Facility in Response to Sustained Large Volumes of Family Units in Yuma, AZ*, U.S. Customs and Border Protection (June 28, 2019), https://tinyurl.com/24r8ecdy.

[19] UNHCR, *Statement attributable to UN High Commissioner for Refugees Filippo Grandi on the need to end US COVID-19 asylum restrictions* (May 20, 2021), https://tinyurl.com/6498ba32.

As in *P.J.E.S.*, an injunction "may force [the government] . . . to make difficult decisions about allocation of resources to mitigate the risks of COVID-19," but such resource-allocation challenges cannot outweigh the fundamental public interest favoring Defendants' "faithful adherence to [their] statutory mandate, which does not permit expulsion." *P.J.E.S.*, 502 F. Supp. 3d at 519-20 (cleaned up).

## IV.   DEFENDANTS' CHALLENGE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION IS UNFOUNDED.

Defendants' sole challenge to class certification is that the proposed class definition is "vague and ambiguous," Opp. 14, because it "uses a term—'the Title 42 Process'" that is "not defined in the class definition" itself, *id.* 13.  But, as in *P.J.E.S.*, Plaintiffs have identified and challenged "a uniform policy or practice" of "expulsion," and sought relief enjoining application of the challenged CDC orders to the class. 502 F. Supp. 3d at 509-10 (certifying class of unaccompanied children).  Defendants do not seriously claim to misunderstand the contours of this legal challenge, as they admit "it is no secret that Plaintiffs challenge the 'practice of summary expulsion under the Title 42 Process' and the alleged lack of access to asylum." Opp. 14 (quoting Class Mot. 2).  And, of course, the Court could, if it felt it necessary, simply add a definition of "the Title 42 Process" when certifying the class and issuing the injunction.

## V.   SCOPE AND TIMING OF INJUNCTION.

1. Any injunction should encompass the new August 2, 2021 CDC Order and any subsequent CDC Order applying the Title 42 Process to families, as "there is no relevant material distinction" between that most recent Order and the prior CDC Orders as to the class at issue here.

*See P.J.E.S.*, 502 F. Supp. 3d at 520 (citing *Ne. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993)).[20]

2. Defendants have requested that the Court stay any injunction.  Opp. 36-37.  Plaintiffs do not oppose a short one to two week stay should the Court conclude that Defendants need a brief period in which to implement additional protocols, provided that any stay prohibits the government from expelling families at a higher rate during such a stay than it was expelling them at the time the parties returned to Court on August 2.

## CONCLUSION

This Court should grant Plaintiffs' Motions for Class Certification and for Classwide Preliminary Injunction.

Dated: August 11, 2021                                    Respectfully submitted,

                                                          /s/ Lee Gelernt_____

Stephen B. Kang (Bar ID. CA00090)                        Lee Gelernt (Bar ID. NY0408)
Cody Wofsy (Bar ID. CA00103)                             Daniel A. Galindo (Bar ID. NY035)
Morgan Russell*                                          Omar Jadwat*
My Khanh Ngo                                             Ming Cheung*
American Civil Liberties Union Foundation,               David Chen
Immigrants' Rights Project                               American Civil Liberties Union Foundation,
39 Drumm Street                                          Immigrants' Rights Project
San Francisco, CA 94111                                  125 Broad Street, 18th Floor
Tel: (415) 343-0770                                      New York, NY 10004
                                                         Tel: (212) 549-2660
Andre Segura
Kathryn Huddleston                                       Robert Silverman
Brantley Shaw Drake                                      Irit Tamir
American Civil Liberties Union Foundation                Oxfam America
of Texas, Inc.                                           Boston, MA 02115, Suite 500
5225 Katy Freeway, Suite 350                             Tel: (617) 482-1211
Houston, Texas 77007
Tel. (713) 942-8146

---

[20] Plaintiffs are submitting an updated proposed order with this brief to cover the August 2 CDC Order, and are prepared to amend the complaint to add that Order should the Court deem it necessary.

Tamara F. Goodlette*
Refugee and Immigrant Center for
Legal Education and Legal Services
(RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
Tel: (210) 960-3206

Karla M. Vargas*
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
Tel: (956) 787-8171

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

Jamie Crook (D.C. Bar No. 1002504)
Karen Musalo
Neela Chakravartula
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

*Attorneys for Plaintiffs*
*Admitted pro hac vice*