SUPPLEMENTAL DECLARATION OF TAYLOR LEVY

I, Taylor Levy, hereby declare, pursuant to 28 U.S.C. § 1746:

**SUMMARY**

1. Having worked with border communities for over ten years, including having represented over 1,200 migrants impacted by the Title 42 policy, I am deeply familiar with the humanitarian crisis fueled by the policy and the policy's disconnect from COVID-19 concerns.

2. CBP expulsions of migrants occur in predictable locations at predictable times in areas where kidnappers and organized crime are rampant. As a result, many migrants are kidnapped immediately upon CBP releasing them into Mexico from a U.S. port of entry.

3. The risks to migrants are particularly acute when CBP engages in so-called lateral expulsions, in which migrants are apprehended at one part of the border (often the Rio Grande Valley in Texas), detained for as long as seven days, transported by plane or bus to another part of the U.S. border (as far away as San Diego, California), and then expelled into a completely different part of Mexico.  Such expulsions make asylum-seekers even bigger targets for organized crime because the migrants (1) are easily identifiable outside the ports of entry, (2) are unfamiliar with their new surroundings,  (3) have no shelter or other resources in the area, and (4) they likely have no more money to pay extortion ("protection fees") to another local gang or cartel (after already being extorted at their previous location).

4. My clients in Mexico suffer abuse from every possible source.  For instance, one El Salvadoran woman had been expelled by the United States, then kidnapped, raped, and dumped in the desert, before the Mexican police told her that "migrants like to be raped" when she tried to report it; she then discovered that she was pregnant from the rape and suffered a forced abortion while seeking prenatal care at a public hospital. Overall, approximately 40% of the clients I worked with in Nuevo Laredo, Mexico report either an actual or attempted kidnapping (or both).

5. The horrific conditions that migrants endure in Mexico, combined with the federal government's decision to exempt children but not their parents from Title 42, have also forced parents to make gut-wrenching decisions to send their children across the border alone, unsure whether they will ever reunite.

6. Many of my clients were also actively harmed by CBP during their expulsions. Mothers who recently gave birth were expelled—while still bleeding profusely—with their U.S.-citizen newborns. Others had their critical medications seized and disposed of.

7. Through my work, I have become familiar with border processing, as well as shelter operations on both sides of the border. In my experience, Customs and Border Protection (CBP) has demonstrated that it can process families quickly, and shelter operators have taken extensive measures to prevent COVID-19 transmission among migrants, including testing and quarantine.

8. I have helped facilitate COVID-19 testing for 858 clients, and only 22 people (2.56%) tested positive.

## QUALIFICATIONS

9. I am an attorney admitted to practice in Texas. I became licensed in 2019. I am in good standing with the State Bar of Texas (State Bar No. 24113588). I specialize in immigration law, and run a private law firm called Taylor Levy Law through which I provide primarily pro bono legal services to individuals along the U.S.-Mexico border.

10. Since 2009, I have worked as an attorney and advocate in various capacities for noncitizens at or near the southern border. Among other roles, I have worked as Legal Coordinator for Annunciation House in El Paso, Texas. Prior to my attorney licensure, I worked for five years as an accredited representative for the U.S. Department of Justice representing individuals in immigration court in the El Paso, Texas area.

11. Beginning in March 2020 I began going to the Mexican side of the Paso del Norte Port of Entry in Ciudad Juarez, Mexico to provide free legal advice to migrants presenting for their (canceled) Migrant Protection Protocols ("MPP") hearings. From March 2020 through August 2020, I went to the Paso del Norte Port of Entry almost every weekday from approximately 4 am to 10 am and provided free legal advice and free consultations. From March 2020 through November 2020, I also frequently visited migrant shelters to give free legal advice and consultations to families who had been expelled under Title 42. In addition to my work in Juarez, I served as a free mentor to immigration attorneys from across the country. Since March 2020, I have consulted on numerous cases involving asylum-seeking families expelled across the southern border.

12. Since May 2021, I shifted my focus from my work in the Ciudad Juarez region to Nuevo Laredo (in partnership with the nonprofit organization VECINA) due to the alarming rates of expulsions under Title 42, which has subjected individuals seeking asylum to dangerous conditions in Nuevo Laredo, Mexico. I also work with some clients subjected

to Title 42 in Reynosa and Piedras Negras. I also communicate extensively with other immigration attorneys and humanitarian aid organizations providing services across the Mexican border.

