DECLARATION OF CHELSEA SACHAU

I, Chelsea Jordan Sachau, declare under penalty of perjury, that the following is true and correct to the best of my knowledge:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

**Summary**

2. Based on my experience with Title 42 along the Arizona-Mexico border, the number of migrants who test positive on the Mexican side before entering is exceedingly low, as outlined below.

3. Title 42 has resulted in grave harm to our clients. They face kidnapping, rape, extortion, and other violence on a regular basis.

**Expertise**

4. My name is Chelsea Sachau and I am an Equal Justice Works Fellow at the Florence Immigrant and Refugee Rights Project in Arizona ("Florence Project") where I have been employed for 11 months. Founded in 1989, the Florence Project is a 501(c)(3) nonprofit legal service organization providing free legal and social services to adults and unaccompanied children facing removal proceedings in Arizona.

5. At the Florence Project, I work on the Border Action Team. Since 2017, the Florence Project has worked in partnership with the Kino Border Initiative (KBI) by creating the Border Action Team to provide legal services to migrants at KBI's Aid Center for Migrants located in Nogales, Sonora, Mexico. The Border Action Team also works in close collaboration with other local legal services, humanitarian, and community organizations to support migrants in Sonora, Mexico or detained in the state of Arizona. In this capacity, I have provided Know Your Rights orientations, intakes, referrals, asylum application assistance, support with humanitarian parole, and direct representation, among other services, to individuals and families subject to various border policies, including the "Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists" issued by the Centers for Disease Control and Prevention (CDC), commonly referred to as "Title 42."[1]

**Background**

6. The Title 42 expulsion policy has closed the US border to nearly all asylum seekers since March 20, 2021, with the exception of unaccompanied minors. Recently, while Title 42 has been in effect, two possible exception systems emerged: the

---

[1] https://www.cdc.gov/coronavirus/downloads/10.13.2020-CDC-Order-Prohibiting-Introduction-of-Persons-FINAL-ALL-CLEAR-encrypted.pdf

exemption process in this litigation ("the exemption process") and the Consortium process. While there are some distinctions between the two processes, they both largely functioned by having legal service providers and other non-profit organizations refer particularly vulnerable families and/or individuals to the government to be considered as an exception to Title 42. Once approved, the families and individuals were scheduled for dates and times to present at designated ports of entry along the border, and were processed into the U.S. by immigration authorities and placed in Title 8 removal proceedings. Depending on the details of the particular case, many were paroled directly from the port of entry, but others were referred to Immigration and Customs Enforcement (ICE), which then determined whether to place the individual in detention or in an alternatives to detention program, such as the use of GPS monitoring devices.

7. The Florence Project made at least 719 referrals for families and individuals to be excepted from Title 42 through both processes. In total, FIRRP referred at least 2,107 persons through these processes. As of August 9, 2021, 127 referrals (about 374 persons) remain pending – meaning these individuals await a call from the local Consortium partner, COVID testing, and a scheduled date to enter into the U.S.

**COVID-19 positivity rates for migrant families crossing into Arizona are extremely low**

8. Initially, particularly vulnerable families and individuals referred through the exemption process in this litigation were not required to receive COVID-19 testing in Mexico prior to presenting at the Nogales POE. However, all persons who were referred through the exemption process and presented at the Nogales POE prior to June 7, 2021 were released from the port and then transported to shelters in Tucson, AZ, where they were tested promptly upon arrival. There was quarantine space available for those who tested positive.

9. In early June 2021 the U.S. government abruptly changed the COVID policy for the exemption process: all individuals ages six years or older who were referred through the exemption process were required to be COVID tested in Mexico prior to presenting at the designated ports of entry, and should anyone test positive, the entire family would be required to quarantine in Mexico.

10. **Of the 137 persons referred through the exemption process who were required to undergo testing for COVID-19 in Nogales, Sonora, Mexico, only one individual tested positive for COVID-19. This is a 0.72% COVID-19 positivity rate amongst the exemption clients for whom we were forced to coordinate testing and received access to their COVID test results.**

11. The Nogales U.S. Port of Entry does not provide COVID-19 testing, vaccines, or quarantine space to any non-citizens who are referred for exceptions to Title 42. The local humanitarian partners in Mexico, with support from partners in Arizona, were forced to assume those costs and responsibilities through the exemption and Consortium processes.

