**DECLARATION OF AARON REICHLIN-MELNICK**

I, Aaron Reichlin-Melnick, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

## <u>Summary</u>

1.    I submit this declaration to make two principal points in response to the government's argument that an injunction of Title 42 expulsions for family unit members would strain CBP's ability to safely process asylum seeking families at the border. First, while the government points to a high number of overall "encounters" with undocumented noncitizens at the border, that figure is misleading. Title 42 has perversely led to a high level of "recidivism"—individuals attempting to cross the border (and seek safety in the United States) more than once, and often many times. Thus Title 42, far from reducing border "encounters," has in fact increased the number of border encounters, and thus the number of times CBP officials must interact with families and other noncitizens.

2.    Second, it is important to place the number of individuals potentially impacted by an injunction in this case in context. The number of people entering the United States lawfully at land ports of entry, such as U.S. citizens and permanent residents traveling for pleasure, truck drivers, students, and people attending business meetings, is vastly larger than the number of family unit members apprehended and currently subject to Title 42. Indeed, family unit members who are subjected to Title 42 in June 2021 represented roughly 0.1% of the number of individuals who entered the United States from Mexico through a land port of entry. Yet while that vastly larger set of individuals is subject to no testing or other COVID screening, the

government claims the relatively tiny set of families must be expelled in the name of public health.

## Qualifications

3.    I am a Policy Counsel at the American Immigration Council ("Immigration Council"), a nonprofit and non-partisan organization whose mission includes the use of facts to educate the public on the important and enduring contributions that immigrants make to America. At the Immigration Council, I track and analyze immigration-related statistics produced by the Department of Homeland Security ("DHS"), data on border crossings produced by the Department of Transportation ("DOT"), and any other available data on border processing produced by reputable sources.

4.    I have previously submitted declarations analyzing government-produced immigration statistics in *East Bay Sanctuary Covenant v. Barr*, 4:19-cv-04073-JST (N.D. Cal. filed July 16, 2019), *Innovation Law Lab v. McAleenan*, 3:19-cv-00807-RS (N.D. Cal. filed Feb. 14, 2019), and *Padilla v. ICE*, No. 2:18-cv-00928-MJP (W.D. Wash. filed June 25, 2018).

5.    In my role as policy counsel, I have extensively studied the impact of the novel coronavirus SARS-CoV-2 ("COVID-19") on the United States' immigration system. I have also extensively studied the current humanitarian processing challenges occurring at the U.S.-Mexico border.

6.    On April 27, 2021, I testified as an expert on border trends in front of the House Homeland Security Subcommittee on Border Security, Facilitation, and Operations at a hearing entitled Unaccompanied Children at the Border: Stakeholder Perspectives on the Way Forward.

7.    In preparation for this declaration I reviewed Defendants' declarations, the Centers for Disease Control and Prevention ("CDC") Title 42 Orders, public statistics on entries into the United States that are published by U.S. Customs and Border Protection ("CBP") and DOT, as

well as public information from the CDC on COVID-19 screening and quarantine protocols for individuals who enter the United States through a port of entry or who enter irregularly between ports of entry. I have also reviewed all available data on Title 42 and its effect on individuals entering between ports of entry, as well as extensive public news reporting on the current status of testing and quarantine protocols in use by nongovernmental organizations which are assisting families released by CBP.

### Title 42 Artificially Inflates The Total Number Of Border "Encounters"

8.    In opposing an injunction in this case, DHS repeatedly points to the number of "border encounters." Decl. of David Shahoulian ¶ 19. DHS argues that because of these high encounter rates, the Court should not enjoin Title 42 as applied to families.

9.    The statistics on which DHS is relying—rates of "encounters"—are misleading, however, because Title 42 itself has artificially inflated the number of "encounters" as compared to the actual number of *people* seeking to cross the border and find protection in the United States. That is because when a person attempts to cross multiple times—sometimes 3, 5, 10, or more—each time they are apprehended is counted as a new "encounter." And Title 42 has dramatically increased how often people try to cross the border multiple times—as CBP officials have themselves admitted.

10.   For over a decade, CBP has tracked the "recidivism rate" of individuals encountered at the southwest border, meaning the percent of those individuals apprehended at the border who have previously been apprehended. The agency calculates this rate by dividing the number of "unique individuals" who have been apprehended more than once at the border during a 12-month period by the total number of "unique individuals" apprehended over that same period. *See* Carla N. Argueta, *Border Security Metrics Between Ports of Entry*, Congressional Research Service, Feb.

16, 2016, at 7. The statistics refer to "unique individuals" because a single "unique individual" may be encountered multiple times. For example, if 100 unique individuals were encountered, and two of them had been encountered more than once in the past 12 months, the recidivism rate would be 2 percent.

11.   From 2007 through 2019, recidivism rates fell steadily. But under Title 42, the recidivism rate rose from 6.7 percent in Fiscal Year 2019[1] to 24.9% in Fiscal Year 2020. *See* Customs and Border Protection, *U.S. Customs and Border Protection Budget Overview: Fiscal Year 2022 Congressional Justification* (2021), at CBP – 2. The recidivism rate has risen even further since, increasing to 40% for Fiscal Year 2021 through May 2021 (see Figure 1).

**Figure 1: Border Recidivism Rate, Fiscal Year 2005 to FY 2021 (through May)[2]**



12.   That increase makes sense: After Title 42 went into effect, the overwhelming majority of undocumented Guatemalans, Hondurans, Salvadorans, and Mexicans who crossed the border were expelled under Title 42 were sent back to Mexico without a deportation order or an

---

[1] The federal government's fiscal year runs from October 1 through September 30, so Fiscal Year 2021 began on October 1, 2020.
[2] *See* U.S. Customs and Border Protection, Congressional Budget Justifications, FY 2008-2022; data for Fiscal Year 2021 through May on file with author.

opportunity to access to the asylum process. As a result, the rate at which people crossed the border multiple times began to increase, as desperate individuals sought to cross repeatedly.

