UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al., <br><br> Defendants. | Civ. A. No. 21-100 (EGS) |

## <u>NOTICE OF CDC PUBLIC HEALTH DETERMINATION AND ORDER</u>

Defendants in the above-captioned action, by and through undersigned counsel, file this Notice of CDC Public Health Determination and Order to advise the Court that the Centers for Disease Control and Prevention ("CDC"), a component of the U.S. Department of Health and Human Services ("HHS"), issued on April 1, 2022, a Public Health Determination and Order Regarding the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists ("April 2022 Order").  *See* Attachment A.  The April 2022 Order terminates the Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists ("August 2021 Order"), and all related prior orders, and the termination will be implemented on May 23, 2022.

Pursuant to the Court's Minute Order of March 29, 2022, the parties have been directed to submit a joint status report with a recommendation for further proceedings by April 7, 2022.

Dated:  April 1, 2022

Respectfully submitted,

MATTHEW M. GRAVES
D.C. Bar. #481052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

  /s/ Sean M. Tepe
SEAN M. TEPE, DC Bar #1001323
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2533
Email: sean.tepe@usdoj.gov

*Counsel for Defendants*

# ATTACHMENT A

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC)**

**ORDER UNDER SECTIONS 362 & 365 OF THE PUBLIC HEALTH SERVICE ACT
(42 U.S.C. §§ 265, 268) and 42 C.F.R. § 71.40**

**PUBLIC HEALTH DETERMINATION
AND
ORDER REGARDING THE RIGHT TO INTRODUCE CERTAIN PERSONS FROM
COUNTRIES WHERE A QUARANTINABLE COMMUNICABLE DISEASE EXISTS**

## Executive Summary

The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), is hereby issuing this Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists (Public Health Determination and Termination). This Public Health Determination and Termination terminates the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on August 2, 2021 (August Order),[1] and all related prior orders issued pursuant to the authorities in sections 362 and 365 of the Public Health Service (PHS) Act (42 U.S.C. §§ 265, 268) and the implementing regulation at 42 C.F.R. § 71.40 (CDC Orders);[2] this Termination will be implemented on May 23, 2022. The August Order continued a suspension of the right to introduce "covered noncitizens," as defined in the Order,[3] into the United States along the U.S. land and adjacent coastal borders.[4] The August Order states that CDC will reassess at least every 60 days whether the Order remains necessary to protect the public health. Based on the public health landscape, the current status of the COVID-19 pandemic, and the procedures in place for the processing of covered noncitizens, taking into account the inherent risks of transmission of SARS-CoV-2 in congregate settings, CDC has determined that a suspension of the right to introduce such covered noncitizens is no longer necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States. This Termination will be implemented on May 23, 2022, to enable the Department of Homeland Security (DHS) to implement appropriate COVID-19 mitigation protocols, such as scaling up a program to provide COVID-19 vaccinations to

---

[1] Available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf (last visited Mar. 7, 2022); *see also* 86 Fed. Reg. 42828 (Aug. 5, 2021).
[2] "CDC Orders" issued under these legal authorities are found at 85 Fed. Reg. 17060 (Mar. 26, 2020), 85 Fed. Reg. 22424 (Apr. 22, 2020), 85 Fed. Reg. 31503 (May 26, 2020), 85 Fed. Reg. 65806 (Oct. 16, 2020), and 86 Fed. Reg. 42828 (Aug. 5, 2021) (fully incorporating by reference 86 Fed. Reg. 38717 (July 22, 2021), see 86 Fed. Reg. 42828, 42829 at note 3).
[3] *See infra* I.
[4] The August Order specifically excepted unaccompanied noncitizen children (UC) and incorporated an exception for UC issued by CDC on July 16, 2021 (July Exception). Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf (July 16, 2021); 86 Fed. Reg. 38717 (July 22, 2021); *see* 86 Fed. Reg. 42828, 42829 at note 1 (Aug. 5, 2021) (which fully incorporated by reference the July Exception relating to UC). On March 11, 2022, CDC fully terminated the August Order and all prior orders issued under the same authorities with respect to UC. *See* https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren-update.pdf.

migrants, and prepare for full resumption of regular migration processing under Title 8 authorities. Until that date, it is CDC's expectation that DHS will continue to apply exceptions outlined in the August Order to covered noncitizens as appropriate, including the exception based on the totality of an individual's circumstances on a case-by-case basis.

**<u>Outline of Determination and Order</u>**

I.   Background

    A.  Evolution of the COVID-19 Pandemic and the U.S. Government Response

        1.  First Wave – January to June 2020

        2.  Second Wave – June to August 2020

        3.  Third Wave – Alpha Variant – September 2020 to May 2021

        4.  Fourth Wave – Delta Variant – June to October 2021

        5.  Fifth Wave – Omicron Variant – November 2021 to March 2022

    B.  Current Status of the COVID-19 Pandemic

        1.  Community Levels

        2.  Healthcare Systems and Resources

        3.  Mitigation Measures

            a.   Test Availability

            b.   Vaccines and Boosters

            c.   Treatments

        4.  Congregate Settings

        5.  DHS Mitigation Measures

II.  Public Health Determination

III. Legal Considerations

    A.  Temporary Nature of Orders under 42 U.S.C. § 265 and Absence of Reliance Interests

    B.  Basis for Termination under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40

IV. Issuance and Implementation

    A.  Implementation of this Termination

    B.  APA Review

## I.     Background

Coronavirus disease 2019 (COVID-19) is a quarantinable communicable disease[5] caused by the SARS-CoV-2 virus. As part of U.S. government efforts to mitigate the introduction, transmission, and spread of COVID-19, CDC issued the August Order,[6] replacing a prior order issued on October 13, 2020 (October Order) which continued a series of orders issued pursuant to 42 U.S.C. §§ 265, 268 and the implementing regulation at 42 C.F.R. § 71.40,[7] suspending the right to introduce[8] certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID-19.[9] The August Order applied specifically to "covered noncitizens," defined as "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station[10] at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE."[11]

Three groups typically make up covered noncitizens—single adults (SA),[12] individuals in family units (FMU),[13] and unaccompanied noncitizen children (UC).[14] UC were specifically excepted from the

---

[5] Quarantinable communicable diseases are any of the communicable diseases listed in Executive Order 13295, as provided under § 361 of the Public Health Service Act (42 U.S.C. § 264), 42 C.F.R. § 71.1. The list of quarantinable communicable diseases currently includes cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow fever, viral hemorrhagic fevers (Lassa, Marburg, Ebola, Crimean-Congo, South American, and others not yet isolated or named), severe acute respiratory syndromes (including Middle East Respiratory Syndrome and COVID-19), influenza caused by novel or reemergent influenza viruses that are causing, or have the potential to cause, a pandemic, and others. See Exec. Order 13295, 68 Fed. Reg. 17255 (Apr. 4, 2003), as amended by Exec. Order 13375, 70 Fed. Reg. 17299 (Apr. 1, 2005) and Exec. Order 13674, 79 Fed. Reg. 45671 (July 31, 2014), 86 Fed. Reg. 52591 (Sep. 22, 2021).

[6] See supra note 1.

[7] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order), which was subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503 (May 26, 2020).

[8] Suspension of the right to introduce means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 C.F.R. § 71.40(b)(5).

[9] See supra note 2.

[10] POE and U.S. Border Patrol stations are operated by U.S. Customs and Border Protection (CBP), an agency within Department of Homeland Security (DHS).

[11] 86 Fed. Reg. 42828, 42841.

[12] A single adult (SA) is any noncitizen adult 18 years or older who is not an individual in a "family unit." 86 Fed. Reg. 42828, 42830 at note 13.

[13] An individual in a family unit (FMU) includes any individual in a group of two or more noncitizens consisting of a minor or minors accompanied by their adult parent(s) or legal guardian(s). Id. at note 14.

[14] CDC understands UC to be a class of individuals similar to or the same as those individuals who would be considered "unaccompanied alien children" (see 6 U.S.C. § 279) for purposes of HHS Office of Refugee Resettlement custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code. 86 Fed. Reg. 38717, 38718 at note 4.

August Order[15] based on its explicit incorporation by reference of CDC's July Exception of UC.[16] On March 11, 2022, CDC fully terminated the August Order and all previous orders issued under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 with respect to UC. This termination with respect to UC was based on a thorough determination of the current status of the COVID-19 pandemic as well as an analysis of the specific care available to UC[17] and the absence of legitimate countervailing reliance interests, and was prioritized ahead of CDC's reassessment for SA and FMU in light of the entry of a preliminary injunction by the U.S. District Court for the Northern District of Texas that was to go into effect on March 11, 2022, enjoining CDC from excepting UC from the August Order based solely on their status as UC.[18]

The CDC Orders issued under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 were intended to reduce the risk of COVID-19 introduction, transmission, and spread at POE and U.S. Border Patrol stations by significantly reducing the number and density of covered noncitizens held in these congregate settings, thereby reducing risks to U.S. citizens, U.S. nationals, lawful permanent residents, DHS and U.S. Customs and Border Protection (CBP) personnel and noncitizens at the facilities, and local healthcare systems. The measures included in the CDC Orders were deemed necessary for the protection of public health.

In the August Order, CDC committed to reassessing the public health circumstances necessitating the Order at least every 60 days by reviewing the latest information regarding the status of the COVID-19 public health emergency and associated public health risks, including migration patterns, sanitation concerns, and any improvement or deterioration of conditions at the U.S. borders.[19] CDC conducted its most recent reassessment on January 28, 2022; in addition, a reassessment specific to UC was completed on March 11, 2022. The instant Public Health Determination and Termination considers the current status of the pandemic, including the receding numbers of COVID-19 cases, hospitalizations, and deaths most recently related to the Omicron variant, and constitutes the reassessment concluding on March 30, 2022. This Determination and Termination also reflects the recent issuance of CDC's COVID-19 Community Levels framework.[20] Additionally, the National COVID-19 Preparedness Plan was recently updated to provide a roadmap to help the nation continue fighting COVID-19, while also allowing resumption of more normal routines.[21]

Based on the analysis below, the CDC Director finds that, pursuant to 42 U.S.C. § 265 and 42 C.F.R. § 71.40, there is no longer a serious danger that the entry of covered noncitizens, as defined by

---

[15] 86 Fed. Reg. 42828, 42829 at note 3.

[16] *See supra* note 4.

[17] While SA, FMU, and UC are all processed by U.S. Customs and Border Protection (CBP), a component of DHS, following that initial intake, UC are referred to HHS' Office of Refugee Resettlement (ORR) for care. *See* 86 Fed. Reg. 42828, 42835-37 (describing the processing of noncitizen SA and FMU by DHS components, CBP and Immigration and Customs Enforcement (ICE), under both regular Title 8 immigration and under an order pursuant to 42 U.S.C. § 265). At both the CBP and ORR stages, UC receive special attention. This care and the distinct immigration processing available to UC compared to SA and FMU provided the basis for the exception of UC in the July Exception and the August Order. *See* 86 Fed. Reg. 42828, 42835-37 (describing the processing of noncitizen SA and FMU by DHS components, CBP and ICE, under both regular Title 8 immigration and under an order pursuant to 42 U.S.C. § 265); *see also* 87 Fed. Reg. 15243, 15246-47 (Mar. 17, 2022) (describing the different COVID-19 mitigation measures applied where UC are processed).

[18] *Texas v. Biden*, No. 4:21-cv-0579-P, 2022 WL 658579, at *16-18 (N.D. Tex. Mar. 4, 2022).

[19] 86 Fed. Reg. 42828, 42841.

[20] *COVID-19 Community Levels*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html (updated Mar. 24, 2022); *see infra* I.B.1.

[21] *National COVID-19 Preparedness Plan – March 2022*, available at https://www.whitehouse.gov/wp-content/uploads/2022/03/NAT-COVID-19-PREPAREDNESS-PLAN.pdf (last visited Mar. 30, 2022).

the August Order, into the United States will result in the introduction, transmission, and spread of COVID-19 and that a suspension of the introduction of covered noncitizens is no longer required in the interest of public health. While the introduction, transmission, and spread of COVID-19 into the United States is likely to continue to some degree, the cross-border spread of COVID-19 due to covered noncitizens does not present the serious danger to public health that it once did, given the range of mitigation measures now available. CDC continues to stress the need for robust COVID-19 mitigation measures at the border, including vaccination and continued masking in congregate settings. CDC has determined that the extraordinary measure of an order under 42 U.S.C. § 265 is no longer necessary, particularly in light of less burdensome measures that are now available to mitigate the introduction, transmission, and spread of COVID-19. Therefore, as described below, CDC is terminating the August Order and all related prior orders issued pursuant to 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40. This Termination will be implemented on May 23, 2022, to enable DHS to implement appropriate COVID-19 protocols, such as scaling up a program to offer COVID-19 vaccinations to migrants, and prepare for full resumption of regular migration under Title 8 authorities.

