## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.,* | ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | No. 1:21-cv-00100-EGS |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity, *et al.,* | ) ) ) | |
| *Defendants.* | ) ) ) | |

### DECLARATION OF MING CHEUNG IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION

I, Ming Cheung, Esq., declare as follows:

1.      I submit this declaration in support of Plaintiffs' Second Motion for Classwide Preliminary Injunction.  I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would testify competently as follows:

2.      On Friday, November 12, 2021, I downloaded a document from the website of the House Select Subcommittee on the Coronavirus Crisis.  The document contained excerpts of the Subcommittee's transcribed interviews of certain Centers for Disease Control and Prevention officials, including Dr. Anne Schuchat.  Attached as Exhibit A is a true and correct copy of the excerpts of Dr. Schuchat's transcribed interview as released by the Subcommittee.

3.      On Monday, February 2, 2022, I received a copy of the transcript of the oral argument which occurred on January 19, 2022, before the U.S. Court of Appeals for the D.C. Circuit in *Huisha-Huisha v. Mayorkas*, No. 21-5200.  The document was transmitted to me by Deposition Services, Inc., which is the entity designated by the Circuit as the exclusive transcriber of oral arguments in that court.  Attached as Exhibit B is a true and correct copy of that document.

I, Ming Cheung, declare under penalty of perjury of the laws of the State of New Jersey and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 10, 2022, in Jersey City, New Jersey.

_____
MING CHEUNG, ESQ.

# EXHIBIT A

**Excerpts from Transcribed Interview of Dr. Anne Schuchat**

**White House Efforts to Block CDC Briefings and Media Appearances**

Q:     On February 26th, 2020, Dr. Nancy Messonnier gave a telebriefing update on COVID 19. During this briefing, she warned about the risk of community spread saying, "We will see community spread in this country.  It's not so much a question of if it will happen anymore, but rather more a question of exactly when." Are you familiar with this particular briefing?

A:     I think it was the February 25th, but, yes, I'm familiar with that briefing when she spoke and used those words, yes.

…

Q:     … Do you believe that Dr. Messonnier's remarks were accurate at the time based on the best known information?

A:     Yes, I do.

Q:     It's been recorded that the President was angered by Dr. Messonnier's remarks at the briefing, I think it has been widely reported publicly.  I'm wondering if at that time you were aware of any feedback CDC received from HHS or the White House?

A:     What I can say is that on February 25th, I was in Washington, DC doing some briefings and so forth.  And I was not following what CDC had done a briefing on, but I was asked to adjust my schedule so that I could join the Secretary in a media briefing that afternoon on COVID.  So my familiarity was there had been a briefing in the morning and then there was another briefing that afternoon that I was asked to be part of.  And I didn't know why, I was just asked to attend.

Q:     Did you later find out that there were other reasons for the later briefing?

A:     **The impression that I was given was that the reaction to the morning briefing was quite volatile, and having another briefing – you know, later I think I got the impression that having another briefing might get – you know, there was nothing new to report, but get additional voices out there talking about that situation.**

…

Q:     So I think following that particular briefing, CDC conducted, I think, four more public briefings in the next few weeks.  I'm going to assume they actually happened the day before they are listed here, so February 27th, March 1st, March 2nd, and then March 9th.  **I think that my understanding is that on March 9th, Dr. Messonnier also took over the briefing and gave similar warnings.  After that point, CDC stopped providing public briefings until about June 11th or 12th, 2020; is that correct?**

A:     **That sounds right.**

Q:     **Do you know why CDC stopped providing public briefings during that period?**

A:     **I think there were two factors.  One was a request.  We would submit a request to the others to do a briefing and it was declined, and then – or we didn't get approval to be able to do one.**  And then at some point during that period the White House task force began doing briefings that were not really – I would say they didn't get carried out exactly the way we would have done them in terms of the content or Q&A or availability. But as a whole of government response, the communication center moved to the task force.

Q:     You mentioned having requests denied.  Who communicated that denial to you?

A:     In general – let me speak generally.  When the media would request for me to speak, you know, in a one on one or some sort of – you know, if there was an ask for me personally, I had the CDC media contact a public affairs support person who would submit a request through our office of communication to HHS for the ASPA to let us know.  **And so my contact – there were several requests for me personally, and basically she said we didn't get approval or we haven't heard back or it's too late.  They either said no or they didn't say anything.**

For telebriefings, it would be a different story that our office of communication would be directly communicating with ASPA.  And I wouldn't have seen the back and forth on that.  So I'm only familiar with when somebody asked for me, and it got to the point where I was surprised when there was approval.  I was, like, are you sure?  Did they really say I could do that interview?  Let's make sure before I do it.  So there were not too many interviews after the February time period.

Q:     So just to make sure I understand, in the sense a media outlet, say, requested you for an interview, that request process would run its way up through ASPA.  And before this time period, were those requests generally approved and then after they started being denied?

A:     That's right.

Q:     And were you ever given any explanation of the reasons for the denials?

A:     Only one time where I pushed and said, you know, do we know why not?  You know, I got the email trail on that one, and it was from the White House communications had said, no, we won't have time to prep her.  We've made lots of announcements this week and we can't get her ready by the morning show.

…

Q:     Do you recall any specific telebriefing requests being denied?

A:     **I do recall the agency asking to do briefings, but I don't recall when and which ones. I know there was a point where they stopped asking because they kept saying no.  So**

**I knew where there were some we asked, you know, there was enough going on or we had important content coming out.**

The typical rhythm was if we had a lot of new science coming out, we wanted to push it rather than just respond or not respond at all and let others be trying to interpret it.  And in that March April period, there was a lot of – in the U.S. in terms of the field investigations we were doing and the emerging understanding of the situation both here and around the world.

And so rather than – you know, if we had two or three MMWRs coming out, the ability to explain them as a narrow focus rather than as a policy kind of thing could have helped disseminate that fast moving case of understanding that was going on.  **So, basically, we didn't get approval for most of those, so far as I know.**

…

Q:  You mentioned one of the reasons that you were given or that you understood for the CDC not doing the briefings during this period is that the White House task force had taken over that role.  **In your opinion, were the White House task force briefings that occurred an adequate substitute for the CDC briefings or other information that CDC would have disseminated through the media?**

A:  I should qualify this by saying after a certain point, I didn't watch them anymore.  **But my sense of the ones that I saw were that they were not, in general, an adequate way to – you know, there were parts of them that were probably fine, but that the – you know, the intrusion of conflicting points of view from the speakers were – you know, I used the example of the briefing where the policies to recommend masks for the general public, which I think was a critical, essential tool in our toolkit early on in this accelerating epidemic, were at the very same briefing where the scientists were describing these new policies, a politician said that he was not going to use that. That, to me, was a poor way to announce the new policy that had been reviewed and bought into and agreed upo**n.  So I think the idea of conflicting messaging, even in the same press briefing, let alone insufficient time for media to really ask their questions.

Q:  I think you might be referring to the President's comment on April 3rd, he said, "The mask is going to be really a voluntary thing.  If you do it, you don't have to do it.  I'm choosing not to do it, but some people may want to do it, and that's okay."  Is that what you're referring to generally?

A:  Yes.

Q:  I believe – and we will talk about this a little bit more – I believe the CDC had put out guidance on face coverings that same day.

A:  That's right.  And the way that guidance was announced was in that press conference, because we didn't do a press briefing ourselves.  It was through the task force essentially.

Q:     So is it your opinion that comments like that at those briefings undermine the government's response to the pandemic?

A:     I think that that was potentially confusing to the public and may have reduced use of a preventable tool that we had before we had vaccines or many other means to reduce spread.  And particularly at a time where a number of – where a lot of thought was going into how some settings could reopen or could partially open, the masks were a key tool in that toolbox.  And so that mixed messaging or contradiction of the message was unfortunate.

…

Q:     I'm guessing your colleague has spoken to the media often, not by name, but there are some quotes that they have made about CDC's authority to communicate to the public during this period of time.  **I think one quote reported in CNN in May 2020 said that CDC officials say they've been, "muzzled and that their agency's efforts to mount a coordinated response to the COVID 19 pandemic were hamstrung by a White House whose decisions are driven by politics rather than science." Do you agree with that assessment?**

A:     **That is the feeling that we had, many of us had.**

Q:     **Do you think that allowing CDC to speak publicly – or perhaps a better way to say it is, is having clear, consistent, and accurate messaging, regardless of the speaker, particularly in that early stage of the pandemic, could or would have resulted in fewer infections and deaths in the U.S.?**

A:     **Yes, I do…**

### Trump Officials' Interference with CDC Public Health Guidance

Q:     … On March 20th, 2020, there was an order under Title 42 suspending the introduction of certain persons from countries where a communicable disease exists.  In other words, there was an order to close borders and to support unaccompanied children in asylum.

There's been public reporting about the way in which this order was instituted.  Do you have any knowledge about how it came to be instituted at this time?

A:     I don't have knowledge about the final decision.  I'm familiar with the CDC's presentation of data about the relative risks of disease in different sides of the border.  And at that time, there was a lot more disease in the U.S. than south of the border.  But the decisionmaking process that led to that I wasn't familiar with, but that case wasn't based on a public health assessment at the time.

Q:     Do you believe that that order was necessary to prevent the spread of coronavirus in the U.S. at that time, at this specific time, March 20, 2020?

A:    No.

Q:    Why not?

A:    The focus on reducing spread on our side of the border was critically needed.  And, again, the – that's what I would say.

**Q:    It's been reported that Mr. Cetron refused to sign it.  Did you ever discuss that with him?**

**A:    … I did have some discussions with Dr. Cetron about the issue, yes.**  Is that the question?

Q:    That was actually the question.  I'm just wondering if he told you the reasons why he wouldn't sign it.

A:    Dr. Cetron takes the regulatory authority for quarantine very seriously and weighs – you know, the typical issue is, the least restrictive means possible to protect public health is when you exert a quarantine order versus other measures.  **And the bulk of the evidence at that time did not support this policy proposal**; that there was focus on trying to improve the conditions in the facility during – where individuals were housed to reduce the risk.  There were CDC recommendations to ICE and to ACF and everything about how to make the transit of individuals less problematic.

But his view was that the facts on the ground didn't call for this from a public health reason, and that the decision wasn't being made based on criteria for quarantine.  It may have been initiated for other purposes.  So I don't think he was comfortable using his authority to do that because it didn't meet his careful review of what the criteria are.

…

Q:    Do you know why Dr. Redfield made the decision he decided not to render his opinion?

A:    No.  **I imagine that Dr. Redfield was put in many impossible situations over the course of his position.**

Q:    **By impossible situations, you mean the pressure from a political perspective?**

A:    **I would agree with that.**

…

Q:    So the next three exhibits, in that case, might be documents that you have less familiarity with, but I still want to make sure because they were widely reported.  It is Exhibits 15, 16, and 17, and they are each titled Overview of Testing for SARS-CoV-2, COVID 19.

Exhibit 15 is dated July 17, 2020, Exhibit 16 is dated August 24, 2020, and then Exhibit 17 is dated October – hold on, I'm sorry – September 18th, 2020.

The version that was updated on August 24th changed a statement in earlier guidance which recommended such change for close contact of persons with concerned coronavirus infections.  It says, "You do not necessarily need a test unless you are a vulnerable individual or your healthcare provider or local health officials recommend you take one."

First of all, I just talked a lot, but are you familiar with these changes that took place at the time?

A:    When the August 24th document was posted and released, I was contacted by a partner, an expert who was concerned about the guidance and wondered, what was the rationale?  What were we thinking?  And I wasn't familiar with this before it came out, and so I looked into it and spoke with the leadership of the response to understand what happened?  That doesn't seem to follow.

…

Q:    Who did you then go to obtain the information about what had happened?

A:    I went to our incident manager.

Q:    Who?

A:    **So Dr. Henry Walke was the incident manager for the longest period.  Really I think from July 1st until this past week.  So I went to him to say, do you have a sense of what happened here?  And he shared with me kind of this point by point review of the evolution.**

You know, this was an important work.  Admiral Brett Giroir, who was the testing czar, was convening the big picture of testing, because so much had been learned, so many tools were available.  There was a need for a big picture, everything you need to know about testing in one place.

So this document was developed over several weeks at least with several of the HHS entities contributing, reviewing, and revising.  And then this last version that went out, I don't think either – in media reports, Admiral Giroir distanced himself from the final piece.

Dr. Fauci, he commented on the earlier draft.  He was having surgery when the thing was finalized, and, of course, it was updated later without that change.

So this wasn't – sorry, I don't even remember the question.

Q:    No, I think the question was who you went to find out

A:      Yeah.  I went to Dr. Giroir to ask his brief summary, and he shared with me a written one.

Q:      At the time, he was familiar with the advice having been changed to advice about testing asymptomatic close contact?

A:      He was familiar with what had happened and shared the version evolution with me.  So he was aware, and also he knew that this was the final that had gone out and that that was how – and our team just tried to document what are the inaccuracies so that if we did get a chance to update it, we could fix those.

Q:      Did he tell you who had instituted these changes that were inaccurate?

A:      I believe it was just the White House.  I don't know who.


**Trump Administration Officials' Efforts to Alter MMWRs**

Q:      Let's turn to some other specific MMWRs, ones that you did not draft, but I think were part of the approval team for.  We have one marked here as Exhibit 28….  This is titled SARS-CoV-2 Transmission and Infection Among Attendees of an Overnight Camp, in June 2020.  Do you remember the circumstances surrounding the publication of this MMWR?

A:      Yes.  Yes.

Q:      I believe this was published on August 7th….  This is an email chain dated – the date at the top of the chain is July 27, 2020, and at the very end of the chain it includes a summary of this MMWR scheduled for early release.

A:      Mm hmm.

Q:      Your next email in the chain after the summary from Dr. Kent is a long list of items of questions and some feedback from Dr. Alexander about the MMWRs.  He explains his reaction asking them both questions.  And then he goes on to explain he thought the MMWR contradicted CDC's guidance on schools.  Do you remember seeing this before?

A:      Yeah.  Okay, I do remember Mr. Alexander sending a lot of comments about this and several other MMWRs, yes.  Charlotte would share with the senior leaders both in the science chain about when she had questions about how to handle some of the inputs.

