UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary of<br>Homeland Security, et al.,<br><br>Defendants. | Civ. A. No. 21-100 (EGS) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 3

    I.      CDC'S TITLE 42 AUTHORITY TO RESTRICT ENTRY ............................ 3

    II.     CDC'S INVOCATION OF TITLE 42 AUTHORITY .................................... 4

    III.    THE PRESIDENT'S EXECUTIVE ORDER AND CDC'S
           REASSESSMENT ............................................................................................... 5

    IV.    CDC'S TWO TERMINATION ORDERS .................................................... 7

    V.     THIS LITIGATION ....................................................................................... 8

STANDARD OF REVIEW ........................................................................................... 9

ARGUMENT ................................................................................................................. 9

    I.      CDC'S PUBLIC HEALTH DETERMINATIONS UNDER SECTION 265
           ARE UNREVIEWABLE ................................................................................. 9

    II.     PLAINTIFFS' ARBITRARY AND CAPRICIOUS CHALLENGE FAILS
           AS A MATTER OF LAW ............................................................................. 13

           A.     This Court's Review of CDC's Decision Is Highly Deferential ......................... 13

           B.     The August 2021 Order Was the Result of Reasoned Decisionmaking .......... 14

           C.     CDC's Title 42 Orders Are Not Subject to any "Least Restrictive
                 Means" Standard ............................................................................... 19

           D.     CDC Considered Available Alternatives Before Issuing the
                 August Order ..................................................................................... 24

           E.     CDC's August Order Reasonably Advanced Title 42's
                 Statutory Purpose ............................................................................. 28

           F.     CDC Was Not Required to Consider Harms to Noncitizens in
                 Issuing the August 2021 Order ........................................................ 33

    III.    AN INJUNCTION IS NOT AN APPROPRIATE FORM OF RELIEF
           AND, REGARDLESS, EQUITABLE FACTORS FAVOR
           DEFENDANTS ............................................................................................. 36

CONCLUSION ........................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
   429 F.3d 1136 (D.C. Cir. 2005)...................................................................................32

*Am. Wild Horse Preservation Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017)....................................................................................35

*Anglers Conservation Network v. Pritzker*,
   809 F.3d 664 (D.C. Cir. 2016)....................................................................................27

*Associated Dog Clubs of N.Y. State, Inc. v. Vilsack*,
   75 F. Supp. 3d 83 (D.D.C. 2014).................................................................................31

*Biden v. Texas*,
   142 S. Ct. 2528 (2022).......................................................................................12, 23

*Blount v. SEC*,
   61 F.3d 938 (D.C. Cir. 1995).....................................................................................30

*Bonacci v. Trans. Sec. Admin.*,
   909 F.3d 1155 (D.C. Cir. 2018)..................................................................................32

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011)..................................................................................................30

*Camp v. Pitts*,
   411 U.S. 138 (1973)..................................................................................................14

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)..................................................................................................28

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)..................................................................................................24

*Dep't of Homeland Sec. v. Regents of the University of California*,
   140 S. Ct. 1891 (2020)..............................................................................................35

*Dep't of Homeland Sec. v. Thuraissigiam*,
   140 S. Ct. 1959 (2020)..............................................................................................21

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019)..............................................................................................14

*EarthLink, Inc. v. FCC*,
   462 F.3d 1 (D.C. Cir. 2006).......................................................................................14

i

*eBay Inc. v. MercExchange, L.L.C.,*
　　547 U.S. 388 (2006) ............................................................................36

*Elec. Privacy Info. Ctr. v. IRS,*
　　910 F.3d 1232 (D.C. Cir. 2018) ...........................................................27

*Encino Motorcars v. Navarro,*
　　136 S. Ct. 2117 (2016) ........................................................................28

*FCC v. Fox Television Stations, Inc.,*
　　556 U.S. 502 (2009) ............................................................................21

*FCC v. Nat'l Citizens Comm. for Broad.,*
　　436 U.S. 775 (1978) ............................................................................14

*FCC v. Prometheus Radio Project,*
　　141 S. Ct. 1150 (2021) ..................................................................13, 31

*FDA v. American Coll. of Obstetricians & Gynecologists,*
　　141 S. Ct. 578 (2021) ....................................................................10, 11

*FERC v. Elec. Power Supply Ass'n,*
　　136 S. Ct. 760 (2016) ....................................................................13, 24

*Forest Cnty. Potawatomi Cmty. v. United States,*
　　330 F. Supp. 3d 269 (D.D.C. 2018) ......................................................9

*Franks v. Salazar,*
　　816 F. Supp. 2d 49 (D.D.C. 2011) ........................................................9

*Guedes v. ATF,*
　　920 F.3d 1 (D.C. Cir. 2019) ................................................................28

*Huisha-Huisha v. Mayorkas,*
　　27 F.4th 718 (D.C. Cir. 2022) ......................................................*passim*

*Huisha-Huisha v. Mayorkas,*
　　560 F. Supp. 3d 146 (D.D.C. 2021) ......................................................8

*IMS, P.C. v. Alvarez,*
　　129 F.3d 618 (D.C. Cir. 1997) ............................................................14

*Judulang v. Holder,*
　　565 U.S. 42 (2011) ..............................................................................33

*Lincoln v. Vigil,*
　　508 U.S. 182 (1993) ......................................................10, 11, 12, 13

*Louisiana v. CDC,*
    --- F. Supp. 3d ---, No. 6:22-CV-00885, 2022 WL 1604901 (W.D. La. May 20, 2022)..................8, 11

*Marshall v. United States,*
    414 U.S. 417 (1974) .....................................................................................................................11

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ....................................................................................................................36

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)......................................................................................................................13

*Nat'l Lifeline Ass'n v. FCC,*
    921 F.3d 1102 (D.C. Cir. 2019)..................................................................................................35

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004)......................................................................................................................27

*O.A. v. Trump,*
    404 F. Supp. 3d 109 (D.D.C. 2019).............................................................................................36

*Oceana, Inc. v. Locke,*
    831 F. Supp. 2d 95, (D.D.C. 2011)..............................................................................................9

*P.J.E.S. ex rel. Francisco v. Wolf,*
    502 F. Supp. 3d 492 (D.D.C. 2020)..............................................................................................5

*Phillips Chem. Co. v. Dumas School Dist.,*
    361 U.S. 376 (1960) ....................................................................................................................30

*Privacy Info. Ctr. v. IRS,*
    910 F.3d 1232 (D.C. Cir. 2018)..................................................................................................27

*Rodriguez v. Gonzalez,*
    451 F.3d 60 (2d Cir. 2006).........................................................................................................28

*Rural Cellular Ass'n v. FCC,*
    588 F.3d 1095 (D.C. Cir. 2009)............................................................................................14, 33

*S. Bay United Pentecostal Church v. Newsom,*
    140 S. Ct. 1613 (2020)................................................................................................................11

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943)......................................................................................................................23

*Sierra Club v. EPA,*
    No. 20-1121, --- F. 4th ----, 2022 WL 3694866 (D.C. Cir. Aug. 26, 2022) ...............................12

*Sierra Club v. Jackson,*
    648 F.3d 848 (D.C. Cir. 2011) ..............................................................................13

*Simpson v. Young,*
    854 F.2d 1429 (D.C. Cir. 1988) ............................................................................14

*South Bay United Pentecostal Church,*
    141 S. Ct. 716 (2021) ............................................................................................14

*Texas v. Biden,*
    --- F. Supp. 3d. ---, 2022 WL 658579 (N.D. Tex. Mar. 4, 2022) .....................7, 13

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ..............................................................................................28

*United States v. Simmons,*
    No. CR 18-344 (EGS), 2022 WL 1302888 (D.D.C. May 2, 2022) ......................13

*Vance v. Bradley,*
    440 U.S. 93 (1979) ................................................................................................30

*Water O. Boswell Mem'l Hosp. v. Heckler,*
    749 F.2d 788 (D.C. Cir. 1984) .........................................................................14, 19

*Webster v. Doe,*
    486 U.S. 592 (1988) ..............................................................................................12

*West Virginia v. EPA,*
    362 F.3d 861 (D.C. Cir. 2004) .........................................................................14, 33

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ..............................................................................................34

*Williams-Yulee v. Fla. Bar,*
    575 U.S. 433, 449 (2015) ......................................................................................30

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ..................................................................................................36

*Zevallos v. Obama,*
    793 F.3d 106 (D.C. Cir. 2015) .........................................................................13, 23

*Zhu v. Gonzales,*
    411 F.3d 292 (D.C. Cir. 2005) .........................................................................11, 13

**Statutes**

5 U.S.C. § 701(a)(2) ......................................................................................................9

5 U.S.C. § 706 .................................................................................................................22

5 U.S.C. § 706(1) ............................................................................................................27

42 U.S.C. § 264 ...............................................................................................................19

42 U.S.C. § 265 ........................................................................................................ *passim*

Act of Februrary 15, 1893, 27 Stat. 449 (1893) ......................................................3, 33

**Legislative Materials**

24 Cong. Rec. (Jan. 10, 1893) ................................................................................33, 34

H.R. Rep. No. 78-1364 (1944) ........................................................................................3

**Regulations**

42 C.F.R. § 70.15 ......................................................................................................19, 20

42 C.F.R. § 71.40 ...................................................................................................... *passim*

42 C.F.R. § 71.63 .............................................................................................................19

73 Fed. Reg. 58047 (Oct. 6, 2008) .................................................................................20

82 Fed. Reg. 6890 (Jan. 19, 2017) ............................................................................19, 20

85 Fed. Reg. 16,559 (Mar. 24. 2020) ...........................................................................4, 5

85 Fed. Reg. 17,060 (Mar. 26, 2020) ..................................................................... *passim*

85 Fed. Reg. 22,424 (Apr. 22, 2020) ...............................................................................4

85 Fed. Reg. 31,503 (May 26, 2020) ...............................................................................4

85 Fed. Reg. 56,424 (Sept. 11, 2020) ..................................................................... *passim*

85 Fed. Reg. 65,806 (Oct. 16, 2020) ...............................................................................5

85 Fed. Reg. 86,933 (Dec. 31, 2020) .............................................................................20

86 Fed. Reg. 8267 (Feb. 2, 2021) ....................................................................................5

86 Fed. Reg. 8025 (Feb. 3, 2021) ..................................................................................20

86 Fed. Reg. 9942 (Feb. 17, 2021) ..................................................................................5

86 Fed. Reg. 38,717 (July 22, 2021) ..........................................................................5, 18

86 Fed. Reg. 42,828 (Aug. 5, 2021) ..................................................................................*passim*

86 Fed. Reg. 69,256 (Dec. 7, 2021) ..................................................................................20

87 Fed. Reg. 15,243 (Mar. 17, 2022) ................................................................................7

87 Fed. Reg. 19,941 (Apr. 6, 2022) ..................................................................................*passim*

**Other Authorities**

Exec. Order No. 5143 (June 21, 1929) ..............................................................................3

Exec. Order No. 14,010 (Feb. 2, 2021) ............................................................................5

**INTRODUCTION**

Since the onset of the COVID-19 pandemic in March 2020, the Centers for Disease Control and Prevention ("CDC") has issued a series of orders ("Title 42 orders") invoking its authority under the Public Health Service Act, 42 U.S.C. § 265 ("Section 265"), to temporarily suspend the right to introduce into the United States certain noncitizens traveling from Mexico and Canada who would otherwise be held in congregate settings in ports of entry or U.S. Border Patrol stations. The currently operative order was issued in August 2021, when the highly transmissible Delta variant was raging in the United States, driving a stark increase in COVID-19 cases, hospitalizations, and deaths. After conducting a comprehensive assessment of the public health conditions as applied to border facilities, CDC determined that unlike unaccompanied children, excepting noncitizen single adults and family units from the order would pose a significant public health risk. CDC thereafter terminated the August order based on significantly improved public health conditions, but another federal court has preliminarily enjoined that termination order.

