**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.,* | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   No. 1:21-cv-00100-EGS |
| | ) |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity, *et al.,* | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

I.      PLAINTIFFS' CLAIMS ARE REVIEWABLE UNDER THE APA……………………...2

II.     THE TITLE 42 POLICY IS ARBITRARY AND CAPRICIOUS. ..................................... 7

        A. CDC FAILED TO ACKNOWLEDGE ITS BREAK WITH THE "LEAST

        RESTRICTIVE MEANS" STANDARD................................................................................ 8

        B.      THE TITLE 42 POLICY DOES NOT RATIONALLY SERVE ITS STATED

        PURPOSE, ESPECIALLY GIVEN THE ALTERNATIVES ............................................. 13

                1. CDC Failed to Adequately Consider Alternatives...................................................... 13

                2. The Title 42 Policy Did Not Rationally Serve its Stated Purpose. .......................... 16

        C.      The Agency Failed To Consider the Harms of Expulsion. ........................................... 21

III.    THE BALANCE OF THE EQUITIES OVERWHELMINGLY FAVORS A

PERMANENT INJUNCTION. ................................................................................................ 24

CONCLUSION.......................................................................................................................... 25

# TABLE OF AUTHORITES

**Cases**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
    429 F.3d 1136 (D.C.Cir. 2005) ................................................................. 17

*ALLTEL Corp. v. F.C.C.*,
    838 F.2d 551 (D.C. Cir. 1988) .................................................................. 7

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
    934 F.3d 649 (D.C. Cir. 2019) ................................................................. 23

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017) ........................................................... 21, 22

*Buffalo Field Campaign v. Williams*,
    579 F. Supp. 3d 186 (D.D.C. 2022) ........................................................... 7

*Cody v. Cox*,
    509 F.3d 606 (D.C. Cir. 2007) ....................................................... 2, 3, 4, 5

*Defs. of Wildlife v. Babbitt*,
    958 F. Supp. 670 (D.D.C. 1997) ............................................................... 7

*Delta Air Lines, Inc. v. Exp.-Imp. Bank of the U.S.*,
    718 F.3d 974 (D.C. Cir. 2013) .................................................................. 4

*DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ........................................................................... 22

*Dickson v. Secretary of Defense*,
    68 F.3d 1396 (D.C. Cir. 1995). ............................................................. 5, 6

*District of Columbia v. U.S. Dep't of Agric.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) ............................................................ 17

*Florida v. Becerra*,
    544 F. Supp. 3d 1241 (M.D. Fla. 2021) ..................................................... 3

*Grace v. Barr*,
    965 F.3d 883 (D.C. Cir. 2020) ........................................... 11, 14, 20, 23

*Grace v. Whitaker*,
    No. CV 18-1853, 2019 WL 329572 (D.D.C. Jan. 25, 2019) ..................... 24

*Health Freedom Def. Fund, Inc. v. Biden*, ___ F. Supp. 3d ____,
    2022 WL 1134138 (M.D. Fla. Apr. 18, 2022) .......................................................... 3

*Hispanic Affairs Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018) ............................................................................... 10

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022).................................................................. 2, 7, 21, 22

*Huisha-Huisha v. Mayorkas*,
    560 F. Supp. 3d 146 (D.D.C. 2021) ....................................................................... 21

*Judulang v. Holder*,
    565 U.S. 42 (2011)............................................................................................. 7, 17

*Kreis v. Sec'y of the Air Force*,
    866 F.2d 1508 (D.C. Cir. 1989) ............................................................................... 6

*Louisiana v. CDC*, __ F. Supp. 3d __,
    2022 WL 1604901 (W.D. La. May 20, 2022) .................................................. 2, 3, 4

*Marshall Cnty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) ........................................................................... 5, 6

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ............................................................................. 22

*Nat'l Min. Ass'n v. Jackson*,
    856 F. Supp. 2d 150 (D.D.C. 2012) ....................................................................... 10

*P.J.E.S. v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020) ....................................................................... 21

*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020) ......................................................................... 2, 4, 5

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) ............................................................................... 4, 6

*S. Bay United Pentecostal Church v. Newsom*,
    141 S. Ct. 716 (2021).............................................................................................. 4

*Sierra Club v. EPA*,
    No. 20-1121, 2022 WL 3694866 (D.C. Cir. Aug. 26, 2022)..................................... 5

*Sierra Club v. Jackson*,
   648 F.3d 848 (D.C. Cir. 2011) ................................................................. 3

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
   997 F.3d 1247 (D.C. Cir. 2021) ............................................................. 14

*Texas v. Biden*, __ F. Supp. 3d __,
   2022 WL 658579 (N.D. Tex. Mar. 4, 2022) ..................................... 2, 3, 6

*United States v. Simmons*,
   No. CR 18-344 (EGS), 2022 WL 1302888 (D.D.C. May 2, 2022) ........... 5

*United Steel v. Mine Safety & Health Admin.*,
   925 F.3d 1279 (D.C. Cir. 2019) ............................................................. 24

*United Student Aid Funds, Inc. v. Devos*,
   237 F. Supp. 3d 1 (D.D.C. 2017) ........................................................... 10

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ............................................................................... 23

*Zevallos v. Obama*,
   793 F.3d 106 (D.C. Cir. 2015) ......................................................... 11, 12

*Zhu v. Gonzales*,
   411 F.3d 292 (D.C. Cir. 2005) ................................................................. 6

**Statutes**
8 U.S.C. § 1182(a)(1)(A) ............................................................................. 10

24 U.S.C. § 413(b) ........................................................................................ 3

42 U.S.C. § 265 ............................................................................................. 4

42 U.S.C. § 268(b) ....................................................................................... 11

**Regulations**
42 C.F.R § 71.40(a) .................................................................... 6, 16, 17, 24

**Other Authorities**
73 Fed. Reg. 58047 (Oct. 6, 2008) ............................................................. 10

82 Fed. Reg. 6890 (Jan. 19, 2017) .......................................................... 8, 12

85 Fed Reg. 17060 (Mar. 26, 2020) ........................................................... 16

85 Fed. Reg. 70153 (Nov. 4, 2020)..................................................................... 19

86 Fed. Reg. 59603 (Oct. 28, 2021)............................................................... 11, 18

86 Fed. Reg. 72843 (Dec. 23, 2021) ..................................................................... 18

87 Fed. Reg. 15243 (Mar. 17, 2022)...................................................... 4, 9, 10, 15

87 Fed. Reg. 19941 (Apr. 6, 2022) ............................................................ 9, 15, 24

Caitlin Dickerson & Michael D. Shear, *Before Covid-19, Trump Aide Sought to Use Disease to Close Borders*, N.Y. Times (May 3, 2020), https://tinyurl.com/53buh4kb............................................................................... 7

CBP, *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* (May 21, 2022), https://www.aila.org/infonet/cbp-issues-guidance-on-processing-of-noncitizens ............................................................................................................... 25

CBP, *Southwest Border Land Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last updated Aug. 15, 2022) (drop-down filters: select "FMUA" for Demographic and "Title 42" for Title of Authority) .............................................. 25

**INTRODUCTION**

Plaintiffs' opening brief explained that the Title 42 policy is arbitrary and capricious for three principal reasons: Defendants (1) jettisoned the "least restrictive means" standard without acknowledgment, much less explanation; (2) failed to establish a rational relationship between the policy and the purported public health objectives or employ obvious less drastic alternatives; and (3) ignored the horrific daily harms directly caused by their ongoing policy.

