**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.,* | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-00100-EGS |
| | ) | |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity, *et al.,* | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR
CLASSWIDE PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 2

ARGUMENT ........................................................................................................ 4

   I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ................................ 4

       A.  CDC Disregarded Its Established Policy Regarding Responses to Communicable

          Diseases By Failing To Use the Established Least Restrictive Means Standard...... 5

       B.  The Title 42 Policy Does Not Rationally Serve its Stated Purpose Especially Given

          the Alternatives. ..................................................................................... 10

          1.  CDC failed to adequately consider alternatives to the drastic Title 42

             policy. ...................................................................................... 11

          2.  Apart from alternatives, the Title 42 policy did not further its stated objectives

             given COVID-19's already-widespread existence in the United States......... 16

       C.  The Agency Failed to Consider the Countervailing Harms to Vulnerable Migrants

          Subject to Summary Expulsion Under Title 42. .................................................. 20

   II.   FAMILIES WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT A

       PRELIMINARY INJUNCTION. ................................................................. 23

   III.  THE REMAINING EQUITABLE FACTORS ALSO FAVOR PLAINTIFFS. .......... 24

CONCLUSION..................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ................................................................................. 20, 22

*Bechtel v. FCC*,
  957 F.2d 873 (D.C. Cir. 1992) ........................................................................................ 11

*Butte Cnty., Cal. v. Hogen*,
  613 F.3d 190 (D.C. Cir. 2010) .................................................................................. 12, 15

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) .................................................................................................... 11

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..................................................................................................... 5, 7

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020) ................................................................................ passim

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022) ................................................................................. passim

*Huisha-Huisha v. Mayorkas*,
  560 F. Supp. 3d 146 (D.D.C. 2021) .......................................................................... passim

*Judulang v. Holder*,
  565 U.S. 42 (2011) ........................................................................................... 10, 16, 20

*Lone Mountain Processing, Inc. v. Sec'y of Lab.*,
  709 F.3d 1161 (D.C. Cir. 2013) ........................................................................................ 6

*Louisiana v. CDC*, ___ F. Supp. 3d. ___,
  No. 6:22-CV-00885, 2022 WL 1604901 (W.D. La. May 20, 2022) ......................................... 3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .......................................................................................................... 14

*Nat'l Lifeline Ass'n v. FCC*,
  921 F.3d 1102 (D.C. Cir. 2019) .............................................................................. 20, 22

*Portland Cement Ass'n v. EPA*,
  665 F.3d 177 (D.C. Cir. 2011) ........................................................................................ 16

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
  997 F.3d 1247 (D.C. Cir. 2021) ........................................................................ 11, 14

*Louisiana v. CDC*,
  No. 22-30303 (5th Cir., 2022) .................................................................................. 3

*Yakima Valley Cablevision, Inc. v. FCC*,
  794 F.2d 737 (D.C. Cir. 1986) ................................................................................ 11

**Statutes**

42 U.S.C. § 265 .......................................................................................................... 2

**Rules and Regulations**

82 Fed. Reg. 6890 (Jan. 19, 2017). ............................................................. 6, 7, 9, 17

85 Fed. Reg. 16559 (Mar. 24, 2020) ........................................................................ 22

85 Fed. Reg. 17060 (Mar. 26, 2020) .......................................................... 11, 17, 22

85 Fed. Reg. 42732 (July 15, 2020) ........................................................................... 7

85 Fed. Reg. 56424 (Sept. 11, 2020) .......................................................... 7, 12, 15, 22

86 Fed. Reg. 41863 (Aug. 3, 2021) .......................................................................... 21

86 Fed. Reg. 42828 (Aug. 5, 2021) .................................................................... passim

87 Fed. Reg. 15243 (Mar. 17, 2022) ........................................................... 9, 12, 13, 25

87 Fed. Reg. 19941 (Apr. 6, 2022) .................................................................... passim

**Other Authorities**

CBP, *January 2021 Operational Update* (Feb. 10, 2021), *available at*
  https://www.cbp.gov/newsroom/national-media-release/cbp-announces-january-2021-
  operational-update.................................................................................................. 12, 18

CBP, *Nationwide Encounters* (last modified July 15, 2022), *available at*
  https://www.cbp.gov/newsroom/stats/nationwide-encounters ................................... 13

CBP, *Southwest Land Border Encounters* (last updated July 15, 2022) *available at*
  https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters. ......................... 4, 24

CDC, *Developing a Framework for Assessing and Managing Individual-Level Risk of Coronavirus Disease 2019 (COVID-19) Exposure in Mobile Populations* (last updated Oct. 29, 2021), *available at* https://www.cdc.gov/immigrantrefugeehealth/exposure-mobile-populations.html........................................................................................................ 7, 20

CDC, *Menu of Suggested Provisions For State Tuberculosis Prevention and Control Laws* (Sept. 1, 2012), *available at* https://www.cdc.gov/tb/programs/laws/menu/ appendixa.htm .............. 6

CDC, *Notes on the Interim U.S. Guidance for Monitoring and Movement of Persons with Potential Ebola Virus Exposure* (last updated Dec. 27, 2017)*, available at* https://www.cdc.gov/vhf/ebola/exposure/monitoring-and-movement-of-persons-with-exposure.html........................................................................................................................... 6

CDC, *Public Health Law 101: A CDC Foundational Course for Public Health Practitioners* (Jan. 16, 2009), *available at* https://www.cdc.gov/phlp/docs/phl101/PHL101-Unit-2-16Jan09-Secure.pdf. ............................................................................................................................ 7

CNN, *Fauci: Expelling immigrants 'not the solution' to stopping Covid-19 spread* (Oct. 3, 2021), *available at* https://tinyurl.com/5ua5m4bm (2:13 to 4:05 of video) ............................ 16

Dep't of Health and Human Services ("HHS"), *HHS Pandemic Influenza Plan* (November 2005), *available at* https://www.cdc.gov/flu/pdf/professionals/hhspandemicinfluenzaplan.pdf..................... 17, 18

DHS, *Sec'y Mayorkas Delivers Remarks in Brownsville, Texas* (Aug. 12, 2021), *available at* https://www.dhs.gov/news/2021/08/12/secretary-mayorkas-delivers-remarks-brownsville-texas. ..................................................................................................................................... 19

Gov't Accountability Off., *CBP's COVID-19 Response* (June 2021), *available at* https://www.gao.gov/assets/gao-21-431.pdf..................................................................... 18, 19

Human Rights First, *The Nightmare Continues: Title 42 Court Order Prolongs Human Rights Abuses, Extends Disorder at U.S. Borders* (June 2022), *available at* https://www.humanrightsfirst.org/sites/default/files/NightmareContinues.pdf....................... 24

