**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, in his official capacity, Secretary, Department of Homeland Security, *et al.*,<br><br>Defendants. |

Civil Action No. 21-100 (EGS)

<u>**MEMORANDUM OPINION**</u>

Plaintiffs—a group of asylum-seeking families who fled to the United States—bring this lawsuit against Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security, and various other federal government officials ("Defendants" or the "government") for violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*; and the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), 8 U.S.C. § 1231 note; and the Public Health Service Act of 1944, 42 U.S.C § 201, *et seq. See generally* Second Am. Compl., ECF No. 131.[1] Pending before the Court is Plaintiffs' Motion for Partial

---

[1] When citing electronic filings throughout this Memorandum Opinion, the Court cites to the ECF page number, not the page number of the filed document.

Summary Judgment.[2] *See* Mot. Partial Summ. J., ECF No. 144. Upon consideration of the motion, the responses and replies thereto, the applicable law, the entire record, and for the reasons stated below, the Court **GRANTS** Plaintiffs' motion.

## I.   Background

### A. Factual Background

Since 1893, federal law has provided federal officials with the authority to stem the spread of contagious diseases from foreign countries by prohibiting, "in whole or in part, the introduction of persons and property from such countries." Act of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452 ("1893 Act"). Under current law:

> Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in

---

[2] On August 12, 2022, the Court converted Plaintiffs' second motion for preliminary injunction to a motion for partial summary judgment, and consolidated the second motion for preliminary injunction with a determination on the merits with regard to the issue of whether the Title 42 policy is arbitrary and capricious under the Administrative Procedure Act ("APA"). *See* Fed. R. Civ. P. 65(a)(2).

> order to avert such danger, and for such
> period of time as he may deem necessary for
> such purpose.

42 U.S.C. § 265 ("Section 265"). In 1966, the Surgeon General's

Section 265 authority was transferred to the Department of

Health and Human Services ("HHS"), which in turn delegated this

authority to the Centers for Disease Control and Prevention

("CDC") Director. *See P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 503

(D.D.C. 2020); 31 Fed. Reg. 8855 (June 25, 1966), 80 Stat. 1610

(1966).

On March 20, 2020, as the COVID-19 virus spread globally,

HHS issued an interim final rule pursuant to Section 265 that

aimed to "provide[] a procedure for CDC to suspend the

introduction of persons from designated countries or places, if

required, in the interest of public health." Interim Final Rule,

Control of Communicable Diseases; Foreign Quarantine: Suspension

of Introduction of Persons Into United States From Designated

Foreign Countries or Places for Public Health Purposes, 85 Fed.

Reg. 16559-01, 2020 WL 1330968, (March 24, 2020) ("Interim Final

Rule"). Pursuant to the Interim Final Rule, the CDC Director

could "suspend the introduction of persons into the United

States." *Id.* at 16563. The Interim Final Rule stated, in

relevant part:

> (1) Introduction into the United States of
> persons from a foreign country (or one or more
> political subdivisions or regions thereof) or

3

place means the movement of a person from a
foreign country (or one or more political
subdivisions or regions thereof) or place, or
series of foreign countries or places, into
the United States so as to bring the person
into contact with persons in the United
States, or so as to cause the contamination of
property in the United States, in a manner
that the Director determines to present a risk
of transmission of a communicable disease to
persons or property, even if the communicable
disease has already been introduced,
transmitted, or is spreading within the United
States;

(2) Serious danger of the introduction of such
communicable disease into the United States
means the potential for introduction of
vectors of the communicable disease into the
United States, even if persons or property in
the United States are already infected or
contaminated with the communicable disease;
and

(3) The term "Place" includes any location
specified by the Director, including any
carrier, as that term is defined in 42 CFR
71.1, whatever the carrier's nationality.

*Id.* at 16566-67.

The CDC's interim rule went into effect immediately. *Id.* at
16565. The CDC explained that, pursuant to 5 U.S.C. 553(b)(3)(B)
of the APA, HHS had concluded that there was "good cause" to
dispense with prior notice and comment. *Id.* Specifically, the
CDC stated that "[g]iven the national emergency caused by COVID-
19, it would be impracticable and contrary to the public health—
and, by extension, the public interest—to delay these
implementing regulations until a full public notice-and-comment
process is completed." *Id.*

Pursuant to the Interim Final Rule, the CDC Director issued an order suspending for 30 days the introduction of "covered aliens," which he defined as "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land Port of Entry [("POE")] or Border Patrol station at or near the United States borders with Canada and Mexico." *Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists*, 85 Fed. Reg. 17060-02, 17061, 2020 WL 1445906 (March 26, 2020) ("March 2020 Order"). The March 2020 Order declared that "[i]t is necessary for the public health to immediately suspend the introduction of covered aliens" and "require[d] the movement of all such aliens to the country from which they entered the United States, or their country of origin, or another location as practicable, as rapidly as possible." *Id.* at 17067. The CDC Director then "requested that [the Department of Homeland Security ("DHS")] implement th[e] [March 2020 Order] because CDC does not have the capability, resources, or personnel needed to do so." *Id.* The CDC Director also noted that U.S. Customs and Border Protection ("CBP"), a federal law enforcement agency of DHS, had already "developed an operational plan for implementing the order." *Id.*

Soon thereafter, the CBP issued a memorandum on April 2, 2020 establishing its procedures for implementing the March 2020 Order. *See* Ex. E to Cheung Decl. ("CAPIO Memo"), ECF No. 57-5 at 15. The CAPIO Memo instructed that agents may determine whether individuals are subject to the CDC's order "[b]ased on training, experience, physical observation, technology, questioning and other considerations." CAPIO Memo, ECF No. 57-5 at 15. If an individual was determined to be subject to the order, they were to be "transported to the nearest POE and immediately returned to Mexico or Canada, depending on their point of transit." *Id.* at 17. Those who are "not amenable to immediate expulsion to Mexico or Canada, will be transported to a dedicated facility for limited holding prior to expulsion" to their home country. *Id.*

On April 22, 2020, the March 2020 Order was extended for an additional 30 days. *See Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists*, 85 Fed. Reg. 22424-01, 2020 WL 1923282 (April 22, 2020) ("April 2020 Order"). The order was then extended again on May 20, 2020 until such time that the CDC Director "determine[s] that the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health." *Amendment and Extension of Order*

6

*Under Sections 362 and 365 of the Public Health Service Act;*
*Order Suspending Introduction of Certain Persons From Countries*
*Where a Communicable Disease Exists*, 85 Fed. Reg. 31503-02,
31504, 2020 WL 2619696 (May 26, 2020) ("May 2020 Order").