13. I have also represented and helped many people seek exemptions from the CDC's Title 42 policy and be successfully processed at various ports of entry since April 2021. I have also helped arrange COVID-19 tests for hundreds of migrants prior to their entry into the United States since June 2021.

**Migrant Families Are Trapped in Horrific Conditions in Mexico As They Await the End of Title 42.**

14. Migrant families are extremely vulnerable in Mexico because, among other things, they are routinely (1) targeted for kidnapping, rape, trafficking, and extortion; (2) denied medical care even for serious illnesses; (3) displaced, homeless, and often forced to sleep on the street or in a plaza; (4) discriminated, harassed, and attacked based on race, gender, and sexual orientation; (5) assaulted by a combination of police and private actors; and (6) prevented from accessing basic services and legal protection due to language barriers.

15. Since May 2021, I have represented 398 families, and 22% of them had been kidnapped in Mexico. Twenty-one percent managed to escape from an attempted kidnapping. Overall, 41% experienced an actual or attempted kidnapping or both.

16. One of my female clients from El Salvador, who had been expelled three times under Title 42, was kidnapped by two men who put a wet rag over her mouth, causing her to lose consciousness. When she awoke, she was alone, mostly naked, dumped in the desert, and had been raped. She walked until she found a woman who gave her pants and some money for a bus ride. My client went to the municipal police to report the rape, and the police officers told her that they were not going to accept her complaint because she was a migrant and "migrants liked to be raped." She later realized that she was pregnant as a result of the rape and went to the public hospital for prenatal care. At the hospital, a doctor, without informing my client or obtaining her consent, forcibly induced an abortion. As a Christian, my client does not believe in abortion and wanted to keep her baby, who was innocent, despite being the product of rape.

17. That client's trauma was severe but not unique. I also represented a Black Honduran mother and her 7-year-old son—they were kidnapped in Reynosa, and the mother was severely beaten and raped in front of her son. When she sought help, Mexican police officers refused to help her and instead taunted her, asking her how much she would

charge to give them a turn. Since this trauma, the 7-year-old became extremely depressed and has frequently told his mother that he wants to die.

18. Another client told me that she was "lucky," because even though the kidnappers gang-raped her repeatedly, they always did it in a separate room so that her 8-year-old daughter and 6-year-old son did not have to watch.

19. Kidnappers target migrants in hopes of extracting ransom from family and friends in the U.S. Migrants, particularly Black migrants and other racial minorities, are readily identified based on their appearance and their proximity to the border.

20. Many of the families I work with have serious medical conditions and they are unable to access appropriate medical care in Mexico. They report going to the public hospitals to seek emergency treatment (as officially required under Mexican law) only to be denied care because of their status as migrants. My clients' untreated medical conditions have included cerebral palsy, seizures resulting from brain injuries suffered during beatings, brain tumor, vaginal infection, skin rashes, hernias, fainting, heart problems, diabetes, high blood pressure, asthma, anxiety, depression, suicidality, diarrhea, serious weight-loss, bed-wetting, gallstones, kidney stones, pediatric liver disease, anemia, ovarian cysts, spina bifada, hyperthyroidism, blood disease, autism, epilepsy, and scoliosis.

21. I represented a Honduran family whose one-year-old baby was denied emergency medical attention when he stopped breathing. The baby has Down's Syndrome and a heart murmur. The family sought help at a public Mexican hospital and was told explicitly that they were denied care because they were foreigners. This family has been expelled to Mexico twice after trying to seek asylum in the United States.

22. I also represented a young Venezuelan man with spina bifada who was in a wheelchair, whose immobility made him particularly vulnerable to kidnapping. He was unable to receive necessary check-ups for his condition, and he ended up with an infection that moved to his kidneys as a result.

23. Another client had experienced vaginal bleeding for 3 months and was told by a doctor at the public hospital that she had over 20 uterine fibroids and was in severe need of surgery. However, the hospital refused to perform the operation because she was a migrant.