**CBP has additional processing capacity in the Tucson Sector**

12. The Tucson Sector of Customs and Border Patrol (CBP) covers most of the state of Arizona, from the New Mexico State line to the Yuma County line, an area covering a total of 262 border miles.[2] There are nine (9) ports of entry – organized into eight (8) CBP stations – in the Tucson region. The ports of entry are (from west to east): San Luis, Yuma, Lukeville, Sasabe, Nogales (there are three within Nogales – Mariposa, DeConcini, and Morely Gate), Naco, and Douglas.  However, CBP only processes asylum seekers excepted from Title 42 at the DeConcini POE.

13. From the end of March 2021 until the last day of May 2021, the Nogales POE refused to process any more than ten (10) persons per day. The stated reason was that the Nogales POE did not have the staff capacity to process any more persons per day. This is despite reports that the government had instructed ports to increase capacity to process 50 persons per day if necessary. Moreover, the alleged lack of staff capacity was also contrary to what the Florence Project staff witnessed on a regular basis in April and May 2021. The Florence Project staff crossed the border at least once per day for months during Title 42, and we frequently saw one or more CBP officers sitting idly at desks at either the DeConcini Port of Entry or the Mariposa Land Port of Entry in Nogales.

14. From May 31, 2021 through early July 2021, the Nogales POE was processing 30 persons per day in total, Monday through Friday, with a few exceptionally urgent cases being processed on Saturdays. Beginning July 12, 2021, Nogales POE again increased its capacity and began to allow for 40 persons per day to present for processing. Beginning in early August, the Nogales POE agreed to expand processing capacity even further to 50 persons per day.

15. The Florence Project and other legal and humanitarian service providers have repeatedly requested that the other ports of entry process asylum seekers through the exemption or Consortium processes, as there are hundreds of displaced persons in more remote parts of the border, in particular Lukeville and San Luis ports of entry, as hundreds of our remote clients are displaced in Sonoyta, Sonora and San Luis Rio Colorado, Sonora. Repeatedly, CBP has refused to do so.

16. The government's refusal to process particularly vulnerable families at remote ports of entry has dire consequences for displaced migrants. In late July 2021, cartel violence began to escalate even more in Sonora. Many of the highways that migrants displaced in other parts of Sonora would need to take in order to travel to Nogales, Sonora for processing would place the families we represent directly in the path of the cartel fighting.

**Dangers for expelled families**
17. Migrant families expelled under Title 42 to Sonora face extreme danger and live in precarity. Few have access to safe housing, medical care, or work to support themselves. They face kidnapping, rape, extortion, and other violence on a regular basis.

---

[2] https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/tucson-sector-arizona

18. For example, in the spring of 2021, the Florence Project represented a young woman who was kidnapped in Mexico, held hostage for weeks, repeatedly raped, and then abandoned in the United States near Phoenix. Though Border Patrol did take her to the hospital on account of her obvious injuries and trauma, she nonetheless was expelled to Mexico under Title 42, where she was at risk of being re-trafficked.

19. In mid-February 2021, the Florence Project provided a remote consultation to a single-mother in Sasabe, Sonora, Mexico. On or about March 31, 2021, the mother attempted suicide in Sasabe, Mexico due to the extreme stress and desperate circumstances without access to security. Fortunately, the Florence Project was able to work with local volunteers in Sasabe to get to the mother before she died, and the local volunteers stayed with her for her own protection and that of her daughter. However, she and her daughter continued to suffer, given that the single mother could not access any mental health treatment in Mexico, and did not have any of her medications. The mother's mental health began to deteriorate even further when the organized crime groups that control Sasabe discovered the mother and her daughter had reentered the city without paying the bribes or extortion fee that many displaced migrants are subjected to. Someone told the mother that the organized crime boss "was coming back soon, and would be by to see her," indicating a threat to the mother and her daughter's physical safety.