13.   High recidivism rates since Title 42 went into place have led to a significant inflation of the overall count of encounters compared to previous years. For example, during the first nine months of Fiscal Year 2019, CBP recorded 780,479 encounters, of which 721,328 were unique encounters of people who had not been encountered in the previous 12 months. During the first nine months of Fiscal Year 2021, CBP recorded 1,119,204 encounters, of which 690,718 were unique encounters—30,610 *fewer* unique encounters than in Fiscal Year 2019 despite 338,725 *more* overall encounters.

14.   The increased recidivism rate is new for family units, who have in previous years shown very low rates of recidivism. For example, through the first nine months of Fiscal Year 2019 the recidivism rate for members of family units was just 1.5% (6,354 out of 421,428 unique individuals encountered). By comparison, through the first nine months of Fiscal Year 2021, the recidivism rate for family units has grown to 16.8% (35,231 out of 209,862 unique individuals encountered). Reports by advocates along the border indicate that the true rate may be even higher. After a first failed attempt as a family, some families are breaking up to try to reenter as single adults and unaccompanied children, in the hope that the children at least will be exempted from Title 42 and the adults can take a shot at crossing on their own.

15.   CBP has formally acknowledged the link between Title 42 and an increased recidivism rate. *See* Customs and Border Protection, *U.S. Customs and Border Protection Budget Overview: Fiscal Year 2022 Congressional Justification* (2021), at CBP – 2. As the agency explained: "[I]ncluding persons encountered by Border Patrol and expelled under Title 42 authority has substantially increased the number of persons counted by this [recidivism rate] measure." *Id.*

16.   DHS's reliance on levels of encounters thus overstates the true level of migration, a fact which CBP has also acknowledged. "The large number of expulsions during the pandemic has contributed to a larger-than-usual number of noncitizens making multiple border crossing attempts, and means total encounters somewhat overstate the number of unique individuals arriving at the border." Customs and Border Protection, *CBP Announces May 2021 Operational Update*, June 9, 2021, https://www.cbp.gov/newsroom/national-media-release/cbp-announces-may-2021-operational-update. In other words, Title 42 has led to an exaggerated measure of the total number of *individuals* coming to the United States by prompting a larger number of *encounters* of the same people attempting to enter over and over.

17.   DHS's declarant suggests that encounters are currently at a "historic" level. Shahoulian Decl. ¶ 20. But as explained, that encounter data is elevated because of Title 42, so the comparison to past years in which that program was not encouraging increased recidivism is comparing apples to oranges.  Furthermore, even apart from the government's failure to properly take into account the high recidivism rate, the declarant himself acknowledges that total encounters have been higher in the past, namely in Fiscal Year 2000.

18.   DHS's declarant also makes comparisons to the very early days of the COVID-19 pandemic, including arguing that family encounters have increased "100-fold" since April 2020. Shahoulian Decl. ¶ 23. But that is misleading as well, as movement around the world cratered during those months and Mexico went into a 70-day lockdown. Thus, using April 2020 as a baseline is fundamentally misleading when other more relevant baselines exist. For example, there were 88,587 encounters of family unit members in May 2019, which is 120 times higher than the April 2020 figure the declarant uses as his baseline—and is notably higher than the July 2021 figures that he cites.

19.   In sum, the evidence indicates that Title 42 has increased the number of encounters at the southern border. And yet DHS is paradoxically using that inflated level of encounters to justify keeping Title 42 in place for families. Indeed, by encouraging repeat crossings, Title 42 may well be exacerbating the public health situation it is supposed to address: Each successive Title 42 "encounter" means an additional time that CBP must interact with a family, rather than just being processed once under ordinary immigration procedures.

### Permitted Entries At Ports Vastly Outnumber Families Subjected To Title 42

20.   Despite some restrictions DHS has imposed on non-essential travel at land ports of entry between the United States and Mexico, millions of individuals are permitted to enter the United States from Mexico every month. Permitted entries include not only all U.S. citizens and lawful permanent residents (traveling for any purpose including tourism), but also any individual travelling to attend school or work in the United States, all individuals "engaged in lawful cross-border trade" such as truck drivers, and any individual travelling for medical treatment in the United States. *See, e.g.,* U.S. Department of Homeland Security, *Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexic*o, 85 Fed. Reg. 22,353 (April 22, 2020).

21.   Since March 2021, more than 10 million people a month have entered the United States from Mexico through a land port of entry. By June 2021, an average of 361,976 people per day were entering the country through land ports of entry along the southwest border. Notably, these restrictions do not include a requirement to present a negative test for COVID-19 nor do they require CBP officials to screen individuals for symptoms of COVID-19.

22.   By contrast, approximately 2,583 individuals in family units are apprehended along the border every day. Shahoulian Decl. ¶ 19. Of those, according to recent government statistics,

currently approximately 86% are being processed into the country and not expelled. The remaining 14% who are expelled represent roughly 362 individuals expelled per day, or the equivalent of 0.1% of the average 361,976 individuals who entered from Mexico at land ports every day in June 2021. Thus, families subject to Title 42 make up a very small number of entries into the United States from Mexico. And unlike those entering the United States through ports of entry, in nearly all cases, families released by CBP and permitted to travel further into the United States are not only tested for COVID-19 but also given quarantine space if necessary—albeit generally by nonprofit organizations or local government agencies rather than the federal government.

EXECUTED this ____10th____ day of August, 2021.

_____/s/ Aaron Reichlin-Melnick_____
                AARON REICHLIN-MELNICK