### A.    Evolution of the COVID-19 Pandemic and the U.S. Government Response

Since late 2019, SARS-CoV-2, the virus that causes COVID-19, has spread throughout the world, resulting in a pandemic. As of March 30, 2022, there have been over 480 million confirmed cases of COVID-19 globally, resulting in over six million deaths.[22] The United States has reported over 79 million cases resulting in over 975,000 deaths due to the disease[23] and is currently averaging around 26,000 new cases of COVID-19 a day as of March 28, 2022.[24]

The U.S. government response to the COVID-19 pandemic has focused on taking actions and providing guidance based on the best available scientific information. The United States has experienced five waves of the pandemic, each with its own unique epidemiologic characteristics.[25] As the waves of COVID-19 cases have surged and ebbed, so too have actions taken in response to the pandemic. Earlier phases of the pandemic required extraordinary actions by the U.S. government and society at large. However, epidemiologic data, scientific knowledge, and the availability of public health mitigation measures, vaccines, and therapeutics have permitted many of those early actions to be relaxed in favor of more nuanced, targeted, and narrowly tailored guidance that provides a less burdensome means of preventing and controlling the SARS-CoV-2 virus and COVID-19. Of note for this Determination are the multiple travel- and migration-related measures taken by the U.S. government in each phase.

### 1.    First Wave – January to June 2020

SARS-CoV-2 was first identified as the cause of an outbreak of respiratory illness that began in Wuhan, Hubei Province, People's Republic of China.[26] The United States reported its first COVID-19

---

[22] *Coronavirus disease (COVID-19) pandemic*, World Health Organization, https://covid19.who.int/ (last visited Mar. 30, 2022).

[23] *COVID Data Tracker*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Mar. 30, 2022).

[24] *See Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#trends_dailycases, noting a seven-day moving average of 26,190 cases on March 28, 2022.

[25] *Supra* note 21.

[26] Patel A, Jernigan DB. *Initial Public Health Response and Interim Clinical Guidance for the 2019 Novel Coronavirus Outbreak — United States, December 31, 2019–February 4, 2020*. MMWR Morb Mortal Wkly Rep 2020;69:140–146. DOI: http://dx.doi.org/10.15585/mmwr.mm6905e1.

case on January 21, 2020,[27] and the HHS Secretary declared COVID-19 a public health emergency on January 31, 2020.[28] Community transmission was detected in the United States in February 2020.[29] COVID-19 cases initially spread in a small number of U.S. metropolitan areas, most notably in New York City and surrounding areas.[30] The resulting first wave of the pandemic peaked in the United States on April 7, 2020, with two million cases (3% of cumulative cases) and over 127,000 deaths (13% of cumulative deaths).[31] During this period, public health officials monitored the situation closely and began instituting community-level nonpharmaceutical interventions such as school closures and physical distancing, in addition to promoting respiratory and hand hygiene practices.[32] Vaccines and approved therapeutics were not available during this time.[33]

As public health officials learned more about the epidemiology of SARS-CoV-2, the U.S. government, state and local health departments, and other partners implemented aggressive measures to slow transmission of the virus in the United States.[34] Many of the mitigation actions taken by the U.S. government during this wave involved travel and migration. The President issued a series of actions limiting entry into the United States, including proclamations suspending entry into the country of immigrants or nonimmigrants who were physically present within certain countries during the 14-day period preceding their entry or attempted entry,[35] and Canada and Mexico joined the United States in temporarily restricting travelers across land borders for non-essential purposes.[36] CDC began screening travelers from certain countries at airports and issued several travel health notices[37] and, following a series of COVID-19 outbreaks on cruise ships, issued a No Sail Order and Suspension of Further Embarkation.[38]

---

[27] *Id.*

[28] *Determination that a Public Health Emergency Exists*, U.S. Department of Health and Human Services (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (last visited Mar. 30, 2022).

[29] *Geographic Differences in COVID-19 Cases, Deaths, and Incidence — United States, February 12–April 7, 2020*. MMWR Morb Mortal Wkly Rep 2020;69:465–471. DOI: http://dx.doi.org/10.15585/mmwr.mm6915e4.

[30] *Id.*

[31] *Case notifications from state, local and territorial public health jurisdictions*, Centers for Disease Control and Prevention, https://data.cdc.gov/Case-Surveillance/COVID-19-Case-Surveillance-Public-Use-Data/vbim-akqf, (last accessed Mar. 30, 2022); *Provisional COVID-19 Death Counts by Week Ending Date and State*, Centers for Disease Control and Prevention, https://data.cdc.gov/NCHS/Provisional-COVID-19-Death-Counts-by-Week-Ending-D/r8kw-7aab (last accessed Mar. 30, 2022); *COVID-19 Reported Patient Impact and Hospital Capacity by State Timeseries*, Unified Hospital Analytic, https://healthdata.gov/Hospital/COVID-19-Reported-Patient-Impact-and-Hospital-Capa/g62h-syeh (last accessed Mar. 30, 2022).

[32] Jernigan DB. *Update: Public Health Response to the Coronavirus Disease 2019 Outbreak — United States, February 24, 2020*. MMWR Morb Mortal Wkly Rep 2020;69:216–219. DOI: http://dx.doi.org/10.15585/mmwr.mm6908e1.

[33] *Id.*

[34] *See supra* note 26.

[35] *See* Proclamation 9984 (Jan. 31, 2020), 85 Fed. Reg. 6709 (Feb. 5, 2020) (regarding the People's Republic of China); Proclamation 9992 (Feb. 28, 2020), 85 Fed. Reg. 12855 (Mar. 4, 2020) (regarding the Republic of Iran); Proclamation 9993 (Mar. 11, 2020), 85 Fed. Reg. 15045 (Mar. 16, 2020) (regarding the Schengen Area of Europe); Proclamation 9996 (Mar. 14, 2020), 85 Fed. Reg. 15341 (Mar. 18, 2020) (regarding the United Kingdom and Republic of Ireland); and Proclamation 10041, as amended by Proclamation 10042 (May 24, 2020), 85 Fed. Reg. 31933 (May 28, 2020) (regarding the Federative Republic of Brazil).

[36] *See* 85 Fed. Reg. 16547 (Mar. 24, 2020); 85 Fed. Reg. 16548 (Mar. 24, 2020).

[37] *Supra* note 32; *see also CDC Advises Travelers to Avoid All Nonessential Travel to China,* Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/s0128-travelers-avoid-china.html (Jan. 28, 2020), advising travelers to avoid all nonessential travel to countries with known viral spread.

[38] 85 Fed. Reg. 16628 (Mar. 24, 2020); extended 85 Fed. Reg. 21004 (Apr. 15, 2020); *see also* Moriarty LF, Plucinski MM, Marston BJ, et al. *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*. MMWR Morb Mortal Wkly Rep 2020;69:347-352. DOI: http://dx.doi.org/10.15585/mmwr.mm6912e3.

It was in the context of this initial wave of the pandemic and travel- and migration-related actions that the CDC Director promulgated an interim final rule at 42 C.F.R. § 71.40 implementing his authority under 42 U.S.C. §§ 265, 268[39] and issued an Order under the interim final rule suspending the introduction of certain "covered aliens" on March 20, 2020 (March Order).[40] The March Order sought to avert the serious danger of the introduction of COVID–19 into the land POEs and Border Patrol stations at or near the United States borders with Canada and Mexico due to encountered noncitizens otherwise being held in the common areas of the facilities and in close proximity to one another as they undergo immigration processing. The March Order applied to SA, FMU, and UC and was subsequently amended and extended in April and May 2020.[41]

## 2.  Second Wave – June to August 2020

During the second wave of the pandemic, from approximately June to August 2020, COVID-19 spread geographically throughout the United States.[42] Case numbers peaked on July 14, 2020, and in total the second wave resulted in approximately 2.6 million COVID-19 cases (4% of cumulative cases) and over 75,000 deaths (4% of cumulative deaths). During the second wave, public health officials and scientists learned more about COVID-19 transmission, including asymptomatic transmission,[43] particularly in congregate, high-density settings, such as meat-packing plants and correctional facilities.[44] The medical community learned more about potential effects of COVID-19 on specific populations, such as pregnant people,[45] the elderly, and immunocompromised people. In July 2020, CDC announced that cloth face coverings (masks) are a critical public health tool in reducing the spread of COVID-19, particularly when used universally within communities.[46] As stay-at-home orders issued during the first wave were lifted, CDC continued to promote broad implementation of masking and face covering requirements.[47] One pivotal marker of the second wave was the creation of Operation Warp

---

[39] See 85 Fed. Reg. 16559 (Mar. 24, 2020).

[40] See 85 Fed. Reg. 17060 (Mar. 26, 2020).

[41] See supra note 7.

[42] Oster AM, Kang GJ, Cha AE, et al. *Trends in Number and Distribution of COVID-19 Hotspot Counties — United States, March 8–July 15, 2020*. MMWR Morb Mortal Wkly Rep 2020;69:1127–1132. DOI: http://dx.doi.org/10.15585/mmwr.mm6933e2.

[43] Payne DC, Smith-Jeffcoat SE, Nowak G, et al. *SARS-CoV-2 Infections and Serologic Responses from a Sample of U.S. Navy Service Members — USS Theodore Roosevelt, April 2020*. MMWR Morb Mortal Wkly Rep 2020;69:714–721. DOI: http://dx.doi.org/10.15585/mmwr.mm6923e4.

[44] Dyal JW, Grant MP, Broadwater K, et al. *COVID-19 Among Workers in Meat and Poultry Processing Facilities ▬ 19 States, April 2020*. MMWR Morb Mortal Wkly Rep 2020;69:557–561. DOI: http://dx.doi.org/10.15585/mmwr.mm6918e3; *see also* Hagan LM, Williams SP, Spaulding AC, et al. *Mass Testing for SARS-CoV-2 in 16 Prisons and Jails — Six Jurisdictions, United States, April–May 2020*. MMWR Morb Mortal Wkly Rep 2020;69:1139–1143. DOI: http://dx.doi.org/10.15585/mmwr.mm6933a3; Njuguna H, Wallace M, Simonson S, et al. *Serial Laboratory Testing for SARS-CoV-2 Infection Among Incarcerated and Detained Persons in a Correctional and Detention Facility — Louisiana, April–May 2020*. MMWR Morb Mortal Wkly Rep 2020;69:836-840. DOI: http://dx.doi.org/10.15585/mmwr.mm6926e2.

[45] Ellington S, Strid P, Tong VT, et al. *Characteristics of Women of Reproductive Age with Laboratory-Confirmed SARS-CoV-2 Infection by Pregnancy Status — United States, January 22–June 7, 2020*. MMWR Morb Mortal Wkly Rep 2020;69:769–775. DOI: http://dx.doi.org/10.15585/mmwr.mm6925a1.

[46] *CDC calls on Americans to wear masks to prevent COVID-19 spread* (press release), Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html (Jul. 14, 2020) (noting the growing body of evidence supporting cloth face coverings as a source control to help prevent the person wearing the mask from spreading COVID-19 to others; the main protection individuals gain from masking occurs when others in their communities also wear face coverings).

[47] Hendrix MJ, Walde C, Findley K, Trotman R. *Absence of Apparent Transmission of SARS-CoV-2 from Two Stylists After Exposure at a Hair Salon with a Universal Face Covering Policy — Springfield, Missouri, May 2020*. MMWR Morb Mortal Wkly Rep 2020;69:930-932. DOI: http://dx.doi.org/10.15585/mmwr.mm6928e2.