Q:      **You referenced that this is something that Dr. Alexander had, I guess, started a practice of doing, you might say – is that fair to say – providing feedback?**

A:      **Yes, that's right.  He was in the public affairs office, and typically our MMWRs are they're scientific products and they don't go through our communication office or ASPA for review or clearance.**  You know, they are developed, reviewed, and cleared if

they're a single agency or with State through our science chain.  So he was not sending comments on the actual MMWRs, he was sending comments on title or brief drafts, you know, summaries of the general content.  But I don't think he understood that what he was sending comments on was not in the actual article.

…

Q:  So further up on this email chain where you are no longer copied, this is on the first page, Michael Beach says to Charlotte Kent --  and Henry Walke is copied here – "Folks on the HHS Secretary's call want to see this MMWR – do we normally do this, how do we do this?  Here, they're asking for – people from the Secretary's office are asking to see the original summary?

A:  Yeah.  My interpretation is they want to see both what we would call the proof and then the full report with its tables and figures.  You know, it may not be the absolute final, but it would have not just the abstract or the summary.

Q:  Ms. Kent responds at 10:05 a.m.  "We do not normally share.  Done once before after discussion with Dr. Schuchat.  Only comfortable if she approves."  First of all, why would Charlotte Kent say that they don't normally share?

A:  **There's a longstanding practice that the MMWRs are scientific products of CDC, and that there's a firewall between the editorial production and political levels**.  So a proof might be – you know, the authors might include FDA or there might be a state health department that would be reviewing the proofs.  **But the proofs don't usually go outside of the author and the agency, so we wouldn't be sharing the full content outside.  And that's longstanding for every administration that I'm aware of**.  I can't say that's never been breached, but that's the practice that the agency's had.

…

Q:  I want to refer back to your comments a moment ago about why CDC wouldn't normally share these reports.  You talked, I think, about the MMWR being scientifically independent.  **So I just want to ask, when you saw that these political issues with Mr. Caputo, Dr. Alexander in the communications department at HHS were starting to be included in the summaries, did it give you pause or cause you any concerns?**

A:  **Yes.  Yes, it gave me many concerns.**

Q:  What concerns did it raise?

A:  It seemed important for us to double our efforts to protect the scientific independence and integrity of the MMWR.  One of the roles that the senior leaders who review it and clearance take is to assure that we're not making new policies, so we really are independent and we need to clear and confer.  But on scientific results, there's an extensive internal review process like a competitive peer reviewed process on other journals that is meant to assure the scientific integrity and quality of the articles.  And it

didn't seem appropriate for political appointees in communication to be involved in that effort from any administration.

…

Q:    I want to actually skip up to the 11:22 p.m., now on August 26.  This is on the first page, the second one down.  Dr. Kent writes to you and Michael Iademarco saying that she received the communication from Dr. Alexander and she doesn't know how to respond. She's looking for guidance.  Do you remember what you said, if anything?

A:    Yes, I do remember this well.  When I received Charlotte's email, I believe I called Dr. Iademarco or perhaps Dr. Iademarco called me.  But we had a conversation; and I recommended that Charlotte not send this email, that Dr. Iademarco speak with Dr. Redfield and have Dr. Redfield follow up with HHS.  I didn't think it was appropriate for Charlotte to offer this very polite draft response and didn't think we should wordsmith her polite response.  **I thought this was an inappropriate offer on his part and that we should have Dr. Redfield follow up**.

…

Q:    I just want to ask one more clarifying question about some of what we talked earlier about Charlotte Kent, and the requests, I guess, you could say she was receiving from Dr. Alexander.  I think your testimony was, in summary, and her testimony was as well, was that she feels, and you said that she was able to protect the scientific integrity of CDC's work ultimately; is that right?

A:    Yes.  My understanding is that her – you know, that she was able to.  And I would say that senior leadership did our part to try to help protect that integrity and always improve the quality, we can always improve, but to try to not let our work be compromised.  And so the MMWR, we had more control over, I guess, than some of the others.

Q:    **Now, just because you were successful in your efforts doesn't mean that there weren't attempts by others – particularly Dr. Alexander, perhaps under the direction of Mr. Caputo – to compromise the scientific integrity of CDC's work.**  Those are two – I just want to clarify that those are two distinctive things, that attempts happened without the work ultimately being compromised; is that fair?

A:    **I would say that's absolutely true, and that it took great effort to protect that integrity.  It took active effort on the part of Dr. Kent and others to make sure that the attempts were not successful.**

***

# EXHIBIT B

```
                    UNITED STATES COURT OF APPEALS
  1              FOR THE DISTRICT OF COLUMBIA CIRCUIT

  2
- - - - - - - - - - - - - - - X
  3                             :
                                :
  4   NANCY GIMENA HUISA-HUISA,  :
      and her minor child, et al., :
  5                             :
              Appellees,        :
  6                             :
         v.                     :     No. 21-5200
  7                             :
      ALEJANDRO N. MAYORKAS,    :
  8   Secretary of Homeland     :
      Security, in his official :
  9   capacity, et al.,         :
                                :
 10           Appellants.       :
                                :
 11 - - - - - - - - - - - - - - - X
                                     Wednesday, January 19, 2022
 12
                                     Washington, D.C.
 13

 14
          The above-entitled matter came on for oral
 15   argument pursuant to notice.

 16       BEFORE:

 17           CHIEF JUDGE SRINIVASAN, AND CIRCUIT JUDGES WILKINS
              AND WALKER
 18
          APPEARANCES:
 19
              ON BEHALF OF THE APPELLANTS:
 20
              SHARON SWINGLE, ESQ.
 21
              ON BEHALF OF THE APPELLEES:
 22
              LEE GELERNT, ESQ.
 23

 24

 25
```

**Deposition Services, Inc.**
P.O. Box 1040
Burtonsville, MD 20886
Tel: (301) 881-3344 Fax: (301) 881-3338
info@DepositionServices.com  www.DepositionServices.com

C O N T E N T S

ORAL ARGUMENT OF:                                      PAGE

          Sharon Swingle, Esq.
          On Behalf of the Appellants              3; 75

          Lee Gelernt, Esq.
          On Behalf of the Appellees                  44

1                      P R O C E E D I N G S

2           THE CLERK:  Case No. 21-5200, Nancy Gimena Huisha-

3    Huisha, and her minor child, et al. v. Alejandro N.

4    Mayorkas, Secretary of Homeland Security, in his official

5    capacity, et al., Appellants.  Ms. Swingle for the

6    Appellants, Mr. Gelernt for the Appellees.

7           JUDGE SRINIVASAN:  Good morning, counsel.  Ms.

8    Swingle, please begin when you're ready.

9           MS. SWINGLE:  Thank you, Your Honor.

10               ORAL ARGUMENT OF SHARON SWINGLE, ESQ.

11                  ON BEHALF OF THE APPELLANTS

12           MS. SWINGLE:  Sharon Swingle for the Department of

13   Justice representing the defendants/appellants in this case.

14   In issuing the Title 42 rule and order, CDC applied its

15   scientific expertise to address a once in a century, highly

16   dynamic public health emergency involving emergent variants

17   of COVID-19, rising transmission rates, and strained

18   healthcare resources, in particular, at remote areas near

19   the southwest border.  The challenged CDC order response to

20   the serious danger of the transmission of COVID-19 that

21   arises for non-citizens who enter the United States without

22   valid travel documents, and as a result would normally be

23   held in congregate settings pending their processing under

24   the Immigration laws.

25               Under the Title 42 order, those non-citizens can

1    be rapidly screened and then quickly expelled, substantially

2    reducing the risk of transmission.  If those non-citizens

3    were required to be processed under Title 8, they would have

4    to be transported to Border Patrol stations or held at ports

5    of entry, facilities that are not designed or equipped to

6    quarantine, isolate or treat COVID positive individuals, and

7    they would be held for lengthy periods in these crowded and

8    over-capacity facilities, posing a substantial risk of the

9    spread of COVID-19 to other non-citizens, CBP officials and

10   the public at large.

11          Two different panels of this Court have already

12   concluded in granting stays of preliminary injunctions in

13   this case and PJES that the Government is likely to succeed

14   on the merits and we similarly ask this Court to vacate the

15   district court's preliminary injunction which was premised

16   on an erroneously cramped view of the CDC's authority under

17   Section 265.

18          JUDGE WALKER:  Ms., Ms. Swingle, you started out

19   by mentioning, or leading with the CDC's expertise, health

20   expertise, and as you know, the plaintiffs have to a

21   somewhat small degree in their briefing suggested that this

22   decision was not really made based on any health concerns.

23   Now the arbitrary and capricious challenge that the

24   plaintiffs brought to this order was not briefed on this

25   appeal, but it was raised in their complaint; and so, I, I,

1  I'd be grateful if you could, if you could address some

2  concerns I have about whether this order was arbitrary and

3  capricious as the plaintiffs allege in their complaint, and

4  some factors that seem to inform my concern, that do inform

5  my concern are as follows.

6         One is that the statute refers to introducing a

7  disease, but COVID is, unfortunately, quite introduced into

8  the United States by this point in time.  In particular,

9  with regard to Mexico and Canada, which the order applies

10 to, I don't know of anything in the record suggesting that

11 COVID is more prevalent in Mexico or Canada than it is in

12 the United States.  In addition to that, the order only

13 covers about .1 percent of people who cross the Canadian or

14 Mexican border; and I don't know of anything in the record

15 suggesting that those .1 percent of border crossers are more

16 likely to have COVID than the other 99.9 percent.

17        In addition, the order applies only to Mexico and

18 Canada.  I don't know of anything in the record suggesting

19 that those two countries have especially high prevalence of

20 COVID relative to other countries that are not covered by

21 the CDC'S order.

22        And then I guess I would add to that sort of,

23 perhaps less specific, but a general concern, maybe concern

24 is the wrong word, but factor in the arbitrary and

25 capricious analysis, that the plaintiffs have alleged and

1    cited to some reports that there are no experts in the CDC

2    who actually think any health concerns justify this order;

3    that the order was forced on the CDC's director over the

4    objections of those career CDC people who refused to sign

5    the order.  And I would suggest maybe if the order was

6    justified, was not arbitrary and capricious, in March of

7    2020 when there was so much uncertainty.  It's now January

8    of 2022 and we've heard from Dr. Fauci, who in many ways, in

9    many instances, this Administration has pointed to as, as an

10   expert deserving of trust, and he has said directly that

11   expelling immigrants is not a solution to COVID-19.

12          Now I'm not suggesting that we should defer to Dr.

13   Fauci, but it seems that the Administration has sometimes

14   suggested that his, his guidance is worthy of deference.

15   So, with all of those things in mind, can you explain to me

16   why the plaintiffs were not correct when they said that this

17   policy is arbitrary and capricious?

18          MS. SWINGLE:  So, there's a lot there to unpack

19   and I hope you'll give me a chance to address it with all

20   due steps.  First, I just, as Your Honor's question, I

21   think, made clear, the arbitrary and capricious claim that

22   was brought by the plaintiffs was not the basis for the

23   district court's preliminary injunction; and they have not

24   argued that that should be a basis for this Court to affirm

25   that injunction as not being abusive discretion on wholly

1  alternative grounds.  So, I think it's not appropriately

2  before the Court.

3          But I want to be also clear that the CDC has and

4  continues to apply its public health expertise, and as

5  recently as the August 2021 new order has again concluded

6  that the order remains necessary as applied to members of

7  family units and single adults who cross the border without

8  valid travel documents.  And the reason for that really goes

9  to the circumstances in which those individuals would be

10  held under normal immigration processing, which is to say if

11  they cross outside of ports of entry, they would be held in

12  Border Patrol stations that are often rather small

13  facilities; often, you know, largely over capacity even in

14  normal times, much less in these COVID times with restricted

15  capacity in an effort to mitigate the spread of COVID.  And

16  those conditions are highly conducive to the spread of

17  COVID-19 to non-citizens, to CBP officials and the public at

18  large.

19          Now to get to some of your specific questions, if

20  I can start sort of where you ended with Dr. Fauci?  I would

21  encourage the Court to listen to the specific Dr. Fauci

22  interview that the plaintiffs cite multiple times in their

23  brief seconds after the quote that they rely on, he was

24  specifically asked if there was a medical necessity for the

25  CDC's Title 42 order and he said that he was not

1  sufficiently aware of the circumstances to express a comment
2  on that issue.  So, I think that it in no way undermines the
3  CDC's judgment; and it's a judgment that has been made
4  repeatedly across two political administrations, and as
5  recently as the most recent re-review of the order at the
6  end of November of this year, last year, that the order
7  remains necessary to protect the public health.

8         I think the fact that there is a higher prevalence
9  in Mexico or Canada, or a lower prevalence was not the basis
10 for the order.  I think the basis for the order is the
11 spiking incidents.  The continuing basis for the order is
12 the spiking incidents of COVID, most recently in August of
13 the new delta variant and I, obviously, I'm not telling the
14 Court anything it doesn't know; but now the Omicron variant
15 has also had an impact on the need for the order.

16        Going to your question about, but I would add that
17 the CDC did note that the non-citizens who were coming to
18 the United States across the border were coming from
19 countries that at that time had lower vaccination rates than
20 within the United States.  You mentioned the very small
21 percentage of the individuals who crossed the order who are
22 subject to the order.  That, again, is not surprising
23 because those are the individuals who would be held in
24 congregate settings at CBP, border stations or ports of
25 entry.  Now for individuals who cross with valid travel

1  documents, the process of entering is very quick.  It does

2  not involve any kind of confinement or holding in a closed

3  setting that poses the kind of risks of transmission that

4  are really designed to be responded to by the CDC's order.

5         And then, finally, going to your first question

6  about how the CDC's expertise is implicated by its

7  interpretation of introduction.  The CDC determined, and I

8  think reasonably so, that introduction can occur when

9  somebody moves into the country in such a manner as to pose

10  a risk of transmission of a communicable disease; and here,

11  an individual who crosses the border and, you know, walks

12  five miles into the interior of the country who would then

13  come into contact with other persons in a way that would

14  risk transmission of COVID-19 is reasonably understood to be

15  in the process of introduction; and I think that reflects

16  CDC's application of its expertise about the way in which

17  communicable diseases spread and the circumstances that give

18  rise to the public health emergency that justified the order

19  here.