Plaintiffs and class members are noncitizen family units subject to the August 2021 order. They previously moved for and obtained a preliminary injunction based on their statutory claims, but the D.C. Circuit held that, subject to certain limitations, CDC likely has statutory authority to expel the class members, thus narrowing the scope of the preliminary injunction. Plaintiffs now move for partial summary judgment on their remaining claim that CDC's "Title 42 Policy" is arbitrary and capricious under the Administrative Procedure Act ("APA"), focusing primarily on the operative August order.

This Court should deny the motion. As a threshold matter, CDC's decision in issuing the August 2021 order is committed to the agency's discretion by law and not reviewable under the APA. This is so because CDC's exercise of its Section 265 authority involved a complicated analysis of a variety of factors uniquely within CDC's expertise and scientific judgment, and the statute provides no standards to guide the Court's review of the public health determination that the August order was necessary to prevent the serious danger of the introduction of COVID-19 into the United States.

On the merits, Plaintiffs' arbitrary and capricious claim fails as a matter of law. Despite Plaintiffs' attempt to challenge the rationality of the August 2021 order based on more current public health conditions, this Court's review is limited to the administrative record before CDC at the time of the August order. Here, the administrative record amply demonstrates that the August order was the result of reasoned decision-making. Central to CDC's public health determination was the rapid spread of the Delta variant, which was a particularly formidable threat to the unvaccinated, especially those in congregate settings. And yet, a significant number of incoming covered noncitizens who otherwise would be held in the border facilities' congregate setting for hours to days were coming from countries with low vaccination rates. Moreover, border facilities are ill-equipped to manage an outbreak and must rely on local healthcare systems for medical care to noncitizens, but there were worrisome signs of stress in healthcare resources in the southern regions of the United States. The United States was also experiencing a migratory surge of noncitizens entering the United States that threatened to lengthen the time noncitizens spent in border facilities. In the face of a confluence of factors, CDC reasonably concluded that the August 2021 order was necessary in the interest of public health.

Plaintiffs' attempts to argue otherwise are unavailing. They contend that CDC unreasonably deviated from its alleged "least restrictive means" standard for implementing public health measures. But CDC has no such all-encompassing agency policy. The 2017 CDC regulation Plaintiffs cite that adopted such a standard was in the specific context of quarantine orders applicable to U.S. citizens and others, which can implicate constitutionally protected liberty interests. Even if the standard were applicable here, the August order clearly met it because CDC considered and rejected various alternatives to expulsion precisely because those alternatives were either unavailable or inadequate to protect the public health.

Ultimately, Plaintiffs' challenge boils down to the idea that the government should have done more to resume normal immigration processing, either by building up more processing capacity, setting up testing and vaccination programs, or constructing facilities to quarantine the tens of thousands of migrants seeking to cross the border between ports of entry or present themselves at a

port of entry without valid travel documents. But Plaintiffs do not, and cannot, assert a "failure to act" claim, which requires them to identify a nondiscretionary duty unequivocally commanding Defendants to scale up those mitigation measures. While Plaintiffs evidently believe that CDC should have tried to protect the public health through different means (rather than invoking Section 265), this Court's review of CDC's expert judgment is highly deferential. Because CDC has reasonably explained its decision after considering the relevant issues, this Court should not substitute Plaintiffs' policy judgment for that of the agency.

For these reasons, and those stated below, this Court should deny Plaintiffs' motion for partial summary judgment.

## BACKGROUND

### I.     CDC'S TITLE 42 AUTHORITY TO RESTRICT ENTRY

Section 362 of the Public Health Service Act of 1944 provides the CDC Director "the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as [the CDC Director] shall designate," whenever CDC "determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States" and that "a suspension of the right to introduce such persons and property is required in the interest of the public health." 42 U.S.C. § 265. The provision is nearly identical to its predecessor statute, the Act of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452, except that the 1893 Act lodged the authority in the President.[1] Before the COVID-19 pandemic, the authority to restrict the entry of persons had been invoked only once—in 1929 by President Herbert Hoover during a meningitis outbreak in parts of Asia. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 727 (D.C. Cir. 2022); Exec. Order No. 5143 (June 21, 1929).

---

[1] In re-enacting the 1893 Act, Congress placed the authority in the Surgeon General. *See* H.R. Rep. No. 78-1364, at 25 (1944); 42 U.S.C. § 265. The authority was later transferred to the HHS Secretary and then delegated to the CDC Director. *See* 85 Fed. Reg. 56,424 (Sept. 11, 2020).

## II.      CDC'S INVOCATION OF TITLE 42 AUTHORITY

In March 2020, as the world faced a historic, unprecedented outbreak of COVID-19, CDC issued an interim final rule implementing its Title 42 authority, 85 Fed. Reg. 16,559 (Mar. 24, 2020), and simultaneously issued an order suspending the right to introduce into the country certain noncitizens (most commonly those who lack valid travel documents) traveling from Canada or Mexico who would otherwise be introduced into a congregate setting in a port of entry or Border Patrol station at or near the border, 85 Fed. Reg. 17,060 (Mar. 26, 2020) ("March 2020 order").  As CDC explained, these border facilities were "not designed for, and [were] not equipped to, quarantine, isolate, or enable social distancing," and the introduction of persons into congregate settings in such facilities "increase[d] the already serious danger to the public health" posed by COVID-19.  *Id.* at 17,061. Moreover, CDC explained that the "infection control procedures" then employed at the border facilities "[were] not easily scalable for large numbers of [noncitizens]."  *Id.* at 17,065.  In addition, the public health tool of conditional release was "not a viable solution in this context."  *Id.* at 17,067. CDC assessed that many covered noncitizens might lack homes or other places in the United States where they could effectively self-quarantine, self-isolate, or otherwise comply with existing social distancing guidelines.  *Id.*  And, in any event, "CDC lack[ed] the resources and personnel necessary to effectively monitor such a large number of persons."  *Id.*; *see also* 85 Fed. Reg. 31,503, 31,508 (May 26, 2020) (same).  CDC later extended and amended the order, and reassessed it periodically to determine its continued necessity.  *See* 85 Fed. Reg. 22,424 (Apr. 22, 2020); 85 Fed. Reg. at 31,509; AR22458– 472; AR23096–98.

In September 2020, following notice-and-comment rulemaking, CDC promulgated a regulation to govern its future exercise of Title 42 authority.  *See* 42 C.F.R. § 71.40; *see also* 85 Fed. Reg. 56,424 (Sept. 11, 2020) ("Final Rule").  As with the statute, the regulation authorizes the CDC Director to issue a Title 42 order "in the interest of public health" and "for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease" into the United States.  42 C.F.R. § 71.40(a).  The regulation defines "serious danger of the introduction of [a] quarantinable communicable disease into the United States" to mean "the probable

introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease." *Id.* § 71.40(b)(3). The Final Rule also explains that the regulatory definition does not require the CDC Director to make a numerical finding or a quantitative or empirical showing of probability in order to prohibit the introduction of persons. 85 Fed. Reg. 56,446. Instead, the Director may make a qualitative determination that the introduction of one or more persons capable of transmitting the quarantinable communicable disease is probable. *Id.*

In October 2020, CDC issued a new order pursuant to the regulation, superseding the prior orders. *See* 85 Fed. Reg. 65,806 (Oct. 16, 2020). The following month, this Court preliminarily enjoined the application of the October order to unaccompanied children. *P.J.E.S. ex rel. Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020). The D.C. Circuit stayed the injunction pending appeal, *see P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021), but shortly thereafter, CDC temporarily paused the expulsion of unaccompanied children under Title 42, *see* 86 Fed. Reg. 9942 (Feb. 17, 2021).

## III.   THE PRESIDENT'S EXECUTIVE ORDER AND CDC'S REASSESSMENT

In February 2021, the President ordered the Secretary of Health and Human Services and the CDC Director, in consultation with the Secretary of Homeland Security, to "promptly review and determine whether termination, rescission, or modification of the [October order and the September regulation] is necessary and appropriate." Exec. Order No. 14,010, § 4(ii)(A), 86 Fed. Reg. 8,267, 8,269 (Feb. 2, 2021). By July 2021, CDC determined that it was appropriate to except unaccompanied children from the October 2020 order given the COVID-19 mitigation measures in place for this population. *See* 86 Fed. Reg. 38,717 (July 22, 2021) ("July Exception"). In August 2021, CDC completed its "comprehensive reassessment of the October Order," as directed by the Executive Order, and issued a new order replacing and superseding the October order. 86 Fed. Reg. 42,828, 42,831 (Aug. 5, 2021) ("August 2021 order"). The August 2021 order incorporated the July Exception by reference but determined that the public health conditions continued to require the order for covered single adults and family units. *Id.* at 42,829 n.3. In reaching that conclusion, CDC considered,

among other things, the "current status of the COVID-19 public health emergency and ongoing public health concerns, including virus transmission dynamics, viral variants, mitigation efforts, the public health risks inherent to high migration volumes, low vaccination rates among migrants, and crowding of immigration facilities." *Id.* at 42,840.

Critically important to the August 2021 order was the rapid spread of the highly transmissible Delta variant, *id.* at 42,832, which had increased COVID-19 cases by approximately 400% in the weeks before the August order, *id.* at 42,831. "[H]ospitalization rates [were] once again soaring nationally," *id.* at 42,837, and there were "signs of distress" in the healthcare and community resources in the southern regions of the United States, *id.* at 42,835. Although vaccines were widely available in the United States, vaccination uptake had "plateaued," slowing nationally with wide variations by state (33.9% to 67.2%) and by county (8.8% to 89.0%). *Id.* at 42,8334 & n.55. And there was a rising number of breakthrough infections. *Id.* at 42,832, 42,834. Moreover, countries of origin for the majority of incoming covered noncitizens had "markedly lower vaccination rates." *Id.* at 42,834 & n.57. Because the risk of COVID-19 transmission was "acutely present in congregate settings," where "even a single asymptomatic case can trigger an outbreak," *id.* at 42,833, there was "heightened risk of morbidity and mortality" to unvaccinated covered noncitizens in the border facilities, *id.* at 42,834.