Defendants' first response is that this Court lacks authority even to review the Policy—or any other similar challenge to a Title 42 policy—no matter how arbitrary or illogical.  But under D.C. Circuit precedent, Section 265 provides ample guidance against which to judge the agency's choices, as the only courts to consider the question have concluded.

Defendants' responses on the merits are equally unavailing.  *First*, they contest the existence of the prior "least restrictive means" standard, but that standard is confirmed by, among other things, the statements of CDC's then second-in-command, as well as 2017 CDC rulemaking.  Defendants suggest that the 2017 rulemaking applied only to quarantines, but the rulemaking expressly clarified that the test was applicable to "all" "public health measures."

*Second*, Defendants disclaim any need to consider the many public health tools available as an alternative to life-threatening expulsions because Defendants had not made enough progress in getting those tools in place.  But CDC never adequately explained why the government could not, over *years*, set up outdoor processing, on-site testing, or the many other measures CDC itself had urged.  And Defendants still cannot draw a reasonable line between the Title 42 Policy and meaningful public health impacts, given that COVID-19 has long been widespread in the United States and the Policy only ever involved a tiny fraction of cross-border travel.

1

*Third*, Defendants remarkably claim they were under no legal obligation even to *acknowledge*, much less meaningfully consider, that the policy has directly caused immense human suffering by handing vulnerable families over to "death, torture, and rape." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). But agencies cannot simply look away from the uncomfortable horrors created by their own policies. The time has come to eliminate the Title 42 Policy for good.

## I.     PLAINTIFFS' CLAIMS ARE REVIEWABLE UNDER THE APA.

Defendants argue that the Title 42 policy is "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2), contending that public health measures are presumptively unreviewable and, alternatively, that the Title 42 statute is "drawn" in a way to provide the courts with no meaningful standard to apply. Opp. 9-13. Neither argument has merit. Section 701(a)(2) "applies only in rare instances," *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (citation and quotation marks omitted), and Defendants cannot overcome the strong presumption in favor of review, *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020). Indeed, the only two cases to address the reviewability of the Title 42 Policy both rejected the government's extraordinary argument that the CDC can enact any policy it wishes without *any* court oversight of its arbitrariness. *Louisiana v. CDC*, __ F. Supp. 3d __, 2022 WL 1604901, at *17 (W.D. La. May 20, 2022); *Texas v. Biden*, __ F. Supp. 3d __, 2022 WL 658579, at *11–12 (N.D. Tex. Mar. 4, 2022).

1. Defendants wrongly suggest that public health laws generally fall into the narrow categories of agency actions that are presumptively unreviewable. Opp. 10-11. Under D.C. Circuit law, however, those "narrow categories" have not included public health laws (or scientific laws generally), but an agency's non-enforcement decisions, its allocations of lump-

2

sum appropriations, and certain "complicated foreign policy matters."  *Cody*, 509 F.3d at 610

(veterans' health care did "not fall into one of the narrow categories").[1]

Indeed, courts routinely review CDC's decisions under the arbitrary-and-capricious

standard, including in the COVID-19 context.  *See, e.g.*, *Health Freedom Def. Fund*, *Inc. v.*

*Biden*, ___ F. Supp. 3d ____, 2022 WL 1134138, at *18–20 (M.D. Fla. Apr. 18, 2022); *Florida*

*v. Becerra*, 544 F. Supp. 3d 1241, 1292-94 (M.D. Fla. 2021).  And, as noted, the only courts to

have considered the question under § 265 have concluded the statute does not commit decisions

to CDC's discretion.  *Louisiana v. CDC*, *supra*; *Texas v. Biden*, *supra.*

Defendants argue that public health decisions involve "balancing of a number of factors,"

and that Title 42 involves complicated, technical issues.  Opp. 10.  But nearly every agency

decision involves a balancing of factors, and frequently involve highly technical issues, so

Defendants' rule would essentially gut the APA's strong presumption favoring review.

Defendants' argument is also squarely contrary to the D.C. Circuit's approach.  *Cody*, for

example, rejected a challenge to reviewability over a statutory directive to provide for "health

care needs . . . in a high quality and cost-effective manner," 24 U.S.C. § 413(b), notwithstanding

the agency's "broad discretion in administering care" and the "difficulty of defining the

boundaries of 'high quality and cost-effective' health care."  509 F.3d at 610 (emphasis omitted).

It is thus unsurprising that Defendants cannot muster a single case holding that public health

measures are presumptively unreviewable.  Opp. 10.  Rather, they rely on opinions applying a

degree of deference *while reviewing* certain public health decisions, Opp. 10-11—an entirely

different issue.  None of those cases even applied § 701(a)(2), much less held the measures

---

[1] *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011), on which Defendants rely, involved the first category, a non-enforcement decision.

unreviewable.  *Cf. S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021)

(Roberts, C.J., concurring) (stressing that any such deference "has its limits").

2.  Defendants' alternative contention—that § 265 is drawn in a way that provides "no

meaningful standard against which to judge the agency's exercise of discretion"—is also wrong.

Opp. 11.  Even where a statute gives an agency discretion, that "does not render the agency's

decisions completely nonreviewable" unless "the statutory scheme, taken together with other

relevant materials, provides *absolutely no guidance* as to how that discretion is to be exercised."

*Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (emphasis added); *see Delta Air Lines, Inc.*

*v. Exp.-Imp. Bank of the U.S.*, 718 F.3d 974, 977 (D.C. Cir. 2013).  But § 265 provides extensive

guidance to the agency.  A § 265 order may remain in place only where "necessary *for* [*the*]

*purpose*" of "avert[ing]" a "*serious danger* of the introduction of a [communicable] disease into

the United States," as "*required* in the interest of the public health."  42 U.S.C. § 265 (emphases

added); *see Louisiana*, 2022 WL 1604901, at *17 (holding that § 265 provides meaningful

standard by which to judge a Title 42 policy).  Indeed, CDC has acknowledged these statutory

constraints on its authority.  87 Fed. Reg. 19941, 19955 (Apr. 2022 Order) ("[T]his authority

extends only for such period of time deemed necessary to avert the serious danger of the

introduction of a quarantinable communicable disease into the United States."); *accord* 87 Fed.