Martin Cetron et al., *Public Health and Ethical Considerations in Planning for Quarantine*, 78 Yale Journal of Biology and Medicine 325 (Oct. 2005), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2259156/pdf/17132339.pdf ......................... 9

Mem. from Alejandro N. Mayorkas, Sec'y of Homeland Sec., *DHS Plan for Southwest Border Security and Preparedness,* Apr. 26, 2022, *available at* https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security preparedness.pdf ............................................................................................... 13, 15

Mem. from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021), *available at*

https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-justification-memo.pdf .......................................................................................................................... 23

Mem. from Matthew S. Davies, Executive Director of Admissibility and Passenger Programs, CBP, *Title 42 Exceptions for Ukrainian Nationals* (Mar. 11, 2022), available at https://tinyurl.com/59fjhrbx. ........................................................................................................ 13

NY Post, *Fauci says US travel bans don't 'make any sense' now given rapid spread of Omicron* (Dec. 20, 2021), available at https://tinyurl.com/2ksp2nyk. ..................................................... 16

## INTRODUCTION

Defendants continue to use the Title 42 policy to expel thousands of vulnerable families, including young children, each month.  This Court and the D.C. Circuit previously considered certain arguments addressing the government's purported statutory authority for the policy, and the Circuit held that expulsions could proceed subject to certain safeguards against persecution and torture.  The Circuit remanded the case for further proceedings, however, pointedly noting "Plaintiffs' claim that the § 265 Order is arbitrary and capricious" in violation of the Administrative Procedure Act ("APA"), which had not yet been addressed by this Court because the administrative record had not been produced at that point.  *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 735 (D.C. Cir. 2022); *see also id.* (noting that the policy appears not to serve "any purpose").  Although the Centers for Disease Control and Prevention ("CDC") has since decided to terminate the Title 42 policy in its entirety for lack of a public health necessity, that termination decision has been enjoined by another court on notice-and-comment grounds, keeping the policy in place indefinitely.  That court did *not* address whether the policy was arbitrary and capricious.

Plaintiffs therefore respectfully move the Court to issue a preliminary injunction against the Title 42 policy on their arbitrary-and-capricious claim.  Second Amended Complaint, Dkt. 131 at 21–22.  The Title 42 policy is arbitrary and capricious for several independent reasons.  First, CDC's settled practice is to adopt the least restrictive means necessary to protect public health, but the agency departed from that standard *sub silentio* when authorizing the Title 42 policy.  Second, the Title 42 policy bears no rational connection to the stated goal of preventing the introduction of COVID-19 into the country.  That is particularly so in light of more effective and less burdensome alternatives that are now readily available, such as vaccinations and testing.

Third, CDC failed to consider the human impact the Title 42 policy would have on vulnerable migrants.

The equitable considerations now favor Plaintiffs even more decisively than when this Court granted the original preliminary injunction.  Since then, CDC has echoed the findings of this Court and the D.C. Circuit, and indeed, has concluded that the Title 42 policy is *unnecessary* as a public health measure.  Defendants have now also admitted that Plaintiffs suffer horrific harms as a result of Title 42 expulsions.  In short, the Title 42 policy unnecessarily and unlawfully endangers lives, and it must be immediately enjoined to prevent further harm.

Plaintiffs have conferred with Defendants, who oppose this Motion.

## BACKGROUND

The Court is familiar with the history of the Title 42 policy and this litigation.  *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 156–60 (D.D.C. 2021).  In short, CDC first instituted the Title 42 policy in March 2020; the original regulatory framework was replaced by a final rule issued in September 2020; and CDC issued the last of several orders keeping the policy in effect in August 2021 (the "August 2021 Order").  *Id*. at 156–58.  Throughout that time, the policy has directed the expulsion of noncitizens under the purported authority of a public health statute, 42 U.S.C. § 265.  The justification for these expulsions has been COVID-19, even as the public health landscape has changed dramatically since early 2020.  *See infra*; *Huisha-Huisha*, 27 F.4th at 734 ("The CDC's § 265 order looks in certain respects like a relic from an era with no vaccines, scarce testing, few therapeutics, and little certainty.").

Plaintiffs—a certified class of families—moved for a preliminary injunction on three statutory grounds: that § 265 regulates only transportation carriers and not individual travelers, that it does not authorize expulsions even if it does regulate individual travelers, and that it

cannot authorize expulsions in violation of the humanitarian protections designed to protect migrants fleeing danger. *Huisha-Huisha*, 560 F. Supp. 3d at 171 n.6. This Court granted the motion, holding that § 265 likely did not authorize expulsions. *Id*. at 166–71. The D.C. Circuit affirmed that Order in part. *Huisha-Huisha*, 27 F.4th at 735. It held that § 265 likely did authorize expulsions of families in general, but "only to places where they will not be persecuted or tortured." *Id*.

Less than a month after the D.C. Circuit's opinion, CDC issued an order terminating Title 42 entirely as unnecessary and concluding "that less restrictive means are available to avert the public health risks associated with the introduction, transmission, and spread of COVID-19 into the United States." *Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 87 Fed. Reg. 19941, 19955 (Apr. 6, 2022) (the "April 2022 Order"). The termination was to be implemented on May 23, 2022. *Id*. at 19955. However, the termination order was preliminarily enjoined on May 20 in separate litigation brought by Louisiana and other states, on the ground that CDC was required to undertake notice-and-comment rulemaking in order to rescind Title 42. *Louisiana v. CDC*, ___ F. Supp. 3d. ___, No. 6:22-CV-00885, 2022 WL 1604901, at *22–23 (W.D. La. May 20, 2022). That ruling is on appeal, and the federal government has not sought a stay. *See* No. 22-30303 (5th Cir.). As a result, the August 2021 CDC Order continuing the Tile 42 policy remains in effect, subject to the limitations imposed by the D.C. Circuit's ruling. In June 2022, the first full month following issuance of the D.C.

Circuit's mandate, over 14,000 Class Members were expelled—the highest monthly total since September 2021.  CBP, *Southwest Land Border Encounters*.[1]

## ARGUMENT

The Court should preliminarily enjoin the Title 42 policy because it is arbitrary and capricious.  *See Huisha-Huisha*, 560 F. Supp. 3d at 160-61 (recounting the preliminary injunction standard).  That claim was not before this Court or the D.C. Circuit earlier in this litigation, but the Circuit pointedly instructed that the claim be considered on remand.  *See Huisha-Huisha*, 27 F.4th at 735 (remanding "for further proceedings and ultimate resolution of the merits, including the Plaintiffs' claim that the § 265 Order is arbitrary and capricious."); *see also* Second Amended Complaint, Dkt. 131 at 21–22.  The balance of equities strongly favors a preliminary injunction because the Title 42 policy is set to remain in place indefinitely despite CDC's judgment that it is unnecessary, and Class Members face devastating impacts on a daily basis.