On September 11, 2020, the CDC published the final rule.
*See Control of Communicable Diseases; Foreign Quarantine:*
*Suspension of the Right To Introduce and Prohibition of*
*Introduction of Persons Into United States From Designated*
*Foreign Countries or Places for Public Health Purposes*, 85 Fed.
Reg. 56424-01, 2020 WL 5439721, (Sept. 11, 2020) (Effective
October 13, 2020) ("Final Rule"). The Final Rule "defin[ed] the
phrase to '[p]rohibit, in whole or in part, the introduction
into the United States of persons' to mean 'to prevent the
introduction of persons into the United States by suspending any
right to introduce into the United States, physically stopping
or restricting movement into the United States, or physically
expelling from the United States some or all of the persons.'"
*Id.* at 56445. The CDC Director then replaced the March, April,
and May 2020 Orders with a new order on October 13, 2020. *Order*
*Suspending the Right To Introduce Certain Persons From Countries*
*Where a Quarantinable Communicable Disease Exists*, 85 Fed. Reg.
65806, 65808 (Oct. 16, 2020) ("October 2020 Order").

In February 2021, the President ordered the HHS Secretary
and the CDC Director, in consultation with the DHS Secretary, to

"promptly review and determine whether termination, rescission, or modification of the [October order and the September regulation] is necessary and appropriate." Exec. Order No. 14,010, § 4(ii)(A), 86 Fed. Reg. 8267, 8269 (Feb. 2, 2021). On August 2, 2021, the CDC issued the order at issue in this case, "Public Health Assessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists," which replaced and superseded the October 2020 Order. *Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42828 ("August 2021 Order"). The August 2021 Order stated that "CDC has determined that an Order under 42 U.S.C. § 265 remains necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States during the COVID-19 public health emergency." *Id.* at 42829-30. The August 2021 Order continued to prohibit the introduction of "covered noncitizens"— which is defined to include "family units"—into the United States along the U.S. land and adjacent coastal borders. *Id.* at 7. The Court refers to the process developed by the CDC and implemented by the August 2021 Order as the "Title 42 policy."

On April 1, 2022, the CDC terminated the August 2021 Order, with an implementation date of May 23, 2022. *Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 87 Fed. Reg. 19941, 19942. CDC explained that "[w]hile earlier phases of the pandemic required extraordinary actions by the government and society at large," "epidemiologic data, scientific knowledge, and the availability of public health mitigation measures, vaccines, and therapeutics have permitted the country to safely transition to more normal routines." *Id.* The agency explained that "although COVID-19 remains a concern, the readily available and less burdensome public health mitigation tools to combat the disease render a [Title 42 order] . . . unnecessary." *Id.* at 19953. In view of the changed circumstances, CDC stated that "the previously identified public health risk is no longer commensurate with the extraordinary measures instituted by the CDC Orders." *Id.*

### B. Procedural History

Plaintiffs filed this action on January 12, 2021. *See* Compl., ECF No. 1. Plaintiffs filed a motion for class certification on January 28, 2021, *see* Mot. Certify Class, ECF No. 23; and they filed a motion for preliminary injunction on February 5, 2021, *see* Mot. Prelim. Inj., ECF No. 57. On September 16, 2021, the Court granted both motions. *See Huisha-*

*Huisha*, 560 F. Supp. 3d at 155. The Court certified Plaintiffs'
class and preliminarily enjoined Defendants from expelling
Plaintiffs pursuant to the Title 42 policy. *Id.* In granting the
preliminary injunction, the Court concluded that Plaintiffs were
likely to succeed on the merits of their claim that Section 265
did not authorize deportations, that Plaintiffs would face grave
harm if they were expelled without the opportunity to seek
humanitarian relief, and that the balance of the equities and
public interest favored an injunction. *Id.* at 167, 172, 174.

Defendants appealed the Court's decision, and the United
States Court of Appeals for the District of Columbia Circuit
("D.C. Circuit") affirmed the preliminary injunction in part.
*Huisha-Huisha*, 27 F.4th at 735. The circuit court held that,
pursuant to Section 265, "the Executive can expel the Plaintiffs
from the country," but "it cannot expel them to places where
they will be persecuted or tortured." *Id.* at 722. Moreover, the
D.C. Circuit agreed with this Court's findings that Plaintiffs
have established they will suffer irreparable harm absent a
preliminary injunction and that the balance of the equities
favored their request. *Id.* at 733.

Although the CDC terminated the August 2021 Order one month
after the D.C. Circuit's decision, *see* 87 Fed. Reg. at 19,942;
on May 20, 2022, the termination order was preliminarily
enjoined in a separate litigation in the United States District

10

Court for the Western District of Louisiana on the ground that the order violated the APA's notice-and-comment requirements, *see Louisiana v. CDC*, No. 22-cv-885, 2022 WL 1604901 (W.D. La. May 20, 2022). The government appealed the decision but did not seek to undertake notice and comment regarding the termination order.

Plaintiffs filed a second motion for preliminary injunction on August 10, 2022. *See* Pls.' Second Mot. Prelim. Inj., ECF No. 141. On August 12, 2022, the Court issued a Minute Order converting the second motion for preliminary injunction to a motion for partial summary judgment and consolidating the second motion for preliminary injunction with a determination on the merits with regard to the issue of whether the Title 42 policy is arbitrary and capricious under the APA. Min. Order (Aug. 12, 2022). The Court considered the second motion for preliminary injunction to be withdrawn without prejudice. *Id.* In view of the Court's Minute Order, Plaintiffs filed a motion for partial summary judgment on August 15, 2022, *see* Pls.' Mot., ECF No. 144; Defendants filed their opposition on August 31, 2022, *see* Defs.' Opp'n, ECF No. 147; and Plaintiffs filed their reply on September 14, 2022, *see* Pls.' Reply, ECF No. 149-1. The Court granted Defendants' motion for leave to file a surreply on September 22, 2022, and further ordered Plaintiffs to file their response to the surreply on September 30, 2022. *See* Defs.'

Surreply, ECF No. 160; Pls.' Response, ECF No. 159. The motion is ripe for adjudication.

## II.  Legal Standards

### A. Administrative Procedure Act

The APA establishes a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702). That presumption can be rebutted by a showing that the relevant statute "preclude[s]" review, § 701(a)(1); or that the "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2). "The former applies when Congress has expressed an intent to preclude judicial review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The latter applies: (1) "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); and (2) when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Heckler*, 470 U.S. at 830. "Agency actions in these circumstances are unreviewable because the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) (citation omitted).

If reviewable, courts consider "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action" in determining whether an action is committed to agency discretion. *Sec. of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006) (citation omitted). However, Section 701(a)(2) "provides a 'very narrow exception' that applies only in 'rare instances.'" *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). Courts "begin with the strong presumption that Congress intends judicial review of administrative action[] unless there is persuasive reason to believe that such was the purpose of Congress." *Ramah Navajo School Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1343–44 (D.C. Cir. 1996) (citations omitted).

### B. Summary Judgment

Plaintiffs seek review of an administrative decision under the APA. Therefore, the standard articulated in Federal Rule of Civil Procedure 56 is inapplicable because the Court has a more limited role in reviewing the administrative record. *Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 160 (D.D.C. 2011) (internal citation omitted). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision

it did." *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)(internal quotation marks and citations omitted). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Wilhelmus*, 796 F. Supp. 2d at 160 (internal citation omitted).