24. One of my clients was an 8-year-old girl with an enlarged heart that results in her turning purple and struggling to breathe. When the family sought out medical treatment for her,

doctors at public hospitals refused to serve them on numerous occasions, saying that Mexicans were more deserving of their help.

25. Families also frequently report a severe fear of leaving the shelters to seek out medical treatment because they are worried about being kidnapped, especially those families who have already survived one kidnapping and worry that their families will be unable to gather another ransom if requested.

26. My clients frequently report being harmed by Mexican law enforcement. Many families report being robbed, bribed, kidnapped, beaten, and sexually assaulted by Mexican police. Other migrants report Mexican immigration officials demanding $500 bribes in exchange for their release; some expelled migrants report being handed over directly to kidnappers by Mexican immigration officials immediately upon expulsion.

27. I represented a Black Honduran asylum-seeker who was six-months-pregnant and suffered a miscarriage due to extreme distress caused by frequent police raids at her apartment.

**Title 42 Has Exacerbated the Dangers that Migrant Families Face in Mexico.**

28. In addition to prolonging the time that people spend under dangerous conditions, Title 42 elevates the risks that migrants face in Mexico and inflicts additional trauma on asylum-seekers.

29. CBP expulsions of migrants occur in predictable locations at predictable times in areas where kidnappers and organized crime are rampant. As a result, many migrants are kidnapped immediately upon CBP releasing them into Mexico from a U.S. port of entry.

30. The risks to migrants are particularly acute when CBP engages in so-called lateral expulsions, in which migrants are apprehended at one part of the border (often the Rio Grande Valley in Texas), detained for as long as seven days, transported by plane or bus to another part of the U.S. border (as far away as San Diego, California), and then expelled into a completely different part of Mexico.

31. Such expulsions make asylum-seekers even bigger targets for organized crime because the migrants (1) are easily identifiable outside the ports of entry, (2) are unfamiliar with their new surroundings, (3) have no shelter or other resources in the area, and (4) they likely have no more money to pay extortion ("protection fees") to another local gang or cartel (after already being extorted at their previous location).

32. At multiple ports of entry in Texas (Laredo, El Paso, Eagle Pass, and Hidalgo), CBP has routinely expelled my clients, including newborns, into the waiting arms of kidnappers biding their time next to the port. Migrants become immediate targets as soon as they are marched over the boundary line into Mexico. Several of my clients have reported kidnappings and attempted kidnappings by armed men in trucks and vans waiting near the spots where Title 42 expulsions occur.

33. During those incidents, children are sometimes ripped from the arms of their mothers and fathers and pulled into the kidnappers' vehicles. Oftentimes migrant families run from these kidnappers trying to escape, resulting in family separation where some members escape while others are not so lucky. In some cases, the family members who survived the attempted kidnapping never again hear from their missing family members.

34. Others have reported being kidnapped by supposed taxi drivers who park near the ports and either kidnap the migrants directly or who refuse to take them to their destination and instead hand them over to kidnappers.

35. I represented a father and his six-year-old son, who were kidnapped and almost kidnapped a second time, each time immediately after being expelled from a U.S. port of entry. The first time, they were immediately kidnapped after CBP expelled them into Reynosa; the father was trafficked for labor. After they were released, the family tried to seek asylum again—this time, CBP transported the family and expelled them into Nuevo Laredo, where they narrowly escaped another kidnapping attempt.

36. Another client family, consisting of a mother and her seven-year-old son from El Salvador, were expelled into Mexico on several occasions trying to seek asylum in the United States. On their final attempt, they were kidnapped immediately upon expulsion to Nuevo Laredo and held for eight days while their family gathered the money to pay their ransom. The mother reported that her son did not eat anything during the entire kidnapping and was deeply traumatized.

37. I also represented a Honduran mother, father, and their children, ages eight and one. The mother was kidnapped and held for a month before finally being released after her family in the United States paid a ransom. Later, the father was approached by the cartel in Nuevo Laredo who demanded that he work for them. He refused, and they beat him so badly that they broke his hip and told him that he was going to have to start working for him once he healed. The family was so terrified that they hid in the migrant shelter rather than try to seek medical care; as a result, the father can no longer walk unassisted.