20. The Title 42 expulsion process also pushes asylum seekers, including those facing imminent danger, to attempt risky border crossings, resulting in deaths and serious injuries, and makes expelled people more vulnerable to attack.

21. I represented a gay man from El Salvador who U.S. immigration officials separated from his partner under Title 42. This young man fled El Salvador in late January 2020 due to persecution by gangs on the basis of his sexual orientation and family ties. My client met his partner, who was fleeing persecution in Cuba, in Tapachula in February 2020. My client and his partner were regularly taunted for being gay. Around August or September 2020, neighbors broke into the home my client and his partner shared and robbed them. After moving to Nogales in October 2020, my client and his partner were constantly taunted for being gay by a group of men who regularly hung out outside a convenience store located near their home. In February 2021, the same group of men donned ski masks and chased after my client, who narrowly escaped into a nearby taxi. The taxi driver told my client that those men were involved with a cartel and very dangerous. On or about February 14, 2021, in desperation after all they had endured, my client and his partner crossed the U.S.-Mexico border in order to present themselves to Border Patrol agents and request asylum. To their horror, my client and his partner were separated when they tried to present their asylum claim at the border. They were told by CBP that only my client's partner, a Cuban migrant, would be processed into the U.S. and detained, and that my client, a Salvadoran man, would be expelled back across the border under Title 42. After being separated from his partner, my client lived alone in Nogales and took steps to protect himself by minimizing in every way how much time he spent in public view. My client's neighbor, a retired woman, helped run his errands so that he need not be out in public more than necessary, and she also accompanied him if he needed to attend a meeting or tend to an errand in person.

22. Florence Project staff also represented a young woman in her third trimester of pregnancy who fled Guatemala primarily as a result of gender-based violence. Her partner would beat her, and during her pregnancy it worsened. In one instance, he attempted to abort her pregnancy by beating her. He told her he would hurt her if she went to the police and she was afraid he would follow her and threaten her wherever she might hide. She fled Guatemala to seek asylum in the United States. Unfortunately, she was also persecuted in Mexico. On around April 15, 2021 she was kidnapped and held captive by a group of armed traffickers. She was held for ten days, and during her captivity she did not receive adequate food and was threatened, even though she was pregnant. On around April 25, 2021 she escaped with other kidnapped migrants. The traffickers chased them in vans, but they were able to escape into the United States. When she was located in the desert, Border Patrol took her to the Banner Hospital in Tucson, AZ. She was 38 weeks pregnant and was put on an IV. At the time, she had a contraction, but the doctors told her it was due to the stress. She was put on an IV and her vitals stabilized. She was also told she had a urinary and a vaginal infection. However, she was returned to Mexico under Title 42, despite her late-term pregnancy and medical issues, and attempted intervention by Florence Project legal advocates who had already filed G-28s in her case to inform Border Patrol and other DHS officials that they represented the young woman. She was forced to attend a fear-based screening alone, even though she had counsel. She failed the USCIS screening despite detailing her kidnapping at the border and despite providing the names of some of her kidnappers that she had overheard while restrained. Without informing counsel, CBP expelled the young woman to Nogales, Sonora via the DeConcini Port of Entry in Nogales, Arizona on April 28, 2021, with no resources and no place to stay. She indicated that Border Patrol confiscated her medical release documents before removing her to Mexico. Pregnant, medically vulnerable, and alone, this young woman was only able to reconnect with the Florence Project after a random benefactor took pity and took her in for the night. She was then driven to the KBI Migrant Aid Center, where she received humanitarian services and had a legal intake with the Border Action Team. The young woman gave birth days after being expelled. On May 8, 2021, she and her infant were processed into the U.S., however the infant immediately had to seek medical attention within days of entering the U.S. and nearly died, due to the circumstances of his birth.

23. The U.S. government's failure to timely process migrants, to process migrants at all ports of entry, or to timely end Title 42 continues to expose thousands of migrants to extreme danger at the hands of cartels or other persecutors in Mexico.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 10, 2021 at Tucson, Arizona.

_____
Chelsea Sachau