Speed, a partnership between the HHS and Department of Defense (DOD) aimed to help accelerate the development of a COVID-19 vaccine.[48]

As concerns about asymptomatic transmission grew and vaccines and therapeutics were still being developed, the U.S. government continued to take steps to protect the public health. CDC extended the No Sail Order and Suspension of Further Embarkation for cruise ships[49] and, as the second wave was being replaced by the third, issued an Order temporarily halting evictions in the United States due to the potential for accelerated transmission in congregate settings such as shelters for displaced persons.[50] The CDC Order under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 issued in March 2020 and amended and extended in April and May 2020, continued to be in place throughout this period.

### 3. Third Wave – Alpha Variant – September 2020 to May 2021

COVID-19 variants, including the B.1.1.7 (Alpha) variant, emerged in the fall of 2020, heralding the third wave of the pandemic[51] and resulting in 22.5 million COVID-19 cases (34% of cumulative cases) and over 398,000 deaths (21% of cumulative deaths) in the United States.[52] The third wave lasted from approximately September 2020 to May 2021 and coincided with the initial availability of vaccines for COVID-19[53] and increased availability of therapeutics.[54] Even as the third wave began to ebb, however, a new variant—B.1.617.2 (Delta)—began circulating in India and other countries.

The U.S. government responded to the Alpha variant and resulting surge in cases with additional travel- and migration-related restrictions, beginning with a requirement for air passengers from the United Kingdom (where the Alpha variant was first identified) to present a negative COVID-19 test

---

[48] *Operation Warp Speed: Accelerated COVID-19 Vaccine Development Status and Efforts to Address Manufacturing Challenges*, Government Accountability Office, https://www.gao.gov/products/gao-21-319 (Feb. 11, 2021).

[49] *See* 85 Fed. Reg. 44085 (July 21, 2020).

[50] *See* 85 Fed. Reg. 55292 (Sept. 4, 2020). The CDC Director subsequently renewed the "eviction moratorium" Order until March 31, 2021 (86 Fed. Reg. 8020 (Feb. 3, 2021)), then modified and extended the Order until June 30, 2021 (86 Fed. Reg. 16731 (Mar. 31, 2021)) and extended the Order until July 31, 2021 (86 Fed. Reg. 34010 (Jun. 28, 2021)). On August 3, 2021, the CDC Director announced a new Order to temporarily halt residential evictions in communities with substantial or high transmission of COVID-19 to prevent the further spread of COVID-19 (86 Fed. Reg. 43244 (Aug. 6, 2021)).

[51] *Science Brief: Emerging SARS-CoV-2 Variants – Updated*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/scientific-brief-emerging-variants.html (updated Jan. 28, 2021).

[52] Per internal CDC calculations.

[53] COVID-19 vaccines were initially available only for those persons with higher risk of COVID-19, such as immunocompromised individuals and healthcare workers, but access was subsequently expanded to the general population aged 16 years and older. The U.S. Food and Drug Administration (FDA) issued emergency use authorizations for three COVID-19 vaccines: two mRNA vaccines (produced by Pfizer-BioNTech and Moderna) and one viral vector vaccine (produced by Johnson & Johnson/Janssen); *see generally* https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#coviddrugs; Dooling K, McClung N, Chamberland M, et al. *The Advisory Committee on Immunization Practices' Interim Recommendation for Allocating Initial Supplies of COVID-19 Vaccine — United States*, 2020. MMWR Morb Mortal Wkly Rep 2020;69:1857-1859. DOI: http://dx.doi.org/10.15585/mmwr.mm6949e1. In May 2021, adolescents 12 to 15 years old became eligible to receive COVID-19 vaccines. Wallace M, Woodworth KR, Gargano JW, et al. *The Advisory Committee on Immunization Practices' Interim Recommendation for Use of Pfizer-BioNTech COVID-19 Vaccine in Adolescents Aged 12–15 Years — United States, May 2021*. MMWR Morb Mortal Wkly Rep 2021;70:749–752. DOI: http://dx.doi.org/10.15585/mmwr.mm7020e1.

[54] U.S. Food and Drug Administration, *Emergency Use Authorization*, https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#coviddrugs (last accessed Mar. 30, 2022).

result before boarding a flight to the United States;[55] CDC subsequently expanded the predeparture testing requirement to air passengers departing to the United States from any foreign country.[56] Due to the inherent risk of transmission of COVID-19 in the travel context,[57] CDC also issued an Order requiring face masks to be worn while on conveyances traveling into, within, or out of the United States and at U.S. transportation hubs.[58] Based on developments with respect to variants and the continued spread of COVID-19, the U.S. government expanded the list of countries from which entry into the United States was limited.[59] CDC also announced a Conditional Sailing Order framework under which cruise ships could resume passenger operations only after meeting stringent public health mitigation measures, such as frequent testing of crew members.[60]

In October 2020, following the promulgation of the Final Rule for 42 C.F.R. § 71.40,[61] CDC published a new Order under 42 U.S.C. §§ 265 and 268 and the regulation suspending the right to introduce certain covered persons into the United States.[62] As with all prior CDC Orders, the October Order applied to "covered aliens," which included certain SA, FMU, and UC seeking entry into the United States without valid travel documents and provided certain exceptions, including a case-by-case exception to be applied by CBP officers with supervisor approval upon a determination that an individual should be excepted from application of the Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. The October Order was the subject of litigation regarding its application to both FMU and UC.[63]

---

[55] *CDC to Require Negative COVID-19 Test for Air Travelers from the United Kingdom to the U.S.*, Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/s1224-CDC-to-require-negative-test.html (Dec. 24, 2020).

[56] *See* 86 Fed. Reg. 7387 (Jan. 26, 2021).

[57] CDC has issued orders and guidance focusing on the "travel context," which encompasses both conveyances and transportation hubs, because these are locations where large numbers of people may gather and physical distancing can be difficult. Furthermore, many people need to take public transportation for their livelihoods. Passengers (including young children) may be unvaccinated and some on board, including personnel operating the conveyances or working at the transportation hub, may have underlying health conditions that cause them to be at increased risk of severe illness (i.e., those who might not be protected by vaccination because of weakened immune systems). Such people may not have the option to disembark or relocate to another area of the conveyance. Transportation hubs are also places where people depart to different geographic locations, both across the United States and around the world. Therefore, an exposure in a transportation hub can have consequences to many destination communities if people become infected after they travel. *See Requirement for Face Masks on Public Transportation Conveyances and at Transportation Hubs*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html (updated Feb. 25, 2022).

[58] *Id.*

[59] This included restrictions and suspension of entry of noncitizens (immigrants and nonimmigrants) who were present within the European Schengen Area, the United Kingdom (excluding overseas territories outside of Europe), the Republic of Ireland, the Federative Republic of Brazil, the Republic of South Africa, and the Republic of India in the 14-day period prior to attempted entry. *See* Proclamation 10143 (Jan. 25, 2021), 86 Fed. Reg. 7467 (Jan. 28, 2021) (regarding the Schengen Area of Europe, the United Kingdom, the Republic of Ireland, the Federative Republic of Brazil, and the Republic of South Africa); Proclamation 10199 (Apr. 30, 2021), 86 Fed. Reg. 24297 (May 6, 2021) (regarding the Republic of India).

[60] *See* 86 Fed. Reg. 59720 (Oct. 28, 2021). The Order was extended in April, May, and October 2021.

[61] *See* 85 Fed. Reg. 56424 (Sept. 11, 2020).

[62] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65806 (Oct. 16, 2020).

[63] For example, on November 18, 2020, the United States District Court for the District of Columbia preliminarily enjoined the U.S. government from expelling UC pursuant to the October 2020 Order. *PJES v. Mayorkas*, No. 1:20–cv–02245 (D.D.C.), Dkt. Nos. 79–80. While prohibited from expelling UC, the U.S. government worked to create solutions for the appropriate care of UC pursuant to regular immigration authorities. On Friday, January 29, 2021, the United States Court of Appeals for the District of Columbia Circuit granted a stay pending appeal of the District Court's preliminary injunction (*PJES v. Mayorkas*, No. 20–5357, Doc. No. 1882899), thereby permitting CDC and DHS to resume enforcement of the

### 4.  Fourth Wave – Delta Variant – June to October 2021

The COVID-19 pandemic's fourth wave lasted from June to October 2021 and was characterized by the spread of the Delta variant in the United States; during this period the United States experienced 9.8 million cases (15% of cumulative cases) and over 179,000 deaths (9% of cumulative deaths).[64] Vaccines were widely available during the fourth wave and uptake rose slightly throughout this period.[65]

Given the predictable global spread of the virus, the effectiveness of COVID-19 vaccines, and the rising availability of COVID-19 vaccines globally, and recognizing the need to allow the domestic and global economy to continue recovering from the effects of the pandemic, the President issued a Proclamation reflecting the United States' desire to move away from the country-by-country restrictions previously applied during the COVID-19 pandemic and to adopt an air travel policy that relies primarily on vaccination to advance the safe resumption of international air travel to the United States.[66] The Proclamation was followed by a suite of travel-related mitigation measures.[67] Even as available mitigation measures allowed the U.S. government to shift its pandemic approach in the travel context, the country continued to see a surge in COVID-19 cases caused by the Delta variant necessitating different measures in non-travel contexts. For example, as a result, the CDC Director extended the aforementioned eviction moratorium[68] for persons in counties experiencing substantial or high rates of transmission.[69]

During the fourth wave, CDC also issued the July Exception excepting UC from the October 2020 Order, which followed CDC's decision in January 2021 to temporarily except UC from expulsion pending a public health reassessment of the October Order.[70] The October 2020 Order was subsequently replaced by the August Order under 42 U.S.C. §§ 265 and 268 and 42 C.F.R. § 71.40, which fully incorporated the July Exception. The August Order explained why the mitigation measures specific to UC and discussed in the July Exception were not available to SA and FMU and, thus, why the August Order applied only to SA and FMU.[71] As with many of the other actions taken by the U.S. government

---

October Order and immediately expel UC. On January 30, 2021, CDC exercised its discretion to temporarily except UC from expulsion pending the outcome of its public health reassessment of the October Order. *See* 86 Fed. Reg. 9942 (Feb. 17, 2021).

[64] Per internal CDC calculations.

[65] *Trends in Number of COVID-19 Vaccinations in the US*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccination-trends (last updated Mar. 29, 2022).

[66] *See* Proclamation 10294 (Oct. 25, 2021), 86 Fed. Reg. 59603 (Oct. 28, 2021) (terminating the suspension of entry into the United States regarding the People's Republic of China, the Republic of Iran, the Schengen Area of Europe, the United Kingdom and Republic of Ireland, the Federative Republic of Brazil, the Republic of South Africa, and the Republic of India).

[67] Including amending the *Requirement for Proof of Negative COVID-19 Test or Recovery from COVID-19 for All Air Passengers Arriving in the United States* (https://www.cdc.gov/quarantine/fr-proof-negative-test.html) to shorten the time window for predeparture testing to one day for air passengers who were not fully vaccinated against COVID-19; *Order Requiring Airlines to Collect Contact Information for All Passengers Arriving into the United States* (https://www.cdc.gov/quarantine/order-collect-contact-info.html), and the *Order Implementing Presidential Proclamation on Safe Resumption of Global Travel During the COVID-19 Pandemic*, which required all non-U.S.-citizen, non-immigrants, with limited exceptions, traveling to the United States by air to be fully vaccinated against COVID-19 and show proof of vaccination (https://www.cdc.gov/quarantine/order-safe-travel.html).

[68] *See* 85 Fed. Reg. 55292, (Sept. 4, 2020).

[69] *See* 86 Fed. Reg. 43244, (Aug. 6, 2021).

[70] *See supra* note 63.

[71] 86 Fed. Reg. 42828, 42837-38.

during this wave, the August Order was predicated, in part, on the significant increase in community transmission levels brought forth by the Delta variant.