20         JUDGE SRINIVASAN:  As I understand the basis of

21  the order, though, the fact that somebody comes in and then

22  might encounter other people, let's say sometime afterwards,

23  that can't be the basis for the order because that's true of

24  all kinds of people who come over, who immigrate into the

25  country.  The entire rationale for the order, I think, has

1  to be because otherwise it would be substantially under-

2  inclusive.  It has to be bound up in the congregate

3  settings, right?  It's all about the congregate settings

4  because any other explanation that deals with COVID at large

5  just can't substantiate this order, I think you would agree

6  with, and that's why the order is framed as it is.  It has

7  to do with the congregate settings and the congregate

8  settings are a product of the way that the Government

9  chooses to structure its affairs.  Now I'm not saying that

10 there's practical alternatives.  I don't mean to suggest

11 that there's something that's, you know, just obviously

12 there that should be done.  I'm just saying that it's a

13 consequence of the way that the Government structures its

14 handling of persons who come to the order without

15 documentation and seek these forms of relief under Title 8.

16         MS. SWINGLE:  And, yes, I don't mean to suggest

17 otherwise, Judge Srinivasan.  I would just add that to the

18 extent that those congregate settings and, and the normal

19 mechanism by which non-citizens would be processed when they

20 are in the United States, or enter the United States without

21 valid travel documents poses the risk attains both as to

22 individuals who can be turned away at the border and

23 individuals who manage to evade the prohibition on entry by

24 entering outside of ports of entry.

25         JUDGE WILKINS:  When, when does introduction end?

1          MS. SWINGLE:  So, I think that's an interesting

2   question and I think it's one that is addressed in part in

3   one of the final rules, the September 2020 final rule which

4   reflects that somebody who has been in the United States for

5   longer than the incubation period, and doesn't have symptoms

6   or hasn't tested positive may have finished introducing

7   himself into the United States, that's at 85 F. Reg. 56445;

8   but I, I don't think, you know, the, the challenged order

9   applies to individuals who are apprehended or encountered at

10  or near the border after either entering, presenting

11  themselves at a port of entry, or entering, you know,

12  outside of a port of entry; and I think the plaintiffs here

13  have not brought any challenge that somehow it's being

14  applied to people who have been apprehended far enough away

15  from the border, or a long enough period of time that they

16  are no longer still in the process of being introduced.

17          JUDGE WILKINS:  Thank you.

18          JUDGE SRINIVASAN:  Can I ask a question about the

19  inter-relationship between 265 and the Title 8 provisions

20  that provide for a particular process, or at least an

21  entitlement vis-à-vis asylum, the withholding of removal and

22  the Convention Against Torture?

23          MS. SWINGLE:  Certainly.

24          JUDGE SRINIVASAN:  So, the context against which

25  we think about the inter-relationship between those, because

1    I think both sides treat with the inter-relationship, and

2    what you say is, well, 265 takes control because it, it

3    deals with the specific context of the kind of emergency

4    we're dealing with here and so it tends, it supersedes,

5    overrides or carves out from what otherwise would be the

6    case under Title 8.  Then the other side says, no, that's

7    got it backwards; actually, the specific provisions are the

8    ones under Title 8 and they carve out from what otherwise

9    might be authority under 265; and so, I'm trying to figure

10   out how do we, how do we assess which side has it right in

11   terms of which statutory regime governs over the other one

12   to the extent that there's an inter-relationship between the

13   two and a need to harmonize them or figure out how they work

14   together in this, in this situation?  And so, the context

15   against which we assess that question is informed by the

16   fact that the Title 8 already accounts for inadmissibility

17   for individuals who have communicable diseases and says that

18   if you have a communicable disease, that's a ground for

19   inadmissibility and so you don't otherwise qualify for

20   admission into the United States; but it specifically,

21   Congress specifically said even as to that ground of

22   inadmissibility for somebody who actually has a communicable

23   disease and it's a communicable disease of public interest,

24   I can't remember the precise wording, but I think you know

25   the language, of public significance maybe is what it says;

1  that the Title 8 entitlement still govern and so

2  notwithstanding that somebody has a communicable disease of

3  public significance, they still have the entitlement to see

4  through the processes under Title 8 to seek asylum relief

5  under withholding or Convention Against Torture.  So, if

6  that's the balance that Congress has already struck with

7  respect to somebody who has a communicable disease and is

8  inadmissible to the United States by virtue of that, then

9  that seems to me to, to have some salience as we're trying

10  to figure out how 265 interrelates with the Title 8

11  authorities.

12         MS. SWINGLE:  Absolutely, Your Honor.  I would

13  first point out that, of course, the district court did not

14  ground its preliminary injunction on that, that argument.

15  It didn't reach it.

16         JUDGE SRINIVASAN:  Yes.

17         MS. SWINGLE:  Didn't rule on it.  So, it would be,

18  in the Government's view --

19         JUDGE SRINIVASAN:  It's, it's definitely an

20  alternate ground and I take, and I appreciate your, your

21  noting that; but it's also one that's at least before us, I

22  think, because both parties have briefed it as an alternate

23  ground and you've engaged on it.  That's not necessarily to

24  say we would do it without sending it back, but it's at

25  least to say that it's a possibility.

1          MS. SWINGLE:  Agreed, Your Honor.  I would first

2    point out that even at the time that the predecessor statute

3    to Section 265 was first enacted in 1893, communicable

4    diseases were already at that point a ground of

5    inadmissibility under the immigration laws; but Congress

6    clearly meant to displace that general rule and to grant a

7    broader authority to, at that time, the president to suspend

8    introduction of persons in the face of a significant public

9    health emergency of the sort that is the basis for invoking

10   Section 265.  So, I think you can see in that, that Congress

11   understood, even at the time, that Section 265's predecessor

12   would be focused on a very specific, rare set of

13   circumstances; and I think under normal principles of the

14   specific governing the general that reflects a Congressional

15   intent for this different rule to apply in the unique

16   circumstances that we are facing in this --

17          JUDGE SRINIVASAN:  If I can just stop you there

18   for a second?  That's true, but at that point in time, you

19   didn't have the Title 8 humanitarian provisions that you

20   have now; and you didn't have Congress having struck the

21   balance in favor of those, in, as against somebody who

22   presents with a communicable disease.

23          MS. SWINGLE:  So, I, I agree that the Congress in

24   enacting the Convention Against Torture and the refugee

25   protocol did set out generally applicable rules for

1   immigrants generally.  I think our view is that Section 265,

2   nevertheless, constitutes the more specific rule of

3   decision; and I think to the extent that there is conflict,

4   you can look to the text of Section 265 and its context, and

5   drafting history, you know?  It was originally entitled the

6   suspension of immigration, that the, the specific provisions

7   of the statute envision that the, initially the President,

8   now the CDC, will have the authority to suspend the right to

9   introduce.  That right was one that was understood to be

10  applicable, in our view, under the immigration laws; and the

11  suspension of immigration necessarily encompasses the

12  authority to suspend what would otherwise be the operation

13  of the immigration laws in the face of this kind of unique

14  public health emergency.

15          JUDGE WILKINS:  Is there also, and, and I guess an

16  argument that Section 265 says basically Congress is giving

17  the Surgeon General the authority where there is serious

18  danger of the introduction of such disease into the United

19  States, is that, I guess, fodder for your argument that this

20  is the specific trumping the general because nowhere in

21  those other immigration statutes is there kind of a, an, I

22  guess an acknowledgement that there is a serious danger

23  introducing the communicable disease into the United States?

24          MS. SWINGLE:  Yes, Your Honor.  That is our view.

25  To the extent there is anything in the immigration laws

1  relating to transmission of communicable diseases, it's in

2  the grounds of ineligibility that were in place already at

3  the time that Section 265 was enacted and was clearly

4  intended to supplant.  And to the extent we're looking at

5  sort of generally applicable entitlements to apply for

6  asylum or relief under the Convention Against Torture, those

7  have no reference to the kind of significant public health

8  emergency at issue here.

9            I do want to be clear, however, that in its

10  application of the Title 42 order, the CBP officials are

11  providing an opportunity for some humanitarian relief for

12  non-citizens who express fear of torture upon return to the

13  country that is the country of destination.  They are being

14  referred to USCIS for further screening.

15            JUDGE SRINIVASAN:  But you're not taking the view

16  that that complies with Title 8, right?  You're just saying

17  that that (indiscernible)?

18            MS. SWINGLE:  That's correct.

19            JUDGE SRINIVASAN:  Otherwise, we wouldn't even

20  have this dispute if it actually --

21            MS. SWINGLE:  Exactly, Your Honor.

22            JUDGE SRINIVASAN:  Can I ask you, does the

23  Government on, on this set of issues, I didn't read anywhere

24  in the brief that the Government draws any distinction as

25  among the three forms of Title 8 relief that we're talking

1  about, i.e., asylum, withholding of removal and Convention

2  Against Torture, that they stand or fall together?  Either

3  there's, either if plaintiffs are right in their alternate,

4  alternative argument, there's an entitlement to pursue that

5  Title 8 process notwithstanding 265 as to all three, or your

6  right that that entitlement that otherwise would, would,

7  otherwise would exist is non-existent in the face of an

8  assertion of 265 authority?

9        MS. SWINGLE:  That's correct, Your Honor.  We have

10 not distinguished between the, the three forms of relief.

11 We think in these circumstances where Section 265 has been

12 invoked, all of them are displaced.

13       JUDGE SRINIVASAN:  Can I ask you one other, one

14 other question?  It's, it's on a little bit of a different

15 axis.  So, getting back to the point that the focal point of

16 the order is the circumstances in congregate settings, and

17 that's really the basis against which the order was

18 promulgated and then renewed, what's the status of

19 unaccompanied minors vis-à-vis congregate settings because I

20 know that unaccompanied minors aren't covered by the order;

21 and the question I have in my mind is in terms of the

22 rationale for not including, are they meaningfully

23 differently situated vis-à-vis congregate settings?  I, it's

24 not my understanding that they avoid congregate settings

25 altogether.  It may be the case that there, as a rough

1  average, they're there for a lesser amount of time.  I don't

2  know for sure, but I'm just curious to get your explanation

3  as to why unaccompanied minors are carved out vis-à-vis the

4  concerns about congregate settings that underly the order?

5          MS. SWINGLE:  Your Honor, so I think unaccompanied

6  minors are different in a number of pretty critical ways.

7  Obviously, for an initial period of time upon their

8  encounter, they are going to be held in a congregate setting

9  pending transfer.  They would be held, as with other

10  distinct demographics, separately from other members or

11  family units, for example, or single adults.  There are a

12  much smaller number of unaccompanied minors who are

13  encountered than members of family units or single adults in

14  particular.  So, the risk of overcrowding is in some

15  respects lessened as to that population; but I think most

16  importantly they can be transferred to the Office of Refugee

17  Resettlement has robust capacity for holding those minors,

18  and they can be transferred quickly into those facilities

19  which have testing available; they have quarantine and

20  isolation available; they can provide vaccination for the

21  minors; and then they can ensure that during that period in

22  which they need to be quarantined or isolated, they are

23  actually complying with mitigation protocols.  For members

24  of family units, there is not the comparable ability to do

25  that kind of monitored quarantining or isolation testing

1  treatment in a way that exists for the unaccompanied minors.

2       JUDGE SRINIVASAN:  But if I'm understanding it

3  correctly, that happens after leaving the initial congregate

4  setting because if you, if the order was based on what

5  happens outside of the congregate setting, then there's lots

6  of people who are coming over every day who raise the,

7  exactly the same kinds of concerns but aren't covered by the

8  order.  So, the order has to be justified by what happens in

9  the initial congregate setting, and so the distinction

10 between unaccompanied minors and members of family units

11 would need to be grounded in a different, vis-à-vis that

12 initial placement, in a congregate setting before the

13 unaccompanied minors go to an RR facility and have the kinds

14 of benefits that you've, you've listed.

15       MS. SWINGLE:  Principally, Your Honor, but I, I

16 want to respond in a couple of ways.  First, in addition to

17 the risk of congregate settings, there is this question

18 about the strain on local regional healthcare resources.

19 You know, in the CBP facilities, in the ports of entry,

20 there are limited or no medical resources available and so

21 for individuals who are sick, who need treatment, who need

22 to be tested, particularly PCR testing, they need to be

23 transported to local healthcare facilities for that

24 treatment and testing; and so that itself both risks spread

25 of COVID but, in particular, in areas where there are

1  limited resources that can be a real strain on the resources

2  of the healthcare institutions at a time when they are

3  already strained because of rising COVID rates in the local

4  communities.  So, I think that's one distinction that we

5  see.

6           The second, you know, yes, absolutely one critical

7  risk is of the spread in the congregate settings; but one of

8  the concerns about spread in congregate settings is about

9  the, then the potential spread into a local community.  And

10 for members of family units because of the Flores

11 settlement, there are limits on how long members of family

12 units can be held in detention.  And so what's happening is

13 that if they are being processed under Title 8 after being

14 held in this congregate setting which is posing this risk of

15 spread of COVID, they are then released on discretionary

16 parole into the community; and the concern is that people

17 who either were previously infected upon entering the

18 country, or who have then become infected in that congregate

19 setting are then being released into the community where

20 there is limited ability to quarantine, isolate, monitor the

21 compliance.  And I think --

22           JUDGE SRINIVASAN:  But that, but that's true, but

23 is that, that's just true of all kinds of people who come

24 across the border every minute of every hour of every day.

25 They are released into a community.  So, there has to be

1  some --

2          MS. SWINGLE:   I would respectfully disagree, Your

3  Honor, because what I'm saying is that the risk is caused by

4  the release after the holding in the congregate setting,

5  right?

6          JUDGE SRINIVASAN:   Right.   So, then it's the

7  congregate setting that creates the problem.   So, everything

8  comes back to the basis of the order which is bound up by

9  the congregate, initial congregate setting.