CDC noted that while U.S. Customs and Border Protection ("CBP") had attempted to implement a variety of mitigation measures, those measures were insufficient because of space constraints and because an ongoing surge in migrants had "caused CBP to exceed COVID-constrained capacity and routinely exceed its non-COVID capacity." *Id.* at 42,835. Various other constraints also increased the amount of time covered noncitizens spent in the border facilities; by August 2021, the average time spent at CBP facilities for family units was as long as 62 hours, which "would likely increase significantly" in the absence of the August order. *Id.* at 42,836. Finally, CDC differentiated unaccompanied children from single adults and family units because there was "appropriate infrastructure in place to protect the children, caregivers and local and destination communities," *id.* at 42,838, concluding that while excepting that population would not pose a "significant public health risk, the same [was] not true for [single adults] and [family units]," *id.*

6

CDC thereafter reassessed the August order every 60 days to determine its continued necessity in light of the most current public health conditions. *See id.* at 42,830; AR23485–508, AR23514–17. By the time of the second reassessment in late November 2021, the "sudden emergence of the Omicron variant" led CDC to find that the August order continued to be necessary in the interest of public health. 87 Fed. Reg. 19,941, 19,948 (Apr. 6, 2022) (termination order); *see also* AR23500. Indeed, the United States recorded its highest seven-day moving average number of cases on January 15, 2022. 87 Fed. Reg. at 19,948.

## IV.    CDC'S TWO TERMINATION ORDERS

In March 2022, the U.S. District Court for the Northern District of Texas preliminarily enjoined the government from enforcing the July Exception and the August 2021 order "to the extent that they except unaccompanied alien children from the Title 42 procedures based solely on their status as unaccompanied alien children." *Texas v. Biden*, --- F. Supp. 3d. ---, 2022 WL 658579, at *21 (N.D. Tex. Mar. 4, 2022). That court also stayed the injunction for seven days to allow the government to seek emergency relief at the appellate level. *Id.* at *24. Before the injunction became effective, CDC terminated all prior suspension orders to the extent they applied to unaccompanied children. 87 Fed. Reg. 15,243, 15,248 (Mar. 17, 2022). By this point, the most recent wave of the pandemic caused by Omicron was "receding." 87 Fed. Reg. at 19,947.

On April 1, 2022, the CDC terminated the August 2021 order entirely, with an implementation date of May 23, 2022. 87 Fed. Reg. at 19,942. CDC explained that the status of the COVID-19 pandemic was substantially different from the environment in which the August 2021 order or the earlier suspension orders were issued. Among other things, there was "widespread population immunity and a generally lower overall risk of severe disease due to the nature of the Omicron variant." *Id.* at 19,948. "While earlier phases of the pandemic required extraordinary actions by the government and society at large," CDC explained, "epidemiologic data, scientific knowledge, and the availability of public health mitigation measures, vaccines, and therapeutics have permitted the country to safely transition to more normal routines." *Id.* Moreover, testing was widely used and available, and a significant percentage of the population (including 86% of the CBP workforce on the U.S.-

Mexico border) had been vaccinated. *Id.* at 19,949, 19,951. There were also higher levels of vaccination and infection-induced immunity globally as well as in the countries of origin for the current majority of covered noncitizens. *Id.* at 19,952 & n.144. And since the August order, the Department of Homeland Security ("DHS") had worked with state, local, tribal, territorial, and non-governmental partners to develop robust testing and quarantine programs along the southwest border. *Id.* at 19,951. Furthermore, effective treatments for COVID-19 were more widely available, including oral antiviral medications and a monoclonal antibody. *Id.* at 19,950 & nn.125, 127. Accordingly, CDC judged that "although COVID-19 remains a concern, the readily available and less burdensome public health mitigation tools to combat the disease render a [Title 42 order] … unnecessary." *Id.* at 19,953. "At this point in the pandemic," CDC concluded, "the previously identified public health risk is no longer commensurate with the extraordinary measures instituted by the CDC Orders." *Id.*

On May 20, 2022, the U.S. District Court for the Western District of Louisiana preliminarily enjoined the termination order on the basis that CDC likely was required to conduct notice-and-comment rulemaking in issuing the termination order but failed to do so. *Louisiana v. CDC*, --- F. Supp. 3d. ---, No. 6:22-CV-00885, 2022 WL 1604901, at *22–23 (W.D. La. May 20, 2022). The government has appealed that preliminary injunction, and briefing will be complete in September.

## V.    THIS LITIGATION

Plaintiffs brought this suit in January 2021 on behalf of a putative class of noncitizen family units to challenge CDC's "Title 42 Process" or "Title 42 Policy," which Plaintiffs characterized as consisting of "a new regulation, several orders, and an implementation [DHS] memo." *See* Compl, ¶ 1, ECF No. 1; 1st Am. Compl., ECF No. 22; 2d Am. Compl., ECF No. 131. Plaintiffs thereafter moved for a preliminary injunction on the grounds that Section 265 did not authorize expulsions and that the Title 42 expulsions violated certain immigration laws affording humanitarian protections, ECF No. 57, which covered the first five counts of the six-count complaint, *see* 2d Am. Compl. ¶¶ 77–106.

In September 2021, this Court certified the class and preliminarily enjoined the application of the "Title 42 Process"—defined by the Court as "the process developed by the CDC and implemented by the August 2021 Order," *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 159 (D.D.C. 2021)—to

8

the class.  The Court found that the statute, 42 U.S.C. § 265, likely did not authorize the government to expel noncitizens once they have crossed the border into the United States.  *Id.* at 166–71; *see also* ECF No. 122.  The government appealed, and obtained a stay of the preliminary injunction pending appeal.  On March 4, 2022, the D.C. Circuit affirmed the preliminary injunction in part, holding that Section 265 likely authorizes the expulsion of covered noncitizens, but that such expulsion may not be "to places where [the noncitizens] will be persecuted or tortured."  *Huisha-Huisha*, 27 F.4th at 722. The mandate was issued on May 23, 2022.

Plaintiffs now move for partial summary judgment on Count VI of the operative complaint, which alleges an arbitrary-and-capricious claim under the APA.  *See* ECF Nos. 141, 141-1.  Their motion focuses on CDC's August 2021 order, except that they also cite material concerning the March 2020 order.

## STANDARD OF REVIEW

In actions under the APA, summary judgment is the mechanism for "deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106, (D.D.C. 2011).  In such cases, the standard set forth in Rule 56 of the Federal Rules of Civil Procedure "does not apply because of the limited role of a court in reviewing the administrative record."  *Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269, 278 (D.D.C. 2018).  Rather, "a federal district court sits as an appellate tribunal to review the purely legal question of whether the agency acted" reasonably and otherwise in accordance with the APA.  *Franks v. Salazar*, 816 F. Supp. 2d 49, 55–56 (D.D.C. 2011).

## ARGUMENT

### I.   CDC'S PUBLIC HEALTH DETERMINATIONS UNDER SECTION 265 ARE UNREVIEWABLE

As a threshold matter, Plaintiffs' arbitrary-and-capricious claim is unreviewable because Congress committed the decision to issue, modify, or terminate a Title 42 order to CDC's discretion by law.  *See* 5 U.S.C. § 701(a)(2) (precluding review of decisions "committed to agency discretion by law").  Although courts presume reviewability under the APA, review is generally unavailable in two

circumstances. First, review is precluded for "administrative decisions that courts traditionally have regarded as committed to agency discretion"—particularly judgments that "require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise" and "area[s] of executive action in which courts have long been hesitant to intrude." *Lincoln v. Vigil*, 508 U.S. 182, 191–93 (1993). Second, review is unavailable when "the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 191.

Although either one of these circumstances would be sufficient to preclude review, both are present here. The CDC Director's discretionary determination under Section 265 "involves a complicated balancing of a number of factors which are peculiarly within the agency's expertise." *Lincoln*, 508 U.S. at 191. While neither the statute nor the regulation requires the consideration of any specific factors, the preamble to the Final Rule lists a number of facts and circumstances that CDC "may, in its discretion," consider when determining whether a Title 42 order is required in the interest of public health in a particular situation. 85 Fed. Reg. at 56,444; *see also id.* (noting that CDC may "consider a wide array of facts and circumstances"). The Title 42 orders consistently examined a range of public health factors and evaluated how those factors impacted CBP's border facilities and the personnel and noncitizens in those facilities, including whether the impact varied by categories of noncitizens. In issuing the operative August 2021 order, for example, CDC considered, among other things, the manner of COVID-19 transmission, the emerging variants of the SARS–CoV–2 virus, the risks specific to certain types of facilities or congregate setting, the availability of testing, vaccines and other mitigation measures, and the impact on U.S. communities and healthcare resources. *See, e.g.*, 86 Fed. Reg. at 42,831. It then judged those factors against the context of CBP's processing of covered noncitizens in the border facilities, including by different categories of noncitizens. The balancing of various public health factors to determine whether a Title 42 order remained in the interest of the public health directly implicates the agency's scientific knowledge and expert judgment.

Because these decisions require a complicated balancing of factors that are peculiarly within the agency's expertise, courts have traditionally given deference to public health officials when they exercise their expert judgment to address public health emergencies. *See, e.g., FDA v. American Coll. of*

*Obstetricians & Gynecologists*, 141 S. Ct. 578, 579 (2021) (Roberts, C.J., concurring in the grant of application for stay) (noting deference owed "concerning government responses to the pandemic"); *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (explaining that the latitude "to guard and protect" "[t]he safety and the health of the people" "must be especially broad" when acting "in areas fraught with medical and scientific uncertainties"); *Marshall v. United States*, 414 U.S. 417, 427 (1974) (courts may not substitute their judgment for an agency's "in areas fraught with medical and scientific uncertainties"); *Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905) ("[i]t is no part of the function of a court or a jury to determine" how best to protect the public from a disease). Accordingly, the CDC Director's determination under Section 265 is an administrative decision that courts "traditionally have regarded as committed to agency discretion" and is thus "unreviewable" under the APA. *Lincoln*, 508 U.S. at 191–93.

The relevant statute is also drawn so that a court would have no meaningful standard against which to judge the agency's exercise of its discretion. Section 265 entrusts the decision whether to issue a Title 42 order to the CDC Director's judgment. If the Director determines that an order "is required in the interest of the public health" to prevent the "serious danger" of "the introduction of [a communicable] disease into the United States," then the Director "shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger." 42 U.S.C. § 265. Section 265 does not provide judicially manageable standards to guide a court's review of CDC's determination; nor does it define what constitutes a "serious danger" in this context. *See* 85 Fed. Reg. at 56,446 (noting that Congress "did not explain when the danger of the introduction of a communicable disease becomes [serious]"). Rather, the statute leaves the public health determination to the CDC Director's expert judgment.[2]

---

[2] In *Louisiana v. CDC*, ---F. Supp. 3d ---, 2022 WL 1604901, at *17 (W.D. La. May 20, 2022), the court found that Section 265 provides "meaningful standards" to review the agency action because it "limits the CDC's authority to regulating 'communicable' diseases and, more importantly, requires the CDC to exercise that discretion only when 'required in the interest of public health.'" Defendants respectfully disagree with that ruling for the reasons explained herein. Again, the statute does not explain what standards CDC must apply to determine that a Title 42 order would be "in the interest of public health."