Reg. 15243, 15250, 15252 (Mar. 2022 Order).

These constraining features of § 265 clearly allow review under D.C. Circuit precedent,

which regularly identifies "meaningful standards to apply under 'far more permissive and

indeterminate language.'"  *Physicians for Soc. Resp.*, 956 F.3d at 643 (quoting *Cody*, 509 F.3d at

610).  *Dickson*, for example, held that a statute providing that the agency "may excuse" an

untimely filing "if it finds it to be in the interest of justice" did not commit the matter to

unreviewable agency discretion. *Dickson v. Secretary of Defense*, 68 F.3d 1396, 1402 (D.C. Cir.

1995). Here, the finding required for § 265 orders is:

> by reason of the existence of any communicable disease in a foreign country there is
> serious danger of the introduction of such disease into the United States, and that the
> danger is so increased by the introduction of persons or property from such country that a
> suspension of the right to introduce such persons and property is required in the interest
> of the public health.

That is far more detailed than the "interest of justice" standard found sufficiently meaningful in

*Dickson*. *See Cody*, 509 F.3d at 610 ("If [the *Dickson* standard] provides a 'meaningful standard

against which to judge the agency's exercise of discretion,' surely wording mandating that the

[agency] 'shall' provide 'high quality and cost-effective' health care does so as well") (citation

omitted). "Set against this precedent," § 265 affords "'meaningful standards for defining the

limits of the agency's discretion'" and thereby provides "'law to apply' under § 701(a)(2)."

*Physicians for Soc. Resp.*, 956 F.3d at 643–44 (quoting *Heckler*, 470 U.S. at 834) (cleaned up).[2]

Defendants suggest that the word "deem" in § 265 renders the statute unreviewable.

Opp. 12 (citing *Webster v. Doe*, 486 U.S. 592, 600-01 (1988), and *Zhu v. Gonzales*, 411 F.3d

292, 295 (D.C. Cir. 2005)). But the D.C. Circuit has rejected efforts to place "too much

emphasis on the word 'deem.'" *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221,

1224 (D.C. Cir. 1993). And the Circuit has repeatedly explained that *Webster*'s holding

concerned presumptively unreviewable national security intelligence decisions, holding that

---

[2] By contrast, in *Sierra Club v. EPA*, No. 20-1121, 2022 WL 3694866, at *5-6 (D.C. Cir. Aug.
26, 2022), the statute contained nothing to guide or constrain the agency's choice whether to
trigger venue in the D.C. Circuit. Similarly, in *United States v. Simmons*, No. CR 18-344 (EGS),
2022 WL 1302888, at *10 (D.D.C. May 2, 2022), this Court rejected a challenge to a policy of
prosecuting certain criminal cases in federal court rather than D.C. Superior Court, explaining
that the statutes offered no guidance for exercising prosecutorial discretion, and that criminal
charging decisions are generally unreviewable.

outside that context even "similarly worded statute[s]" do not establish unreviewability.

*Marshall County*, 988 F.2d at 1224-25 (*Webster* inapplicable to statute providing for

reimbursement adjustments "as the Secretary deems appropriate"); *see also Dickson*, 68 F.3d at

1402-03 (declining to extend *Webster*); *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1513-14

(D.C. Cir. 1989) (same).  *Zhu* was about an entirely different issue, namely an immigration-

specific jurisdiction-stripping provision of Title 8 not applicable here.  *See Zhu*, 411 F.3d at 294.

In fact, *Zhu* expressly "d[id] not reach the . . . question" of reviewability under the APA.  *Id.*

      Defendants assert that the "regulation implementing Section 265" bolsters their

unreviewability claim and that Plaintiffs are not challenging the regulation, but only the CDC

orders.  Opp. 12.  But Plaintiffs *are* challenging that regulation, as Defendants acknowledge.  *Id.*

at 8 (stating that Plaintiffs "challenge CDC's 'Title 42 Process' or 'Title 42 Policy,' which

Plaintiffs characterized as consisting of 'a new *regulation*, several orders, and an implementation

[DHS] memo'") (emphasis added); ECF No. 144-2 (proposed order seeking vacatur of CDC

Orders *and* regulation).  In any event, the regulation further cabins the agency's discretion.  *See*

*Texas*, 2022 WL 658579, at *11 (relying on this regulation to hold CDC orders reviewable).  The

regulation underscores, for example, that an order may remain in place "*only* for such period of

time that the Director deems necessary *to avert the serious danger of the introduction of a*

*quarantinable communicable disease*."  42 C.F.R. § 71.40(a) (emphasis added); *see also* 87 Fed.

Reg. at 15250 (Mar. 2022 Order) (acknowledging that "both Section 265 and [the] implementing

regulation" limit orders' duration in this way).  Only in the exceedingly rare situation where

statutes and regulations provide "absolutely no guidance as to how . . . discretion is to be

exercised" may an agency action be unreviewable.  *Robbins*, 780 F.2d at 45.  Not so here.

Finally, Defendants' position has stark implications: *any* arbitrary-and-capricious challenge to any Title 42 Order would be unreviewable. Courts would thus be powerless if a future administration invoked § 265 to authorize expulsions based on even the most transparent pretext.[3] That cannot be right—and, unsurprisingly, the D.C. Circuit never so much as hinted at a reviewability bar in this case. *See Huisha-Huisha*, 27 F.4th at 735 (remanding for consideration of arbitrary-and-capricious claim); Oral Argument Tr. at 4-6, ECF No. 144-3 at 17-19 (Judge Walker suggesting policy may be arbitrary and capricious).

## II.   THE TITLE 42 POLICY IS ARBITRARY AND CAPRICIOUS.

Plaintiffs make one threshold point regarding the standard and scope of review. Defendants invite the Court to view this case with extreme deference. Opp. 14. But courts have instructed that "[t]he deference a court must accord an agency's scientific or technical expertise is not unlimited" and decisions based on that expertise must still be reasoned. *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 679, 685 (D.D.C. 1997); *ALLTEL Corp. v. F.C.C.*, 838 F.2d 551, 562 (D.C. Cir. 1988) (striking rule and discounting reliance on economic analysis due to shifting agency positions on rule's effects); *Buffalo Field Campaign v. Williams*, 579 F. Supp. 3d 186, 205 (D.D.C. 2022) ("[T]he Court can defer to an agency's scientific judgment only if the agency's rationale may reasonably be discerned.") (internal quotation marks omitted).

Thus, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). That means, as particularly relevant here, that the agency had to (1) acknowledge and explain breaks with prior

---

[3] Even before COVID-19, the last Administration considered using § 265 to bar asylum seekers based *on the flu*. Caitlin Dickerson & Michael D. Shear, *Before Covid-19, Trump Aide Sought to Use Disease to Close Borders*, N.Y. Times (May 3, 2020), https://tinyurl.com/53buh4kb.

policy and practice, Mot. 5-6; (2) consider and explain its rejection of obvious alternatives as well as demonstrate a reasonable connection between its policy and its purported goals, Mot. 11,16; and (3) acknowledge and consider the impacts of its policy, Mot. 20.