## I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are likely to succeed on the merits of their claim that the Title 42 policy is arbitrary and capricious, for several independently dispositive reasons.  First, it is bedrock APA law that an agency may not deviate from its prior practice without sufficient explanation, yet here CDC never even mentioned, much less explained, why it failed to apply the agency's established "least restrictive means" standard when authorizing the drastic step of expulsions. Notably, when CDC's now-retired second in command testified before the House, she

---

[1]      https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last updated July 15, 2022) (drop-down filters: select "FMUA"—i.e., "family unit aliens"—for Demographic and "Title 42" for Title of Authority).

specifically noted the agency's longstanding least restrictive means standard, its failure to apply that standard, and the political pressure placed on the agency.  *See* Section A, *infra*.

Second, as both the D.C. Circuit and this Court have stressed in this case, the Title 42 policy does not appear to serve "any purpose," especially in light of the widespread availability of vaccines and other alternative measures.  *Huisha-Huisha*, 27 F.4th at 734 (calling the policy "a relic"); *Huisha-Huisha*, 560 F. Supp. 3d at 171 (granting injunction "in view of the wide availability of testing, vaccines, and other minimization measures").  Moreover, as Dr. Anthony Fauci and other experts have long pointed out, immigrants are not a significant source of COVID-19 in the United States, and Class Members are dwarfed by millions of other travelers who are permitted to cross the U.S.-Mexico border, including many who are not tested or vaccinated for COVID-19.  CDC's orders authorizing the Title 42 policy failed to address those obvious disconnects between its chosen policy and public health.  *See* Section B, *infra*.

Third, CDC failed to take account of the harm the Title 42 policy would inflict on vulnerable migrants.  But the countervailing harm to affected individuals must be factored into an agency's analysis, not only under CDC's least restrictive standard but also as a matter of well-established APA principles.  *See* Section C, *infra*.

### A.    CDC Disregarded Its Established Policy Regarding Responses to Communicable Diseases By Failing To Use the Established Least Restrictive Means Standard.

It is settled law that an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  An agency must "acknowledge and explain its departure from past practice."  *Grace v. Barr*, 965 F.3d 883, 903 (D.C. Cir. 2020).  It may not "gloss over or swerve from prior precedents without discussion."  *Id.* at 900 (cleaned up).  "Failing to supply such analysis renders

5

the agency's action arbitrary and capricious." *Lone Mountain Processing, Inc. v. Sec'y of Lab.*, 709 F.3d 1161, 1164 (D.C. Cir. 2013); *see Grace*, 965 F.3d at 903 (affirming injunction in relevant part "on that basis alone").

Prior to instituting the Title 42 policy, CDC's settled practice was to impose only the "least restrictive means necessary to prevent spread of disease" in "all situations," including the spread of communicable diseases from abroad. *Control of Communicable Diseases*, 82 Fed. Reg. 6890, 6912 (Jan. 19, 2017).[2] This rigorous least restrictive means standard requires CDC to consider and seek to minimize the burdens of any proposed public health measure on individuals. *See id.* at 6896. For example, in responding to the 2014–2016 Ebola outbreak, CDC applied "principles of least restrictive means" in determining that "measures to ban travel . . . were unnecessary," in part because those measures "would have had dramatic negative implications for travelers." *Id.*; *see also* CDC, *Notes on the Interim U.S. Guidance for Monitoring and Movement of Persons with Potential Ebola Virus Exposure* (stating that CDC's 2014 Ebola response sought to "apply[] the least-restrictive measures necessary to protect communities and travelers").[3] CDC has also applied that principle to combat tuberculosis and even COVID-19 outside of the Title 42 context.[4] Indeed, least restrictive means—sometimes referred to as "least

---

[2]    This 2017 CDC final rule notice amended regulations in 42 C.F.R. Parts 70 and 71 setting forth the agency's authority to respond to communicable diseases, in part to "clarify the agency's standard operating procedures and policies." 82 Fed. Reg. at 6931, 6935, 6962. The subsequently-issued regulation governing the Title 42 policy, 42 C.F.R. 71.40, is located in 42 C.F.R. Part 71.

[3]    https://www.cdc.gov/vhf/ebola/exposure/monitoring-and-movement-of-persons-with-exposure.html (last updated Dec. 27, 2017).

[4]    *E.g.*, CDC, *Menu of Suggested Provisions For State Tuberculosis Prevention and Control Laws* (Sept. 1, 2012), https://www.cdc.gov/tb/programs/laws/menu/ appendixa.htm ("Public health officials generally employ a step-wise approach to implementing TB control measures,

restrictive infringement" or "least infringement"—is a foundational principle that CDC has taught in its "Public Health Law 101" course.  *See* CDC, *Public Health Law 101: A CDC Foundational Course for Public Health Practitioners*, at 24 (Jan. 16, 2009).[5]

CDC disregarded its established least restrictive means standard when adopting and maintaining the Title 42 policy, and failed to even acknowledge that it was doing so.  From March 2020 on, none of CDC's rules or orders authorizing the Title 42 policy even referenced the least restrictive means standard, much less explained why it was jettisoning that standard. *E.g.*, 85 Fed. Reg. 56424 (Final Rule); 86 Fed. Reg. 42828 (August 2021 Order); *compare* 82 Fed. Reg. at 6896 (CDC discussing agency's Ebola policy: "HHS/CDC used the best available science and risk assessment procedures . . . and principles of least restrictive means to successfully ensure that measures to ban travel between the United States and the affected countries were unnecessary."); *Control of Communicable Diseases; Importation of Human Remains*, 85 Fed. Reg. 42732, 42733–35 (July 15, 2020) (CDC considering "less burdensome alternative[s]" when regulating importation of human remains pursuant to its Title 42 authority). The agency thus failed even to "display awareness that it [was] changing position," *Fox*, 556 U.S. at 515, thereby "fail[ing] the APA's requirement of reasoned decisionmaking," *Grace*, 965 F.3d at 901.

---

beginning with the least restrictive measure necessary . . . ."); CDC, *Developing a Framework for Assessing and Managing Individual-Level Risk of Coronavirus Disease 2019 (COVID-19) Exposure in Mobile Populations* ("CDC COVID-19 Framework") (CDC recommendations regarding COVID-19 based on risk level and relative restrictiveness of policy options for arriving travelers) (last updated Oct. 29, 2021), https://www.cdc.gov/immigrantrefugeehealth/exposure-mobile-populations.html.

[5]      https://www.cdc.gov/phlp/docs/phl101/PHL101-Unit-2-16Jan09-Secure.pdf.