## III. Analysis

Plaintiffs argue that the Title 42 Process is arbitrary and capricious because: (1) the CDC failed to apply the "least restrictive means" standard when authorizing the policy; (2) the policy does not rationally serve its stated purpose in view of the alternatives; and (3) the CDC failed to consider the harm the policy would inflict on impacted individuals. Pls.' Mot., ECF No. 144-1 at 10–11. For the reasons below, the Court concludes that summary judgment is appropriate for Plaintiffs.

### A. Plaintiffs' Claim Is Reviewable

Defendants contend that Plaintiffs' claim is exempted from judicial review under the APA because the decision to "issue, modify, or terminate a Title 42 order" is committed to the CDC's discretion by law, and Title 42 "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Defs.' Opp'n, ECF No. 147 at 17 (citing 5 U.S.C. § 701(a)(2); *Lincoln v. Vigil*, 508 U.S. 182, 191-93

14

(1993)). The Court, however, concludes that Defendants have not overcome the "strong presumption of reviewability" under the APA. *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).

First, the Title 42 Process "does not fall into one of the narrow categories that usually satisfies the strictures of subsection 701(a)(2)." *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (citing *Lincoln*, 508 U.S. at 191-92). This case does not involve "second-guessing executive branch decision[s] involving complicated foreign policy matters," *id.* (quoting *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997)); "an agency's refusal to undertake an enforcement action," *id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)); or a "determination about how to spend a lump-sum appropriation," *id.* (citing *Lincoln*, 508 U.S. at 192).

Second, and contrary to Defendants' assertion, the fact that CDC's determination under Section 265 may "involve[] a complicated balancing of a number of factors which are peculiarly within the agency's expertise," Defs.' Opp'n, ECF No. 147 at 18; does not on its own compel the conclusion that such decisions are unreviewable, *see, e.g.*, *Louisiana v. CDC*, No. 6:22-cv-00885, 2022 WL 1604901, at *17 (W.D. La. May 20, 2022) (holding that CDC's decision to terminate its prior Title 42

orders was subject to judicial review); *Texas v. Biden*, No.
4:21-cv-0579-P, 2022 WL 658579, at *11–12 (N.D. Tex. Mar. 4,
2022) (finding CDC's July 2021 and August 2021 orders were not
committed to agency discretion); *Health Freedom Def. Fund, Inc.
v. Biden*, No. 8:21-cv-1693-KKM-AEP, 2022 WL 1134138, at *18-20
(M.D. Fla. Apr. 18, 2022) (reviewing CDC regulation mandating
mask usage in certain locations during COVID-19 pandemic);
*Florida v. Becerra*, 544 F. Supp. 3d 1241, 1292-94 (M.D. Fla.
2021) (reviewing CDC's "no-sail orders" that halted the cruise
industry's operation from March 2020 through October 2020). As
Plaintiffs point out, "nearly every agency decision involves a
balancing of factors, and frequently involve highly technical
issues, so Defendants' rule would essentially gut the APA's
strong presumption favoring review." Pls.' Reply, ECF No. 149-1
at 9. Indeed, the D.C. Circuit rejected a similar argument in
*Cody v. Cox*, 509 F.3d 606 (D.C. Cir. 2007). In *Cody*, the circuit
court addressed whether a provision requiring an agency
retirement home to provide "high quality and cost-effective"
health care was reviewable under the APA. 509 F.3d at 610. The
D.C. Circuit concluded that although the statute gave the agency
"broad discretion in administering care" and "'high quality and
cost-effective' health care is a tricky standard for a court to
apply," the provisions at issue did not commit decisions to
agency discretion by law. *Id.*

16

Moreover, Defendants cite no case law supporting their contention that an agency's public health decisions are outside the judiciary's purview. Rather, Defendants point to a line of cases standing for the proposition that courts typically grant agencies *deference* when reviewing their public health determinations. *See* Defs.' Opp'n, ECF No. 147 at 18-19. However, whether an agency is given deference is a different issue from whether an agency's decision is reviewable in the first instance, and none of the cases Defendants cite involve the application of Section 701(a)(2). *See* F*DA v. Am. Coll. Of Obstetricians & Gynecologists*, 141 S. Ct. 578, 579 (2021) (Roberts, C.J., concurring in grant of stay application) (stating that the question before the court was "whether the District Court properly ordered the FDA to lift [certain] established requirements because of the court's own evaluation of the impact of the COVID-19 pandemic"); *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (finding that it was "improbable" that California's restrictions on social gatherings during the pandemic were unconstitutional, where party sought emergency relief in an interlocutory posture); *Marshall v. United States*, 414 U.S. 417, 427 (1974) (considering "petitioner's claim that the provisions of Title II of the Narcotic Addict Rehabilitation Act of 1966 . . . deny due

17

process and equal protection by excluding from discretionary
rehabilitative commitment, in lieu of penal incarceration,
addicts with two or more prior felony convictions"); *Jacobson v.
Massachusetts*, 197 U.S. 11, 30 (1905) (reviewing
constitutionality of state provisions relating to vaccination).

Third, the Court also disagrees that Section 265 "is drawn
so that a court would have no meaningful standard against which
to judge the agency's exercise of discretion." Defs.' Opp'n, ECF
No. 147 at 19. Section 265 mandates that, whenever the CDC
Director determines that there is a "*serious danger* of the
introduction" of a "communicable" disease into the country, the
CDC "shall have the power to prohibit, in whole or in part, the
introduction of persons and property from such countries or
places as he shall designate in order to avert such danger, and
for such period of time as he may deem *necessary for such
purpose*" and when "*required* in the interest of public health."
42 U.S.C. § 265 (emphasis added); *see also* 87 Fed. Reg. 19941,
19955 (Apr. 2022 Order) ("[T]his authority extends only for such
period of time deemed necessary to avert the serious danger of the
introduction of a quarantinable communicable disease into the
United States."). Despite the use of the words "may" and "deem" in
the statute, the D.C. Circuit has "regularly found Congress has not
committed decisions to agency discretion under far more permissive
and indeterminate language." *Cody*, 509 F.3d at 610-11 (citing

18

*Dickson v. Sec'y of Def.*, 68 F.3d 1396 (D.C. Cir. 1995) (reviewing provision stating that agency "may" take an action if it finds it to be "in the interest of justice"); *see also Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1224 (D.C. Cir. 1993) ("[T]he government, in our view, puts too much emphasis on the word 'deem.'"). The statute, therefore, "limit[s] the agency's discretion in discrete ways." *Sierra Club v. U.S. Fish & Wildlife Serv.*, 930 F. Supp. 2d 198, 209 (D.D.C. 2013).

As the D.C. Circuit has explained, "[t]he mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely nonreviewable under the 'committed to agency discretion by law' exception unless the statutory scheme, taken together with other relevant materials, provides *absolutely no guidance* as to how that discretion is to be exercised." *Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985) (emphasis added) ("[G]iven the fact that the statute limits the uses for which the funds can be used, we see no barrier to our assessing whether the agency's decision was based on factors that are relevant to this goal."). Because Section 265 provides meaningful standards against which to examine agency action, Plaintiffs' claim is reviewable.