38. Another client was immediately kidnapped after being expelled from El Paso and was repeatedly sexually assaulted by her captors.

39. I also worked with a young mother of three who attempted to cross at Reynosa, Mexico but the family was apprehended and expelled more than a thousand of miles away into Tijuana, Mexico. On their second attempt, they were deported to Nuevo Laredo, where the family was kidnapped for five days and threatened with dismemberment for a ransom of $20,000. The family is now traumatized from the event.

40. In another case, a mother and her two sons—including one who has severe autism and is nonverbal—were kidnapped for three weeks after being expelled into Mexico. The family had fled their home country after the children's father was murdered.

41. Another mother and her 8-year old son seeking asylum were expelled and then kidnapped for several days until her son fell ill and they were released "so her son would die elsewhere."

42. I also worked with a family of four that included a nine-month-pregnant mother, a father, and two children ages four and nine. The family originally sought asylum in the Reynosa area, only to be expelled. During their second attempt to seek safety, the family was accosted by cartel members. The young children made it across the river (thereby becoming unintentional unaccompanied minors), but the mother and father were kidnapped, separated, and brutalized. Eventually, the mother was released when she went into labor, and her baby was born with severe complications.

43. Title 42 has also resulted in more dangerous crossings. Prior to Title 42, I had rarely witnessed or learned of families attempting to climb over the border wall, but now, this has become a more common occurrence for desperate families subject Title 42 expulsions. I worked with a family who attempted to jump over the border wall and the two children fell off; one broke their leg and the other was seriously injured.

44. I have also represented clients who suffered direct harm at the hands of the Border Patrol during the expulsion process. For instance, expelled families frequently report having their medications seized by the Border Patrol. For example, I recently represented a Honduran mother with a chronic heart condition whose medication was taken away by Border Patrol upon apprehension and never returned; this resulted in her having extremely high blood pressure and swelling in her feet. I also represented a mother and her two-year-old son, whose asthma medicine was seized.

45. Since March 2021, I have represented five Central American mothers who were expelled into the streets of Piedras Negras, Mexico, within 48-72 hours after giving birth to a U.S. citizen baby in Eagle Pass, Texas. All of the mothers reported being expelled with limited baby formula, diapers, and clothing. The mothers—including one who had a cesarean section—all told me that they were in significant pain from given birth and unable to access medical care in Mexico. One mother told me that the Border Patrol took away all her belongings prior to expulsion—including her cell phone, money, clothing, and sanitary napkins—such that she had bled through her only pair of underwear and pants. All five mothers were expelled prior to obtaining birth certificates for their infants. Once in Mexico, they were unable to obtain appropriate medical attention for their babies because of their undocumented status.

**Title 42 Has Caused Innumerable Families to Become Separated From Their Children.**

46. Given the dangerous conditions in Mexico, the continued application of Title 42 to migrant families has forced parents to make heart-wrenching decisions to send their children to the United States alone, not knowing when (or if) they would ever see each other again.

47. I have witnessed the desperation that has forced parents to send their children unaccompanied to the border, because the Biden administration will accept only unaccompanied minors and not families under Title 42. Parents believe that is their only option. I have heard parents say, "no me queda de otra" ("I have no other option").

48. For example, I worked with an indigenous mother with limited Spanish fluency who tried to seek asylum with her eight-year-old daughter. Immediately upon expulsion, the family was pursued by masked men with guns. The mother told her daughter to run, and the child was able to narrowly escape while the mother was abducted. The daughter ended up in the custody of the Office of Refugee Resettlement ("ORR")—deeply traumatized—and thinking for over a month that her mother had been killed.

49. Another one of my clients was the mother of a nine-year-old boy fleeing forced gang recruitment in Honduras. After an attempted kidnapping in Mexico, the child's mother sent him alone to the U.S, where he was languishing in ORR custody with no viable sponsor and about to be placed in long-term foster care.

50. I also represented a family that crossed the border twice in April 2021 seeking asylum. After being expelled both times, the family decided to send their son across alone. The remaining adult family members narrowly escaped an attempted kidnapping in Ciudad Juarez. They were also accosted and robbed by Mexican police officers. The father also

had uncontrolled diabetes and was unable to access proper medical care in Mexico. An attorney for the child, who was in ORR custody, contacted me for assistance applying for a humanitarian exemption from Title 42 for the adult family members, because the child—who had been identified as a victim of human trafficking—was suffering severe psychological trauma worrying about his family's safety.