### 5. Fifth Wave – Omicron Variant – November 2021 to March 2022

The highly infectious SARS-CoV-2 variant B.1.1.529 (Omicron) is responsible for the currently receding fifth wave of the pandemic. The fifth wave resulted in an extraordinary and unparalleled increase in COVID-19 cases around the world.[72] Although the emergence of the Omicron variant resulted in the highest reported numbers of cases and hospitalizations during the pandemic, disease severity indicators, including hospital length of stay, intensive care unit admissions, and deaths, remained lower than during previous pandemic waves.[73] As a result of the Omicron surge, the United States experienced almost 24 million cases (36% of cumulative cases); given this volume of cases, however, the resulting number of deaths in the United States (163,000 deaths, or 9% of cumulative deaths) was comparatively small.[74] Vaccination efforts continued across the country during this fifth wave and were expanded to include children aged 5 to 11 years.[75] Despite breakthrough cases due to Omicron, vaccines continued to provide substantial protection against severe illness, hospitalizations, and deaths due to COVID-19.[76]

Although the COVID-19 public health emergency continues,[77] scientific understanding about the epidemiology of COVID-19 and its variants as well as the effectiveness of pharmaceuticals and nonpharmaceutical interventions have substantially expanded, allowing the U.S. government and CDC to transition to a more narrowly tailored set of tools to prevent and control the spread of the SARS-CoV-2 virus and COVID-19. The U.S. government continues to pivot away from country-specific measures. Following the temporary issuance of country-based restrictions as Omicron emerged,[78] all country-based

---

[72] Omicron was first reported to the World Health Organization (WHO) by South Africa on November 24, 2021; on November 26, 2021, WHO designated it a Variant of Concern (VOC). On November 30, 2021, the U.S. also decided to classify Omicron as a VOC. This decision was based on a number of factors, including detection of cases attributed to Omicron in multiple countries, even among persons without travel history, transmission and replacement of Delta as the predominant variant in South Africa, changes in the spike protein of the virus, and concerns about potential decreased effectiveness of vaccination and treatments.

[73] Iuliano AD, Brunkard JM, Boehmer TK, et al. *Trends in Disease Severity and Health Care Utilization During the Early Omicron Variant Period Compared with Previous SARS-CoV-2 High Transmission Periods — United States, December 2020–January 2022*. MMWR Morb Mortal Wkly Rep. ePub: 25 January 2022. DOI: http://dx.doi.org/10.15585/mmwr.mm7104e4; *see also supra* note 26.

[74] Per internal CDC calculations.

[75] Woodworth KR, Moulia D, Collins JP, et al. *The Advisory Committee on Immunization Practices' Interim Recommendation for Use of Pfizer-BioNTech COVID-19 Vaccine in Children Aged 5–11 Years — United States, November 2021*. MMWR Morb Mortal Wkly Rep 2021;70:1579–1583. DOI: http://dx.doi.org/10.15585/mmwr.mm7045e1.

[76] *Omicron Variant: What You Need to Know*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (updated Feb. 2, 2022). *See also* Tenforde MW, Self WH, Gaglani M, et al. *Effectiveness of mRNA Vaccination in Preventing COVID-19–Associated Invasive Mechanical Ventilation and Death — United States, March 2021–January 2022*. MMWR Morb Mortal Wkly Rep. ePub: 18 March 2022. DOI: http://dx.doi.org/10.15585/mmwr.mm7112e1.

[77] The public health emergency determination has been renewed by the Secretary of HHS at 90-day intervals since January 2020, most recently on January 14, 2022. *See Renewal of Determination That A Public Health Emergency Exists*, Office of the Assistant Secretary for Preparedness and Response, https://aspr.hhs.gov/legal/PHE/Pages/COVID19-14Jan2022.aspx (last visited Mar. 9. 2022).

[78] Those restrictions included suspending entry into the United States of immigrants or nonimmigrants who were physically present within eight southern African countries during the 14-day period preceding their entry or attempted entry into the United States. *See* Proclamation 10315 (Nov. 26, 2021), 86 Fed. Reg. 68385 (Dec. 1, 2021).

restrictions were later lifted by the President, as recommended by CDC.[79] Based on an increasing body of evidence, CDC recommended that everyone be vaccinated and remain up to date with vaccines, including boosters for those eligible.[80] As more information about the Omicron variant and vaccine effectiveness became available, CDC calibrated its mitigation measures in accordance with the epidemiology of the virus and the different characteristics of the predominant variants. This included shortening the recommended duration of quarantine and isolation for most members of the general public in community settings[81] and also shortening the timeframe for its COVID-19 testing requirements for all air passengers boarding flights to the United States.[82] DHS also required that all inbound non-citizen, non-lawful permanent residents traveling to the United States via land POE—whether for essential or non-essential reasons—must provide proof of full COVID-19 vaccination status upon request.[83] These refinements in policy reflect CDC's increased understanding of the science and its desire to tailor mitigation measures so that they are no more burdensome than necessary. The ability of CDC to be responsive to the public health landscape and adjust such measures up and down is critical to successfully fighting the pandemic.

During the fifth wave of the pandemic and as specified in the August Order, CDC reviewed the public health rationale underlying the need for the Order every 60 days. By the time of the second reassessment in late November 2021 the public health situation with respect to COVID-19 was improving. However, the sudden emergence of the Omicron variant led CDC to find that the August Order continued to be necessary. Because case numbers remained historically high in January, CDC's third public health reassessment determined that the need for the August Order remained.

## B.     Current Status of the COVID-19 Pandemic

As a result of the Omicron variant, the United States recorded its highest seven-day moving average number of cases on January 15, 2022.[84] Following this unprecedented peak, however, the number of COVID-19 cases in the United States began to rapidly decrease, falling by over 95% as of

---

[79] *See* Proclamation 10329 (Dec. 28, 2021), 87 Fed. Reg. 149 (Jan. 3, 2022) (terminating Proclamation 10315 regarding eight southern African countries).

[80] A person is considered up to date after receiving all recommended COVID-19 vaccines, including any booster dose(s) when eligible, *Stay Up to Date with Your Vaccines*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html (issued Jan. 2022, updated Mar. 22, 2022).

[81] *CDC Updates and Shortens Recommended Isolation and Quarantine Period for General Population*, Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2021/s1227-isolation-quarantine-guidance.html (Dec. 27, 2021). Specifically, the length of isolation period for the general public was shortened to five days, followed by five days of wearing a well-fitting mask. *See also What We Know About Quarantine and Isolation*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine-isolation-background.html (updated Feb. 25, 2022).

[82] *Requirement for Proof of Negative COVID-19 Test or Recovery from COVID-19 for All Air Passengers Arriving in the United States,* updating COVID-19 testing requirements (available at https://www.cdc.gov/quarantine/pdf/Amended-Global-Testing-Order_12-02-2021-p.pdf). All air passengers two years or older with a flight departing to the United States from a foreign country starting on December 6, 2021, are required show a negative COVID-19 viral test result taken no more than one day before travel, or documentation of having recovered from COVID-19 in the past 90 days, before they board their flight. This requirement remains in place.

[83] *See* 87 Fed. Reg. 3429 (Jan. 24, 2022) (applying restrictions to the U.S.-Canada border) and 87 Fed. Reg. 3425 (applying restrictions to the U.S.-Mexico border).

[84] *See supra* note 24, citing a seven-day moving average of 806,324 cases on January 15, 2022 (last updated Mar. 29, 2022).

March 30, 2022.[85] After a brief period of continued increases,[86] deaths and hospitalizations also reversed course and began a swift descent.[87] Even at their peaks, however, the number of deaths and hospitalizations during Omicron were substantially lower than would have been expected from previous waves, based on the case counts. These welcomed changes were due, in part, to widespread population immunity[88] and a generally lower overall risk of severe disease due to the nature of the Omicron variant.

As the overall COVID-19 case count decreases, CDC has observed an increased percentage of cases due to a newly detected subvariant of Omicron, BA.2. As of March 24, 2022, the BA.2 subvariant is estimated to represent approximately 54.9% of sequenced cases in the United States.[89] Experts do not expect this subvariant to lead to a large surge in cases or hospitalizations, due in part to the levels of immunity provided by other Omicron subvariants (B.1.1.529 and BA.1.1) and by vaccination. Should COVID-19 cases show signs of potentially straining the U.S. healthcare system in the future, CDC's Community COVID-19 Levels framework described below better equips the country to swiftly respond.

As the waves of the pandemic have surged and ebbed, so too have actions the U.S. government has taken in response to the pandemic. While earlier phases of the pandemic required extraordinary actions by the government and society at large, epidemiologic data, scientific knowledge, and the availability of public health mitigation measures, vaccines, and therapeutics have permitted the country to safely transition to more normal routines.[90] As part of that transition, CDC is also shifting to more nuanced and narrowly tailored guidance that provides a less burdensome means of preventing and controlling the SARS-CoV-2 virus and COVID-19.

---

[85] *Id.* (noting a peak of 806,324 seven-day moving average number of cases to 26,190 seven-day moving average number of cases on March 29, 2022).

[86] *COVID Data Tracker Weekly Review: Stay Up to Date – Interpretive Summary for Jan. 28, 2022*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/01282022.html (Jan. 28, 2022).

[87] *See New Admissions of Patients with Confirmed COVID-19, United States*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions (last updated Mar. 28, 2022); *see also supra* note 24, noting a peak of 4,172 seven-day moving average number of deaths declining to 644 seven-day moving average number of deaths on March 29, 2022.

[88] In addition to vaccine-induced immunity, studies have consistently shown that infection with SARS-CoV-2 lowers an individual's risk of subsequent infection and an even lower risk of hospitalization and death. National estimates of both vaccine- and infection-induced antibody seroprevalence have been measured among blood donors; as of December 2021, these measures demonstrated 94.7% of persons 16 years and older showed antibody seroprevalence for COVID-19. *Science Brief: Indicators for Monitoring COVID-19 Community Levels and Making Public Health Recommendations*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/indicators-monitoring-community-levels.html (updated Mar. 4, 2022); *Nationwide COVID-19 Infection- and Vaccination-Induced Antibody Seroprevalence (Blood donations)*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#nationwide-blood-donor-seroprevalence (last updated Feb. 18, 2022).

[89] *Variant Proportions*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (showing data for the week ending March 26, 2022).

[90] *Transcript for CDC Media Telebriefing: Update on COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2022/t0225-covid-19-update.html (Feb. 25, 2022). COVID-19 vaccines are highly effective against severe illness and death. Widespread uptake of these vaccines, coupled with higher rates of infection-induced immunity at the population level, as well as the broad availability of mitigation measures and effective therapeutics have moved the pandemic to a different phase. *See also State of the Union Address*, https://www.whitehouse.gov/state-of-the-union-2022/ (Mar. 1, 2022).

1.  **Community COVID-19 Levels**

During the first four waves of the pandemic, CDC relied on a formula to calculate community transmission levels and update COVID-19 prevention strategies.[91] These indicators reflected the goal of limiting transmission as vaccine availability increased.[92] The CDC Director examined these indicators in conducting the public health assessment for the August Order.[93]

The COVID-19 pandemic has shifted to a new phase, however, due to the widespread uptake of highly effective COVID-19 vaccines, the accrual of high rates of vaccine- and infection-induced immunity at the population level, and the availability of effective therapeutics, testing, and masks or respirators.[94] As a result, CDC released a new framework in February 2022, "COVID-19 Community Levels," reflecting a shift in focus from eliminating SARS-CoV-2 transmission toward disease control and healthcare system protection.[95] This new framework examines three currently relevant metrics for each U.S. county: new COVID-19 hospital admissions per 100,000 population in the past seven days, the percent of staffed inpatient beds occupied by patients with COVID-19, and total new COVID-19 cases per 100,000 population in the past seven days.[96] CDC determined that data on disease severity and healthcare system strain complement case rates, and that these data together are more informative for public health recommendations for individual, organizational, and jurisdictional decisions than data on community transmission rates alone.[97] This comprehensive approach to assessing COVID-19 Community Levels can inform decisions about layered COVID-19 prevention strategies, including testing and masking to reduce medically significant disease and limit strain on the healthcare system and other societal functions.[98]

Using these data, the COVID-19 Community Levels for each county are classified as low, medium, or high. CDC recommends using county COVID-19 Community Levels to help determine which mitigation measures should be implemented within a community.[99] As of March 31, 2022, 94.9% of U.S. counties are classified at the low COVID-19 Community Level, 4.5% of U.S. counties are classified at the medium COVID-19 Community Level; only 0.5% of U.S. counties are classified at the

---

[91] In September 2020, CDC released the Indicators of Community Transmission framework, which incorporated two metrics to define community transmission: total new cases per 100,000 persons in the past seven days, and percentage of Nucleic Acid Amplification Test results that are positive during the past seven days. CDC also encouraged local decision-makers to also assess the following factors, in addition to levels of SARS-CoV-2, to inform the need for layered prevention strategies across a range of settings: health system capacity, vaccination coverage, capacity for early detection of increases in COVID-19 cases, and populations at risk for severe outcomes from COVID-19. *See* Christie A, Brooks JT, Hicks LA, et al. *Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage*. MMWR Morb Mortal Wkly Rep. ePub: 27 July 2021. DOI: http://dx.doi.org/10.15585/mmwr.mm7030e2.