10         MS. SWINGLE:   Yes, although I, I think the risk is

11  not limited sort of temporally to that period.

12         JUDGE SRINIVASAN:   Oh, I --

13         MS. SWINGLE:   Yeah, exactly.

14         JUDGE SRINIVASAN:   -- I take that point.   There's

15  subsequent risks that emerge from the initial congregate

16  setting but the differentiator is the congregate setting, at

17  least that's the entire gravamen of the order as I

18  understand it.

19         MS. SWINGLE:   That's correct, Your Honor.   And I,

20  I, I want to be clear for the Court, you know, the goal for

21  the Government is to eventually work back to orderly, normal

22  immigration processing; and notwithstanding the very real

23  resource constraints that DHS and ICE have been faced with

24  in light of limited Congressional expropriations, they have

25  taken significant steps in recent months, recent years, to

1  increase capacity and improve processing.  DHS has stood up

2  numerous emergency facilities and retrofitted existing ones

3  and, in part, that has allowed for greater capacity to

4  process unaccompanied children and now family members.  ICE

5  has transitioned existing facilities and DHS is sometimes

6  using private contractors to build out facilities; and they,

7  of course, have previously set up programs for special

8  exceptions for non-citizens which have allowed collectively

9  some 29,000 people to come in as exceptions to the order.

10  The goal is to, to return to a world in which everyone is

11  processed under Title 8 but we are just not there yet.

12          JUDGE SRINIVASAN:  On, on the, on that point, you,

13  you, you had also mentioned that for unaccompanied minors,

14  the numbers are less than the numbers for family units --

15          MS. SWINGLE:  Much, much less, yes.

16          JUDGE SRINIVASAN:  And I'm just wondering, how,

17  how much less is it if we only talk about the number of

18  individuals in family, family units who are, in fact,

19  processed under Title 42 rather than Title 8 because as I

20  understand the record, at least for one relevant period, 86

21  percent of individuals in family units were, in fact, given

22  the Title 8 process because of the refusal of other

23  countries to accept people who hadn't gone through the Title

24  8 processing.  So, I'm wondering what the comparison is

25  between unaccompanied minors and then the number of people

1  in family units who actually went, go through the Title 42

2  process, or the limited --

3         MS. SWINGLE:  Certainly, Your Honor.  You know,

4  the, the latest numbers are not in the record before the

5  Court, but they are available online.  DHS does keep those.

6  And I would just note that although at the time the opening

7  brief was filed, the most recent month had been a, sort of a

8  unique low in the percentage of family unit members who were

9  being expelled under Title 42.  That number has been

10  significantly higher in subsequent months and has varied

11  between over 11,000 individuals in November 2022 and over

12  17,000 individuals in August and September of 2022, and up

13  to a high of 30 percent, 31 percent of members of family

14  units in October 2021.  So, the 14 percent is not a number

15  that has remained static.

16         I don't have the numbers for unaccompanied minors

17  directly in front of me, but my understanding is that they

18  are a much smaller number compared to the number of family

19  member units who have been expelled.  And, of course, I

20  would just add, if I might, you know, that the District

21  Court's reasoning here, although it was applied in a class

22  action brought only by members of family units would be

23  wholly applicable to any category of non-citizens expelled

24  under the order and I would just mention that the numbers

25  for single adults have remained staggeringly high and the

1   idea that the Government would be able to process, you know,

2   what now is like probably close to 100,000 non-citizens

3   monthly and hold those individuals in congregate settings

4   is, obviously, an alarming specter from the public health

5   perspective.

6          JUDGE SRINIVASAN:  There's, looking in the record

7   of, of prior CDC regulations in 2017 related to Ebola and

8   other communicable diseases, do any of those prior

9   regulations purport to give the CDC the authority to suspend

10  immigration laws and expel persons either, either

11  explicitly, or did it happen?

12         MS. SWINGLE:  So, I don't believe so, Your Honor.

13  I would note that those regulations were not issued under

14  Section 265.  I believe the only time Section 265 has

15  previously been invoked to suspend introduction of persons

16  was in response to the epidemic coming from China and the

17  Philippines in 1929; and it, which did not by its plain

18  terms provide for expulsion; but, of course, in the

19  Government's view, suspending the introduction of persons

20  from a country sort of necessarily encompasses the authority

21  to expel somebody who comes in contravention of that

22  prohibition.

23         In the same way, you know, Federal law prohibits,

24  for example, the unauthorized entry onto the White House

25  grounds; and, surely, the fact that that also provides for

1  criminal punishment, a fine or imprisonment of somebody who

2  violates that prohibition doesn't disable the Secret Service

3  from, you know, apprehending somebody who has managed to hop

4  the fence and turning them around again.

5           JUDGE WILKINS:  But it doesn't mean that they have

6  the authority to, for example, you know, shoot and kill them

7  on sight, right?  I mean there's, there's, there's, because

8  they can stop the introduction doesn't mean that they can

9  stop the instruction any way they so please?

10          MS. SWINGLE:  Agreed, Your Honor.  Our point is

11 only that the power to suspend introduction or prohibit

12 introduction is most normally understood to include the

13 power to expel somebody, push out somebody who has entered

14 notwithstanding that prohibition.

15          JUDGE WILKINS:  What are we to do with, I mean I'd

16 be, I'm inclined to be very sympathetic to your position,

17 but we have Supreme Court authority that says that when, you

18 know, an agency is, is taking, you know, unprecedented, you

19 know, action or, or exercising some unprecedented power,

20 that we are to look askance at that; and, and so, so what

21 are we to do with that authority?

22          MS. SWINGLE:  With all due respect, Your Honor, we

23 think that line of authority is simply not applicable here.

24 This is not a circumstance in which, you know, the

25 Government has exercised an authority that has long been

1  understood to be, or has long been applied in a more

2  circumscribed kind of way.  This is a very rarely used

3  authority which is coming to bear in an extraordinary public

4  health emergency of a sort, you know, never seen in our

5  lifetimes and I think, with all due respect, this is akin

6  to, for example, the application of the Medicare, Medicaid

7  rules to require vaccination that the Supreme Court has just

8  recently opined on and that was the subject of our 28(j)

9  response letter last evening.

10         You know, this is a unique and extraordinary

11  circumstance, and it is hardly surprising that the

12  Government would invoke a quite extraordinary power that was

13  intended to be a quite extraordinary power to bring, has

14  brought that to bear to respond to try and protect the

15  public health.

16         JUDGE WILKINS:  Well, of course, your friends on

17  the other side say it's more akin to the OSHA rule that the

18  Court struck down, right?

19         MS. SWINGLE:  And we think that's just simply not

20  correct.  This is not a circumstance in which we are

21  claiming the power to regulate some vast array of economic

22  activity.  This is not a restriction that applies even to

23  U.S. persons and it is carefully circumscribed, and I think,

24  you know, really tailored to the precise risk that happens

25  when non-citizens are being held in these congregate

1    settings in a, in a manner that poses really a substantial

2    risk of the spread of this terrible disease.

3         JUDGE SRINIVASAN:  This is also a category of

4    persons as to whom, just to get back to Title 8, the record

5    materials indicate, and I think just what the Title 8

6    provisions are about, are some harrowing conditions that are

7    faced by people who are turned away; and I think you, you

8    would, you would acknowledge that aspect of this such that

9    the 265 authority when it's asserted in this context will

10   mean that individuals who otherwise couldn't be sent back to

11   a particular country because they will be tortured there,

12   will be.

13        MS. SWINGLE:  Certainly, Your Honor.  We are aware

14   of and deplore the quite horrific circumstances that non-

15   citizens are in in some of the countries that are at issue

16   here.  I would take issue with the fact that somebody who

17   expresses a fear of torture certainly is being referred

18   appropriately to USCIS for a possible exception; and, you

19   know, we are, we do have humanitarian exceptions to the

20   Title 42 order.  We have previously used that to try and

21   bring in particularly vulnerable people and I would just

22   note that the August 2021 order, again, contains a new

23   exception for programs if they can be developed to safely

24   bring people to ports of entry consistent with public health

25   needs to try and apply for the kind of relief Your Honor is

1   seeking.

2           JUDGE WILKINS:  How would you want the Court to,

3   to use that information, I guess, in your favor?  Is it just

4   information that we use in, in thinking about irreparable

5   harm or, or balance of equities, or does it go to likelihood

6   of success on the merits?

7           MS. SWINGLE:  So, I, I don't think it goes to

8   likelihood of success on the merits as to the statutory

9   authority question that was the basis for the District

10  Court's preliminary injunction; and I also don't think it

11  goes to likelihood of success on the merits at this stage of

12  the litigation where neither the plaintiffs, nor the

13  defendants, have briefed that as an alternate basis for

14  affirming the preliminary injunction.  I do think it is

15  relevant at the balancing of equities stage.

16          Of course, in the Government's view, because a

17  likelihood of success on the merits is a necessary factor to

18  be established to be a basis for preliminary injunction, in

19  the Government's view, that court doesn't actually need to

20  reach the balancing of evidence.

21          JUDGE WALKER:  But if we disagree with you about

22  likelihood of success on the merits and we have to reach the

23  balance of equities, I wonder if we should consider the sort

24  of self-contradiction between your, the Department of

25  Justice's briefing in this case and the Department of

1  Justice's current cert petition with regard to remain in
2  Mexico where the cert petition says alien sent to Mexico
3  faced persecution, abuse and other harms.  The cert petition
4  says there's, quote, "Extreme violence perpetrated by
5  criminal organizations."  The cert petition says sending
6  asylum seekers to Mexico doesn't, quote, "Align with the
7  Administration's values."  And as you know, and as I think
8  you don't contest, the plaintiffs in this case describe how
9  the plaintiffs will be pushed across bridges at predicable
10 times, locations where cartels lie in wait.  They tell the
11 story of a mother who was expelled and then armed men
12 grabbed her and raped her multiple times while she begged
13 them not to harm her daughter; and they say that's just one
14 example, an example out of 3,000 or so kidnappings and other
15 attacks.  So, what are we supposed to do with this, what I
16 would describe as self-contradiction between the cert
17 petition you filed on remain in Mexico and your argument
18 with regard to the bounds of equities in this case?
19        MS. SWINGLE:  So, Your Honor, I don't believe
20 there is contradiction there.  We have not contested that
21 migrants are, have been subject to extremely harrowing
22 conditions in Mexico or elsewhere; and, certainly, we
23 deplore the horrific treatment of those individuals by
24 gangsters, and criminals, and violent persons.
25        JUDGE WALKER:  I, I understand why.  I, I

1   appreciate that and I, I know that you, you're not, you're

2   not denying it.  You're conceding that, that, that's the

3   reality they face, but you seem in this case to be

4   downplaying it relative to what you describe as the risk

5   from COVID, which as I mentioned, covers only .1 percent of

6   people who cross the border.  I understand that there have

7   been congregate settings, but this isn't March 2020.  We

8   have widespread, available, effective vaccines.  We also

9   have a whole host of testing that wasn't as widely available

10  and treatments as well.  So, I'm not asking whether you,

11  whether, whether you agree that these terrible risks exist

12  for these migrants.  I know you agree that they exist.  I'm

13  asking you to sort of square how much you emphasize them

14  relative to other values and concerns in the remain in

15  Mexico litigation and how much you seem to devalue them with

16  regard to COVID concerns in this litigation.

17            MS. SWINGLE:  So, with all due respect, Your

18  Honor, I simply don't agree.  Obviously, the Government's

19  goal is to get back to a state of orderly immigration

20  processing for everyone; but currently, in CDC's view, the

21  public health realities don't permit that.  And just to

22  respond to a couple of specific points in your question, for

23  example, yes, vaccines are more available; but vaccinating

24  somebody upon encounter does nothing to reduce the risk that

25  that person may spread COVID in a congregate setting in the

1  days after vaccination when the vaccine has not yet become

2  effective.  Testing is, you know, certainly more widespread

3  now and I don't want to downplay its efficacy.  It is one of

4  the mitigation measures that --

5          JUDGE WALKER:  Ms., Ms. Swingle, if I may

6  interrupt.  I didn't mean that it would be effective to

7  vaccinate the migrants.  I meant that the American citizens,

8  those who wish to be protected through vaccination have had

9  that option for almost a year now and the administration has

10  said that those who are vaccinated will have a good, a good

11  year, something like a good summer, a good year ahead.  The

12  Administration has said that the unvaccinated are at great

13  risk and that, you know, it's, it's sort of criticized them

14  for making that choice; but I'm, I'm saying in a country

15  where everyone who wants to be vaccinated has been

16  vaccinated, and in an era where the vaccines are as

17  effective as they are, how is it that you, you devalue these

18  risks to migrants that you seem to emphasize so much in your

19  remain in Mexico litigation?

20          MS. SWINGLE:  So, if I may, Your Honor, I think,

21  yes, many CBP officials are now vaccinated who were not

22  vaccinated in March 2020.  We certainly are extremely happy

23  that there is a vaccination available and widespread, more

24  widespread through the United States than it was at the

25  outset of these challenged rules and orders.  On the other

1  hand, you know, we have new variants even as of August 2021.

2  The delta variant was a game changer and can lead to

3  breakthrough vaccinations even in vaccinated, breakthrough

4  infections even in vaccinated people.  That doesn't mean

5  that non-citizens are vaccinated.  You know, there is a

6  change in the calculus of risk and I think the CDC has

7  responded, you know, effectively and timely to changed risk

8  by, for example, accepting unaccompanied children as the

9  facts on the ground have changed; but in the CDC's judgment,

10  the need for this order remains in place notwithstanding the

11  changes that have happened.  And I think --

12          JUDGE WALKER:  Is there any, is there any

13  affidavit in the record from an expert at CDC attesting to

14  what you just said?  Maybe there is.  I, but I'm asking.

15          MS. SWINGLE:  No, Your Honor, but I would also

16  just point out that, you know, no record has been put

17  forward yet.  This was all decided at the preliminary

18  injunction stage.  I would just add, you know, I think this

19  all highlights the need why the CDC should be making the

20  public health determinations in the first instance.  I don't

21  need to tell the Court that this is an extremely dynamic set

22  of circumstances.  You know, at the time of the August 2021

23  order, we had the delta variant, which, you know, was a very

24  significant game changer in terms of sort of anticipated

25  plans for federal reopening and other things.  You know,

1  just in the past few weeks we have the Omicron variant.