Besides the lack of statutory standards to review the CDC Director's exercise of discretion, the statute also contains discretion-conferring language, providing that Title 42 orders should last "only for such period of time as [the CDC Director] *may deem necessary*." 42 U.S.C. § 265 (emphasis added). The Supreme Court has "repeatedly observed" that "the word 'may' *clearly* connotes discretion." *Biden v. Texas*, 142 S. Ct. 2528, 2541 (2022). The D.C. Circuit has likewise recognized that the word "deem" demonstrates that the "determination calls upon [an agency's] expertise and judgment unfettered by any statutory standard whatsoever." *Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *see also Webster v. Doe*, 486 U.S. 592, 600-01 (1988) (termination decision committed to agency discretion by law where the statute provided that termination was appropriate whenever the agency director "shall deem such termination necessary or advisable in the interests of the United States").

CDC's regulation implementing Section 265—which Plaintiffs' motion does not challenge—makes clear the public health determination is left to the agency's discretion. *See* 42 C.F.R. § 71.40(a) ("The Director *may* prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, only for such period of time that the Director *deems* necessary to avert the serious danger of the introduction of a quarantinable communicable disease." (emphasis added)). Although the regulation "clarifies that the danger of introduction becomes serious when one or more additional persons capable of disease transmission would more likely than not be introduced into the United States," the preamble to the Final Rule also makes clear that this regulatory definition does not require the Director to make "a numerical finding or a quantitative or empirical showing of probability in order to prohibit the introduction of persons." 85 Fed. Reg. at 56,445. Rather, "[t]he Director may make a *qualitative* determination, based on the known facts and circumstances, that the introduction of one or more persons capable of transmitting the quarantinable communicable disease is probable." *Id.* (emphasis added). The statute and regulation thus lack any "meaningful standard" against which to judge the CDC Director's exercise of discretion. *Lincoln*, 508 U.S. at 191; *see also Sierra Club v. EPA*, No. 20-1121, --- F. 4th ---, 2022 WL 3694866, at *6 (D.C. Cir. Aug. 26, 2022) (EPA's decision whether to

make and publish a finding of nationwide scope or effect was committed to agency discretion because statute offered "no meaningful standard" against which to judge EPA's decision); *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011) (EPA Administrator's determination whether to prevent construction of facility was unreviewable because the statute provided "no guidance" to reviewing court); *United States v. Simmons*, No. CR 18-344 (EGS), 2022 WL 1302888, at *11 (D.D.C. May 2, 2022) (Sullivan, J.) (collecting cases holding that agency action was committed to agency discretion by law).[3] The CDC Director's determination under Section 265 "is accordingly unreviewable under [5 U.S.C.] § 701(a)(2)." *Lincoln*, 508 U.S. at 193.

## II. PLAINTIFFS' ARBITRARY AND CAPRICIOUS CHALLENGE FAILS AS A MATTER OF LAW

### A. This Court's Review of CDC's Decision Is Highly Deferential

Judicial review under the APA's arbitrary-and-capricious standard is "highly deferential." *Zevallos v. Obama*, 793 F.3d 106, 112. "[A] court may not substitute its own policy judgment for that of the agency," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), and "is not to ask whether [an agency's] decision is the best one possible or even whether it is better than the alternatives," *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). Rather, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 141 S. Ct. at 1158. Even if the agency decision is "of less than ideal clarity," it must be upheld "if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court only considers "whether there has been a clear error of judgment." *Id.*

---

[3] In *Texas v. Biden*, --- F. Supp. 3d. ---, 2022 WL 658579, at *11 (N.D. Tex. Mar. 4, 2022), the court found that the August order was reviewable because 42 C.F.R. § 71.40(c) purportedly "establishe[d] the parameters the CDC must consider." The provision, however, merely lists information that the Director must specify in a Title 42 order, *see* 42 C.F.R. § 71.40(c)(1)-(5), including the "countries … from which the introduction of persons shall be prohibited," *id.* § 71.40(c)(1), and "[t]he period of time or circumstances under which the introduction of any persons … shall be prohibited," *id.* § 71.40(c)(2). That information plainly is designed to inform the public of the CDC Director's invocation of Section 265 authority and the precise scope of the Title 42 order, not to inform *how* the Director should exercise her discretion, let alone what factors to consider in issuing a Title 42 order. Accordingly, the provision does not provide a meaningful standard against which to judge the Director's exercise of discretion in issuing a Title 42 order.

This deference to the agency is heightened in cases such as this one, which calls for the application of scientific and technical expertise. Courts "give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise," *West Virginia v. EPA*, 362 F.3d 861, 871 (D.C. Cir. 2004), for a court "cannot decide … whether technical evidence beyond [its] ken supports the proposition it is asserted to support," *Simpson v. Young*, 854 F.2d 1429, 1434 (D.C. Cir. 1988). *Cf. South Bay United Pentecostal Church*, 141 S. Ct. at 716 (Roberts, C.J., concurring in the partial grant of application for injunctive relief) ("[F]ederal courts owe significant deference to politically accountable officials with the background, competence, and expertise to assess public health."). Moreover, where, as here, an agency's decision involves predictive judgments, the court's review is likewise "particularly deferential." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009); *see also FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813–14 (1978); *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006).

Importantly, in evaluating CDC's August 2021 order, the Court considers only the material that was before the CDC Director *at the time* of that order, not the facts and circumstances as they exist today, because "the focal point for judicial review" is the administrative record that was before the agency at the time of the decision. *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."); *accord IMS, P.C. v. Alvarez*, 129 F.3d 618, 623–24 (D.C. Cir. 1997). "If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision." *Water O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).

### B.  The August 2021 Order Was the Result of Reasoned Decisionmaking

Here, the administrative record amply demonstrates that the August 2021 order satisfies the highly deferential standard of review and is the result of reasoned decisionmaking. In issuing the order, CDC comprehensively examined the following public health factors: "(1) [t]he manner of COVID-19 transmission, including asymptomatic and pre-symptomatic transmission; (2) the

emerging variants of [COVID-19]; (3) the risks specific to the type of facility or congregate setting; (4) the availability of testing and vaccines and the applicability of other mitigation efforts; and (5) the impact on U.S. communities and healthcare resources." 86 Fed. Reg. 42,832–42,835; *see, e.g.*, AR3975 (CDC, Emerging Infectious Diseases, Transmission Dynamics of Severe Acute Respiratory Syndrome Coronavirus 2 in High-Density Settings, Minnesota, USA, March-June 2020, Aug. 2021); AR3186 (CDC, SARS-CoV-2 Transmission, May 7, 2021); AR3154 (CDC, SARS-CoV-2 and Surface Fomite Transmission for Indoor Community Environments, Apr. 5, 2021); AR4020 (JAMA, SARS-CoV-2 Transmission from People Without COVID-19 Symptoms, Jan. 7, 2021); AR2905 (CDC, Update on Emerging SARS-CoV-2 Variants and COVID-19 Vaccines, June 29, 2021); AR2585 (CDC, Morbidity and Mortality Weekly Report, COVID-19 Vaccination Coverage Among Adults—United States, December 14, 2020-May 22, 2021, June 25, 2021); AR7070 (CDC, COVID-19 Daily Update, July 21, 2021); AR7463 (CDC, COVID Data Tracker Weekly Review, Interpretive Summary for July 30, 2021); AR22347 (CDC, Community Profile Report, July 26, 2021). CDC then evaluated the impact of those factors on CBP's immigration processing at border facilities and on the personnel and noncitizens in those facilities, including assessing whether those impacts varied by category of noncitizens. 86 Fed. Reg. at 42,831, 42,835–42,838.

Of "critical significance" for the August 2021 order was the rapid spread of the Delta variant. *Id.* at 42,832. "[M]ore than two times as transmissible as the original strains of [the virus]," *id.* at 42,834, the Delta variant "[had] driven a stark increase in COVID–19 cases, hospitalizations, and deaths," with cases increasing by approximately 400% in the weeks before the August order. *Id.* at 42,831; *see also id.* (noting that the Delta variant, along with other variants of concern, could cause "more severe disease"); *see, e.g.*, AR3501 (Morbidity and Mortality Weekly Report, Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage, July 30, 2021). "[B]oth the United States and Mexico [were] experiencing high or substantial incidence rates." 86 Fed Reg. at 42,831. Over 70% of the U.S. counties along the U.S.-Mexico border were experiencing "high or substantial levels of community transmission." *Id.* at 42,834; *see, e.g.*, AR7138 (CDC, COVID Daily Update, July 28, 2021).

15

Although vaccines were widely available in the United States for those 12 years of age and older and provided significant protection against COVID-19, there was a rising number of breakthrough infections. 86 Fed. Reg. at 42,832, 42,834. "[E]merging evidence" further "suggested that fully vaccinated persons who do become infected with the Delta variant are at risk for transmitting it to others." *Id.* at 42,833. Moreover, vaccination uptake had "plateaued, particularly in those under the age of 65 years," which, in combination "with the extreme transmissibility of the Delta variant has resulted in rising numbers of COVID-19 cases, primarily and disproportionately affecting the unvaccinated population." *Id.* at 42,834. CDC forecasted increased hospital admissions in the coming weeks, and noted "worrisome trends in healthcare and community resources," including "[s]igns of stress" already present in the southern regions of the United States. *Id.* at 42,835; *see, e.g.*, AR16029 (CDC, COVID-19 Response Update Report, July 22, 2021). As CDC recognized, "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." 86 Fed. Reg. at 42,835.

The Title 42 order, of course, is specifically focused on congregate settings in CBP's border facilities. Because the spread of COVID-19 is more likely when people are "in close contact with one another … especially in crowded or poorly ventilated indoor settings," 86 Fed. Reg. at 42,832, CDC assessed that "the risk [of transmission] is acutely present in congregate settings," *id.* at 42,833. "[E]ven a single asymptomatic case can trigger an outbreak that may quickly exceed a facility's capacity to isolate and quarantine residents." *Id.* CDC noted that in the border facilities, noncitizens undergoing immigration processing at CBP facilities typically are held in close proximity to one another "anywhere from several hours to several days." *Id.* at 42,835; *see also* 85 Fed Reg. at 17,066 (noting that "a typical Border Patrol station is designed to temporarily hold a maximum of 150 to 300 people standing shoulder-to-shoulder," and has only between two to five separate holding areas for to segregating noncitizens based on demographic factors such as age, gender, and family status, as required by law). Although CBP had sought to enhance physical distancing and COVID-19 cohorting of noncitizens in the border facilities (in addition to complying with existing cohorting requirements), there was a migratory surge of noncitizens entering the country at that time, which caused CBP to

exceed its COVID-constrained capacity and even its non-COVID capacity.  86 Fed. Reg. at 42,835, 42,836 n.79.  This "extreme population density and the resulting increased time spent in custody by noncitizens," combined with the other factors described above, presented a "serious risk of increased COVID-19 transmission in CBP facilities" at that time.  *Id.* at 42,836.