### A.   CDC FAILED TO ACKNOWLEDGE ITS BREAK WITH THE "LEAST RESTRICTIVE MEANS" STANDARD.

CDC's policy and practice has been to apply the "least restrictive means" test to its responses to communicable diseases, yet it failed to apply, or even acknowledge, that standard in maintaining the Title 42 Policy.  Mot. 5-10.  In a 2017 rulemaking about communicable diseases, the CDC specifically explained that was the standard.  *Control of Communicable Diseases*, 82 Fed. Reg. 6890, 6912 (Jan. 19, 2017).  And Dr. Anne Schuchat, CDC's second-in-command at the time the Title 42 Policy was instituted, confirmed to Congress that the "least restrictive means" standard was the proper one and that the agency did not apply this standard to the Title 42 Policy's adoption.  Mot. 8.

Defendants contend that the 2017 rulemaking was limited to "quarantine and isolation" orders and does not apply to Title 42 orders under § 265.  Opp. 20.  But that rulemaking did not invent the "least restrictive means" standard, which has long been the agency's policy; rather, the agency explained that its rulemaking was "clarify[ing] the agency's standard operating procedures and policies."  Mot. at 6 n.3; *see also* 82 Fed. Reg. at 6896 (describing rule provisions as generally neither "new practices, nor new authorities, but a codification of HHS/CDC practice to protect public health").  And Defendants' attempt to limit the 2017 rulemaking to "quarantine and isolation" decisions ignores that the agency "clarifie[d]" that the "least restrictive" standard applied "in *all* situations involving quarantine, isolation, or *other public health measures*, it seeks to use the least restrictive means necessary to prevent spread of disease."  *Id.* at 6912 (emphases added).

8

Indeed, Defendants' post-hoc claim that the "least restrictive means" standard does not apply to § 265 Orders at all is belied by CDC's belated invocation of that standard when it finally terminated the Title 42 policy in its April 2022 Order.  Mot. 9-10.  That Order stated: "CDC . . . has determined that less restrictive means are available to avert the public health risks associated with the introduction, transmission, and spread of COVID-19 into the United States . . . ."  87 Fed. Reg. at 19955; 87 Fed. Reg. at 15252 (rescinding Policy as to unaccompanied children and stating "CDC is committed to using the least restrictive means necessary and avoiding the imposition of unnecessary burdens in exercising its communicable disease authorities.").

Defendants also try to cabin the 2017 rulemaking by suggesting CDC only meant that the "least restrictive means" standard should apply where U.S. citizens are involved because of due process concerns.  *See* Opp. 22-23.  But that post-hoc gloss is nowhere found in the 2017 rulemaking.  To the contrary, that rulemaking confirmed the CDC's practice of applying public health laws in a manner that does not discriminate based on citizenship: "HHS/CDC notes that it will continue to apply communicable disease control and prevention measures uniformly to all individuals in the United States, *regardless of citizenship*, religion, race, *or country of residency*."  82 Fed. Reg. at 6894 (emphases added).

Moreover, Defendants do not contest that prior to instituting the Title 42 Policy, the agency used a "least restrictive means" standard in a host of contexts involving disease outbreaks, including deciding whether to ban travel as part of its 2014-16 response to the Ebola outbreak.  Mot. 6-7.  Defendants suggest, however, that CDC has not always used the "least restrictive" test, and cite certain other COVID-19 measures.  Opp. 20-21 (citing masking measures and requirements for pre-flight negative COVID-19 testing or documentation showing recovery before U.S. entry).  But masking or testing are among the least restrictive COVID-19

measures available—that the agency adopted low-burden policies without explicitly analyzing

them as the least restrictive means is unremarkable.  By contrast, Title 42 expulsions are, in the

CDC's *own* view, "among the most restrictive measures CDC has undertaken" against COVID-

19.  87 Fed. Reg. at 19951.  Indeed, as noted, when the agency finally terminated the Title 42

Policy in April 2022 it did so by *explicitly* applying the "least restrictive means."[4]

Finally, Defendants ask the Court to disregard the statements to Congress made by Dr.

Anne Schuchat, CDC's former principal deputy director, in which she confirmed that the Title 42

Process should have been subjected to "the least restrictive means" standard under the agency's

practice.  *See* ECF No. 144-3, Ex. A at 28.  First, Defendants claim Dr. Schuchat's statements are

improper extra-record evidence.  Opp. 23.  But these sworn statements, from CDC's former

second in command, are critical evidence of the agency's past practice, and are therefore

admissible under controlling D.C. Circuit law.  *See Hispanic Affairs Project v. Acosta*, 901 F.3d

378, 386 n.4 (D.C. Cir. 2018) (holding that declarations outside the administrative record are

permissible to prove existence of DHS policy).  This extra-record testimony can also be

considered to evaluate whether "the agency failed to explain adequately its grounds for its

decision."  *Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156–57 (D.D.C. 2012); *see also*

*United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 4-5 (D.D.C. 2017) (considering

---

[4]  Defendants note only one pre-COVID-19 agency action, Opp. 20 (citing *Medical Examination of Aliens—Revisions to Medical Screening Process*, 73 Fed. Reg. 58047 (Oct. 6, 2008)), but that rule merely updated testing requirements for a ground of exclusion set by Congress, *see id.* at 58048 (citing 8 U.S.C. § 1182(a)(1)(A)).  In any case, to the extent that the 2008 Rule cast any doubt on the agency's prior practice, the 2017 Rule sought to "clarify the agency's standard operating procedures and policies" to require such analysis in "all situations" involving public health orders in response to an outbreak. Mot. at 6 n.3

extra-record evidence where "[t]he administrative record in this case "sheds no light on two factual issues" concerning whether agency action announced new rule).[5]

Defendants also suggest that Dr. Schuchat's statements were limited to quarantine orders and that "the August [Title 42] Order is not a quarantine order."  Opp. 22.  But Dr. Schuchat brought up the "least restrictive means" standard specifically in the context of explaining that the Title 42 Process was not justified in the interest of public health.   Her statements are thus consistent with the 2017 rulemaking stating that the agency uses the "least restrictive means" standard both for an order to quarantine an individual *and* for broader restrictions ("all situations involving quarantine, isolation, or other public health measures . . . to prevent spread of disease"), 82 Fed. Reg. at 6912. *See also* Mot. 6-7.[6]