Congressional testimony further confirms that the Title 42 policy was an unjustified deviation from CDC's prior practice.  According to interview excerpts released by the House of Representatives, Dr. Anne Schuchat, who was second-in-command at CDC when the Title 42 policy was adopted in March 2020, testified that CDC's "typical" practice was to seek the "least restrictive means possible to protect public health" when considering quarantine and other public health measures.  *House Subcommittee Interview* at 28, Cheung Decl., Ex. A.  She revealed that the Title 42 policy was *not* subjected to that usual analysis.  In fact, Dr. Schuchat reported that the Title 42 policy "wasn't based on a public health assessment," that "the decision wasn't being made based on criteria for quarantine," and that the policy "may have been initiated for other purposes."  *Id.* at 27–28.

Dr. Schuchat further explained that the Title 42 policy was not necessary to prevent the spread of COVID-19 in the United States and that "the bulk of the evidence . . . did not support th[e] policy" because other mitigation measures were available to reduce the risk of infection in border facilities and during transit.  *Id.* at 28.  She also suggested that in general then-CDC Director Dr. Robert Redfield's decisionmaking was subjected to political pressure on many occasions.  *See id.*  According to Dr. Schuchat, Dr. Martin Cetron, who at all relevant times has headed the CDC division responsible for exercising the agency's authority under 42 U.S.C.

§ 265,[6] likewise concluded that "the facts on the ground didn't call for this [policy] from a public health reason, and that the decision wasn't being made based on [the relevant] criteria."[7]  *Id.*

Notably, when the CDC finally terminated the Title 42 policy, first as to unaccompanied minors and then more generally, it did so because the continuation of Title 42 could not satisfy the "least restrictive means" standard.  Specifically, CDC's March 2022 order terminating the program as to unaccompanied children stated that "CDC is committed to using the least restrictive means necessary and avoiding the imposition of unnecessary burdens in exercising its communicable disease authorities."  87 Fed. Reg. 15243, 15252 (Mar. 17, 2022) ("[L]ess restrictive means are available to avert the public health risks associated with the introduction, transmission, and spread of COVID-19 into the United States.").  Likewise, its April 2022 Order terminating the Title 42 policy in its entirety stated that "CDC . . . has determined that less restrictive means are available to avert the public health risks associated with the introduction, transmission, and spread of COVID-19 into the United States due to the entry of covered noncitizens."  87 Fed. Reg. at 19955 ("CDC is committed to avoiding the imposition of unnecessary burdens in exercising its communicable disease authorities.").  In doing so, CDC

---

[6]     According to CDC's 2017 rulemaking, "[t]he authority for carrying out these regulations [at 42 C.F.R. Parts 70 and 71] has been delegated from the HHS Secretary to the CDC Director, who in turn delegated these authorities to HHS/CDC's Division of Global Migration & Quarantine (DGMQ)," which has been led by Dr. Cetron at all relevant times.  82 Fed. Reg. at 6898; *see* AR 23485 (identifying Dr. Cetron as the Director of DGMQ).

[7]     Dr. Cetron has previously concluded that "least restrictive means" must be considered when setting public health policy, including during a pandemic.  Specifically, he agreed that pandemic responses "should be proportional, necessary, relevant, equitably applied, and done by least restrictive means."  Martin Cetron et al., *Public Health and Ethical Considerations in Planning for Quarantine*, 78 Yale Journal of Biology and Medicine 325, 329 (Oct. 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2259156/pdf/17132339.pdf; *see also id.* at 325 (identifying Dr. Cetron's affiliation as the "Division of Global Migration and Quarantine, Centers for Disease Control").

belatedly acknowledged that expulsions are "among the most restrictive measures CDC has undertaken." *Id.* at 19952; *see also id.* at 19944 ("[T]he extraordinary measure of an order under 42 U.S.C. 265 is no longer necessary, particularly in light of less burdensome measures that are now available to mitigate the introduction, transmission, and spread of COVID–19.").

Yet, as noted, the agency never once cited, much less applied, the least restrictive means standard when it chose to enact and *continue* the policy, presumably because it recognized from the beginning it could not satisfy that demanding standard. The failure to reference and apply the least restrictive means standard, or justify deviating from that standard, violates the APA's reasoned decisionmaking requirement and renders the policy arbitrary and capricious. *See Grace*, 965 F.3d at 901. Indeed, even were Defendants now to (implausibly) claim in litigation that it could have satisfied that standard, CDC's "failure to acknowledge and explain its departure from past practice" is enough, standing "alone," to render the Title 42 policy unlawful. *Id.* at 903 (rejecting agency "lawyers' post-hoc rationalizations").

**B.     The Title 42 Policy Does Not Rationally Serve its Stated Purpose Especially Given the Alternatives.**

An agency action is also arbitrary and capricious if it lacks a reasonable "connection to the goals" it purports to advance or "the rational operation" of the laws it purports to implement. *Judulang v. Holder*, 565 U.S. 42, 58 (2011).

Here, the D.C. Circuit correctly observed that "from a public-health perspective," it is "far from clear that [the Title 42 policy] serves *any* purpose." *Huisha-Huisha*, 27 F.4th at 735 (emphasis added). And as this Court held nearly a year ago, Defendants had numerous options available to them even at that time, given "the wide availability of testing, vaccines, and other minimization measures." *Huisha-Huisha*, 560 F. Supp. 3d at 176. Defendants' failure to account for fundamental changes in the pandemic response and other serious defects from the

10

outset demonstrate the inherent irrationality of the Title 42 policy and render it arbitrary and capricious.

1.     CDC failed to adequately consider alternatives to the drastic Title 42 policy.

Even absent an established agency practice like CDC's least restrictive means principle, "[a]n agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (citation omitted).  At minimum, agencies must consider "obvious and less drastic alternative[s]." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 (D.C. Cir. 1986).  "[T]he failure of an agency to consider obvious alternatives has led uniformly to reversal." *Spirit Airlines*, 997 F.3d at 1255 (cleaned up); *see also DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (failure to consider less sweeping alternative was arbitrary and capricious).  Here, CDC consistently failed to consider public health measures less drastic than indefinitely authorizing summary expulsions.

a. First, Defendants could have instituted testing, vaccination, and quarantine protocols, rather than continuing to authorize expulsions.  An agency must "reexamine its approach if a significant factual predicate of a prior decision has been removed." *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) (cleaned up).  In March 2020, the Title 42 policy was purportedly justified as an emergency measure at a time when there was "no vaccine," "no rapid test," and no "approved therapeutics."  85 Fed. Reg. 17060, 17062 (Mar. 26, 2020) (original Title 42 order).  By the time CDC issued its operative Order in August 2021, each of these core factual underpinnings for the policy had changed entirely.  Highly effective vaccines and on-site rapid antigen tests were available.  86 Fed. Reg. at 42833 (August 2021 Order); *see also* AR 2517 (CDC July 2021 report: "COVID-19 vaccination remains the most effective means to achieve