### B. The Title 42 Process Is Arbitrary and Capricious

#### 1. Defendants Failed to Apply the Least Restrictive Means Standard

The D.C. Circuit has explained that "[r]easoned decision-making requires that when departing from precedents or practices, an agency must 'offer a reason to distinguish them or explain its apparent rejection of their approach.'" *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (quoting *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)). Not "every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance." *Grace v. Barr*, 965 F.3d 883, 900 (D.C. Cir. 2020) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009)). However, the agency may not "gloss[] over or swerve[] from prior precedents without discussion." *Id.* (quoting *Sw. Airlines*, 926 F.3d at 856).

Plaintiffs argue that the Title 42 Process is arbitrary and capricious because the CDC (1) failed to impose the "least restrictive means necessary to prevent the spread of disease" when implementing the policy and (2) failed to explain its departure from this "settled practice." Pls.' Mot., ECF No. 144-1 at 11-12. According to Plaintiffs, CDC had previously "clarif[ied]" this standard in *Control of Communicable Diseases*,

82 Fed. Reg. 6890, 6912 (Jan. 19, 2017) ("2017 Final Rule").
Pls.' Reply, ECF No. 149-1 at 14 (quoting 82 Fed. Reg. 6890,
6912). The 2017 Final Rule amended CDC regulations "governing
its domestic (interstate) and foreign quarantine regulations"
following the "largest outbreak of Ebola virus disease . . . on
record" and the "outbreak of Middle East Respiratory Syndrome
(MERS)." 82 Fed. Reg. at 6890-91. The rule was intended to
"enhance HHS/CDC's ability to prevent the introduction,
transmission, and spread of communicable diseases into the
United States and interstate by clarifying and providing greater
transparency regarding its response capabilities and practices."
*Id.* Among other things, the 2017 Final Rule "clarif[ied]" that
"in all situations involving quarantine, isolation, or other
public health measures, it seeks to use the least restrictive
means necessary to prevent spread of disease." *Id.* at 6912.

Defendants, however, dispute that CDC's Title 42 orders are
subject to the "least restrictive means" standard. In
Defendants' view, the 2017 Final Rule provided that the standard
applies solely in the context of quarantine and isolation, and
only with regard to measures implemented "*under this [2017]
Final Rule.*" Defs.' Opp'n, ECF No. 147 at 28 (quoting 82 Fed.
Reg. at 6890). The Court disagrees with Defendants.

First, the Court is not convinced that the Title 42 orders
do not fall into the category of a "quarantine, isolation, or

21

other public health measures," as contemplated by the 2017 Final
Rule. The August 2021 Order, after all, specifically concerns
"quarantinable communicable diseases," discusses the feasibility
of quarantine or isolation of individuals, and lists 42 U.S.C. §
268 as its legal authority, which in turn sets out the
"[q]uarantine duties of consular and other officers." 86 Fed.
Reg. at 42838; 42 U.S.C. § 268; *see also id.* § 268(b) ("It shall
be the duty of the customs officers and of Coast Guard officers
to aid in the enforcement of quarantine rules and
regulations."). Moreover, Dr. Anne Schuchat, the former CDC
principal deputy director in 2020, testified before the House of
Representatives that some in the agency did not believe that the
agency's adoption of the March 2020 Order was appropriately
"based on criteria for *quarantine*."[3] Ex. A to Cheung Decl., ECF
No. 144-3 at 7 (emphasis added). She further testified that "the
typical issue is, the least restrictive means possible to
protect public health is when you exert a quarantine order

---

[3] The Court considers Dr. Schuchat's extra-record testimony to
evaluate the existence of a "least restrictive means" standard
with respect to public health measures generally. *See, e.g.*,
*Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 386 n.4 (D.C.
Cir. 2018) ("The district court struck many of the Project's
declarations because they were outside of the administrative
record considered by the Labor Department in promulgating its
2015 Rule. But as relevant here, the Project employs the
declarations for the distinct and permissible purpose of proving
that the Department of Homeland Security has a practice or
policy of routinely extending H-2A visa status for three years."
(internal citation omitted)).

versus other measures. And the bulk of the evidence at that time did not support this policy proposal." *Id.*

Even the examples the 2017 Final Rule provided of measures requiring the "least restrictive means" test did not include quarantine or isolation as their primary recommendations. Rather, the 2017 Final Rule stated:

> HHS/CDC agrees and clarifies that in all situations involving quarantine, isolation, or other public health measures, it seeks to use the least restrictive means necessary to prevent spread of disease. Regarding quarantine, as an example, during the 2014-2016 Ebola epidemic, HHS/CDC recommended monitoring of potentially exposed individuals rather than quarantine. Most of these people were free to travel and move about the community, as long as they maintained daily contact with their health department. For some individuals with higher levels of exposure, HHS/CDC recommended enhanced monitoring (involving direct observation) and, in some cases restrictions on travel and being in crowded places, but did not recommend quarantine. HHS/CDC has the option of "conditional release" as a less restrictive alternative to issuance of an order of quarantine or isolation.

82 Fed. Reg. at 6912. The August 2021 Order similarly considered the availability of facilities for isolation and quarantine before determining it was not a feasible option. *See e.g.*, 86 Fed. Reg. at 42836 (stating that releasing family units to communities required, among other things, quarantine facilities, but that such facilities would not be available for all individuals). And significantly, the CDC applied the "least

restrictive means" standard in the April 2022 Order terminating
the Title 42 policy, stating that the agency had "determined
that *less restrictive means* are available to avert the public
health risks associated with the introduction, transmission, and
spread of COVID-19 into the United States." 87 Fed. Reg. at
19955 (emphasis added); *see also* 87 Fed. Reg. at 15252
(rescinding Title 42 policy as to unaccompanied children and
explaining "CDC is committed to using the least restrictive
means necessary and avoiding the imposition of unnecessary
burdens in exercising its communicable disease authorities.").

Further, whether the specific goals of the 2017 Final Rule
does not preclude a finding that the agency's practice was to
apply the "least restrictive means" test more broadly. After
all, the 2017 Final Rule did not state that it was applying the
"least restrictive means" test for the first time; instead, the
CDC explained that the intent behind the rule was "to clarify
the agency's standard operating procedures and policies." 82
Fed. Reg. at 6931. For example, in noting that the agency had
"received several comments requesting the 'least restrictive'
means with respect to quarantine and isolation," the CDC not
only clarified that it used the "least restrictive means" with
respect to those two specific contexts, but also "agree[d] and
clarifie[d]" that the agency sought to use that standard "in *all
situations* involving quarantine, isolation, or *other public*

24

*measures*." 82 Fed. Reg. at 6912 (emphasis added). Defendants' contention that the "least restrictive" standard applies only to U.S. citizens similarly fails because the CDC has clarified that it "appl[ies] communicable disease control and prevention measures uniformly to all individuals in the United States, *regardless of citizenship*, religion, race, or country of residency." 89 Fed. Reg. at 6894 (emphasis added).