51. It is my professional opinion that the unaccompanied minor increase at the border is directly linked to the Title 42 expulsions and the decision to only exempt children (but not their parents and adult relatives) from expulsion.

52. Almost all of the parents I have worked with who sent their kids ahead alone as unaccompanied minors did so only after first being expelled as a family unit.

53. I have worked with dozens of such families, including many who sent across young children. Some families decided to only send their older children across the border alone, keeping their younger children with them. After sending their kids across the border unaccompanied, the parents then continue to try and enter the country, as single adults.

54. I have worked with clients who have attempted to cross into the United States as many as nine times out of desperation, being expelled each time without an asylum hearing that could have been provided the first time they sought entry, thereby avoiding multiple contacts with CBP.

55. Instead of deterring families from coming into the United States, Title 42 forces families to enter again and again, because there is no other way to seek protection or to reunite with their children.

56. In many of these cases, unless the parent is allowed to enter the United States, the child would be stuck in government foster care indefinitely, potentially for years. I frequently field phone calls and emails from attorneys representing unaccompanied minors in ORR custody who have been designated "Category 4"—meaning that there is no parent or other sponsor able to take custody of the child in the United States.

**DHS's Selective Application of Title 42 Discriminates on the Basis of Nationality.**

57. Although the Title 42 policy on its face applies to undocumented persons regardless of country of origin, in reality, DHS engages in selective application of Title 42 that discriminates on the basis of nationality.

58. As the federal government has acknowledged, DHS generally does not expel nationalities that the Mexican government refuses to accept. *See* Centers for Disease Control and Prevention, *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* (Aug. 2, 2021) (hereinafter "CDC Order") at 15, https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf. Mexico in turn "will only accept the return of Mexican and Northern Triangle nationals," with "limited exceptions." *Id.*

59. By adopting Mexico's nationality preferences, DHS is distinguishing between migrants under Title 42 for geopolitical reasons, rather than on the basis of public health.

60. As a result of DHS's selective enforcement, Mexican, Guatemalan, Honduran, and Salvadoran migrants are much more likely to be expelled into Mexico compared to other nationalities, even though they may present the exact same COVID-19 risk. *See* CBP, *Southwest Land Border Encounters* (last visited Aug. 10, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

**CBP Can Process More Families at Ports of Entry, Including at El Paso.**

61. Rather than force families to cross dangerous terrain to seek asylum, CBP can and should make orderly presentment at ports of entry a possibility for asylum-seeking families. I have worked with many families who approached ports of entry for an opportunity to prove their asylum claims before they were prevented from entering the port.

62. Although the government claims that every individual takes hours to process, based on my experience, CBP is capable of processing people more quickly than that.

63. I am also familiar with families and individuals being processed for humanitarian exemptions from the Title 42 policy via the so-called consortium process, which enables certain NGOs to identify and refer vulnerable individuals to the federal government to receive exemptions. Those individuals are able to be quickly processed without being detained for hours in congregate settings.

64. Over the past several months, I have maintained a waiting list of hundreds of families who were waiting for a humanitarian exemption from Title 42. Many of these families have been waiting in Mexico for a chance to pursue their asylum claims in the United States since before the onset of Title 42, due to various other Trump administration policies undermining access to asylum. Some of those families have waited their turn for 1-2 years under dangerous conditions, hoping to follow the law and do everything the "correct" way. Now that NGOs responsible for referring exemption requests to DHS are

no longer accepting new cases because of a backlog, those families whose desperation has reached a tipping point after years of suffering are now left with no options.

65. In the past, families were able to be processed much more quickly than the amount of time that the government is currently contending.  Prior to 2018, I seldom witnessed noncitizens being immediately issued Notices to Appear (NTA), which formally commence removal proceedings and create a process for asserting asylum claims.  Now, DHS has opted to issue NTAs immediately and asserts that the complexities of issuing an NTA requires significant processing time (and the detention of the noncitizen while the paperwork is being prepared). However, as past practice would indicate, DHS is not required to issue NTAs immediately, particularly when doing so unnecessarily prolongs detention and strains processing capacity. DHS and CBP could easily address their capacity issue by merely returning to historical practices. In the past, noncitizens could be quickly issued release documents and informed to check in with ICE at their ultimate destination to receive their NTA.