[92] *Id.*

[93] *Supra* note 1.

[94] *Supra* note 88.

[95] *Indicators for Monitoring COVID-19 Community Levels and Implementing Prevention Strategies*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/downloads/science/Scientific-Rationale-summary_COVID-19-Community-Levels_2022.02.23.pptx (Feb. 23, 2022).

[96] New COVID-19 admissions and the percent of staffed inpatient beds occupied represent the current potential for strain on the health system, while data on new cases acts as an early warning indicator of potential increases in health system strain in the event of a COVID-19 surge. Community vaccination coverage and other local information, like early alerts from surveillance, such as through wastewater or the number of emergency department visits for COVID-19, when available, can also inform decision making for health officials and individuals. *Supra* note 20.

[97] *Supra* note 88.

[98] *Id.*

[99] *See supra* note 20.

high COVID-19 Community Level.[100] Furthermore, 97.1% of the U.S. population lives in counties classified as "low," 2.5% live in counties classified as "medium," and 0.4% live in counties classified as "high."[101]

### 2. Healthcare Systems and Resources

With the ebb of the fifth wave, the number of new hospital admissions of patients with confirmed COVID-19 has similarly receded. Daily new hospitalization admissions peaked with 154,696 daily new admissions on January 15, 2022. The large number of cases in a very short time led to a high volume of hospitalizations that strained some local healthcare systems and, in some instances, impacted care for non-COVID-19-related concerns.[102] Despite this high volume of COVID-19 cases and hospitalizations, COVID-19 cases caused by the Omicron variant were, on average, less severe.[103]

The observed reduction in severity of COVID-19 cases and ongoing effective use of pharmaceutical interventions make it possible to minimize medically significant disease and prevent excessive strain on the healthcare sector, even with the occurrence of SARS-CoV-2 transmission.[104] Accordingly, at this stage of the pandemic, data on disease severity and healthcare system strain complement case rates and result in a more comprehensive approach to assessing COVID-19 Community Levels.

### 3. Mitigation Measures

Effective public health mitigation measures have contributed to the vast majority of the U.S. population living in a county identified by CDC as having either a "low" or "medium" COVID-19 Community Level. In addition to earlier public health measures, such as masking and physical distancing, the development and widespread deployment of COVID-19 tests, vaccines, and therapeutics have greatly reduced the transmission of the virus and severity of the disease throughout the United States and provided a new understanding of how prevention measures may be used to minimize the impact of COVID-19 on health and society.[105] These measures and the resulting current status of the COVID-19 pandemic are a major factor in CDC's determination that the Orders issued under the authorities of 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 suspending the right to introduce certain persons into the United States are no longer necessary to protect the public health.

#### a. Test Availability

Testing continues to be an essential part of COVID-19 mitigation due to the potential for asymptomatic and pre-symptomatic transmission. Compared to earlier in the pandemic, COVID-19 tests are widely available in the United States. During January 2022, Americans had access to over 480

---

[100] *COVID-19 Integrated County View,* Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#county-view?list_select_state=all_states&list_select_county=all_counties&data-type=CommunityLevels&null=CommunityLevels  (last updated Mar. 31, 2022); *see also infra* note 152.

[101] Per internal CDC calculations.

[102] *Supra* note 73.

[103] *Id.*

[104] *Supra* note 88.

[105] *See COVID Data Tracker Weekly Review: Interpretive Summary for March 4, 2022*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/03042022.html (Mar. 4, 2022), indicating that the whole community can be safe only when [everyone] take[s] steps to protect each other, even when the COVID-19 Community Level is low or medium.

million at-home tests in addition to rapid point of care and laboratory tests.[106] With the additional testing capacity available through antigen tests, rapid testing can be implemented to identify infected persons for isolation and identification of close contacts for quarantine and testing if indicated.[107]

Testing is also particularly helpful in congregate settings, where testing facility residents and personnel can help facilitate early identification of increased infection rates and prompt mitigation actions to help avoid strain on facility operations.[108] CDC recommends broad use of COVID-19 tests among facility workforces and within the larger community; such workforce testing may decrease the necessity for testing residents in congregate settings.

### b.  Vaccines and Boosters

Since August 2021, the scientific community has made significant strides in the development and distribution of COVID-19 vaccines, including booster shots. When the August Order was issued, three COVID-19 vaccines were authorized by the U.S. Food and Drug Administration (FDA) for emergency use and recommended for all people 12 years of age and up. While the daily count of total COVID-19 vaccine doses administered across the United States has plateaued, the cumulative number of people protected by COVID-19 vaccination has grown since the August Order.[109] As of March 30, 2022, over 209 million people in the United States 12 years of age or older (73.9% of the population 12 years or older) have been fully vaccinated and over 245 million people in the United States 12 years or older (86.6%) have received at least one dose.[110] To address concerns with potential waning immunity,[111] booster shots are now recommended for all adults ages 18 years and older.[112] As of March 30, 2022, 48.3% of fully vaccinated individuals 18 years and older in the United States have also received a booster dose.[113]

Since the August Order, eligibility for COVID-19 vaccines has expanded to include children ages five to 11.[114] Children ages six months through four years may soon become eligible for a COVID-

---

[106] Testing is available for free at 21,500 locations around the country. *See supra* note 21.

[107] *See* COVID-19 Testing and Diagnostics Working Group (TDWG). U.S. Department of Health and Human Services, https://www.hhs.gov/coronavirus/testing/testing-diagnostics-working-group/index.html (last visited Mar. 31, 2022) (defining the role of the COVID-19 TDWG, which develops testing-related guidance and provides targeted investments to expand the available testing supply and maximize testing capacity).

[108] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#Strategies (updated Feb. 15, 2022).

[109] *Supra* note 65.

[110] In comparison, as of July 28, 2021, over 163 million people in the United States (57.6% of the population 12 years or older) had been fully vaccinated and over 189 million people in the United States (66.8% of the population 12 years or older) had received at least one dose. *Id.*; *see also COVID-19 Vaccinations in the United States*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations (last updated Mar. 30, 2022).

[111] Thompson MG, Natarajan K, Irving SA, et al. *Effectiveness of a Third Dose of mRNA Vaccines Against COVID-19–Associated Emergency Department and Urgent Care Encounters and Hospitalizations Among Adults During Periods of Delta and Omicron Variant Predominance — VISION Network, 10 States, August 2021–January 2022*. MMWR Morb Mortal Wkly Rep 2022;71:139–145. DOI: http://dx.doi.org/10.15585/mmwr.mm7104e3.

[112] *CDC Expands Eligibility for COVID-19 Booster Shots to All Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2021/s1119-booster-shots.html (released Nov. 19, 2021). *See also* COVID-19 Vaccine Booster Shots, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (updated Feb. 2, 2022).

[113] *See supra* note 112 (citing data as of Mar. 30, 2022). Additionally, 46.5% of fully vaccinated individuals 12 years of age and older in the United States have received a booster dose.

[114] *See supra* note 75.

19 vaccine; CDC is working with state and local jurisdictions for the eventual rollout of this critical product.[115] Improving COVID-19 vaccination coverage among children and adolescents is crucial to maintaining low rates of COVID-19-associated morbidity and mortality among these groups and ensuring a safe and expedited return to normal routines for everyone.[116]

Vaccines, including boosters, continue to be the single most important public health tool for fighting COVID-19 and CDC recommends that all people get vaccinated as soon as they are eligible and stay up to date on vaccinations.[117] Evidence shows that people who have completed the primary COVID-19 vaccination series, and received a booster when eligible, are at substantially reduced risk of severe illness and death from COVID-19; in contrast, the cumulative rate of COVID-19-associated hospitalizations is substantially higher in unvaccinated adults than in those who are up to date on COVID-19 vaccines.[118] Therefore, vaccines, including booster doses when appropriate, provide a substantial measure of protection against COVID-19-associated hospitalization and severe disease, including from the Omicron variant.[119] The increased percentage of individuals who are not only vaccinated but have also received a booster—which was not available at the time of the August Order—strengthens community protection levels and is a critical step toward resuming normal routines safely.

The availability of COVID-19 vaccines globally has also increased dramatically since the August Order.[120] On August 2, 2021, only 29% of the world had received at least one dose of a COVID-19 vaccine, with 12% being fully vaccinated.[121] As of March 30, 2022, 64.9% of the world population has received at least one dose of a COVID-19 vaccine and 57% of the global population is fully vaccinated with a primary vaccine series.[122] Fighting COVID-19 abroad is key to the nation's effort to protect people at home and stay ahead of new variants; therefore, the United States remains committed to accelerating global vaccination efforts.[123]

---

[115] *COVID-19 Vaccination for Children*, Centers for Disease Control and Prevention, https://www.cdc.gov/vaccines/covid-19/planning/children.html (last reviewed Dec. 9, 2021).

[116] *See generally* Murthy BP, Zell E, Saelee R, et al. *COVID-19 Vaccination Coverage Among Adolescents Aged 12–17 Years — United States, December 14, 2020–July 31, 2021*. MMWR Morb Mortal Wkly Rep 2021;70:1206–1213. DOI: http://dx.doi.org/10.15585/mmwr.mm7035e1.

[117] *COVID-19 Vaccines Work*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html (updated Dec. 23, 2021). *See also supra* note 111, attributing decline of vaccine effectiveness to waning vaccine induced immunity over time, possible increased immune evasion by SARS-CoV-2 variants, or a combination of these and other factors and finding that receiving a booster shot was highly effective at preventing COVID-19-associated emergency department and urgent care encounters and preventing COVID-19-associated hospitalizations). *See also Stay Up to Date with Your Vaccines*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html (updated Mar. 30, 2022), a person is considered up to date after receiving all recommended COVID-19 vaccines, including any booster dose(s) when eligible. *See also infra* I.B.5.

[118] This pattern applies to all age groups but is most pronounced among adults aged 65 years and older, who are at increased risk for hospitalization and death.

[119] A recent CDC study found that among people hospitalized with COVID-19, severe outcomes during the Omicron wave appear lower than during previous high transmission waves. *COVID Data Tracker Weekly Review: Boosters Work – Interpretive Summary for Feb. 11, 2022*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/02112022.html.

[120] *Coronavirus disease (COVID-19): Vaccine access and allocation*, World Health Organization, https://www.who.int/news-room/questions-and-answers/item/coronavirus-disease-(covid-19)-vaccine-access-and-allocation (Aug. 6, 2021).

[121] *Coronavirus (COVID-19) Vaccinations*, Our World in Data, https://ourworldindata.org/covid-vaccinations#what-share-of-the-population-has-received-at-least-one-dose-of-the-covid-19-vaccine (updated Mar. 30, 2022).

[122] *Id.*

[123] *See supra* note 21.

### c. *Treatments*

Compared to August 2021, treatments for COVID-19 are more widely available. Although monoclonal antibodies were available in August 2021 and some continue to be effective and were widely used during the Omicron wave, such treatments must be administered by infusion and are cumbersome to administer. The FDA has issued emergency use authorizations (EUA) for a number of treatments for COVID-19 for people at high risk of COVID-19 disease progression, some of which were developed after August 2021.[124] In February 2022, FDA issued an EUA for a new monoclonal antibody that is specifically effective in combatting the Omicron variant.[125] FDA has also authorized oral antiviral medications that target the SARS-CoV-2 virus.[126] The U.S. government has expedited the development, manufacturing, and procurement of these treatments, securing 20 million courses of antiviral pills, which have been shown to reduce the risk of hospitalization or death by 89%.[127] The availability of efficacious and accessible treatments add a powerful layer of protection against severe COVID-19 that was not available in the summer of 2021.[128] The U.S. government's commitment to making such medications available and the ability to produce variant-specific treatments are critical components of the next phase of the fight against COVID-19.