2  These all emphasize why the CDC rather than, you know, a

3  judge issuing a preliminary injunction should be making

4  decisions about what the public health requires.

5           JUDGE SRINIVASAN:  There Is something called -- go

6  ahead, Judge Walker.

7           JUDGE WALKER:  Now, please, I was going to go back

8  to the likelihood of success on the merits.  So, please,

9  Chief Judge.

10          JUDGE SRINIVASAN:  I'm on likelihood of success on

11  the merits, too, so --

12          JUDGE WALKER:  Right.  Go ahead.

13          JUDGE SRINIVASAN:  Okay.  So, there is something,

14  there is something interesting about and anomalous about

15  this exercise of authority by the CDC because even if as a

16  general matter, I certainly don't take issue with the

17  proposition that the CDC director would be acting in the

18  interest of public health and is doing so, and is intending

19  to do so here for sure; and that would be true in the normal

20  instance in which 265 would apply to an across-the-board

21  kind of mechanism.

22          What makes this case something different in terms

23  of its architecture is that it only applies in the context

24  of border crossings and the order draws the kind of

25  distinctions that just make immigration policy because it

1  carves out certain categories; it carves in certain

2  categories; and it just, it can't help but be, it invokes

3  the assistance, totally understandably and necessarily, of

4  DHS and CBP; but it can't help but be a document that ends

5  up being an immigration policy resolution that is being done

6  under the auspices of the CDC.

7          MS. SWINGLE:  And with all due respect, Judge

8  Srinivasan, I think that is precisely what Congress intended

9  in enacting this statute.  You know, in 1893, in the fact of

10  a Cholera epidemic, and I might add a Cholera epidemic that

11  had already started in the United States, that had already

12  been introduced to the United States; that, you know, the

13  prior year the Government had taken action to try and stop;

14  Congress specifically intended to, to confer this authority

15  to suspend all immigration, as well as all non-immigrant

16  travel, or some subset of those people precisely in order to

17  stop this kind of increased transmission of a disease,

18  increased risk of a transmission of a disease.

19          JUDGE SRINIVASAN:  Right, no, but I think all non-

20  immigrant travel, true, factors into this because something

21  that would apply to everybody coming here, of course, it's

22  going to overlap with immigration.  I, I completely take

23  that point.  It's necessarily bound up in it.  But when the

24  document deals specifically with the population of

25  undocumented immigrants and draws distinctions among

1  undocumented immigrants, it starts to sound like exactly the

2  type of immigration debates that have been vexing

3  immigration policy makers for a long time.

4       MS. SWINGLE:  Well, you know, Your Honor, I think

5  it's really quite instructive to look at the legislative

6  history and, in particular, the drafting history of what

7  became Section 7 of the 1893 Act because in that debate over

8  the statute and in the various iterations of the bill that

9  were considered and rejected in favor of this one, there was

10 widespread understanding about precisely what Your Honor is

11 discussing, which is that the authority conveyed by this

12 statute would allow the President to choose subsets of

13 individuals crossing the border to suspend the introduction

14 of, prohibit the introduction of precisely, in order to

15 reflect, you know, judgments about the difference in

16 consequence and impact of bringing, for example, immigrants

17 versus travelers who came for tourism or pleasure purposes,

18 immigrants versus U.S. citizens or U.S. persons.  So, I

19 think it envisioned, you know, I, I appreciate that

20 immigration policy gets kind of caught up in this, but I

21 think that is by virtue of the sort of basic set of

22 circumstances that this statute is intended to address which

23 is the fear of significant danger of transmission of a

24 disease over the border coming from people crossing the

25 border.

1           JUDGE SRINIVASAN:  I have, I have one last

2  question along these lines, but I, and then I want to make

3  sure my colleagues don't have additional questions for you,

4  which is you're not going to buy this, this premise, but I'm

5  just going to ask you to buy it just for purposes of

6  understanding the architecture of the case; and that is that

7  among the various grounds that he plaintiffs have asserted,

8  before us, not at large in the case, but before us, am I

9  right in understanding that the one that would be the

10  narrowest limitation on the scope of the CDC's authority

11  under Section 265 would be the Title 8 ground as opposed to

12  either the ground on which the District Court rested, which

13  is that there, the power to stop introduction just doesn't

14  encompass expulsions at all; or the notion that the statute

15  was directed at the common carriers or third parties, and

16  you can glean that from the use of the, the introduction,

17  that Title 8-1 is narrower in scope, not narrower in scope

18  in a way that you would accept, but narrower in scope than

19  those other two grounds?

20           MS. SWINGLE:  I do think in, in that sense it's

21  probably technically narrower in scope because, of course,

22  there are other arguments would leave Section 265

23  essentially insignificant or really a nullity.  I would say

24  that as a practical matter, the ramifications of that would

25  be substantial because it would require offering processes,

1   procedures for any individual subject, potentially subject

2   to the order to invoke rights or protections under the

3   asylum laws or the CAT beyond what is being done now in a

4   way that effectively would, I think, eviscerate the

5   authority of the Government to apply the order in the way

6   that it's actually protective of public health.

7        JUDGE SRINIVASAN:  Yes, certainly with respect to

8   the order, I, I, I completely take that point.  As, with

9   respect to the scope of 265 at large?

10       MS. SWINGLE:  Yes, I, I agree, Your Honor.

11  Certainly, the other arguments that this is only intended to

12  be a regulation of common carriers or that, I think, the

13  most extreme version of the argument that the Government can

14  issue a prohibition on entry, but has no ability to enforce

15  that except through criminal prosecution and fines, those

16  would, obviously, be much more sweeping.

17       JUDGE WALKER:  If I could, if I could ask a

18  question or two on the, on the merits and likelihood of

19  success?  I think I'm with you on both, on this statute not

20  just applying to transportation, third-party providers; and

21  I'm also, I think I'm with you on the statute didn't need to

22  expressly give the executive the authority to expel an order

23  for the executive to be able to expel under this statute.

24       And even on some of the Title 8 questions, I, I

25  think I might be with you.  It seems odd to give an asylum

1  process to someone who 265, to, who under a 265 order is

2  guaranteed to not be able to get asylum, someone whose,

3  whose very presence is rendered illegal under 265.  And then

4  on the Convention Against Torture, as you mentioned, that,

5  there may be some accommodations for that under the order as

6  it exists.

7           So, what, what do I do if I think only on the

8  right to withholding of removal is this order inconsistent

9  with the statutory right to withholding of removal?  What do

10  I do then?

11          MS. SWINGLE:  So, again, Your Honor, I, I think we

12  would urge because those were not issues the District Court

13  ruled on, if the Court thought that that were a significant

14  question, we think it ought to be sent back to the District

15  Court.  I do think withholding of removal is somewhat

16  different from the right to apply for asylum in the sense

17  that it is a defense to removal which is a process, a term

18  of art under the immigration laws; and, of course, the

19  individuals here are not being removed within the meaning of

20  that term of art.  They are simply being expelled.  And I

21  want to be clear, this is, this is not actually an adverse

22  immigration act.  It has no adverse consequences under the

23  immigration laws, unlike removal, which has some legal

24  consequences for non-citizens.  This is simply not that

25  process.  It's a wholly different thing.

1        JUDGE WALKER:  Can you, can you spell that out a

2    little bit for me because I mean I think that may be the

3    solution to this case from my perspective.  The, the

4    difference between expelling, as you're doing under this

5    order, and removing in the sense that the statutory right to

6    withholding of removal to a, to a place where you'll be

7    persecuted uses the term removal.

8        MS. SWINGLE:  Yes.  So, and, again, this has not

9    been briefed and so I'm, I'm winging it a little bit here

10   and I, I want to not be inaccurate for the Court; and,

11   certainly, if this is something Your Honor would like

12   supplemental briefing on, we would be happy to provide it.

13   Withholding of removal is a defense to removal for somebody

14   who would otherwise be subject to removal, either expedited

15   removal or normal removal under Title 8; and what is

16   happening in the, the, the implementation of this order at

17   ports of entry or outside of ports of entry is that

18   individuals who are encountered, who are subject to Title 42

19   are, the Government obtains some basic biographic

20   information on them just to check to make sure that they are

21   not criminal aliens who would be subject to prosecution

22   under the criminal laws; but to the extent that they are

23   not, they are then simply transported to a port of entry and

24   walked across the border; or if it's not possible to expel

25   them to Mexico, flown to another country; but there is no

1   adjudication made that would have any adverse consequences

2   for them.  The way it's documented in the Government's

3   systems is, is not something that has any negative legal

4   ramifications for a non-citizen who subsequently attempts to

5   enter the country or apply for relief, or some type of right

6   under the immigration laws.  It's, it's of no consequence.

7   Unlike removal, which may affect a statutory bar, for

8   example, to a subsequent effort to enter the United States.

9           JUDGE WALKER:  And I'm, I'm in some ways because

10   it wasn't briefed, you know, it wasn't the basis of the

11   District Court decision, I'm, I'm flying a bit blind myself.

12   So, don't take this as a, as a hostile question but, you

13   know, the right, the right to removal to a country where

14   you'll be persecuted seems to, to kind of make real a value

15   that we have as a nation that, you know, if, if there were a

16   genocide in another country, we wouldn't put somebody who is

17   currently on American soil back into that, that country if

18   their, if their group is the target of the genocide.  And

19   I'm not saying it's a way, applies to genocide, but that's,

20   that would be like the most drastic example.

21           So, imagine that there was a genocide against a

22   certain religion in Mexico and someone of that religion

23   crosses the border and encounters Border Patrol 10 minutes

24   later.  Are you saying that the statutory right to

25   withholding of removal would not prevent the United States

1  from taking that person from American soil and putting them

2  back in Mexico where in my hypothetical there's a genocide

3  and they, their group is the target of the genocide?

4          MS. SWINGLE:  So, two things, Your Honor.  First,

5  to the extent that that person expresses a fear of

6  mistreatment, a fear of torture upon expulsion, that person

7  is going to be referred to USCIS for relief.  So, I, the

8  order contemplates application of humanitarian exceptions to

9  expulsion; but, you know, in our view, the order is not

10 removal.  It is sort of operating apart and entirely

11 separate from the operation of the immigration laws; and so,

12 no, statutory defenses to removal being effectuated under

13 Title 8 do not apply.

14         JUDGE SRINIVASAN:  All right.  So, I mean as a

15 matter --

16         JUDGE WALKER:  And if I --

17         JUDGE SRINIVASAN:  Go, please, please, please

18 finish.

19         JUDGE WALKER:  I, I was, I was just going to

20 correct something I said earlier.  I misspoke when I said

21 every American can be vaccinated.  It's, it would be every

22 American over, over five and, at least unless they have

23 health conditions that, that prevent it.  I just wanted to

24 correct my misstatement, Chief.

25         JUDGE SRINIVASAN:  So, as I understand your

1    response, as a matter of legal authority, the hypothetical

2    that was presented by Judge Walker, the answer would be,

3    yes, the 265 authority would allow for sending that person

4    back in the face of the circumstances that he outlines.

5    There may be some minimal process that even you acknowledge,

6    I think you have to, is not the normal Title 8 process for

7    someone who is seeking withholding or relief, or protection

8    under the Convention Against Torture.  That, that may exist

9    as a matter of grace under the order; but as a matter, the

10   Government's understanding of the 265 authority, it does

11   completely supersede the withholding of removal protection

12   that otherwise would exist.

13            MS. SWINGLE:  That is correct, Your Honor.

14   Although, as I understand the withholding of removal, you

15   know, that is a statutory defense to removal under Title 8,

16   which is, obviously, not in our view what's happening here.

17            JUDGE SRINIVASAN:  And did you see a distinction

18   between withholding of removal and Convention Against

19   Torture?  I'm not aware that there's any distinction between

20   those other than I know that the order carves out this non-

21   Title 8 compliant minimalist process by which somebody can

22   affirmatively exclaim that they have, that they would be

23   subjected to torture if they were sent back.  I understand

24   that, that that's a possibility, and it's happened in a

25   handful of instances; but in terms of the relationship

1  between Convention Against Torture and withholding of

2  removal, I didn't understand there to be a distinction

3  between those two, but maybe there is.

4          MS. SWINGLE:  We have not drawn a distinction for

5  purposes of this humanitarian exception under 265, you're

6  correct, Your Honor.  In our view, the 265 expulsion

7  authority is independent from Title 8 and supplants what

8  would otherwise apply under Title 8, including any Title 8

9  defenses to removal.

10          JUDGE SRINIVASAN:  Okay.

11          MS. SWINGLE:  If I could just add --

12          JUDGE WALKER:  I think I would just anticipate,

13  let me just anticipate something that the plaintiffs are

14  going to say.  They're going to say we shouldn't ask for

15  supplemental briefing, or they're going to say we shouldn't

16  send this back to the District Court on this Title 8

17  question.  If, if that's what the Court would be inclined,

18  if the Court is inclined to disagree with the District Court

19  on what it did but wants to not decide the Title 8 question,

20  they're going to say, don't send it back to the District

21  Court because that would just put these plaintiffs through

22  months and months more of delay.  What, what's your response

23  to that?

24          MS. SWINGLE:  So, we don't disagree that the Court

25  can reach that question.  We do think it's, it's somewhat

1  anomalous to say the District Court didn't abuse its

2  discretion because it could have, but didn't rely on wholly

3  independent grounds; but, you know, it's certainly within

4  the Court's authority to reach that.  We just think that

5  they're wrong on the Title 8 question.

6  And if I can be precise about one thing, Judge

7  Walker, in offering supplement briefing, we're certainly

8  happy to offer supplemental briefing on Title 8 at large,

9  but I think the precise issue I was suggesting hadn't been

10  briefed really at all is whether if one were to look at

11  Title 8 defenses to removal or particular rights available

12  under Title 8, whether the defense against, the defense for

13  withholding of removal might be differently situated, for

14  example, than the right to apply for asylum which is not a

15  defense to removal but is, you know, a free-standing Title 8

16  provision.