Other constraints also increased the risk of transmission in border facilities.  For example, only a "limited number" of family units could be transferred to Family Staging Centers operated by the U.S. Immigration and Customs Enforcement, whose capacity was limited by COVID-19 mitigation protocols.  *Id.*  Although other family units could be released to communities, CDC had to factor in the capacity of state and local agencies and non-governmental organizations ("NGOs") partnered with DHS to provide testing, vaccination where possible, and consequence management (*e.g.*, facilities for isolation and quarantine).  *Id.*  But those partners' resources were "limited," "already stretched thin, and certainly not available for all [family units] who would be processed under Title 8 in the absence of [a Title 42 order]."  *Id.*  In addition, foreign governments have imposed restrictions on the United States' ability to expel certain family units to their countries, further adding to the congestion at border facilities.  *Id.*  CDC found that the average time spent at CBP facilities for family units was as long as 62 hours, which "would likely increase significantly" in the absence of the August order.  *Id.* at 42,837.  As CDC noted, normal immigration processing under Title 8 of the U.S. Code of a noncitizen can take up to eight times as long as Title 42 processing.  *Id.*

CDC also considered the availability of mitigation measures at CBP's border facilities.  It recognized that CBP had implemented a variety of mitigation efforts to prevent the spread of COVID-19, including by investing in engineering upgrades, adhering to CDC guidance on cleaning and disinfection, and providing masks and Personal Protective Equipment to CBP personnel.  *Id.* at 42,835.  But on-site testing was "very limited," and CBP could not appropriately minimize spread or transmission of COVID-19 within its facilities due to space constraints.  *Id.* at 42,837.  "Of particular note," the CDC explained, border facilities  "are ill-equipped to manage an outbreak" and are "heavily reliant on local healthcare systems for the provision of more extensive medical services to noncitizens."  *Id.*  CDC assessed that "[t]ransfers to local healthcare systems for care could strain local

or regional healthcare resources," particularly given that "hospitalization rates [were] once again soaring nationally" due to the Delta variant. *Id.* Yet, "[e]nsuring the continued availability of healthcare resources is a critical component of the federal government's overall public health response to COVID-19." *Id.*

The concern about COVID-19 transmission in border facilities was magnified also because, at the time, countries of origin for the majority of incoming covered noncitizens had "markedly lower vaccination rates." *Id.* at 42,834; *see id.* at 42,834 n.57 (noting fully vaccinated rates ranging from 1.6% to 22% for the top five countries of origin for covered noncitizens). Thus, in CDC's expert judgment, there was a "heightened risk of morbidity and mortality" to covered noncitizens in the border facilities "due to the congregate holding facilities at the border and the practical constraints on implementation of mitigation measures in such facilities." *Id.* CDC further concluded that "[o]utbreaks in these settings [would] increase the serious danger of further introduction, transmission, and spread of COVID-19 and variants into the country." *Id.*

Finally, CDC differentiated unaccompanied children from single adults and family units in light of the government's "greater ability to care for [unaccompanied children] while implementing appropriate COVID-19 mitigation measures." *Id.* at 42,837-38; *see also* July Exception, 86 Fed. Reg. 38,717 (discussing the infrastructure in place to care for unaccompanied children). Importantly, unaccompanied children are released to a sponsor only after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction. 86 Fed. Reg. at 42,838. CDC judged that there was a "very low likelihood" that processing unaccompanied children under Title 8 would result in an "undue strain on the U.S. healthcare systems or healthcare resources." *Id.* As a result, CDC reasonably concluded that unaccompanied children could be excepted from the order "without posing a significant public health risk," while "the same [was] not true for [single adults] and [family units]." *Id.* CDC then "considered various possible alternatives (including but not limited to terminating the application of [a Title 42 order] for some or all [single adults] or [family units] … )," *id.* at 42,838, but ultimately determined that single adults and family units should continue to be subject to the August order "pending further

improvements in the public health situation," *id.* at 42,837, and "greater ability to implement COVID-19 mitigation measures in migrant holding facilities," *id.* at 42,838.

In challenging CDC's conclusion as arbitrary and capricious, Plaintiffs ask the Court to consider events that post-date the agency's decision. *See* Br. at 12–13 (discussing CBP's efforts in March 2022 related to Ukrainians fleeing Russian aggression, and CDC's April 2022 termination order). Under basic administrative law, however, the Court may not take into account the evolving public health conditions following the August 2021 order in assessing whether the order itself was arbitrary and capricious when issued. *See Boswell Mem'l Hosp.*, 749 F.2d at 792 (noting that in analyzing agency action, courts "should have before it neither more nor less information than did the agency when it made its decision"). Plaintiffs' reliance on subsequent events, therefore, is unavailing. Plaintiffs also seek to rely on the D.C. Circuit's March 2022 decision on the government's appeal of this Court's preliminary injunction, *see* Br. at 10, in which the D.C. Circuit noted that "CDC's § 265 order look[ed] in certain respects like a relic from an era with no vaccines, scarce testing, few therapeutics, and little certainty." *Huisha-Huisha*, 27 F.4th at 734. But Plaintiffs take the D.C. Circuit's comment out of context. The D.C. Circuit's decision was focused on assessing CDC's statutory authority to expel noncitizens under the August order, not the rationale behind the August order. The court's comment on the August order being a "relic" was made in the context of its balance-of-the-equities analysis and was comparing the August order to the public health situation in "March 2022." *Id.* The D.C. Circuit's comment therefore is inapposite to the question whether the August order is arbitrary and capricious at the time it was issued. On that question, Plaintiffs ask the Court to substitute their own judgment for that of the agency's expert public health determination. As discussed below, their arguments have no merit.

## C.  CDC's Title 42 Orders Are Not Subject to any "Least Restrictive Means" Standard

Plaintiffs argue that the August 2021 order is arbitrary and capricious because CDC allegedly "disregarded" a purportedly "established policy" of using the "least restrictive means" to prevent the spread of communicable diseases. Br. at 5–10. This argument fails for at least two reasons: (1) CDC's Title 42 orders are not subject to the "least restrictive means" standard, and (2) even if they were, the

August order was the "least restrictive means" available to "avert the serious danger of the introduction of a quarantinable communicable disease" into the United States, 42 C.F.R. § 71.40(a).

First, Plaintiffs are incorrect that CDC has adopted a "least restrictive means standard" that governs the use of any and all public health measures. They cite a 2017 Final Rule that amended CDC's quarantine regulations issued under 42 U.S.C. § 264, including regulations authorizing the apprehension, detention, and physical examination of individuals, including citizens. *See Control of Communicable Diseases*, 82 Fed. Reg. 6890, 6968–6978 (Jan. 19, 2017); *see also* 42 C.F.R. § 70.15(c); *id.* § 71.38(c).[4]  In that Final Rule, CDC stated that it would "seek to use the least restrictive means necessary to prevent the spread of communicable disease" in "implementing quarantine, isolation, or other public health measures *under this Final Rule*."  *Id.* at 6890 (emphasis added).  Thus, the Final Rule amended CDC regulations to provide that when the CDC Director issues an order requiring the quarantine of an individual, for example, the Director must reassess within 72 hours whether the quarantine remains necessary or whether "less restrictive alternatives would adequately serve to protect the public health."  42 C.F.R. § 70.15(c).  The requirement to use the least restrictive means was appropriate in the context of quarantine and isolation, including of citizens, because such measures often implicate liberty interests protected by the Due Process Clause.  *See, e.g.*, 82 Fed. Reg. at 6900 (discussing due process concerns).

But the 2017 Final Rule did not "establish" a blanket policy of applying "least restrictive means" to any public health measures designed to prevent the spread of a communicable disease.  Br. at 5.  To the contrary, CDC routinely implements such measures without regard to the "least restrictive means."  For example, CDC has issued regulations governing medical examinations of certain noncitizens seeking to enter the United States without applying a "least restrictive means" analysis. *See, e.g.*, *Medical Examination of Aliens—Revisions to Medical Screening Process*, 73 Fed. Reg. 58047 (Oct. 6, 2008); *see also* 42 C.F.R. part 34.  Similarly, when issuing orders requiring a negative pre-departure

---

[4] Although the 2017 Final Rule also cites Section 265 as statutory authority, the regulations adopted by the Final Rule based on Section 265 do not contain a "least restrictive means" standard. *See, e.g.*, 42 C.F.R. § 71.63 (regulation regarding suspension of entry of animals, articles, or things from designated foreign countries).

COVID-19 test result or documentation of recovery from COVID-19 for all airline or other aircraft passengers arriving into the United States from any foreign country, CDC did not apply a "least restrictive means" test. *See, e.g.*, 86 Fed. Reg. 69,256 (Dec. 7, 2021); 85 Fed. Reg. 86,933 (Dec. 31, 2020). Nor did CDC apply such a standard when it issued orders requiring persons to wear masks when traveling on any conveyance (*i.e.*, various modes of transportation) into or within the United States. *See, e.g.*, 86 Fed. Reg. 8025 (Feb. 3, 2021).

The August order was issued pursuant to 42 U.S.C. § 265 and implementing regulations at 42 C.F.R. § 71.40—distinct authorities from those governing the relevant portion of the 2017 Final Rule. Nor is it a quarantine or isolation order applicable to citizens. *See Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1983 (2020) (due process rights of noncitizen seeking entry are limited to "only those rights regarding admission that Congress has provided by statute"). Thus, the "least restrictive means" standard is inapplicable.[5]

In any event, CDC's August 2021 order ultimately was in fact the least restrictive means available to prevent the further introduction of COVID-19 into the United States at the borders at the time it was issued. Section 265 authorizes the CDC Director to issue a Title 42 order only where "necessary" to prevent the "serious danger" of the introduction of a communicable disease into the United States. 42 U.S.C. § 265. As discussed above, the August 2021 order explains in detail why that

---

[5] To be sure, as a matter of best public health practices, scientists at the CDC may strive to avoid imposing public health measures that are more restrictive than necessary. For example, Plaintiffs note that in a 2005 paper, Dr. Martin Cetron, the former director of CDC's Division of Global Migration and Quarantine, endorsed the view that pandemic responses "should be proportional, necessary, relevant, equitably applied, and done by least restrictive means." Br. at 9 n.7 (quoting Martin Cetron et al., *Public Health and Ethical Considerations in Planning for Quarantine*, 78 Yale J. of Biology & Med. 325, 329 (Oct. 2005), https://perma.cc/MAM9-38AS). But that paper—which predates the COVID-19 pandemic by almost two decades—references using "least restrictive means" in the context of "recommendations" developed by the Toronto Joint Centre for Bioethics. 78 Yale J. of Biology & Med. at 329. Plaintiffs also note that CDC referenced "least restrictive means" in a "Public Health Law 101" course. Br. at 7. But, again, the course mentioned the principle in the context of an "ethics guide" for public health decisionmaking. *See* CDC, *Public Health Law 101: A CDC Foundational Course for Public Health Practitioners*, at 24 (Jan. 16, 2009), https://perma.cc/FUE5-WK5G. That is, the use of "least restrict means" is an aspirational goal that must be assessed in context of the specific public health threats and countermeasures at issue. In any event, contrary to Plaintiffs' argument, these public health best practices do not constitute an "established policy" that CDC may not "depart from" without explanation. *See* Br. at 5 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

statutory standard was met and why various other alternatives were unavailable or inadequate.   It was not until April 2022 that CDC assessed that "the previously identified public health risk is no longer commensurate with the extraordinary measures instituted by the CDC Orders."  87 Fed. Reg. at 19,951.   As CDC explained in April 2022, "[w]hile earlier phases of the pandemic required extraordinary actions by the government and society at large, epidemiologic data, scientific knowledge, and the availability of public health mitigation measures, vaccines, and therapeutics have permitted the country to safely transition to more normal routines."  *Id.* at 19,948.  "[A]lthough COVID–19 remains a concern," CDC judged that "the readily available and less burdensome public health mitigation tools to combat the disease render a [Title 42 order] … unnecessary." *Id.* at 19,953.