Defendants fall back on the contention that CDC *did* in fact use the least restrictive means.  Opp. 21.  But such an analysis is absent from the August Order, or in any other orders instituting or continuing the Title 42 Policy.  Mot. 7.  Courts "assessing the reasonableness of an agency's action, . . . look only to what the agency said at the time of the action—not to its lawyers' post-hoc rationalizations."  *Grace v. Barr*, 965 F.3d 883, 903 (D.C. Cir. 2020) (cleaned up).  Citing *Zevallos v. Obama*, 793 F.3d 106 (D.C. Cir. 2015), Defendants suggest that failing to discuss least restrictive means could somehow be harmless error, if in fact they substantively

[5] Defendants argue that Dr. Schuchat's testimony applies only to the 2020 Orders and that she was not commenting on the later 2021-22 Orders.  Opp. 23.  But she described the "least restrictive means" test as a generally applicable standard, not one specific to the 2020 Orders.
[6] Even if the least restrictive means test applied only to quarantines (which it does not), the Title 42 Process *is* a quarantine order, as that is the basis for Defendants asking DHS officers to implement it.  *See* 42 U.S.C. § 268(b) (establishing "duty of the customs officers . . . to aid in the enforcement of *quarantine* rules and regulations") (emphasis added); 86 Fed. Reg. at 42838 (citing § 268 for legal authority).

complied with that standard.  Op. at 23.  But *Zevallos* never excused the type of flawed decision

making at issue here.  *See* 793 F.3d at 115 (allegation of lost evidence deemed harmless error).

Beyond the failure to actually mention, much less discuss, the least restrictive means test

in its Title 42 orders, the agency clearly did not actually apply that test.  Indeed, the slim

evidence Defendants offer for why they believe that CDC did apply the least restrictive means

test rests is simply that CDC stated that the Title 42 orders were "necessary" to prevent "serious

danger."  Opp. 21 (citing 42 U.S.C. § 265).  But the fact that CDC repeated the statutory

language does not suggest that CDC used the least restrictive analysis test when it adopted an

extraordinary and draconian expulsion policy.  Nor can Defendants claim to have chosen the

least restrictive means after failing to adequately consider the availability of numerous mitigation

options like outdoor processing, increased on-site testing, vaccination programs, and quarantine

protocols, even after those measures were widely available.  *See infra* (discussing alternatives).

Defendants also argue that the Court should assume that CDC applied the least restrictive

analysis test because it belatedly exempted unaccompanied children from the Title 42 Policy, and

also offered case-by-case exemptions from the policy.  Opp. 22.  But the fact that CDC chose to

treat unaccompanied children differently from families does not demonstrate that, as to adults

and families, it selected the least restrictive measure.  Moreover, the exemptions do little to

change the fact that the *overwhelming* majority of families who sought asylum in recent years

were expelled to great harm.  *See infra*.  These efforts are hardly consistent with what a least

restrictive means analysis would require: carefully analyzing the burdens of various options,

choosing the least restrictive one, and explaining and justifying that choice.  *See* 82 Fed. Reg. at

6896 (discussing use of "best available scientific and risk assessment procedures," combined

with "principles of least restrictive means" to determine CDC's response to Ebola outbreak); *see also* Mot. at 6 (citing examples of least restrictive means analysis).

### B.   THE TITLE 42 POLICY DOES NOT RATIONALLY SERVE ITS STATED PURPOSE, ESPECIALLY GIVEN THE ALTERNATIVES.

#### 1.   CDC Failed to Adequately Consider Alternatives.

The Title 42 Policy is also arbitrary and capricious because it failed to acknowledge and explain its refusal to adopt obvious mitigation alternatives. Plaintiffs have explained that Defendants could have relied on numerous tools at their disposal, including testing, vaccination, quarantine protocols, outdoor processing, and self-quarantine in lieu of the extraordinary step of continuing to summarily expel vulnerable noncitizens. Mot. 11-16. Indeed, by August 2021 (through the spring of 2022 during which time CDC repeatedly renewed the Policy), CDC was plainly relying on many of these existing mitigation steps to lessen restrictions in other contexts, allowing individuals to attend indoor sporting events and other large gatherings. Mot. 14-15. That CDC failed to adequately explain its continuation of the expulsions in light of these alternatives was arbitrary and capricious. *Id*.

Defendants' response reduces to variations on the same theme: Because outdoor processing, vaccination, and all the other various available measures were "not in place in August 2021," Opp. 25, CDC had no choice but to continue the expulsions. *See id*. ("DHS did not begin initiating a vaccination program until the Spring of 20222"). But that is not true as to certain mitigation measures that CDC did not even mention, much less adequately address. For instance, the August 2021 order did not mention the availability of therapeutic treatments. Mot. 12. Defendants concede as much, pointing to statements from CDC's *2022* termination order rather than anything in the August 2021 order itself. Opp. 25. Even then, they concede that such treatments "*were available* in August 2021," saying only that they were "not *as* widespread" or

available in "*as many* varieties" as in 2022.  *Id.* (emphases added).  Perhaps CDC could have

explained in August 2021 that the concededly existing treatments were not adequate, perhaps

not.  But it did not so much as mention them.

Moreover, CDC cites the unavailability of government-sponsored testing and vaccination

programs for migrants in August 2021.  Opp. 24-25.  Yet if that were the problem, CDC could

have considered accepting noncitizens who tested negative and/or obtained their own

vaccinations—as Defendants began to do with air travelers in the fall of 2021.  *See infra.*  Yet the

Order does not even address that possibility.  Similarly, noncitizen asylum seekers could have

adhered to self-quarantine and other public health measures at their U.S. destinations, like

millions of land and air passengers were permitted to do.  Mot. 15-16.  Defendants say that CDC

"did not believe" that migrants could comply with those guidelines, Opp. 26, but they cite no

record evidence to support that "belief."  *See* Mot. 15 (describing comments concerning

widespread availability of self-quarantine or shelter options).

Outdoor processing was also an option, if indoor congregate settings were CDC's

concern.  In response, Defendants assert, without *any* citation, that "Outdoor processing . . . was

unavailable in August 2021" and "could not have been a viable alternative."  Opp. 25.  But

assertions in a brief cannot replace "a reasoned explanation for its rejection of such alternatives"

from the agency itself.  *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C.

Cir. 2021); *Grace*, 965 F.3d at 903 (rejecting post-hoc justifications in brief).  Here, CDC itself

did not so much as *acknowledge* the option of outdoor processing in August 2021, much less

explain why such processing was not an alternative.

More fundamentally, to the extent mitigation measures had not been implemented to the

necessary degree, Defendants *could have implemented them*.  *See, e.g.*, 86 Fed. Reg. 42,828,

42,838 (CDC explaining in August 2021 Order that implementing mitigation protocols and resuming normal border processing was "feasible"); AR 23494 (CDC noting in November 2021 that "COVID-19 can be mitigated by instituting less restrictive means than expulsion," but "DHS continues to delay implementing necessary public health interventions").  DHS could have ramped up vaccinations, outdoor processing, and all the other available public health measures— just as it did to rapidly process thousands of Ukrainians.  Mot. 12-13.  Yet Defendants repeatedly renewed the Title 42 Process through the spring of 2022, without taking any such steps.  *See* AR 23485, 23490, 23498 (post-August 2021 memos renewing Title 42).