11

control of the pandemic").  Two-thirds of people in the United States over age 12 had received at least one vaccine dose.  86 Fed. Reg. at 42834.  All American adults had been vaccine-eligible for more than three months, AR 2585, and CBP "frontline personnel" had been prioritized for vaccination for months longer.  CBP, *January 2021 Operational Update* (Feb. 10, 2021).[8] Effective new treatments including "monoclonal antibodies were available in August 2021," 87 Fed. Reg. at 19950 (April 2022 Order), and these therapeutics greatly reduced hospitalizations resulting from infection, AR 6846.  Notably, the August 2021 Order failed to even mention these advances in therapeutics, violating the APA's requirement that an "agency cannot ignore evidence contradicting its position."  *See Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

Yet, for unexplained reasons, CBP still was not testing or vaccinating the migrants who came into its custody.  Nor does the record indicate that Defendants had taken measures to build out quarantine and processing capacity—anticipated to take approximately "90 days" in the initial March 2020 Order.  *See* 85 Fed. Reg. at 17067 n.66.  The August 2021 Order was issued nearly a year and a half later, and the government had evidently done virtually nothing to institute these basic public health measures at the border.  *See* 86 Fed. Reg. at 42837 (continuing to cite lack of testing and quarantine space in existing facilities); *id.* at 42840 ("encourag[ing]" but declining to require vaccination programs for noncitizens subject to the policy).

That year and a half was more than enough time to institute alternatives to expulsion. Indeed, DHS has demonstrated a capacity to move expeditiously when it so chooses.  In March 2022, for example, CBP rapidly instituted an exception to the Title 42 policy for thousands of

---

[8]     https://www.cbp.gov/newsroom/national-media-release/cbp-announces-january-2021-operational-update.

Ukrainian citizens arriving at U.S. borders.  *See* Mem. from Matthew S. Davies, Executive

Director of Admissibility and Passenger Programs, CBP, *Title 42 Exceptions for Ukrainian*

*Nationals* (Mar. 11, 2022).[9]   And in April 2022, when CDC finally set an "implementation

timeline" for the end of the Title 42 policy, it concluded that a comparatively short period of

seven weeks would be sufficient to expand a vaccination program for migrants and deploy other

additional COVID-19 protocols at border facilities.  87 Fed. Reg. at 19955–56 (April 2022

Order).  A few weeks later, DHS agreed that CDC's timeframe was adequate to implement

migrant testing and vaccination protocols at 24 CBP sites and improve its logistics and

processing capacity, "including the deployment of soft-sided facilities and virtual processing."

Mem. from Alejandro N. Mayorkas, Sec'y of Homeland Sec., *DHS Plan for Southwest Border*

*Security and Preparedness*, Apr. 26, 2022, at 2, 9.[10]

      Yet from March 2020 to August 2021 (and after), Defendants seemingly did nothing to

obviate the asserted need for the Title 42 policy.  Indeed, an internal CDC memo from November

2021 expressed frustration that "DHS continue[d] to delay implementing . . . public health

interventions" for families and single adults, even though similar measures had already been

successfully implemented at other DHS facilities and for unaccompanied children and Afghan

evacuees.  AR 23494; *see also Huisha-Huisha*, 560 F. Supp. 3d at 176 (pointing out in

September 2020 that "the government has successfully implemented mitigation measures with

---

[9]     https://tinyurl.com/59fjhrbx.  From March through May 2022, CBP encountered 23,767
Ukrainians at the southern border and subjected only 148 of those individuals to the Title 42
policy.  *See* CBP, *Nationwide Encounters* (last modified July 15, 2022),
https://www.cbp.gov/newsroom/stats/nationwide-encounters (drop-down filters: "Southwest
Land Border" for Region, "Ukraine" for Citizenship, and "Title 8" or  "Title 42" for Title of
Authority).
[10]    https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-
security-preparedness.pdf.

regard to processing unaccompanied minors"). In fact, DHS had not even "developed a *plan* for the resumption of normal border operations." AR 23494 (emphasis added).

Thus, as the D.C. Circuit rightly recognized, the Title 42 policy is "a relic from an era with no vaccines, scarce testing, few therapeutics, and little certainty." *Huisha-Huisha*, 27 F.4th at 734. All the public health tools needed to institute these alternative testing, vaccination, and quarantine protocols were already available by August 2021. *See Huisha-Huisha*, 560 F. Supp. 3d at 176. Despite their acknowledged efficacy, Defendants failed to institute these less drastic measures or "to give a reasoned explanation for its rejection of such alternatives." *See Spirit Airlines*, 997 F.3d at 1255 (citation omitted). That failure constitutes arbitrary and capricious agency action. *Id.*

b. Second, even apart from increased testing and the development of vaccines and therapeutics, CDC failed to adequately consider other "alternative way[s] of achieving [its] objectives" that were raised by commenters and were available from the very beginning— namely self-quarantine and outdoor processing. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

At the outset, CDC failed to adequately consider an obvious solution to the purported risks of processing noncitizens in congregate settings. In its August 2021 Order, CDC indicated that Title 42 processing poses a lower risk of COVID-19 transmission because it "generally happens outdoors." *See* 86 Fed. Reg. at 42841. But nothing in the record indicates that Title 8 processing must occur indoors. CDC's failure to consider whether processing under Title 8 could also happen outside of a facility, as one commenter suggested, AR 6, overlooks an obvious and less drastic alternative to expulsions. *See also* Mem. from Alejandro N. Mayorkas, *supra*

14

note 10, at 9 (stating that DHS has capacity to deploy "soft-sided facilities" and utilize "virtual processing").

Many commenters also explained that CDC could order noncitizens to self-quarantine or self-isolate instead of authorizing their expulsion.  *E.g.*, AR 173, 238, 282, 301.  CDC rejected this proposal, asserting "that covered noncitizens [likely] do not have homes in the United States" where they could self-quarantine or -isolate.  *See*, *e.g.*, 86 Fed. Reg. at 42841 (August 2021 Order).  But the administrative record belies that claim.  In fact, the record shows that the vast majority (approximately 92%) of migrants have family or friends already in the United States who could provide shelter for self-quarantine.  *E.g.*, AR 30 (citing study conducted by U.S. Immigration Policy Center), 97, 173, 238, 274, 301.  CDC posited that any homes available to noncitizens might not be suitable for self-quarantine, but again nothing in the record supports that rank speculation.  *See* 85 Fed. Reg. at 56453 (Final Rule).  And the agency failed entirely to address the availability of shelters as a backstop, *id.*, even though the record demonstrates that community and faith-based organizations responsible for receiving migrants were available to provide shelter and quarantine to those who may lack a place to quarantine.  AR 30.  Finally, CDC acknowledged that Europe and Canada had successfully implemented self-quarantine systems for arriving travelers but failed to explain why Defendants could not do the same.  85 Fed. Reg. at 56434–37.