Finally, Defendants point to other CDC regulations governing mask mandates and pre-departure COVID-19 testing requirements as examples of measures CDC implemented without applying the standard at issue.[4] Defs.' Opp'n, ECF No. 147 at 28-29 (citing 86 Fed. Reg. 69256 (Dec. 7, 2021); 86 Fed. Reg. 8025 (Feb. 3, 2021); 85 Fed. Reg. 86933 (Dec. 31, 2020)). Defendants argue that these examples demonstrate that "CDC routinely implements [public health] measures without regard" to the standard. *Id.* However, the Court agrees with Plaintiffs that "masking or testing are among the least restrictive COVID-19 measures available," and, by contrast, "Title 42 expulsions are, in the CDC's *own* view, 'among the most restrictive measures CDC has undertaken' against COVID-19.'" Pls.' Reply, ECF No. 149-1

---

[4] Defendants also cite to "regulations governing medical examinations of certain noncitizens seeking to enter the United States." Defs.' Opp'n, ECF No. 147 at 28-29. This regulation, however, was implemented prior to the 2017 Final Rule's policy clarification.

at 15-16 (quoting 87 Fed. Reg. at 19951). Moreover, the CDC has applied the standard to more comparable public health measures, such as those regarding the introduction of persons into the country during the Ebola virus outbreak. *See Control of Communicable Diseases*, 82 Fed. Reg. 6890, 6896 (stating that "HHS/CDC used the best available science and risk assessment procedures . . . and principles of least restrictive means to successfully ensure that measures to ban travel between the United States and the affected countries were unnecessary" during Ebola outbreak).

Defendants argue, however, that "[i]n any event, CDC's August 2021 order ultimately was in fact the least restrictive means available to prevent the further introduction of COVID-19 into the United States at the borders at the time it was issued." Defs.' Opp'n, ECF No. 147 at 29. They contend that "while CDC may not have expressly used the term 'least restrictive means,' the substance of CDC's August order makes clear that CDC did, in practice, issue an order that was in fact the least restrictive means available to protect the country from further introduction, transmission, and spread of COVID-19." *Id.* at 30. However, a plain reading of the August 2021 Order does not indicate that the CDC instituted the "least restricted means available," and a discussion of potential

26

mitigation measures does not necessarily mean that the least burdensome measures were selected.

The Court therefore concludes that the August 2021 Order is arbitrary and capricious due to CDC's "failure to acknowledge and explain its departure from past practice." *Grace*, 965 F.3d at 903. (finding that agency's "failure to acknowledge the change in policy is especially egregious given its potential consequences for asylum seekers").

## 2. Defendants Failed to Consider the Consequences of Suspending Immigration to Covered Noncitizens

Plaintiffs further argue that the Title 42 orders are arbitrary and capricious because the CDC failed to consider the harms to migrants subject to expulsion. Pls.' Mot., ECF No. 144-1 at 26. Defendants, in opposition, argue that the CDC was not required to consider the harms to noncitizens because "neither the statute nor the implementing regulation calls for the CDC Director to engage in any such balancing of harms." Defs.' Opp'n, ECF No. 147 at 41-42. The "sole inquiry," in Defendants' view, is whether a Title 42 order "is required in the interest of the public health." *Id.* at 42.

As an initial matter, consideration of the negative impacts that the measures would have on migrants was required by the least restrictive means standard. *See, e.g.*, 82 Fed. Reg. at 6896 (weighing the necessity of measures to ban travel to the

United States against the "dramatic negative implications for travelers and industry").

Moreover, and as set forth above, the APA requires that agencies engage in "reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1913 (2020). "Under this narrow standard of review, a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 1905 (2020) (internal quotation marks omitted) (citation omitted). "That task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Here, the consequences of suspending immigration proceedings for all covered noncitizens was a "relevant factor," or an "important aspect of the problem," that CDC should have considered. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

And contrary to Defendants' argument, the factors that an agency must consider are not limited to those that are expressly mentioned within a statute or regulation. For example, the Supreme Court in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 18981 (2020), held that the agency was required to consider any reliance interests prior

28

to terminating Deferred Action for Childhood Arrivals, despite the lack of statute or regulation mandating that the agency do so. *See Regents*, 140 S. Ct. at 1914-15 (considering whether agency appropriately addressed whether there was "legitimate reliance" on DACA program prior to rescission).

Although Defendants are correct that Section 265 is concerned with preventing the introduction of communicable disease into the United States, the *means* of prevention is just as relevant. It is unreasonable for the CDC to assume that it can ignore the consequences of any actions it chooses to take in the pursuit of fulfilling its goals, particularly when those actions included the extraordinary decision to suspend the codified procedural and substantive rights of noncitizens seeking safe harbor. *See Huisha-Huisha*, 27 F.4th at 724-25 (describing the "procedural and substantive rights" of aliens, such as asylum seekers, "to resist expulsion"); *cf. Regents*, 140 S. Ct. at 1914-15 (holding that agency should have considered the effect rescission of DACA would have on the program's recipients prior to the agency making its decision). As Defendants concede, "a Title 42 order involving persons will *always* have consequences for migrants," Defs.' Opp'n, ECF No. 147 at 42, and numerous public comments during the Title 42 policy rulemaking informed CDC that implementation of its orders would likely expel migrants to locations with a "high

29

probability" of "persecution, torture, violent assaults, or rape." *See* Pls.' Mot., ECF No. 144-1 at 27; *see also id.* at 27-28 (listing groups subject to expulsion under Title 42, including "survivors of domestic violence and their children, who have endured years of abuse"; "survivors of sexual assault and rape, who are at risk of being stalked, attacked, or murdered by their persecutors in Mexico or elsewhere"; and "LGBTQ+ individuals from countries where their gender identity or sexual orientation is criminalized or for whom expulsion to Mexico or elsewhere makes them prime targets for persecution" (citing AR, ECF No. 154 at 28-29, 47, 153) (cleaned up)). It is undisputed that the impact on migrants was indeed dire. *See, e.g.*, *Huisha-Huisha*, 27 F.4th at 734 (finding Plaintiffs would suffer irreparable harm if expelled to places where they would be persecuted or tortured).

The CDC "has considerable flexibility in carrying out its responsibility," *Regents*, 140 S. Ct. at 1914, and the Court is mindful that it "is not to substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). But regardless of the CDC's conclusion, its decision to ignore the harm that could be caused by issuing its Title 42 orders was arbitrary and capricious.

### 3. The Title 42 Policy Failed to Adequately Consider Alternatives

Plaintiffs also argue that the Title 42 policy is arbitrary and capricious because CDC failed to adequately consider alternatives and the policy did not rationally serve its stated purpose. *See* Pls.' Mot., ECF No. 144-1 at 10-11.

First, Plaintiffs contend that "CDC failed to adequately consider other 'alternative way[s] of achieving [its] objective' that were raised by commenters and were available from the very beginning—namely self-quarantine and outdoor processing." Pls.' Mot., ECF No. 144-1 at 21.