66. Another practice that should be adopted to speed up the processing times and reduce time in congregate settings is to utilize available space around the ports of entry.  For example, due to my extensive work in the El Paso area, I am extremely familiar with the port of entry and its ability to utilize outdoor spaces for processing.  I have witnessed the use of mobile fingerprinting stations, trailers, and tents for the quick processing of migrants. The El Paso port of entry and nearby Border Patrol facilities have ample outdoor spaces and empty parking lots where mobile processing stations could be set up for faster and COVID-safe processing.  Notably, CBP has developed innovative ways to process noncitizens, but unfortunately is employing these methods to undertake Title 42 expulsions, and not for regular asylum processing.

## Testing, Quarantine, and Shelter Capacity

67.  Through my extensive work at the border, I have personal experience with the non-governmental organizations (NGOs) that assist noncitizen families in Juarez and El Paso as well as Nuevo Laredo and Laredo.

68. My work with Annunciation House for a decade provided me with intimate knowledge in the ways that these shelters and organizations can and are more than willing to accommodate larger numbers of people entering the country.

69. The work of these organizations was happening prior to the pandemic, it continued through the pandemic, and currently they are waiting to be able to take in more people. I

have personally been responsible for setting up pop-up shelters in churches, community centers, and hotels when expansions were needed.

70. Shelters and other NGOs on both sides of the border have worked to provide COVID-19 testing and implement steps designed to reduce the risk of COVID-19 transmission in migrant shelters. For example, from March 2020 through November 2020, I observed first-hand the various mitigation measures undertaken in the migrant shelter system in Ciudad Juarez, Mexico. There were various "filter" shelters erected to house, quarantine, and treat migrants who were COVID-19 positive and those who had not yet been tested. The rest of the shelters severely restricted in-and-out privileges to reduce the risk of contagion, and masks are generally required indoors. Hand sanitizer, bleach, and soap were plentiful. Visitation was limited to those providing essential services (such as legal aid) and occurred outdoors, masked, and with sufficient social distancing.

71. Similarly, I work closely with a network of migrant shelters in Nuevo Laredo and Monterrey, Mexico. While I have not visited them in person, I have heard about their COVID-19 protocols from both the pastor managing the shelters and the migrants themselves. Migrants are instructed not to leave the shelters except for doctor's appointments or work; regardless, most rarely leave upon arrival because of the danger faced by migrants in Nuevo Laredo. There are plentiful masks, hand sanitizer, and cleaning supplies. The shelters are cleaned twice per day by the migrants. People who test positive for COVID-19 or who have high temperatures are transferred to a special quarantine shelter and isolated from the general population. A local lab comes to the shelters to administer COVID-19 tests as needed.

72. In both Juarez and Nuevo Laredo, families who receive a humanitarian exemption from Title 42 are able to access free or affordable COVID-19 tests before their appointments at the ports of entry, to ensure that they are not carrying the virus into the United States.

73. As part of my representation of clients seeking humanitarian exemptions, I have tracked their COVID-19 test results because those who test positive for COVID-19 were rejected by CBP.

74. Overall, 2.56% of my clients (22 out of 858) tested positive for COVID-19 in Mexico when they received a test prior to their appointments at the Laredo Port of Entry.

75. On the U.S.-side, shelters like Annunciation House that receive families released by CBP have developed procedures for COVID-19 testing, quarantine, and isolation as well. They provide rapid tests on-site and move positive families to quarantine locations.

76. Vaccinations are also available in Texas on demand without an appointment.

77. Prior to, during, and after the pandemic, I have been and will be working with families to ensure safe and humane processing into the United States while they await an asylum decision. Based on years of direct experience, I know there are ways to process people quickly and in a manner that is safe for both my clients, border communities, and government personnel.

I declare under the penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. Executed in El Cerrito, California.

Dated: August 10, 2021  /s/ Taylor Levy
TAYLOR LEVY