### 4. **Congregate Settings**

As highlighted in the August Order, the very nature of congregate settings increases the risk for COVID-19 outbreaks.[129] Now, however, numerous non-pharmaceutical and pharmaceutical interventions are available to decrease the spread and severity of COVID-19 in these settings.[130] Throughout the pandemic, congregate settings have adapted processes to mitigate COVID-19 risk, including incorporating mask use, improving ventilation, enhancing cleaning and disinfection procedures, and connecting people to medical care. Current CDC guidance for correctional and detention facilities recommends that certain key mitigation measures, including provision of vaccinations and use of standard infection controls remain in place at all times.[131] In addition, facilities

---

[124] *Treatments Your Healthcare Provider Might Recommend if You Are Sick*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/your-health/treatments-for-severe-illness.html (updated Jan. 13, 2022), noting monoclonal antibody treatments may help the immune system recognize and respond more effectively to the virus.

[125] *FDA News Release: Coronavirus (COVID-19) Update: FDA Authorizes New Monoclonal Antibody for Treatment of COVID-19 that Retains Activity Against Omicron Variant*, U.S. Food and Drug Administration, https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-new-monoclonal-antibody-treatment-covid-19-retains (Feb. 11, 2022).

[126] *See supra* note 124.

[127] *See supra* note 21. The availability of new oral antiviral medications makes treatment more accessible to patients who are at risk for progression to severe COVID-19, *see FDA News Release: Coronavirus (COVID-19) Update: FDA Authorizes First Oral Antiviral for Treatment of COVID-19*, U.S. Food and Drug Administration, https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-oral-antiviral-treatment-covid-19 (Dec. 22, 2022).

[128] *Id*. Antiviral pills will also be added to the stockpile for the first time.

[129] *See supra* note 44, explaining preventing coronavirus disease 2019 (COVID-19) in correctional and detention facilities can be challenging because of population-dense housing, varied access to hygiene facilities and supplies, and limited space for isolation and quarantine.

[130] *See supra* note 108.

[131] *Id.* CDC recommends facilities should maintain, at all times, the following aspects of standard infection control, monitoring, and capacity to respond to cases of COVID-19: (1) provide COVID-19 vaccination, including boosters; (2) maintain standard infection control; (3) maintain SARS-CoV-2 testing strategies; (4) prevent COVID-19 introduction from the community; and (5) prepare for outbreaks.

are encouraged to identify their own risk levels and apply additional mitigation measures as necessitated by local conditions.[132]

Rather than requiring physical distancing to be kept in place at all times, CDC's congregate settings guidance allows such measures to be scaled up or down based on local data trends and facility characteristics.[133] Because case counts and hospitalizations are decreasing in most areas of the country, many correctional and detention facilities are resuming certain activities that had previously been paused to facilitate physical distancing, signaling the resumption of more normal operations for many congregate settings.[134]

## 5.   DHS Mitigation Measures

It is CDC's understanding that DHS facilities incorporate some of the recommended COVID-19 mitigation measures for congregate settings into their protocols. In particular, CBP continues to implement a variety of mitigation measures based on the infection prevention strategy referred to as the hierarchy of controls, which includes engineering upgrades, masking for migrants, and PPE for its workforce.[135] Moreover, vaccine uptake among the CBP workforce has reached approximately 86% among personnel on the U.S.-Mexico border.

Of particular note, DHS has recently begun implementing a vaccination program for migrants processed under Title 8 immigration authorities and held in CBP facilities. The DHS vaccination program will apply to all age-appropriate migrants who lack legal status and are processed pursuant to Title 8 authorities; have entered the United States after crossing the Southwest Border; and are taken into DHS custody. DHS has conveyed to CDC that all such migrants who are unable to provide proof of vaccination with an FDA EUA- or WHO EUL-approved vaccine will be provided an initial dose of a COVID-19 mRNA vaccine. DHS began implementing their vaccination program at 11 sites on March 28, 2022. DHS is working to expand this program over the next two months and states that their goal is to provide vaccinations to up to 6,000 migrants a day across 27 sites across the Southwest Border by May 23, 2022.

In addition, since the August Order, the DHS Office of the Chief Medical Officer has worked with partners in local communities to move individuals safely out of CBP custody and through the appropriate Title 8 immigration procedures, as applicable to the individual noncitizens. Through these partnerships, DHS has supported state, local, tribal, and territorial partners and NGOs in developing robust COVID-19 testing and quarantine programs along the Southwest Border.

---

[132] Some congregate settings and detention facilities are resuming activities such as inter-facility transfers and detention of individuals for non-violent offenses, which has previously been paused due to the pandemic.

[133] *Id*. (Recommending that facilities develop and use metrics to guide modification of COVID-19 prevention measures using data on local trends and facility characteristics).

[134] Per information provided by DHS.

[135] These mitigation efforts include installing plexiglass dividers in facilities, enhancing ventilation systems, adhering to CDC guidance of cleaning and disinfection, and providing masks to migrants, as well as PPE to CBP personnel. These measures generally follow the infection prevention control referred to as the hierarchy of controls. *See Hierarchy of Controls*, Centers for Disease Control and Prevention, available at https://www.cdc.gov/niosh/topics/hierarchy/default.html (last visited Mar. 30, 2022). The hierarchy of controls is used as a means of determining how to implement feasible and effective control solutions. The hierarchy is outlined as: (1) Elimination (physically remove the hazard); (2) Substitution (replace the hazard); (3) Engineering Controls (isolate people from the hazard); (4) Administrative Controls (change the way people work); and (5) PPE (protect people with Personal Protective Equipment). CBP also continues to update the CBP Job Hazard Analysis and the CBP COVID toolkit based on the latest relevant public health guidance.

## II.      Public Health Determination

As the COVID-19 pandemic and public health landscape evolve, CDC reassesses the need for continued measures under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40, the authorities that support the CDC Orders.[136] This Public Health Determination and Termination is based upon the most recent science and data available to CDC. Based upon the data, CDC has determined that, although the implementation of the CDC Orders to reduce the numbers of noncitizens held in congregate settings in POEs and Border Patrol stations has been part of the layered COVID-19 mitigation strategy used over the past two years, less burdensome measures are now available to mitigate the introduction, transmission, and spread of COVID-19 resulting from the entry of covered noncitizens.

This Public Health Determination and Termination is the most recent step in CDC's continued efforts toward aligning the public health measures response to the COVID-19 pandemic with the best available science. Throughout the COVID-19 pandemic, CDC has taken a range of actions to help protect the public's health. These actions have been informed by the status of the pandemic based on the scientific and epidemiological information available at the time. The actions fall along a spectrum of restrictions on movement and activities in public. Some, like the masking order for conveyances, impact individuals but do not restrict movement; others, like the No Sail Order, apply to entire industries.

The CDC Orders issued under the authorities of 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 suspending the right to introduce certain persons into the United States are among the most restrictive measures CDC has undertaken in the fight against COVID-19. The U.S. government has only used the extraordinary authority available under 42 U.S.C. § 265 to restrict the introduction of persons in one instance prior to the COVID-19 pandemic—in 1929, in response to a meningitis outbreak.[137] During the earlier periods of the COVID-19 pandemic, while scientists were still learning about its epidemiology and developing therapeutics and vaccines, the CDC Orders were deemed necessary due to the rapid spread of the virus. As the understanding of the virus has grown and vaccines and therapeutics for the disease have become more widely available, lower COVID-19 Community Levels have been observed.

The August Order recognized the full panoply of mitigation measures available as key to slowing the spread of the virus and protecting U.S. healthcare systems while widespread vaccination efforts continued. Like other COVID-19 mitigation measures issued by CDC, the August Order was always intended as a temporary measure as understanding of the virus evolved. The scientific knowledge, availability of vaccines and therapeutics, and high percentage of the U.S. population living in a county identified as having "low" or "medium" COVID-19 Community Levels have permitted CDC to carefully step-down the various public health mitigation measures used. This step-down involves purposeful narrowing of some restrictions while terminating others when the public health need for and efficacy of the measures no longer outweigh the severity of the restriction. For example, CDC took the unprecedented step of halting cruise ship travel during the earliest phases of the pandemic, but permitted gradual resumption of cruises as the public health situation evolved.[138] Likewise, the United States has

---

[136] As noted above, CDC reviews the public health rationale underlying the need for the Order every 60 days.

[137] *See* 85 Fed. Reg. 56424, 56440-42 (noting that, despite passing the precursor to 42 U.S.C. § 265 during a cholera epidemic in 1893, the U.S. government did not exercise this authority until 1929).

[138] CDC issued the original No Sail Order on March 14, 2020, and a version of the order remained in place until October 29, 2020, when it was replaced with a Framework for Conditional Sailing which permitted a phased resumption of cruise ship operations as long as certain public health mitigation measures were met. This Framework for Conditional Sailing became non-binding for cruise ships in Florida by court order in July 2021 and was allowed to expire on January 15, 2022. The

transitioned from suspending the entry of persons traveling from specified countries[139] to a framework of CDC travel health notices and testing and proof of vaccination requirements[140] that allow for reopening global travel and migration while still implementing necessary mitigation measures. CDC believes that the restrictions remaining in place as part of the travel framework (e.g., proof of vaccination requirements for noncitizens entering the United States by air or land POE, and proof of a negative COVID-19 test result)[141] continue to be necessary and are appropriately balanced to minimize restrictions on individuals. CDC continually evaluates the need for these measures and is committed to tailoring them to meet the current public health needs. These careful step-downs have been driven by the evolution of the COVID-19 pandemic and scientific developments and are part of CDC's commitment to exercise its authorities in a manner that provides the greatest benefit for public health while imposing the minimum necessary burden on individuals and communities.

In the context of the CDC Orders issued under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40, this public health-driven step-down first narrowed implementation to except UC and then fully terminated the Orders with respect to UC once there was no longer public health justification for such a suspension. While the CDC Orders under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 provided an important measure to protect against the introduction, transmission, and spread of COVID-19 during earlier phases of the pandemic by reducing the number of noncitizens held in congregate settings, other public health measures are now available to provide necessary public health protection for noncitizens, Americans, and the DHS workforce.[142] CDC acknowledges that public health concerns may arise in congregate settings, including COVID-19 transmission. CDC has determined that, although there is still a risk of COVID-19 transmission in crowded congregate settings, including DHS facilities, that risk does not present a sufficiently serious danger to public health to necessitate maintaining the August Order. Furthermore, the mitigation measures available will help reduce severe outcomes and reduce the serious danger of introduction, transmission, and spread of COVID-19 into the United States by covered noncitizens.

Both at home and abroad, vaccination rates are increasing. Vaccination among the American public and the DHS workforce in particular has been largely successful and, as stated in the August Order, widespread vaccination of federal employees and personnel in congregate settings at POE and Border Patrol stations demonstrates important progress toward the normalization of border operations.[143] Since August 2021, vaccination rates in the countries of origin for the current majority of incoming

---

Framework was replaced by a voluntary program, CDC's COVID-19 Program for Cruise Ships, wherein cruise lines choosing to opt into the program are required to follow all recommendations and guidance as a condition of their participation in the program. *See Technical Instructions for CDC's COVID-19 Program for Cruise Ships Operating in U.S. Waters*, Centers for Disease Control and Prevention, https://www.cdc.gov/quarantine/cruise/management/technical-instructions-for-cruise-ships.html#program-for-cruise-ships (last updated Mar. 18, 2022); *see also supra* notes 38, 49, and 60.

[139] *See supra* notes 35, 59, 66, 78, and 79.

[140] *See supra* note 67.

[141] *CDC Orders*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cdcresponse/laws-regulations.html (updated Mar. 12, 2022).

[142] Since the August Order, the collection, production, and analysis of key COVID-19 response metrics has continued to expand. Advances in public health surveillance may enable officials and facilities (including congregate setting facilities) to rapidly institute necessary mitigation measures in the event of an outbreak. For example, CDC launched and is continually enhancing the National Wastewater Surveillance System to track the presence of SARS-CoV-2 in wastewater samples collected across the country. *See supra* note 21.