17  JUDGE WALKER:  Okay.

18  JUDGE SRINIVASAN:  Thank you, Ms. Swingle.  If my

19  colleagues have no further questions for you at this time,

20  we'll give you some time for rebuttal; but we'll hear from

21  the plaintiffs now, Mr. Gelernt?

22  ORAL ARGUMENT OF LEE GELERNT, ESQ.

23  ON BEHALF OF THE APPELLEES

24  MR. GELERNT:  Good morning, Your Honors.  May it

25  please the Court, Lee Gelernt from the ACLU for

1    plaintiffs/appellees.  I want to just jump into the

2    conversation you've just been having about reconciling Title

3    8 with 265.  Just to clear up a few points.  Withholding

4    applies regardless of whether you're in the immigration

5    system because I gather that's what my friend's argument is,

6    that that's clear-cut.  The refugee convention says, to

7    quote, "It is expel or return (indiscernible) in any manner

8    whatsoever."  Our domestic law makes it clear you can apply

9    -- and the reason is sort of common sense, and this is laid

10   out in the UNHCR brief and the IRAP amicus brief, because

11   otherwise a sovereign nation could just relabel their laws

12   and then send anybody back where they want to to

13   persecution.  So, it can't be that it's limited to the

14   immigration laws.  That still leaves reconciling with 265,

15   but I just wanted to clear up that very specific point.

16        And on asylum, of course, you have a statutory

17   right to apply.  You have no statutory right ultimately to

18   be granted it.  Withholding and CAT are mandatory but,

19   ultimately, the Government is not raising a distinction.  I

20   think that's because they need to provide these -- putting

21   aside 265, they do need to provide these protections.  And

22   just one other note about CAT.  As Judge Srinivasan has

23   said, it doesn't, it's not a legal answer for the Government

24   because even if they were providing it for CAT relief, CAT

25   screenings at least, they would under Title 8 have to

1  provide for asylum and withholding screenings; and in any

2  event, I think we've pointed out, and some of the amicus

3  briefs have pointed out, it's a fairly illusory CAT

4  screening, but I want to turn to the larger issue about

5  reconciling 265 with these Title 8 protections.

6        I think the key is that the later statute applies,

7  but you, if there's a conflict; but you don't need to get to

8  that conflict, as Your Honors have been pointing out,

9  because it can be harmonized; and I just want to raise one

10 nuance point about, what may be a nuance about the

11 harmonization.  We think that the first step in harmonizing

12 as the Brown and Williams case lays out, and as the much

13 more recent case in Epoch lays out is you try and construe

14 the two statutes not to have a conflict.  If that doesn't

15 work, you then go to specific versus general CAT.  So, I

16 want to start with trying to harmonize the laws.

17        I think what's clear is that Congress, in enacting

18 the asylum laws, does not have a carveout for communicable

19 diseases.  Congress has repeatedly amended the asylum laws;

20 repeatedly created additional exemptions every few years,

21 but has never put in an exception for communicable diseases

22 or pandemics; and that's consistent with the refugee

23 convention which we're bound by and as, again, laid out by

24 UNHCR.  There is no exception in the Refugee Convention for

25 pandemics or communicable diseases and that's because what

1  the nations of the world decided was you can deal with those

2  with mitigation, but you're not to send someone back to

3  danger because of a communicable disease; and so, I, I think

4  that what we have are settled asylum laws, and so to the

5  extent you can harmonize the two laws not to conflict, the

6  law that's not settled in its interpretation, that's never

7  been interpreted is 265.

8          In 265, we have multiple reasons why we don't

9  believe 265 conflicts because we don't believe it allows for

10  expulsions because we don't believe it applies to only

11  transportation providers, but ultimately, I think you would

12  have to read a lot into 265 to override the balance Congress

13  has struck with these protective statutes.  So --

14          JUDGE SRINIVASAN:  Can I just, just to --

15          MR. GELERNT:  Yes.

16          JUDGE SRINIVASAN:  -- make sure I'm understanding

17  this part of your argument.  So, let's suppose, and I know

18  you're going to disagree with the premise, but let's just

19  suppose to get down to the nub of it on this axis of the

20  argument, that we disagree with you on expulsion and we

21  disagree with you on third-party/transportation.  So, we're

22  only talking about the inter-relationship between 265 and

23  the Title 8 entitlements.

24          And as to that, I'm not understanding how it's a

25  harmonization to say that the Title 8 provisions should be

1  given effect in the face of 265 any more than I understand

2  why it's a harmonization to say the opposite.  It just seems

3  like at the end of the day, one of them is going to be

4  viewed as a carveout to the other.  Under your argument,

5  it's that Title 8 is a carveout to what otherwise exists

6  under 265.  Under the Government's argument, it's that 265

7  is a carve out from what otherwise exists under Title 8.

8  So, it's not a harmonization; it's just a decision that one

9  of the statutory regimes is going to govern in the face of

10  the otherwise applicable other one.

11          MR. GELERNT:  Sure, Your Honor.  So, I think,

12  ultimately, if you got to the point where there's a, sorry,

13  irreconcilable conflict, that ultimately you would apply the

14  later enacted statutes.  That's sort of black letter law.

15  But as to the harmonization point, I think what you would be

16  saying is 265, on the assumption it applies to individuals,

17  not just transportation providers, it allows for expulsion,

18  still should be understood in light of the later statutes to

19  have Congress' policy decision to not send people back to

20  danger; and I think that's what Brown and Williamson teaches

21  as you had an earlier statute construed in light of later

22  statutes and policy directives from Congress in later

23  statutes, and so the Supreme Court went back and construed

24  the earlier statute in light of those later enactments.  I

25  think that's what we're saying here.  On your, on the

1  premise of your question, it applies to individuals and

2  allows exclusion, but it doesn't mean it needs to be

3  interpreted inconsistently with later enactments from

4  Congress in the asylum laws because I think it's very clear

5  that Congress did not want people sent back because of

6  communicable diseases; and the Charming Betsy canon,

7  obviously, comes in here where you have the international

8  laws being very clear and UNHCR rarely submits an amicus

9  brief, much less takes a position on a very specific policy

10  in one country, but they have here to point out that the

11  Refugee Convention does not allow for communicable disease

12  exception.  And I would just note just as a practical

13  matter, with the exception of Hungary, every European Union

14  country now has the exception allowing people to apply for

15  asylum.  There's been, you know, some differences in how

16  they do it, but ultimately only Hungary is not allowing

17  people to apply for asylum.  And on the Government's --

18          JUDGE SRINIVASAN:  Can I, can I ask a question

19  about the, whether these can be harmonized?  Section 265

20  discusses communicable diseases, but it has the additional

21  language that there is a serious danger of the introduction

22  of such disease into the United States.  Is it true that

23  that clause, there is serious danger of the introduction of

24  such disease into the United States does not appear in any

25  of the Title 8 provisions?

1          MR. GELERNT:  In, in the asylum provisions, it

2    does not, Your Honor.  What the asylum laws and the

3    withholding laws set out are various exceptions.  A good

4    many of them have to do with criminal convictions.  In

5    asylum, it has to do with when you apply.  There's various

6    exceptions that Congress has repeatedly enacted different

7    exemptions, but they have never put in a communicable

8    disease exception and I think that's because --

9          JUDGE SRINIVASAN:  But what I'm, I guess my

10   question then is, is can you, if our duty is to try to

11   harmonize these, then isn't that the answer as to how, how

12   you can harmonize 265 with the Title 8?  Is that Title 8,

13   Congress meant, well, you're not going to deny asylum to

14   people with communicable diseases so long as there is no

15   serious danger of them introducing such disease into the

16   United States; but if the surgeon general makes that finding

17   under 265, then the person with the communicable disease

18   will be treated differently.  Isn't that the answer as to

19   how you harmonize these?

20         MR. GELERNT:  Sure, Your Honor.  I, I don't think

21   that's the way we would view it, obviously, because we think

22   that Congress in refusing to make an exception for

23   communicable diseases, even if you actually had a

24   communicable disease, would have put something in.  And I

25   think the reason they didn't is because they're following

1  international law.  And if you were to reconcile the two

2  statutes that way, you would then be creating an

3  inconsistency between domestic law and international law.

4  And as the Charming Betsy cannon suggests, that is something

5  that the Court should try and avoid; and so, I think what

6  you have are the domestic laws specifically based on our

7  treaty obligations and those treaty obligations are very

8  clear that there is no exception even for a pandemic and

9  that once you have that, the domestic laws should be

10  construed consistent; and I think there's nothing in 265

11  that's clear enough to say, yes, this overrides the later

12  statutes.  I think to the extent you can harmonize it, you

13  have a statute that's never been interpreted.  And to go to

14  your earlier point, Judge Wilkins, it's absolutely

15  unprecedented to be used against individuals.  And contrary

16  to my friend's explanation of the 1929, that was only

17  against ships.  I think you can look at the historian,

18  public health historian's brief to see that it was only

19  against ships.  So, this is the first time in more than a

20  hundred years of its enactment, since 1893, that it's ever

21  been used.  So, you have a statute that's never been used

22  this way, has no definitive interpretation, does not have

23  language making it clear that you should override Congress'

24  policy judgments later on.  And so, you have those policy

25  judgments that are very clear, codified in the statute based

1   on our treaty obligations.  Congress very easily could have

2   put in --

3            JUDGE WILKINS:  But are you telling me that it

4   would violate international law if there were a disease

5   with, with 90 percent or more lethality, like some of the

6   Ebola strains, that was very communicable as a virus, you

7   know, airborne and there were no cure, no vaccine, no

8   effective treatment for it, that it would violate

9   international law for the United States or any other country

10  to bar persons from entering them and, and expel them even

11  if they had a valid asylum claim if that country made a

12  determination in its technical, scientific, medical judgment

13  that there was no safe way to kind of quarantine that

14  person, that it would violate international law to expel

15  that person?

16           MR. GELERNT:  Your Honor, so certainly your

17  hypothetical puts this into sharp relief, but it is the

18  position of UNHCR that there can be no exception.  Now I

19  want to, I want to make clear, and this is, this also is a

20  takeaway, maybe the biggest takeaway from the Supreme

21  Court's decisions that you referenced earlier is ultimately

22  Congress could decide to change the law and pull us out of a

23  treaty, or make a reservation about that aspect of the

24  treaty; but right now, under an international law, there is

25  no exception and I think, you know, you look at the European

1  Union countries, they've all managed to do this.  I think,

2  you know, your hypothetical does put this position to test

3  for UNHCR, but I think this is the position that

4  international law has taken because their commitment to

5  asylum is so solemn and, you know, for the U.S. after World

6  War II, it has been so solid.

7           I think in this, in, you know, this case going to

8  the equities, I think there's no reason why you would need

9  to expel asylum seekers.  And, I just want to say a couple

10 of points.  One, to, I'm sorry, Judge Wilkins --

11          JUDGE WALKER:  No, go ahead.

12          MR. GELERNT:  Did you want to -- I think two

13 points, one raised by Chief Judge Srinivasan, and the other

14 by Judge Walker, Judge Srinivasan's point about really it's

15 all about Congress settings and you see, I want to address

16 that; and I also want to come to Judge Walker's point about

17 what is going on here with CDC, and I think they're, they're

18 related.

19          We are not contesting, and I think this is

20 critical, we are not contesting CDC's expert judgment.  I

21 think it is absolutely clear from CDC's August 2nd order

22 what they are doing, the line they are, the needle they're

23 threading, and our experts also pointing this out.  What CDC

24 is saying is, look, the whole country is open.

25 Unaccompanied minors are processed in the exact same

1   Congress setting and sometimes, and even longer.  It varies

2   how long they spend and sometimes the numbers are exactly

3   the same going to your earlier questions you, Judge, in

4   November, for example, of this year, the numbers were the

5   same between how many expulsions of families there were and

6   how many UC's had to be, unaccompanied minors, sorry, had to

7   be processed; and, you know, again, as Judge Walker pointed

8   out, there has not been affidavit by CDC.  There's no

9   administrative record but, of course, CDC was free to put in

10  an affidavit.  Everybody under the sun for the Government

11  put in an affidavit except CDC; and you also, this is

12  mentioned in the amicus briefs because it was post our

13  briefs, but second in command at CDC, Anne Schuchat,

14  recently came out and testified before the House that

15  there's never been a public health justification for this.

16  She's since resigned.

17          And I want to get to the point about UC's because

18  I think that's critical.  It's all about congregate

19  settings.  The whole country is open, even a basketball

20  arena, one-third of NBA arenas do not require testing or

21  vaccines.  CDC has not said you shouldn't ride Amtrak,

22  airlines, domestic, all different sorts of congregate

23  settings are open.  The Government says, well, this

24  congregate setting is different.  Unaccompanied minors are

25  processed in the exact same place.

1          In the July order with unaccompanied minors, it

2    mentions that unaccompanied minors were spending 131 hours,

3    still they signed off, CDC signed off on the exemption for

4    them.  So, there's -- and there's really no difference.

5    Once you get out of, I'm not saying that it's for all the

6    reasons Chief Judge Srinivasan pointed out and Judge Walker,

7    then they're just, those people are just the same as anybody

8    else and they represent, they represented .1 of the traffic

9    over Mexico; .1, .01 percent of the traffic for Mexico, and

10   that was even before they've opened the country up to non-

11   essential traffic over Mexico.

12          JUDGE WILKINS:  That hasn't been in all part of an

13   arbitrary and capricious argument that's not before us?

14          MR. GELERNT:  Well, Your Honor, sure.  I think it,

15   it is most central to the arbitrary and capricious argument

16   that Judge Solomon could look at on remand; but I think it

17   does also go to the equities because I think the theme here

18   is that the Government's brief is essentially applying a

19   different standard to family asylum seekers than they are to

20   anybody else.  And I think that's most clear if you look at

21   the Government's brief, opening brief at 50 and 51, and the

22   reply brief at 25.  Every time we point out the mitigation

23   steps that CDC has suggested, they say, well, that would

24   not, quote, unquote, "Fully eliminate the risk, or eliminate

25   the risk."  But, of course, that can't be the standard that

1    CDC has pointed out.  It's not the standard for

2    unaccompanied minors.  It's whether it's acceptable risk or

3    there's a significant risk, a serious risk, and I think

4    that's really what's happening here is that this is getting

5    caught up in a debate about immigration, but it can't be

6    that these asylum seekers are presenting more of a risk; and

7    I think that's why Dr. Fauci came out and said, well, look,

8    I'm not responsible for Title 42.  I don't know anything

9    about it.