Further, where less restrictive means were available prior to the April 2022 termination order, CDC used them.  CDC did not extend its August 2021 order to unaccompanied children, explaining that the government had a greater ability to care for such children so that there was a "very low likelihood" that processing them under Title 8 would unduly strain healthcare resources. 86 Fed. Reg. 42,838. As to family units, CDC noted that releasing families to communities would necessitate robust testing and vaccination by partner agencies and organizations whose resources were already "stretched thin" and "certainly not available for all [family units] who would be processed under Title 8 in the absence of [a Title 42 order]."  *Id.* at 42,836.   Still, the August order allowed for "case-by-case exceptions based on the totality of the circumstances where appropriate," including for humanitarian reasons.  *Id.* at 42,840–41.   Under this case-by-case humanitarian exception, CBP officers have excepted tens of thousands of individuals from the August order.  *See, e.g.*, Defs.' Monthly Data Report at 6, ECF No. 154, *Louisiana v. CDC*, No. 22-cv-00885 (W.D. La. Aug. 16, 2022) (reporting 11,574 humanitarian exceptions across six ports of entry in July 2022).   Thus, while CDC may not have expressly used the term "least restrictive means," the substance of CDC's August order makes clear that CDC did, in practice, issue an order that was in fact the least restrictive means available to protect the country form further introduction, transmission, and spread of COVID-19.  *See also* Section II.D, *infra* (discussing other alternatives that CDC considered).   Accordingly, any alleged failure in not expressly citing the "least restrictive means" standard was at most a harmless error and cannot serve

as a basis to invalidate the August order. *See Zevallos*, 793 F.3d at 115; 5 U.S.C. § 706 (courts shall take "due account … of the rule of prejudicial error").

In contending otherwise, Plaintiffs principally rely on extra-record excerpts of a congressional interview with Dr. Anne Schuchat, a former Principal Deputy Director of CDC. *See* Br. at 8. Specifically, Plaintiffs cite Dr. Schuchat's statements that CDC "typical[ly]" uses the "least restrictive means possible" when "exert[ing] a quarantine order versus other measures." Decl. of Ming Cheung, Ex. A at 28, ECF No. 144-3; *see also* Br. at 6 (noting that CDC sought to use the least restrictive means when deciding whether to quarantine individuals during the 2014–2016 Ebola epidemic). Even if this Court could appropriately consider such extra-record material in this APA case—which it cannot, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)—the excerpts do not call into doubt the rationality of CDC's decisionmaking in the August 2021 order. As noted above, the August order is not a quarantine order. It is a public health measure that prevents the introduction of a communicable disease into the United States by temporarily suspending the right to introduce noncitizens from a foreign country into the United States. Orders suspending entry are distinct from quarantine orders, which can implicate constitutionally protected liberty interests.

Plaintiffs next cite Dr. Schuchat's statement that, in her view, CDC's March 2020 order "wasn't based on a public health assessment at the time." Br. at 8. But in that same answer, Dr. Schuchat acknowledged that she "d[id]n't have knowledge about the final decision" and "wasn't familiar with" the decisionmaking process that led to the March order. Cheung Decl., Ex. A at 27. Moreover, Dr. Schuchat was discussing only the March 2020 order and not any subsequent orders, including the operative August 2021 order at issue here. *See id.* at 27–28. Thus, the interview excerpts on which Plaintiffs rely are irrelevant to the question whether the August order is arbitrary and capricious. The August 2021 order sets forth CDC's reasons for the order, explaining why the CDC Director believed the order was necessary and thus why other alternatives were unavailable. Those reasons are entitled to a "presumption of regularity," *Biden v. Texas*, 142 S. Ct. 2528, 2546 (2022); *see*

*also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and must be upheld because they are supported by the administrative record.[6]

Accordingly, Plaintiffs have not shown that CDC acted arbitrarily and capriciously with respect to the "least restrictive means" standard. The standard is inapplicable here, and even if it were, the administrative record shows that the operative August 2021 order was necessary in the interest of the public health, and, thus, was the least restrictive means to achieve the statutory purpose.

### D.  CDC Considered Available Alternatives Before Issuing the August Order

Plaintiffs argue that Defendants failed to consider "obvious alternatives" to issuing the August 2021 order, such as "instituting testing, vaccination, and quarantine protocols,"[7] Br. at 10, outdoor processing, and self-quarantining, *id.* at 14.  But Plaintiffs' Motion does not identify any available alternative that was not considered by CDC.  Rather, Plaintiffs argue that CDC failed to "*adequately* consider alternatives to the drastic Title 42 policy," meaning CDC had considered the alternatives; just not the way Plaintiffs would have. *Id.* (emphasis added).  Under basic administrative law, however, the Court may not "ask whether [an agency's] decision is the best one possible or even whether it is better than the alternatives." *Elec. Power Supply Ass'n*, 136 S. Ct. at 782.

In any event, CDC fully considered the availability of other mitigation measures, *see, e.g.*, 86 Fed. Reg. at 42,833 (section entitled, "Availability of Testing, Vaccines, and Other Mitigation Measures"), and concluded that there were no viable alternatives at that time to sufficiently mitigate the risk of spread of COVID-19.  For example, CDC noted that "[o]n-site COVID-19 testing for noncitizens at CBP holding facilities [was] very limited," and while off-site testing was potentially available, the noncitizen would have to be transported to community healthcare facilities for medical care, and if local protocols permitted, the noncitizen would then receive testing at such facilities.  *Id.*

---

[6] Although Plaintiffs assert that the March 2020 order was the product of "political pressure" and was initiated for purposes unrelated to public health, Br. at 8, Plaintiffs have also expressly disclaimed any reliance on allegations of pretext in support of their motion, *see* Br. at 4 n.1.

[7] Even Plaintiffs recognize that the public health circumstances underlying the March 2020 order was entirely different.  *See* Br. at 11 (recognizing that the Title 42 policy was justified in March 2020 as an "emergency measure at a time when there was 'no vaccine,' 'no rapid test,' and no 'approved therapeutics.'" (quoting 85 Fed. Reg. at 17,062)).

at 42,837.  CDC also recognized that "vaccination programs [were] not available at th[at] time."  *Id.* at 42,840.  In fact, DHS did not begin initiating a vaccination program until the Spring of 2022.  *See* 87 Fed. Reg. at 19,955-56.  Plaintiffs themselves admit that CBP was "not testing or vaccinating the migrants who came into its custody" in August 2021.  Br. at 12.  Plaintiffs argue that CBP's rationale for not doing so is "unexplained," *id.*, but CDC must base its decision on the operational reality, not hypothetical circumstances.

Also unavailable as an alternative mitigation measure in this context was the use of therapeutics.  As CDC explained in the April 2022 termination order, although therapeutic treatments in the form of monoclonal antibodies were available in August 2021, their use was not as widespread in August 2021, they were cumbersome to administer, and there were not as many varieties of treatments available.  87 Fed. Reg. at 19,950.  Outdoor processing similarly was unavailable in August 2021.  Plaintiffs cite to extra-record statements from Secretary Mayorkas in April 2022 that DHS would be employing soft-sided facilities and virtual processing.  Br. at 13 & n.10, 14.  The statements, however, only serve to show that those measures were not in place in August 2021 and could not have been a viable alternative.

As for federal quarantine, CDC made clear from its first Title 42 order that it "lacks the resources, manpower, and facilities to quarantine covered aliens" and must rely on the "Department of Defense, other federal agencies, and states and local governments to provide both logistical support and facilities for federal quarantines."  85 Fed. Reg. at 17,067 n.66.  Early in the pandemic, CDC learned valuable lessons regarding the feasibility of large-scale quarantine operations when it quarantined U.S. citizens repatriated from China and cruise ship travelers.  *See* 85 Fed. Reg. at 56,426.  Together, these two efforts constitute the largest quarantine operation in U.S. history.  *Id.* at 56,433. The operational challenges observed during that operation—including locating or constructing physical facilities, arranging necessary staffing, providing required medical and legal assistance to quarantined individuals, and identifying funding—demonstrated to CDC that a similar program could not be undertaken at the border.  *Id.*  CDC recognized these lessons learned in the preamble to the Final Rule implementing Section 265, noting that "Federal quarantine and isolation … may be scalable

and effective for hundreds of persons, but not thousands of them," and "[e]ven then, Federal quarantine and isolation require substantial resources and are not sustainable for extended periods of time." *Id.*

As for self-quarantine and self-isolation, Plaintiffs admit that CDC considered this option in the Final Rule. *See* Br. at 15 (citing 85 Fed. Reg. at 56,453). They nevertheless argue that CDC overlooked the availability of noncitizens self-quarantining in the homes of friends and family or in shelters. But CDC did consider those options. CDC "assume[d] that many covered [noncitizens] have family or close friends in the United States," but did not believe that such family or close friends would have personal residences available to the noncitizens for self-quarantine or self-isolation in a manner that complied with HHS/CDC guidelines. 85 Fed. Reg. at 56,453. Plaintiffs call this "rank speculation," Br. 15, but that simple assertion is insufficient to show that CDC's assessment was unreasonable.

Nor were shelters a reasonable "backstop," as Plaintiffs suggest. Br. at 15. Plaintiffs argue that "community and faith-based organizations … were available to provide shelter and quarantine to those who may lack a place to quarantine," citing a "April 23, 2019 [sic]" letter from a legal services organization indicating the existence of such resources. Br. at 15 (citing AR 30). But in the August order, CDC noted the assistance of DHS's state, local and NGO partners and concluded that their resources were "limited," "already stretched thin and certainly not available for all [family units] who would be processed under Title 8 in the absence of an order issued under [Title 42]." 86 Fed. Reg. at 42,83. As for Plaintiffs' citation to certain self-quarantine options permitted by Europe and Canada, *see* Br. at 15, the record demonstrates that such options were extremely limited in both regions to specific eligible travelers, *see* 85 Fed. Reg. at 56,434–37, and that policies employed by both Europe and Canada "reinforce[d] the Director's view that [the Title 42] final rule is an important tool for protecting public health in the United States," *id.* at 56,435.

Moreover, CDC had already assessed that the "implementation of a self-quarantine or self-isolation protocol … would consume undue HHS/CDC and CBP resources without averting the serious danger of the introduction of COVID-19 into CBP facilities." 85 Fed. Reg. at 56,453; *see also*

26

85 Fed. Reg. at 17,067 (discussing that the public health tool of conditional release was not viable because "CDC lacks the resources and personnel necessary to effectively monitor such a large number of persons"). As CDC explained, "if the persons arriving into the United States must first spend time in congregate settings," such as CBP's border facilities, then by the time of the isolation, the disease may already have been spread to other travelers and government personnel, who may in turn spread to the domestic population. 85 Fed. Reg. at 56,426.