Defendants also point fingers at each other.  CDC, they assert, had to accept DHS's failure to implement any steps to vaccinate noncitizens or engage in other obvious public health measures as the "operational reality."  Opp. 25.  That argument is deeply troubling.  The federal government can, in Defendants' view, refuse to take reasonable and available mitigation steps for *years*, then use that failure to act as indefinite justification for the expulsions of noncitizens fleeing for their lives, without even acknowledging that choice.  That cannot be right.

CDC plainly could have done more than "encourage[]" DHS to take measures to obviate the claimed need for expulsions.  *See* 86 Fed. Reg. at 42840.  It could have, for example, set a reasonable deadline for DHS to undertake such measures.  In fact, that is exactly what CDC did in its April 2022 Order announcing the end of the Title 42 Policy, which gave DHS approximately six weeks "to ready [its] operational plans and prepare for full resumption of regular migration."  87 Fed. Reg. at 19956.

Defendants assert that "Plaintiffs cannot ask the Court to compel Defendants to operate in the manner of Plaintiffs' choosing."  Opp. 27.  For one thing, these mitigation measures were *CDC*'s own repeated recommendations.  Moreover, CDC cannot have it both ways.  The

suspension orders clearly state that CDC lacks ability on its own to implement expulsions, and

therefore the agency recruited DHS to "develop[] an operational plan for implementing the

order[s]."  85 Fed Reg. 17060, 17068.  After leaning on DHS to *implement* Title 42, CDC cannot

now turn around and claim that DHS had no responsibility to take steps to avoid the continued

human suffering of so many vulnerable asylum-seekers.

　　　　In short, CDC failed explain why the government could not ramp up its use of

alternatives insofar as they already did not sufficiently exist.  Perhaps CDC could have explained

it (though that is highly doubtful).  But for purposes of this analysis, that is beside the point:

CDC did not offer that explanation, and the Order is arbitrary and capricious.

### 2.  The Title 42 Policy Did Not Rationally Serve its Stated Purpose.

　　　　Particularly in light of the failure to consider alternatives, the Title 42 Policy lacks any

reasonable connection to its purported goals, including because COVID-19 was already rampant

in the United States in August 2021, Mot. 16-17; the egregious disjuncture between its stated

goal of banning infectious migration and the narrow group of travelers it actually targeted, *id.*

17-18; and the ways the Title 42 Policy *contributed* to spreading disease, *id.* 18-20.

　　　　Defendants cite the broad language of their authorizing regulation, and invoking *Chevron*

deference.  *See* Opp. 28-29 (citing 42 C.F.R. § 72.40(b)).  Setting aside that the regulation suffers

from the same legal defects as CDC's suspension orders and reassessments, the text of

Defendants' self-serving regulation does not save them—Plaintiffs' point is that the Title 42

Policy as a whole does not advance CDC's public health objectives.  Defendants' invocation of

the regulation also fails because it creates a remarkably capacious definition of "serious danger"

that authorizes bans based on the "probable introduction of one or more persons capable of

transmitting . . . disease."  42 C.F.R. § 71.40(b)(3).  Thus, under Defendants' reasoning, the

"probability" of *a single person* with a disease could serve as the basis for a total ban on migration for millions of people seeking to enter the country.  This would be true "even if the [disease] has already been introduced, transmitted, or spreading within the United States."  *Id.* § 71.40(b)(1). That simply cannot be a rational public health rule.

Apart from the regulation, there is another glaring incongruity between CDC's policy and its purported objectives: CDC instituted a ban that disregards *over 99%* of land border travelers and focuses on a mere 0.1%.  In stark contrast, CDC had previously acknowledged that a travel restriction would need to *ban* 99% of travelers to have even a brief effect on the "introduction" of a disease into the United States.  *See* Mot. 17-18 (citing Dep't of Health and Human Services, HHS Pandemic Influenza Plan (November 2005) at 307, 369, https://tinyurl.com/ytds879m).  CDC also had previously stated that such bans were "likely to be much less effective once the pandemic is widespread."  *Id.*  This incongruity cannot plausibly be justified by public health concerns and reveals the significant flaws in the agency's reasoning process.  *See Judulang*, 565 U.S. at 58; *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1145 (D.C. Cir. 2005) (invalidating rule with "little apparent connection to the inadequacies it purports to address"); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 31 (D.D.C. 2020) (finding agency action arbitrary and capricious based on "mismatch" between methodology and goals).[7]

_____

[7] Defendants claim Plaintiffs are raising a constitutional "underinclusivity" argument.  Opp. 30.  Plaintiffs' motion nowhere uses that term, and regardless, Defendants miss the point.  Plaintiffs have shown that the Title 42 Policy lacks a rational connection to its purported aims.  That is a standard arbitrary and capricious challenge.  *See Judulang*, 565 U.S. at 58-59.  Defendants try to distinguish *Judulang*, while ignoring its instruction that an agency "may well have legitimate reasons" for taking an action, "[b]ut still, it must do so in some rational way."  *Id.* at 55.  The Supreme Court invalidated an agency rule that "disfavor[ed] deportable [noncitizens]" for reasons that "neither focuse[d] on nor relate[d] to [a noncitizen's] fitness to remain in the

Defendants state that CDC's assessment "is not a simple numeric calculation," and that "the critical consideration" is the potential of COVID-19 spread in "space-constrained congregate settings." Opp. 31.  But as Plaintiffs have explained, other options existed to mitigate the concern over congregate settings. *See supra.*  Moreover, the unexplained flaw in CDC's analysis is its singular focus on noncitizens without documentation, without justifying why such aggressive measures were necessary for that population but no others.  In fall 2021, numerous travelers were crossing the border in congregate settings like "trains[] and road vehicles," 85 Fed. Reg. 16,560-61 (Mar. 2020 Order), yet CDC did not ban their migration, *see* Mot. 17-18 (July 2021 CBP data showing over 8.4 million people crossed border in cars, buses, and trains).