The APA's requirement to consider alternatives demands more than rejection based on speculation contradicted by the record before the agency.  An "agency cannot ignore evidence contradicting its position."  *Butte Cnty*, 613 F.3d at 194.  Faced with data undermining its assumption that noncitizens are unable to self-quarantine, CDC was obligated "to deal with newly acquired evidence in some reasonable fashion or to reexamine [its] approach[]."  *See*

*Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (citations omitted).  CDC's

failure to meaningfully address the alternatives of requiring testing, vaccination, self-quarantine,

self-isolation, and outdoor processing is arbitrary and capricious.

> 2.  <u>Apart from alternatives, the Title 42 policy did not further its stated objectives given COVID-19's already-widespread existence in the United States.</u>

An agency action is arbitrary and capricious if it lacks a reasonable "connection to the

goals" it purports to advance or "the rational operation" of the laws it purports to implement.

*Judulang*, 565 U.S. at 58.  The record here does not reflect that the Title 42 policy has had or

could have any remotely meaningful impact on the spread of COVID-19 within the United

States.   Indeed, as Dr. Anthony Fauci has stated, immigrants are "absolutely not" a "major

reason why COVID-19 is spreading in the US," and "expelling [immigrants] is not the solution."

CNN, *Fauci: Expelling immigrants 'not the solution' to stopping Covid-19 spread* (Oct. 3,

2021)[11]; NY Post, *Fauci says US travel bans don't 'make any sense' now given rapid spread of

Omicron* (Dec. 20, 2021) ("[W]hen you get to the point when there's enough of a virus in your

own country, it doesn't really make any sense of trying to keep it out . . . [I]nput from countries

that might even have less infection than we have doesn't give any added value.").[12]

First, by August 2021 COVID-19 was indisputably widespread *within* the United States.

By the time the CDC issued its August 2021 Order, there had already been "over 34 million"

confirmed COVID-19 cases in the United States.  86 Fed. Reg. at 42830–31 (August 2021

Order).  And CDC failed to cite any evidence that noncitizens subject to the order would

meaningfully contribute to the existing spread—███████████████████████████

███████████████████████████████████████████

---

11       https://tinyurl.com/5ua5m4bm (2:13 to 4:05 of video).
12       https://tinyurl.com/2ksp2nyk.

████████████████████   Indeed, the August 2021 Order reported that COVID-19 was more widespread in the United States than in Canada and Mexico: 137.9 daily cases per 100,000 people in the United States, compared to 68.6 in Mexico and 8.0 in Canada.  86 Fed. Reg. at 42831.  As Defendants have concluded in the past, travel restrictions are unlikely to be effective, particularly when a disease is already widespread, and are likely to be counterproductive.  82 Fed. Reg. at 6895 (CDC concluding in 2017 that travel restrictions are presumptively "detrimental to efforts to combat the spread of communicable disease"); Dep't of Health and Human Services ("HHS"), *HHS Pandemic Influenza Plan* (November 2005) at 369 ("[T]ravel restrictions . . . are likely to be much less effective once the pandemic is widespread.").[13]

Second, even just considering cross-border traffic, the Title 42 policy's limited scope meant that it could not affect the vast majority of travel and thus the travel-related spread. Indeed, the record bears out Judge Walker's observations during the D.C. Circuit argument that because "the [CDC's] order only covers about .1 percent of people who cross the Canadian or Mexican border," nothing "suggest[s] that those .1 percent of border crossers are more likely to have COVID than the other 99.9 percent."  Oral Argument Tr. at 5, Cheung Decl., Ex. B.  CDC had reasoned that the risk that travelers could spread infection increased when they traveled in "congregate settings" such as "trains[] and road vehicles."  85 Fed. Reg. at 16560–61 (Interim Final Rule).  But tens of millions of people continued to be permitted to cross the southern border, even if they traveled in such "congregate settings."  CBP's own data shows that in July 2021 alone, over 11 million people entered from Mexico by land, including over 8.4 million

---

[13]     https://www.cdc.gov/flu/pdf/professionals/hhspandemicinfluenzaplan.pdf.

people in cars, buses, and trains.[14]   According to HHS's pandemic plan, even a near-complete

ban on travel has only a marginal effect on the introduction of disease.  *See HHS Pandemic*

*Influenza Plan* at 307 ("[T]ravel restrictions would need to be about 99% effective to delay

introduction into a country by one to two months.").  A travel restriction that ignores 99% of

travelers cannot possibly be effective, and CDC fails to explain otherwise.

Third, the record indicates that, if anything, Title 42 expulsions likely *exacerbate* rather

than reduce COVID-19 transmission on both sides of the U.S.-Mexico border by increasing the

number of times migrants are encountered by CBP—a dynamic that CDC again failed even to

acknowledge.  The evidence continues to bear out this Court's previous finding that "under the

Title 42 regime, individuals seeking an asylum hearing have attempted to cross the border

multiple times, sometimes 10 times or more."  *Huisha-Huisha*, 560 F. Supp. 3d at 176.

Noncitizens expelled back to Mexico are forced to "attempt to cross [the border] again and

again."  AR 439; *see also* CBP, *January 2021 Operational Update* (Feb. 10, 2021) ("[T]he

Border Patrol estimates that between March 20, 2020 and February 4, 2021, 38 percent of all

encounters involved recidivism, or individuals who have been apprehended more than once.");[15]

Gov't Accountability Off., *CBP's COVID-19 Response* (June 2021) ("CBP COVID-19

Response"), at 40–41 ("[T]he recidivism rate along the Mexican border increased from 7 percent

in fiscal year 2019 to . . . 34 percent for the first quarter of fiscal year 2021.").[16]

---

[14]      U.S. Bur. of Transp. Stats., Border Crossing Entry Data,
https://explore.dot.gov/views/BorderCrossingData/Monthly?%3Aembed=y&%3AisGuestRedire
ctFromVizportal=y (select July 2021 and "US-Mexico Border"); *see also* U.S. Bur. of Transp.
Stats., Border Crossing/Entry Data, https://www.bts.gov/browse-statistical-products-and-
data/border-crossing-data/border-crossingentry-data ("Border crossing data are collected at ports
of entry by [CBP]").
[15]      https://www.cbp.gov/newsroom/national-media-release/cbp-announces-january-2021-
operational-update.
[16]      https://www.gao.gov/assets/gao-21-431.pdf.