With regard to self-quarantine measures, the Court disagrees. The record shows that commenters informed CDC that the "vast majority (approximately 92%) of migrants have family or friends already in the United States," and proposed that covered noncitizens could self-quarantine or self-isolate in these homes or in the shelters of community and faith-based organizations. Pls.' Mot., ECF No. 144-1 at 21. In responding to this proposed alternative, CDC stated that even if it "were to assume that many covered aliens have family or close friends in the United States," the commenters had not provided evidence that the "family or close friends had personal residences and, if so, whether they would make them available as self-quarantine or self-isolation locations." 85 Fed. Reg. at 56452. Nor did the

commenters "look at whether residences were suitable for self-
quarantine or self-isolation in compliance with HHS/CDC
guidelines." *Id.* CDC "maintain[ed] that its implementation of a
self-quarantine or self-isolation protocol for covered aliens
would consume undue HHS/CDC and CBP resources without averting
the serious danger of the introduction of COVID-19 into CBP
facilities" and that "[e]xpulsion is a more effective public
health measure for CBP facilities that preserves finite HHS/CDC
resources for other public health operations." *Id.* Thus, based
on the record evidence, it appears that CDC considered the
possibility of permitting self-quarantining, but ultimately
concluded that lack of resources made it impractical.

However, Defendants failed to consider another "obvious and
less drastic alternative" and give a reasoned explanation for
its rejection of the alternative. *Yakima Valley Cablevision,
Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986); *see also
Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247,
1255 (D.C. Cir. 2021). In the August 2021 Order, the CDC noted
the risk of spreading COVID-19 to others "when people are in
close contact with one another . . . , especially in crowded or
poorly ventilated indoor settings." 86 Fed. Reg. at 42832. Due
to this risk, the CDC indicated that processing under Title 42
presented a safer alternative to processing under Title 8
because "processing an individual for expulsion under the CDC

order takes roughly 15 minutes and generally happens outdoors."
*Id.* at 42836. However, the August 2021 Order makes no mention of
whether Title 8 processing could also take place outdoors, as
suggested by at least one commenter as a less drastic measure to
expulsion. *See generally id.*; AR, ECF No. 154 at 9; Pls.' Mot.,
ECF No. 144-1 at 20-21. And although Defendants state in their
opposition brief that "[o]utdoor processing . . . was
unavailable in August 2021," they do so without citation to the
record. Defs.' Opp'n, ECF No. 147 at 33. It is well-established
that courts "look only to what the agency said at the time of
the [action]—not to its lawyers' post-hoc rationalizations,"
*Grace*, 965 F.3d at 903 (quoting *Good Fortune Shipping SA v.
Comm'r of Internal Revenue Serv.*, 897 F.3d 256, 263 (D.C. Cir.
2018)). Because Defendants' explanation "falls well short of
what is needed to demonstrate the agency grappled with an
important aspect of the problem before it considered another
reasonable path forward," *Spirit Airlines*, 997 F.3d at 1255;
CDC's failure to consider such an important alternative is
arbitrary and capricious, *see, e.g.*, *Yakima Valley*, 794 F.2d at
746 n.36 (noting that "[t]he failure of an agency to consider
obvious alternatives has led uniformly to reversal"); *Allied
Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir.
2000) ("To be regarded as rational, an agency must . . .

33

consider significant alternatives to the course it ultimately chooses").

Next, Plaintiffs argue that "Defendants could have instituted testing, vaccination, and quarantine protocols, rather than continuing to authorize expulsions." Pls.' Mot., ECF No. 144-1 at 17. Defendants dispute Plaintiffs' contention, arguing that CDC had determined that "[o]n-site COVID-19 testing for noncitizens at CBP holding facilities [was] very limited," off-site testing would harm community healthcare facilities, and "vaccination programs [were] not available at th[at] time." Defs.' Opp'n, ECF No. 147 at 32-33.

"Agencies 'have an obligation to deal with newly acquired evidence in some reasonable fashion,' . . . [and] to 'reexamine' their approaches 'if a significant factual predicate changes.'" *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (quoting *Catawba Cty. v. EPA*, 571 F.3d 20, 45 (D.C. Cir. 2009); *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992)). Moreover, an agency's statements "must be one of 'reasoning'; it must not be just a 'conclusion'; it must 'articulate a satisfactory explanation' for its action." *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)).

Here, the March 2020 Order listed the lack of vaccines, "approved therapeutics," and rapid testing as justifications for

the emergency measures. *See* 85 Fed. Reg. at 17062. Thus, the
relevant "significant factual predicate change[]" with regard to
the August 2021 Order was the development and disbursal of
COVID-19 vaccines, on-site rapid antigen tests, and effective
therapeutics. *See* Pls.' Mot., ECF No. 144-1 at 17-18; *see also*
86 Fed. Reg. at 42833 (mentioning the wide availability of
vaccines and antigen tests). The CDC therefore was required to
"reexamine" its approach in view of the rapidly changing
healthcare environment.

The Court concludes that CDC failed to appropriately
consider the availability of effective therapeutics that
"reduce[d] the risk of hospitalization" by approximately 70
percent in its August 2021 Order. *See* Pls.' Mot., ECF No. 144-1
at 18; AR, ECF No. 154 at 143 (listing the availability of
monoclonal antibody doses and their effectiveness against COVID-
19). Defendants do not dispute that the August 2021 Order failed
to even mention such treatments or their overall availability.
Defs.' Opp'n, ECF No. 147 at 33. Instead, Defendants cite to the
April 2022 termination order as explaining that the treatments
were not as widespread or as diverse in August 2021 and were
difficult to administer. Defs.' Opp'n, ECF No. 147 at 33 (citing
87 Fed. Reg. at 19950); *see also* 87 Fed. Reg. at 19950
("Although monoclonal antibodies were available in August 2021
and some continue to be effective and were widely used during

the Omicron wave, such treatments must be administered by
infusion and are cumbersome to administer."). However, whether
CDC analyzed the availability of treatments in April 2022 does
not establish that it did so in August 2021. CDC therefore
failed to "deal with newly acquired evidence in some reasonable
fashion" with regard to therapeutics. *Portland*, 665 F.3d at 187.

With regard to whether Defendants could have "ramped up
vaccinations, outdoor processing, and all the other available
public health measures," *Butte Cty.*, 613 F.3d at 194, the Court
finds that CDC failed to articulate a satisfactory explanation
for why such measures were not feasible. Defendants argue that
CDC did consider the availability of mitigation measures, but
ultimately, they were limited by the "operational reality."
Defs.' Opp'n, ECF No. 147 at 32-33. For example, in August 2021,
Defendants explained that DHS had not yet begun initiating a
vaccination program and on-site testing was "very limited." *Id.*
Moreover, quarantine measures were unavailable because CDC
"'lacks the resources, manpower, and facilities to quarantine
covered aliens' and must rely on the 'Department of Defense,
other federal agencies, and states and local governments to
provide both logistical support and facilities for federal
quarantines.'" *Id.* at 33 (quoting 85 Fed. Reg. at 17,067 n.66).
However, CDC's statements are largely conclusory and do not
reflect any serious analysis of whether reasonable steps could

have been taken to at least begin instituting vaccination programs, particularly given that all Americans had been eligible for the vaccine for more than three months by that point, and increasing the supply of on-site testing. *See* AR, ECF No. 154 at 56. Further, despite CDC's finding in March 2020 that DHS could "build and start bringing hard-sided facilities online" in "90 days (likely more)," 85 Fed. Reg. at 17067 n.66; there is no indication why those efforts still would not have addressed the public health emergency months later. The Court agrees with Plaintiffs that Defendants cannot rest on the "operational reality" when Defendants themselves had the power to change that reality. *See* Pls.' Reply, ECF No. 149-1 at 22 ("After leaning on DHS to implement Title 42, CDC cannot now turn around and claim that DHS had no responsibility to take steps to avoid the continued human suffering of so many vulnerable asylum-seekers."); *see also Portland*, 665 F.3d at 187 ("It is nothing more than a determination that EPA would not address the problem unless it happened to appear at an inconvenient time—an eventuality over which EPA had full control. The refrain that EPA must promulgate rules based on the information it currently possesses simply cannot excuse its reliance on that information when its own process is about to render it irrelevant.").