[143] CBP most recently reported vaccination rates between 75% and 91% among its U.S. Border Patrol and Office of Field Operations personnel.

noncitizens have also increased dramatically.[144] Such global increases in vaccination rates and infection-induced immunity provide additional layers of protection. As noted above, DHS is currently scaling up a program that provides vaccines to encountered noncitizens taken into CBP custody along the Southwest Border.[145] CDC is supportive of these efforts as a public health measure as they align with CDC's and the U.S. government's emphasis on global vaccination to fight COVID-19. Even if full COVID-19 vaccination cannot be assured, partial vaccination provides some level of protection against severe illness and hospitalization and helps maintain U.S. healthcare resources.[146]

The August Order also highlighted the threat posed by emerging variants and the potential for a future, vaccine-resistant variant, either of which could negatively impact U.S. communities and local healthcare resources.[147] Based in part on these threats, CDC concluded at that time that SA and FMU should continue to be subject to the August Order, pending further improvements in the public health situation, and subject to continual reassessment.[148] Since the August Order was implemented, public health officials have learned a great deal about variants and how best to respond to them. In response to Omicron, the U.S. government updated the National COVID-19 Preparedness Plan for monitoring COVID-19 to swiftly adapt tools to combat a new variant and deploy emergency resources to help communities.[149] The Plan includes steps to ensure that variant surveillance, vaccines, tests, and treatments can be updated and deployed quickly.[150]

At this point in the pandemic, the United States has high rates of vaccine and infection-induced immunity in the population, as well as availability of effective therapeutics, testing, and well-fitting masks. These tools, which have been developed and distributed over the past two years, help minimize medically significant disease and prevent excessive strain on the healthcare sector even while SARS-CoV-2 virus continues to circulate. As noted above, 97.1% of the U.S. population is currently living in an area classified as having a "low" COVID-19 Community Levels, meaning most of the population can operate under more relaxed COVID-19 mitigation strategies.[151] Noteworthy for purposes of this Determination, as of March 31, 2022, all 24 U.S. counties along the U.S.-Mexico border are classified as having a "low" COVID-19 Community Level.[152] Like prior CDC Orders, the August Order, issued

---

[144] Thus far in 2022, Mexico, Cuba, Guatemala, Honduras, and Nicaragua constitute the top five countries of origin for covered noncitizens. Rates of vaccination for each country are as follows: Cuba: 88% fully vaccinated, 94% only partly vaccinated; Guatemala: 33% fully vaccinated, 9.8% only partly vaccinated; Honduras: 47% fully vaccinated, 6% only partly vaccinated; Mexico: 61% fully vaccinated, 4.5% only partly vaccinated; Nicaragua: 61% fully vaccinated, 82% only partly vaccinated. *Coronavirus (COVID-19) Vaccinations*, Our World in Data, https://ourworldindata.org/covid-vaccinations (last visited Mar. 31, 2022).

[145] *See supra* I.B.5. CDC strongly supports broad vaccination at the Southwest Border in furtherance of public health, and will implement termination of the Order on May 23, 2022, in part to give DHS time to scale up its vaccination program. That said, given the current status of the pandemic and the range of mitigation measures currently in place and in the process of being implemented, CDC believes the serious risk to public health that the CDC Orders were intended to address has been sufficiently alleviated, even in the absence of complete implementation of the DHS vaccination program.

[146] As demonstrated by the U.S. government's experience with Operation Artemis and Operation Allies Welcome, a COVID-19 vaccination program helps protect noncitizens, as well as personnel serving these populations and American communities. Vaccination of all encountered noncitizens aligns with larger U.S. government pandemic efforts and safe travel policies.

[147] 86 Fed. Reg. 42828, 42837.

[148] *Id.*

[149] *See supra* note 21.

[150] *Id.*

[151] Per internal CDC calculations.

[152] *COVID-19 Integrated County View*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#county-view?list_select_state=all_states&list_select_county=all_counties&data-type=CommunityLevels (last

during the fourth wave of the pandemic, noted the goal of slowing the introduction, transmission, and spread of SARS-CoV-2 into the United States by covered noncitizens.[153] With the ebb of the Omicron surge across the United States, however, the public health findings underlying the August Order have changed. Although COVID-19 remains a concern, the readily available and less burdensome public health mitigation tools to combat the disease render an order under 42 U.S.C. § 265 to prevent a serious danger to the public health unnecessary. At this point in the pandemic, the previously identified public health risk is no longer commensurate with the extraordinary measures instituted by the CDC Orders. As the pandemic evolves, CDC will continue to monitor the situation with respect to COVID-19 at U.S. borders and will continue to consult with DHS on combatting COVID-19 in DHS facilities following the Termination of the August Order.

## III.    Legal Considerations

### A.    Temporary Nature of Orders under 42 U.S.C. § 265 and Absence of Reliance Interests

In issuing this Public Health Determination and Termination, CDC has considered whether state or local governments, or their subdivisions, have any "legitimate reliance"[154] interests in the continued expulsion of covered noncitizens pursuant to 42 U.S.C. § 265 (Section 265). CDC has determined that no state or local government could be said to have legitimately relied on the CDC Orders issued under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 to implement long-term or permanent changes to its operations because those orders are, by their very nature, short-term orders, authorized only when specified statutory criteria are met, and subject to change at any time in response to an evolving public health crisis. Section 265 may be invoked only if CDC determines that there is a "serious danger of the introduction of [a communicable] disease into the United States, and that this danger is so increased by the introduction of persons or property from such country [where the communicable disease exists] that a suspension of the right to introduce such persons and property is required in the interest of the public health."[155] Moreover, the statute may be invoked only "for such period of time as [CDC] may deem necessary" to avert such a danger.[156] As HHS's implementing regulation further recognizes, in prohibiting the introduction of covered persons "in whole or in part,"[157] a CDC Order is effective "only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease."[158]

For these reasons, the CDC Orders have consistently been subject to periodic reviews to ensure their continued necessity. CDC's initial order issued in March 2020 made clear that the Order represented a "*temporary* suspension of the introduction of [covered] persons into the United States"[159] and that the order would remain effective only for "30 days, or until [CDC] determine[s] that the danger

---

updated Mar. 31, 2022), noting 100% (n=24) of counties along the U.S.-Mexico border are considered "Low": California (San Diego County, Imperial County); Arizona (Pima County, Santa Cruz County, Cochise County, Yuma County); New Mexico (Luna County, Dona Ana County, Otero County, Eddy County, Lea County); and Texas (Presidio County, Brewster County, Terrell County, Webb County, Zapata County, Cameron County, El Paso County, Hudspeth County, Val Verde County, Kinney County, Maverick County, Starr County, Hidalgo County).

[153] *See* 86 Fed. Reg. 42828, 42834 and 42838.

[154] *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

[155] 42 U.S.C. § 265.

[156] *Id.*

[157] *Id*.

[158] 42 C.F.R. § 71.40(a).

[159] 85 Fed. Reg. at 17061 (emphasis added).

of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health, *whichever is shorter*."[160] The March 2020 Order was subsequently extended on April 20, 2020, and then amended on May 19, 2020. The fact that the policy was frequently reviewed should have underscored that CDC's use of its authority under 42 U.S.C. § 265 was a temporary measure subject to change at any time. The October 2020 Order again confirmed this understanding of CDC's authority, noting the "temporary" nature of the suspension of the introduction of covered persons, as well as the facts that the Order would be reviewed every 30 days based on "the latest information regarding the status of the COVID-19 pandemic and associated public health risks," and that CDC "retain[ed] the authority to extend, modify, or terminate the Order, or implementation of [the] Order, at any time as needed to protect public health."[161]

In addition, CDC's ability to exercise its authority under Section 265 as to certain groups has fluctuated due to litigation, further rendering it unreasonable for any state or local government to have acted in reliance on the continued exercise of the authority. CDC's exercise of the Section 265 authority was first challenged shortly after CDC issued its initial order in March 2020, and subsequent court orders enjoining CDC from exercising its authority under 42 U.S.C. § 265 as to certain groups of covered noncitizens should have further discouraged reliance on temporary CDC orders. For example, in November 2020, the United States District Court for the District of Columbia enjoined the expulsion of UC on the basis that Section 265 likely did not authorize such expulsions.[162] Although the government obtained a stay of the injunction in January 2021,[163] the extent of the government's authority under Section 265 remained contested. In addition, in September 2021, the United States District Court for the District of Columbia similarly enjoined the expulsion of FMU, again on the basis that Section 265 likely did not authorize such expulsions.[164] The U.S. Court of Appeals for the D.C. Circuit recently upheld the government's authority under 42 U.S.C. § 265 to expel FMU, but the court held that such expulsions cannot be to places where the noncitizen are likely to be persecuted or tortured.[165] Although the decision will not take effect until the mandate issues in late April 2022, the decision should have put any state or local government on notice that there might be significant practical constraints on the government's ability to expel covered FMU quickly.

Moreover, by August 2021, state and local governments were on notice that the federal government would be taking steps towards the resumption of normal border operations. In the August 2021 Order, CDC stated that it "view[ed] this public health reassessment as setting forth a roadmap toward the safe resumption of normal processing of arriving noncitizens, taking into account COVID-19 concerns and immigration facilities' ability to implement mitigation measures."[166] Accordingly, state

---

[160] 85 Fed. Reg. at 17068.

[161] 85 Fed. Reg. at 65807, 65812.

[162] *See P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020).

[163] Order, *P.J.E.S. v. Mayorkas, et al.*, No. 20-5357 (D.C. Cir. Jan. 29, 2021), Doc. No. 1882899.

[164] *See Huisha-Huisha v. Mayorkas*, No. CV 21-100 (EGS), 2021 WL 4206688, at *12 (D.D.C. Sept. 16, 2021).

[165] *Id.* at *1. The D.C. Circuit also noted the "considerable difference" in public health situations between March 2020 and March 2022. *Id.* at *13.

[166] 86 Fed. Reg. 42828, 42831; *see also id.* at 42837 (discussing a necessary mitigation measure "as DHS moves towards the resumption of normal border operations"); *id.* at 42838 ("CDC believes that the gradual resumption of normal border operations under Title 8 is feasible. With careful planning, this may be initiated in a stepwise manner that complies with COVID-19 mitigation protocols."); *id.* at 42840 (noting that "although this Order will continue with respect to SA and FMU, DHS will use case-by-case exceptions based on the totality of the circumstances where appropriate to except individual SA and FMU in a manner that gradually recommences normal migration operations as COVID-19 health and safety protocols and capacity allows"); *id.* (CDC considered "the use of case-by-case exceptions as a step towards the resumption of normal border operations under Title 8").

and local governments could not have reasonably relied on CDC's indefinite use of its expulsion authority under Section 265. As a factual matter, CDC is not aware of any reasonable or legitimate reliance on the continued expulsion of covered noncitizens under 42 U.S.C. § 265 beyond potentially local healthcare systems' allocation of resources, which CDC has considered in this Order.[167]

Even if a state or local government had relied on the continued existence of a CDC order under this authority, 42 U.S.C. § 265 only authorizes CDC to prevent the introduction of noncitizens when it is required in the interest of public health. No state or local government could reasonably rely on CDC's continued application of Section 265 once CDC determined that there is no longer sufficient public health risk present with respect to the introduction of covered noncitizens. Therefore, CDC's considered judgment is that any reliance interest that might be said to exist in connection with the continued suspension of the right to introduce covered noncitizens under 42 U.S.C. § 265 is not weighty enough to displace CDC's determination that there is no public health justification for such a suspension at this time.[168] To the extent that any state or local government did rely on the expulsion of noncitizens for purposes of resource allocation despite the reasons cautioning against such reliance, CDC concludes that resource allocation concerns do not outweigh CDC's determination that the suspension of the right to introduce covered noncitizens is not required to avert a serious danger to public health.

CDC has also considered whether there may be any short-term reliance on the continued expulsion of noncitizens under the August 2021 Order. CDC concludes that any short-term reliance interests should be limited for all the reasons explained above, and particularly in light of the expressly temporary nature of the Order. For the same reasons, CDC concludes that any such reliance does not outweigh CDC's determination that the expulsion of covered noncitizens is not required to avert a serious danger to public health. Moreover, to the extent that any state or local government has made any short-term plans based on the existence of the August Order, the effective date of this Termination has been set for 52 days from the date of issuance, thus providing state and local governments time to adjust to the resumption of regular Title 8 immigration processing.

Finally, the CDC Orders issued under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 are not, and do not purport to be, policy decisions about controlling immigration; rather, as explained, CDC's exercise of its authority under Section 265 depends on the existence of a public health need. Thus, to the extent that state and local governments along the border or elsewhere were relying on an order under 42 U.S.C. § 265 as a means of controlling immigration, such reliance would not be reasonable or legitimate. And even if such reliance were reasonable or legitimate, that reliance would not outweigh CDC's conclusion that expulsions are not necessary under the terms of 42 U.S.C. § 265 or warrant disruption of ordinary processing of covered noncitizens.