10              JUDGE WILKINS:  But, but still on likelihood of

11   success on the merits, counsel, I mean just common sense

12   introduced has to include expel.  I mean if, if, if a parent

13   tells children living in the house, you're not allowed to

14   introduce drugs into this house, and they, you know, search

15   the kids' bedroom and find drugs, you're not going to tell

16   me with a straight face that the parent couldn't throw the

17   drugs away.  That the parent somehow has to quarantine the

18   drugs because introduce doesn't mean expel, right?

19              MR. GELERNT:  So, Your Honor, as a parent, I'm

20   going to definitely agree with you, that I could throw the

21   drugs away; but I think it's different here for, for a few

22   reasons and I, but I didn't want to spend too much time -- I

23   want to answer your question as directly as I can but,

24   ultimately, agree that the narrowest way to do this is to

25   reconcile with the asylum laws.  But on your expulsion

1  point, I think a few things.  When someone's liberty is at

2  stake, there's never been a statute that allows someone's

3  body to be taken and moved from the country without a clear

4  statement, whether that's Immigration.  It breaks tradition.

5        The other point I would make is that the

6  Government concedes, and I think everyone concedes, that

7  this applies to U.S. citizens.  So, what you would be having

8  is Congress implicitly, implicitly saying we can summarily

9  expel U.S. citizens.  That would have been a big thing for

10  Congress to do in --

11        JUDGE WILKINS:  But, but, but that's not before

12  us.  All that's before us is this order.  This order doesn't

13  say anything about U.S. citizens.  It explicitly excludes

14  U.S. citizens.

15        MR. GELERNT:  Well, I think, Your Honor, you would

16  have to, you would have to bring that into bear for the

17  reasons that the Supreme Court has laid out in the Zadvydas

18  case and the Clark case.  In interpreting a statute, whether

19  the litigants who raised the constitutional problem were

20  actually before you, you ought to take that into account in

21  interpreting the statute.

22        I think the other thing that Supreme Court has

23  said is where it's so unprecedented, you ought to bring a

24  skeptical eye to this; but, ultimately, Your Honor, I

25  recognize that the Court may be not, not ready to go to that

1  argument on the merits; and so, on the asylum question,

2  that's a much more narrow issue.

3       JUDGE SRINIVASAN:  Before we go to asylum for, let

4  me just ask one follow-up question on the theory that's most

5  squarely before us, which is the one that District Court

6  adopted and that you're defending.  What is the implication

7  of that theory for whether the plaintiffs have committed a

8  crime because as I understand it, that theory would mean

9  that there's been an introduction and under, the way you see

10 the case, and I think your brief spells this out, there's an

11 alternate avenue of enforcement that's available to the

12 Government which is criminal prosecution under 371?  So, 271

13 rather, sorry.  So, does that mean that for this part of the

14 case, that the plaintiffs' class is subject to criminal

15 punishment?

16       MR. GELERNT:  They are, Your Honor, and I think

17 that's one of the reasons why there are, enforced mechanisms

18 are heavy civil penalties; there are criminal penalties;

19 there's quarantine; and, ultimately, they can be removed

20 under the immigration laws.  And this, I think, scopes over

21 all our arguments are --

22       JUDGE SRINIVASAN:  And does the commission of a

23 crime not affect the entitlement to any of the relief under

24 Title 8?

25       MR. GELERNT:  It does not, your Honor.  It has to

1   be a more serious penalty.  I would also note that even

2   without 265, it is illegal to cross between ports of entry.

3   That's 8 U.S.C. 1325.  It's a misdemeanor.  But the one

4   thing Congress made clear is whether or not you cross

5   between a port of entry, you can still apply for asylum.

6   So, for the Government to suggest, well, they have no right

7   to be here, therefore, it's absolutely not true.  That's 8

8   U.S.C. 1158.  The Supreme, the Ninth Circuit in the East Bay

9   case said it doesn't matter that people cross between ports

10  illegally.  They have a right to apply for asylum.  That was

11  Judge Bibey's decision that ultimately the Government asked

12  the Supreme Court to stay and the Supreme Court refused to.

13          So, what I think there are, are there are a lot of

14  deterrents.  There are penalties.  It's not as if you can't

15  do anything, and you ultimately can expel them.  There are

16  the immigration laws, and I want to be clear about how quick

17  that is because I think the Government is suggesting a huge

18  gulf in the time period.  The expedited removal statute was

19  enacted in 1996.  What Congress thought was, we need a swift

20  way to remove people right at the border, people who are

21  covered by the CDC order in effect.  And so, Congress said,

22  we're going to allow expedited removal.  If you're not

23  applying for asylum, that can be a matter of minutes, some,

24  but he just has to, a supervisor just has to sign off; they

25  have to ask if you want to apply for asylum; if no, the

1  supervisor signs off, you're gone right over, out of the

2  country.  If you want to apply for asylum, you can, but it's

3  a very quick timetable that under the regulations can last

4  about a week.  And on that, Congress, again, was very clear,

5  you still have to be allowed to apply for asylum even if

6  this expedited removal process is going to be applied to

7  you; and, again, but no exceptions for communicable

8  diseases.  So, I think it's, it's much quicker -- and so I,

9  I take Judge Wilkins' hypothetical and it's, it's a fair

10 one, but I think there are ways to deal with it.

11 Ultimately, Congress can change it, but I think

12 international law takes the idea that people running for

13 their lives have to be allowed to apply; there have to be

14 mitigation steps taken.  If we ever get to a disease where

15 there are literally no way to handle it, I ensure Congress

16 will react to that and, perhaps, (indiscernible).

17           JUDGE SRINIVASAN:  So, I guess, I guess the

18 question is, I guess the question is whether 265 already did

19 that and, and forecast that possibility and left it up to

20 the CDC direct, at that time the Surgeon General, I guess,

21 but the CDC director as to whether we're in that situation

22 now.  And as to that, I, I take the point that under the

23 existing laws under Title 8, Congress has already made,

24 struck a balance between somebody who has a communicable

25 disease and whether they're nonetheless entitled to apply

1  for asylum.  That balance has been struck.  And I also take

2  the point that because having a communicable disease is a

3  ground for inadmissibility, then we're already talking about

4  people who at least pose some danger to the United States

5  because otherwise why make it a ground of inadmissibility if

6  they're not going to pose a danger to the United States in

7  the first place?  That's the reason the communicable disease

8  is a problem because it could be introduced.

9        But as Judge Wilkins points out, 265 talks about a

10  serious danger and the argument that the Government makes is

11  that it's only a narrow emergency situation in which you

12  have the serious danger, and Congress hasn't yet struck that

13  balance.  That's -- 265 does that.  265 says in the narrow

14  necessarily, historically, almost unprecedented

15  circumstances in which this kind of authority can be

16  asserted, Congress did strike the balance and say that 265

17  governs even if in non-emergency situations the entitlement

18  to asylum would overcome somebody who has a communicable

19  disease.

20        MR. GELERNT:  Sure, Your Honor.  So, I think what

21  we have then is a statute in 1893 that not specific to

22  asylum and no, and protection of what it might overcome.

23  So, there's no sort of clear statement in the statute and I,

24  and I think that's sort of like Brown and Williamson.  You

25  have a statute that's not been definitively interpreted, and

1  you then have yet later statutes where Congress is making

2  clear what they think about the very specific issue; and I

3  think that's the asylum laws.  So, I don't think you're

4  foreclosed from interpreting 265 to say, well, there's going

5  to be an exception because I don't think 265 directly

6  addressed it.  And I want to take a step back because even,

7  even if it goes more to our first two arguments that there's

8  no expulsion, only transportation providers, I do think some

9  of the historical context is worth emphasizing.

10         It may seem implausible in today's day that

11 Congress would have only regulated transportation providers

12 or not put in an expulsion for individuals.  The reason is

13 because two things were markedly different back in 1893.

14 The first was the immigration landscape.  As the legislative

15 history points out, 95 percent of immigrants came just to

16 the New York harbor, and that doesn't include Boston and San

17 Francisco harbor; so, virtually all immigrants came by ship

18 to the harbor.  So, there was very little land migration.

19         Secondly, the Federal Government really wasn't

20 involved in the public health sphere.  They were just

21 tipping their, dipping their toe in in 1893, but they were

22 relying on the states and the historian's brief lays this

23 out.  The states could criminalize.  They even expelled

24 people.  And the Federal Government couldn't practically

25 actually enforce the border.  They did not have agents along

1  the border, the states did that.  So, for the Congress

2  looking at this, they would have said, well, there's very

3  few people coming at land; we don't have the agents along

4  the border; we're going to leave that to the states.

5          So, I think what's happening is the Government is

6  suggesting, well, it couldn't be that they wouldn't regulate

7  individuals back in 1893, but the fact is, again, as the

8  historian's brief lays out, that's what they were doing

9  because that was the landscape.  But even if you don't

10  accept either of those two arguments, I think there's

11  nothing in that statute that says you can't reconcile it

12  with very clear pronouncements by Congress later on.  And --

13          JUDGE SRINIVASAN:  What about the language that

14  says suspension of the right to introduce because if, if

15  we're past the transportation part, I, I take it, I know

16  that you have the response that what that was about was

17  licenses; but for purposes of this part of the argument,

18  we're already past that.  Then the suspension of the right

19  to introduce, it could be that the right to introduce is the

20  sort of thing that asylum covers and what 265 contemplates

21  is suspension of that kind of right.

22          MR. GELERNT:  Sure, Your Honor, that, that is the

23  Government's argument.  I think what we believe is that

24  that's not sufficiently clear language and if it was in a

25  dependent clause, and I think as Your Honor just pointed

1  out, it's most naturally read to suspend the license of a

2  shipping company.  And I, I think what it goes to is the

3  larger point of is there anything in 265 that is so clear

4  that it's going to allow the CDC director to wipe away all

5  our asylum laws, withholding laws, CAT laws, that really is

6  an enormous change to the landscape; but I know the major

7  questions issue that's raised in the CATO brief has been

8  used with economic, with economic questions; but I think to

9  wipe away all of the U.S.'s protection statutes in violation

10  of international law would be an enormous step and I think

11  there's nothing that suggests you cannot reconcile 265.  And

12  it would be very different, I think, I don't that the legal

13  question would be different, but I think we might be in a

14  different conversation if there was really no way to

15  mitigate.

16          And one thing I want to mention about what my

17  friend said, and my friend said, well, we really want to do

18  this; we're working at it.  And I think that was a fine

19  response first month, second month, third month, but we're

20  two years into this and we're six months from CDC saying you

21  can do this, here's the road map, you've done it for

22  unaccompanied minors release, HHS has done it for

23  unaccompanied minors, but up 14 new emergency shelters in

24  only two months, 20,000 new beds.  Here's the road map for

25  you to do it.

1          And so, I think what Judge Sullivan, just bringing

2     a common sense approach to it said is, look, at some point,

3     this is just a matter of allocating resources.  CDC is

4     giving you a road map how to do this.  It's been a long

5     time.  It seems like DHS needs a little bit of a push.

6     There's something going on here that can't be strictly about

7     public health because as Judge Walker pointed out, when you

8     start, and, and Chief Judge Srinivasan pointed out, when you

9     start comparing the various groups, it's clear that these

10    asylum seekers don't prevent such a different risk.

11         So, we are not taking issue with CDC.  We are just

12    simply saying at some point DHS needs to comply with CDC,

13    and it's been a long, long time now; and we, as Your Honors

14    know, we put this case on hold --

15         JUDGE WILKINS:  But how are we, so how are we

16    supposed to look at that?  I mean either the statute, we,

17    we're to decide whether the statute gives the Government the

18    authority to do this or not, whether it's wise for them to

19    be doing it or not.  I don't think it's for us to assess

20    whether they could avoid doing this if they allocated their

21    resources differently, or more efficiently, or more wisely

22    is not for us to assess.  We're assessing whether the

23    statute gives them this authority.  So, what, what are we

24    supposed to do with, with, with, with that argument that

25    you're making?

1          MR. GELERNT:  Sure, Your Honor.  I, and I, I

2   apologize if I was conflating two different parts of our

3   case, but I was simply going to the, I moved without much of

4   a transition, I apologize for that, moving to the equities

5   arguments.  Simply saying I think that they can reconcile

6   that the asylum, withholding and CAT statutes, and I don't

7   think it raises the specter, going to the balance of harms,

8   it raises the specter that Your Honor's hypothetical

9   presented because I do think -- and, you know, if anything

10  like that ever came about, it may be that they don't have

11  the power to do it but the injunction wouldn't be proper.

12  You can deal with that at the equities but, ultimately, I

13  think if something catastrophic like that ever did happen

14  where there were literally no vaccines, mitigation steps, I

15  think that's probably where Congress steps in and says we're

16  bowing out of the treaty, or maybe even the international

17  community says we need to adjust.  I was simply going to the

18  equities and I think there's absolutely no question that the

19  theme here is that the Government's brief is treating asylum

20  seekers very differently.  All the mitigation steps that

21  have been recommended by everyone are not enough according

22  to the Government because they don't fully eliminate and,

23  again, CDC has repeatedly said it cannot be a zero risk.

24  They're letting people go to basketball games, fly on

25  planes, Amtrak, unaccompanied minors.

1          The other thing I would make as a point of

2    comparison is in litigation over ICE facilities where people

3    are being detained long-term, the Government has repeatedly

4    said in every brief, we don't have to eliminate all risk,

5    just have to make it acceptable and mitigation steps are

6    sufficient like testing and various things.  So, I think

7    even there the Government has made it clear there is

8    absolutely no way there could be zero risk and so they're

9    applying a different standard.  I think that's not

10   dissimilar to the contradictions that Judge Walker pointed

11   out with the MPP briefing about individual harms.