In the end, Plaintiffs' arguments about alternative mitigation measures are premised on the idea that the government should have done more. Plaintiffs argue that by August 2021, the government had had "more than enough time to institute alternatives to expulsion," including building out quarantine and processing capacity. Br. at 12. They also seek to rely on a CDC memo from November 2021 in which CDC noted that DHS had not "developed a plan for the resumption of normal border operations in the event of termination of the August order," AR23494. *See* Br. at 13–14. And they generally argue that Defendants should have created infrastructure to protect against COVID-19 for covered family units as they did for unaccompanied children. *See* Br. at 13. But Plaintiffs cannot ask the Court to compel Defendants to operate in the manner of Plaintiffs' choosing. Plaintiffs did not assert a "failure to act" claim under 5 U.S.C. § 706(1), and understandably so, because they cannot make the required showing that Defendants "failed to perform a non-discretionary duty to act"—*i.e.*, a "ministerial or non-discretionary" duty amounting to "a specific, unequivocal command," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63, 64 (2004); *see also Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) ("Section 706(1) permits judicial review of agency inaction but only within strict limits."); *Elec. Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1244 (D.C. Cir. 2018) (judicial authority to "compel agency action 'unlawfully withheld'" exists only "under narrow circumstances").

In sum, CDC acted within a zone of reasonableness; it appropriately utilized its technical and scientific expertise to consider the relevant issues, and reasonably explained its public health determination in issuing the August 2021 Order. The APA requires no more.

**E.  CDC's August Order Reasonably Advanced Title 42's Statutory Purpose**

Plaintiffs next argue that the August order failed to advance the purpose of 42 U.S.C. § 265 because COVID-19 was already widespread in the United States. Br. at 16.  This argument is untethered from the regulatory framework. The regulation defines "serious danger of the introduction of [a] quarantinable communicable disease into the United States" as "the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease."  42 C.F.R. § 71.40(b)(3); *see also id.* § 71.40(b)(1) (defining "introduction into the United States" to include situations where "the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States").

Plaintiffs' motion does not challenge the regulation, and in any event, CDC's interpretation of its authority under Section 265 is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001); *Guedes v. ATF*, 920 F.3d 1, 17-18 (D.C. Cir. 2019). "[W]hen an agency is authorized by Congress to issue regulations and promulgates a regulation interpreting a statute it enforces, the interpretation receives deference if the statute is ambiguous and if the agency's interpretation is reasonable." *Encino Motorcars*, 136 S. Ct. at 2124.  The premise of *Chevron* is that when Congress grants an agency the authority to issue statute-implementing regulations, "it presumes the agency will use that authority to resolve ambiguities in the statutory scheme." *Id.* at 2125.  Under *Chevron*'s two-step analysis, a court must first determine "whether Congress has directly spoken to the precise question at issue," and if it has, that is the end of the inquiry.  *Id.* at 2124–25 (cleaned up).  If the statute is ambiguous, the Court "must defer to the agency's interpretation if it is reasonable." *Id.* at 2125 (cleaned up).

As CDC explained in the preamble to the Final Rule, "[i]n the public health context, the term 'serious danger' is ambiguous." 85 Fed. Reg. at 56,446.  Because Congress did not define the term, it was "within HHS's delegated statutory rulemaking authority" to do so. *Id.*; *see, e.g., Rodriguez v. Gonzalez*, 451 F.3d 60, 63 (2d Cir. 2006) (affording *Chevron* deference to an agency's "construction of

undefined statutory terms such as 'moral turpitude,'" under federal immigration law "because of the [agency's] expertise applying and construing immigration laws"). Moreover, CDC had the scientific and technical expertise to resolve the ambiguity, which was further informed by "CDC's experience during the COVID-19 pandemic." 85 Fed. Reg. at 56,446. As CDC further explained, the determination of whether there is a "serious danger" is a "qualitative determination," and "does not require the CDC Director to make a numerical finding or a quantitative or empirical showing of probability in order to prohibit the introduction of persons." *Id.*

The CDC Director duly complied with the regulation when she issued the August order, making a qualitative judgment that a suspension of the right to introduce noncitizens was required to prevent the spread of COVID-19, even though the virus was already spreading in the United States. *See* 86 Fed. Reg. at 42,838–40; *see also id.* at 42,839 (recognizing that "COVID-19 has already been introduced and is spreading within the United States"). And as already demonstrated above, the CDC Director's conclusion was reasonable and is amply supported by the administrative record.

Nevertheless, Plaintiffs argue that the August 2021 order was not justified because the record does not show that noncitizens were having a "meaningful impact on the spread of COVID-19 within the United States." Br. at 16.[8] But neither the statute nor the implementing regulation uses a "meaningful impact" standard. Rather, the CDC Director was to make a qualitative judgment whether a Title 42 order was "necessary" to protect the public health in light of the rapid spread of the Delta variant. The CDC Director determined that it was. Indeed, Plaintiffs cannot reasonably argue that in August 2021, noncitizens coming across the southwest border were somehow immune from the highly transmissible Delta variant even while undergoing processing in the congregate settings of CBP's

---

[8] Plaintiffs selectively quote from an October 2021 interview of Dr. Anthony Fauci in which Dr. Fauci suggested that expelling immigrants was not the solution to stopping the spread of COVID-19. Br. at 16 (citing CNN, *Fauci: Expelling immigrants 'not the solution' to stopping COVID-19 spread* (Oct. 3, 2021)), *available* at https://tinyurl.com/5ua5m4bm. Later in the interview, Dr. Fauci was asked about the CDC's ongoing reevaluation of the August order and Dr. Fauci responded, "I am not as familiar with the intricacies of that to make any comment about that rule." *Fauci: Expelling immigrants 'not the solution' to stopping COVID-19 spread* at 3:30–4:05. Accordingly, even if this interview could be considered by the Court in this record-review case under the APA, it is irrelevant to the arbitrary and capricious analysis.

border facilities or were incapable of transmitting the virus into the United States. To the contrary, the CDC Director found that "[f]or the unvaccinated, Delta remain[ed] a formidable threat," 86 Fed. Reg. at 42,832, and "[c]ountries of origin for the majority of incoming covered noncitizens have markedly lower vaccination rates," *id.* at 42,834. The CDC Director therefore reasonably determined that their introduction into the United States "present[ed] a heightened risk of morbidity and mortality … due to the congregate holding facilities at the border and the practical constraints on implementation of mitigation measures in such facilities." *Id.*. at 42,834. And "[o]utbreaks in these settings increase the serious danger of further introduction, transmission, and spread of COVID-19 and variants into the country." *Id.*

Plaintiffs also argue that the August order is "underinclusive" because trains and road vehicles are also considered congregate settings. Br. at 17. The argument again relies on an inapposite standard. Underinclusiveness is a concept employed in constitutional scrutiny "to ensure that the proffered state interest actually underlies the law." *Blount v. SEC*, 61 F.3d 938, 946 (D.C. Cir. 1995) (cleaned up). It is particularly used in the First Amendment context where the government is required to show that its restriction on speech is narrowly drawn to serve a compelling government interest. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011). "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.* But even in the First Amendment context, underinclusiveness is not necessarily fatal, and seemingly underinclusive laws have been upheld under strict scrutiny. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). In contrast, under rational basis review of government action in equal protection cases, a law can be "both underinclusive and overinclusive" because "'perfection is by no means required.'" *Vance v. Bradley*, 440 U.S. 93, 108 (1979) (quoting *Phillips Chem. Co. v. Dumas School Dist.*, 361 U.S. 376, 385 (1960)).

The August 2021 order, of course, does not implicate the First Amendment or otherwise infringe on any constitutional rights. The concept of underinclusiveness is simply inapplicable. The APA does not "require agencies to tailor their regulations as narrowly as possible" to the issues sought to be addressed by the regulations. *Associated Dog Clubs of N.Y. State, Inc. v. Vilsack*, 75 F. Supp. 3d 83,

92 (D.D.C. 2014). As discussed above, "[s]urviving arbitrary and capricious review requires only a reasoned explanation based on the facts found by the agency." *Id.* Here, CDC clearly "has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 141 S. Ct. at 1158. For example, a commenter on the interim final rule noted, as Plaintiffs do here, that the rule did not "bar travel by tourists arriving by plane or ship, even though these modes of transportation are explicitly listed as congregate settings with a risk of disease." 85 Fed. Reg. at 56,452. CDC's response was that there were other tools "available to address public health risks in transportation hubs." *Id.* Indeed, by the time of the August 2021 order, "the U.S. government and CDC [had] implemented a number of COVID-19 mitigation and response measures," many of which "involved restrictions on international travel and migration." 86 Fed. Reg. at 42,831 & n.22 (describing restrictions on "non-essential travel along land borders," restrictions on cruise ship passenger operations, and restrictions on air travel). CDC's assessment of the issue was reasonable when viewed in the context of the full panoply of the U.S. government's restrictions on entry into the United States.

Plaintiffs further contend that the August 2021 order was too limited in scope to have any meaningful effect, citing statistics noted by Judge Walker during D.C. Circuit oral argument in this matter that the August order only covers about 0.1% of border crossers of the Canadian and Mexican borders. Br. at 17 (citing Oral Argument Tr. at 5, Cheung Decl., Ex. B). But as discussed above, CDC's public health assessment is not a simple numeric calculation. Rather, the critical consideration for CDC is that covered noncitizens would, under normal circumstances, be processed under Title 8 and held for some time potentially extended period of time in space-constrained congregate settings. 86 Fed. Reg. at 42,835. As CDC noted, "COVID–19 has disproportionately affected persons in congregate settings," and studies have shown that "a single introduction of SARS–CoV–2 into a facility can result in a widespread outbreak." *Id.* at 42,833 n.46; *id.* at 42,833 ("in congregate settings … even a single asymptomatic case can trigger an outbreak").

Again citing extra-record material, Plaintiffs further argue that the August 2021 order likely exacerbated, rather than reduced, COVID-19 transmissions. Br. at 18-20. But even if this Court could appropriately consider such extra-record material, which it cannot, none of it undermines the

31

CDC's decision-making.  For example, Plaintiffs highlight evidence indicating that Title 42 expulsions lead to high rates of recidivist border crossings.  Br. at 18.  Even so, CDC rationally determined that the August order was appropriate because, among other things, Title 8 processing of a noncitizen can still take up to eight times as long as Title 42 processing.  86 Fed. Reg. at 42,836.  The experience of using Title 42 orders since the onset of the pandemic shows that such orders "significantly reduced the length of time covered noncitizen [single adults] and [family units were] held in congregate setting [by DHS]."  *Id.* at 42,837.  "By reducing congestion in these facilities, the Orders have helped lessen the introduction, transmission, and spread of COVID-19 among border facilities and into the United States while also decreasing the risk of exposure to COVID-19 for DHS personnel and others in the facilities."  *Id.*  While recidivism may be a by-product of Title 42 orders, courts simply "are not authorized to second-guess agency" decisions that weigh the advantages and disadvantages of any given policy.  *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005); *see also Bonacci v. Trans. Sec. Admin.*, 909 F.3d 1155, 1162 (D.C. Cir. 2018) (declining to second-guess the Transportation Security Administration's decision to screen crewmembers differently from airport employees).