Defendants respond that CDC had implemented other "restrictions on international travel and migration" as of August 2021, Opp. 31 (citing 86 Fed. Reg. at 42,831 & n.22), but the cited restrictions were either less sweeping than the Title 42 Policy or had been rescinded by early 2022.  For example, Defendants cite Presidential proclamations restricting air travel from certain countries, as well as limitations on "non-essential travel along land borders," 86 Fed. Reg. at 42,831 n.22.  But in October 2021—the same month CDC reauthorized the Title 42 Process yet another time—the President revoked country-specific bans on incoming air travel and instead permitted such travel conditioned on vaccination, *see Advancing the Safe Resumption of Global Travel During the COVID-19 Pandemic*, 86 Fed. Reg. 59603 (Oct. 28, 2021), and also lifted bans on travel through land ports conditioned on vaccination, *Notification of the Lifting of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries*, 86 Fed. Reg. 72843 (Dec. 23, 2021) (describing October 2021 ban lift).  Similarly, CDC cited a plan to "take a

country." *Id.*  Likewise, CDC may claim to be carrying out the goals Congress set for it, but it must still do so in "some rational way."  *Id.*

phased approach to resuming cruise ship passenger operations in U.S. waters," *Framework for Conditional Sailing and Initial Phase COVID-19 Testing Requirements for Protection of Crew*, 85 Fed. Reg. 70153 (Nov. 4, 2020), which was issued almost a year before the August 2021 Title 42 Order.  A "phased resumption" is a far cry from the life-endangering expulsions CDC continued to authorize under Title 42 for vulnerable asylum seekers.[8]

This disparity also undermines Defendants' reliance on the prevalence of the Delta variant during this time period.  Opp. 15-16 & 29-30.  If Delta were the obstacle, why was (for example) cruise ship travel for pleasure permissible, yet migration for humanitarian reasons was not?  And why could millions of vaccinated individuals fly into the country and cross land borders after spending time in congregate settings like planes or travel hubs, yet no similar exception existed for vulnerable asylum seekers?

In essence, CDC was applying a "zero risk" standard to asylum seekers, but to no other population.  Defendants note, for instance, that CDC's concern that Delta was causing breakthrough infections and that vaccination numbers were plateauing.  Opp. 15-16.  But by that time, an enormous proportion of the population (including CBP agents) had been vaccinated and the remainder had access to vaccines, as Judge Walker noted in this case.  Oral Argument Tr. at 30, ECF No. 144-3.  And because of the availability of vaccines (and testing, therapeutics and other measures), CDC had also substantially relaxed its restrictions in numerous other contexts throughout the summer and fall of 2021, despite Delta's prevalence.  CDC never explained why these alternatives made it proper to open up the country for all sorts of indoor activities, but not

---

[8] Defendants also cite the Title 42 Final Rule's response to commenters raising this same concern, noting the existence of travel bans such as proclamations under INA 212(f) and other measures.  85 Fed. Reg. at 56,452.  However, the Final Rule was issued in September 2020, and as noted above, the government had revoked those measures by the end of 2021.

for asylum-seekers (even assuming outdoor processing facilities could not have been built for asylum seekers, which clearly they could have been).  And, as Plaintiffs have noted, prominent CDC officials, including Dr. Anthony Fauci, stated during Delta's height that banning migration was not an effective means of controlling the spread of a disease that was already widespread here.  Mot. 16 (Dr. Fauci's comments).  Defendants note that Dr. Fauci did not comment specifically about Title 42, but that detracts little from his overall point.

Defendants' response regarding the "recidivism" created by the Title 42 Policy is similarly unpersuasive.  Defendants assert that there is no record evidence concerning recidivism, Opp. 31, but that is flatly wrong.  *See* AR 439 (commenter describing recidivism); AR 23506 (acknowledging recidivism); ████████████████████████

███████████████████████████████████████████

████████████████████████████

Defendants' fallback is that CDC did not in fact ignore recidivism, but merely balanced it against the prospect of reducing capacity in border facilities.  Opp. 32.  That is also wrong— nowhere does CDC's order even acknowledge, much less engage, with this significant by-product of its decisions.  The Court must discount such post-hoc rationalizations.  *See Grace*, 965 F.3d at 903.

Defendants' arguments concerning DHS's *implementation* of Title 42 are similarly unconvincing.  Defendants do not dispute that some noncitizens must be held in DHS custody for longer periods of time due to their inability to be expelled by land to Mexico, Opp. 31██████ ████████████████████████████████; AR 275 (commenter noting that noncitizens are detained pending flights, with only temperature screen); *see also P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 548 (D.D.C. 2020) (children held for average of five days

pending expulsion during 2020).  They also do not dispute that as part of implementing Title 42, DHS regularly moves noncitizens on planes and buses from one border location to another for expulsion.  *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 175 (D.D.C. 2021) (describing practice of moving noncitizens along border for expulsion).  Although such practices greatly risk spreading COVID-19, Defendants respond only that "Congress already has determined that the suspension is connected to the goal of promoting public safety from communicable diseases." Opp. 33 (emphasis omitted).  But the question here is whether the CDC's implementation in this instance furthers that statutory purpose, and it is hard to see how a policy that actively *spreads* COVID-19 along the border advances legitimate public health objectives.

### C.       The Agency Failed To Consider the Harms of Expulsion.

Defendants do not seriously dispute that the agency failed even to acknowledge the harms to vulnerable migrants.  It might have been unpleasant for CDC to look squarely at what the D.C. Circuit called the "stomach-churning" pattern of murder, rape, and kidnapping visited on families due to Defendant's actions.  *Huisha-Huisha*, 27 F.4th at 733.  And it might have been difficult to explain why the dubious public health benefits of this Policy justified handing mothers, fathers, and children over to their persecutors and kidnappers without a chance to seek safety in this country.  But the APA's reasoned decisionmaking mandate does not permit an agency to "avert[] its eyes."  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017); *see* Mot. 20-21.

Defendants make the remarkable assertion that the CDC was not required even to *mention* these extraordinary harms to noncitizens.  Opp.  33–36.  This not only ignores CDC's least restrictive means standard, but also flies in the face of the APA's mandate that agencies "engage in reasoned decisionmaking . . . based on a consideration of the relevant factors" including

"important aspects of the problem." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905, 1910 (2020) (cleaned up).  Agencies are compelled "to consider [and] to adequately analyze the . . . consequences of" their actions.  *Am. Wild Horse Pres. Campaign*, 873 F.3d at 931-32.  Here, the undisputed record evidence is that the consequences of the Title 42 Policy are a consistent pattern of unspeakable horrors.  *See* AR 90; *Huisha-Huisha*, 27 F.4th at 733 (noting "'the quite horrific circumstances'" of noncitizens "forced to walk the plank into those places") (quoting oral argument transcript).  It is common sense that an agency considering a policy question and charged with offering a reasoned explanation for its choice must at least *acknowledge* that one available course of action would continue to subject people to such horrors.  Yet CDC did not do so.