Similarly, the Title 42 policy requires noncitizens who otherwise could be processed and released from CBP custody to spend additional time in congregate detention and transportation awaiting expulsion.  As CDC has acknowledged, many noncitizens subject to the order cannot be immediately expelled by land, because Mexico will only accept the return of certain nationalities.  86 Fed. Reg. at 42836 (August 2021 Order).  To expel noncitizens that Mexico will not accept, Defendants detain them pending an international flight.  AR 275.  This has "resulted in prolonged contact between agents and detainees" and thus "sent a conflicting message to agents on health and safety."  CBP COVID-19 Response at 41.

As this Court previously found, the Title 42 policy thus results in placing noncitizens on "on crowded planes and buses" and does so "without first testing the individuals and isolating those who test positive, and transporting them to other locations [on the border], before expelling them or releasing them into the United States."  *Huisha-Huisha*, 560 F. Supp. 3d at 175; *see also* AR 275 (noting that migrants are placed on flights with only temperature screen).  Indeed, in the lead-up to the August 2021 Order, DHS had "increased lateral flights of migrants" up and down the border prior to expulsion.  *See* DHS, *Sec'y Mayorkas Delivers Remarks in Brownsville, Texas* (Aug. 12, 2021).[17]

All this needless additional transportation necessarily increases close-quarters exposure between noncitizens and DHS personnel.  As commenters from Columbia University's medical school explained, expelling noncitizens therefore contributes to "the spread of diseases on both sides of the border."  AR 96.  Indeed, CDC itself has advised other countries *not* to deny entry to any individual as a means of combatting COVID-19 if doing so may "put others at risk," such as

---

[17]    https://www.dhs.gov/news/2021/08/12/secretary-mayorkas-delivers-remarks-brownsville-texas.

by "requiring the individual to depart the country by plane."  *See* CDC, *Developing a Framework for Assessing and Managing Individual-Level Risk of Coronavirus Disease 2019 (COVID-19) Exposure in Mobile Populations*, *supra* note 4.  These numerous, obviously counterproductive consequences of the Title 42 policy underscore its disconnect from "the rational operation" of the public health laws.  *Judulang*, 565 U.S. at 58.

The purpose of the Title 42 policy was purportedly to protect against the spread of COVID-19.  But each of these defects demonstrates that the Title 42 policy lacks a rational "connection to the goals" that purportedly justify it, and the policy is therefore arbitrary and capricious.  *See Judulang*, 565 U.S. at 58.

> **C.**      **The Agency Failed to Consider the Countervailing Harms to Vulnerable Migrants Subject to Summary Expulsion Under Title 42.**

From the beginning in March 2020, CDC's orders continuously failed to consider the harm to migrants.  Consideration of harm was required by CDC's least restrictive means standard.  It was also required under the APA's general reasoned decision-making mandate, which compels agencies "to consider [and] to adequately analyze the . . . consequences of" their actions on affected individuals.  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 931–32 (D.C. Cir. 2017); *see also Regents of the Univ. of Cal.*, 140 S. Ct. at 1914 (invalidating agency action and explaining that agency was required to consider impact that rescinding DACA program would have on affected noncitizens).  An agency may not ignore the negative effects of its actions even as it pursues otherwise desirable ends.  *See Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1105–06 (D.C. Cir. 2019) (invalidating action because agency failed to consider that its actions would cause low-income consumers to lose access to affordable services).  As the D.C. Circuit explained in *Grace*, an agency's "failure to acknowledge the change in policy is

especially egregious" where it poses grave "potential consequences for asylum seekers." *Grace*, 965 F.3d at 901.

In this case, the D.C. Circuit observed that there is ample "stomach-churning evidence of death, torture, and rape" and other "horrific circumstances" that the Title 42 policy causes to migrants. *Huisha-Huisha*, 27 F.4th at 735–36. Even if Defendants were somehow unaware of these dire consequences on their own, they were put on notice by numerous public comments on the Title 42 policy rulemaking. *See generally* AR 1–807 (public comments). One commenter explained that migrants are expelled to border regions in Mexico that are "controlled by dangerous cartels" and where migrants face a "high probability" of persecution, torture, violent assaults, or rape. AR 90 (citing more than 1,000 publicly reported attacks on migrants in Mexico within a one-year period). Another commenter noted that many migrants are also returned under Title 42 to countries such as Guatemala, Haiti, Honduras, and El Salvador with "fragile healthcare systems, deepening poverty, severe food insecurity, repressive policing of public health measures, and restrictions on public transportation," which hinder migrants' ability to find shelter after they are expelled. AR 276–77. Expulsions to Haiti are particularly egregious, in light of DHS's own determination that the country is too destabilized and dangerous to receive deportations. *See Designation of Haiti for Temporary Protected Status*, 86 Fed. Reg. 41863, 41864 (Aug. 3, 2021) (citing "a deteriorating political crisis, violence, and a staggering increase in human rights abuses").

Among other groups, noncitizens subject to summary expulsion under Title 42 include: "survivors of domestic violence and their children," who "have endured years of abuse," AR 705; "survivors of sexual assault and rape," who are at risk of being stalked, attacked, or murdered by their persecutors in Mexico or elsewhere, *id.*; and LGBTQ+ individuals from

countries where their gender identity or sexual orientation is criminalized, AR 620, or for whom expulsion to Mexico or elsewhere makes them prime targets for persecution, AR 73–74 (citing State Department report indicating that more than half of LGBTQ+ individuals have experienced hate speech and physical aggression in Mexico within past year).

CDC never addressed any of these harms.  It did not do so in its rulemaking.  *See generally* 85 Fed. Reg. 16559 (Mar. 24, 2020) (Interim Final Rule); 85 Fed. Reg. 56424 (Final Rule).  And it did not so in any of its orders, including the operative August 2021 Order.  *See generally, e.g.*, 85 Fed. Reg. 17060 (original Title 42 order); 86 Fed. Reg. 42828 (August 2021 Order).

Faced with uncontroverted evidence that migrant families would be brutalized as a result of its policy, the agency impermissibly "averted its eyes altogether."  *See Am. Wild Horse Pres. Campaign*, 873 F.3d at 931.  CDC's failure to consider the Title 42 policy's consequences independently renders the policy arbitrary and capricious.  *See Grace*, 965 F.3d at 901; *Nat'l Lifeline Ass'n*, 921 F.3d at 1113 (invalidating FCC action because agency's "decision [did] not indicate that it considered the effect of eliminating" a government subsidy on consumers who would lose access to the subsidized service).

*       *       *

In sum, there are three independently sufficient grounds on which to find that the Title 42 policy is arbitrary and capricious in violation of the INA: the agency (1) did not justify its departure from its established "least restrictive means" standard; (2) did not provide a sufficient factual basis to show that the policy furthered its stated objectives, especially in light of available alternatives, and (3) did not consider the countervailing harm to noncitizens who are subject to the Title 42 policy.