Finally, Plaintiffs argue that the Title 42 policy did not rationally serve its stated purpose because "COVID-19 was already rampant in the United States in August 2021, the egregious disjuncture between its stated goal of banning infectious migration and the narrow group of travelers it actually targeted, and the ways the Title 42 Policy *contributed* to spreading disease." Defs.' Reply, ECF No. 149-1 at 22 (internal citations omitted).

The Court finds that the fact that COVID-19 was already "widespread" within the United States at the time of the August 2021 Order is not sufficient to show that the Title 42 policy did not rationally serve its stated purpose. *See* Pls.' Mot., ECF No. 144-1 at 22-23. The relevant regulation defines "serious danger of the introduction of [a] quarantinable communicable disease into the United States" as "the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease." 42 C.F.R. § 71.40(b)(3). Although Plaintiffs contend that CDC's definition "simply cannot be a *rational* public health rule," they otherwise do not provide any arguments regarding why the Court should not defer to CDC's interpretation of the term "serious danger." *See* Pls.' Reply, ECF No. 149-1 at 22-23. In view of CDC's scientific and technical expertise, the Court does not find the definition to be unreasonable.

However, despite the above, Defendants have not shown that the risk of migrants spreading COVID-19 is "a real problem." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 27 (D.D.C. 2020) (citing *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006)). "Professing that an agency action ameliorates a real problem but then citing no evidence demonstrating that there is in fact a problem is not reasoned decisionmaking." *Id.* (cleaned up); *see Huisha-Huisha*, 27 F.4th at 735 ("[W]e would be sensitive to declarations in the record by CDC officials testifying to the efficacy of the § 265 Order. But there are none."). As Plaintiffs point out, record evidence indicates that "during the first seven months of the Title 42 policy, CBP encountered on average just one migrant per day who tested positive for COVID-19." Pls.' Mot., ECF No. 144-1 at 22 (citing Sealed AR, ECF No. 155-1 at 23). In addition, at the time of the August 2021 Order, the rate of daily COVID-19 cases in the United States was almost double the incidence rate in Mexico and substantially higher than the incidence rate in Canada. *See* 86 Fed. Reg. at 42831 (noting 137.9 daily cases per 100,000 people in the United States, compared to 68.6 in Mexico and 8.0 in Canada). The lack of evidence regarding the effectiveness of the Title 42 policy is especially egregious in view of CDC's previous conclusion that "the use of quarantine and travel restrictions, in the absence of evidence of their utility, is detrimental to efforts to combat the spread of communicable disease," *Control of Communicable Diseases*, 82 Fed.

Reg. 6890, 6896; as well as record evidence discussing the "recidivism" created by the Title 42 policy, which actually increased the number of times migrants were encountered by CBP, *see* AR, ECF No. 154 at 45 (commenter describing recidivism); AR, ECF No. 155-1 at 4 (January/February 2021 statistics showing nearly 40% of family units DHS encountered in January-February 15, 2021 were migrants who had attempted to cross at least once before).

Moreover, it is undisputed that the suspension of immigration under Title 42 covered only approximately 0.1% of land border travelers, *see* Pls.' Mot., ECF No. 144-1 at 23. And though Defendants claim that their focus was on the risk of spreading COVID-19 in congregate settings, *see* Defs.' Opp'n, ECF No. 147 at 39, millions of others were permitted to cross the border under less restrictive measures, even if they traveled in congregate setting such cars, buses, and trains, *see* Pls.' Mot., ECF No. 144-1 at 23-24; *see id.* ("CBP's own data shows that in July 2021 alone, over 11 million people entered from Mexico by land, including over 8.4 million people in cars, buses, and trains.").

In view of the above, the Court concludes that the Title 42 policy is arbitrary and capricious.

### C. Remedies

Having concluded that the Title 42 policy is arbitrary and capricious, the question of remedy remains. For the reasons below, the Court shall vacate the Title 42 policy and enjoin

Defendants from applying the Title 42 policy with respect to
Plaintiff Class Members.

### 1.    The Title 42 Policy Is Vacated

Plaintiffs first request that the Court vacate the Title 42
policy. Pls.' Reply, ECF No. 149-1 at 30. Defendants oppose the
request, contending that "[b]ecause any order granting partial
summary judgment would be interlocutory and ineffective until
final judgment except in limited circumstances, the Court should
not grant any relief premised on any such order but should defer
consideration of the issue of remedy until the Court has
adjudicated all of Plaintiffs' claims." Defs.' Opp'n, ECF No.
160 at 2.

"[U]nsupported agency action normally warrants vacatur."
*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety
Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005). However, courts
have discretion to remand without vacatur if "there is at least
a serious possibility that the [agency] will be able to
substantiate its decision," and if "vacating would be
disruptive." *Radio-TV News Directors Ass'n v. FCC*, 184 F.3d 872,
888 (D.C. Cir. 1999) (alteration in original) (citation
omitted); *see Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
988 F.2d 146, 150-51 (D.C. Cir. 1993) ("The decision whether to
vacate depends on the seriousness of the order's deficiencies .
. . and the disruptive consequences of an interim change that

may itself be changed." (citation omitted)). "Alternatively, a court may vacate the unlawful action but stay its order of vacatur for a limited time to allow the agency to attempt to cure the defects that the court has identified." *NAACP v. Trump*, 298 F. Supp. 3d 209, 244 (D.D.C. 2018) (citing *Friends of Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006)).

Here, because this action can be disposed of based on Plaintiffs' arbitrary and capricious claim, the Court finds that vacatur is not premature at this stage. *See, e.g.*, *Child.'s Hosp. Ass'n of Texas v. Azar*, 300 F. Supp. 3d 190, 205 (D.D.C. 2018), *rev'd and remanded on other grounds*, 933 F.3d 764 (D.C. Cir. 2019); *see also Zhang v. USCIS*, 344 F. Supp. 3d 32, 66 & n.10 (D.D.C. 2018). Moreover, the *Allied-Signal* factors do not compel a different result. The CDC has already terminated the August 2021 Order based on "significantly improved public health conditions," and the Title 42 policy only remains in effect because another federal court has preliminarily enjoined the termination order, which Defendants are opposing before the Fifth Circuit. Defs' Opp'n, ECF No. 147 at 9. Given the agency's current position, it is unlikely that the agency would seek to justify a renewal of the policy on remand, and vacatur would not be disruptive given CDC's rescission of the policy. *See id.* at 15-16.