## B.    Basis for Termination under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40

CDC is hereby terminating the August Order[169] and all prior orders issued pursuant to sections 362 and 365 of the PHS Act (42 U.S.C. §§ 265, 268) and the implementing regulation at 42 C.F.R. § 71.40.[170] This Termination will be implemented on May 23, 2022, for the operational reasons outlined

---

[167] *See supra* I.B.2.
[168] *See Regents*, 140 S. Ct. at 1913 (explaining that features evidencing the temporary and non-rights-conferring nature of a government program "surely are pertinent in considering the strength of any reliance interests," and can be considered by the agency).
[169] *See supra* notes 1 and 4.
[170] *See supra* note 7.

herein, including to give DHS time to implement additional COVID-19 mitigation measures. The statutory and regulatory authorities permit the CDC Director to issue Orders prohibiting, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, *only for such period of time that the Director deems necessary* to avert the serious danger of the introduction of a quarantinable communicable disease, based on a determination by the Director that:

    (1) By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and

    (2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.[171]

       Pursuant to 42 U.S.C. § 265 and the implementing regulation, the CDC Director has the authority to issue orders to mitigate the introduction and further spread of COVID-19 disease.[172] In recognition of the extraordinary nature of these emergency public health powers, section 265 and its implementing regulation contemplate that the exercise of these authorities will be temporally and geographically limited in scope as described below. Critically, these authorities also require that any orders issued will be terminated when they are no longer necessary to protect the public health. The authority to make this determination has been delegated to the CDC Director.

       CDC explained in the preamble to the Final Rule for 42 C.F.R. § 71.40 that, in issuing an Order under these authorities, it may "consider a wide array of facts and circumstances when determining what is required in the interest of public health in a particular situation . . . includ[ing]: the overall number of cases of disease; any large increase in the number of cases over a short period of time; the geographic distribution of cases; any sustained (generational) transmission; the method of disease transmission; morbidity and mortality associated with the disease; the effectiveness of contact tracing; the adequacy of state and local healthcare systems; and the effectiveness of state and local public health systems and control measures."[173] Other factors noted in the Final Rule are the potential for disease spread among persons held in congregate settings, the potential for disease spread to the community at large, and strain on healthcare systems.[174]

       CDC is committed to avoiding the imposition of unnecessary burdens in exercising its communicable disease authorities. This aligns with the underlying legal authority in 42 U.S.C. § 265, which makes clear that this authority extends only for *such period of time* deemed necessary to avert the serious danger of the introduction of a quarantinable communicable disease into the United States.[175] Such an order must also be predicated, in part, upon a determination that the danger of such introduction is so increased that a suspension of the right to introduce such persons into the United States is *required in the interest of public health*.[176]

---

[171] 42 U.S.C. § 265; 42 C.F.R. § 71.40.
[172] 85 Fed. Reg. 56424, 56425-26. The Director may suspend the introduction of persons not only to prevent the introduction of a quarantinable communicable disease, but also to aid in continued efforts to mitigate spread of that disease.
[173] *Id*. at 56444.
[174] *Id*. at 56431; 56434.
[175] 42 U.S.C. § 265; 42 C.F.R. § 71.40.
[176] 42 C.F.R. § 71.40.

CDC has considered these and other relevant factors in the foregoing determination, including the overall shift in the U.S. government response to the pandemic, and has determined that less restrictive means are available to avert the public health risks associated with the introduction, transmission, and spread of COVID-19 into the United States due to the entry of covered noncitizens. Although COVID-19 continues to spread within the United States, as a result of the numerous tools for disease prevention, mitigation, and treatment which have become available over the past two years, and the other considerations explained above, an order suspending the right to introduce covered noncitizens under 42 U.S.C. § 265 is no longer required in the interest of public health.

## IV.    Issuance and Implementation

Based on the foregoing Public Health Determination, I hereby Terminate the August Order and all previous orders issued pursuant to Sections 362 and 365 of the PHS Act (42 U.S.C. §§ 265, 268), and their implementing regulations under 42 C.F.R. § 71.40.[177] This Termination will be implemented on May 23, 2022.

Following an assessment of the current epidemiologic status of the COVID-19 pandemic and the U.S. government's ongoing response efforts, I find there is no longer a public health justification for the August Order and previous Orders issued under these authorities; employing such a broad restriction to preserve the health and safety of U.S. citizens, U.S. nationals, and lawful permanent residents, and personnel and noncitizens in POE and U.S. Border Patrol stations is no longer necessary to protect the public health. Other current public health mitigation measures sufficiently reduce the serious danger of introduction, transmission, and spread of the virus that causes COVID-19 as a result of the entry of covered noncitizens, including in congregate settings where such noncitizens would otherwise be held while undergoing immigration processing, including at POE and U.S. Border Patrol stations at or near the U.S. land and adjacent coastal borders.

Termination of the August Order is based on the current status of the COVID-19 pandemic and the available public health mitigation measures. In making this determination, I have considered myriad facts, including epidemiological information such as the viral transmissibility and asymptomatic transmission of COVID-19, the epidemiology and spread of SARS-CoV-2 variants, the morbidity and mortality associated with the disease for individuals in certain risk categories, COVID-19 Community Levels, national levels of transmission and immunity, the availability and efficacy of vaccination and treatments, as well as public health concerns with congregate settings at border facilities. While holding noncitizens in congregate settings with limited options for COVID-19 mitigation is accompanied by inherent risk, the overall public health landscape in the United States has changed such that the justification for the August Order is no longer sustained.

The COVID-19 pandemic is ongoing and appropriate public health mitigation measures must continue to be applied.[178] Although it cannot be known how the spread of SARS-CoV-2 will change in the future (e.g., due to the emergence of a new variant), CDC plans to rely on COVID-19 Community Levels, among other factors, to inform how prevention measures may be used to minimize the impact of

---

[177] Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56424 (Sept. 11, 2020).

[178] *See supra* note 105, indicating that the whole community can be safe only when [everyone] take[s] steps to protect each other, even when the COVID-19 Community Level is low or medium.

COVID-19 on health and society, including at the U.S. borders.[179] To that end, CDC will continue to assess the public health situation at the U.S. borders even after this Termination as part of its comprehensive COVID-19 response. If, for example, there is a substantial change in the public health situation with respect to the pandemic, such as due to new and particularly concerning SARS-CoV-2 variants, CDC could determine a new order under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 is necessary. Any such determination would be based on the public health needs identified at that time.

### A.      Implementation of this Termination

CDC is required by the Final Rule to consult with "all Federal departments or agencies whose interests would be impacted by this order," "as practicable under the circumstances.[180] CDC recognizes that resumption of border operations under Title 8 authorities, and the need to put additional appropriate COVID-19 mitigation measures in place, requires time to operationalize in a manner that protects the health and safety of the migrants, workforce, and American communities. Based on DHS' recommendation and in order to provide DHS time to implement operational plans for fully resuming Title 8 processing, including incorporating appropriate COVID-19 measures, this Termination will be implemented on May 23, 2022.

DHS has represented that over the next several weeks it is taking important steps to implement processes in preparation for the full resumption of border operations pursuant to Title 8 authorities, in a manner that promotes the health and safety of migrants, CBP employees, and the local communities. Most recently, DHS has initiated a vaccination program for all age-eligible migrants who lack legal status and are processed pursuant to Title 8 authorities; this program will be scaled up over the next two months.[181] As stated above, CDC recognizes vaccination as the single most important public health tool for fighting COVID-19 and recommends that all eligible persons, regardless of citizenship, be vaccinated and remain up to date with boosters.[182] The implementation timeline of this Termination will provide DHS with time to scale its vaccination program, as well as ready its operational capacity, implement appropriate COVID-19 protocols, and prepare for resumption of regular migration under Title 8.

CDC recognizes that the Termination of the August Order will lead to an increase in the number of noncitizens being processed in DHS facilities which could result in overcrowding in congregate settings. Moreover, DHS projects, based on available intelligence as well as seasonal migration patterns, an increase in encounters in the coming months, which could lead to further crowding in DHS facilities. DHS reports that it is taking steps to plan for such increases, including by readying decompression plans, deploying additional personnel and resources to support U.S. Border Patrol, and enhancing its ability to safely hold noncitizens it encounters. Putting such plans in place, ensuring that the workforce is adequately and appropriate trained for their shifting roles, and deploying critical resources require time. This Termination will be implemented on May 23, 2022, to provide DHS with additional time to ready such operational plans and prepare for full resumption of regular migration under Title 8.

---

[179] *Id.*
[180] 42 C.F.R. § 71.40.
[181] *See supra* I.B.5.
[182] In line with CDC's emphasis on the importance of vaccination, CDC has kept its requirement for noncitizens to provide proof of vaccination for air travel and also supports DHS's Order requiring the same at the land borders (*see supra* notes 67 and 83).

For the foregoing reasons, this Termination will be implemented on May 23, 2022. To the extent that any state or local government has a misplaced reliance interest on the August Order, the timeline for implementation of the Termination also allows time for such entities to adjust their planning in anticipation of the full resumption of Title 8 border processing. During this temporary period of continued application of the August Order, DHS will continue to exercise its discretion to issue case-by-case exceptions based on the totality of the circumstances as set forth in the August Order.[183] DHS has represented that it will continue to make use of this exception where, for example, a noncitizen may suffer particular harms associated with expulsion (e.g., vulnerable and medically fragile persons) until the Termination is effective.

## B.    APA Review

This Termination shall be implemented on May 23, 2022. I consulted with DHS and other federal departments as required by the Final Rule before I issued this Order and requested that DHS aid in the implementation of this Termination.[184] DHS is developing operational plans for implementing this Termination. CDC will review these plans and ensure that they are consistent with the language of this Termination and public health best practices.

This Termination, like the preceding Orders issued under this authority, is not a rule subject to notice and comment under the Administrative Procedure Act (APA).[185] Even if it were, notice and comment are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Termination.[186] Given the extraordinary nature of an order under Section 265, the resultant restrictions on application for asylum and other immigration processes under Title 8, and the statutory and regulatory requirement that an CDC order under the authority last no longer than necessary to protect public health, it would be impracticable and contrary to the public interest and immigration laws that apply in the absence of an order under 42 U.S.C. § 265 to delay the effective date of this termination beyond May 23, 2022 for the reasons outlined herein.[187] As explained, DHS requires time to institute operational plans to implement this order, including COVID-19 mitigation measures, and begin regular immigration processing pursuant to Title 8. In light of the August Order's significant disruption of ordinary immigration processing and DHS's need for time to implement an orderly and safe termination of the order, there is good cause not to delay issuing this termination or to delay the termination of this order past May 23, 2022. In addition, this Order concerns ongoing discussions with Canada, Mexico, and other countries regarding immigration and how best to control COVID-19 transmission over shared borders and therefore directly "involve[s] . . . a . . . foreign affairs function of the United States;"[188] thus, notice and comment are not required.

---

[183] "Persons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS will consult with CDC regarding the standards for such exceptions to help ensure consistency with current CDC guidance and public health recommendations." 86 Fed. Reg. 42828, 42841 (Aug. 5, 2021).
[184] 42 U.S.C. § 268; 42 C.F.R. § 71.40(d).
[185] While this Termination is not a rule subject to notice and comment under the APA (5 U.S.C. § 553), the Office of Information and Regulatory Affairs has determined that this is a major rule as defined by Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996, also known as the Congressional Review Act (CRA). 5 U.S.C. § 804(2). The agency finds, for the reasons listed above, that good cause exists to make this rule effective on May 23, 2022, under 5 U.S.C. § 808(2).
[186] 5 U.S.C. § 553(b)(3)(B).
[187] 5 U.S.C. § 553(a)(1).
[188] 5 U.S.C. § 553(a)(1).

With this Termination, I hereby determine that the danger of further introduction, transmission, or spread of COVID-19 into the United States from covered noncitizens, as defined in the August Order, has ceased to be a serious danger to the public health and therefore the continuation of the August Order, and all previous orders issued under the same authority, is no longer necessary to protect public health. Nothing in this Termination will prevent me from issuing a new Order under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 based on new findings, as dictated by public health needs.

In testimony whereof, the Director, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set her hand at Atlanta, Georgia, this 1st day of April, 2022.

_____
Rochelle P. Walensky, MD, MPH
Director
Centers for Disease Control and Prevention