12          And, you know, I haven't, I want to just turn for

13   one second to the individuals' harms.  I don't need to dwell

14   on it. I think Judge Walker laid them out carefully, but

15   it's literally like the families are walking the plank and

16   the U.S. Government knows it.  The U.S. Government is

17   pushing them over the bridge, walked, as they walk over the

18   bridge.  The cartels are sitting there waiting for them.

19   Mothers and fathers are holding their little kids' hands

20   knowing that the cartels are at the other end.  In some

21   regions, between 20 and 40 percent of the families are being

22   targeted and then, for kidnapping; and then after the

23   kidnapping, the most brutal treatment, sexual assault,

24   mothers being assaulted in front of their kids; and so, for

25   the, for the Government to say, look, transmission risks for

1   this one group outweigh all those harms, I, I don't think

2   it's plausible and I think Judge Sullivan was right to find

3   that the balance of equities favors us; but, again --

4           JUDGE SRINIVASAN:  Well, what's, what's your

5   response to the Government's argument that, that this case

6   is not really like the OSHA reg, that it's really more like

7   the Medicaid?

8           MR. GELERNT:  Yeah, I, I think, Your Honor, that

9   what the Supreme Court said in the Medicare is the law was

10  very specific that they had done all of these types of

11  things, protect from infection could, and answered

12  questions, argument that, sorry, that the, the companies'

13  arguments at, at oral argument, that they could do various

14  measures, make them wear gloves.  So, it was just a matter

15  of degree, I think; and the, the statute was much clearer.

16  I think this is closer to OSHA where it was unprecedented,

17  this type; and this is really night and day from regulating

18  ships.

19          In 1893, we have gone through a number of

20  pandemics, including the Spanish flu and meningitis.  They

21  have never used it to expel people.  And so, the other thing

22  I would, with all due respect to my friend on the other

23  side, the Government's letter said, well, this is only non-

24  citizens, a certain group of non-citizens being expelled.

25  It's not economic impact on Americans.  I would submit that

1    I'm not, I don't want to minimize any of the economic

2    impact, but I would submit that the harm here is deeply

3    great.

4              And what the Supreme Court, to the extent there's

5    a takeaway in all the Supreme Court cases, and I think there

6    is, it's you can't factor in the dangers of COVID in

7    interpreting a statute.  You need to find that very specific

8    statutory authority and you want to be very skeptical if

9    it's never been used before.  This statute goes way back,

10   obviously, before the OSHA statute.  This statute goes back

11   to 1893.  And, and, again, I would urge the Court to look at

12   the historian's brief because the example the Government

13   gave of it being used in 1929, which is already almost a

14   hundred years, is simply wrong.  That was only for

15   transportation entities.  So, it's never been used for

16   expulsions and, certainly, not after Congress said we have

17   to have these asylum laws.  We are never going to allow what

18   happened after World War II to happen again.

19             JUDGE WILKINS:  And that balance of equities, I

20   can imagine two very different responses, different from

21   each other, but that would be responses to, to your, to your

22   argument on the equities.  One is an argument, and I'm

23   neither endorsing or criticizing either of these arguments.

24   One is an argument that we've heard that you'll ultimately

25   have a better humanitarian situation with fewer people

1  taking great risk to cross the border if the Government

2  makes it extremely painful on them when they are

3  apprehended.  So, that's one, I'd like you to respond to

4  that and the other, the other one as well.  It's very

5  different.

6           We heard in the vaccine oral argument, Justice

7  Breyer asked on multiple occasions the question along these

8  lines.  He would say to the challengers, I'll assume your

9  argument is reasonable.  I'll assume the Government's

10 argument is reasonable.  Rather than exactly trying to

11 figure out, you know, which is better there have been, he

12 kept mentioning the statistic of 750,000 new COVID cases

13 yesterday he said.  He said I mean there were three quarters

14 of a million new cases yesterday, new cases, nearly three-

15 quarters, seven and some odd thousand, okay?  And you said

16 the hospitals are today, yesterday, full, almost to the

17 point of the maximum that ever see in this disease, okay?

18 And he said, are you telling me that when I consider the

19 stay factors, or when this Court considers preliminary

20 injunction factors, that that really shouldn't just be the

21 end of the case?  There, COVID is, COVID is prevalent.  The

22 Government is trying to protect people from COVID and we

23 ought to just, when we balance equities, you know, just do

24 whatever the Government and the CDC say.

25           MR. GELERNT:  Sure, Your Honor.  I maybe take

1   those in the order you gave them to me.  One is on the

2   deterrence and I think that goes to a point that Chief Judge

3   Srinivasan asked, which is, isn't really what's going on

4   here in light of the lack of CDC affidavit and other

5   indications that this is being used as an immigration

6   statute?  People can debate whether the border policies work

7   and the asylum policies work but, ultimately, this can't be

8   used as an immigration provision to deter people; and I

9   think that relates to your second point of people are coming

10  over.

11          One point I neglected to mention is that at one

12  point the Government was safely doing 70,000 families,

13  processing 70,000 families.  They're only doing 30,000

14  families now.  So, it's absolutely clear they can do more;

15  but as to Judge, Justice Breyer's point, I mean, obviously,

16  he was in dissent in one of the cases; but, but putting that

17  aside, I think it goes to there they were simply asking can

18  we force mitigation steps?  Here we're saying even with

19  mitigation steps, we want to actually expel you.  And so,

20  all we're saying is that the mitigation steps are sufficient

21  to make family asylum seekers the same as all the other

22  groups who are being allowed to do stuff.  I, I think CDC is

23  saying, yes, go to a basketball game, 15,000 people, as long

24  as, you know, you, we urge you to vaccinate; we urge you to

25  wear a mask; but the arenas are not requiring that in many,

1  many college arenas and in one-third of the NBA.  The CDC is

2  not saying don't ride Amtrak; don't go on planes; and so, I

3  think, ultimately, that's what's going on here is that we

4  can't have a zero risk; we're never going to have a zero

5  risk; and asylum seekers can't be singled out for worse

6  treatment, have a zero risk applied to them, especially not

7  where the harm is so great.  Whatever --

8          JUDGE WILKINS:  But people have a choice to

9  whether to go to the basketball game, to get on the Amtrak,

10 to get on an airplane, you know?  Border Patrol officer who

11 is working, you know, they have to do their job and to the

12 extent that they are exposed to increased risk from

13 congregate settings from these people, they're not, they're

14 not similarly situated to those other circumstances.

15 They're, they're basically kind of forced into this.  Isn't

16 that part of what the, this order is trying to prevent?

17         MR. GELERNT:  So, a --

18         JUDGE WILKINS:  (Indiscernible.)

19         MR. GELERNT:  Sorry, Your Honor.  A few responses.

20 One is I think that the Government had been making that

21 argument much more forcefully and CDC had been pointing it

22 out much more forcefully in the very beginning. Now that

23 there are vaccines and there's a mandate for Federal

24 employees and most CBP officers are now vaccinated, I don't

25 think that's an argument that can be made that's, that CD,

1  that the Border Patrol is any different than other people

2  who come into contact.

3         The other point is that they're already coming

4  into contact with unaccompanied minors.  The CDC has said

5  that's fine.  So, I think, ultimately, they're not that much

6  different.  The people who work in the arenas, the people

7  who work on the planes, I think once you get out of that

8  Congress setting, then it no longer, the order can no longer

9  be justified; and within the Congress setting, I think

10 that's why the Government and CDC have pulled back from that

11 argument, because of the vaccinations, because they're

12 saying it's okay for unaccompanied minors to, to be

13 exempted.

14        And so, we, we, I want to be clear, Judge Wilkins,

15 we are not being cavalier.  We hope we are not coming off as

16 cavalier about COVID, but I do think the country now has

17 moved; and I think it, more importantly, CDC has said we'd

18 move to a place where mitigation steps are the solution;

19 and, notably, not only has CDC not put an affidavit in, it

20 made that clear in its August 2nd order that mitigation

21 steps are the way to go, but I am not aware of any real

22 public health support from the CDC order.  We've put in

23 affidavits from former CDC officials and other public health

24 experts saying that mitigation steps are the way to go.

25 What's really happening is DHS is refusing to take those

1  steps and I know that they've said that they're trying in

2  their, they want to do it; but now it's been two years and

3  it's been six months even since the August 2nd order.  At an

4  absolute, absolute minimum, one thing this Court can do is

5  send it back to Judge Sullivan and say, does DHS have a plan

6  for putting these mitigation steps in place because right

7  now DHS is refusing to even say how the mitigation steps are

8  coming along; and you, you see in their affidavits, for

9  example, the Shehulian (phonetic sp.) affidavit, where he

10  says these, these Congress settings were not designed for

11  this.  Well, that's all well and good if they weren't

12  designed; but now it's been two years to change them.  I

13  mean it can't be that hard to build outdoor processing; and

14  yet, they haven't done that, or not sufficiently.

15        The NGOs are saying we have more capacity, we'll

16  help you; and, ultimately, the Government, this is not

17  asking the Government to reverse gravity.  They know how to

18  do this because they've done it and safely processed at the

19  time of the order 86 percent of the families.  We're talking

20  about another 8,000 families that represents the 14 percent.

21  That's 267 a day.  That's half a plane load coming from the

22  entire southern border.  If we had ever said to TSA, could

23  you process 267 people from a plane load in the entire U.S.

24  and they said, well, we can't do it, we've, it's been two

25  years, that would be inconceivable, right?

1          Right now, they're processing 30,000 people.  They

2    absolutely can do this and I; and, again, I just, you know,

3    stressing what Judge Sullivan, I think looking at it from a

4    common sense standpoint said, if there's a likelihood of

5    success on the merits, which, yes, Judge Walker, we

6    absolutely have to show that; but if there is, ultimately,

7    there is extraordinary harm to these families, maybe out of

8    sight, out of mind to most of the American public, but just

9    really gruesome harm; and DHS can do this, they're doing it

10   for unaccompanied minors, they're doing it around the

11   country.  So, ultimately, I think that's where the case

12   comes down to; and I would urge the Court to at least take

13   the narrowest ground and reconcile with, as Brown and

14   Williamson did with the later statutes.  The Congress has

15   specifically looked at this issue.

16          JUDGE SRINIVASAN:  I'll make sure my colleges

17   don't have additional questions for you, Mr. Gelernt.  Thank

18   you

19          MR. GELERNT:  Thank you, Your Honors.

20          JUDGE SRINIVASAN:  Ms. Swingle, we'll give you

21   three minutes for rebuttal.

22          MS. SWINGLE:  Thank you, Your Honor.

23          REBUTTAL ARGUMENT OF SHARON SWINGLE, ESQ.

24                ON BEHALF OF THE APPELLANTS

25          MS. SWINGLE:  I'd like to just turn to this

1  question Mr. Gelernt left off and which was a focus of the

2  Courts' questioning earlier, which is how to best harmonize

3  what seems to be his primary argument today, how to

4  harmonize Section 265 and international treaties providing a

5  right to apply for asylum or for relief under the Convention

6  Against Torture.

7           So, this, perhaps, seems self-evidence, but I

8  would, I would note that those conventions, the Convention

9  Against Torture and the refugee protocol, which is the only

10 one that the United States is a party to, are non-self-

11 executing treaties.  They are non-self-executing treaties

12 that Congress then implemented into domestic law.  And so, I

13 think it is extremely odd to invoke the Charming Betsy

14 principle to try and harmonize the statutes.  I think the

15 question is, what did Congress intend?  And so, the best

16 evidence, I think, of what Congress intended is to put those

17 statutes side-by-side; and when we look at Section 265, I

18 think there are multiple indicia that Congress intended for

19 it to displace and be the more specific rule of decision in,

20 in contradiction to the immigration laws.

21           First, I think as Judge Wilkins pointed out, it

22 applies only where there is a determination of a serious

23 danger of the introduction of a communicable disease from a

24 foreign country into the United States.  We know from the

25 title of the section when it was originally enacted, it was

1   entitled, "Suspension of Immigration During Existence of

2   Contagious Diseases."  We can look to see that the President

3   was originally given the authority to invoke authority under

4   this section.  It was considered so significant a power to

5   be invoked that unlike the other provisions of the 1893 Act

6   which were invoked at the authority of the Secretary of

7   Treasury or of various health officials, this was the

8   President alone who had the power; and it's notable that

9   even in the current version of 265, the Surgeon General, now

10  the CDC, has to act in accordance with regulations approved

11  by the President, which I think is reflective of sort of the

12  significant nature of the decision being made under this

13  provision.

14          And then I think we can look to, as we've noted,

15  that the determination is that a suspension of the right to

16  introduce persons is necessary to protect the public health;

17  and that was intended to infer, confer the authority to

18  suspend immigration, which I think necessarily envisions

19  suspension of what would be the otherwise applicable

20  immigration laws.  And even today, the section is entitled,

21  "Suspension of Entries from Designated Places."  And so, I

22  think together that all manifests pretty clear congressional

23  intent that this statute should take precedence in the

24  extraordinary circumstances in which it is necessary to

25  invoke this authority.

1            And I just want to, one final point, it is true
2    that the only time that the President has previously invoked
3    Section 265 to suspend entry, it related to entry from
4    foreign countries; but I think that tells you very little
5    about what the outer scope of the authority is.  Obviously,
6    in 1929, when you're talking about passengers coming from
7    China and the Philippines to the United States, it would not
8    be surprising that they would be traveling by vessel; but I
9    would also note that the actual suspension order was not by
10   its terms so limited, and it referred to introduction
11   directly, or indirectly, and by trans-shipment or otherwise.
12            JUDGE SRINIVASAN:  Thank you, counsel.  If my
13   colleagues don't have additional questions for you, thank
14   you to you.  Thank you to both counsel for your arguments
15   this morning.  We will take this case under submission.
16            (Whereupon, the proceedings were concluded.)
17
18
19
20
21
22
23
24
25

<u>DIGITALLY SIGNED CERTIFICATE</u>

      I certify that the foregoing is a correct transcription of the electronic sound recording of the proceedings in the above-entitled matter.


_____       __January 28, 2022__
Tracy Hahn                       Date

DEPOSITION SERVICES, INC.