Plaintiffs next argue that CDC's Title 42 orders keep noncitizens in CBP custody longer than under normal circumstances because certain noncitizens cannot be expelled immediately to Mexico but must await repatriation flights to their home countries.  Br. at 19.  However, to the extent noncitizens are expelled by flights under the August 2021 order, terminating the order would not have decreased the time family units spent in congregate settings undergoing Title 8 immigration processing.  Just the opposite – CDC assessed, based on information provided by DHS, that in the absence of the August order, "both [single adults] and [family units'] time in [CBP] custody would likely increase significantly."  86 Fed. Reg. at 42,837.

Finally, Plaintiffs argue that the August 2021 order requires "needless additional transportation" on planes and buses and actually increases close-quarters exposures, thereby contributing to the spread of COVID-19 across both sides of the border.  Br. at 19-20.  Plaintiffs contend that this violates the principle set forth in *Judulang v. Holder*, 565 U.S. 42, 58 (2011), that

policies must have a "connection to the goals" of or constitute a "rational operation of" the laws at issue. This case is nothing like *Judulang*. In that case, the Supreme Court invalidated a Board of Immigration Appeals' policy that it found to be "unmoored from the purposes and concerns of the immigration laws," because the policy allowed "an irrelevant comparison between statutory provisions to govern a matter of utmost importance—whether lawful resident aliens with longstanding ties to this country may stay here." *Id.* at 64. Here, in contrast, in enacting Section 265 authorizing the suspension of the right to introduce noncitizens into the United States to address the public health crisis, *Congress* already has determined that the suspension is connected to the goal of promoting public safety from communicable diseases. CDC's extension of its Title 42 authority in August 2021 was thus tied to its public health determination, not unmoored from it. CDC concluded that, as of August 2021, "[c]omplete termination [of its prior Title 42 orders] would increase the number of noncitizens requiring processing under Title 8, resulting in severe overcrowding and a high risk of COVID-19 transmission among those held in the facilities and the CBP workforce, ultimately burdening the local healthcare system." 86 Fed. Reg. at 41,837. Its decision to extend its Title 42 authority was thus in line with the purposes of Section 265.

In sum, Plaintiffs' attempts to poke holes in CDC's public health determination are unavailing, especially given the "extreme deference" owed to the agency's decision-making in this context. *West Virginia*, 362 F.3d at 871; *see also Rural Cellular Ass'n*, 588 F.3d at 1105.

### F. CDC Was Not Required to Consider Harms to Noncitizens in Issuing the August 2021 Order

Plaintiffs' final argument is that CDC acted arbitrarily and capriciously by not weighing the "countervailing harms" to noncitizens against the domestic public health benefit when it issued its August 2021 order. Br. at 20–22. But neither the statute nor the implementing regulation calls for the CDC Director to engage in any such balancing of harms. Rather, Section 265 is concerned with preventing the introduction of a "communicable disease in a foreign country" into the United States. Congress enacted Section 265's predecessor statute in 1893 in response to a cholera epidemic. *See* Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449, 452; *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 723 (D.C.

Cir. 2022). Congress recognized the threat of cholera from Europe, Mexico, and Canada, and sought to prevent the disease "from either entering the country or spreading after it has made its entry." 24 Cong. Reg. at 359; *see also id.* at 363, 364, 370, 371. The sole inquiry under the statute is whether, in the CDC Director's judgment, a Title 42 order "is required in the interest of the public health." 42 U.S.C. § 265; *see also* 42 C.F.R. § 71.40(a)(2) (same standard).

The relevant statute thus limits CDC's authority to addressing a specific and serious danger to public health posed by a communicable disease. Nothing in Section 265 shows an intent by Congress to allow CDC to disregard its public health conclusions based on countervailing harms to migrants. Indeed, by its very nature, a Title 42 order involving persons will *always* have consequences for migrants because such an order operates by allowing CDC to temporarily suspend their entry into the United States. *See* 42 U.S.C. § 265 ("Suspension of entries ... to prevent the spread of communicable diseases"); *see also* 24 Cong. Rec. at 470 (Jan. 10, 1893) (statement of Senator George Gray explaining that the exigency posed by "invasion of contagious disease, is sufficient . . . to justify this extraordinary power of the entire suspension of immigration"); *id.* at 393 (statement of Senator George Hoar: "this section should be added, declaring in terms whenever the health or protection of the country from infection requires the total suspension of immigration"); *id.* at 393–94 (similar statement of Senator Chandler). The statute makes clear that CDC's assessment is about the interest of public health *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("[W]e find it implausible that Congress would give to the EPA through these modest words [i.e., 'requisite to protect the public health' with an 'adequate margin of safety,'] the power to determine whether implementation costs should moderate national air quality standards.").

The cases Plaintiffs cite are readily distinguishable. *See* Br. at 20. For example, in *American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017), the relevant statutes and regulations expressly "obligated" the United States Forest Service to "analyze the environmental consequences of proposed federal actions." *Id.* at 919–20. It was in the context of that express statutory requirement that the court held that the Forest Service acted arbitrarily and capriciously by failing to adequately analyze those consequences. *Id.* at 930–32. In *Nat'l Lifeline Ass'n v. FCC*, 921

34

F.3d 1102, 1111 (D.C. Cir. 2019), the agency was found to have acted arbitrarily and capriciously because "Congressional directives" and agency regulations required the agency to make voice and broadband services more available for low-income consumers, and yet the agency failed to consider that its actions would result in the loss of access for such consumers.

Plaintiffs' reliance on *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), is also misplaced. In *Regents*, the Court held that in rescinding the DACA program, DHS acted arbitrarily and capriciously by failing to consider the "reliance interests" of DACA recipients, many of whom had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children." *Id.* at 1914. Plaintiffs point to no similar reliance interests for noncitizens who are not yet in the country, and particularly since Title 42 orders had already been in place for nearly a year at the time CDC issued its August 2021 Order. More fundamentally, Plaintiffs do not, and in fact cannot, contend that any reliance interest they had on immigration processing as it existed before CDC issued its Title 42 order could override the statutory authority granted by Congress to address a public health emergency through the temporary suspension of immigration laws. Indeed, as CDC has explained, its Title 42 orders "are not, and do not purport to be, policy decision about controlling immigration; rather … CDC's exercise of its authority under Section 265 depends on the existence of a public health need." 87 Fed. Reg. at 19,954. CDC's statutory directive is clear, and it need not consider the immigration consequences to noncitizens whose entry is temporarily suspended by a Title 42 order when it determines that the interest of the public health requires such an order.

In any event, while not relevant to the public health determination under Section 265, CDC did not simply "ignore" the consequences that its Title 42 orders would have on noncitizens, as Plaintiffs contend. Br. at 20. As explained, CDC has always recognized that a Title 42 order is an extraordinary measure precisely because it displaces normal immigration processing. *See, e.g.,* 87 Fed. Reg. at 19,956. For that reason, CDC carefully considered alternatives to a blanket suspension order and adopted those alternatives when warranted, including by excepting unaccompanied children and allowing for case-by-case exceptions based on the totality of the circumstances. *See supra* Section II.D.

But as a public health agency charged with protecting the health of the American people, CDC is not required to engage in the kind of balancing of harm to noncitizens that Plaintiffs maintain is required in this context. *See* AR 3378 (CDC's mission is to "serve[] as the national focus for developing and applying disease prevention and control, environmental health, and health promotion and health education activities designed to improve the health of the people of the United States") (emphasis added). CDC has appropriately grounded its public health assessment in the statutory factors that Congress directed the agency to consider. No more is required.

## III.    AN INJUNCTION IS NOT AN APPROPRIATE FORM OF RELIEF AND, REGARDLESS, EQUITABLE FACTORS FAVOR DEFENDANTS

Because Plaintiffs' arbitrary and capricious claim fails on the merits, the Court need not consider what form of relief is appropriate. But even if the Court were to conclude otherwise, Plaintiffs are not entitled to a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (a movant for a permanent injunction must show (1) that remedies available at law are inadequate to compensate for that injury; (2) they have suffered an irreparable injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction). "'An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course' or where 'a less drastic remedy … [is] sufficient to redress' the plaintiffs' injury." *O.A. v. Trump*, 404 F. Supp. 3d 109, 154 (D.D.C. 2019) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). "An injunction … does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008); *see also eBay Inc.*, 547 U.S. at 392–93 ("[T]his Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination [of the merits].").

Here, as Plaintiffs admit, CDC recognizes that the current public health conditions no longer require the continuation of the August 2021 order. Br. at 24–25. CDC has issued a termination order whose effect has been preliminarily enjoined by another court and the injunction is currently pending appeal in the Fifth Circuit. That is the only reason the August 2021 order is still in effect. And if

CDC were to use a new Title 42 order in the future restricting the entry of family units into the United States, Plaintiffs, like "any party aggrieved by a hypothetical … decision[,] will have ample opportunity to challenge it, and to seek appropriate preliminary relief." *Monsanto*, 561 U.S. at 164. Of note, in September 2021, the D.C. Circuit stayed this Court's prior preliminary injunction order pending appeal, which stay was dissolved when the D.C. Circuit issued its decision in March 2022. *See* Order, No. 21-5200 (D.C. Cir. Sept. 30, 2021), Doc. No. 1916334. Plaintiffs did not seek a separate preliminary injunction under its arbitrary and capricious claim in the interim. Nor did they move for such relief after the D.C. Circuit issued its decision in March or when the mandate issued in late May. Indeed, the situation for class members has improved since the D.C. Circuit first stayed this Court's preliminary injunction because the D.C. Circuit has since held that Defendants may not expel class members to places where they would be persecuted or tortured. *Huisha-Huisha*, 27 F.4th at 722; *see also id.* at 733 (recognizing that the government did not "attempt to deny that the Plaintiffs will suffer irreparable harm if they are expelled to places where they will be persecuted or tortured").

On the other hand, the government and the public have an interest in protecting the integrity of government's valid orders. To be sure, the public health conditions underlying the August 2021 order no longer exist, and CDC's order seeking to terminate the August order was enjoined by the U.S. District Court for the Western District of Louisiana. But those events do not call into doubt the validity of the August 2021 order or provide a basis to invalidate the August order based on today's facts. This is particularly so when the government is actively pursuing its appeal of the preliminary injunction in the U.S. Court of Appeals for the Fifth Circuit. The orderly administration of justice compels that the August order be judged based solely on the administrative record before the agency and that this highly deferential review process not be used to short-circuit the separate appellate process in the Fifth Circuit.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for partial summary judgment.

Dated: August 31, 2022

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar. #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

SEAN M. TEPE, DC Bar #1001323
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-2533
Email: sean.tepe@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JEAN LIN
Special Litigation Counsel, NY Bar #4074530
Federal Programs Branch

*/s/  John Robinson*
JOHN ROBINSON, DC Bar #1044072
JONATHAN KOSSAK, DC Bar #991478
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20530
Tel (202) 514-3716
Email: jonathan.kossak@usdoj.gov
        john.j.robinson@usdoj.gov

*Counsel for Defendants*

38