Defendants seek to avoid this glaring lack of consideration by suggesting that an agency need only consider factors that statutes or regulations expressly mention.  Opp. 34-35.  Setting aside that this merely identifies a flaw with the regulation as well as the CDC Orders, *see supra*, Defendants' rule is invented from whole cloth and they do not cite a single case to support it. Indeed, no statute or regulation specifically required the agency in *Regents* to consider the harms that would be inflicted by ending Deferred Action for Childhood Arrivals (DACA)—that requirement flowed from the general APA mandate to engage in reasoned decisionmaking.  140 S. Ct. at 1913-14.  Defendants' attempt to distinguish *Regents* by claiming that the particular kinds of harms at issue there—impacts on reliance interests for those already inside the country—are different from the harms imposed here.  Opp. 35.  But that makes no difference.  In *Regents*, DHS had to acknowledge the "consequences of the rescission" of DACA even if it ultimately chose to give those consequences "no or diminished weight."  140 S. Ct. at 1914.  So too here.[9]

---

[9] Neither *American Wild Horse*, nor *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019), endorsed Defendants' proposed limitation to factors Congress has specifically mentioned.  Rather,

Defendants also have no response to *Grace*, where the D.C. Circuit held that the agency's "failure to acknowledge the change in policy [was] especially egregious given its potential consequences for asylum seekers," and "ignore[d] 'an important aspect of the problem,'" namely the denial of meritorious asylum claims. 965 F.3d at 901–02. Here, the consequences are even more extreme—not incorrect asylum adjudications, but the *total elimination* of asylum access and the delivery of noncitizens to the hands of kidnappers and persecutors.

Nor, contrary to Defendants' suggestion, does anything in § 265's text or legislative history *prohibit* CDC from considering the extraordinary harms being visited on noncitizens. Indeed, CDC has long acknowledged that it *can* consider "humanitarian" questions in implementing the Title 42 Policy by granting individual exemptions—even if it has chosen to exercise that humanitarian power in only a sliver of cases. *See* Opp. 22. And while Defendants argue that "a Title 42 order involving persons will *always* have consequences for migrants," Opp. 34, that does not mean that CDC—in choosing *whether* and *how* to exercise its Title 42 authority—can simply pretend those consequences are not happening and not take them into account. That is particularly so here, where the consequence is not simply a prohibition on travel, but handing asylum seekers over for rape, murder, and other harms. Nothing in the statute prohibited CDC from honestly looking at that reality; the agency's failure to do so was arbitrary and capricious. *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 668–71 (D.C. Cir. 2019) (holding agency action was arbitrary and capricious because, despite being consistent with the relevant statute's text and purpose, it failed to consider the negative impact on certain populations).[10]

---

those cases apply the basic requirement that an agency must consider the consequences of its own proposed policies.

[10] By contrast, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 467-68 (2001), on which Defendants rely, involved the Clean Air Act, which had been interpreted to *foreclose* implicit authority to consider costs in light of other provisions expressly granting that authority.

Alternatively, Defendants attempt to argue that CDC *did* address harms to migrants. That is plainly inaccurate: CDC made no attempt to grapple with the harms to vulnerable noncitizens when extending the Title 42 policy.  Tellingly, Defendants offer just one citation to the record, where CDC acknowledges that Title 42 is "extraordinary."  Opp. 35 (citing 87 Fed. Reg. at 19956). But this vague language hardly constitutes full consideration of the harms to asylum seekers. Moreover, that "extraordinary" comment actually comes from CDC's April 2022 *termination* order—making the lack of any prior mention of harms that much more glaring.  In short, Defendants simply failed to address any of the numerous comments about the horrific consequences of the Title 42 Policy.  Mot. 20–22.

## III.   THE BALANCE OF THE EQUITIES OVERWHELMINGLY FAVORS A PERMANENT INJUNCTION.

Defendants do not contest that vacatur is appropriate if the Title 42 policy is arbitrary and capricious.  That concession is well taken.  This Court has noted "the general rule that "[w]hen a reviewing court determines that agency regulations [or policies] are unlawful, the ordinary result is that the rules are vacated . . ."  *Grace v. Whitaker*, No. CV 18-1853, 2019 WL 329572, at *2 (D.D.C. Jan. 25, 2019) (quoting *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)) (first alteration in original); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action.") (citing 5 U.S.C. § 706(2)).  Thus, even if the Court does not reach the appropriateness of an injunction, it should vacate the Title 42 policy—namely "the regulation at 42 C.F.R. § 71.40 and all orders and decision memos issued by the Centers for Disease Control and Prevention or the U.S. Department of Health and Human Services suspending the right to introduce certain persons into the United States."  Proposed Order, ECF No. 144-2.

In addition to vacatur, this Court should also grant a permanent injunction.  Defendants do not dispute that Title 42 continues to cause irreparable harm on a daily basis, even after the D.C. Circuit's mandate.  *See* Mot. at 23–24; Opp. at 36–37.  Since last reported to the Court, in the month of July 2022 alone, 9,574 members of family units encountered at the southern border were summarily expelled pursuant to the Title 42 policy.[11]  Defendants half-heartedly argue, however, that the harm has been mitigated by the injunction in this case requiring screenings for persecution and torture.  Opp. 37.  Notably, though, Defendants have refused to provide statistics about how many screenings are actually occurring.  That is not surprising given that the number of continuing expulsions is so high and that Defendants have remarkably refused to advise families of the possibility of a screening.  Rather, Defendants have directed their agents to provide screenings *only* if the family affirmatively asks for one (or somehow non-verbally "manifest[s] a fear").[12]

Against these harms, Defendants press only a general interest in the "integrity" of their orders.  Opp. 37.  That does not justify denial of relief, particularly where CDC itself does not believe that expulsions are necessary any longer.  *Id.* 36 ("CDC recognizes that the current public health conditions no longer require the continuation of the August 2021 order.").  Nor are Defendants correct that Plaintiffs delayed in requesting relief.  Relief only became necessary when the August 2021 Order was reinstated by virtue of the Louisiana injunction prohibiting the policy's termination.  In addition to vacatur, an injunction is thus warranted.

## CONCLUSION

The Court should grant Plaintiffs' motion for partial summary judgment.

---

[11] https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last updated Aug. 15, 2022) (drop-down filters: select "FMUA" for Demographic and "Title 42" for Title of Authority).
[12] CBP, *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* (May 21, 2022), https://www.aila.org/infonet/cbp-issues-guidance-on-processing-of-noncitizens.

Dated: September 14, 2022

Respectfully submitted,

/s/ Lee Gelernt

Stephen B. Kang (Bar ID. CA00090)
Cody Wofsy (Bar ID. CA00103)
Morgan Russell*
My Khanh Ngo
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770

Kathryn Huddleston
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel. (713) 942-8146

Tamara F. Goodlette*
Refugee and Immigrant Center for
Legal Education and Legal Services
(RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
Tel: (210) 960-3206

Laura Peña
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
Tel: (956) 787-8171

Lee Gelernt (Bar ID. NY0408)
Daniel A. Galindo
Omar Jadwat*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660

Robert Silverman
Irit Tamir
Oxfam America
Boston, MA 02115, Suite 500
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

Blaine Bookey
Neela Chakravartula
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, N.W.
Suite 200
Washington, DC  20005
Tel: (202) 355-4471

*Attorneys for Plaintiffs*
*Admitted pro hac vice*