## II.     FAMILIES WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

There is no question that the Title 42 policy inflicts irreparable injury on Class Members. As this Court previously held, "Plaintiffs have provided ample unrebutted evidence" that "they face real threats of violence and persecution if they were to be removed from the United States." *Huisha-Huisha*, 560 F. Supp. 3d at 173 ("Plaintiffs' alleged injuries would likely be 'beyond remediation.'").  The D.C. Circuit agreed that "the record is replete with stomach-churning evidence of death, torture, and rape." *Huisha-Huisha*, 27 F.4th at 733.  And Defendants themselves, at oral argument, acknowledged "the quite horrific circumstances that non-citizens" face as a result of the Title 42 policy.  *Id.*

Similarly, in an October 2021 memorandum explaining his decision to terminate the so-called Migrant Protection Protocols—a policy that also involves the forced return of noncitizens across the border to Mexico—the DHS Secretary determined that "[s]ignificant evidence indicates that individuals were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way" once returned to Mexico.  Mem. from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021); *accord id.* at 12–14[18]; *see also Huisha-Huisha*, 27 F.4th at 734 ("In defending its repeal of the 'Remain in Mexico' policy, the Executive recently said that sending similarly situated aliens to dangerous places 'exposes migrants to unacceptable risks' of 'extreme violence.'" (citation omitted)).

---

[18]     https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-justification-memo.pdf.

At the time of this Court's original decision, approximately 14% of families encountered at the southwest border were being summarily expelled pursuant to the Title 42 policy. *See Huisha-Huisha*, 560 F. Supp. 3d at 175. Now, the rate of expulsions is nearly twice as high, reaching 27%. *See* CBP, *supra* note 1. In June 2022—the first full month following issuance of the D.C. Circuit's mandate—14,028 individual members of families were expelled. *Id.* Documented cases of kidnapping, rapes, and other violence against noncitizens subject to Title 42 have also risen dramatically since last year: In Mexico alone, recorded incidents spiked from 3,250 cases in June 2021 to over 10,318 in June 2022. *See* Dkt. 118-4 ¶ 8; Human Rights First, *The Nightmare Continues: Title 42 Court Order Prolongs Human Rights Abuses, Extends Disorder at U.S. Borders*, at 3-4 (June 2022).[19] Title 42 expulsions must be immediately enjoined to prevent further irreparable harm to Class Members.

## III.   THE REMAINING EQUITABLE FACTORS ALSO FAVOR PLAINTIFFS.

Title 42 policy is wholly unnecessary as a public health measure—the balance of the equities and the public interest therefore weigh decisively in favor of an injunction. Nearly a year ago, this Court ruled that COVID-19 risks can be adequately mitigated "in view of the wide availability of testing, vaccines, and other minimization measures." *Huisha-Huisha*, 560 F. Supp. 3d at 176. The D.C. Circuit affirmed, concluding that the Title 42 policy appears to lack a public health purpose in an era of effective vaccinations and testing and greater certainty about the disease. *Huisha-Huisha*, 27 F.4th at 734–35. In April 2022, CDC finally echoed those findings and decided to terminate the Title 42 policy. 87 Fed. Reg. at 19944 (April 2022 Order).

In its termination order, CDC "determined that the extraordinary measure of an order under 42 U.S.C. 265 is no longer necessary, particularly in light of less burdensome measures

---

[19]   https://www.humanrightsfirst.org/sites/default/files/NightmareContinues.pdf.

that are now available."  87 Fed Reg. at 19944; *id.* at 19949–50 (discussing "widespread

deployment of COVID-19 tests, vaccines, and therapeutics"; the availability of rapid tests that

are "particularly helpful in congregate settings"; and the increase in vaccination rates around the

world); *id.* at 19951 (citing other measures such as "incorporating mask use, improving

ventilation, [and] enhancing cleaning and disinfection procedures" that further reduce risk in

congregate settings); *id.* (explaining that 86% of CBP personnel already received a COVID-19

vaccination and that, by May 23, 2022, DHS would be providing up to 6,000 vaccinations a day

to noncitizens at the U.S.-Mexico border); *id.* (noting DHS's coordination with nonprofit and

other entities to test and quarantine individuals released from CBP custody).  In light of those

alternative measures that do not expose noncitizens to the extraordinary harms of expulsion, the

Title 42 policy plainly imposes "unnecessary burdens" on persons seeking to enter the United

States.  *Id.* at 19955.

  Critically, CDC itself recognizes that its factual determination that the Title 42 policy is

"unnecessary" deprives the agency of the *statutory* authority to maintain the policy.  *Id.*

("[A]voiding the imposition of unnecessary burdens . . . aligns with the underlying legal

authority in 42 U.S.C. 265, which makes clear that this authority extends only for such period of

time deemed necessary to avert the serious danger of the introduction of a quarantinable

communicable disease into the United States.").  As this Court has previously held, "there is

generally no public interest in the perpetuation of unlawful agency action."  *See Huisha-Huisha*,

560 F. Supp. 3d at 174 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C.

Cir. 2016)).  Meanwhile, "the public has an interest in ensuring that we do not deliver aliens into

the hands of their persecutors and preventing aliens from being wrongfully removed, particularly

to countries where they are likely to face substantial harm."  *Id.* (citations omitted).

The equities here could not be clearer: the agency policy is admittedly unnecessary and unlawful, yet it continues to remain in effect, subjecting parents and children to horrific but preventable violence.  Injunctive relief is warranted to prevent further harm.

## CONCLUSION

The Court should grant the motion and issue a classwide preliminary injunction against the Title 42 policy.

Dated: August 10, 2022

Respectfully submitted,

/s/ Lee Gelernt

Stephen B. Kang (Bar ID. CA00090)
Cody Wofsy (Bar ID. CA00103)
Morgan Russell*
My Khanh Ngo
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770

Kathryn Huddleston
Brantley Shaw Drake
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel. (713) 942-8146

Tamara F. Goodlette*
Refugee and Immigrant Center for
Legal Education and Legal Services
(RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
Tel: (210) 960-3206

Karla M. Vargas*
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
Tel: (956) 787-8171

Lee Gelernt (Bar ID. NY0408)
Daniel A. Galindo
Omar Jadwat*
Ming Cheung*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660

Robert Silverman
Irit Tamir
Oxfam America
Boston, MA 02115, Suite 500
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

Blaine Bookey
Neela Chakravartula
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, N.W.
Suite 200
Washington, DC  20005
Tel: (202) 355-4471

*Attorneys for Plaintiffs*
*Admitted pro hac vice*