Particularly in view of the harms Plaintiffs face if summarily expelled to countries they may be persecuted or tortured, the Court

therefore vacates the Title 42 policy. *Cf. Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262-64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such.").

### 2.   Plaintiffs Are Entitled to Injunctive Relief

Plaintiffs also request that the Court permanently enjoin Defendants and their agents from applying the Title 42 policy with respect to Plaintiff Class Members. *See* Pls.' Proposed Order, ECF No. 144-2 at 1.

A permanent injunction "is a drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). It "should not be granted as a matter of course," *id.*, and "[s]uccess on an APA claim does not automatically entitle the prevailing party to a permanent injunction," *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 908 F.3d 123, 128 (D.C. Cir. 2020). Rather, a permanent injunction "should issue only if the traditional four-factor test is satisfied." *Monsanto*, 561 U.S. at 157. The four-factor test requires that a plaintiff demonstrate that: (1) "it has suffered an irreparable injury"; (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public

interest would not be disserved by a permanent injunction." *Id.* at 156-57 (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

Having found that Plaintiffs are entitled to summary judgment on their APA claim, the Court first turns to whether Plaintiffs have demonstrated irreparable injury.

"[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (same). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted). This presents a "very high bar." *Beck v. Test Masters Educ. Servs. Inc.*, 994 F. Supp. 2d 98, 101 (D.D.C. 2014) (quoting *Coal. for Common Sense In Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008)).

Plaintiffs argue that they continue to face irreparable harm because, despite the D.C. Circuit's holding in this case that Defendants may not expel Class Members to areas where they would be persecuted or tortured, "[d]ocumented cases of

kidnapping, rapes, and other violence against noncitizens subject to Title 42 have also risen dramatically since last year." Pls.' Mot., ECF No. 144-1 at 30. Defendants, in opposition, contend that "the situation for class members has improved since the D.C. Circuit first stayed this Court's preliminary injunction [in September 2021]." Defs.' Opp'n, ECF No. 147 at 45 (citing *Huisha-Huisha II*, 27 F.4th at 722).

The Court is mindful that "[e]xpulsion is not categorically irreparable harm." *Huisha-Huisha II*, 27 F.4th at 734 (quoting *Nken*, 556 U.S. at 435) (internal quotation marks omitted). Here, however, Defendants do not argue that its guidance to field officers following the D.C. Circuit's opinion in this case has prevented harms to Plaintiffs, only that it has "improved" the situation. *See* Defs.' Opp'n, ECF No. 147 at 45. And while the Court does not doubt that USCIS screenings are a vital tool in preventing the expulsion of individuals to countries in which they could be persecuted, Defendants have not provided any information regarding how many screening have occurred since the D.C. Circuit issued its opinion in March 2022. *See* Pls.' Reply, ECF No. 149-1 at 31. Meanwhile, Plaintiffs have presented evidence demonstrating that the rate of summary expulsions pursuant to the Title 42 policy has nearly doubled since September 2021. *See* Pls.' Mot., ECF No. 144-1 at 30 ("At the time of this Court's original decision, approximately 14% of

45

families encountered at the southwest border were being summarily expelled pursuant to the Title 42 policy. . . . Now, the rate of expulsions is nearly twice as high, reaching 27%."); *see also* Pls.' Reply, ECF No. 149-1 at 31 ("[I]n the month of July 2022 alone, 9,574 members of family units encountered at the southern border were summarily expelled pursuant to the Title 42 policy."). And "[i]n Mexico alone, recorded incidents" of "kidnapping, rapes, and other violence against noncitizens subject to Title 42" have "spiked from 3,250 cases in June 2021 to over 10,318 in June 2022." Pls.' Mot., ECF No. 144-1 at 30 (citing Neusner Decl., ECF No. 118-4; Human Rights First, *The Nightmare Continues: Title 42 Court Order Prolongs Human Rights Abuses*, Extends Disorder at U.S. Borders, at 3-4 (June 2022)). Accordingly, even if the Court accepts Defendants' unsupported statement that the "situation for class members has improved," the evidence demonstrates that Plaintiffs continue to face irreparable harm that is beyond remediation. *See Huisha-Huisha*, 27 F.4th at 733 ("[T]he record is replete with stomach-churning evidence of death, torture, and rape.").

The Court next addresses the balance of the equities and public interest factors, which "merge when the Government is the opposing party." *Nken*, 556 U.S. at 434.

Defendants argue that "the government and the public have an interest in protecting the integrity of government's valid

orders." Defs.' Opp'n, ECF No. 147 at 45. However, as explained above, this Court has determined that the Title 42 policy is arbitrary and capricious, and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Ramirez v. ICE*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018) ("The public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate."); *R.I.L-R*, 80 F. Supp. 3d at 191 ("The Government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns.'"). Because "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate," *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977); the Court concludes that an injunction in this case would serve the public interest, *see A.B.-B. v. Morgan*, No. 20-cv-846, 2020 WL 5107548, at *9 (D.D.C. Aug. 31, 2020) ("[T]he Government and public can have little interest in executing removal orders that are based on statutory violations . . . .").

Moreover, Defendants do not contend that issuing a permanent injunction would cause them harm or be inconsistent with the public health. Indeed, "CDC recognizes that the current public health conditions no longer require the continuation of

the August 2021 order," Defs.' Opp'n, ECF No. 147 at 44; *see also* Pls.' Mot., ECF No. 144-1 at 30, in view of the "less burdensome measures that are now available," 87 Fed Reg. at 19944; *id.* at 19949–50. The parties also do not dispute that Plaintiffs continue to face substantial harm if they are returned to their home countries, notwithstanding the availability of USCIS screenings. *See, e.g.*, Human Rights First, *The Nightmare Continues: Title 42 Court Order Prolongs Human Rights Abuses*, Extends Disorder at U.S. Borders, at 3-4 (June 2022). As the Supreme Court has explained, the public has a strong interest in "preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436.

Therefore, the balance of the equities also favors Plaintiffs.

## IV.  Conclusion

For the reasons stated above, the Court hereby **GRANTS** Plaintiffs' Motion for Partial Summary Judgment, ECF No. 144. The Court vacates and sets aside the Title 42 policy—consisting of the regulation at 42 C.F.R. § 71.40 and all orders and decision memos issued by the Centers for Disease Control and Prevention or the U.S. Department of Health and Human Services suspending the right to introduce certain persons into the United States; and declares the Title 42 policy to be arbitrary

and capricious in violation of the Administrative Procedure Act

and permanently enjoins Defendants and their agents from

applying the Title 42 policy with respect to Plaintiff Class

Members. An appropriate Order accompanies this Memorandum

Opinion.

　　　　**SO ORDERED.**

**Signed:**　　　**Emmet G. Sullivan**
　　　　　　　　**United States District Judge**
　　　　　　　　**November 15, 2022**