# United States District Court
## Northern District of Texas
## Fort Worth Division

STATE OF TEXAS,
 *Plaintiff,*

v.

JOSEPH R. BIDEN, JR., *et al.*;
 *Defendants.*

Case 4:21-cv-00579-P

## Appendix to Texas's Renewed Motion for Preliminary Injunction

| 1 | Final Rule (42 C.F.R. § 71.40) | Appx. 1 |

| 2 | October Order | Appx. 4 |
| | *Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 85 Fed. Reg. 65806 (Oct. 16, 2020) | |

| 3 | February Order | Appx. 11 |
| | *Notice of Temporary Exception From Expulsion of Unaccompanied Noncitizen Children Pending Forthcoming Public Health Determination*, 86 Fed. Reg. 9942 (Feb. 17, 2021) | |

| 4 | July Order | Appx. 12 |
| | *Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 28717 (July 22, 2021) | |

| 5 | August Order | Appx. 16 |
| | *Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42828 (Aug. 5, 2021) | |

| 6 | *Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexico*, 85 Fed. Reg. 16547 (Mar. 24, 2020) | Appx. 30 |
| 7 | *Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexico*, 86 Fed. Reg. 46963 (Aug. 23, 2021) | Appx. 32 |
| 8 | Declaration of Rodney S. Scott | Appx. 34 |
| 9 | Agreement Between Department of Homeland Security and the State of Texas | Appx. 42 |
| 10 | "Hidalgo County Judge declares local state of disaster because of growing numbers of migrants seeking asylum," Office of County Judge Richard F. Cortez (Aug. 2, 2021) | Appx. 51 |
| 11 | Hidalgo County Declaration of a Local State of Disaster (Aug. 2, 2021) | Appx. 52 |
| 12 | "City of McAllen Approves Setting Up Temporary Emergency Shelter in Response to Migrant Surge," City of McAllen (Aug. 4, 2021) | Appx. 54 |
| 13 | Declaration of Sgt. Joel Villarreal | Appx. 57 |
| 14 | Webb County Corrected Declaration of Local State of Disaster (July 20, 2021) | Appx. 63 |
| 15 | Declaration of Dr. Victor Treviño | Appx. 66 |
| 16 | Declaration of David Shahoulian | Appx. 71 |
| 17 | Declaration of Lisa Kalakanis | Appx. 81 |
| 18 | Declaration of Leonardo Lopez | Appx. 88 |
| 19 | Declaration of Sheri Gipson | Appx. 96 |

| 20 | Declaration of Rebecca Waltz | Appx. 108 |
| 21 | CBP Directive No. 2210-004 (Dec. 20, 2019) | Appx. 111 |
| 22 | Declaration of Brian S. Hastings | Appx. 116 |

§ 71.40 Suspension of the right to introduce and prohibition of..., 42 C.F.R. § 71.40

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 4 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 4 of 128   PageID 862

Code of Federal Regulations
Title 42. Public Health
Chapter I. Public Health Service, Department of Health and Human Services (Refs & Annos)
Subchapter F. Quarantine, Inspection, Licensing
Part 71. Foreign Quarantine (Refs & Annos)
Subpart D. Health Measures at U.S. Ports: Communicable Diseases

42 C.F.R. § 71.40

§ 71.40 Suspension of the right to introduce and prohibition of the introduction of persons into the United States from designated foreign countries or places for public health purposes.

Effective: October 13, 2020
Currentness

<See P.J.E.S. by & through Escobar Francisco v. Wolf, No. CV 20-2245, 2020 WL 6770508 (D.D.C. Nov. 18, 2020), recommending to grant a preliminary injunction prohibiting expulsion of class members from the United States under 42 C.F.R. 71.40. See 85 FR 65806-01, summarized as announcing "the issuance of an Order suspending the right to introduce certain persons into the United States from countries where a quarantinable communicable disease exists". For additional judicial decisions and information regarding this rule, see KeyCite citing references for this section on Westlaw.>

(a) The Director may prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease, by issuing an order in which the Director determines that:

(1) By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and

(2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.

(b) For purposes of this section:

(1) Introduction into the United States means the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons or property in the United States, in a manner that the Director determines to present a risk of transmission of a quarantinable communicable disease to persons, or a risk of contamination of property with a quarantinable communicable disease, even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States;

(2) Prohibit, in whole or in part, the introduction into the United States of persons means to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting movement into the United States, or physically expelling from the United States some or all of the persons;

(3) Serious danger of the introduction of such quarantinable communicable disease into the United States means the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease;

(4) The term Place includes any location specified by the Director, including any carrier, as that term is defined in 42 CFR 71.1, whatever the carrier's flag, registry, or country of origin; and

(5) Suspension of the right to introduce means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States.

(c) Any order issued by the Director under this section shall include a statement of the following:

(1) The foreign countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons shall be prohibited;

(2) The period of time or circumstances under which the introduction of any persons or class of persons into the United States shall be prohibited;

(3) The conditions under which that prohibition on introduction shall be effective in whole or in part, including any relevant exceptions that the Director determines are appropriate;

(4) The means by which the prohibition shall be implemented; and

(5) The serious danger posed by the introduction of the quarantinable communicable disease in the foreign country or countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited.

(d) When issuing any order under this section, the Director shall, as practicable under the circumstances, consult with all Federal departments or agencies whose interests would be impacted by the order. The Director shall, as practicable under the circumstances, provide the Federal departments or agencies with a copy of the order before issuing it. In circumstances when it is impracticable to engage in such consultation before taking action to protect the public health, the Director shall consult with the Federal departments or agencies as soon as practicable after issuing his or her order, and may then modify the order as he or she determines appropriate. In addition, the Director may, as practicable under the circumstances, consult with any State or local authorities that he or she deems appropriate in his or her discretion.

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 6 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 6 of 128   PageID 864

(1) If the order will be implemented in whole or in part by State and local authorities who have agreed to do so under 42 U.S.C. 243(a), then the Director shall explain in the order the procedures and standards by which those authorities are expected to aid in the enforcement of the order.

(2) If the order will be implemented in whole or in part by designated customs officers (including any individual designated by the Department of Homeland Security to perform the duties of a customs officer) or Coast Guard officers under 42 U.S.C. 268(b), or another Federal department or agency, then the Director shall, in coordination with the Secretary of Homeland Security or other applicable Federal department or agency head, explain in the order the procedures and standards by which any authorities or officers or agents are expected to aid in the enforcement of the order, to the extent that they are permitted to do so under their existing legal authorities.

(e) This section does not apply to:

(1) Members of the armed forces of the United States and associated personnel if the Secretary of Defense provides assurance to the Director that the Secretary of Defense has taken or will take measures such as quarantine or isolation, or other measures maintaining control over such individuals, to prevent the risk of transmission of the quarantinable communicable disease into the United States; or

(2) Other United States government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, if the Director receives assurances from the relevant head of agency and determines that the head of the agency or department has taken or will take, measures such as quarantine or isolation, to prevent the risk of transmission of a quarantinable communicable disease into the United States.

(f) This section shall not apply to U.S. citizens, U.S. nationals, and lawful permanent residents.

(g) Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**Credits**
[85 FR 16566, March 24, 2020; 85 FR 56458, Sept. 11, 2020]

SOURCE: 21 FR 9870, Dec. 12, 1956; 50 FR 1519, Jan. 11, 1985; 68 FR 17559, April 10, 2003, unless otherwise noted.

AUTHORITY: Secs. 215 and 311 of Public Health Service (PHS) Act. as amended (42 U.S.C. 216, 243); secs. 361–369, PHS Act, as amended (42 U.S.C. 264–272).

Current through September 2, 2021; 86 FR 49260.

**End of Document**                                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 7 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 7 of 128   PageID 865

**65806**   Federal Register / Vol. 85, No. 201 / Friday, October 16, 2020 / Notices

## EARLY TERMINATIONS GRANTED—Continued
[July 1, 2020 thru July 31, 2020]

| | | |
|---|---|---|
| 20201217 ........ | G | Oaktree Power Opportunities Fund V, L.P.; Montrose Environmental Group, Inc.; Oaktree Power Opportunities Fund V, L.P. |
| 20201220 ........ | G | General Atlantic Partners 100, L.P.; Doctor on Demand, Inc.; General Atlantic Partners 100, L.P. |
| **07/16/2020** | | |
| 20201198 ........ | G | Enviva Partners, LP; RWE Aktiengesellschaft; Enviva Partners, LP. |
| **07/17/2020** | | |
| 20201192 ........ | G | Vista Equity Partners Fund V, L.P.; 4C Insights, Inc.; Vista Equity Partners Fund V, L.P. |
| 20201207 ........ | G | Genstar Capital Partners IX, L.P.; Sentinel Capital Partners V, L.P.; Genstar Capital Partners IX, L.P. |
| **07/27/2020** | | |
| 20201218 ........ | G | Fiera Infrastructure Fund; CSC CUB Holdings, LP; Fiera Infrastructure Fund. |
| 20201219 ........ | G | Stichting Pensioenfonds ABP; CSC CUB Holdings, LP; Stichting Pensioenfonds ABP. |
| 20201221 ........ | G | Citadel Kensington Global Strategies Fund Ltd.; UP Energy Corporation; Citadel Kensington Global Strategies Fund Ltd. |
| 20201222 ........ | G | Sony Corporation; Timothy D. Sweeney; Sony Corporation |
| 20201223 ........ | G | Crescent Acquisition Corp; F45 Training Holdings Inc.; Crescent Acquisition Corp. |
| 20201224 ........ | G | VPI Holding Company, LLC; Centerbridge Capital Partners III, L.P.; VPI Holding Company, LLC. |
| 20201231 ........ | G | Thomas Tull; Acrisure Holdings, Inc.; Thomas Tull. |
| 20201234 ........ | G | Temasek Holdings (Private) Limited; LegalApp Holdings, Inc.; Temasek Holdings (Private) Limited. |
| 20201235 ........ | G | Authentic Brands Group LLC; LBD Parent Holdings, LLC; Authentic Brands Group LLC. |
| **07/29/2020** | | |
| 20201233 ........ | G | Roark Capital Partners III LP; Roark Capital Partners IV Cayman AIV LP; Roark Capital Partners III LP. |
| 20201238 ........ | G | Insurance Acquisition Corp.; Shift Technologies, Inc.; Insurance Acquisition Corp. |
| 20201241 ........ | G | GT Polaris Holdings, L.P.; I. Charles Widger; GT Polaris Holdings, L.P. |
| 20201242 ........ | G | GT Polaris Holdings, L.P.; NorthStar Topco, LLC; GT Polaris Holdings, L.P. |
| 20201248 ........ | G | KIA X (Breathe), L.P.; GlaxoSmithKline plc; KIA X (Breathe), L.P. |
| 20201249 ........ | G | Eppendorf AG; Promega Corporation; Eppendorf AG. |
| 20201250 ........ | G | Naspers Limited; Remitly Global, Inc.; Naspers Limited. |
| 20201251 ........ | G | Blackstone Capital Partners VII L.P.; Gregory Burgess; Blackstone Capital Partners VII L.P. |
| 20201258 ........ | G | Hargray Acquisition Holdings, LLC; Cable One, Inc.; Hargray Acquisition Holdings, LLC. |
| **07/31/2020** | | |
| 20201252 ........ | G | EQT VIII (No. 1) SCSp; Rancher Labs, Inc.; EQT VIII (No. 1) SCSp. |

**FOR FURTHER INFORMATION CONTACT:**
Theresa Kingsberry (202–326–3100), Program Support Specialist, Federal Trade Commission Premerger Notification Office, Bureau of Competition, Room CC–5301, Washington, DC 20024.

By direction of the Commission.

**April J. Tabor,**
*Acting Secretary.*

[FR Doc. 2020–22944 Filed 10–15–20; 8:45 am]

**BILLING CODE 6750–01–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), a component of the Department of Health and Human Services (HHS), announces the issuance of an Order suspending the right to introduce certain persons into the United States from countries where a quarantinable communicable disease exists. This Order is based on the CDC Director's determination that introduction of aliens, regardless of their country of origin, migrating through Canada and Mexico into the United States creates a serious danger of the introduction of COVID–19 into the United States, and the danger is so increased by the introduction of such aliens that a temporary suspension is necessary to protect the public health.

**DATES:** This action took effect October 13, 2020.

**FOR FURTHER INFORMATION CONTACT:**
Nina B. Witkofsky, Office of the Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS V18–2, Atlanta, GA 30329. Phone: 404–639–7000. Email: *cdcregulations@cdc.gov.*

**SUPPLEMENTARY INFORMATION:** The Director of the CDC (Director) is issuing this Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. 265, 268, and their implementing regulations,[1] which authorize the Director of the Centers for Disease Control and Prevention (CDC) to

---
[1] 85 FR 56424.

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 8 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 8 of 128   PageID 866

**Federal Register** / Vol. 85, No. 201 / Friday, October 16, 2020 / Notices **65807**

suspend the right to introduce [2] persons into the United States when the Director determines that the existence of a quarantinable communicable disease in a foreign country or place creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of the right of such introduction is necessary to protect public health. This Order replaces the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March 20, 2020 Order), extended on April 20, 2020, and amended May 19, 2020, which were based on the prior interim final rule.[3]

This Order applies to persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station at or near the United States borders with Canada or Mexico, subject to the exceptions detailed below.

This Order does not apply to U.S. citizens and lawful permanent residents; members of the armed forces of the United States, and associated personnel, and their spouses and children; persons from foreign countries who hold valid travel documents and arrive at a POE; or persons from foreign countries in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE. Additionally, this Order does not apply to any alien who must test negative for COVID–19 before they are expelled to their home country. Further, this Order does not apply to persons whom customs officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS shall consult with CDC concerning how these types of case-by-case, individualized exceptions shall be made to help ensure consistency with current CDC guidance and public health assessments.

DHS has informed CDC that persons who are traveling from Canada or Mexico (regardless of their country of origin), and who must be held longer in

congregate settings in POEs or Border Patrol stations to facilitate immigration processing, would typically be aliens seeking to enter the United States at POEs who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended at or near the border seeking to unlawfully enter the United States between POEs. This Order is intended to cover all such aliens. For simplicity, I shall refer to the persons covered by this Order as ''covered aliens.''

This Order, which is substantially the same as the amended and extended March 20, 2020 Order, is necessary to continue to protect the public health from an increase in the serious danger of the introduction of Coronavirus Disease 2019 (COVID–19) into the POEs, and the Border Patrol stations between POEs, at or near the United States borders with Canada and Mexico. Those facilities are operated by U.S. Customs and Border Protection (CBP), an agency within DHS. This Order is intended to help mitigate the continued risks of transmission and spread of COVID–19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the POEs and Border Patrol stations; further transmission and spread of COVID–19 in the interior of the United States; and the increased strain that further transmission and spread of COVID–19 would put on the United States healthcare system and supply chain during the current public health emergency.[4]

There is a serious danger of the introduction of COVID–19 into the POEs and Border Patrol stations at or near the United States borders with Canada and Mexico, and into the interior of the country as a whole, because COVID–19 exists in Canada, Mexico, and the other countries of origin of persons who migrate to the United States across the United States land and coastal borders with Canada and Mexico. Those persons are subject to immigration processing in the POEs and Border Patrol stations. Many of those persons (typically aliens who lack valid travel documents and are therefore inadmissible) are held in the common areas of the facilities, in close proximity to one another, for hours or days, as they undergo immigration

processing. The common areas of such facilities were not designed for, and are not equipped to, quarantine, isolate, or enable social distancing by persons who are or may be infected with COVID–19. The introduction into congregate settings in land and coastal POEs and Border Patrol stations of persons from Canada or Mexico increases the already serious danger to the public health to the point of requiring a temporary suspension of the right of introduction of such persons into the United States.

The public health risks of inaction include transmission and spread of COVID–19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the POEs and Border Patrol stations; further transmission and spread of COVID–19 in the interior; and the increased strain that further transmission and spread of COVID–19 would put on the United States healthcare system and supply chain during the current public health emergency.

These risks are troubling because POEs and Border Patrol stations were not designed and are not equipped to deliver medical care to numerous persons exposed to or infected with a quarantinable communicable disease, nor are they capable of providing the level of medical care that would be necessary in the cases of serious COVID–19 infection that occur with greater frequency in vulnerable populations like the elderly and those with certain pre-existing conditions. Indeed, CBP transfers persons with acute presentations of illness to local or regional healthcare providers for treatment. Outbreaks of COVID–19 in POEs or Border Patrol stations would lead to transfers of such persons to local or regional health care providers, which would exhaust the local or regional healthcare resources, or at least reduce the availability of such resources to the domestic population, and further expose local or regional healthcare workers to COVID–19. The continuing availability of healthcare resources to the domestic population is a critical component of the federal government's overall public health response to COVID–19.

Based on these ongoing concerns and to protect the public health, I hereby suspend the introduction of all covered aliens into the United States until I determine that the danger of further introduction of COVID–19 into the United States has ceased to be a serious danger to the public health, and continuation of the Order is no longer necessary to protect the public health. Every 30 days, CDC shall review the latest information regarding the status of the COVID–19 pandemic and associated

---

[2] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[3] 85 FR 16559, 85 FR 17060, 85 FR 22424, 85 FR 31503.

[4] As of October 1, 2020, CBP has had 2,195 employees contract COVID–19. In addition, 13 employees and one USBP transportation contractor have died due to the virus. Any outbreak of COVID–19 among CBP personnel in land POEs or Border Patrol stations would impact CBP operations negatively. Although not part of the CDC public health analysis, it bears emphasizing that the impact on CBP could reduce the security of U.S. land borders and the speed with which cargo moves across the same.

public health risks to ensure that the Order remains necessary to protect the public health. Upon determining that the further introduction of COVID–19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the **Federal Register** terminating this Order and its Extensions. I may amend this Order as necessary to protect the public health.

A copy of the Order is provided below and a copy of the signed Order can be found at *https://www.cdc.gov/coronavirus/2019-ncov/order-suspending-introduction-certain-persons.html.*

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention (CDC)

### Order Under Sections 362 & 365 of the Public Health Service Act

### (42 U.S.C. 265, 268):

### Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists

### I. Purpose and Application

I issue this Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. 265, 268, and their implementing regulations,[5] which authorize the Director of the Centers for Disease Control and Prevention (CDC) to suspend the right to introduce[6] persons into the United States when the Director determines that the existence of a quarantinable communicable disease in a foreign country or place creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of the right of such introduction is necessary to protect public health. This Order replaces the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March 20, 2020 Order), extended on April 20, 2020, and amended May 19, 2020, which were based on the prior interim final rule.[7]

This Order applies to persons traveling from Canada or Mexico

(regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station at or near the United States borders with Canada or Mexico, subject to the exceptions detailed below.

This Order does not apply to U.S. citizens and lawful permanent residents; members of the armed forces of the United States or U.S. government personnel serving overseas, and associated personnel, and their spouses and children; persons from foreign countries who hold valid travel documents and arrive at a POE; or persons from foreign countries in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE. Additionally, this Order does not apply to any alien who must test negative for COVID–19 before they are expelled directly to their home country. Further, this Order does not apply to persons whom customs officers determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS shall consult with CDC concerning how these types of case-by-case, individualized exceptions shall be made to help ensure consistency with current CDC guidance and public health assessments.

DHS has informed CDC that persons who are traveling from Canada or Mexico (regardless of their country of origin), and who must be held longer in congregate settings in POEs or Border Patrol stations to facilitate immigration processing, would typically be aliens seeking to enter the United States at POEs who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended at or near the border seeking to unlawfully enter the United States between POEs. This Order is intended to cover all such aliens. For simplicity, I shall refer to the persons covered by this Order as "covered aliens."

This Order, which is substantially the same as the amended and extended March 20, 2020 Order, is necessary to continue to protect the public health from an increase in the serious danger of the introduction of Coronavirus Disease 2019 (COVID–19) into the POEs, and the Border Patrol stations between POEs, at or near the United States borders with Canada and Mexico. Those facilities are operated by U.S. Customs and Border Protection (CBP), an agency within the U.S. Department of Homeland Security (DHS). This Order is

intended to help mitigate the continued risks of transmission and spread of COVID–19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the POEs and Border Patrol stations; further transmission and spread of COVID–19 in the interior of the United States; and the increased strain that further transmission and spread of COVID–19 would put on the United States healthcare system and supply chain during the current public health emergency.[8]

There is a serious danger of the introduction of COVID–19 into the POEs and Border Patrol stations at or near the United States borders with Canada and Mexico, and into the interior of the country as a whole, because COVID–19 exists in Canada, Mexico, and the other countries of origin of persons who migrate to the United States across the United States land and coastal borders with Canada and Mexico. Those persons are subject to immigration processing in the POEs and Border Patrol stations. Many of those persons (typically aliens who lack valid travel documents and are therefore inadmissible) are held in the common areas of the facilities, in close proximity to one another, for hours or days, as they undergo immigration processing. The common areas of such facilities were not designed for, and are not equipped to, quarantine, isolate, or enable social distancing by persons who are or may be infected with COVID–19. The introduction into congregate settings in land and coastal POEs and Border Patrol stations of persons from Canada or Mexico increases the already serious danger to the public health to the point of requiring a temporary suspension of the right of introduction of such persons into the United States.

The public health risks of inaction include transmission and spread of COVID–19 to CBP personnel, U.S. citizens, lawful permanent residents, and other persons in the POEs and Border Patrol stations; further transmission and spread of COVID–19 in the interior; and the increased strain that further transmission and spread of COVID–19 would put on the United States healthcare system and supply chain during the current public health emergency.

---

[5] 85 FR 56424, 42 CFR 71.40.

[6] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[7] 85 FR 17060, 85 FR 22424, 85 FR 31503.

[8] As of October 1, 2020, CBP has had 2,195 employees contract COVID–19. In addition, 13 employees and one USBP transportation contractor have died due to the virus. Any outbreak of COVID–19 among CBP personnel in land and coastal POEs or Border Patrol stations would impact CBP operations negatively. Although not part of the CDC public health analysis, it bears emphasizing that the impact on CBP could reduce the security of U.S. borders and the speed with which cargo moves across the same.

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 10 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 10 of 128   PageID 868

**Federal Register** / Vol. 85, No. 201 / Friday, October 16, 2020 / Notices   **65809**

These risks are troubling because POEs and Border Patrol stations were not designed and are not equipped to deliver medical care to numerous persons exposed to or infected with a quarantinable communicable disease, nor are they capable of providing the level of medical care that would be necessary in the cases of serious COVID–19 infection that occur with greater frequency in vulnerable populations like the elderly and those with certain pre-existing conditions. Indeed, CBP transfers persons with acute presentations of illness to local or regional healthcare providers for treatment. Outbreaks of COVID–19 in POEs or Border Patrol stations would lead to transfers of such persons to local or regional health care providers, which would exhaust the local or regional healthcare resources, or at least reduce the availability of such resources to the domestic population, and further expose local or regional healthcare workers to COVID–19. The continuing availability of healthcare resources to the domestic population is a critical component of the federal government's overall public health response to COVID–19.

Based on these ongoing concerns and to protect the public health, I hereby suspend the introduction of all covered aliens into the United States until I determine that the danger of further introduction of COVID–19 into the United States has ceased to be a serious danger to the public health, and continuation of the Order is no longer necessary to protect the public health. Every 30 days, CDC shall review the latest information regarding the status of the COVID–19 pandemic and associated public health risks to ensure that the Order remains necessary to protect the public health. Upon determining that the further introduction of COVID–19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the **Federal Register** terminating this Order and its Extensions. I may amend this Order as necessary to protect the public health.

## II. Factual Basis for Order [9]

### 1. COVID–19 is a global pandemic that has spread rapidly

COVID–19 is a quarantinable communicable disease caused by a novel (new) coronavirus, SARS–CoV–2,

that was first identified as the cause of an outbreak of respiratory illness that began in Wuhan, Hubei Province, People's Republic of China (China). As of October 1, 2020, there were over 34,103,279 cases of COVID–19 globally, resulting in over 1,016,167 deaths.

COVID–19 spreads easily and sustainably within communities.[10] The virus is thought to transfer principally by person-to-person contact through respiratory droplets produced during exhalation, such as breathing, speaking, coughing, and sneezing. Droplets can span a wide spectrum of sizes that can remain airborne from seconds for larger droplets to several hours for smaller droplets and particles. The virus may also transfer through contact with surfaces or objects contaminated with these droplets.[11] There is also evidence of asymptomatic transmission, in which an individual infected with COVID–19 is capable of spreading the virus to others before exhibiting symptoms.[12]

Symptoms may include fever or chills, cough, and shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and diarrhea, and typically appear 2–14 days after exposure to the virus.[13] Manifestations of severe disease have included severe pneumonia, acute respiratory distress syndrome (ARDS), septic shock, and multi-organ failure.[14] Mortality rates are higher among seniors and those with certain underlying medical conditions, such as chronic

obstructive pulmonary disease (COPD), serious heart conditions, cancer, Type 2 diabetes, and those with compromised immune systems.[15]

Unfortunately, at this time, there is no vaccine against COVID–19, although several are in development. While U.S. Food and Drug Administration (FDA) has not approved drugs to treat patients with COVID–19 based on a demonstration of safety and efficacy in randomized controlled trials, FDA has granted an Emergency Use Authorization for the use of VEKLURY® (remdesivir) and other investigational therapeutics in the treatment of COVID–19 infection. Beyond these therapeutics, treatment is currently limited to supportive care to manage symptoms. Hospitalization may be required in severe cases and mechanical respiratory support may be needed in the most severe cases.

Global efforts to slow the spread of COVID–19 have included sweeping travel limitations and lockdowns. Nations such as the European Union (EU) Member States and Schengen Area countries,[16] Australia, New Zealand, and Canada have imposed restrictions on international travelers.[17] In many countries, individuals are being asked to self-quarantine for 14 days—the outer limit of the COVID–19's estimated incubation period—following return from a foreign country with sustained community transmission. For example, all returning citizens and residents of Australia and New Zealand are subject to a mandatory 14-day quarantine at

---

[9] Given the dynamic nature of the public health emergency, CDC recognizes that the types of facts and data set forth in this section may change rapidly (even within a matter of hours). The facts and data cited by CDC in this order represent a good-faith effort by the agency to present the current factual justification for the order.

[10] *COVID–19 Pandemic Planning Scenarios,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html,* (last visited Oct. 3, 2020), (CDC estimates that the viral transmissibility (R₀) of COVID–19 is around 2.5, but may be as high as 4, meaning that a single infected person will on average infect between 2 to 4 others).

[11] *Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID–19) Pandemic,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Finfection-control%2Fcontrol-recommendations.html* (last visited Sept. 29, 2020),

[12] *COVID–19 Pandemic Planning Scenarios,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html,* (last visited Sept. 29, 2020), (CDC's current best estimate is that between 30 to 70% of infections are transmitted prior to symptom onset (pre-symptomatic transmission)).

[13] *Coronavirus Disease 2019 (COVID–19): Symptoms of Coronavirus,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html* (last updated May 13, 2020).

[14] Sevim Zaim, et al., *COVID–19 and Multiorgan Response,* 00 Current Problems in Cardiology 2020, (available at: *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7187881/pdf/main.pdf*).

[15] *Coronavirus Disease (COVID–19): People with Certain Medical Conditions,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed;-extra-precautions%2Fgroups-at-higher-risk.html* (last updated Sept. 11, 2020).

[16] *Migration and Home Affairs: Schengen Area,* Eur. Comm'n (Jan. 1, 2020), *https://ec.europa.eu/home-affairs/what-we-do/policies/order-and-visas/schengen_en* ("Today, the Schengen Area [of the EU] encompasses most EU States, except for Bulgaria, Croatia, Cyprus, Ireland and Romania. However, Bulgaria, Croatia and Romania are currently in the process of joining the Schengen Area. Of non-EU States, Iceland, Norway, Switzerland and Liechtenstein have joined the Schengen Area."); *Travel to and from the EU during the pandemic: Travel restrictions,* Eur. Comm'n, *https://ec.europa.eu/info/live-work-travel-eu/health/coronavirus-response/travel-and-transportation-during-coronavirus-pandemic/travel-and-during-pandemic_en* (last visited Aug. 31, 2020).

[17] *See* Andrea Salcedo, Sanam Yar, & Gina Cherelus, *Coronavirus Travel Restrictions, Across the Globe,* N.Y. Times (July 16, 2020), *https://www.nytimes.com/article/coronavirus-travel-restrictions.html.*

designated secure facilities, such as a hotel at their port of arrival.[18]

*2. The March 20, 2020 Order has reduced the risk of COVID–19 transmission in POEs and Border Patrol stations*

I issued the March 20, 2020 Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. 265, 268, and an interim final rule implementing Section 362.[19] The March 20, 2020 Order suspended the introduction of certain ''covered aliens'' into the United States for a period of 30 days. The definition of ''covered aliens'' in the March 20, 2020 Order is substantially the same as in this Order. The March 20, 2020 Order was based on the following determinations:

• COVID–19 is a communicable disease that poses a danger to the public health;

• COVID–19 is present in numerous foreign countries, including Canada and Mexico;

• There is a serious danger of the introduction of COVID–19 into the land POEs and Border Patrol stations at or near the United States borders with Canada and Mexico, and into the interior of the country as a whole, because COVID–19 exists in Canada, Mexico, and the other countries of origin of persons who migrate to the United States across the land borders with Canada and Mexico;

• But for a suspension-of-entry order under 42 U.S.C. § 265, covered aliens would be subject to immigration processing at the land POEs and Border Patrol stations and, during that processing, many of them (typically aliens who lack valid travel documents and are therefore inadmissible) would be held in the congregate areas of the facilities, in close proximity to one another, for hours or days; and

• Such introduction into congregate settings of persons from Canada or Mexico would increase the already serious danger to the public health of the United States to the point of requiring a temporary suspension of the introduction of covered aliens into the United States.

The March 20, 2020 Order was extended on April 20, 2020 and amended on May 19, 2020, to clarify

that it applies to all land and coastal POEs and Border Patrol stations [20] at or near the United States' border with Canada or Mexico that would otherwise hold covered aliens in a congregate setting.[21] Pursuant to the May 19, 2020 Amendment, the March 20, 2020 Order was again extended with CDC thereafter conducting reviews every 30 days.[22] Upon conducting these reviews, I have kept the amended Order in place; the current 30 day period lapses on October 17, 2020.

In general, the federal government's overall experience with the March 20, 2020 Order, together with the factual developments since May 20, 2020, sustain the policy rationales for issuing this Order.

Since the March 20, 2020 Order was issued, the daily average population in CBP custody is 1,134 individuals. This is a 64% reduction of daily in custody numbers since the March 20, 2020 Order went into effect and a 67% reduction from the same period in 2019. In the 50 days preceding the March 20, 2020 Order, CBP officers made over 1,600 trips to community hospitals to facilitate advanced medical care for individuals. For the first 80 days after the March 20, 2020 Order's implementation, CBP made only 400 trips for individuals to receive medical care from community hospitals. This represents a 75% decrease in utilization. In the 60 days preceding September 16, 2020, CBP made 746 trips for individuals to receive medical care from community hospitals. The increase in hospital utilization corresponds with a month-over-month increase in CBP enforcement encounters, including encounters with covered aliens who have subsequently tested positive for COVID–19. The risks of COVID–19 transmission and overutilization in community hospitals serving domestic populations would have been greater absent the March 20, 2020 Order.

The March 20, 2020 Order has reduced the risk of COVID–19 transmission in POEs and Border Patrol stations, and thereby reduced risks to DHS personnel and the U.S. health care system. The public health risks to the DHS workforce—and the erosion of DHS operational capacity—would have been greater absent the March 20, 2020 Order. DHS data shows that the March 20, 2020 Order has significantly reduced the population of covered aliens held in congregate settings in POEs and Border

Patrol stations, thereby reducing the risk of COVID–19 transmission for DHS personnel and others within these facilities.

By significantly reducing the number of covered aliens held in POEs and Border Patrol stations, the March 20, 2020 Order reduced the density of covered aliens held in congregate custody within these facilities, which reduced the risk of exposure to COVID–19 for DHS personnel and others in POEs and Border Patrol stations.

*3. Conditions in Canada, Mexico, and the United States warrant issuing this Order*

COVID–19 has continued to spread since the March 20, 2020 Order. Canada, Mexico, and the countries of origin of many of the individuals who travel to the United States through Canada or Mexico continue to see increasing numbers of COVID–19 infections and deaths.

i. Canada

As detailed in the March 20, 2020 Order, approximately 33 million individuals crossed the Canadian border into the United States in 2017. Historically, inadmissible aliens attempting to unlawfully enter the United States from Canada have included not only Canadian nationals, but also nationals of countries experiencing, or suspected of experiencing, widespread COVID–19 transmission such as the member countries of the Schengen Area, China, and Iran.[23] From March through August, 2020, CBP has processed 28,841 inadmissible aliens at POEs at the U.S.-Canadian border, and CBP has apprehended 2,014 inadmissible aliens attempting to unlawfully enter the United States between POEs, of which DHS determined 1,126 were covered aliens subject to the March 20, 2020 Order.[24]

As of October 6, 2020, Canada reported over 171,300 cases of COVID–19 and over 9,500 confirmed deaths with a seven day average of 1,797 new

---

[18] *Id.; COVID–19 and the border: Travel restrictions,* Cmlth. of Austl, Dep't of Home Aff., *https://covid19.homeaffairs.gov.au/travel-restrictions-0* (last updated Aug. 28, 2020); *COVID-19: New Zealanders in the UK—Frequently Asked Questions,* N.Z. Foreign Aff. & Trade, *https://www.mfat.govt.nz/en/countries-and-regions/europe/united-kingdom/new-zealand-high-commission/living-in-the-uk/covid-19-coronavirus/* (last visited Aug. 28, 2020).

[19] 85 FR 16559.

[20] As explained below, air POEs are excluded from the Amended Order and Extension because they do not present the same public health risk as land and coastal POEs.

[21] 85 FR 22424.

[22] 85 FR 31503.

[23] *U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector in Fiscal Years 2007 to 2019,* U.S. Border Patrol, U.S. Dep't of Homeland Security, *https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY2007%20-%20FY%202019%29_1.pdf* (last visited Oct. 9, 2020).

[24] *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions,* U.S. Customs and Border Protection, U.S. Dep't of Homeland Security, *https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics* (last visited Oct. 9, 2020).

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 12 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 12 of 128   PageID 870

**Federal Register** / Vol. 85, No. 201 / Friday, October 16, 2020 / Notices   **65811**

cases.[25] In response to increases in the level of community transmission, authorities in Toronto, Ottawa, and several other Ontario cities have mandated indoor mask use. On September 19, 2020, Ontario issued new restrictions limiting indoor gatherings to 10 people and outdoor gatherings to 25.[26] In Quebec masks have been mandated in all indoor public places since July 27, 2020. In an effort to slow the transmission and spread of the virus, the Canadian government banned most foreign nationals from entry and mandated that returning Canadians and excepted foreign nationals (including Americans) self-monitor for COVID–19 symptoms for 14 days following their return.[27] Canadian public health officials have expressed alarm at the recent increase in new COVID–19 cases after several months of low level community transmission, particularly as Canada begins to enter influenza season.[28]

### ii. Mexico

As of October 1, 2020, Mexico has 738,163 confirmed cases, and 77,163 reported deaths.[29] While Mexico's official statistics for COVID–19 infections and number of deaths provide insights to general trends, they have serious deficiencies that greatly understate actual totals. COVID–19 infections and deaths are likely multiples of what is reported as Mexico has the lowest diagnostic testing per capital of OECD countries. Mexico's positivity rate is estimated to be around 44% based on confirmed positive cases, confirmed negative tests, and suspected cases. This is an improvement from a positivity rate of approximately 50% in mid-July. However, Mexico's Health Ministry, SALUD, reported on

September 4, 2020 excess mortality totals of 122,765 deaths through August 28, 2020 as compared to 2019 totals. This figure includes confirmed cases of COVID–19 and deaths confirmed from other causes, but the excess suggests the true number of deaths from COVID–19 in Mexico is much higher than official counts.

While the data on Mexico is more limited, there are signs that the rate of COVID–19 community transmission in Mexico is slowing as the overall public health situation improves somewhat. As of September 25, 2020, under SALUD's ''stoplight'' designation system, none of Mexico's 32 states are red, 15 are orange, 16 are yellow and 1, Colima, is green. According to SALUD, Mexico City has the most lab-confirmed cases with 121,087 and the most deaths with 11,814 as of September 24, 2020. Hospital occupancy rates have also improved in recent weeks—the national hospital occupancy rate is 28 percent— hospital occupancy rates remain elevated in Mexican border-states such as Nuevo Leon (47 percent). As of September 25, 2020, several Mexican border states report relatively high numbers of active COVID–19 infections: Tamaulipas (3,566 active cases), Nuevo Leon (6,028 actives cases) and Baja California (1,440 active cases).

The COVID–19 pandemic in Mexican states along the U.S.-Mexico border region presents increased concerns for the United States because all covered aliens crossing the U.S.-Mexico border necessarily travel through that region and the level of migration is so high. From March to August, 2020, DHS has processed 54,503 inadmissible aliens at POEs along the border, and U.S. Border Patrol has apprehended 345,267 aliens attempting to unlawfully enter the United States between POEs.[30] DHS determined 153,569 were covered aliens subject to the March 20, 2020 Order, of which over 70% were Mexican nationals. With the continued growth of COVID–19 cases in Central and South America, the overwhelming majority of covered aliens encountered on the U.S.-Mexico border are nationals of countries experiencing sustained human to human transmission of COVID–19.

The continued prevalence of COVID–19 in Mexico continues to present a serious danger of the introduction of COVID–19 into the United States. If community transmission in the Mexican border region accelerates, experience shows then the numbers of COVID–19 cases in that region are likely to increase, as are the numbers of infected covered aliens who seek to introduce

themselves into the United States. The introduction of more infected covered aliens would likely have a negative impact on community transmission in the United States.

### iii. United States

While pandemic conditions have improved, community transmission of COVID–19 is continuing across the United States. The United States has recorded over 7,200,000 cumulative confirmed cases; and more than 200,000 deaths.[31] The country is averaging around 36,000 to 40,000 new cases a day.[32] Nationally, since mid-July, there has been an overall decreasing trend in the percentage of specimens testing positive and a decreasing or stable (change of ≤0.1%) trend in the percentage of hospitalizations.[33] To wit, as of October 3, 2020, the seven day average of new cases and deaths are down 35.8% and 40.3% respectively from their peak levels. Similarly, the seven day positivity rate, as of October 3, 2020, was 4.6%. This low positivity rate is not shared uniformly, Arizona and Texas both report positivity rates of between 11–20%.[34]

Millions of Americans are subject to local and state public health restrictions and precautions calculated to slow the spread of, and protect others from, COVID–19. CDC continues to recommend that all Americans practice vigorous hand hygiene, engage in social distancing,[35] limit non-essential travel,[36] and wear cloth face coverings or masks when out in public.[37] Public health measures intended to slow the spread of COVID–19 in order to avoid

---

[25] *Coronavirus Disease (COVID–19): Outbreak Update,* Gov't of Can., *https://www.canada.ca/en/ public-health/services/diseases/2019-novel-coronavirus-infection.html* (last updated Oct. 6, 2020).

[26] *Reopening Ontario in Stages: Gathering Limits,* Gov't of Ontario, *https://www.ontario.ca/page/ reopening-ontario-stages#restrictions* (last updated Oct. 2, 2020).

[27] *Travel Restriction Measures: COVID–19 Program Delivery Travel Restriction Exemptions for Those Departing From a Country Other Than the U.S.,* Gov't of Canada, *https://www.canada.ca/en/ immigration-refugees-citizenship/corporate/ publications-manuals/operational-bulletins-manuals/service-delivery/coronavirus/travel-restrictions.html#travel-restriction-exemptions* (last updated Jul. 23, 2020).

[28] *Statement from the Chief Public Health Officer of Canada on October 3, 2020,* Gov't of Canada, *https://www.canada.ca/en/public-health/news/ 2020/10/statement-from-the-chief-public-health-officer-of-canada-on-october-3-2020.html* (last updated Oct. 3, 2020).

[29] *WHO Coronavirus Disease (COVID–19) Dashboard,* WHO, *https://covid19.who.int/table* (last visited Oct. 2, 2020).

[30] *Supra,* note 21.

[31] *CDC COVID Data Tracker: United States COVID–19 Cases and Deaths by State,* Ctrs. for Disease Control & Prevention *https://covid.cdc.gov/ covid-data-tracker/#cases_casesinlast7days* (last visited Oct. 6, 2020).

[32] *Id.*

[33] *COVID View: A Weekly Summary of U.S. COVID–19 Activity Week 39,* Ctrs. for Disease Control & Prevention *https://www.cdc.gov/ coronavirus/2019-ncov/covid-data/covidview/ index.html* (last visited Oct. 6, 2020).

[34] *CDC COVID Data Tracker: United States Laboratory Testing,* Ctrs. for Disease Control & Prevention *https://covid.cdc.gov/covid-data-tracker/#testing_totalpercentpositive* (last visited Oct. 6, 2020).

[35] *How to Protect Yourself & Others,* Ctrs. for Disease Control & Prevention *https://www.cdc.gov/ coronavirus/2019-ncov/prevent-getting-sick/ prevention.html* (last visited Oct. 6, 2020).

[36] *Travel During the COVID–19 Pandemic,* Ctrs. for Disease Control & Prevention *https:// www.cdc.gov/coronavirus/2019-ncov/travelers/ travel-during-covid19.html* (last visited Oct. 6, 2020).

[37] *COVID–19: Use of Cloth Face Coverings to Help Slow the Spread of COVID–19,* Ctrs. for Disease Control & Prevention, *https://www.cdc.gov/ coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html* (last reviewed Oct. 6, 2020).

Case 1:21-cv-00100-EGS  Document 168-3  Filed 11/21/22  Page 13 of 128
Case 4:21-cv-00579-P  Document 69  Filed 09/08/21  Page 13 of 128  PageID 871

**65812** **Federal Register** / Vol. 85, No. 201 / Friday, October 16, 2020 / Notices

overwhelming healthcare systems have largely proven successful. However, several cities and states, including several located at or near U.S. borders, continue to experience widespread, sustained community transmission that has strained their healthcare and public health systems. Furthermore, continuing to slow the rate of COVID–19 transmission is critical as states and localities ease public health restrictions on businesses and public activities in an effort to mitigate the economic and other costs of the COVID–19 pandemic.

## III. Determination and Implementation

Based on the foregoing, I find that COVID–19 is a quarantinable communicable disease [38] and that there is a serious danger of the introduction of COVID–19 into the POEs and Border Patrol stations at or near the United States borders with Canada and Mexico, and the interior of the country as a whole, because COVID–19 exists in Canada, Mexico, and the countries or places of origin of the covered aliens who migrate to the United States across the land and coastal borders with Canada and Mexico. I also find that the introduction into land and coastal POEs and Border Patrol stations of covered aliens increases the seriousness of the danger to the point of requiring a temporary suspension of the right to introduce covered aliens into the United States. Therefore, I am suspending the right to introduce and prohibiting the introduction of covered aliens travelling into the United States from Mexico and Canada.

In making this determination, I have considered facts including the overall number of cases of COVID–19 reported in Mexico, Canada, and the countries or places of origin of the covered aliens who migrate to the United States across the land and coastal borders with Canada and Mexico, the influx of cases in areas near the U.S.-Mexico border, epidemiological factors including the viral transmissibility and asymptomatic transmission of the disease, the morbidity and mortality associated with the disease for individuals in certain risk categories, and the negative effects of the disease already experienced by CBP. Therefore, it is necessary for the United States to continue the suspension of the right to introduce covered aliens at this time.

The continued suspension of the right to introduce covered aliens requires the movement of all such aliens to the country from which they entered the United States, their country of origin, or another practicable location outside the United States, as rapidly as possible, with as little time spent in congregate settings as practicable under the circumstances. The faster a covered alien is returned to the country from which they entered the United States, to their country of origin, or another location as practicable, the lower the risk the alien poses of introducing, transmitting, or spreading COVID–19 into POEs, Border Patrol stations, other congregate settings, and the interior.

I consulted with DHS and other federal departments as needed before I issued this Order, and requested that DHS aid in the enforcement this Order because CDC does not have the capability, resources, or personnel needed to do so. As part of the consultation, CBP developed an operational plan for implementing this Order. The plan is generally consistent with the language of this Order directing that covered aliens spend as little time in congregate settings as practicable under the circumstances. Additionally, DHS will continue to use repatriation flights as necessary to move covered aliens on a space-available basis, as authorized by law. In my view, DHS's assistance with implementing the Order is necessary, as CDC's other public health tools are not viable mechanisms given CDC resource and personnel constraints, the large numbers of covered aliens involved, and the likelihood that covered aliens do not have homes in the United States.[39]

This Order is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Order and a delay in effective date. Given the public health emergency caused by COVID–19, it would be impracticable and contrary to public health practices—and, by extension, the public interest—to delay the issuing and effective date of this Order. In addition, because this Order concerns the ongoing discussions with Canada and Mexico on how best to control COVID–19 transmission over our shared border, it directly ''involve[s] . . . a . . . foreign affairs function of the United States.'' 5 U.S.C. 553(a)(1).

Notice and comment and a delay in effective date would not be required for that reason as well.

\* \* \* \* \*

This Order shall remain effective until I determine that the danger of further introduction of COVID–19 into the United States has ceased to be a serious danger to the public health, and continuation of this Order is no longer necessary to protect public health. Every 30 days, the CDC shall review the latest information regarding the status of the COVID–19 pandemic and associated public health risks to ensure that the Order remains necessary to protect public health.

Upon determining that the further introduction of COVID–19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the **Federal Register** terminating this Order and its Extensions. I retain the authority to extend, modify, or terminate the Order, or implementation of this Order, at any time as needed to protect public health.

### Authority

The authority for this Order is Sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40.

**Nina B. Witkofsky,**
*Acting Chief of Staff, Centers for Disease Control and Prevention.*
[FR Doc. 2020–22978 Filed 10–13–20; 4:15 pm]
**BILLING CODE 4163–18–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

[CMS–3399–FN]

**Medicare and Medicaid Programs: Application from DNV–GL Healthcare USA, Inc. for Continued Approval of its Critical Access Hospital Accreditation Program**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), Health and Human Services (HHS).

**ACTION:** Final notice.

---

**SUMMARY:** This final notice announces our decision to approve DNV–GL Healthcare USA, Inc. (DNV–GL) for continued recognition as a national accrediting organization for critical access hospitals that wish to participate in the Medicare or Medicaid programs.

---

[38] COVID–19 is a severe acute respiratory syndrome, which is one of the diseases included in the ''Revised List of Quarantinable Communicable Diseases.'' Exec. Order 13295 (Apr. 4, 2003), as amended by Exec. Order 13375 (Apr. 1, 2005) and Exec. Order 13674 (July 31, 2014).

[39] CDC relies on the Department of Defense, other federal agencies, and state and local governments to provide both logistical support and facilities for federal quarantines. CDC lacks the resources, manpower, and facilities to quarantine covered aliens.

Case 1:21-cv-00100-EGS Document 168-3 Filed 11/21/22 Page 14 of 128
Case 4:21-cy-00579-P Document 69 Filed 09/08/21 Page 14 of 128 PageID 872
**9942** Federal Register / Vol. 86, No. 30 / Wednesday, February 17, 2021 / Notices

Dated: February 10, 2021.

**Dharmesh Vashee,**

*Acting General Counsel, Federal Retirement Thrift Investment Board.*

[FR Doc. 2021–03102 Filed 2–16–21; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Notice of Temporary Exception From Expulsion of Unaccompanied Noncitizen Children Pending Forthcoming Public Health Determination

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** General Notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), located within the Department of Health and Human Services (HHS) announces a temporary exception from expulsion for unaccompanied noncitizen children to its Order issued October 13, 2020 suspending the right to introduce certain persons from countries where a quarantinable communicable disease exists.

**DATES:** The temporary exception went into effect on or about January 30, 2021.

**FOR FURTHER INFORMATION CONTACT:** Jennifer Buigut, Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H16–4, Atlanta, Georgia 30329. Telephone: 404–498–1600. Email: *dgmqpolicyoffice@cdc.gov*.

**SUPPLEMENTARY INFORMATION:** On October 13, 2020, the CDC Director issued an Agency Order titled 'Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists' (85 FR 65806; pub. Oct. 16, 2020). The CDC Order was based on the most current information at that time regarding the COVID–19 pandemic and the situation at the Nation's borders. The Order implemented a final rule published September 11, 2020 entitled ''Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons From Designated Countries or Places for Public Health Purposes'' (85 FR 56424). The final rule was effective October 13, 2020.

CDC has decided to exercise its discretion to temporarily except from

expulsion unaccompanied noncitizen children encountered in the United States pending the outcome of its forthcoming public health reassessment of the Order. This temporary exception from expulsion went into effect on or about Saturday, January 30, 2021, and will remain in effect until CDC has completed its public health assessment and published any notice or modified Order. All other terms of the Order, including its application to adults, remain in place until such time as any modified Order is issued.

Separately, on February 2, 2021 the President signed Executive Order 14010, 'Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Through Norther and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border' (86 FR 8267). This Executive Order requires a review of the CDC Order to determine whether the CDC Order should be terminated, rescinded, or modified.

A copy of the Notice can be found at *https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/CDCPauseNotice-ExceptfromExpulsion.pdf*

**U.S. Department of Health and Human Services**

**Centers for Disease Control and Prevention (CDC)**

**Order Under Sections 362 & 365 of the Public Health Service Act (42 U.S.C. 265, 268):**

**Notice of Temporary Exception From Expulsion of Unaccompanied Noncitizen Children Encountered in the United States Pending Forthcoming Public Health Determination**

\* \* \*

Pursuant to its authority under 42 U.S.C. 265, 268, and implementing regulations, and due to the COVID–19 pandemic, CDC issued an Order suspending the right to introduce and prohibiting the introduction of covered aliens travelling into the United States from Mexico and Canada.[1] On November 18, 2020, the United States District Court for the District of Columbia entered a preliminary injunction in *PJES* v. *Mayorkas* (''*PJES* injunction''),[2] enjoining the expulsion of unaccompanied noncitizen children pursuant to the Order. On Friday, January 29, 2021, the United States Court of Appeals for

the District of Columbia Circuit granted a stay pending appeal of the District Court's *PJES* preliminary injunction.[3]

The current COVID–19 pandemic continues to be a highly dynamic public health emergency. CDC is in the process of reassessing the overall public health risk at the United States' borders and its ''Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists'' based on the most current information regarding the COVID–19 pandemic as well as the situation at the Nation's borders.[4] Although the D.C. Circuit's stay pending appeal permits the CDC to enforce its order and immediately expel unaccompanied noncitizen children, CDC has exercised its discretion to temporarily except from expulsion unaccompanied noncitizen children[5] encountered in the United States pending the outcome of its forthcoming public health reassessment of the Order. This temporary exception went into effect on or about Saturday, January 30, 2021, and will remain in effect until CDC has completed its public health assessment and published any notice or modified Order. All other terms of the Order, including its application to adults, remain in place until such time as any modified Order is issued.[6]

In testimony whereof, the Director, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set her hand at Atlanta, Georgia, this 11th day of February, 2021.

**Sherri Berger,**

*Acting Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2021–03227 Filed 2–12–21; 11:15 am]

**BILLING CODE 4163–18–P**

---

[1] *See* Notice of Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65,806, 65,812 (Oct. 16, 2020), replacing the Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 17,060 (Mar. 26, 2020; eff. Mar. 20, 2020), as extended, 85 FR 22,424 (Apr. 22, 2020; eff. Apr. 20, 2020), and as amended and extended, 85 FR 31,503 (May 26, 2020; eff. May 21, 2020).

[2] No. 1:20–cv–02245 (D.D.C.), Dkt. Nos. 79–80.

[3] No. 20–5357, Doc. No. 1882899.

[4] Review of CDC's 265 Order is also directed by Executive Order 14010, Sec. 4(a)(ii)(A), ''Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,'' Feb. 2, 2021, 86 FR 8267 (Feb. 5, 2021).

[5] Unaccompanied noncitizen children are unaccompanied children who do not hold valid travel documents and who are encountered by the U.S. Department of Homeland Security (DHS) in the United States or otherwise upon introduction into the United States. CDC understands ''unaccompanied noncitizen children'' as the class of individuals subject to the *PJES* litigation (''all unaccompanied noncitizen children who (1) are or will be detained in U.S. government custody in the United States, and (2) are or will be subjected to expulsion from the United States under the CDC Order Process''). It is also CDC's understanding that this class of individuals is similar to or the same as those individuals who would be considered ''unaccompanied alien children'' for purposes of HHS Office of Refugee Resettlement custody, were DHS to make the necessary immigration determinations under Title 8 of the United States Code.

[6] *See* 85 FR 65,806.

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 15 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 15 of 128   PageID 873
**Federal Register** / Vol. 86, No. 138 / Thursday, July 22, 2021 / Notices          **38717**

## Exhibit 2—Estimated Annualized Cost Burden—Continued

| Form name | Number of respondents | Total burden hours | Average hourly wage rate | Total cost burden |
|---|---|---|---|---|
| **Electronic Health Record (EHR) Extracts** | | | | |
| Initial data pull for 10% of hospitals that do not confer rights to their NHSN data (once at baseline for ICU and non-ICU cohorts, 800 units total) ........ | 27 | 135 | ^35.17 | 4,747.95 |
| Initial data pull for hospital onset bacteremia (including MSSA) and MRSA-positive clinical cultures (not available in NHSN) (once at baseline for ICU and non-ICU cohorts, 800 units total) ............................................. | 267 | 935 | ^35.17 | 32,866.37 |
| Initial data pull for 10% of units that submit point prevalence survey data (once at baseline for ICU and non-ICU cohorts, 800 units total) ............... | 27 | 14 | ^35.17 | 474.80 |
| Initial data pull for 20% of surgical settings that do not confer rights to NHSN data (once at baseline for Surgical cohort, 300 settings total) ........ | 20 | 10 | ^35.17 | 351.70 |
| Initial data pull (once at baseline for LTC cohort, 300 facilities total) ............ | 100 | 500 | ^35.17 | 17,585.00 |
| Quarterly data (quarterly during 18 months of implementation for ICU and non-ICU cohorts, 1,100 units total) ........................................................ | 267 | 801 | ^35.17 | 28,171.17 |
| Quarterly data collection of monthly data for 20% of hospitals that do not confer rights to their NHSN data (quarterly during 18 months of implementation for surgical cohorts, 300 units total) ............................................ | 20 | 60 | ^35.17 | 2,110.20 |
| Monthly data (monthly per facility during 18 months of implementation for LTC cohort, 100 facilities total) ...................................................................... | 100 | 900 | ^35.17 | 31,653.00 |
| Total ........................................................................................................... | 13,429 | 11,552 | ...................... | 540,325.83 |

*This is an average of the average hourly wage rate for physician, nurse, nurse practitioner, physician's assistant, and nurse's aide from the May 2019 National Occupational Employment and Wage Estimates, United States, U.S. Bureau of Labor Statistics (*https://www.bls.gov/oes/current/oes_nat.htm#00-0000*).

^This is an average of the average hourly wage rate for nurse and IT specialist from the May 2019 National Occupational Employment and Wage Estimates, United States, U.S. Bureau of Labor Statistics (*https://www.bls.gov/oes/current/oes_nat.htm#00-0000*).

**Request for Comments**

In accordance with the Paperwork Reduction Act, 44 U.S.C. 3501–3520, comments on AHRQ's information collection are requested with regard to any of the following: (a) Whether the proposed collection of information is necessary for the proper performance of AHRQ's health care research and health care information dissemination functions, including whether the information will have practical utility; (b) the accuracy of AHRQ's estimate of burden (including hours and costs) of the proposed collection(s) of information; (c) ways to enhance the quality, utility and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information upon the respondents, including the use of automated collection techniques or other forms of information technology.

Comments submitted in response to this notice will be summarized and included in the Agency's subsequent request for OMB approval of the proposed information collection. All comments will become a matter of public record.

Dated: July 19, 2021.

**Marquita Cullom,**

*Associate Director.*

[FR Doc. 2021–15621 Filed 7–21–21; 8:45 am]

**BILLING CODE 4160–90–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), a component of the Department of Health and Human Services (HHS), announces an Order excepting unaccompanied noncitizen children (UC) from the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order). CDC finds that, at this time, there is appropriate infrastructure in place to protect the children, caregivers, and local communities from elevated risk of COVID–19 transmission as a result of the introduction of UC, and U.S. healthcare resources are not significantly impacted by providing UC necessary care. CDC believes the

COVID–19-related public health concerns associated with UC introduction can be adequately addressed without the UC being subject to the October Order, thereby permitting the government to better address the humanitarian challenges for these children. Therefore, CDC is fully excepting UC from the October Order, and the Notice regarding the temporary exception of UC published February 17, 2021 is hereby superseded.

**DATES:** This Order went into effect July 16, 2021.

**FOR FURTHER INFORMATION CONTACT:** Tiffany Brown, Deputy Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H21–10, Atlanta, GA 30329. Phone: 404–639–7000. Email: *cdcregulations@ cdc.gov.*

**SUPPLEMENTARY INFORMATION:** As part of government efforts to mitigate the introduction, transmission, and spread of COVID–19, CDC issued the October Order,[1] suspending the right to

---

[1] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020. 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, Continued

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 16 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 16 of 128   PageID 874

**38718**    **Federal Register** / Vol. 86, No. 138 / Thursday, July 22, 2021 / Notices

introduce certain persons into the United States (U.S.) from countries or places where a quarantinable communicable disease exists to protect the public's health from an increase in risk of the introduction of COVID–19. The Order applied specifically to certain noncitizens as defined [2] who would otherwise be introduced into a congregate setting in land or coastal ports of entry (POE) or Border Patrol stations at or near the U.S. borders with Canada and Mexico. On February 17, 2021,[3] CDC published a notice announcing the temporary exception from expulsion of unaccompanied noncitizen children [4] (UC) encountered in the United States from the October Order.[5]

As detailed in the Order, CDC has reviewed the current situation with regards to the COVID–19 public health emergency and UC in immigrations facilities and has concluded that it is appropriate to fully except UC from the October Order given the measures in place to prevent and mitigate transmission of COVID–19 in this population. CDC finds that the robust network UC care facilities operated by the Office of Refugee Resettlement (ORR), a component of HHS, the testing and medical care available therein, as well as COVID–19 mitigation protocols including vaccination for personnel and eligible UC, result in very low likelihood that processing UC in accordance with existing immigration procedures under Title 8 of the U.S. Code will result in undue strain on the U.S. healthcare system or healthcare resources. Moreover, UC released to a vetted sponsor or placed in a permanent ORR shelter do not pose a significant level of risk for COVID–19 spread into the community because they are released after having undergone testing, quarantine and/or isolation, and

vaccination when possible, and their sponsors are provided with appropriate medical and public health direction.

A copy of the Order is provided below, and a copy of the signed Order can be found at *https://www.cdc.gov/ coronavirus/2019-ncov/more/pdf/Notice UnaccompaniedChildren.pdf.*

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention (CDC)

**Order Under Sections 362 & 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40**

**Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists**

As part of U.S. government efforts to mitigate the introduction, transmission, and spread of COVID–19, CDC issued an Order on March 20, 2020 (March Order), later replaced on October 13, 2020 (October Order),[6] suspending the right to introduce [7] certain persons into the United States from countries or places where a quarantinable communicable disease [8] exists in order to protect the

public health from an increase in risk of the introduction of COVID–19. The Orders applied specifically to covered noncitizens [9] who would otherwise be introduced into a congregate setting in land or coastal ports of entry (POE) or Border Patrol stations at or near the U.S. borders [10] with Canada and Mexico. On February 17, 2021, CDC published a notice [11] (February Notice) announcing the temporary exception of unaccompanied noncitizen children from the October Order; the February Notice stated that CDC would complete a public health assessment and publish an additional Order or a modified Order. As explained below, CDC has concluded that it is appropriate to except unaccompanied noncitizen children [12] (UC) from the October Order given the measures in place to prevent and mitigate transmission of COVID–19 in this population.

Under the March and October Orders, UC were included as part of the covered noncitizens for whom the right of introduction into the United States was suspended; however, UC largely have been excepted from the application of the Order, first pursuant to judicial

---

85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

[2] *See* 85 FR 65806, 65807.

[3] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Encountered in the United States Pending Forthcoming Public Health Determination, 86 FR 9942 (Feb. 17, 2021).

[4] CDC's understanding is that this class of individuals is similar to or the same as those individuals who would be considered ''unaccompanied alien children'' (see 6 U.S.C. 279) for purposes of HHS ORR custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code.

[5] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Encountered in the United States Pending Forthcoming Public Health Determination, 86 FR 9942 (Feb. 17, 2021).

[6] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020, extended on April 20, 2020, and amended May 19, 2020. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

[7] ''Suspension of the right to introduce'' means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[8] Quarantinable communicable diseases are any of the communicable diseases listed in Executive Order, as provided under § 361 of the Public Health Service Act (42 U.S.C. 264). 42 CFR 71.1. The list of quarantinable communicable diseases currently includes cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow fever, viral hemorrhagic fevers (Lassa, Marburg, Ebola, Crimean-Congo, South American, and others not yet isolated or named), severe acute respiratory syndromes (including Middle East respiratory syndrome and COVID–19), and influenza caused by novel or reemergent influenza viruses that are

causing, or have the potential to cause, a pandemic. *See* Exec. Order 13295, 68 FR 17255 (Apr. 4, 2003), as amended by Exec. Order 13375, 70 FR 17299 (Apr. 1, 2005) and Exec. Order 13674, 79 FR 45671 (July 31, 2014).

[9] This Order is using the term ''covered noncitizens'' to have the same meaning as ''covered aliens'' in the October Order. *See* October Order, 85 FR 65806, 65807 (defining ''covered aliens'' as ''persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station at or near the United States borders with Canada or Mexico,'' subject to certain exceptions. These persons ''would typically be aliens seeking to enter the United States at POEs who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended near the border seeking to unlawfully enter the United States between POEs.'').

[10] When U.S. Customs and Border Protection (CBP) or the U.S. Department of Homeland Security (DHS) partner agencies encounter noncitizens off the coast closely adjacent to the land borders, it transfers the noncitizens for processing in POE or Border Patrol stations closest to the encounter. Absent the October Order, such noncitizens would be held in the same congregate settings and holding facilities as any encounters along the land border, resulting in similar public health concerns related to the introduction, transmission, and spread of COVID–19.

[11] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Encountered in the United States Pending Forthcoming Public Health Determination, 86 FR 9942 (Feb. 17, 2021).

[12] CDC's understanding is that this class of individuals is similar to or the same as those individuals who would be considered ''unaccompanied alien children'' (see 6 U.S.C. 279) for purposes of HHS ORR custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code.

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 17 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 17 of 128   PageID 875

**Federal Register** / Vol. 86, No. 138 / Thursday, July 22, 2021 / Notices      **38719**

action,[13] and later under the February Notice. As a result, since November 18, 2020, UC have generally been processed under regular immigration processes under Title 8 of the U.S. Code and therefore referred from U.S. Customs and Border Protection (CBP), an agency within the U.S. Department of Homeland Security (DHS), to the Office of Refugee Resettlement (ORR) within the U.S. Department of Health and Human Services' (HHS) Administration for Children and Families (ACF) for care and custody, according to the usual legal framework governing such referrals.[14] Pursuant to these requirements, UC encountered in the United States by CBP generally are transferred to ORR within 72 hours of intake at a POE or Border Patrol station.[15] Upon transfer to ORR custody, UC are transported to facilities that operate under cooperative agreements or contracts with HHS and must meet ORR requirements to ensure a high level of quality, child-focused care by appropriately trained staff. ORR operates 210 facilities in 22 states. At these facilities, case managers work to identify and ultimately place UC with vetted family members within the United States).

Beginning in mid-2020, the United States began experiencing an increase in the number of UC arriving daily at the southern border. By February 2021, due to the record numbers of transfers to ORR, UC being held in CBP custody awaiting ORR transfer increased due to a lack of available space in ORR facilities. ORR and other government agencies responded to the influx of UC by rapidly expanding capacity and developing robust, safe COVID–19 protocols in consultation with CDC.

In conjunction with the Federal Emergency Management Agency (FEMA) and with the assistance of the Department of Defense, HHS and ORR opened temporary intake facilities along the U.S. southern border and in the interior to add capacity. A total of 14 Emergency Intake Sites (EIS)[16] were opened across the United States. CDC

assisted ORR by sending medical epidemiologists and other public health professionals to provide technical assistance on COVID–19 mitigation protocols. ORR now has a capacity of over 20,000 beds; currently, over 15,100 children are in its care. ORR has successfully processed and discharged over 55,000 UC since January 20, 2021. The successful efforts to expand capacity for UC have resulted in sufficient capacity at ORR sites—both along the border and in the interior—significantly reducing the length of time that UC remain in CBP custody. As of July 13, 2021, the current average time a UC remained in CBP custody before transferring to ORR custody was 26 hours, and four UC have been in CBP custody for over 72 hours.[17] This represents a substantial improvement from early 2021.[18] While the number of UC encountered may remain at elevated levels, expanded ORR capacity and improved processing methods have resulted in UC remaining in CBP custody for shorter periods of time.

The processes in place at the EIS and at ORR's regular facilities afford sufficient resources and time to identify SARS–CoV–2 cases and implement environmental controls to attenuate the risk of COVID–19 infection and spread.[19] With CDC's assistance and guidance, ORR also has implemented COVID–19 testing regimes for UC in its care and continues to practice other mitigation measures to further prevent and curtail any transmission of the SARS–CoV–2 virus among UC in its care. These strategies include universal and proper wearing of masks, physical distancing, frequent hand washing,

cleaning and disinfection, improved ventilation, staff vaccination, and cohorting UC according to their COVID–19 test status. Per CDC recommendation, ORR conducts serial testing of staff to allow early detection of a possible outbreak.[20] ORR contract staff working in facilities serving UC are encouraged to receive the COVID–19 vaccine.[21] As advised by CDC, ORR restricts movement of unvaccinated personnel between facilities to reduce potential outbreaks resulting from transfer of unvaccinated staff between shelters. These measures help reduce the spread of COVID–19 among UC prior to being introduced into U.S. communities.

In addition to the mitigation measures at EIS and ORR facilities outlined above, following FDA expansion of the emergency use authorization for the Pfizer-BioNTech COVID–19 vaccine for adolescents 12 to 15 years of age, CDC provided updated recommendations to ORR regarding the vaccination of UC ages 12 and older. ORR subsequently approved the administration of COVID–19 vaccine for age-eligible children. Under ORR care, children ages 12 and over are offered a COVID–19 vaccine as soon as possible, as long as there are no contraindications and vaccination does not delay unification of UC with sponsors. Of the total population of UC in ORR care, approximately 90% are eligible for vaccination and, as of July 12, 2021, ORR has administered at least one dose of the COVID–19 vaccine to 10,124 UC. CDC considers these vaccination efforts to be a critical risk reduction measure that supports excepting UC from the October Order.

Although 8,435 UC have tested positive for COVID–19 while at ORR shelters during the period of March 24, 2020 to July 8, 2021, 8,081 of those UC testing positive have successfully completed medical isolation, with few requiring medical treatment. Similarly, 6,590 COVID–19 cases have been reported among 14 EIS as of July 7, 2021; however only 14 (0.5%) of the UC in this group have required hospitalization (including two severe

---

[13] Dkt. No. 80, *P.J.E.S.* v. *Mayorkas et al.,* No. 1:20–cv–02245 (D.D.C. Nov. 18, 2020).

[14] *See* 8 U.S.C. 1232; Stipulated Settlement Agreement, *Flores* v. *Reno,* No. CV 85–cv–4544 (C.D. Cal. Jan. 17, 1997).

[15] 8 U.S.C. 1232(b)(3).

[16] EIS are intended to be a temporary measure providing a standard of care consistent with the best interest of children during an emergency situation. When fully operational with appropriate staffing and basic medical resources, EIS provide a safer, less crowded environment where UC are cared for, processed as quickly as possible, and are either released to a sponsor or transferred to an appropriate ORR facility for longer-term care. When no longer necessary, EIS facilities are demobilized.

[17] HHS Executive Leadership Information Brief (internal document). Published July 12, 2021.

[18] For comparison, on March 29, 2021, nearly 5,500 UC were in CBP custody, with 3,540 of those UC in custody for longer than 72 hours; as of March 31, 2021, the average time in CBP custody for UC was 131 hours.

[19] Specifically, ORR currently uses the following COVID–19 protocols for UC at EIS: UC are tested for COVID–19 by CBP prior to being transported to an EIS and then are also tested upon arrival to EIS. UC are required to quarantine for the first 7 days after admission to an EIS and can be released from quarantine on the morning of day 8 if they remain asymptomatic and had had a negative COVID–19 test in the 48 hours prior. In addition to testing at admission and during quarantine, UC are routinely tested during their stay at EIS (*e.g.,* every three days), and any UC that develops symptoms consistent with COVID–19 infection is immediately tested. UC who test positive for COVID–19 are required to be isolated for 10 days from the date the positive test was collected, or 10 days from the date of symptom onset if asymptomatic. Contact tracing is conducted whenever anyone tests positive for COVID–19; UC exposed to COVID–19 are quarantined for seven days, tested on the 5th, 6th, or 7th day of their quarantine, and are released upon receiving a negative test result. ORR has also issued similar COVID–19 guidance to licensed facilities.

[20] In ORR facilities where the risk of transmission is moderate to high, public health officials working collaboratively with ORR facilities can determine the appropriateness of offering screening and repeat testing of randomly selected asymptomatic staff and children at the facility, as feasible, to identify cases and prevent secondary transmission.

[21] Additional criteria (*e.g.,* continued symptom monitoring and correct and consistent wearing of masks) should be met by ORR as outlined on CDC's website. *See* Science Brief: Options to Reduce Quarantine for Contacts of Persons with SARS–CoV–2 Infection Using Symptom Monitoring and Diagnostic Testing, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-options-to-reduce-quarantine.html* (last updated Dec. 2, 2020).

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 18 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 18 of 128   PageID 876

**38720**   **Federal Register** / Vol. 86, No. 138 / Thursday, July 22, 2021 / Notices

cases requiring intensive care). These numbers indicate that the risk of overburdening the local healthcare systems by UC presenting with severe COVID–19 disease remains low. Based on the robust network of ORR care facilities and the testing and medical care available therein, as well as COVID–19 mitigation protocols including vaccination for personnel and eligible UC, there is very low likelihood that processing UC in accordance with existing Title 8 procedures will result in undue strain on the U.S. healthcare system or healthcare resources. Moreover, UC released to a vetted sponsor or placed in a permanent ORR shelter do not pose a significant level of risk for COVID–19 spread into the community because they are released after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction.

CDC thus finds that, at this time,[22] there is appropriate infrastructure in place to protect the children, caregivers, and local communities from elevated risk of COVID–19 transmission as a result of the introduction of UC, and U.S. healthcare resources are not significantly impacted by providing UC necessary care. CDC believes the COVID–19-related public health concerns associated with UC introduction can be adequately addressed without UC being subject to the October Order, thereby permitting the government to better address the humanitarian challenges for these children. Based on the foregoing, CDC is fully excepting UC from the October Order,[23] and the February Notice is hereby superseded. This Order shall be immediately effective. I consulted with DHS and other federal departments as needed before I issued this Order and requested that DHS continue to aid in the enforcement of this Order because CDC does not have the capability, resources, or personnel needed to do so.[24]

This Order is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Even if it were, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Order and a delayed effective date. Given the public health emergency caused by

COVID–19 and the highly unpredictable nature of its transmission and spread, it would be impracticable and contrary to public health practices and the public interest to delay the issuing and effective date of this Order with respect to UC. In addition, because this Order concerns the ongoing discussions with Canada and Mexico on how best to control COVID–19 transmission over our shared borders, it directly ''involve[s] . . . a . . . foreign affairs function of the United States.'' 5 U.S.C. 553(a)(1). Notice and comment and a delay in effective date would not be required for that reason as well.

**Authority**

The authority for this Order is Sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40.

Dated: July 19,2021.

**Sherri Berger,**

*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2021–15699 Filed 7–20–21; 4:15 pm]

**BILLING CODE 4163–18–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**[Docket No. CDC–2021–0071; NIOSH–341]**

**World Trade Center Health Program; Request for Information**

**AGENCY:** Centers for Disease Control and Prevention, HHS.

**ACTION:** Request for information.

**SUMMARY:** The National Institute for Occupational Safety and Health (NIOSH), within the Centers for Disease Control and Prevention (CDC), is soliciting public comment on the scope of an upcoming funding announcement for FY2022 regarding the World Trade Center (WTC) Health Program's research priorities involving WTC survivors. The WTC Health Program's research program helps answer critical questions about potential 9/11-related physical and mental health conditions as well as diagnosing and treating health conditions on the List of WTC-Related Health Conditions.

**DATES:** Comments must be received by August 23, 2021.

**ADDRESSES:** Comments may be submitted through either of the following two methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov* (follow the instructions for submitting comments), or

• *By Mail:* NIOSH Docket Office, Robert A. Taft Laboratories, MS C–34, 1090 Tusculum Avenue, Cincinnati, Ohio 45226–1998.

*Instructions:* All written submissions received in response to this notice must include the agency name (Centers for Disease Control and Prevention, HHS) and docket number (CDC–2021–0071; NIOSH–341) for this action. All relevant comments, including any personal information provided, will be posted without change to *http:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Rachel Weiss, Program Analyst, 1090 Tusculum Avenue, MS: C–48, Cincinnati, OH 45226; telephone (855) 818–1629 (this is a toll-free number); email *NIOSHregs@cdc.gov.*

**SUPPLEMENTARY INFORMATION:** Title I of the James Zadroga 9/11 Health and Compensation Act of 2010 (Pub. L. 111– 347, as amended by Pub. L. 114–113 and Pub. L. 116–59), added Title XXXIII to the Public Health Service (PHS) Act,[1] establishing the WTC Health Program within the Department of Health and Human Services (HHS). The WTC Health Program provides medical monitoring and treatment benefits for health conditions on the List of WTC-Related Health Conditions (List)[2] to eligible firefighters and related personnel, law enforcement officers, and rescue, recovery, and cleanup workers who responded to the September 11, 2001, terrorist attacks in New York City, at the Pentagon, and in Shanksville, Pennsylvania (responders). The Program also provides benefits to eligible persons who were present in the dust or dust cloud on September 11, 2001, or who worked, resided, or attended school, childcare, or adult daycare in the New York City disaster area (survivors).

The Zadroga Act also requires that the Program establish a research program on health conditions resulting from the September 11, 2001, terrorist attacks, addressing the following topics:[3]

• Physical and mental health conditions that may be related to the September 11, 2001, terrorist attacks;

---

[22] This situation could change based on an increased influx of UC, changes in COVID–19 infection dynamics among UC, or unforeseen reductions in housing capacity.

[23] *See* 86 FR 9942.

[24] 42 U.S.C. 268; 42 CFR 71.40(d).

---

[1] Title XXXIII of the PHS Act is codified at 42 U.S.C. 300mm to 300mm–61. Those portions of the James Zadroga 9/11 Health and Compensation Act of 2010 found in Titles II and III of Public Law 111– 347 do not pertain to the WTC Health Program and are codified elsewhere.

[2] The List of WTC-Related Health Conditions is established in 42 U.S.C. 300mm–22(a)(3)–(4) and 300mm–32(b); additional conditions may be added through rulemaking and the complete list is provided in WTC Health Program regulations at 42 CFR 88.15.

[3] 42 U.S.C. 300mm–51(a).

state, local and courtroom requirements and seek a commitment to adhere to those requirements. The requirements apply to all attorneys, assistants, parties, and witnesses. The discussion will also address who may enter the courtroom, when, and what safety measures, such as masks and social distancing, must be implemented. No person may enter the courtroom, or the witness room without the permission of the Judge. The Judge may consider allowing persons who are not fully vaccinated to enter the courtroom, but they must wear masks and practice social distancing.

All court reporters will be notified that they must be vaccinated.

The Judge may consider all factors, in totality, in determining if a remote hearing will be held and who may be present for the hearing. No single factor is dispositive. These procedures shall be in place until December 31, 2021, unless extended or modified by order. The order shall be posted on the Commission's website (*www.fmshrc.gov*) and the contents of the order will be published in a notice appearing in the **Federal Register**.

*Authority:* 30 U.S.C. 823; 29 CFR part 2700.

Dated: July 30, 2021.

**Sarah L. Stewart,**
*Deputy General Counsel, Federal Mine Safety and Health Review Commission.*

[FR Doc. 2021–16661 Filed 8–4–21; 8:45 am]

**BILLING CODE 6735–01–P**

---

## FEDERAL RESERVE SYSTEM

### Solicitation of Statements of Interest for Membership on the Insurance Policy Advisory Committee

**AGENCY:** Board of Governors of the Federal Reserve System (Board).

**ACTION:** Notice.

**SUMMARY:** The Economic Growth, Regulatory Relief, and Consumer Protection Act established at the Board an Insurance Policy Advisory Committee (IPAC). This notice advises individuals who wish to serve as IPAC members of the annual opportunity to be considered for the IPAC.

**DATES:** Individuals that submit a Statement of Interest that is received by the Board from the first Monday in August through the first Monday in October of each year will be considered for appointments to the IPAC announced in the fourth calendar quarter of the same year. Statements of Interest received outside the period from the first Monday in August through the first Monday in October generally will not be considered.

**ADDRESSES:** Individuals seeking an appointment to the IPAC may send a Statement of Interest by email to *IPAC@frb.gov*. The Statement of Interest contains only contact information. Candidates also may choose to provide additional information. Candidates may send this information by email to *IPAC@frb.gov*. The Privacy Act Statement for IPAC Member Selection, which describes the purposes, authority, effects of nondisclosure, and uses of this information, can be found at *https://www.federalreserve.gov/aboutthefed/ipac-privacy.htm*.

Individuals also may mail Statements of Interest and any additional information to the Board of Governors of the Federal Reserve System, Attn: Insurance Policy Advisory Committee, 20th Street and Constitution Ave. NW, Washington, DC 20551.

**FOR FURTHER INFORMATION CONTACT:** Jan Bauer, Senior Insurance Policy Analyst, (202) 475–7697 or Thomas Sullivan, Senior Associate Director, (202) 452–3000, Division of Supervision and Regulation; or *IPAC@frb.gov*.

**SUPPLEMENTARY INFORMATION:** The Economic Growth, Regulatory Relief, and Consumer Protection Act established at the Board an Insurance Policy Advisory Committee (IPAC) to advise the Board on international capital standards and other insurance matters. This notice advises individuals of the opportunity to be considered for appointment to the IPAC. To assist with the appointment of IPAC members, the Board considers information submitted by the candidate, public information, and any other relevant information the Board determines to consider.

#### Council Size and Terms

The IPAC has at most 21 members. IPAC members serve staggered three-year terms. Members are appointed to three-year terms unless the Board appoints a member to fill a vacant unexpired term. A member that is appointed to serve a three-year term begins his or her service on the first January 1 occurring after his or her appointment. A member appointed to fill an vacant unexpired term serves for the remaining time of the term. The Board provides a nominal honorarium and reimburses members only for their actual travel expenses, subject to Board policy.

#### Statement of Interest

A Statement of Interest must contain the following information:
- Full name;
- Address;
- Phone number; and

- Email address

At their option, candidates may provide additional information for consideration.

#### Qualifications

IPAC candidates should be insurance experts. The Board provides equal appointment opportunity to all persons without regard to race, color, religion, sex (including sexual orientation, gender identity, and pregnancy), national origin, age, disability, genetic information, or military service. In addition, the Board is committed to a diverse committee and seeks a diverse set of expert perspectives from the various sectors of the U.S. insurance industry including life insurance, property and casualty insurance and reinsurance, agents and brokers, academics, consumer advocates, and experts on issues facing underserved insurance communities and consumers. The Board also seeks relevant actuarial, legal, regulatory, and accounting expertise, as well as expertise on lines of business underwritten by its currently supervised population of insurance institutions.

Members must be willing and able to participate in conference calls and prepare for and attend meetings in person. Membership and attendance is not delegable.

By order of the Board of Governors of the Federal Reserve System, acting through the Director of the Division of Supervision and Regulation under delegated authority.

**Ann Misback,**
*Secretary of the Board.*

[FR Doc. 2021–16669 Filed 8–4–21; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), a component of the Department of Health and Human Services (HHS), announces an Order to replace and supersede the Order Suspending the Right to Introduce Certain Persons from

**APPX. 016**

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 20 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 20 of 128   PageID 878
**Federal Register**/Vol. 86, No. 148/Thursday, August 5, 2021/Notices     **42829**

Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 ("October Order"). Following an assessment of the current status of the COVID–19 public health emergency and the situation in congregate settings where noncitizens seeking to enter the United States are processed and held, CDC has determined that an Order remains appropriate at this time for all "covered noncitizens" as defined in the order. Unaccompanied noncitizen children, already excepted under a July 16, 2021 order, remain excepted from the order's coverage. In addition, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID–19 mitigation protocols as recommended by CDC.

**DATES:** This Order went into effect August 2, 2021.

**FOR FURTHER INFORMATION CONTACT:**
Tiffany Brown, Deputy Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H21–10, Atlanta, GA 30329. Phone: 404–639–7000. Email: *cdcregulations@cdc.gov*.

**SUPPLEMENTARY INFORMATION:** CDC has determined that an Order under 42 U.S.C. 265 remains necessary to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States during the COVID–19 public health emergency. This Order reflects the current, highly dynamic conditions regarding COVID–19, including variants of concern and levels of vaccination, as well as evolving circumstances specific to the U.S. borders. As facts change, CDC may further modify the Order. This Order will remain in place until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or the CDC Director determines that the danger of further introduction of COVID–19 into the United States has declined such that continuation of the Order is no longer necessary to protect public health, whichever occurs first. The circumstances necessitating the Order will be reassessed at least every 60 days. This Order continues the suspension of the right to introduce "covered noncitizens," [1] into the United States

along the U.S. land and adjacent coastal borders. In recognition of the specific COVID–19 mitigation measures available in facilities providing care for Unaccompanied Noncitizen Children (UC), CDC excepted UC from the October Order [2] on July 16, 2021 (July Exception) and continues that exception herein.[3] In addition, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID–19 mitigation protocols as recommended by CDC.

A copy of the Order is provided below, and a copy of the signed Order can be found at *https://www.cdc.gov/coronavirus/2019-ncov/downloads/CDC-Order-Suspending-Right-to-Introduce-_Final_8-2-21.pdf.*

---

(regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE.

[2] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order) and subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

[3] Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf* (July 16, 2021); *see* 86 FR 38717 (July 22, 2021). The July Exception relating to UC is hereby made a part of this Order and incorporated by reference as if fully set forth herein.

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC)

### Order Under Sections 362 & 365 of the Public Health Service Act

### (42 U.S.C. 265, 268) and 42 CFR 71.40

### Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists

### Executive Summary

The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), is hereby replacing and superseding the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order). The instant Order continues the suspension of the right to introduce "covered noncitizens," as defined herein,[4] into the United States along the U.S. land and adjacent coastal borders. In recognition of the specific COVID–19 mitigation measures available in facilities providing care for Unaccompanied Noncitizen Children (UC), CDC excepted UC from the October Order on July 16, 2021 (July Exception) and continues that exception herein.[5] Following an assessment of the current status of the COVID–19 public health emergency and the situation in congregate settings where noncitizens seeking to enter the United States are processed and held, CDC has determined that an Order remains appropriate at this time for all other covered noncitizens as described herein. As outlined below, CDC is continuing an exception for individuals on a case-by-case basis, based on the totality of the circumstances, and is incorporating an additional exception for programs approved by the U.S. Department of Homeland Security (DHS) that incorporate appropriate COVID–19 mitigation protocols as recommended by CDC.

CDC has determined that an Order under 42 U.S.C. 265 remains necessary

---

[4] *See infra* Section III.A.

[5] Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf* (July 16, 2021); *see* 86 FR 38717 (July 22, 2021). The July Exception relating to UC is hereby made a part of this Order and incorporated by reference as if fully set forth herein.

---

[1] The term "covered noncitizens" is defined as persons traveling from Canada or Mexico

to protect U.S. citizens, U.S. nationals, lawful permanent residents, personnel and noncitizens at the ports of entry (POE) and U.S. Border Patrol stations, and destination communities in the United States during the COVID–19 public health emergency. This Order reflects the current, highly dynamic conditions regarding COVID–19, including variants of concern and levels of vaccination, as well as evolving circumstances specific to the U.S. borders. As facts change, CDC may further modify the Order. This Order will remain in place until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or the CDC Director determines that the danger of further introduction of COVID–19 into the United States has declined such that continuation of the Order is no longer necessary to protect public health, whichever occurs first. The circumstances necessitating the Order will be reassessed at least every 60 days.

## Outline of Reassessment and Order

I. Background
  A. Current Status of COVID–19 Public Health Emergency
  B. Public Health Factors Related to COVID–19
  1. Manner of COVID–19 Transmission
  2. Emerging Variants of the SARS–CoV–2 Virus
  3. Risks of COVID–19 Transmission Specific To Congregate Settings
  4. Availability of Testing, Vaccines, and Other Mitigation Measures
  5. Impact on U.S. Communities and Healthcare Resources
II. Public Health Reassessment
  A. Immigration Processing and Public Health Impacts
  B. Public Health Assessment of Single Adults and Family Units
  C. Comparison to Unaccompanied Noncitizen Children
  D. Summary of Findings
III. Legal Basis for the Order
IV. Issuance and Implementation of the Order
  A. Covered Noncitizens
  B. Exceptions
  C. APA, Review, and Termination

## I. Background

Coronavirus disease 2019 (COVID–19) is a quarantinable communicable disease [6] caused by the SARS–CoV–2

---

[6] Quarantinable communicable diseases are any of the communicable diseases listed in Executive Order, as provided under § 361 of the Public Health Service Act (42 U.S.C. 264). 42 CFR 71.1. The list of quarantinable communicable diseases currently includes cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow fever, viral hemorrhagic fevers (Lassa, Marburg, Ebola, Crimean-Congo, South American, and others not yet isolated or named), severe acute respiratory syndromes (including Middle East respiratory syndrome and COVID–19), and influenza caused by novel or reemergent influenza viruses that are

virus. As part of U.S. government efforts to mitigate the introduction, transmission, and spread of COVID–19, CDC issued an Order on October 13, 2020 (October Order), replacing an Order initially issued on March 20, 2020 (March Order),[7] suspending the right to introduce [8] certain persons into the United States from countries or places where the quarantine communicable disease exists in order to protect the public health from an increase in risk of the introduction of COVID–19. The October Order applied specifically to covered noncitizens who would otherwise be introduced into a congregate setting in land or coastal POE or U.S. Border Patrol stations at or near the U.S. borders [9] with Canada and Mexico. On February 17, 2021, CDC published a notice announcing the temporary exception of unaccompanied noncitizen children (UC) [10] encountered in the United States from the October

---

causing, or have the potential to cause, a pandemic. *See* Exec. Order 13295, 68 FR 17255 (Apr. 4, 2003), as amended by Exec. Order 13375, 70 FR 17294 (Apr. 1, 2005) and Exec. Order 13674, 79 FR 45671 (July 31, 2014).

[7] Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 FR 65806 (Oct. 16, 2020). The October Order replaced the Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, issued on March 20, 2020 (March Order), and subsequently extended and amended. Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 FR 22424 (Apr. 22, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020).

[8] *Suspension of the right to introduce* means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States. 42 CFR 71.40(b)(5).

[9] When U.S. Customs and Border Protection (CBP) or the U.S. Department of Homeland Security (DHS) partner agencies encounter noncitizens off the coast closely adjacent to the land borders, it transfers the noncitizens for processing in POE or U.S. Border Patrol stations closest to the encounter. Absent the October Order, such noncitizens would be held in the same congregate settings and holding facilities as any encounters along the land border, resulting in similar public health concerns related to the introduction, transmission, and spread of COVID–19.

[10] As stated in the July Exception, CDC's understanding is that UC are a class of individuals similar to or the same as those individuals who would be considered "unaccompanied alien children" (see 6 U.S.C. 279) for purposes of HHS Office of Refugee Resettlement custody, were DHS to make the necessary immigration determinations under Title 8 of the U.S. Code. 86 FR 38717, 38718 at note 4.

Order.[11] The exception of UC from the October Order was confirmed with the publication of the July Exception.[12]

POE and U.S. Border Patrol stations are operated by U.S. Customs and Border Protection (CBP), an agency within DHS. The March and October Orders were intended to reduce the risk of COVID–19 introduction, transmission, and spread in POE and U.S. Border Patrol stations by significantly reducing the number and density of covered noncitizens held in these congregate settings, thereby reducing risks to U.S. citizens and residents, DHS/CBP personnel and noncitizens at the facilities, and the healthcare systems in local communities overall. Because of the congregate nature of these facilities and the sustained community transmission of COVID–19, including the highly transmissible B.1.617.2 (Delta) variant, in both the United States and migrants' countries of origin and transit, at this time, there continues to be a high risk of COVID–19 outbreaks in these facilities following the introduction of an infected person. Upon reassessment of the current situation with respect to the pandemic and the situation at the U.S. borders, CDC finds an Order under 42 U.S.C. 265 for Single Adults (SA) [13] and Family Units (FMU) [14] remains necessary at this time, as discussed in detail below. CDC also recognizes the availability of testing, vaccines, and other mitigation protocols can minimize risk in this area. As the ability of DHS facilities to employ mitigation measures to address the COVID–19 public health emergency increases, CDC anticipates additional lifting of restrictions.

### A. Current Status of COVID–19 Public Health Emergency

Since late 2019, SARS–CoV–2, the virus that causes COVID–19, has spread throughout the world, resulting in a pandemic. As of July 28, 2021, there have been over 195 million confirmed cases of COVID–19 globally, resulting in over 4.1 million deaths.[15] The United

---

[11] Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Pending Forthcoming Public Health Determination, 86 FR 9942 (Feb. 17, 2021).

[12] *Supra* note 2.

[13] A single adult (SA) is any noncitizen adult 18 years or older who is not an individual in a "family unit," *see infra* note 11.

[14] An individual in a family unit (FMU) includes any individual in a group of two or more noncitizens consisting of a minor or minors accompanied by their adult parent(s) or legal guardian(s). Any statistics regarding FMU count the number of individuals in a family unit rather than counting the groups.

[15] *Coronavirus disease (COVID–19) pandemic,* World Health Organization, *https://covid19.who.int/* (last visited July 28, 2021).

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 22 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 22 of 128   PageID 880

**Federal Register** / Vol. 86, No. 148 / Thursday, August 5, 2021 / Notices **42831**

States has reported over 34 million cases resulting in over 609,000 deaths due to the disease [16] and is currently averaging around 61,976 new cases of COVID–19 a day as of July 27, 2021 with high community transmission.[17] Although several of the key indicators of transmission and spread of COVID–19 in the United States improved during the first half of 2021, variants of concern, particularly the more transmissible Delta variant, have driven a stark increase in COVID–19 cases, hospitalizations, and deaths. COVID–19 cases increased approximately 400% between June 19 and July 28, 2021.[18]

Many countries have begun widespread vaccine administration; however, 78 countries continue to experience high or substantial incidence rates (≥50 cases per 100,000 people in the last seven days) and 123 countries, including the United States, are experiencing an increasing incidence of reported new cases.[19] It is imperative that individuals and communities stay vigilant and that vaccination and other COVID–19 mitigation efforts are maintained. As the Delta variant continues to spread, both the United States and Mexico are experiencing high or substantial incidence rates with 137.9 and 68.6 daily cases per 100,000 persons over a seven-day average, respectively; in Canada, the incidence rate is 8.0. The United States saw a 91.0% increase in new cases over the past week, Mexico experienced a 30.2% increase in new cases. During the same time period, the incidence rate in Canada increased by 14.8%.[20]

COVID–19 was first declared a public health emergency in January 2020 [21] and the U.S. government and CDC have implemented a number of COVID–19 mitigation and response measures since that time. Many of these mitigation measures have involved restrictions on international travel and migration.[22] Other measures have focused on recommending and enforcing COVID–19 mitigation efforts, including physical distancing and mask-wearing.[23] Recent concerns regarding the spread of the Delta variant prompted CDC to release updated guidance calling for vaccinated persons to wear a mask indoors in public when in an area of substantial or high transmission.[24] Furthermore, CDC recommends that all individuals, including those fully vaccinated, continue to wear a well-fitted face mask in correctional and detention facilities.[25]

*B. Public Health Factors Related to COVID–19*

As directed by Executive Order,[26] CDC conducted a comprehensive reassessment of the October Order to determine whether the suspension of the right to introduce certain persons into the United States remains necessary in light of the current circumstances, including the evolving understanding of the epidemiology of COVID–19 variants and available mitigation measures including testing and vaccination.[27] In conducting this reassessment, CDC examined a number of public health factors, and evaluated how these factors impact POE and U.S. Border Patrol stations and the personnel and noncitizens in those facilities. CDC also scrutinized whether the potential impacts varied by category of noncitizen: SA, FMU, and UC. In carrying out its reassessment, CDC evaluated the following public health factors: (1) The manner of COVID–19 transmission, including asymptomatic and pre-symptomatic transmission; (2) the emerging variants of the SARS–CoV–2 virus; (3) the risks specific to the type of facility or congregate setting; (4) the availability of testing and vaccines and the applicability of other mitigation efforts; and (5) the impact on U.S. communities and healthcare resources. CDC views this public health reassessment as setting forth a roadmap toward the safe resumption of normal processing of arriving noncitizens, taking into account COVID–19 concerns and immigration facilities' ability to implement mitigation measures.

---

[16] *COVID Data Tracker,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#datatracker-home* (last visited July 28, 2021).

[17] *United States COVID–19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#cases_community* (last visited July 28, 2021).

[18] Christie A, Brooks JT, Hicks LA, et al. Guidance for Implementing COVID–19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage. MMWR Morb Mortal Wkly Rep. ePub: 27 July 2021. DOI: *http://dx.doi.org/10.15585/mmwr.mm7030e2.*

[19] *See Global Trends, Epidemic Curve trajectory Classification,* WHO, as reported at *https://covid.cdc.gov/covid-data-tracker/#global-trends* (last visited July 28, 2021).

[20] Low/Moderate incidence describes <50 cases per 100,000 people during the past 7 days. Increasing or Decreasing incidence is based on the percentage change in the number of cases reported in the past 7 days compared to the 7 days prior to that (Increasing: >0% change, Decreasing: <0% change).

[21] *Determination that a Public Health Emergency Exists,* U.S. Department of Health and Human Services (Jan. 31, 2020), *https://www.phe.gov/*

*emergency/news/healthactions/phe/Pages/2019-nCoV.aspx* (last visited July 21, 2021). The public health emergency determination has been subsequently renewed at 90-day intervals, most recently on July 28, 2021. *See https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-19July2021.aspx* (last visited July 28, 2021).

[22] The President issued proclamations suspending entry into the United States of immigrants or nonimmigrants who were physically present within a number of countries during the 14-day period preceding their entry or attempted entry into the U.S. *See* Proclamation 9984 (Jan. 31, 2020); Proclamation 9992 (Feb. 28, 2020); Proclamation 10143 (Jan. 25, 2021); and Proclamation 10199 (Apr. 30, 2021). Since March 2020, Canada and Mexico have joined with the U.S. to restrict non-essential travel along land borders to prevent the introduction and spread of the virus that causes COVID–19; these restrictions are in place until at least August 21, 2021. Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the U.S. and Canada, 86 FR 38556 (July 22, 2021); Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the U.S. and Mexico, 86 FR 38554 (July 22, 2021). CDC has also issued orders to mitigate risk of further introducing and spreading SARS CoV–2 and its variants into the United States. *See* Framework for Conditional Sailing and Initial Phase COVID–19 Testing Requirements for Protection of Crew, 85 FR 70153 (Nov. 4, 2020) (outlining the process for the phased resumption of cruise ship passenger operations); Requirement for Negative Pre-Departure COVID–19 Test Result or Documentation of Recovery from COVID–19 for all Airline or Other Aircraft Passengers Arriving into the U.S. from any Foreign Country, 86 FR 7387 (Jan. 28, 2021); and *COVID–19 Travel Recommendations by Destination,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html#travel-1* (last updated July 26, 2021) (COVID–19-related travel recommendations, including 62 Level 4 Travel Health Notices for countries with very high COVID–19 rates).

[23] CDC's Order requiring the wearing of face masks by travelers while on a conveyance entering, traveling within, or departing the United States and in U.S. transportation hubs remains in place for all travelers at indoor settings on public transportation conveyances and at transportation hubs, regardless of vaccination. Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs, 86 FR 8025 (Feb. 3, 2021). *See Requirement for Face Masks on Public Transportation Conveyances and at Transportation Hubs,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html* (last updated June 10, 2021).

[24] *Supra* note 15 (CDC also recommends fully vaccinated persons consider wearing a mask

regardless of transmission level if they or someone in their household is immunocompromised or at increased risk for severe disease, or if someone in their household is unvaccinated (including children currently ineligible for vaccination)); *see also infra* page 11, section 5 (discussion of "high" and "substantial transmission").

[25] *Interim Public Health Recommendations for Fully Vaccinated People,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html* (last updated May 28, 2021).

[26] Exec. Order 14010, "Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border," 86 FR 8267 (Feb. 2, 2021).

[27] CDC's reassessment of the public health situation with respect to covered noncitizens and border facilities relies upon information and data provided by DHS, CBP, and HHS' Office of Refugee Resettlement, including information regarding those entities' policies and practices.

### 1. Manner of COVID–19 Transmission

SARS–CoV–2, the virus that causes COVID–19, spreads mainly from person-to-person through respiratory fluids released during exhalation, such as when an infected person coughs, sneezes, or talks. Exposure to these respiratory fluids occurs in three principal ways: (1) Inhalation of very fine respiratory droplets and aerosol particles, (2) deposition of respiratory droplets and particles on exposed mucous membranes in the mouth, nose, or eye by direct splashes and sprays, and (3) touching mucous membranes with hands that have been soiled either directly by virus-containing respiratory fluids or indirectly by touching surfaces with virus on them.[28] Spread is more likely when people are in close contact with one another (within about 6 feet), especially in crowded or poorly ventilated indoor settings. Unvaccinated persons with asymptomatic and pre-symptomatic infection are significant contributors to community SARS–CoV–2 transmission and occurrence of COVID–19.[29] Asymptomatic cases are currently believed to represent roughly 30% of all COVID–19 infections and the infectiousness of asymptomatic individuals is believed to be about 75% of the infectiousness of symptomatic individuals. CDC's current best estimate is that 50% of infections are transmitted prior to symptom onset (pre-symptomatic transmission).[30] Although rare, as discussed below, breakthrough infections may occur in vaccinated individuals. Due to the variety of source of spread—transmission by asymptomatic, pre-symptomatic, symptomatic, and vaccinated individuals—testing is critical to identify those infected with COVID–19.

Among those who are not vaccinated, serious COVID–19 illness necessitating treatment occurs with greater frequency in older adults and those with certain pre-existing conditions.[31] Although children can be infected with SARS–CoV–2, get sick from COVID–19, and spread the virus to others, when compared with adults, children and adolescents who have COVID–19 are more commonly asymptomatic or have mild, non-specific symptoms. Children are less likely to develop severe illness or die from COVID–19.[32] They typically present with mild symptoms, if any, and have a good prognosis, recovering within one to two weeks after disease onset.[33]

### 2. Emerging Variants of the SARS–CoV–2 Virus

Like all viruses, SARS–CoV–2 constantly changes through mutation as it circulates, resulting in new virus variants over time.[34] Unchecked transmission of SARS–CoV–2 may result in increased viral mutations and the emergence of new variants. New variants of SARS–CoV–2 have emerged globally,[35] several of which have been identified as variants of concern,[36] including the Alpha, Beta, Gamma, and Delta variants. These variants of concern have evidence of an increase in transmissibility and more severe disease, which may lead to higher incidence, hospitalization, and death rates among exposed persons.[37] Furthermore, findings suggest variants may reduce levels of neutralization by antibodies generated during previous infection or vaccination, resulting in reduced effectiveness of treatments or vaccines, or increased diagnostic detection failures.[38] The ultimate concern is a variant that substantially decreases the effectiveness of available vaccines against severe or deadly disease.

Currently, the Delta variant is the predominant SARS–CoV–2 strain circulating in the United States, accounting for over 82% of cases as of July 17, 2021.[39] Of critical significance for this Order, the Delta variant has demonstrated increased levels of transmissibility among unvaccinated persons and might increase the risk of vaccine breakthrough infections in the absence of other mitigation strategies.[40] For the unvaccinated, Delta remains a formidable threat and rates of infection of the Delta variant are growing more rapidly in U.S. counties with lower vaccination rates.[41] Available evidence suggests all three vaccines currently authorized for emergency use in the United States provide significant protection against variants circulating in the United States.[42] However, a small

---

[28] *Scientific Brief: SARS–CoV–2 Transmission,* Centers for Disease Control and Prevention (May 7, 2021), *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html; Science Brief: SARS–CoV–2 and Surface (Fomite) Transmission for Indoor Community Environments,* Centers for Disease Control and Prevention (Apr. 5, 2021), *https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html.*

[29] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID–19 outbreaks. *Proc Natl Acad Sci U S A.* 2020;117(30):17513–17515.10.1073/pnas.2008373117, available at *https://www.ncbi.nlm.nih.gov/pubmed/32632012; Johansson MA, Quandelacy TM, Kada S, et al. SARS–CoV–2 Transmission From People Without COVID–19 Symptoms. Johansson MA, et al. JAMA Netw Open.* 2021 January4;4(1):e2035057. doi: 10.1001/jamanetworkopen.2020.35057.

[30] *COVID–19 Pandemic Planning Scenarios,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html* (last visited July 28, 2021).

[31] *People at Increased Risk and Other People Who Need to Take Extra Precautions,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html* (last updated Apr. 20, 2021).

[32] *Science Brief: Transmission of SARS–CoV–2 in K–12 Schools and Early Care and Education Programs—Updated,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/transmission_k_12_schools.html* (last updated July 9, 2021).

[33] *See* Leeb RT, Price S, Sliwa S, et al. COVID–19 Trends Among School-Aged Children—United States, March 1–September 19, 2020. MMWR Morb Mortal Wkly Rep 2020;69:1410–1415. DOI: *http://dx.doi.org/10.15585/mmwr.mm6939e2;* Leidman E, Duca LM, Omura JD, Proia K, Stephens JW, Sauber-Schatz EK. COVID–19 Trends Among Persons Aged 0–24 Years—United States, March 1–December 12, 2020. MMWR Morb Mortal Wkly Rep 2021;70:88–94. DOI: *http://dx.doi.org/10.15585/mmwr.mm7003e1;* Rankin DA, Talj R, Howard LM, Halasa NB. Epidemiologic trends and characteristics of SARS–CoV–2 infections among children in the United States. Curr Opin Pediatr. 2021 Feb 1;33(1):114–121. doi: 10.1097/MOP.0000000000000971. PMID: 33278112; PMCID: PMC8011299; and Castagnoli R, Votto M, Licari A, et al. Severe Acute Respiratory Syndrome Coronavirus 2 (SARS–CoV–2) Infection in Children and Adolescents: A Systematic Review. JAMA Pediatr. 2020;174(9):882–889. doi:10.1001/jamapediatrics.2020.1467.

[34] *About Variants of the Virus that Causes COVID–19,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html* (last updated Apr. 2, 2021).

[35] Abdool Karim SS, de Oliveira T. New SARS–CoV–2 Variants—Clinical, Public Health, and Vaccine Implications [published online ahead of print, 2021 Mar 24]. *N Engl J Med.* 2021;10.1056/NEJMc2100362. doi:10.1056/NEJMc2100362.

[36] *Id.*

[37] Dougherty K, Mannell M, Naqvi O, Matson D, Stone J. SARS–CoV–2 B.1.617.2 (Delta) Variant COVID–19 Outbreak Associated with a Gymnastics Facility—Oklahoma, April–May 2021. MMWR Morb Mortal Wkly Rep 2021;70:1004–1007. DOI: *http://dx.doi.org/10.15585/mmwr.mm7028e2* (describing a B.1.617.2 (Delta) Variant COVID–19 outbreak associated with a gymnastics facility and finding that the Delta variant is highly transmissible in indoor sports settings and households, which might lead to increased incidence rates).

[38] *SARS–CoV–2 Variant Classifications and Definitions,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-info.html#Concern* (last updated June 29, 2021).

[39] *Variant Proportions,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#variant-proportions* (citing data for the two-week interval ending July 17, 2021).

[40] *About Variants of the Virus that Causes COVID–19,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html* (last updated June 28, 2021).

[41] COVID Data Tracker Weekly Review, Interpretive Summary for July 23, 2021, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html* (attributing rising numbers of COVID–19 cases in nearly 90% of U.S. jurisdictions to the rapid spread of the Delta variant).

[42] *Science Brief: COVID–19 Vaccines and Vaccination,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html* (last updated May 27, 2021). Other vaccines, particularly the one manufactured by AstraZeneca, show reduced efficacy against

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 24 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 24 of 128   PageID 882

**Federal Register**/Vol. 86, No. 148/Thursday, August 5, 2021/Notices **42833**

proportion of people who are fully vaccinated may become infected with the Delta variant (known as breakthrough infection); emerging evidence suggests that fully vaccinated persons who do become infected with the Delta variant are at risk for transmitting it to others.[43]

CDC continues to monitor the situation and may adapt recommendations based on the epidemiology of variants of concern. Given the transmissibility of variant strains and the continued emergence of new variants, ongoing monitoring of vaccine effectiveness is needed to identify mutations that could render vaccines most commonly used in the United States less effective against more transmissible variants.[44]

### 3. Risks of COVID–19 Transmission Specific to Congregate Settings

Given the manner of transmission, including asymptomatic or pre-symptomatic transmission, the risk of spreading COVID–19 is particularly pronounced among those who are unvaccinated, partially vaccinated, or vaccinated with less effective vaccines.[45] This risk is acutely present in congregate settings, where a number of people reside, meet, or gather in close proximity for either a limited or extended period of time.[46] Facilities must often carefully weigh the risks of increased transmission not only in the facilities, but also in the local community, due to secondary transmission. These congregate facilities must also consider individual facility

and community characteristics (*e.g.,* ability to maintain physical distancing, compliance with universal mask-use policies, ability to properly ventilate, proportion of staff and occupants vaccinated, numbers of those who are at increased risk for severe illness from COVID–19, the availability of resources for broad-based vaccination, testing, and outbreak response, and level of community transmission).[47]

Congregate settings, particularly detention facilities with limited ability to provide adequate physical distancing and cohorting, have a heightened risk of COVID–19 outbreaks.[48] CDC has long recognized the risks specific to such settings, including homeless shelters, detention centers, schools, and workplaces and has provided a number of guidance documents to address the concerns in such spaces. Specifically, CDC developed interim guidance for law enforcement agencies that have custodial authority for detained populations, including civil and pre-trial detention settings. Among the recommendations are physical distancing strategies, isolation of individuals with confirmed or suspected COVID–19, quarantine of close contacts, cohorting of individuals when space is limited, testing, healthcare evaluations for individuals with suspected COVID–19, clinical care as needed for individuals with confirmed or suspected COVID–19, and addressing specific considerations for people who are at increased risk for severe illness.[49]

Vaccine coverage in congregate settings varies and infection risk is greater where there is sustained community transmission.[50] In light of

this, CDC strongly recommends vaccination against COVID–19 for everyone who is eligible, including people who are incarcerated or detained and staff at correctional and detention facilities.[51] CDC is discussing additional guidance with DHS, highlighting the key metrics to consider before modifying COVID–19 prevention and mitigation measures in facilities that hold or detain migrants.[52]

### 4. Availability of Testing, Vaccines, and Other Mitigation Measures

The potential for asymptomatic and pre-symptomatic transmission makes testing an essential part of COVID–19 mitigation protocols. With the additional testing capacity available through antigen tests, rapid testing can be implemented to identify infected persons so they can be isolated until they no longer pose a risk of spreading infections and their close contacts can be identified and quarantined.[53] Testing is especially important in congregate settings where even a single asymptomatic case can trigger an outbreak that may quickly exceed a facility's capacity to isolate and quarantine residents. Furthermore, if personnel are infected or exposed, the number of available staff members may be reduced, further stressing facility operations. Testing facility residents and personnel can help facilitate prompt mitigation actions.

COVID–19 vaccines are now widely available in the United States, and vaccination is recommended for all people 12 years of age and up. Three COVID–19 vaccines are currently authorized by the U.S. Food and Drug Administration (FDA) for emergency use: Two mRNA vaccines (produced by Pfizer-BioNTech and Moderna) and one viral vector vaccine (produced by

---

infection with certain variants but may still protect against severe disease; at the time of the issuance of this Order, the FDA has not authorized the AstraZeneca COVID–19 vaccine for use in the United States.

[43] *Supra* note 15.

[44] *See About Variants of the Virus that Causes COVID–19, supra* note 37.

[45] Vaccines with effectiveness of less than 50% against wildtype strains of COVID–19 are considered less effective.

[46] Notably, COVID–19 has disproportionately affected persons in congregate settings and high-density workplaces. Studies conducted prior to the availability of vaccines showed that a single introduction of SARS–CoV–2 into a facility can result in a widespread outbreak. Lehnertz NB, Wang X, Garfin J, Taylor J, Zipprich J, VonBank B, et al. Transmission Dynamics of Severe Acute Respiratory Syndrome Coronavirus 2 in High-Density Settings, Minnesota, USA, March–June 2020. Emerg Infect Dis. 2021;27(8):2052–2063. *https://doi.org/10.3201/eid2708.204838.* Whole genome sequencing of samples taken following an outbreak at a correctional facility demonstrated that 92.2% of the samples taken from patients were genetically related, indicating that a single case had likely led to the infection of 48 individuals. Similarly, phylogenetic analysis established that 29.6% of cases from an outbreak at a second correctional facility were closely related and genetically identical, indicating that the index case had led to the infection of approximately 60 others.

[47] *See Recommendations for Quarantine Duration in Correctional Facilities,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/quarantine-duration-correctional-facilities.html* (last visited July 28, 2021).

[48] Since March 31, 2020, the U.S. Federal Bureau of Prisons and state departments of corrections have together recorded 416,854 COVID–19 cases among residents and 108,945 cases among staff in correctional and detention facilities, resulting in 2,911 deaths. *Confirmed COVID–19 Cases and Deaths in U.S. Correctional and Detention Facilities by State,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#correctional-facilities* (last visited July 28, 2021).

[49] *See* Guidance for Correctional & Detention Facilities, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html* (last updated June 9, 2021).

[50] Falk A, Benda A, Falk P, Steffen S, Wallace Z, Høeg TB. *COVID-19 Cases and Transmission in 17 K–12 Schools—Wood County, Wisconsin, August 31–November 29, 2020.* MMWR Morb Mortal Wkly Rep 2021;70:136–140. DOI: *http://dx.doi.org/10.15585/mmwr.mm7004e3. See also* Link-Gelles R,

DellaGrotta AL, Molina C, et al. *Limited Secondary Transmission of SARS–CoV–2 in Child Care Programs—Rhode Island, June 1–July 31, 2020.* MMWR Morb Mortal Wkly Rep 2020;69:1170–1172. DOI: *http://dx.doi.org/10.15585/mmwr.mm6934e2.*

[51] *COVID-19 Vaccine FAQs in Correctional and Detention Centers,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/vaccine-faqs.html* (last updated June 1, 2021).

[52] *See* CDC memo to DHS ''Considerations for modifying COVID–19 prevention and mitigation measures in Department of Homeland Security migrant holding facilities in response to declining transmission,'' Centers for Disease Control and Prevention (last updated June 11, 2021).

[53] *See* COVID–19 Testing and Diagnostics Working Group (TDWG). U.S. Department of Health and Human Services, *https://www.hhs.gov/coronavirus/testing/testing-diagnostics-working-group/index.html* (last visited July 28, 2021) (defining the role of the COVID–19 TDWG, which develops testing-related guidance and provides targeted investments to expand the available testing supply and maximize testing capacity).

Johnson & Johnson/Janssen), each of which has been determined to be safe and effective against COVID–19. As of July 28, 2021, over 163 million people in the United States (57.6% of the population 12 years or older) have been fully vaccinated and over 189 million people in the United States (66.8% of the population 12 years or older) have received at least one dose.[54] After substantial vaccine uptake in the first months of 2021, however, vaccination uptake has plateaued, particularly in those under the age of 65 years.[55] The combination of reduced vaccine uptake and the extreme transmissibility of the Delta variant has resulted in rising numbers of COVID–19 cases, primarily and disproportionately affecting the unvaccinated population.

The availability of COVID–19 vaccines is rising globally but still dwarfed by the rates of vaccination in the United States and a handful of other countries.[56] Countries of origin for the majority of incoming covered noncitizens have markedly lower vaccination rates.[57] Given this, the increased movement of typically unvaccinated covered noncitizens into the United States presents a heightened risk of morbidity and mortality to this population due to the congregate holding facilities at the border and the

practical constraints on implementation of mitigation measures in such facilities. Outbreaks in these settings increase the serious danger of further introduction, transmission, and spread of COVID–19 and variants into the country.

CDC is aware of a rising number of breakthrough SARS–CoV–2 infections[58] in vaccinated individuals; even without variants of concern, more vaccine breakthroughs are to be expected due to the rising number of vaccinated individuals. While the vaccines currently authorized by the FDA are successful in mitigating severe illness from the highly transmissible Delta variant, infection and even mild to moderate illness has been documented in a small percentage of vaccinated persons.[59] The emergence of these more transmissible variants increases the urgency to expand vaccination coverage for everyone and especially those in densely populated congregate settings.[60] Public health agencies and other organizations must collaboratively monitor the status of the pandemic in their communities. As widespread vaccination efforts continue, ongoing use of the full panoply of mitigation measures is nevertheless especially important in congregate settings and remains key to slowing introduction, transmission, and spread of COVID–19.

**5. Impact on U.S. Communities and Healthcare Resources**

COVID–19 cases are on the rise in nearly 90% of U.S. jurisdictions, and multiple outbreaks are occurring in parts of the country that have low vaccination coverage. A person's risk for SARS–CoV–2 infection is directly related to the risk for exposure to infectious persons, which is largely determined by the extent of SARS–CoV–2 circulation in the surrounding community. Emerging evidence regarding the Delta variant finds that it is more than two times as transmissible as the original strains of SARS–CoV–2 circulating at the start of the pandemic. In light of this, CDC recommends assessing the level of community transmission using, at a minimum, two

metrics: New COVID–19 cases per 100,000 persons in the last 7 days and percentage of positive SARS–CoV–2 diagnostic nucleic acid amplification tests in the last 7 days. For each of these metrics, CDC classifies transmission values as low, moderate, substantial, or high. At the time of this Order's issuance, over 70% of the U.S. counties along the U.S.-Mexico border were classified as experiencing high or substantial levels of community transmission.[61] In areas of substantial or high transmission, CDC recommends community leaders encourage vaccination and universal masking in indoor public spaces in addition to other layered prevention strategies to prevent further spread.

Between March and June 2021, rates of hospitalization due to COVID–19 decreased dramatically, easing long endured pressures on the U.S. healthcare system. However, in July 2021, with the rise of the Delta variant, the seven-day average for new hospital admissions in the United States increased 35.8% over the prior seven-day period.[62] Rates of hospitalization are rising most sharply in areas with low vaccination coverage.[63] CDC recommends continuous monitoring of the availability of staffed inpatient and intensive care unit beds, as data on usage of clinical care resources to manage patients with COVID–19 reflect underlying community disease incidence. This information can signal when urgent implementation of layered prevention strategies might be necessary to prevent overloading local and regional health care systems. Strains on

---

[54] *COVID–19 Vaccinations in the United States,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#vaccinations* (last updated July 28, 2021).

[55] Diesel J, Sterrett N, Dasgupta S, et al. COVID–19 Vaccination Coverage Among Adults—United States, December 14, 2020–May 22, 2021. MMWR Morb Mortal Wkly Rep 2021;70: 922–927. DOI: *http://dx.doi.org/10.15585/mmwr.mm7025e1.* The study found that the lowest vaccination coverage and the intent to be vaccinated among adults aged 18–24 years, non-Hispanic Black adults, and individuals with less education, no insurance, and lower household incomes. Concerns about vaccine safety and effectiveness were commonly cited barriers to vaccination. *See also supra* note 15 (finding that vaccine uptake has slowed nationally with wide variation in coverage by state (range = 33.9%–67.2%) and by county (range = 8.8%–89.0%)).

[56] *See* "PAHO Director calls for fair and broad access to COVID–19 vaccines for Latin America and the Caribbean," Pan American Health Organization, *https://www.paho.org/en/news/7-7-2021-paho-director-calls-fair-and-broad-access-covid-19-vaccines-latin-america-and* (July 7, 2021) (noting the discrepancies in vaccine availability coverage among North, Central, and South American countries).

[57] Thus far in 2021, Ecuador, El Salvador, Guatemala, Honduras, and Mexico constitute the top five countries of origin for covered noncitizens. Rates of vaccination for each country are as follows: Ecuador: 11% fully vaccinated, 30% only partly vaccinated; El Salvador: 22% fully vaccinated, 17% only partly vaccinated; Guatemala: 1.6% fully vaccinated, 5.3% only partly vaccinated; Honduras: 1.8% fully vaccinated, 12% only partly vaccinated; Mexico: 18% fully vaccinated, 14% only partly vaccinated, *https://ourworldindata.org/covid-vaccinations* (last visited July 24, 2021).

[58] A vaccine breakthrough infection is defined as the detection of SARS–CoV–2 RNA or antigen in a respiratory specimen collected from a person ≥14 days after receipt of all recommended doses of an FDA-authorized COVID–19 vaccine. COVID–19 Vaccine Breakthrough Infections Reported to CDC—United States, January 1–April 30, 2021. MMWR Morb Mortal Wkly Rep 2021;70:792–793. DOI: *http://dx.doi.org/10.15585/mmwr.mm7021e3.*

[59] *COVID–19 Vaccine Breakthrough Case Investigation and Reporting,* Centers for Disease Control and Prevention, *https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html* (last updated July 15, 2021).

[60] *Supra* at note 55.

[61] Of the 22 U.S. counties along the U.S.-Mexico border, 13 counties are experiencing high levels of community transmission (San Diego County, CA; Hidalgo County, NM; Presidio County, TX; Brewster County, TX; Terrell County, TX; Val Verde County, TX; Kinney County, TX; Maverick County, TX; Webb County, TX; Zapata County, TX; Starr County, TX; Hidalgo County, TX; and Cameron County, TX) and four counties are experiencing substantial levels of community transmission (Imperial County, CA; Pima County, AZ; Santa Cruz County, AZ; and Luna County, NM). Five counties are experiencing moderate levels of community transmission (Yuma County, AZ; Cochise County, AZ; Dona Ana County, NM; El Paso County, TX; and Hudspeth County, TX). No counties along the border are experiencing low levels of community transmission. *COVID–19 Integrated County View,* Centers for Disease Control and Prevention, *https://covid.cdc.gov/covid-data-tracker/#county-view* (last updated July 28, 2021).

[62] COVID Data Tracker Weekly Review, Interpretive Summary for July 16, 2021, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07162021.html* (last visited July 28, 2021).

[63] COVID Data Tracker Weekly Review, Interpretive Summary for July 9, 2021, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07092021.html.*

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 26 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 26 of 128   PageID 884

**Federal Register** / Vol. 86, No. 148 / Thursday, August 5, 2021 / Notices    **42835**

critical care capacity can increase COVID–19 mortality while decreasing the availability and use of health care resources for non-COVID–19 related medical care.[64] Increased hospital admissions are forecasted in the coming weeks as the Delta variant continues to predominate.[65]

The rapid spread of the highly transmissible Delta variant is leading to worrisome trends in healthcare and community resources. Signs of stress are already present in the southern regions of the United States.[66] Ultimately, the flow of migration directly impacts not only border communities and regions, but also destination communities and the healthcare resources of both. In light of this, the totality of the U.S. community transmission, health system capacity, and public health capacity, as well as local capacity to implement mitigation protocols, are important considerations when reassessing the need for this Order.[67]

## II. Public Health Reassessment

### A. Immigration Processing and Public Health Impacts

Noncitizens arriving in the United States who lack proper travel documents, whose entry is otherwise contrary to law, or who are apprehended at or near the border seeking to unlawfully enter the United States between POE are normally subject to initial immigration processing by CBP in POE facilities and U.S. Border Patrol stations. Absent CDC's issuance of an order under 42 U.S.C. 265 directing otherwise, immigration processing takes place pursuant to Title 8 of the U.S. Code. Although some number of inadmissible noncitizens present at POE, the vast majority are encountered by CBP between POE.[68] Upon such encounters, Border Patrol agents conduct an initial field assessment and transport the

individuals to a CBP facility for intake processing.[69]

CBP facilities are designed to provide this short-term intake processing and are thus space-constrained.[70] While undergoing intake processing under Title 8 at CBP facilities, noncitizens are regularly held in close proximity to one another anywhere from several hours to several days. Depending on the outcome of intake processing, a noncitizen is generally referred to the DHS' Immigration and Customs Enforcement (ICE), where they are often subject to longer-term detention.[71][72]

Compared to CBP facilities, ICE facilities have space allocations similar to traditional long-term correctional facilities. Still, during migratory surges, capacity constraints hinder CBP and ICE operations and facilities alike. If downstream ICE operations and facilities reach capacity limits, ICE may be unable to take custody of additional noncitizens in a timely manner. When this movement of noncitizens from CBP to ICE custody is impeded or delayed, noncitizens may remain in CBP's densely populated, short-term holding facilities for much longer periods. Of note, the United States is currently experiencing such a migratory surge of noncitizens attempting to enter the country at and between POE at the southern border.[73] DHS has already recorded more encounters this fiscal year to date than the approximate 977,000 encounters in the whole of FY 2019.[74]

CBP has implemented a variety of mitigation efforts to prevent the spread of COVID–19 in POE and U.S. Border Patrol facilities based on the infection prevention strategy referred to as the

hierarchy of controls.[75] CBP has invested in engineering upgrades, such as installing plexiglass dividers in facilities where physical distancing is not possible and enhancing ventilation systems. All CBP facilities adhere to CDC guidance for cleaning and disinfection. Surgical masks are provided to all persons in custody and are changed at least daily and if or when they become wet or soiled. Personal protective equipment (PPE) and guidance are regularly provided to CBP personnel. Recognizing the value of vaccination, CBP is encouraging vaccination among its workforce. All noncitizens brought into CBP custody are subject to health intake interviews, including COVID–19 screening questions and temperature checks. If a noncitizen in custody displays symptoms of COVID–19 or has a known exposure, CBP facilitates referral to the local healthcare system for testing. Finally, in the event CBP decides to release a noncitizen prior to removal proceedings, the agency has coordinated with local governments and non-governmental organizations to arrange COVID–19 testing at release.[76]

In addition to these mitigation measures, enhanced physical distancing and cohorting remain key to preventing transmission and spread of COVID–19, particularly in congregate settings. To address this, as the pandemic emerged, CBP greatly reduced capacity in their holding facilities. While U.S. Border Patrol facilities along the southern border currently have a non-pandemic total holding capacity of 14,553 individuals, implementation of mitigation measures led to a 50–75% reduction in holding capacity depending on the design of a given facility, resulting in COVID-constrained holding capacity of 4,706.[77] However, the current surge has caused CBP to exceed COVID-constrained capacity and routinely exceed its non-COVID capacity.[78] From July 3 to July 24, 2021,

---

[64] *Supra* note 15.

[65] COVID–19 Forecasts: Hospitalizations, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/hospitalizations-forecasts.html* (last updated July 21, 2021).

[66] *See* COVID Data Tracker: New Hospital Admissions, *https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions* (last updated July 22, 2021) (showing HHS Regions 4, 6, and 9, encompassing all southern states, experiencing increased rates of new admissions of COVID–19-confirmed patients).

[67] *See Implementation of Mitigation Strategies for Communities with Local COVID–19 Transmission,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/community-mitigation.html* (last visited May 6, 2021).

[68] Fiscal year to date, 96% (1,076,242 of 1,119,204) of encounters of noncitizens occurred between POE.

[69] CBP facilities include POE, U.S. Border Patrol stations, and facilities managed by the Office of Field Operations.

[70] CBP facilities were designed for the immediate processing of persons and are statutorily designated as short-term (less than 72 hours) holding facilities. 6 U.S.C. 211(m).

[71] FMU transferred to ICE custody are generally held at a Family Staging Center (FSC). Following intake processing, UC are referred to the Office of Refugee Resettlement (ORR) within HHS' Administration for Children and Families (ACF) for care.

[72] While CBP policies regarding transfer and release decisions are the same across the Southwest Border, implementation varies based on local CBP capacity, and ICE capacity.

[73] According to data from DHS, encounters at the southern border have been rising since April 2020 due to several factors, including ongoing violence, insecurity, and famine in the Northern Triangle countries of Central America (El Salvador, Honduras, Guatemala).

[74] *Southwest Land Border Encounters,* U.S. Customs and Border Protection, available at *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited July 28, 2021).

[75] *Hierarchy of Controls,* Centers for Disease Control and Prevention, available at *https://www.cdc.gov/niosh/topics/hierarchy/default.html* (last visited July 6, 2021). The hierarchy of controls is used as a means of determining how to implement feasible and effective control solutions. The hierarchy is outlined as: (1) Elimination (physically remove the hazard); (2) Substitution (replace the hazard); (3) Engineering Controls (isolate people from the hazard); (4) Administrative Controls (change the way people work); and (5) PPE (protect people with Personal Protective Equipment).

[76] This is also true of ICE facilities.

[77] Similarly, the operational holding capacity for SA in ICE facilities was reduced by 30% from a regular total capacity of 56,888 beds to 39,821 beds.

[78] Non-COVID–19 holding capacity was exceeded as recently as July 25, 2021.

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 27 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 27 of 128   PageID 885

**42836**   **Federal Register** / Vol. 86, No. 148 / Thursday, August 5, 2021 / Notices

CBP encountered an average of 3,573 SA and 2,479 FMU daily, over a 21-day period, even with the CDC Order in place. This extreme population density and the resulting increased time spent in custody by noncitizens presents a serious risk of increased COVID–19 transmission in CBP facilities.

CBP faces unique challenges in implementing certain COVID–19 mitigation measures. All individuals encountered by U.S. Border Patrol must be processed in CBP facilities. Not only does this involve close and often continuing contact between CBP personnel and noncitizens, but CBP is further constrained by requirements separate noncitizens within its holding facilities according to specific permutations.[79] These cohorting requirements significantly complicate CBP's ability to address COVID–19-related risks, as CBP facility capacity to accommodate COVID–19 mitigation protocols may not always align with the makeup of the incoming population of noncitizens and the categorical separations required of DHS.

Immigration Processing Under Title 8 of the U.S. Code

The vast majority of noncitizens attempting to enter the United States without proper travel documents are SA; SA account for 68% of overall CBP encounters this fiscal year as of July 26, 2021. Under normal Title 8 immigration processes, SA are transferred to ICE custody pending removal proceedings. As noted above, absent expulsions directed by an order under 42 U.S.C. 265, SA presenting at POE or attempting entry between POE would be processed and held in CBP facilities while awaiting transfer to ICE. Generally, CBP only releases SA into U.S. communities as a last resort, due to severe overcrowding and when all possible detention options have been explored.

A smaller percentage, 23%, of noncitizens encountered by CBP are members of an FMU.[80] As with SA, CBP has limited capacity to hold FMU. Under Title 8, due to court-ordered restrictions that largely prohibit the long-term detention of families, FMU are generally released from DHS custody pending removal proceedings. Prior to release, some FMU are transferred from CBP custody to Family Staging Centers (FSC) operated by ICE. Only a limited number of FMU may be held in an FSC, and time in custody for an FMU is

generally about 2–3 days before being released. FSC capacity is further limited by COVID–19 mitigation protocols.[81]

Releasing FMU to communities necessitates robust testing, vaccination where possible, and careful attention to consequence management (*e.g.*, facilities for isolation and quarantine). DHS has partnered with state and local agencies and non-governmental organizations to facilitate COVID–19 testing of FMU upon release from CBP custody. Pursuant to these arrangements, CBP generally transports FMU to release locations where partner agencies and organizations are on-site to provide testing and facilitate consequence management. Although the implementing partners and their capacities (including for consequence management such as housing) vary, the objectives are constant. These resources, however, are limited. They are already stretched thin, and certainly not available for all FMU who would be processed under Title 8 in the absence of an order issued under 42 U.S.C. 265. DHS has committed to supporting and, where possible, expanding these efforts, including exploring the incorporation of vaccination into this model. CDC strongly supports DHS efforts that include broad-based testing and vaccination.

Immigration Processing With an Order Under 42 U.S.C. 265

Following the issuance of the March and October Orders, covered noncitizens apprehended at or near U.S. borders, regardless of their country of origin, generally were expelled to Mexico or Canada, whichever they entered from, via the nearest POE, or to their country of origin. Where possible, SA and FMU eligible for expulsion based on the March and October Orders have been processed pursuant to the Title 42 authority, unless a case-by-case exception was made by DHS.[82]

Even with the March and October Orders in place, a significant percentage of FMU were unable to be expelled pursuant to the order, given a range of factors, including, most notably, restrictions imposed by foreign governments.[83] For example, the Mexican government has placed certain nationality- and demographic-specific restrictions on the individuals it will accept for return via the Title 42 expulsion process. With limited exceptions, the Mexican government will only accept the return of Mexican and Northern Triangle nationals. Moreover, along sections of the border, Mexican officials refuse to accept the return of any non-Mexican family with children under the age of seven, greatly reducing DHS' ability to expel FMU. In addition, many countries impose travel requirements, including COVID–19 testing, consular interviews, and identity verification that can delay repatriation. These added requirements often make prompt expulsion a practical impossibility. Conversely, DHS continues to be able to process the majority of SA under Title 42.[84] In those cases where Title 42 processing is not possible, SA and FMU are instead processed pursuant to Title 8. Processing noncitizens and issuing a Notice to Appear under Title 8 processes takes approximately an hour and a half to two hours per person. Conversely, processing an individual for expulsion under the CDC order takes roughly 15 minutes and generally happens outdoors.

The March and October Orders permitted noncitizens to be promptly returned to their country of origin, rather than being transferred to ICE custody or released into the United States, resulting in noncitizens spending shorter amounts of time in custody at CBP facilities. However, as the number of noncitizens attempting to enter the United States has surged and as individuals cannot be expelled pursuant to Title 42 given the restrictions in place, the time in custody at CBP facilities has increased for SA and FMU, even with the October Order in place. As of July 29, 2021, the current average time in custody at CBP facilities for SA

---

[79] For example, criminal cases must be held separately from administrative cases, SA must be separated by gender identity, FMU and UC must be separated from SA, and all vulnerable individuals must be protected from harm.

[80] Thus far this fiscal year, as of July 26, 2021.

[81] The total capacity for these FSCs is 3,230. However, due to COVID–19 mitigation protocols and family composition limitations, current operational capacity for the FSCs is approximately 2,400. In July 2021, due to an influx of single adults at the SWB, ICE ceased intake of family units at one of the FSCs and began to transition the facility to hold single adults. With this transition, the remaining COVID-limited FSC capacity for family units is approximately 1,800. Additionally, ICE has procured 1,200 additional beds at Emergency Family Staging Centers (EFSCs); this bed space is not limited by family composition or COVID–19.

[82] Some countries have put in place limitations that make expulsion pursuant to Title 42 inapplicable. The October Order excepted covered noncitizens "who must test negative for COVID–19 before they are expelled to their home country" and several countries refuse to accept the return of SA and FMU and other individuals unless DHS first secures a negative test result for each individual to be returned. These noncitizens are thus not covered

by the prior Order and thus cannot be expelled pursuant to Title 42. See 85 FR at 65807.

[83] Only 33% of FMU encountered fiscal year to date have been expelled under Title 42 and this percentage has fallen over time. In June 2021, only 14% of FMU were expelled under Title 42, an average of approximately 300 per day.

[84] Fiscal year to date, 89% of SA have been expelled under Title 42. This percentage has fallen slightly as the constraints on expelling individuals have increased. In June 2021, 82% of SA were expelled under Title 42, an average of over 3,000 per day.

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 28 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 28 of 128   PageID 886
**Federal Register** / Vol. 86, No. 148 / Thursday, August 5, 2021 / Notices   **42837**

not subject to expulsion under the October Order is 50 hours. FMU currently spend an average of 62 hours in CBP custody prior to release or transfer to ICE. If the CDC Order were not in place, both SA and FMU time in custody would likely increase significantly.

*B. Public Health Assessment of Single Adults and Family Units*

Implementation of CDC's March and October Orders significantly reduced the length of time covered noncitizen SA and FMU are held in congregate settings at POE and U.S. Border Patrol stations, as well as in the ICE facilities that subsequently hold noncitizens.[85] By reducing congestion in these facilities, the Orders have helped lessen the introduction, transmission, and spread of COVID–19 among border facilities and into the United States while also decreasing the risk of exposure to COVID–19 for DHS personnel and others in the facilities. Implementation of the Orders has mitigated the potential erosion of DHS operational capacity due to COVID–19 outbreaks. The reduction in the number of SA and FMU held in these congregate settings continues to be a necessary mitigation measure as DHS moves towards the resumption of normal border operations.

The availability of testing, vaccination, and other mitigation measures [86] at migrant holding facilities must also be considered. ==While downstream ICE facilities may have greater ability to provide these measures, CBP cannot appropriately execute consequence management measures to minimize spread or transmission of COVID–19 within its facilities. Space constraints, for example, preclude implementation of cohorting and consequence management such as quarantine and isolation.== Covered noncitizens housed in congregate settings who may be infected with COVID–19 may ultimately increase community transmission rates in the United States, especially among susceptible populations (*i.e.,* non-

immune, under-vaccinated, and non-vaccinated persons). Mitigation measures, especially testing and vaccination, must be considered for the noncitizens being held, as well as for facility personnel. On-site COVID–19 testing for noncitizens at CBP holding facilities is very limited and the majority of testing takes place off-site. For example, if a noncitizen is transported to a community healthcare facility for medical care, testing is provided based on local protocols. Once transferred to ICE custody, testing for SA and FMU is more widely available.

Although COVID–19-related healthcare resources have substantially improved since the October Order was issued, emerging variants and the potential for a future vaccine-resistant variant mean the possible impacts on U.S. communities and local healthcare resources in the event of a COVID–19 outbreak at CBP facilities cannot be ignored. The introduction, transmission, and spread of SARS–CoV–2—including its variants—among covered noncitizens during processing and holding at congregate CBP settings remain a significant concern to the noncitizens, CBP personnel, as well as the community at large in light of transmission to unvaccinated individuals and the potential for breakthrough cases. Of particular note, POE and U.S. Border Patrol stations are ill-equipped to manage an outbreak and these facilities are heavily reliant on local healthcare systems for the provision of more extensive medical services to noncitizens.[87] Transfers to local healthcare systems for care could strain local or regional healthcare resources. Reliance on healthcare resources in border and destination communities may increase the pressure on the U.S. healthcare system and supply chain during the current public health emergency.[88] Of note, hospitalization rates are once again soaring nationally as the Delta variant spreads and the vaccination rate of the

public lags. Ensuring the continued availability of healthcare resources is a critical component of the federal government's overall public health response to COVID–19.

Given the nature of COVID–19, there is no zero-risk scenario, particularly in congregate settings and with variants as transmissible as that of Delta in high circulation in the country. The ongoing pandemic presents complex and dynamic challenges relating to public health that limit DHS' ability to process noncitizens safely under normal Title 8 procedures. Processing a noncitizen under Title 8 can take up to eight times as long as processing a noncitizen under Title 42. Importantly, longer processing times result in longer exposure times to a heightened risk of COVID–19 transmission for both noncitizens and CBP personnel. Amid the ongoing migrant surge, both the COVID–19-reduced capacity and higher non-COVID holding capacity limits have been exceeded in CBP facilities. Complete termination of any order under 42 U.S.C. 265 would increase the number of noncitizens requiring processing under Title 8, resulting in severe overcrowding and a high risk of COVID–19 transmission among those held in the facilities and the CBP workforce, ultimately burdening the local healthcare system.[89]

All of this is of particular concern as the Delta variant continues to drive an increase in COVID–19 cases. While scientists learn more about Delta and other emerging variants, rigorous and increased compliance with public health mitigation strategies is essential to protect public health.[90] Reducing the further introduction, transmission, and spread of these variants and future variants of concern into the United States is key to defeating COVID–19. CDC has concluded that SA and FMU should continue to be subject to the Order at this time pending further improvements in the public health situation.

*C. Comparison to Unaccompanied Noncitizen Children*

As discussed in the July Exception, UC are differently situated than SA and

[85] For example, when processing noncitizens under Title 8, prior to referral to ICE or release into the community, CBP generally issues the noncitizen a "Notice to Appear" (also called an I–862), which is a charging document that initiates removal proceedings against the noncitizen and may include a court date or direct the noncitizen to report to an ICE office to receive a court date.

[86] *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID–19) in Correctional and Detention Facilities,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention.html#correctional-facilities* (last visited July 28, 2021).

[87] *See* CBP Directive No. 2210–004, U.S. Customs and Border Protection, *https://www.cbp.gov/sites/default/files/assets/documents/2019-Dec/CBP_Final_Medical_Directive_123019.pdf* (Dec. 30, 2019). Many of the U.S. Border Patrol stations and POE facilities are located in remote areas and do not have ready access to local healthcare systems (which typically serve small, rural populations and have limited resources). 85 FR 56424, 56433. *See also* Abubakar I, Aldridge RW, Devakumar D, et al. The UCL-Lancet Commission on Migration and Health: the health of a world on the move. *Lancet.* 2018;392(10164):2606–2654. doi:10.1016/S0140-6736(18)32114–7.

[88] *See COVID-19 State Profile Report—Combined Set, HealthData.gov, https://healthdata.gov/Community/COVID-19-State-Profile-Report-Combined-Set/5mth-2h7d* (last updated July 28, 2021).

[89] Throughout the course of the COVID–19 pandemic, CDC has observed numerous outbreaks in similar congregate settings. *See FAQs for Correctional and Detention Facilities,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html* (last visited Apr. 15, 2021).

[90] *About Variants of the Virus that Causes COVID–19,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html* (last updated Apr. 2, 2021).

FMU. The Government has greater ability to care for UC while implementing appropriate COVID–19 mitigation measures. ORR has established a robust network of care facilities that provide testing and medical care and institute COVID–19 mitigation protocols, including vaccination for personnel and eligible UC. In light of these considerations, there is very low likelihood that processing UC in accordance with existing Title 8 procedures will result in undue strain on the U.S. healthcare system or healthcare resources. Moreover, UC released to a vetted sponsor or placed in a temporary or licensed ORR shelter do not pose a significant level of risk for COVID–19 spread into the community. UC are released only after having undergone testing, quarantine and/or isolation, and vaccination when possible, and their sponsors are provided with appropriate medical and public health direction. CDC thus finds that, at this time,[91] there is appropriate infrastructure in place to protect the children, caregivers, and local and destination communities from elevated risk of COVID–19 transmission. CDC believes the COVID–19-related public health concerns associated with UC introduction can be adequately addressed without UC being subject to this Order. As outlined in the July Exception and incorporated herein, CDC is fully excepting UC from this Order. The number of UC entering the United States is smaller than both the number of SA [92] and of FMU. Whereas UC can be excepted from the Order without posing a significant public health risk, the same is not true of SA and FMU, as described above.

*D. Summary of Findings*

Upon review of the various public health factors outlined above and in consideration of the circumstances at DHS facilities, it is CDC's assessment that suspending the right to introduce covered noncitizen SA and FMU who would otherwise be held at POE and U.S. Border Patrol stations remains necessary as the United States continues to combat the COVID–19 public health emergency. In making this determination, CDC has considered various possible alternatives (including but not limited to terminating the application of an order under 42 U.S.C. 265 for some or all SA and FMU,

modifying the availability of exceptions for individual SA and FMU in an order under 42 U.S.C. 265, and reissuing an order under 42 U.S.C. 265 for some or all UC); but for the reasons discussed herein, CDC finds that the continued suspension of the right to introduce SA and FMU under the terms set forth herein, combined with the exception for UC, is appropriate at this time. This temporary suspension pending further improvements in the public health situation and greater ability to implement COVID–19 mitigation measures in migrant holding facilities will slow the influx of noncitizens into environments at higher risk for COVID–19 transmission and spread.

DHS has indicated a commitment to restoring border operations in a manner that complies with applicable COVID–19 mitigation protocols while also accounting for other public health and humanitarian concerns. In light of available mitigation measures, and with DHS' pledge to expand capacity in a COVID-safe manner similar to expansions undertaken by HHS and ORR to address UC influx, CDC believes that the gradual resumption of normal border operations under Title 8 is feasible. With careful planning, this may be initiated in a stepwise manner that complies with COVID–19 mitigation protocols. HHS and CDC intend to support DHS in this effort and continues to work with DHS to provide technical guidance on COVID–19 mitigation strategies for their unique facilities and populations.[93] CDC understands that DHS intends to continue exercising case-by-case exceptions for individual SA and FMU based on a totality of the circumstances as CDC transitions away from this Order. CDC is also providing an additional exception to permit DHS to except noncitizens participating in a DHS-approved program that incorporates pre-processing COVID–19 testing in Mexico of the noncitizens, prior to their safe and orderly entry to the U.S. via ports of entry. Based on the incorporation of relevant COVID–19 mitigation measures in such programs, in consultation with CDC, CDC believes

such an exception is consistent with its legal authorities and in the public health interest.

**II. Legal Basis for This Order Under Sections 362 and 365 of the Public Health Service Act and 42 CFR 71.40**

CDC is issuing this Order pursuant to sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and the implementing regulation at 42 CFR 71.40. In accordance with these authorities, the CDC Director is permitted to prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease, by issuing an Order in which the Director determines that:

(1) By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and

(2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.[94]

CDC has authority under Section 362 and the implementing regulation to issue this Order to mitigate the further spread of COVID–19 disease, especially as the need to prevent proliferation of COVID–19 disease related to SARS–CoV–2 virus variants is heightened while vaccination efforts continue. Section 362 and the implementing regulation provide the Director with a public health tool to suspend introduction of persons not only to prevent the introduction of a quarantinable communicable disease, but also to aid in continued efforts to mitigate spread of that disease.[95]

The term "introduction into the United States" is defined in 42 CFR 71.40 as "the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons or property in the United States,

---

[91] This situation could change based on an increased influx of UC, changes in COVID–19 infection dynamics among UC, or unforeseen reductions in housing capacity.

[92] Note, the total number of SA encounters may include repeat encounters with SA who attempt entry again following expulsion.

[93] CDC has advised DHS on best practices with regard to testing noncitizens at the point they are released to U.S. communities to await further immigration proceedings. In addition to enforcing physical distancing (as practicable), mask-wearing, and testing for both noncitizens and personnel alike in POE and U.S. Border Patrol stations, CDC advises vaccination of DHS/CBP personnel to further reduce the risk of COVID–19 introduction, transmission, and spread in facilities and communities and protect the federal workforce. Widespread vaccination of federal employees and other personnel in congregate settings at POE and U.S. Border Patrol stations is another layer of the strategy that will lead to the normalization of border operations.

[94] 42 U.S.C. 265; 42 CFR 71.40.

[95] 85 FR 56424 at 56425–26.

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 30 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 30 of 128   PageID 888
**Federal Register** / Vol. 86, No. 148 / Thursday, August 5, 2021 / Notices      **42839**

in a manner that the Director determines to present a risk of transmission of a quarantinable communicable disease to persons, or a risk of contamination of property with a quarantinable communicable disease, even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States.'' 42 CFR 71.40(b)(1). Similarly, the term ''serious danger of the introduction of such quarantinable communicable disease into the United States'' is defined as, ''the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease.'' 42 CFR 71.40(b)(3).

In promulgating § 71.40, CDC and HHS noted that '''introduction' does not necessarily conclude the instant that a person first steps onto U.S. soil. The introduction of a person into the United States can occur not only when a person first steps onto U.S. soil, but also when a person on U.S. soil moves further into the United States, and begins to come into contact with persons or property in ways that increase the risk of transmitting the quarantinable communicable disease.'' [96] This language recognizes that many quarantinable communicable diseases, including COVID–19, may be spread by infected individuals who are asymptomatic and therefore unaware that they are capable of transmitting the disease. Even when a communicable disease is already circulating within the United States, prevention and mitigation of continued transmission of the virus is nevertheless a key public health measure. In this case, although COVID–19 has already been introduced and is spreading within the United States, this Order serves as an important disease-mitigation tool to protect public health. This is particularly true as new variants of the virus continue to emerge. By continuing to suspend the introduction of persons from foreign countries into the United States, this Order will help minimize the spread of variants and their ability to accelerate disease transmission.

Section 71.40(b)(2) defines ''[p]rohibit, in whole or in part, the introduction into the United States of persons'' in Section 362 as ''to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting

movement into the United States, or physically expelling from the United States some or all of the persons.'' *See also* 42 U.S.C. 265 (authorizing the prohibition when the danger posed by the communicable disease ''is so increased by the introduction of persons from such country . . . or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health''). Pursuant to that provision, this Order permits expulsion of persons covered by it, as did the prior Orders issued under this authority.[97] CDC recognizes that expulsion is an extraordinary action but, as explained in the Final Rule, the power to expel is critical where neither HHS/CDC, nor other Federal agencies, nor state or local governments have the facilities and personnel necessary to quarantine, isolate, or conditionally release the number of persons who would otherwise increase the serious danger of the introduction of a quarantinable communicable disease into the United States.[98] In those situations, the rapid expulsion of persons from the United States may be the most effective public health measure that HHS/CDC can implement within the finite resources of HHS/CDC and its Federal, State, and local partners.[99]

As stated in the Final Rule for 42 CFR 71.40, CDC ''may, in its discretion, consider a wide array of facts and circumstances when determining what is required in the interest of public health in a particular situation . . . includ[ing]: the overall number of cases of disease; any large increase in the number of cases over a short period of time; the geographic distribution of cases; any sustained (generational) transmission; the method of disease transmission; morbidity and mortality associated with the disease; the effectiveness of contact tracing; the adequacy of state and local healthcare systems; and the effectiveness of state and local public health systems and control measures.'' [100] Other factors noted in the Final Rule are the potential for disease spread among persons held in congregate settings, specifically during processing and holding at CBP facilities, and the potential for disease spread to the community at large.[101]

As stated in 42 CFR 71.40, this Order does not apply to U.S. citizens, U.S. nationals, lawful permanent residents, members of the armed forces of the United States and associated personnel if the Secretary of Defense provides assurance to the Director that the Secretary of Defense has taken or will take measures such as quarantine or isolation, or other measures maintaining control over such individuals, to prevent the risk of transmission of the quarantinable communicable disease into the United States, and U.S. government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, if the Director receives assurances from the relevant head of agency and determines that the head of the agency or department has taken or will take measures such as quarantine or isolation, to prevent the risk of transmission of a quarantinable communicable disease into the United States.[102]

In addition, this Order does not apply to those classes of persons excepted by the CDC Director. Including exceptions in the Order is consistent with Section 362 and 42 CFR 71.40, which permit the prohibition of introduction into the United States to be ''in whole or in part.'' As explained in the Final Rule for section 71.40, this language is intended to allow the Director to narrowly tailor the use of the authority to what is required in the interest of public health.[103] Pursuant to this capability, CDC is therefore excepting specific categories of persons from the Order, as described herein.

As required by Section 362, this Order will be in effect only for as long as it is needed to avert the serious danger of the introduction, transmission, and spread of COVID–19 into the United States and will be terminated when the continuation of the Order is no longer necessary to protect the public health. Finally, as directed by 42 CFR 71.40(c), the Order sets out the following:

(1) The foreign countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited;

(2) The period of time or circumstances under which the introduction of any persons or class of persons into the United States is being prohibited;

---

[96] *Id.* at 56425.

[97] *See id.* at 56425, 56433.
[98] *Id.* at 56425, 56445–46.
[99] *Id.* at 56425.
[100] *Id.* at 56444.
[101] *Id.* at 56434. Strain on healthcare systems was also cited as a factor in the Final Rule, specifically the additional strain that noncitizen migrant healthcare needs may place on already overburdened systems; the Final Rule described the

reduction of this strain as a result of CDC's previously issued orders. *Id.* at 56431.
[102] 42 CFR 71.40(e) and (f).
[103] 85 FR 56424, 56444.

(3) The conditions under which that prohibition on introduction will be effective, in whole or in part, including any relevant exceptions that the Director determines are appropriate;

(4) The means by which the prohibition will be implemented; and

(5) The serious danger posed by the introduction of the quarantinable communicable disease in the foreign country or countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited.

## III. Issuance and Implementation of Order

Based on the foregoing public health reassessment, I hereby issue this Order pursuant to Sections 362 and 365 of the Public Health Service (PHS) Act, 42 U.S.C. 265, 268, and their implementing regulations under 42 CFR part 71,[104] which authorize the CDC Director to suspend the right to introduce persons into the United States when the Director determines that the existence of a quarantinable communicable disease in a foreign country or place creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of the right of such introduction is necessary to protect public health. This Order hereby replaces and supersedes the Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, issued on October 13, 2020 (October Order)[105] and affirms and incorporates the exception for UC published in the July Exception, such that UC are excepted from this Order.[106]

This Order addresses the current status of the COVID–19 public health emergency and ongoing public health concerns, including virus transmission dynamics, viral variants, mitigation efforts, the public health risks inherent to high migration volumes, low vaccination rates among migrants, and crowding of immigration facilities. In making this determination, I have considered myriad facts, including the congregate nature of border facilities and the high risk for COVID–19 outbreaks—especially now with the predominant, more transmissible Delta

variant—presented following the introduction of an infected person, as well as the benefits of reducing such risks. I have also considered epidemiological information, including the viral transmissibility and asymptomatic transmission of COVID–19, the epidemiology and spread of SARS–CoV–2 variants, the morbidity and mortality associated with the disease for individuals in certain risk categories, as well as public health concerns with crowding at border facilities and resultant risk of transmission of additional quarantinable communicable diseases. I am issuing this Order to preserve the health and safety of U.S. citizens, U.S. nationals, and lawful permanent residents, and personnel and noncitizens in POE and U.S. Border Patrol stations by reducing the introduction, transmission, and spread of the virus that causes COVID–19, including new and existing variants, in congregate settings where covered noncitizens would otherwise be held while undergoing immigration processing, including at POE and U.S. Border Patrol stations at or near the U.S. land and adjacent coastal borders.

Based on an assessment of the current COVID–19 epidemiologic landscape and the U.S. government's ongoing efforts to accommodate UC, CDC does not find public health justification for this Order to apply with respect to UC, as outlined in the July Exception. Although CDC finds that, at this time, this Order should be applicable to FMU, CDC notes that there are fewer FMU than SA unlawfully entering the United States and many FMU are already being processed pursuant to Title 8 versus Title 42 given a variety of practical and other limitations on immediately expelling FMU. DHS has indicated that it plans to continue to partner with state and local agencies and nongovernmental organizations to provide testing, consequence management, and eventually vaccination to FMU who are determined to be eligible for Title 8 processing. CDC considers these efforts to be a critical risk reduction measure and encourages DHS to evaluate the potential expansion of such COVID–19 mitigation programs for FMU such that they may be excepted from this Order in the future. Although vaccination programs are not available at this time, CDC encourages DHS to develop such programs as quickly as practicable. While the migration of SA and FMU into the United States during the COVID–19 public health emergency continues and given the inherent risks that accompany holding these groups in crowded congregate settings with

insufficient options for effective mitigation, CDC finds the public health justification for this Order is sustained at this time.

DHS has indicated that it is committed to restoring border operations and facilitating arrivals to the United States in a manner that comports with CDC's recommended COVID–19 mitigation protocols. Given the recent migrant surge, DHS believes that an incremental approach is the best way to recommence normal border operations while ensuring health and safety concerns are addressed. To this end, DHS will work to establish safe, efficient, and orderly processes that are consistent with appropriate health and safety protocols and the epidemiology of the COVID–19 pandemic, in consultation with CDC.

CDC's expectation is that although this Order will continue with respect to SA and FMU, DHS will use case-by-case exceptions based on the totality of the circumstances where appropriate to except individual SA and FMU in a manner that gradually recommences normal migration operations as COVID–19 health and safety protocols and capacity allows. DHS will consult with CDC to ensure that the standards for such exceptions are consistent with current CDC guidance and public health recommendations. Based on this incorporation of relevant COVID–19 mitigation measures, CDC believes it is consistent with the legal authorities and in the public health interest to continue the use of case-by-case exceptions as a step towards the resumption of normal border operations under Title 8. Additionally, DHS is working in coordination with nongovernmental organizations, state and local health departments, and other relevant facilitating organizations and entities as appropriate to develop DHS-approved processes that include pre-entry COVID–19 testing. Additional public health mitigation measures, such as maintaining physical distancing and use of masks, testing, and isolation and quarantine as appropriate, are included in such processes. DHS has documented these processes and shared them with CDC. CDC has consulted with DHS to ensure that the processes appropriately address public health concerns and align with relevant CDC COVID–19 mitigation protocols. Based on these plans and processes, CDC believes it is consistent with legal authorities and in the public health interest to permit an exception for noncitizens in such DHS-approved processes to allow for safe and orderly entry into the United States.

---

[104] Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 FR 56424 (Sept. 11, 2020); 42 CFR 71.40.

[105] *Supra* note 4.

[106] *Supra* note 3.

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 32 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 32 of 128   PageID 890

**Federal Register** / Vol. 86, No. 148 / Thursday, August 5, 2021 / Notices   **42841**

*A. Covered Noncitizens*

This Order applies to persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a POE or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders subject to certain exceptions detailed below; this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States between POE. For purposes of this Order, I refer to persons covered by the Order as "covered noncitizens."

*B. Exceptions*

This Order does *not* apply to the following:
- U.S. citizens, U.S. nationals, and lawful permanent residents; [107]
- Members of the armed forces of the United States and associated personnel, U.S. government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, subject to required assurances; [108]
- Noncitizens who hold valid travel documents and arrive at a POE;
- Noncitizens in the visa waiver program who are not otherwise subject to travel restrictions and arrive at a POE;
- Unaccompanied Noncitizen Children; [109]
- Noncitizens who would otherwise be subject to this Order, who are permitted to enter the U.S. as part of a DHS-approved process, where the process approved by DHS has been documented and shared with CDC, and includes appropriate COVID–19 mitigation protocols, per CDC guidance; and
- Persons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. DHS will consult with CDC regarding the standards for such exceptions to help ensure consistency with current CDC guidance and public health recommendations.

*C. APA, Review, and Termination*

This Order shall be immediately effective. I consulted with DHS and other federal departments as needed before I issued this Order and requested that DHS continue to aid in the enforcement of this Order because CDC does not have the capability, resources, or personnel needed to do so. [110] As part of the consultation, DHS developed operational plans for implementing this Order. CDC has reviewed these plans and finds them to be consistent with the language of this Order directing that covered noncitizens spend as little time in congregate settings as practicable under the circumstances. In my view, DHS's assistance with implementing the Order is necessary, as CDC's other public health tools are not viable mechanisms given CDC resource and personnel constraints, the large numbers of covered noncitizens involved, and the likelihood that covered noncitizens do not have homes in the United States. [111]

This Order is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Even if it were, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Order and a delayed effective date. Given the public health emergency caused by COVID–19, it would be impracticable and contrary to public health practices and the public interest to delay the issuing and effective date of this Order with respect to all covered noncitizens. In addition, this Order concerns ongoing discussions with Canada and Mexico on how best to control COVID–19 transmission over our shared borders and therefore directly "involve[s] . . . a . . . foreign affairs function of the United States;" [112] thus, notice and comment and a delay in effective date are not required.

This Order shall remain effective until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or I determine that the danger of further introduction, transmission, or spread of COVID–19 into the United States has ceased to be a serious danger to the public health and continuation of this Order is no longer necessary to protect public health, whichever occurs first. At least every 60 days, the CDC shall review the latest information regarding the status of the COVID–19 public health emergency and associated public health risks, including migration patterns, sanitation concerns, and any improvement or deterioration of conditions at the U.S. border, to determine whether the Order remains necessary to protect public health. Upon determining that the further introduction of COVID–19 into the United States is no longer a serious danger to the public health necessitating the continuation of this Order, I will publish a notice in the **Federal Register** terminating this Order. I retain the authority to modify or terminate the Order, or its implementation, at any time as needed to protect public health.

**Authority**

The authority for this Order is Sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and 42 CFR 71.40.

Dated: August 3, 2021.

**Sherri Berger,**
*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2021–16856 Filed 8–3–21; 4:15 pm]

**BILLING CODE 4163–18–P**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Medicare & Medicaid Services

[Document Identifier: CMS–10148 and CMS–10784]

## Agency Information Collection Activities: Proposed Collection; Comment Request

**AGENCY:** Centers for Medicare & Medicaid Services, Health and Human Services (HHS).

**ACTION:** Notice.

---

**SUMMARY:** The Centers for Medicare & Medicaid Services (CMS) is announcing an opportunity for the public to comment on CMS' intention to collect information from the public. Under the Paperwork Reduction Act of 1995 (the PRA), federal agencies are required to publish notice in the **Federal Register** concerning each proposed collection of information (including each proposed extension or reinstatement of an existing collection of information) and to allow 60 days for public comment on the proposed action. Interested persons are invited to send comments regarding our

---

[107] 42 CFR 71.40(f).

[108] 42 CFR 71.40(e)(1) and (3).

[109] As excepted pursuant to the Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children from Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists. 86 FR 38717 (July 22, 2021).

[110] 42 U.S.C. 268; 42 CFR 71.40(d).

[111] CDC relies on the Department of Defense, other federal agencies, and state and local governments to provide both logistical support and facilities for federal quarantines. CDC lacks the resources, manpower, and facilities to quarantine covered noncitizens.

[112] 5 U.S.C. 553(a)(1).

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 33 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 33 of 128   PageID 891
**Federal Register** / Vol. 85, No. 57 / Tuesday, March 24, 2020 / Rules and Regulations **16547**

timeframe that would exacerbate present low flow conditions.

(iii) Discontinue the project's consumptive use, which may include reduction of the project sponsor's consumptive use to less than 20,000 gpd during periods of low flow. In any case of failure to provide the specified discontinuance, such project shall provide mitigation in accordance with paragraph (b)(3) of this section, for the calendar year in which such failure occurs, after which the Commission will reevaluate the continued acceptability of the discontinuance.

\* \* \* \* \*

(e) \* \* \*

(1) *General rule.* Except with respect to projects involving hydrocarbon development subject to the provisions of paragraph (f) of this section, any project that is solely supplied water for consumptive use by public water supply, stormwater, wastewater, or other reused or recycled water, or any combination thereof, may be approved by the Executive Director under this paragraph (e) in accordance with the following, unless the Executive Director determines that the project cannot be adequately regulated under this approval by rule.

\* \* \* \* \*

Dated: March 16, 2020.

**Jason E. Oyler,**

*General Counsel and Secretary to the Commission.*

[FR Doc. 2020–05871 Filed 3–23–20; 8:45 am]

**BILLING CODE 7040–01–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

## 19 CFR Chapter I

## Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexico

**AGENCY:** Office of the Secretary, U.S. Department of Homeland Security; U.S. Customs and Border Protection, U.S. Department of Homeland Security.

**ACTION:** Notification of temporary travel restrictions.

**SUMMARY:** This document announces the decision of the Secretary of Homeland Security to temporarily limit the travel of individuals from Mexico into the United States at land ports of entry along the United States-Mexico border to ''essential travel'' as further defined in this document.

**DATES:** These restrictions go into effect at 11:59 p.m. Eastern Daylight Time (EDT) on March 20, 2020 and will remain in effect until 11:59 p.m. EDT on April 20, 2020.

**FOR FURTHER INFORMATION CONTACT:** Alyce Modesto, Office of Field Operations, U.S. Customs and Border Protection (CBP) at 202–344–3788.

**SUPPLEMENTARY INFORMATION:**

### Background

Coronavirus Disease 2019 (COVID–19), a communicable disease caused by a new (novel) coronavirus named SARS–CoV–2, is a respiratory disease that can cause fever, cough, and difficulty breathing, with reported illnesses ranging from mildly symptomatic to severe illness and death. Although the virus that causes COVID–19 was originally detected in China, it has resulted in a pandemic with cases in 158 countries, including in the United States and Mexico. On January 30, 2020, the Director-General of the World Health Organization declared the outbreak a ''public health emergency of international concern'' under the International Health Regulations (2005).[1] On January 31, 2020, the Secretary of the Department of Health and Human Services declared a nationwide ''public health emergency'' under section 319 of the Public Health Service Act, 42 U.S.C. 274d, as a result of confirmed cases of COVID–19.[2] On March 11, 2020, the World Health Organization announced that the COVID–19 outbreak can be characterized as a pandemic. On March 13, 2020, the President determined that the ongoing COVID–19 pandemic is of sufficient severity and magnitude to warrant an emergency determination under section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121–5207. In addition, on March 13, 2020, the President declared a national emergency under sections 201 and 301 of the National Emergencies Act, 50 U.S.C. 1601 *et seq.*[3] The Mexican Ministry of Education has closed all schools from

March 20 until April 20, and between March 23 and April 19, the Mexican government has implemented a domestic social-distancing campaign to minimize the spread of the virus that causes COVID–19.

### Notice of Action

Given the outbreak and continued transmission and spread of COVID–19 within the United States and globally, I have determined that the risk of continued transmission and spread of COVID–19 between the United States and Mexico poses a ''specific threat to human life or national interests.''

U.S. and Mexican officials have mutually determined that non-essential travel between the United States and Mexico poses additional risk of transmission and spread of COVID–19 and places the populace of both nations at increased risk of contracting COVID–19. Moreover, given the sustained human-to-human transmission of the virus, maintaining the current level of travel between the two nations places the personnel staffing land ports of entry between the United States and Mexico, as well as the individuals traveling through these ports of entry, at increased risk of exposure to COVID–19. Accordingly, and consistent with the authority granted in 19 U.S.C. 1318(b)(1)(C) and (b)(2),[4] I have determined that land ports of entry along the U.S.-Mexican border will suspend normal operations and process for entry only those travelers engaged in ''essential travel,'' defined below, for entry into the United States. Given the definition of ''essential travel'' below,

---

[1] Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019–nCoV) (Jan. 30, 2020), available at *https://www.who.int/news-room/detail/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).*

[2] HHS, ''Determination that a Public Health Emergency Exists,'' *https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.*

[3] Proclamation 9994 of Mar. 13, 2020 on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak, 85 FR 15337 (Mar. 18, 2020).

[4] 19 U.S.C. 1318(b)(1)(C) provides that ''[n]otwithstanding any other provision of law, the Secretary of the Treasury, when necessary to respond to a national emergency declared under the National Emergencies Act (50 U.S.C. 1601 *et seq.*) or to a specific threat to human life or national interests,'' is authorized to ''take any . . . action that may be necessary to respond directly to the national emergency or specific threat.'' On March 1, 2003, certain functions of the Secretary of the Treasury were transferred to the Secretary of Homeland Security. *See* 6 U.S.C. 202(2), 203(1). Under 6 U.S.C. 212(a)(1), authorities ''related to Customs revenue functions'' were reserved to the Secretary of the Treasury. To the extent that any authority under section 1318(b)(1) was reserved to the Secretary of the Treasury, it has been delegated to the Secretary of Homeland Security. *See* Treas. Dep't Order No. 100–16 (May 15, 2003), 68 FR 28322 (May 23, 2003). Additionally, 19 U.S.C. 1318(b)(2) provides that ''[n]otwithstanding any other provision of law, the Commissioner of U.S. Customs and Border Protection, when necessary to respond to a specific threat to human life or national interests, is authorized to close temporarily any Customs office or port of entry or take any other lesser action that may be necessary to respond to the specific threat.'' Congress has vested in the Secretary of Homeland Security the ''functions of all officers, employees, and organizational units of the Department,'' including the Commissioner of CBP. 6 U.S.C. 112(a)(3).

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 34 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 34 of 128   PageID 892

**16548** **Federal Register**/ Vol. 85, No. 57 / Tuesday, March 24, 2020/Rules and Regulations

this temporary alteration in land ports of entry operations should not interrupt legitimate trade between the two nations or disrupt critical supply chains that ensure food, fuel, medicine, and other critical materials reach individuals on both sides of the border.

For purposes of the temporary alteration in certain designated ports of entry operations authorized under 19 U.S.C. 1318(b)(1)(C) and (b)(2), travel through the land ports of entry and ferry terminals along the United States-Mexico border shall be limited to "essential travel," which includes, but is not limited to—

• U.S. citizens and lawful permanent residents returning to the United States;

• Individuals traveling for medical purposes (*e.g.*, to receive medical treatment in the United States);

• Individuals traveling to attend educational institutions;

• Individuals traveling to work in the United States (*e.g.,* individuals working in the farming or agriculture industry who must travel between the United States and Mexico in furtherance of such work);

• Individuals traveling for emergency response and public health purposes (*e.g.,* government officials or emergency responders entering the United States to support Federal, state, local, tribal, or territorial government efforts to respond to COVID–19 or other emergencies);

• Individuals engaged in lawful cross-border trade (*e.g.,* truck drivers supporting the movement of cargo between the United States and Mexico);

• Individuals engaged in official government travel or diplomatic travel;

• Members of the U.S. Armed Forces, and the spouses and children of members of the U.S. Armed Forces, returning to the United States; and

• Individuals engaged in military-related travel or operations.

The following travel does not fall within the definition of "essential travel" for purposes of this Notification—

• Individuals traveling for tourism purposes (*e.g.,* sightseeing, recreation, gambling, or attending cultural events).

At this time, this Notification does not apply to air, freight rail, or sea travel between the United States and Mexico, but does apply to passenger rail and ferry travel between the United States and Mexico. These restrictions are temporary in nature and shall remain in effect until 11:59 p.m. EDT on April 20, 2020. This Notification may be amended or rescinded prior to that time, based on circumstances associated with the specific threat.

The Commissioner of U.S. Customs and Border Protection (CBP) is hereby

directed to prepare and distribute appropriate guidance to CBP personnel on implementation of the temporary measures set forth in this Notification. The CBP Commissioner may determine that other forms of travel, such as travel in furtherance of economic stability or social order, constitute "essential travel" under this Notification. Further, the CBP Commissioner may, on an individualized basis and for humanitarian reasons or for other purposes in the national interest, permit the processing of travelers to the United States not engaged in "essential travel."

The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, is delegating the authority to electronically sign this document to Chad Mizelle, who is the Acting General Counsel for DHS, for purposes of publication in the **Federal Register**.

**Chad R. Mizelle,**

*Acting General Counsel, U.S. Department of Homeland Security.*

[FR Doc. 2020–06253 Filed 3–20–20; 2:30 pm]

**BILLING CODE 9112–FP–P**

---

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

## 19 CFR Chapter I

## Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Canada

**AGENCY:** Office of the Secretary, U.S. Department of Homeland Security; U.S. Customs and Border Protection, U.S. Department of Homeland Security.

**ACTION:** Notification of temporary travel restrictions.

**SUMMARY:** This document announces the decision of the Secretary of Homeland Security to temporarily limit the travel of individuals from Canada into the United States at land ports of entry along the United States-Canada border to "essential travel" as further defined in this document.

**DATES:** These restrictions go into effect at 11:59 p.m. Eastern Daylight Time (EDT) on March 20, 2020 and will remain in effect until 11:59 p.m. EDT on April 20, 2020.

**FOR FURTHER INFORMATION CONTACT:** Alyce Modesto, Office of Field Operations, U.S. Customs and Border Protection (CBP) at 202–344–3788.

**SUPPLEMENTARY INFORMATION:**

## Background

Coronavirus Disease 2019 (COVID–19), a communicable disease caused by a new (novel) coronavirus named SARS–CoV–2, is a respiratory disease that can cause fever, cough, and difficulty breathing, with reported illnesses ranging from mildly symptomatic to severe illness and death. Although the virus that causes COVID–19 was originally detected in China, it has resulted in a pandemic with cases in 158 countries, including in the United States and Canada. On January 30, 2020, the Director-General of the World Health Organization declared the outbreak a "public health emergency of international concern" under the International Health Regulations (2005).[1] On January 31, 2020, the Secretary of the Department of Health and Human Services declared a nationwide "public health emergency" under section 319 of the Public Health Service Act, 42 U.S.C. 274d, as a result of confirmed cases of COVID–19.[2] On March 11, 2020, the World Health Organization announced that the COVID–19 outbreak can be characterized as a pandemic. On March 13, 2020, the President determined that the ongoing COVID–19 pandemic is of sufficient severity and magnitude to warrant an emergency determination under section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121–5207. In addition, on March 13, 2020, the President declared a national emergency under sections 201 and 301 of the National Emergencies Act, 50 U.S.C. 1601 *et seq.*[3] To protect against the COVID–19 threat in Canada, the Government of Canada announced measures effective March 18, 2020 to close its borders to foreign nationals entering the country and to redirect international flight arrivals to predesignated airports. Additionally, multiple provinces within Canada declared states of emergency due to the COVID–19 outbreak.

---

[1] Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019–nCoV) (Jan. 30, 2020), available at *https://www.who.int/news-room/detail/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).*

[2] HHS, "Determination that a Public Health Emergency Exists," *https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.*

[3] Proclamation 9994 of Mar. 13, 2020 on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak, 85 FR 15337 (Mar. 18, 2020).

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 35 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 35 of 128   PageID 893
**Federal Register** / Vol. 86, No. 160 / Monday, August 23, 2021 / Rules and Regulations   **46963**

*www.regulations.gov.* A copy of FAA Order JO 7400.11F may be inspected at the National Archives and Records Administration (NARA). For information on the availability of FAA Order JO 7400.11F at NARA, email: *fr.inspection@nara.gov* or go to *https://www.archives.gov/federal-register/cfr/ibr-locations.html.*

**§ 71.5   [Amended]**

■ 3. Section 71.5 is amended by removing the words ''FAA Order 7400.11E'' and adding, in their place, the words ''FAA Order JO 7400.11F.''

**§ 71.15   [Amended]**

■ 4. Section 71.15 is amended by removing the words ''FAA Order 7400.11E'' and adding, in their place, the words ''FAA Order JO 7400.11F.''

**§ 71.31   [Amended]**

■ 5. Section 71.31 is amended by removing the words ''FAA Order 7400.11E'' and adding, in their place, the words ''FAA Order JO 7400.11F.''

**§ 71.33   [Amended]**

■ 6. Paragraph (c) of section 71.33 is amended by removing the words ''FAA Order 7400.11E'' and adding, in their place, the words ''FAA Order JO 7400.11F.''

**§ 71.41   [Amended]**

■ 7. Section 71.41 is amended by removing the words ''FAA Order 7400.11E'' and adding, in their place, the words ''FAA Order JO 7400.11F.''

**§ 71.51   [Amended]**

■ 8. Section 71.51 is amended by removing the words ''FAA Order 7400.11E'' and adding, in their place, the words ''FAA Order JO 7400.11F.''

**§ 71.61   [Amended]**

■ 9. Section 71.61 is amended by removing the words ''FAA Order 7400.11E'' and adding, in their place, the words ''FAA Order JO 7400.11F.''

**§ 71.71   [Amended]**

■ 10. Paragraphs (b), (c), (d), (e), and (f) of section 71.71 are amended by removing the words ''FAA Order 7400.11E'' and adding, in their place, the words ''FAA Order JO 7400.11F.''

**§ 71.901   [Amended]**

■ 11. Paragraph (a) of section 71.901 is amended by removing the words ''FAA Order 7400.11E'' and adding, in their place, the words ''FAA Order JO 7400.11F.''

Issued in Washington, DC, on August 17, 2021.

**George Gonzalez,**

*Acting Manager, Rules and Regulations Group.*

[FR Doc. 2021–17915 Filed 8–20–21; 8:45 am]

**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Customs and Border Protection**

**19 CFR Chapter I**

**Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexico**

**AGENCY:** Office of the Secretary, U.S. Department of Homeland Security; U.S. Customs and Border Protection, U.S. Department of Homeland Security.

**ACTION:** Notification of continuation of temporary travel restrictions.

**SUMMARY:** This document announces the decision of the Secretary of Homeland Security (Secretary) to continue to temporarily limit the travel of individuals from Mexico into the United States at land ports of entry along the United States-Mexico border. Such travel will be limited to ''essential travel,'' as further defined in this document.

**DATES:** These restrictions go into effect at 12 a.m. Eastern Daylight Time (EDT) on August 22, 2021, and will remain in effect till 11:59 p.m. EDT on September 21, 2021, unless amended or rescinded prior to that time.

**FOR FURTHER INFORMATION CONTACT:** Stephanie Watson, Office of Field Operations Coronavirus Coordination Cell, U.S. Customs and Border Protection (CBP) at 202–325–0840.

**SUPPLEMENTARY INFORMATION:**

**Background**

On March 24, 2020, DHS published notice of its decision to temporarily limit the travel of individuals from Mexico into the United States at land ports of entry along the United States-Mexico border to ''essential travel,'' as further defined in that document.[1] The document described the developing circumstances regarding the COVID–19 pandemic and stated that, given the outbreak and continued transmission and spread of the virus associated with COVID–19 within the United States and globally, DHS had determined that the risk of continued transmission and spread of the virus associated with COVID–19 between the United States and Mexico posed a ''specific threat to human life or national interests.'' DHS later published a series of notifications continuing such limitations on travel until 11:59 p.m. EDT on August 21, 2021.[2]

DHS continues to monitor and respond to the COVID–19 pandemic. As of the week of August 5, 2021, there have been over 200 million confirmed cases globally, with over 4 million confirmed deaths.[3] There have been over 36.1 million confirmed and probable cases within the United States,[4] over 1.4 million confirmed cases in Canada,[5] and over 2.9 million confirmed cases in Mexico.[6]

DHS also notes that the Delta variant is driving an increase in cases, hospitalizations, and deaths in the United States.[7] Canada and Mexico are also seeing increased case counts and deaths.[8]

---

[1] 85 FR 16547 (Mar. 24, 2020). That same day, DHS also published notice of its decision to temporarily limit the travel of individuals from Canada into the United States at land ports of entry along the United States-Canada border to ''essential travel,'' as further defined in that document. 85 FR 16548 (Mar. 24, 2020).

[2] *See* 86 FR 38554 (July 22, 2021); 86 FR 32766 (June 23, 2021); 86 FR 27800 (May 24, 2021); 86 FR 21189 (Apr. 22, 2021); 86 FR 14813 (Mar. 19, 2021); 86 FR 10816 (Feb. 23, 2021); 86 FR 4967 (Jan. 19, 2021); 85 FR 83433 (Dec. 22, 2020); 85 FR 74604 (Nov. 23, 2020); 85 FR 67275 (Oct. 22, 2020); 85 FR 59669 (Sept. 23, 2020); 85 FR 51633 (Aug. 21, 2020); 85 FR 44183 (July 22, 2020); 85 FR 37745 (June 24, 2020); 85 FR 31057 (May 22, 2020); 85 FR 22353 (Apr. 22, 2020). DHS also published parallel notifications of its decisions to continue to temporarily limiting the travel of individuals from Canada into the United States at land ports of entry along the United States-Canada border to ''essential travel.'' *See* 86 FR 38556 (July 22, 2021); 86 FR 32764 (June 23, 2021); 86 FR 27802 (May 24, 2021); 86 FR 21188 (Apr. 22, 2021); 86 FR 14812 (Mar. 19, 2021); 86 FR 10815 (Feb. 23, 2021); 86 FR 4969 (Jan. 19, 2021); 85 FR 83432 (Dec. 22, 2020); 85 FR 74603 (Nov. 23, 2020); 85 FR 67276 (Oct. 22, 2020); 85 FR 59670 (Sept. 23, 2020); 85 FR 51634 (Aug. 21, 2020); 85 FR 44185 (July 22, 2020); 85 FR 37744 (June 24, 2020); 85 FR 31050 (May 22, 2020); 85 FR 22352 (Apr. 22, 2020).

[3] WHO, Coronavirus disease 2019 (COVID–19) Weekly Epidemiological Update (June 8, 2021), available at *https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports* (accessed Aug. 11, 2021).

[4] CDC, COVID Data Tracker: United States (COVID–19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction, *https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days* (accessed Aug. 11, 2021).

[5] WHO, Situation by Region, Country, Territory & Area, available at *https://covid19.who.int/table* (accessed Aug. 11, 2021).

[6] *Id.*

[7] *See* CDC, Delta Variant: What We Know About the Science, *https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html* (accessed Aug. 16, 2021).

[8] *See* Government of Canada, Coronavirus Disease (COVID–19) For Health Professionals, *https://health-infobase.canada.ca/covid-19/*

Continued

Case 1:21-cv-00100-EGS  Document 168-3  Filed 11/21/22  Page 36 of 128
Case 4:21-cv-00579-P  Document 69  Filed 09/08/21  Page 36 of 128  PageID 894
**46964**  **Federal Register** / Vol. 86, No. 160 / Monday, August 23, 2021 / Rules and Regulations

**Notice of Action**

Given the outbreak and continued transmission and spread of COVID–19 within the United States and globally, the Secretary has determined that the risk of continued transmission and spread of the virus associated with COVID–19 between the United States and Mexico poses an ongoing "specific threat to human life or national interests."

In March 2020, U.S. and Mexican officials mutually determined that non-essential travel between the United States and Mexico posed additional risk of transmission and spread of the virus associated with COVID–19 and placed the populace of both nations at increased risk of contracting the virus associated with COVID–19. Given the sustained human-to-human transmission of the virus, coupled with risks posed by new variants, non-essential travel to the United States places the personnel staffing land ports of entry between the United States and Mexico, as well as the individuals traveling through these ports of entry, at increased risk of exposure to the virus associated with COVID–19.

Accordingly, and consistent with the authority granted in 19 U.S.C. 1318(b)(1)(C) and (b)(2),[9] I have determined that land ports of entry

along the U.S.-Mexico border will continue to suspend normal operations and will only allow processing for entry into the United States of those travelers engaged in "essential travel," as defined below. Given the definition of "essential travel" below, this temporary alteration in land ports of entry operations should not interrupt legitimate trade between the two nations or disrupt critical supply chains that ensure food, fuel, medicine, and other critical materials reach individuals on both sides of the border.

For purposes of the temporary alteration in certain designated ports of entry operations authorized under 19 U.S.C. 1318(b)(1)(C) and (b)(2), travel through the land ports of entry and ferry terminals along the United States-Mexico border shall be limited to "essential travel," which includes, but is not limited to—

• U.S. citizens and lawful permanent residents returning to the United States;

• Individuals traveling for medical purposes (e.g., to receive medical treatment in the United States);

• Individuals traveling to attend educational institutions;

• Individuals traveling to work in the United States (e.g., individuals working in the farming or agriculture industry who must travel between the United States and Mexico in furtherance of such work);

• Individuals traveling for emergency response and public health purposes (e.g., government officials or emergency responders entering the United States to support federal, state, local, tribal, or territorial government efforts to respond to COVID–19 or other emergencies);

• Individuals engaged in lawful cross-border trade (e.g., truck drivers supporting the movement of cargo between the United States and Mexico);

• Individuals engaged in official government travel or diplomatic travel;

• Members of the U.S. Armed Forces, and the spouses and children of members of the U.S. Armed Forces, returning to the United States; and

• Individuals engaged in military-related travel or operations.

The following travel does not fall within the definition of "essential travel" for purposes of this Notification—

• Individuals traveling for tourism purposes (e.g., sightseeing, recreation, gambling, or attending cultural events).

At this time, this Notification does not apply to air, freight rail, or sea travel between the United States and Mexico, but does apply to passenger rail, passenger ferry travel, and pleasure boat travel between the United States and Mexico. These restrictions are

temporary in nature and shall remain in effect until 11:59 p.m. EDT on September 21, 2021. This Notification may be amended or rescinded prior to that time, based on circumstances associated with the specific threat. In coordination with public health and medical experts, DHS continues working closely with its partners across the United States and internationally to determine how to safely and sustainably resume normal travel.

The Commissioner of U.S. Customs and Border Protection (CBP) is hereby directed to prepare and distribute appropriate guidance to CBP personnel on the continued implementation of the temporary measures set forth in this Notification. The CBP Commissioner may determine that other forms of travel, such as travel in furtherance of economic stability or social order, constitute "essential travel" under this Notification. Further, the CBP Commissioner may, on an individualized basis and for humanitarian reasons or for other purposes in the national interest, permit the processing of travelers to the United States not engaged in "essential travel."

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2021–18061 Filed 8–20–21; 8:45 am]

**BILLING CODE 9112–FP–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

## 19 CFR Chapter I

## Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Canada

**AGENCY:** Office of the Secretary, U.S. Department of Homeland Security; U.S. Customs and Border Protection, U.S. Department of Homeland Security.

**ACTION:** Notification of continuation of temporary travel restrictions.

**SUMMARY:** This document announces the decision of the Secretary of Homeland Security (Secretary) to continue to temporarily limit the travel of individuals from Canada into the United States at land ports of entry along the United States-Canada border. Such travel will be limited to "essential travel," as further defined in this document.

**DATES:** These restrictions go into effect at 12 a.m. Eastern Daylight Time (EDT) on August 22, 2021, and will remain in

---

*epidemiological-summary-covid-19-cases.html#VOC* (accessed Aug., 16, 2021). *See* Government of Mexico, Ministry of Health, COVID–19 National General Information, *https://datos.covid.conacyt.mx/#DOView* (accessed Aug. 16, 2021); Mexican Consortium of Genomic Surveillance (CoViGen-Mex), Reportes, *http://mexcov2.ibt.unam.mx:8080/COVID-TRACKER/* (accessed Aug. 16, 2021).

[9] 19 U.S.C. 1318(b)(1)(C) provides that "[n]otwithstanding any other provision of law, the Secretary of the Treasury, when necessary to respond to a national emergency declared under the National Emergencies Act (50 U.S.C. 1601 *et seq.*) or to a specific threat to human life or national interests," is authorized to "[t]ake any . . . action that may be necessary to respond directly to the national emergency or specific threat." On March 1, 2003, certain functions of the Secretary of the Treasury were transferred to the Secretary of Homeland Security. *See* 6 U.S.C. 202(2), 203(1). Under 6 U.S.C. 212(a)(1), authorities "related to Customs revenue functions" were reserved to the Secretary of the Treasury. To the extent that any authority under section 1318(b)(1) was reserved to the Secretary of the Treasury, it has been delegated to the Secretary of Homeland Security. *See* Treas. Dep't Order No. 100–16 (May 15, 2003), 68 FR 28322 (May 23, 2003). Additionally, 19 U.S.C. 1318(b)(2) provides that "[n]otwithstanding any other provision of law, the Commissioner of U.S. Customs and Border Protection, when necessary to respond to a specific threat to human life or national interests, is authorized to close temporarily any Customs office or port of entry or take any other lesser action that may be necessary to respond to the specific threat." Congress has vested in the Secretary of Homeland Security the "functions of all officers, employees, and organizational units of the Department," including the Commissioner of CBP. 6 U.S.C. 112(a)(3).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| STATE OF TEXAS, | |
| Plaintiff, | Civil Action No. 4:21-cv-00579-P |
| v. | |
| JOSEPH R. BIDEN, JR., et al., | |
| Defendants. | |

### DECLARATION OF RODNEY S. SCOTT

I, Rodney S. Scott, pursuant to 28 U.S.C. § 1746, based upon my personal knowledge, and documents and information made known or available to me as of the time of signature hereby declare as follows:

1. I served as the Chief, U.S. Border Patrol (USBP), of U.S. Customs and Border Protection (CBP) from February 2, 2020, to August 14, 2021. My tenure as Chief, USBP spanned both the Presidential Administration of Joe Biden as well as Donald Trump. As Chief, I served as the senior most official in CBP responsible for implementing Title 42 Authority between the ports of entry. I honorably retired on August 14, 2021, after serving more than 29 years as a U.S. Border Patrol agent. Prior to serving as the Chief of USBP, I was the Chief of the San Diego Sector. That Sector (a term for the geographic demarcation of a particular area of responsibility within USBP) includes approximately 60 linear miles of border shared with Mexico and 931 miles of coastal border, with approximately 2,200 Border Patrol Agents. I have also served in various other leadership positions in USBP, including Chief Patrol Agent of the El Centro

1

Sector; Deputy Chief Patrol Agent at San Diego Sector; Patrol Agent in Charge at the Brown Field Station in San Diego Sector; Assistant Chief in CBP's Office of Anti-Terrorism in Washington, D.C.; and Director/Division Chief for the Incident Management and Operations Coordination Division at CBP Headquarters.

2. In my position as the Chief of USBP, I was the highest ranking official within USBP, responsible for executing the missions of the Department of Homeland Security (DHS), CBP, and USBP. The USBP is the primary federal law enforcement organization responsible for preventing the entry of terrorists and their weapons and for preventing the illicit trafficking of people and contraband between ports of entry. USBP has a workforce of over 21,000 personnel who support or directly patrol the border of the United States in-between the legal Ports of Entry. As Chief, I was also responsible for the daily operations of USBP, including the development and implementation of all nationwide policy decisions.

3. I am familiar with the Centers for Disease Control and Prevention (CDC) Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists (Mar. 20, 2020) (CDC Order or Title 42) and subsequent extensions and amendments, as well as CBP's role in assisting with implementing this Order.

4. U.S. Border Patrol equipment and facilities are limited and do not allow for social distancing or isolation of individuals as recommended by CDC. The

APPX. 035

significant volume of migrants encountered by USBP, which is currently averaging over 6,000 per day, make COVID testing impractical.

5. I am familiar with the U.S. District Court for the District of Columbia's November 18, 2020, order (District Court Order) in *P.J.E.S. v. Wolf, et al.,* No. 1:20-cv-02245 (D.D.C. August 14, 2020), that, among other things, certified a class of unaccompanied alien children who are or will be in U.S. government custody and would be expelled consistent with the CDC Order, generally discussed above. I also understand that the District Court Order enjoined CBP from "expelling the Class Members from the United States under the CDC Order Process, whether pursuant to an Order issued by the Director of the Centers for Disease Control and Prevention under the authority granted by the Interim Final Rule, 85 Fed. Reg. 16559-01, or the Final Rule, 85 Fed. Reg. 56,424-01." I further understand that the U.S. District Court for the District of Columbia denied the government's request for a stay pending appeal.

6. On November 18, 2020, under my guidance, USBP headquarters issued guidance on the District Court's preliminary injunction to all USBP Field Chiefs and Field Deputies for immediate implementation in their Area of Responsibility. Specifically, the guidance provided that operational procedures must be amended to immediately prohibit the expulsion of class members under Title 42. Additionally, the guidance further confirmed that all unaccompanied alien children (UAC) must be processed consistent with applicable law and policy.

APPX. 036

7. On or about January 29, 2021, the U.S Court of Appeals for the D.C. Circuit granted the federal government's motion to stay the preliminary injunction pending appeal in *P.J.E.S. v. Pekoske, et al.*, No. 1:20-cv02245. Therefore, DHS was allowed to immediately resume expelling unaccompanied alien children under Title 42 and return to pre-November 18th, 2020, Title 42 processing.

8. USBP acted immediately and instructed personnel to resume Title 42 processing and expulsions consistent with the granted stay. Consistent with well-established delegated authority within the USBP Headquarters organizational structure, leadership within the USBP Law Enforcement Operations Directorate (a Directorate directly subordinate to the Chief, U.S. Border Patrol) provided guidance to field chiefs and field deputies to immediately resume implementation of Title 42 for UAC. Simultaneously, I was informed of this action and concurred.

9. On or about January 30, 2021, at approximately 6:03 PM I received written instructions via electronic email from the Acting Commissioner of U.S. Customs and Border Protection, saying that DHS had decided not to act on the approved stay and that USBP was prohibited from resuming Title 42 processing or expulsions of unaccompanied alien children until approved by DHS. I was not directly or indirectly included in any pre-decision deliberations prior to this DHS guidance, nor was I provided any information to support that this decision was formulated based on new medical evidence. Furthermore, in

4

my opinion this decision was in direct contrast to the governments' evidence-based arguments provided during the appeal of this initial injunction.

10. On or about January 31, 2021, I sent an email to Acting Commissioner Miller saying:

> [T]his email serves as my objection to any decision to voluntarily carve out a class of individuals from the CDC order. It is my understanding that the sole intent of the CDC order is to protect America by preventing the further introduction of COVID-19 into the US population. As highlighted in discussions with CDC when the original orders were issued, any voluntary deviations from that order place U.S. citizens, our personnel and the migrants themselves at increased risk of contracting COVID-19. Additionally, this decision will increase the pressure placed on the limited medical capability in the local communities along the border.

11. To date, I have not been provided any medical rationale or scientific evidence to justify excluding any specific group or class of individuals from Title 42.

12. This is a significant departure from well-established practices and protocols. In my experience, USBP leadership, and specifically the Chief of the USBP or his or her delegate, has been included in detailed briefings and deliberations to facilitate informed decision-making prior to implementing a significant policy decision such as this.

13. Based on my experience, knowledge, and previous briefings from CDC, I believe that this decision was arbitrary and lacked any factual or evidentiary basis.

14. Furthermore, based on previous briefings provided by CDC and exposure modeling conducted by CBP, I believe this arbitrary decision and the associated public statements that followed directly attributed to a significant

5

surge in illegal entries by unaccompanied alien children and significantly increased the risk of introducing COVID-19 and its variants into the U.S. population.

15. I am also familiar with CBP's processing of aliens who were encountered as members of family units.

16. Acting under the CDC's Order, prior to the January of 2021, members of family units were largely expelled from the United States under Title 42 or put into an alternate pathway that prevented their release into the interior of the United States.

17. Since approximately January of 2021, CBP has encountered an increasing number of members of family units along the southwest border.

18. In addition to the policy exception for UAC, I believe that a series of political decisions resulted in a significant number of illegal aliens, classified as family units, being granted exemption from Title 42 expulsions.

19. For example, after the change in administrations and during my service as the Chief of the Border Patrol, the Government of Mexico began refusing to accept the return of certain aliens at certain ports of entry, to include family units.

20. In my opinion, during prior administrations, the Department of State would have been engaged to assert political pressure on Mexico to encourage them to find a joint solution. To my knowledge the Biden Administration did not apply such pressure here, and the United States Government accepted Mexico's unilateral decision and allowed them to control the situation. This directly

APPX. 039

resulted in a significant increase in aliens being processed under Title 8 and then released into the United States.

21. For example, in October 2020, over 91% of total encounters by USBP were processed under Title 42 and expelled in an average of 90 minutes. As of August 1, 2021, nearly 53% are being granted exemptions from Title 42 with the majority ultimately being released into the United States.

22. As a routine process, CBP seeks to quickly transfer all aliens—other than UAC—to U.S. Immigration and Customs Enforcement (ICE) who cannot be immediately removed or expelled.

23. However, ICE accepts a small fraction of the total alien family units apprehended by CBP and processes them for detention that normally will not exceed 20 days or for alternatives to detention and then release the family units into the United States.

24. When ICE is unable or unwilling to assume custody of any alien, CBP will process the alien for a Notice to Appear or a Notice to Report and then release the alien at a local transportation hub or to a non-governmental organization that provides assistance to migrant populations.

25. Today, the vast majority of family unit aliens are apprehended, processed, and then released into the United States. They are not tested for COVID-19 prior to their release from CBP custody.

7

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, as of the time of signature.

Executed this 23rd day of August 2021.

Rodney S. Scott
Retired Chief, U.S. Border Patrol

APPX. 041

# AGREEMENT BETWEEN DEPARTMENT OF HOMELAND SECURITY AND THE STATE OF TEXAS

The parties to this Agreement are on the one hand:

    (1)    the Department of Homeland Security,

    (2)    U.S. Customs and Border Protection (CBP),

    (3)    U.S. Immigration and Customs Enforcement (ICE), and

    (4)    U.S. Citizenship and Immigration Services (USCIS);[1]

and on the other hand:

    (5)    the State of Texas, by and through the Office of the Governor (Texas).

## I.    AUTHORITY

The authorities governing this Agreement include, but are not limited to:

    (1)    the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended;

    (2)    the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended;

    (3)    the Privacy Act, 5 U.S.C. Section 552a, as amended;

    (4)    the Inter-Governmental Cooperation Act, 31 U.S.C. Section 6501, *et. seq.* as amended;

    (5)    the Homeland Security Act of 2002, 116 Stat. 2135, 6 U.S.C. Section 101, *et seq.* as amended; and

    (6)    the Immigration and Nationality Act, 8 U.S.C. Section 1101, *et seq.* as amended.

## II.    PURPOSE AND COMMITMENT

DHS recognizes that Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can impact Texas's law enforcement, housing, education, employment, commerce, and healthcare needs and budgets. The harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes. Specifically, DHS recognizes that the following actions result in concrete injuries to Texas:

    (1)    a decrease of any immigration enforcement priorities;

    (2)    a reduction in the number of DHS agents performing immigration enforcement functions;

---

[1] The Department of Homeland Security, CBP, ICE, and USCIS are collectively referred to in this Agreement as "DHS." The Department of Homeland Security, CBP, ICE, and USCIS enter into this Agreement individually and collectively, such that termination or removal of one or more of those parties (whether by law or contract) does not terminate this Agreement as to any other parties.

(3)     a decrease or pause on returns or removals of removable or inadmissible aliens;

(4)     a decrease or pause on apprehensions or administrative arrests;

(5)     relaxation of the standards for granting relief from return or removal, such as asylum;

(6)     an increase in releases from detention;

(7)     a relaxation of the standards for granting release from detention;

(8)     changes to immigration benefits or eligibility, including work authorization, discretionary actions, or discretionary decisions; and

(9)     rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community.

At the same time, Texas recognizes that DHS relies on cooperation with Texas and information shared by Texas to carry out DHS's immigration enforcement functions. Any decrease in a State's cooperation or information sharing with DHS may result in a decrease in immigration enforcement.

To that end, this Agreement establishes a binding and enforceable commitment between DHS and Texas, in which Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

(1)     reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

(2)     decrease the number of ICE agents performing immigration enforcement duties;

(3)     pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

(4)     increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

(5)     increase or decline to decrease the number of releases from detention;

(6)     relax the standards for granting relief from return or removal, such as asylum;

(7)     relax the standards for granting release from detention;

(8)     relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

(9)     increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions for aliens; or

(10)    otherwise negatively impact Texas.

In case of doubt, DHS will err on the side of consulting with Texas.

## III.   RESPONSIBILITIES

### A.   DHS agrees to:

(1)     Utilize its immigration authorities, to the maximum extent possible, to prioritize the protection of the United States and its existing communities. This includes:

APPX. 043

a.  enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens;

b.  enforcing the immigration laws of the United States to prioritize detention over release of inadmissible and removable aliens;

c.  enforcing the immigration laws of the United States to apprehend and administratively arrest inadmissible and removable aliens;

d.  eliminating incentives and so-called "pull factors" for illegal immigration;

e.  limiting eligibility for asylum and other relief from detention, return, or removal to the statutory criteria; and

f.  refusing asylum and other relief from detention, return, or removal for those aliens who pose a danger to the United States, whether due to prior criminal history, the security of the United States, health, or some other bar.

(2)  Consult with Texas before taking any action or making any decision that could reduce immigration enforcement, increase the number of removable or inadmissible aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens.  This includes policies, practices, or procedures which have as their purpose or effect:

a.  reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement;

b.  decreasing the number of ICE agents within Texas's territorial jurisdiction performing immigration enforcement duties;

c.  pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country;

d.  decreasing the number of or criteria for detention of removable or inadmissible aliens from the country;

e.  decreasing or pausing apprehensions or administrative arrests;

f.  increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States;

g.  increasing, expanding, extending, or in any way changing the quantity or quality of immigration benefits or eligibility for these benefits or other discretionary actions for aliens; or

h.  otherwise negatively impacting Texas.

(3)  Provide Texas with 180 days' written notice (in the manner provided for in Section IV of this Agreement) of any proposed action listed in Section III.A.2 and an opportunity to consult and comment on the proposed action. DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action listed in Section III.A.2.  In case of doubt as to whether DHS's action is implicated by this provision,

Page 3 of 9

APPX. 044

DHS will err on the side of consulting with Texas before taking any such action listed above.

**B.    Texas agrees to:**

Support DHS's immigration enforcement by honoring "detainer requests" or "requests to hold" issued to Texas by ICE or CBP, and honoring DHS requests for records or information from the Texas Department of Motor Vehicles.

## IV.   NOTICES

All notices required hereunder shall be given by certified United States mail, postage prepaid return receipt requested, and addressed to the respective parties at their addresses set forth below, or at such other address as any party shall hereafter inform the other party by written notice. All written notices so given shall be deemed effective upon receipt.

> Department of Homeland Security
> Secretary of Homeland Security
> Washington, D.C. 20528
>
> U.S. Customs and Border Protection
> Office of the Commissioner
> 1300 Pennsylvania Ave. NW
> Washington, D.C. 20229
>
> U.S. Immigration and Customs Enforcement
> Office of the Director
> 500 12th Street SW
> Washington, D.C. 20536
>
> U.S. Citizenship and Immigration Services
> Office of the Director
> 5900 Capital Gateway Drive
> Suitland, Maryland 20746
>
> Texas
> c/o Greg Abbott, Governor of Texas          c/o Ken Paxton, Attorney General
> 1100 San Jacinto Boulevard, 4th Floor       300 West 15th Street
> Austin, Texas 78701                         Austin, Texas 78711

## V.   PENALTIES

Texas acknowledges that the information it receives from DHS is governed by the Privacy Act, 5 U.S.C. section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this Agreement may be subject to civil or criminal penalties.

APPX. 045

## VI.    INJUNCTIVE RELIEF

It is hereby agreed and acknowledged that it will be impossible to measure in money the damage that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such party shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

## VII.    THIRD PARTY LIABILITY

Each party to this Agreement shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution or performance of this Agreement, whether civil or criminal, and retains responsibility for the payment of any corresponding liability.

Nothing in this Agreement is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any non-party to this Agreement against any party, its agencies, officers, or employees.

## VIII.    DISPUTE RESOLUTION

DHS and Texas will endeavor to the best of their ability to resolve their disputes informally and through consultation and communication. Disagreements on the interpretation of the provisions of this Agreement that cannot be resolved between the parties should be provided in writing to the authorized officials at both agencies for resolution. If settlement cannot be reached at this level, the disagreement may be adjudicated in a United States District Court located in Texas.

## IX.    CONFLICTS

This Agreement constitutes the full agreement on this subject between DHS and Texas. Any inconsistency or conflict between or among the provisions of this Agreement, will be resolved in the following order of precedence: (1) this Agreement and (2) other documents incorporated by reference in this Agreement. Provided, however, that this Agreement shall not void, abrogate, or modify any other agreement between DHS and Texas unless and to such extent as such agreement conflicts with this Agreement.

APPX. 046

## X.     SEVERABILITY

The Parties agree that if a binding determination is made that any term of this Agreement is unenforceable, such unenforceability shall not affect any other provision of this Agreement, and the remaining terms of this Agreement shall, unless prohibited by law, remain effective as if such unenforceable provision was never contained in this Agreement.

The parties additionally agree that if this Agreement is found to be unenforceable as to one or more of the parties comprising DHS, including the Department of Homeland Security, such unenforceability shall not affect the validity of this Agreement as to the remaining parties and this Agreement shall remain effective as if such party was never a party to this Agreement.

## XI.    ASSIGNMENT

Texas may not assign this Agreement, nor may it assign any of its rights or obligations under this Agreement. To the greatest extent possible, this Agreement shall inure to the benefit of, and be binding upon, any successors to DHS and Texas without restriction.

## XII.   WAIVER

No waiver by any party of any breach of any provision of this Agreement shall constitute a waiver of any other breach. Failure of any party to enforce at any time, or from time to time, any provision of this Agreement shall not be construed to be a waiver thereof.

## XIII.  EFFECTIVE DATE

This Agreement shall be effective immediately when all parties have signed this Agreement. This Agreement shall continue in effect unless modified or terminated in accordance with the provisions of this Agreement.

## XIV.   MODIFICATION

This Agreement is subject to periodic review by DHS, its authorized agents or designees, and, if necessary, periodic modification or renewal, consistent with this Agreement's terms, to assure compliance with current law, policy, and standard operating procedures. This Agreement constitutes the complete Agreement between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of all parties evidenced in writing and signed by all parties.

Any party may accomplish a unilateral administrative modification to change point-of-contact information. A written bilateral modification (*i.e.*, agreed to and signed by authorized officials of all parties) is required to change any other term of this Agreement.

APPX. 047

## XV.   TERMINATION

Any party may terminate its involvement in this Agreement by submitting a request in writing to the other parties and providing 180 days' notice of intent to terminate its involvement in this Agreement. The termination will be effective 180 days after the written termination request was submitted or upon a date agreed upon by all parties, whichever is earlier. Termination by one party of its involvement in this Agreement shall not terminate this Agreement as to the remaining parties.

## XVI.   STATUS

The foregoing constitutes the full agreement on this subject between DHS and Texas.

Nothing in this Agreement may be construed to (1) negate any right of action for a State, local government, other person, or entity affected by this Agreement; or (2) alter the laws of the United States.

## XVII.   KNOWING AND VOLUNTARY ACKNOWLEDGMENT

The parties enter into this Agreement voluntarily, without coercion or duress, and fully understand its terms. The parties acknowledge they had an opportunity to review and reflect on this Agreement and have discussed its provisions with their respective counsel, if any. The parties attest they understand the effect of each of the provisions in this Agreement and that it is binding on all parties.

## XVIII. COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

## XIX.   FORMALIZATION

The undersigned represent that they are authorized to execute this Agreement on behalf of CBP, ICE, USCIS, and Texas, respectively.

Furthermore, the undersigned execute this Agreement on behalf of CBP, ICE, USCIS, Texas, respectively.

[Signatures on the following pages]

APPX. 048

**Signature for the Department of Homeland Security**

DEPARTMENT OF HOMELAND SECURITY

_____   1/8/2021
Kenneth T. Cuccinelli II                          Date
Senior Official Performing the Duties of the Deputy Secretary
Signed individually and collectively[2]

---

[2] "Signed individually and collectively" as used here indicates that the agency is entering into this Agreement both (1) for itself, independently, and (2) along with the other entities that comprise DHS, collectively.  Should one agency, for whatever reason, cease to be a party to this Agreement, this Agreement shall still survive for all other parties and be read and interpreted as if the removed party had never been a party to this Agreement.

APPX. 049

**Signature for the Office of the Governor of Texas**

OFFICE OF THE GOVERNOR OF TEXAS

_____     December 31, 2020
Greg Abbott                         Date
Governor


**Signature for the Office of the Attorney General of Texas**

OFFICE OF THE ATTORNEY GENERAL OF TEXAS

                                    12/31/2020
_____
Ken Paxton                          Date
Attorney General

Page 9 of 9

APPX. 050



## NEWS RELEASE

**FOR IMMEDIATE RELEASE**
Monday, August 2, 2021

### Hidalgo County Judge declares local state of disaster because of growing numbers of migrants seeking asylum

**Hidalgo County Commissioners Court**

**Richard F. Cortez**
*County Judge*

**David L. Fuentes**
*Commissioner, Precinct 1*

**Eduardo "Eddie" Cantu**
*Commissioner, Precinct 2*

**Everardo "Ever" Villarreal**
*Commissioner, Precinct 3*

**Ellie Torres**
*Commissioner, Precinct 4*

**OFFICE OF
COUNTY JUDGE
RICHARD F. CORTEZ**

**Public Affairs Division**

100 E. Cano St., 1ˢᵗ Floor
(956) 292-7026  **P**
(956) 292-7766  **F**
www.co.hidalgo.tx.us **W**
Public.Info@co.hidalgo.tx.us  **E**

**EDINBURG** – Hidalgo County Judge Richard F. Cortez on Monday signed a local state of disaster because of the growing threat of COVID-19 that may be present among the ongoing surge of migrants seeking asylum and being released in Hidalgo County. The declaration is effective immediately and remains in effect for seven days. The Hidalgo County Commissioners Court must vote to extend the disaster after seven days.

The two-page declaration, which declares that "U.S. Customs and Border Protection is releasing an alarmingly substantial number of immigrants into the City of McAllen," is different from the disaster proclamation issued by Governor Greg Abbott on May 31, 2021.

Governor's Abbott's declaration targets those illegally entering the United States and trying to remain in the country without authorization.

Judge Cortez' declaration on Monday focuses on the large numbers of migrants who are legally in this country after having applied for asylum and getting permission by federal officials to remain in the United States until their asylum claims are heard in immigration courts.

"The current situation can be confusing because of the complexity of existing immigration laws," Judge Cortez said. "My order today is targeting those migrants who are legally in this country seeking asylum, but are being released by immigration officials in high volumes while the spread of COVID-19 is spiking within our community."

The order notes that nonprofit agencies and the City of McAllen are being overwhelmed by the continued influx of these asylum-seeking migrants and can "no longer adequately feed, house, provide medical attention or otherwise accommodate" these migrants.

At the same time, Hidalgo County is seeing a spike in COVID-19 cases and now has a hospitalization rate in excess of 18 percent. Governor Abbott has declared that a rate in excess of 15 percent is considered a high hospitalization rate.

"My order declares that extraordinary measures must be taken," Cortez said. A local disaster declaration is the first step in securing additional resources to address the disaster, including potential reimbursement from state and federal authorities.

"We must change current immigration laws and existing policies to slow the volume of migrants seeking asylum," Cortez said. "Until those laws and policies are changed, we must increase local capacity to safely accommodate these migrants legally seeking asylum."

**###**

*Hidalgo County is home to one of the fastest growing regions in the nation. We provide health and justice to the over 800,000 residents of our county. We strive to be accessible and responsive to our citizens by providing excellent public service through the values of leadership, transparency, fairness, collaboration, respect and fiscal responsibility. Follow our social media feed at www.co.hidalgo.tx.us/followus*



AUG 0 2 2021

ARTURO GUAJARDO, JR. COUNTY CLERK
HIDALGO COUNTY, TEXAS
BY_____ DEPUTY

## DECLARING A LOCAL STATE OF DISASTER

**WHEREAS**, the United States Federal Government declared a national emergency on March 13, 2020 due to the COVID-19 public health emergency; and

**WHEREAS,** the State of Texas declared a State of Disaster in Texas on March 13, 2020 due to COVID-19; and

**WHEREAS,** U.S. Customs and Border Protection is releasing an alarmingly substantial number of immigrants into the City of McAllen, Texas, which is within the jurisdictional boundaries of the County of Hidalgo, Texas, including individuals that are positive for COVID-19; and

**WHEREAS,** local Non-Governmental Organizations, and the City of McAllen are overwhelmed with the unanticipated influx of individuals and can no longer adequately feed, house, provide medical attention or otherwise accommodate the individuals being released into the County of Hidalgo, Texas; and

**WHEREAS**, due to recent increases in number of released immigrants and the potential for even greater numbers to come, immigrants being released into the County of Hidalgo may face inadequate access to medical care, shelter and other humanitarian necessities including food and water; and

**WHEREAS,** immigration is under the purview of the federal government and is not under state, county or municipal jurisdiction; and

**WHEREAS,** Hidalgo County is seeing an increase in the total number of positive COVID-19 cases and a hospitalization rate in excess of 18%; and

**WHEREAS**, it is necessary to take additional steps to prepare for, respond to and mitigate the spread of COVID-19 to protect the public health and welfare; and

**WHEREAS**, it is necessary to provide for the humanitarian needs of the immigrants released into the City of McAllen, Texas, and the County of Hidalgo, Texas, including individuals that are positive for COVID-19,

**WHEREAS**, the Judge of the County of Hidalgo has determined that extraordinary measures must be taken to protect the public health, safety and general wellbeing of the population of Hidalgo County, in order to alleviate the suffering of people and to protect or rehabilitate property; and

**WHEREAS**, Section 418.108(a) of the Texas Government Code provides that the presiding officer of the governing body of a political subdivision may declare a state of local disaster;

**NOW, THEREFORE, BE IT PROCLAMIED BY THE JUDGE OF THE COUNTY OF HIDALGO:**

1. That a state of disaster is declared for the County of Hidalgo, Texas;

2. that the County's Emergency Management Plan has been activated;

3. that this State of Disaster shall continue for a period of not more than seven days from the date hereof, unless the same is continued by consent of the Commissioners Court of the County of Hidalgo, Texas; and

4. that this proclamation shall take effect immediately from and after its issuance.

ORDERED this the 2ⁿᵈ day of August, 2021.

_____
Richard F. Cortez, Hidalgo County Judge

ATTEST:

_____
Arturo Guajardo, Jr., County Clerk



**WWW.MCALLEN.NET**

**FOR IMMEDIATE RELEASE**                                                                                                          **AUGUST 4, 2021**
**Contact:**            Xochitl Mora, Office of Communications  O: 681-1202 / M: 662-9269 / E: xmora@mcallen.net

# City of McAllen Approves Setting Up Temporary Emergency Shelter in Response to Migrant Surge

*McAllen City Commission decision seeks to protect public health and safety*

Yesterday, the McAllen City Commission took decisive action to protect public health and safety.

Faced with a rapidly escalating surge of immigrants at the Texas-Mexico Border, the City of McAllen's Emergency Management Office, in coordination with City Management and in accordance with the Mayor's Declaration of Local Disaster executed on August 2, 2021, took swift action to begin its efforts to mitigate emergent health and safety risks.

In response to these actions, by an overwhelming majority, the McAllen City Commission ratified and gave further specific instruction to the Emergency Management Office and City Management, through the Mayor's Disaster Declaration to request that Hidalgo County erect temporary emergency shelter on property in McAllen on 23rd Street for the overwhelming number of immigrants stranded in McAllen by U.S. Customs and Border Protection.  The City Commission also instructed City staff to demand relief from the federal government for the alarming number of immigrants that are being released into the city of McAllen. The Commission further instructed staff to assist local non-governmental organizations to swiftly expand their operations, including identifying additional locations for emergency shelter should the need arise.

The current immigration surge began in 2014 under the Obama administration and has continued for seven years to the present surge the community is now experiencing.  So far in 2021, McAllen has seen well over 87,000 immigrants pass through its city limits.  U.S. Customs and Border Protection has reported a historic increase in immigrant apprehensions.  For context, in 2020 the total number of Title 42 Expulsions on the Southwest Border was 381,928. To date in 2021, in less time, a total of 566,959 Title 42 Expulsions have occurred on the Southwest Border.

While some immigrants are refused entry at the border under current Title 42 restrictions, many are temporarily lawfully admitted into the United States pending their asylum hearing.  In these cases, the federal government only detains them for a couple of days.  After which, absent the commission of a separate crime, neither law enforcement nor private entities have the legal authority to further detain them. As these temporarily admitted immigrants are released, the federal government does not test them for COVID-19 or provide assistance in contacting relatives or sponsors living in the United States to make arrangements for temporary housing.

Due to this unacceptable flaw in the federal immigration system, Catholic Charities of the Rio Grande Valley established the Humanitarian Respite Center.  The facility currently operates under a Conditional Use Permit at 111 S. 15th Street, in a building owned by Catholic Charities of the RGV. The Respite Center focuses its services on family units and has processed over 87,000 immigrants since mid-February of 2021, providing them essentials: clothing, shoes, meals, showers, basic medical care and a safe place to rest.

**-more-**

APPX. 054

**City of McAllen Approves Temporary Emergency Shelters in Response to Migrant Surge/*page 2 of 3***

The Respite Center also assists immigrants in contacting their U.S. sponsor, typically a family member, who will make financial arrangements for the immigrants' final travel into the United States. The City of McAllen does not pay for immigrant travel. In most cases, immigrants move through the Respite Center in one day.  However, at times, due to the unavailability of northbound transportation, some immigrants remain at the Center for more than a day.

For nearly seven years, the Respite Center had the capacity to process the flow of immigrants released into McAllen, keeping them off the streets.  However, in the last several weeks, due to the shockingly large number of immigrants released by CBP, the Respite Center's capacity became overwhelmed, and threatened its ability to provide its humanitarian services to all in need.  This significant change increases the threat of COVID spread or other lawlessness within the city.

At the beginning of July, the Respite Center saw an average of 750 people per day.  That number, over the course of the month, escalated to over 1,100 people per day, and so far in August has surged to over 1,900 people per day.  The Respite Center has capacity for only 1,236 occupants and will not allow more than its maximum occupancy at any given time. Therefore, beginning in August 2021, there has been a significant threat of leaving hundreds  on the streets of McAllen with no place to turn for food, shelter, medical attention, or other humanitarian services.  It was at this point that McAllen Mayor Javier Villalobos saw no option other than to declare a Local State of Disaster in McAllen so the City of McAllen could obtain necessary county and state resources to address the situation that it did not create.

To make matters worse, in 2020 the global pandemic of COVID-19, a highly contagious respiratory virus, swept the globe, including McAllen and the migrants flocking to the Texas-Mexico border.  In order to continue the Respite Center's operations during the deadly pandemic, Catholic Charities of the RGV partnered with American Medical Response (AMR) to test immigrants for COVID-19 at a location near the Respite Center.  Since mid-February of 2021 there have been over 7,000 confirmed COVID-19 positive immigrants released into the City of McAllen by CBP, including over 1,500 new cases in the past seven days. AMR now operates at S.15th Street in a building leased to AMR. AMR's testing operations are allowed under the current zoning for that location, and a permit from the City of McAllen is therefore not required for its operations.  AMR operates under a contract with the City of McAllen which is entirely pre-funded by a FEMA grant program.

The influx of migrants and their movement between AMR, the Respite Center, the McAllen Bus Terminal and McAllen International Airport has required parking management in the area around the Respite Center ,which is coordinated by City of McAllen Downtown Services, a division of McAllen Metro in accordance with the Transit Director's authority under Section 102-229 of the McAllen Code of Ordinances.

Under Catholic Charities' current protocol, immigrants are tested for COVID-19 at AMR. Once the immigrants are tested, they are divided into two groups. Those that test negative are admitted to the Respite Center; those that test positive are transported from the AMR testing facility to quarantine sites in the Rio Grande Valley area. AMR provides the transportation to locations arranged for and directed by Catholic Charities.

**-more-**

**City of McAllen Approves Temporary Emergency Shelter in Response to Migrant Surge/*page 3 of 3***

Once an immigrant has completed quarantine, they proceed on their final northbound travel out of McAllen.

Despite the City of McAllen and its community partners' best efforts, the sheer number of immigrants being released into the city has become a crisis: a crisis the City of McAllen did not create and has proactively tried to avoid for seven years. Now, with the drastic, unexpected increase of immigrants arriving to McAllen, the City Commission's first priority is to protect the health and safety of the residents they serve. Mayor Villalobos's August 2, 2021 Local Disaster Declaration was an important step in McAllen's obtaining additional critical resources from the State of Texas and Hidalgo County. The City of McAllen, known for its safety and security, did not create nor invite this crisis, but it will swiftly respond and take every action within its power to protect the health and safety of its residents.

# # #

 @cityofmcallen          McAllen TX

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-173-KC |
| | § | |
| THE STATE OF TEXAS; GREG ABBOTT, in | § | |
| his official capacity as Governor of Texas, | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF SERGEANT JOEL VILLARREAL**

1. My name is Sergeant Joel Villareal. I am over 18 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts stated within this affidavit.

2. I am an employee of the La Joya Police Department and familiar with the manner in which its records are created and maintained by the La Joya Police Department by virtue of my duties and responsibilities.

3. Attached hereto are four pages of records from the La Joya Police department.

4. The attached records are kept by the La Joya Police Department in the regular course of its official activities and the attached records are true and correct copies of the original document.

5. These records were made by employees of the La Joya Police Department at or near the time of the events recorded or reasonably soon after the events described in the attached documents.

6. It is the regular practice of the La Joya Police Department for an employee or representative of the La Joya Police Department to create or record this type of record

from information known to them or information transmitted to them during an investigation by persons with knowledge of the matters set forth in them.

7. It is the regular practice of La Joya Police Department to maintain this type of official record in the course of its operations.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on August ___, 2021

_____
Sergeant Joel Villearreal

# LA JOYA POLICE DEPARTMENT

## Offense / Incident Report

**GENERAL OFFENSE INFORMATION**          **Report Type:**   Cumulative Report

| | |
|---|---|
| Agency   LA JOYA PD | Location   450 E EXPRESSWAY EXPRESSWAY |
| Case #   07-0159-21 | BUILDING |
| File # | LA JOYA TEXAS 78560 |
| Description          WELFARE CONCERN /// IMMIGRANTS WITH COVID-19 | |
| Incident Status | From Date/Time   07/26/2021 00:00 |
| | To Date/Time |
| | Report Date   07/26/2021 13:15 |
| Reporting Officer   VILLARREAL, JOEL | Initial Rep. Date   07/26/2021 13:15 |

**COMPLAINANT**

| | | | | | |
|---|---|---|---|---|---|
| Name      State Of Texas, | | | | | |
| Address   701 E EXPRESSWAY  LA JOYA TX 78560 | | | | Phone   956-585-4855 | |
| Race      W | Ethnic   H | Sex   M | DOB | | |
| Height    5'08" | Weight | Hair   BRO | Eyes   BRO | | |
| S.S.N.    ___-__-____ | DL & St. | JRN# | | | |

**Entered By**   VILLARREAL, JOEL

**Officer**      VILLARREAL, JOEL

**Supervisor**

APPX. 059

Case No:  07-0159-21

**LA JOYA POLICE DEPARTMENT**
**P.O. BOX H**
**LA JOYA, TEXAS 78560**
**(956) 585-4855**

## Incident # 07-0159-21

VILLARREAL, JOEL

On July 26, 2021 at approximately 1:15pm I, Sergeant Joel Villarreal S2, was informed by Officer Soraida Varela #1407 that she was waved down by a concern citizen who wanted to report a family that was inside the Whataburger restaurant located at 450 E. Expressway 83 La Joya Tx, 78560, who were coughing and sneezing not being observant of the health of other patrons in the restaurant

Officer Varela informed me that she made contact with the woman who had waved her down and expressed concern about the family group not using face masks while they were in visible ill condition as well as coughing without covering their mouths and sneezing without covering their nose and mouths. Officer Varela made contact with the family groups' mother identified as Walquiria Desire Flores- Sauceda ( ) who was accompanied by a teenage girl and two toddlers. Officer Varela explained that she observed that Ms. Sauceda had in her hands a paper from Home Land Security, Form I-385, that identified her and had a date of apprehension dated, 07/23/2021.

Officer Varela asked Ms. Sauceda if she and the people with her were in ill conditions. Ms. Sauceda stated that immigration had taken her, and her family, and that all of them were diagnosed with Covid-19. They were then turned over to a charity group to take care of them. Officer Varela called me and explained what is mentioned above. She also stated that she observed that the children were coughing, sneezing and had a lot of wet and dried mucus all over their face. Officer Varela explained that Whataburger manager Jeffry Homer asked for the people to be asked to leave due to their disregard of safe health practices.

I asked Officer Varela to request a Border Patrol agent to her location to verify the I-385 Form. Communications officer Yaneli Medina called McAllen sector Border Patrol and asked for an agent for verification of the I-385 Form. She was told that Border Patrol Agents were giving out the forms to undocumented aliens who they had already made contact with, which were then released from their custody to go free. Moments later she received a call from the McAllen sector Border Patrol and was told to inform Officer Varela to be careful with Ms. Sauceda because she was positive for Covid - 19. She was also informed that Ms. Sauceda and others were going to staying at the Texas Inn Hotel and Suits located at, 612 E Expressway 83 La Joya Tx,78560

I made contact with McAllen sector Border Patrol Acting Watch Commander Villarreal and asked her about the situation. She explained that when the Border Patrol Agents encountered undocumented aliens their agency would hold them for quarantine. After that they were turned over to Catholic Charities of The Rio Grande Valley who took custody of the people that were sick. She explained that after Catholic Charities of The Rio Grande Valley takes custody of the undocumented aliens, they had no control of what they did with the groups of sick people.

It was later confirmed that Ms. Sauceda and a large group of people that had been apprehended by Border Patrol Agents, confirmed to be sick, were taken by Catholic Charities of The Rio Grande Valley who then rented out the Texas Inn Hotel

Case No:   07-0159-21

and Suits in La Joya to house all the people.

Upon gathering all this information I was directed to talk to Tony Crane, Homeland Security Person in charge for Rio Grande Valley Sector, who explained that if there is no space for illegal immigrants in their facilities they are given to Sister Norma who then finds a place for the illegal immigrant in hotels in the McAllen area. I asked him why the City of La Joya or the La Joya Police Department were not informed of the illegal immigrants stay at the Texas Inn Hotel and Suits. Mr. Crane explained that neither him, nor his agency had any control on what Catholic Charities of The Rio Grande Valley did with the groups of sick people they were housing. Mr. Crane stated that the illegal immigrants were being told by Home Land Security Agents could or Customs and Border Protection Agents to travel to their final destinations in the United States and to report to the nearest ICE office for further processing. Mr. Crane explained that once Home Land Security Agents could or Customs and Border Protection Agents made contact with any illegal immigrant who was given the I-385 Form, Home Land Security Agents could or Customs and Border Protection Agents could not hold them again.

I drove to the Texas Inn and Suits to make contact with management to get more information on the situation. Upon arrival I observed about 20 to 30 individuals walking around the hallways and the parking lot of the hotel. I observed that the majority of them were not wearing masks, especially the children. I made contact with the hotel owner, Mr. Patel, who I asked who had brought the people to his hotel. Mr. Patel showed me a 3 page list with names and rooms of people in them. He stated that a charity had brought the people in.

I asked Mr. Patel to give me a count of how many people the charity had brought. Mr. Patel stated that he only received about 4 people in total. After being questioned again and after pointing out the list he initially showed me, he stated that the hotel had been rented out entirely by Catholic Charities of The Rio Grande Valley with people who were sick. He then directed me to one of his employees, who he told me was in charge of the people brought in by Catholic Charities of The Rio Grande Valley. The man explained that he did not work for the organization and that he feared for his wellbeing and he was in no way connected to what Mr. Patel and Catholic Charities of The Rio Grande Valley were doing. He stated that he was informed that all the people in the hotel were sick and he was aware that everyone staying in the hotel were told they could leave. He explained that more than half of the people that were placed in the hotel by Catholic Charities of The Rio Grande Valley had left the hotel.

As I was talking to the hotel worker I observed a vehicle park next to a meeting building connected to the hotel. A woman exit the building holding an I-385 Form. I asked her where she was going. She stated that she was told by immigration and the charity group that they could leave with an immediate family member within the United States even though they were sick. A large group of people began to gather around us and I asked them if they were sick with Covid-19. Everyone in the group stated that they were all sick with Covid-19.

I immediately made contact with Hidalgo County Health and Human Services who directed me with Doctor Steven Hinojosa and his assistant Vanessa Zuniga. I explained to them the situation and expressed the concern. Ms. Zuniga stated that they would get us further information and a solution for my call.

Dr. Hinojosa called me shortly after and explained that due to the fact that

Case No:   07-0159-21

there was no current emergency mandates given by the State of Texas or the Federal Government, Hidalgo County Health and Human Services could not enforce any shelter at home mandates on Catholic Charities of The Rio Grande Valley. He explained that Catholic Charities of The Rio Grande Valley is a private entity and they are not regulated or required to follow what Hidalgo County Health and Human Services tells them with out an actual mandate coming from the State of Texas or the Federal Government . He explained that the only thing they could do is recommend to them better health and safety practices but they could not force them to do so. Dr. Hinojosa explained that he was going to get to work on finding a solution to what happened.

I also made contact with Hidalgo Emergency Management Rick Saldana who I explained what was happening. Mr. Saldana explained that he had gotten in contact with Catholic Charities of The Rio Grande Valley. He explained that he was told by the Catholic Charities of The Rio Grande Valley that they would be placing security guards at the hotel to keep sick illegal immigrants from leaving or walking around the city.

Update: (07/27/2021)

Doctor Steven Hinojosa and his assistant Vanessa Zuniga called me to give me an update. Doctor Hinojosa explained that he had sent out a letter of recommendation to  Hidalgo County Judges and the District Attorney requesting for Catholic Charities of The Rio Grande Valley be sent a control order for undocumented aliens who tested positive for Covid-19. In addition, for situational awareness, Hidalgo County is working with Catholic Charities on other steps not specified. The goal is to have the control order provided at Catholic Charities so that those identified as positive have notification to be in isolation.

STATE OF TEXAS

COUNTY OF WEBB



MARGIE R. IBARRA
COUNTY CLERK
FILED

2021 JUL 21  AM 10: 21

WEBB COUNTY, TEXAS

BY____RL____DEPUTY

## CORRECTED DECLARATION OF LOCAL STATE
## OF DISASTER AND ORDER
### JULY 20, 2021

**WHEREAS,** the Texas Government Code §418.108 authorizes the County Judge to declare a state of disaster; and

**WHEREAS,** pursuant to the Texas Disaster Act of 1975, the County Judge is designated as the Emergency Management Director of the County of Webb, and may exercise the powers granted to the governor on an appropriate local scale; and

**WHEREAS,** on May 10, 2021 the Commissioner of Public Health, Dr. John Hellerstedt advised the Secretary of State of the State of Texas that he had, for the entire State of Texas, issued "A declaration of a Public Health Disaster Declaration, stating that the novel coronavirus (SAR-CoV-2, that causes the disease COVID-19) continues to present an immediate threat, poses a high risk of death to a large number of people and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas"; and

**WHERAS,** as reported by the Texas Tribune on July 19, 2021, Texas' coronavirus positivity rate exceeds 10% and according the City of Laredo Health Department, as of July 15, 2021 Laredo's positivity rate is 12.5%; and

**WHEREAS,** Webb County has experienced the organized transportation of large numbers of individuals (refugees, immigrants and/or migrants, a significant portion of whom are unvaccinated, untested for the COVID -19 virus and COVID positive) who have been apprehended from outside Webb County and are transported into Webb County by bus and/or van for the purpose of processing and release into the community; and

**WHEREAS,** local resources and services available in Webb County (including those resources provided by the county, the city and non-governmental organizations) to address the unanticipated influx of these individuals has overwhelmed local resources and services to the extent that they can no longer adequately feed, house, provide medical attention or otherwise accommodate these individuals entering Webb County; and



I, Margie Ramirez Ibarra, County Clerk, Webb County, do hereby certify that this is a true and correct copy as the same appears of record in my office. Witness my hand and seal of office on   Margie Ramirez Ibarra, Webb County Clerk
By:
Deputy County Clerk

APPX. 063

**WHEREAS,** the County Judge of Webb County, Texas, has determined that adequate measures must be taken to ensure the protection of the health, safety, and welfare of Webb County residents.

**NOW THEREFORE,** I, Tano E. Tijerina, County Judge for the County of Webb, do hereby declare a local state of disaster and certify that the transportation of refugee, immigrant and/or migrant individuals into Webb County who have been apprehended from outside the U.S. Border Patrol Laredo Sector and are transported into Webb County by bus and/or van for the purpose of processing and release into the community has created a disaster and I have further determined that extraordinary and immediate measures must be taken to further respond, prevent and alleviate the catastrophic effect on the community and do hereby **ORDER:**

Section 1.   The prohibition of the transportation of refugee, immigrant and/or migrant individuals into Webb County who have been apprehended from outside the U.S. Border Patrol Laredo Sector and are transported into Webb County by bus and/or van for the purpose of processing and release into the community.

Section 2.   That law enforcement, upon cause, stop any buses or vans they believe are engaged in the transportation of refugee, immigrant and/or migrant individuals into Webb County who have been apprehended from outside the U.S. Border Patrol Laredo Sector and are transported into Webb County by bus and/or van for the purpose of processing and release into the community and inform the operator and driver of the said bus, that pursuant to Section 418.108(g) the County Judge has prohibited the transportation of said refugee, immigrant and/or migrant individuals into Webb County and they are directed to leave Webb County.

Section 3.   Pursuant to Section 418.108(h) (1) the jurisdiction and authority of the county judge includes the incorporated and unincorporated areas of the county; and (2) to the extent of a conflict between decisions of the county judge and the mayor, the decision of the county judge prevails.

Section 4.   Effective immediately and pursuant to Section 418.108(b) of the Texas Government Code, the state of disaster shall continue for a period of not more than seven days from the date of this declaration unless earlier terminated by the County Judge or continued by the Commissioners Court of Webb County, Texas.

Section 5.   Pursuant to Section 418(c) of the Texas Government Code, this declaration of a local state of disaster shall be given prompt and general publicity and shall be filed promptly with the County Clerk of Webb County, Texas.

Section 6.   Pursuant to Section 418.108(d) of the Texas Government Code, this declaration of a local state of disaster activates the Webb County emergency plan.

I, Margie Ramirez Ibarra, County Clerk, Webb County, do hereby certify that this is a true and correct copy as the same appears of record in my office.
Witness my hand and seal of office on   Margie Ramirez Ibarra, Webb County Clerk
APPX 064
Deputy County Clerk

Section 7.    Where this Declaration and Order is in conflict with any **ORDER** of the Governor of the State of Texas, the Governor's **ORDER** shall control.

Section 8.    This **DECLARATION** applies to all areas of Webb County, including the City of Laredo, the City of Rio Bravo, the City of El Cenizo, Aguilares, Antonio Santos Subdivision, Botines Subdivision, Bruni, Colorado Acres, D-5 Acres, Four Points Subdivisions, Hillside Acres I, Hillside Acres II, La Coma Subdivision, La Presa Subdivision, Laredo Ranchettes Subdivision, Las Haciendas Unit I, Las Lomas I, Las Lomas II, Las Pilas I, Las Pilas II, Lewis Addition (Mirando), Los Altos Subdivision, Los Corralitos Subdivision, Los MInerales and Annex, Los Veteranos (US Hwy 59), Los Veteranos 83, Mirando City, Oilton, Old Milwaukee, Pueblo East, Pueblo Nuevo, Ranchitos 359 East, Ranchitos Los Arcos, Ranchitos Los Centenarios, Ranchitos Los Fresnos, Ranchitos Los Mesquites, Ranchitos Los Nopalitos, Ranchitos Los Veteranos 359, Rancho Penitas West, San Carlos I, San Carlos II, Tanquecitos I, Tanquecitos II.

**CORRECTED ORDERED THIS 20ˢᵗ DAY OF JULY, 2021.**

Tano E. Tijerina
Webb County Judge

ATTEST:
Margie Ramirez Ibarra
Webb County Clerk

By: _____

WEBB COUNTY JUDGE
DISASTER DECLARATION

July 20, 2021
Page 3 of 3



I, Margie Ramirez Ibarra, County Clerk, Webb County, do hereby certify that this is a true and correct copy, as the same appears of record in my office.

Witness my hand and seal of office on

JUL 21 2021

Margie Ramirez Ibarra
Webb County Clerk
By _____
Deputy County Clerk

APPX. 065

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

UNITED STATES OF AMERICA,

     *Plaintiff,*

     v.

THE STATE OF TEXAS and GREG
ABBOTT, in his official capacity as Governor
of the State of Texas,

     *Defendants.*

Case No. 3:21-cv-173-KC

## DECLARATION OF DR. VICTOR TREVIÑO

I, Dr. Victor Treviño, M.D., pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, and information made available to me from official records and reasonably relied upon by me in the course of my employment, hereby declare as follows:

1. I am a licensed physician and have served as the Health Authority for the City of Laredo since 2018. I previously served as the Medical Director for the Health Department for the City of Laredo, Texas, for 10 years and have worked in the Health Department for over 30 years.  *OK*

2. The COVID-19 pandemic has been a significant health threat to our community since the first case was detected in Laredo in early 2020.

3. The Laredo Health Department has treated numerous people over the past 18 months for COVID-19. As a general matter, our community is medically underserved due to a lack of hospital personnel. For example, Laredo has no pediatric intensive care unit.

4. Hospitals in Laredo are on diversion status because they are unable to take additional hospitalizations, and our main NGO has already been placed on quarantine. COVID-19 has placed significant pressure on our health resources. At times, Laredo has had no, or very few, ICU beds available because COVID patients required so many of Laredo's ICU beds.

5. Beginning in or around May of 2021, the City of Laredo was informed by the United States Border Patrol that it would begin busing migrants from other regions to Laredo. At that time, the Border Patrol started sending 6 buses of migrants to Laredo per day. Each bus dropped its migrant passengers in Laredo. Many, if not all, of the migrants released by the Border Patrol had not been tested for COVID-19.

6. Since that time, the Border Patrol has continued to send an average of **3 to 6** buses of migrants per day. Some of the migrants are dropped off at local NGOs, but others are released onto the streets, irrespective of their infection status.

7. On average, a bus contains approximately 50 to 60 migrants, mostly women and children. Many of the buses that travel to Laredo are coming from the Rio Grande Valley. Because we have provided care for many of these migrants we

have discovered that these individuals are largely unvaccinated and are mostly coming from countries with lower vaccination rates than in the United States and in Texas. Among its permanent residents, Laredo has a very high vaccination rate relative to other major Texas cities.

8. The migrants are subject to antigen testing upon arrival at our shelters. Based on antigen testing performed on those individuals it appears approximately 40 to 50 percent of the migrants we have tested were positive for COVID-19. Many of these individuals, including children, become sick, thereby exacerbating our community's already overburdened hospitals and clinics. The actual percentage of these individuals that have contracted COVID-19 is likely even higher than our testing indicates. This is because the individuals who test negative for COVID-19 travel together and routinely share the same buses with those who test positive, and because of the incubation period during which one who has been recently exposed to COVID-19 will not test positive for the virus.

9. The virus also has a uniquely high rate of transmission among this population because of the health problems that often arise from the migratory journey. Conditions such as malnourishment, dehydration, and intestinal diseases such as gastroenteritis put them in a high-risk category to contract COVID-19 and test positive. I am also concerned that our shelters cannot accommodate such a large number of migrants in a manner that is safe and consistent with CDC guidelines.

10. As a result of this situation, our community has seen a recent increase in COVID-19 cases. This includes an increase in COVID-19 cases among younger people. This all brings further harm to our community for reasons already explained.

11. In July, for example, a pregnant woman in her twenties arrived at a Laredo hospital to give birth. She was not vaccinated and tested positive for COVID-19. Despite her doctors' best efforts, the young woman passed away from complications related to COVID-19.

12. In August, a three-month old migrant who was already very ill with COVID pneumonia arrived in Laredo on a bus. The infant was brought to a Laredo hospital, but because no Laredo hospital has a pediatric intensive care unit, the infant had to be transferred to another city. This was not an isolated case.

13. Federal officials have acknowledged the burden that busing migrants to Laredo imposes on the city. At times, they have agreed to temporarily suspend sending migrants from the Rio Grande Valley to Laredo to avoid overburdening local resources, but to date, they have continued to send buses of migrants to Laredo.

14. The continued introduction of more unvaccinated and COVID-positive migrants will exacerbate the burden on Laredo and create a public health crisis. Effectively combatting COVID-19 in Laredo requires ending or reducing the mass release of COVID-positive migrants into the community.

Executed on August 10, 2021.

Dr. Victor Treviño

Health Authority for the City of Laredo, Texas

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary of Homeland Security, et al.,<br><br>Defendants. | Civ. A. No. 21-100 (EGS) |

### DECLARATION OF DAVID SHAHOULIAN

I, David Shahoulian, pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, as well as documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.  I am the Assistant Secretary for Border and Immigration Policy at the Department of Homeland Security (DHS or Department) and have been in this role since January 20, 2021. I previously served as Deputy General Counsel at DHS from June 29, 2014 to January 19, 2017.

2.  I submit this declaration to alert the Court to the adverse consequences of a preliminary injunction prohibiting the Government from applying the Centers for Disease Control and Prevention's (CDC) Order Suspending the Right to Introduce Certain Persons from Countries where a Quarantinable Communicable Disease Exists ["CDC Order"], 85 Fed. Reg. 65806 (Oct. 16, 2020), or any similar order, to the putative class in this case.

3.  As explained in more detail below, the United States is currently encountering record numbers of noncitizens, including families, at the border. These encounter rates have strained DHS operations and caused border facilities to be filled beyond their normal operating capacity,

1

impacting the ability to employ social distancing in these congregate settings.  At the same time, DHS is also experiencing significantly increased rates of noncitizens testing positive for COVID-19.  In light of these and other considerations, enjoining the application of the CDC Order to families would exacerbate overcrowding at DHS facilities and create significant public health risks.

4.  Since January 2021, the Department has engaged in extensive efforts to increase its capacity to safely process asylum seekers and other noncitizens.  Among other things, DHS has worked tirelessly to build capacity and to create innovative new approaches to allow asylum seekers and other noncitizens to be processed in a manner that ensures their health and safety, and that of DHS officers and the American public.  Those efforts—which are the product of extensive collaboration with other U.S. Government agencies, foreign governments, and non-governmental organization (NGO) partners—have been successful in significant respects as detailed below.

5.  The Department lacks sufficient capacity to safely hold and process all individuals seeking to enter the United States during the global pandemic if the U.S. Government were restricted in its ability to implement the CDC Order.  These capacity challenges are particularly acute with respect to families.  DHS continues to have severely limited capacity to hold and process families, and the current migrant surge and ongoing pandemic have only compounded these issues.

6.  If the CDC Order is enjoined with respect to families, the increased number of families seeking to enter the United States would each require additional processing related to admissibility, which would in turn require them to be held for longer periods in increasingly crowded conditions.  Moreover, due to such conditions and other capacity constraints, DHS would effectively need to release a growing number of families into border communities, which risks overwhelming the local testing, isolation, and quarantine infrastructure DHS has worked to create and will thus burden

2

local healthcare systems and strain healthcare resources.  An injunction restricting implementation of the current CDC Order as to families will result in an immediate increased risk of harm from COVID-19 for noncitizens in DHS custody, DHS personnel, and potentially the public.

### I.      The U.S. Government's Efforts to Build Capacity and Improve Processing

7.    Since January 2021, the U.S. Government has engaged in extensive and varied efforts to improve the immigration processing systems at the border, while also dealing with challenges presented by the COVID-19 pandemic and the current influx of noncitizens seeking refuge in the United States.

8.    First, the Government has worked to significantly increase its ability to safely process and house individuals encountered between ports of entry after crossing into the United States.  U.S. Customs and Border Protection (CBP) and the Department of Health and Human Services, for example, have stood up numerous emergency facilities in the United States (and retrofitted existing ones) to increase their ability to safely hold and process individuals—particularly unaccompanied children (UCs) and families—encountered after crossing between ports of entry.  U.S. Immigration and Customs Enforcement (ICE) has transitioned existing facilities for the processing and testing of families, and it has entered into a contract with a non-profit social service organization to add over 1,200 additional beds to ICE's family housing capacity.  And the Department has transferred hundreds of personnel from various component agencies around the country to the southwest border to assist with the processing and care of individuals encountered at the border.

9.    Second, the Department has also taken significant steps to develop systems to facilitate testing, isolation, and quarantine of those individuals who are not immediately returned to their home countries after encounter.  Across most of the southwest border, these systems were developed by DHS in coordination with state and local jurisdictions, non-governmental

3

APPX. 073

organizations, and other private entities. In the Del Rio sector, where there is limited non-governmental organization capacity, the Department set up a system for testing and non-congregate sheltering involving private contractors and ICE family facilities. Due to infrastructure and resource limitations, it is not feasible to replicate this latter system across the border.

10. Third, the U.S. Government also engaged in several lines of effort to improve its capacity to safely process asylum seekers and other individuals through U.S. ports of entry. For example, the U.S. Government—in collaboration with international organizations and domestic non-governmental organizations—rapidly developed an innovative system to register, test, and transport certain individuals previously returned to Mexico pursuant to the Migrant Protection Protocols (MPP) for safe and orderly processing into the United States through various ports of entry at the southwest border. To date, the U.S. Government has processed approximately 13,000 individuals, including many families, pursuant to its Title 8 authorities through this program.

11. The U.S. Government has also engaged with international humanitarian organizations and non-governmental organizations to establish similar streamlined systems for the U.S. processing of other individuals, particularly families, who may qualify for an exception to the CDC Order for humanitarian reasons. Under these systems, non-governmental organizations identify and refer families and other individuals in vulnerable situations in Mexico to DHS for possible exception from expulsion, based on the totality of the circumstances, on a case-by-case basis, as determined by DHS in accordance with the CDC Order. Once they test negative for COVID-19, such individuals may be processed pursuant to Title 8 authorities at designated ports of entry. To date, over 16,000 individuals have been processed into the United States through these CDC-authorized processes.

APPX. 074

12. DHS is committed to continuing to use mechanisms like those described above to allow the safe processing of vulnerable families under Title 8 for as long as Title 42 remains applicable to families.

**II.    An Injunction Would Result in Severe Capacity Limitations Endangering Non-Citizens, DHS Employees, and Others**

13. Despite the U.S. Government's efforts to build safe processing capacity, DHS's application of the CDC Order remains necessary, while the pandemic continues, to prevent COVID-19 exposure risks to DHS personnel, individuals seeking entry to the United States, and border communities. This risk has recently increased due to the recent spread of the highly transmissible COVID-19 Delta variant. The rates at which encountered noncitizens are testing positive for COVID-19 have increased significantly in recent weeks. And although the rate of infection among CBP officers had been declining, this rate recently began increasing again, even though the percentage of officers and agents who have been fully vaccinated has grown significantly since January. This has led to increasing numbers of CBP personnel being isolated and hospitalized.

14. Unlike at ports of entry, where DHS can better manage the volume and rate at which individuals are processed, there is substantially less ability to manage or control the volume and rate of encounters that may occur between the ports. Without the CDC Order, DHS would likely encounter increased numbers of families crossing the border between the ports of entry. And the Department would be faced with processing all such families under Title 8—which is significantly more extensive and time consuming than Title 42 processing—regardless of the number of individuals encountered on a given day. DHS must often transport such noncitizens in passenger vehicles, including from remote locations, to U.S. Border Patrol stations or other CBP facilities for additional processing in congregate settings. Each of these interactions—encounter, custody,

5

transportation, and holding in congregate setting—increases the risks of COVID-19 exposure and transmission.

15. As noted in the CDC Order itself, CBP facilities are designed for short-term holding and initial processing, generally prior to transfer to another agency, such as ICE or the Office of Refugee Resettlement (ORR) within HHS, which houses UCs until they can safely be placed with sponsors.  They are not designed to hold individuals for extended periods of time, particularly during a pandemic when social distancing and isolation are needed to limit the spread of disease. The congregate nature of these facilities restricts the ability to quarantine, isolate, and enable social distancing by persons who are or may be infected with COVID-19.  As these CBP facilities become overcrowded during a surge, bottlenecks in immigration processing develop, along with bottlenecks in ICE transportation, detention capacity for families and single adults, and ORR capacity for UCs.  As a result, noncitizens' length of stay in DHS custody extends significantly.

16. Moreover, CBP's already limited border processing capacity has been greatly reduced through the implementation of public-health protocols designed to mitigate COVID-19 transmission.  Under current protocols, CBP aims to maintain 25 percent capacity at many of its facilities, and up to 50 percent capacity at specialized central processing centers and soft sided facilities.  Loss of the ability to expel families pursuant to the CDC Order will directly contribute to the Department's inability to maintain critical COVID-19 capacity controls.

17. Importantly, the ability to expel certain covered noncitizens under the CDC Order does not result in the expulsion of every individual encountered at the border; DHS must still process noncitizens not covered by the Order, noncitizens excepted from the Order on a case-by-case basis, and noncitizens for whom expulsion is not available for other reasons.  Due to a variety of factors, including an historic surge in southwest border encounters in recent months, CBP has been

6

APPX. 076

encountering a significant and growing number of individuals who must be held for processing in congregate facilities.

18. In May and June 2021, for example, CBP recorded over 180,000 and 188,000 encounters, respectively, at the southwest border. During this period, CBP encountered over 6,000 individuals per day, including about 500 UCs and 1,650 individuals in family units. These constitute the highest numbers of monthly encounters recorded by CBP in more than twenty years, including during previous surges when the Department was not constrained by COVID-19 capacity considerations. As noted above, due to COVID-19-related guidance, border facilities are currently expected to operate at only 25 to 50 percent capacity, depending on individual facility infrastructure and facility type. Due to this combination of factors, many CBP facilities are already over that capacity—many significantly so, even with the CDC Order in place.

19. Based on preliminary data, the number of border encounters continued to increase in July 2021. Over the first 29 days of July, CBP encountered an average of 6,779 individuals per day, including 616 unaccompanied children and 2,583 individuals in family units. Overall, according to preliminary data, CBP is likely to have encountered about 210,000 individuals in July, the highest monthly encounter number since Fiscal Year 2000. July also likely included a record number of unaccompanied child encounters, exceeding 19,000, and the second-highest number of family unit encounters, at around 80,000.

20. Moreover, these historic encounter levels have not been evenly distributed across the southwest border. Two Border Patrol sectors—Rio Grande Valley (RGV) and Del Rio—have experienced a disproportionate amount of these encounters. For example, the RGV sector alone saw over 51,000 and 59,000 encounters in May and June 2021, respectively; and based on preliminary data, there appear to have been about 78,000 RGV encounters in July. These two

APPX. 077

sectors have also experienced a disproportionate amount—about 71 percent—of family encounters. As a result, facilities in these two sectors have been significantly more over-capacity relative to others.

21. As of August 1, 2021, the U.S. Border Patrol was at 389 percent of its overall COVID-19 adjusted capacity along the southwest border. On that date, the Border Patrol had 17,778 noncitizens in custody (2,233 of whom were UCs) at its Border Patrol facilities, despite a COVID-19 adjusted capacity of 4,706. More specifically, the Border Patrol was over capacity in seven of its nine southwest border sectors. As of August 1, the RGV sector—which has been the epicenter of the current surge—was holding 10,002 noncitizens and was thus 783 percent over its COVID-19 adjusted capacity of 1,278 and 287 percent over its normal, non-adjusted capacity of 3,485. Within RGV, noncitizen families and UCs are primarily transferred to a temporary processing facility in Donna, Texas in the RGV, which has a normal operating capacity of 1,625 and a COVID-19 adjusted capacity of 813 based on CDC recommended guidelines. Within nine days of this facility opening on February 9, 2021, it had already exceeded its normal non-COVID-19 operating capacity with more than 1,000 noncitizens in custody. As of August 1, this facility was operating at 446 percent of its COVID-19 adjusted capacity, and 223 percent of its normal non-COVID-19 operating capacity, with 3,623 noncitizens in custody.

22. These capacity figures are extremely worrisome, particularly because of the continued spread of the highly transmissible Delta variant. Overcrowding challenges DHS's ability to effectively execute many of its core public health mitigation and countermeasure activities. Additionally, higher rates of COVID-19 transmission within a DHS facility could quickly impede the Department's ability to utilize that facility's maximum capacity, further lowering the overall processing and holding capacity along the southwest border. Indeed, the Department's operations

APPX. 078

have already been impacted by significantly increased positivity rates among individuals in its facilities, including families.

23. Monthly family encounter rates have generally been increasing since April 2020, rising 100-fold from 738 encounters in April 2020 to over 75,000 in July 2021. Due to the impacts of the current pandemic, and the deteriorating economic conditions and increasing instability in the region from which the migrants originate, such encounters may increase further in the coming months. Based on current trends, the Department expects that total encounters this fiscal year are likely to be the highest ever recorded. The Department also expects that these numbers will climb even higher if the CDC Order is enjoined.

24. If an injunction is issued with respect to families, DHS will be required to process additional families under Title 8, requiring additional staff and space due to increased processing times. Processing a family under Title 42 typically takes 10 to 15 minutes and is largely conducted outdoors, while processing a family for Title 8 can take 1.5 to 3 hours and is generally conducted indoors. Processing all families under Title 8 will thus generally require DHS to hold significantly increased numbers of individuals in a variety of congregate settings, including during transportation to Border Patrol stations or other CBP facilities, and to process them at such facilities. Because many Border Patrol stations and other CBP facilities along the southwest border are already over operating capacity, increasing the number of individuals required to be held at such facilities would further limit the ability to employ social distancing and other COVID-19 related countermeasures.

25. The CDC has determined that the expulsion of certain noncitizens is necessary to protect public health because DHS is simply unable to process all noncitizen families safely under current circumstances, and particularly in the event of a large-scale influx. Enjoining DHS's

APPX. 079

implementation of the CDC Order as to families would therefore endanger noncitizens in DHS facilities, DHS personnel, and ultimately the general public.

*        *        *

26. The United States has been built by generations of immigrants in search of refuge.  In line with that tradition, the Department is committed to ensuring that asylum seekers and other noncitizens seeking protection are treated with dignity and compassion. At the same time, the ongoing COVID-19 pandemic presents complex and dynamic challenges relating to public health that limit the Department's ability to process all such individuals safely under normal procedures. These challenges have been greatly exacerbated by the rise in novel COVID-19 variants, including the Delta variant.  The Department continues to work tirelessly to address those challenges as they emerge and implement procedures as needed to promote the health and safety of noncitizens, DHS personnel, border communities, and the American public.  During this period and given the unique public health danger posed by the ongoing pandemic, implementation of the CDC Order is critical to preventing overcrowding and the spread of infection within DHS facilities.

Executed on August 2, 2021.

*David Shahoulian*
David Shahoulian
Assistant Secretary for Border and Immigration Policy
U.S. Department for Homeland Security

10

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>JOSEPH R. BIDEN, JR., et al.,<br><br>　　　　Defendants. | Civil Action No. 4:21-cv-00579-P |

**DECLARATION OF LISA KALAKANIS**

My name is Lisa Kalakanis, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.  I serve as the Data Dissemination and Reporting Director within Texas Health and Human Services Commission's Office of Data Analytics and Performance (formerly known as Center for Analytics and Decision Support (CADS)). The Texas Health and Human Services Commission (HHSC) is the state agency responsible for ensuring the appropriate delivery of health and human services in Texas. As such, HHSC has operational responsibility for certain health and human services programs and oversight authority over the state health and human services (HHS) agencies.

2.  As a part of my employment with HHSC, I am responsible for analytic and quantitative research on health care utilization, demographic trends, and enrollment patterns for the state's health care and human service programs, including Medicaid. I am also responsible for program evaluation activities and analytic support across all of the HHS agencies and programs.

3.  I served as Interim CADS Director from September 1, 2020 to May 31, 2021.

4.  This declaration was first prepared by Monica Smoot, then Chief Data and Analytics Officer for the Texas Health and Human Services Commission's Center for Analytics and Decision

Support (CADS). Ms. Smoot retired from the agency in August 2020. The data contained in this declaration is true and correct.

5.   In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014 and 2017. The Rider 59 Report completed in 2017 covered state fiscal year (SFY) 2015.

6.   HHSC provides three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State.

7.   Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. Because HHSC Medicaid claims data do not conclusively identify an individual's residency status, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated. Attached as Exhibit 1 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this affidavit. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 report. The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was approximately $80 million in SFY 2007, $62

million in SFY 2009, $71 million in SFY 2011, $90 million in SFY 2013, and $73 million in SFY 2015; the estimate in SFY 2019 was $80 million.

8.   The Family Violence Program contracts with non-profit agencies across the State to provide essential services to family violence victims, including undocumented immigrants, in three categories: shelter centers, non-residential centers, and Special Nonresidential Projects. Because the FVP does not ask individuals about their residency status, the portion of the FVP's expenditures attributable to undocumented immigrants must be estimated. Attached as Exhibit 1 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this affidavit. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 report. The total estimated cost to the State for the provision of direct FVP services to undocumented immigrants residing in Texas was $1.2 million in SFY 2007, $1.3 million in SFY 2009, $1.3 million in SFY 2011, $1.4 million in SFY 2013, and $1.0 million in SFY 2015; the estimate for SFY 2019 is $1.0 million.

9.   Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. There is no way to definitively report the number of undocumented immigrants served by CHIP Perinatal Coverage because the program does not require citizenship documentation. Attached as Exhibit 1 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this affidavit. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 report. CHIP Perinatal Coverage expenditures were not included in HHSC's original Rider 59 Report because a full year of program data was not available when the report was prepared. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented

immigrants residing in Texas was $33 million in SFY 2009, $35 million in SFY 2011, and $38 million in SFY 2013, and $30 million in SFY 2015; the estimate for SFY 2019 is $6 million.

10.   In the 2008 and 2010 versions of the Rider 59 Report, HHSC also provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. In these reports, HHSC estimated that the State's public hospital district facilities incurred approximately $596.8 million in uncompensated care for undocumented immigrants in SFY 2006 and $716.8 million in SFY 2008. HHSC has not provided any estimates of uncompensated care for undocumented immigrants in more recent versions of the Rider 59 Report.

11. Based on my knowledge, expertise, and research regarding the provision of services and benefits to undocumented immigrants by HHSC, I believe that the total costs to the State of providing such services and benefits to undocumented immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year.

12.   All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

**Executed on this 21st day of June, 2021.**

*Lisa Kalakanis*

**LISA KALAKANIS**

# Estimating the Percent of Undocumented Clients

<u>Previous Undocumented Immigrant Estimates</u>

Previously, HHSC relied on different methods to estimate the percent of non-U.S. citizens in Texas who are undocumented. The first method consisted of assuming that one-half of the estimated non-U.S. citizen population in the state was undocumented. Under this method, HHSC would obtain the estimate for total number of non-U.S. citizens in the state, as reported from the U.S. Census Bureau's American Community Survey (ACS)[1], and would divide that number by two in order to obtain an estimate of the undocumented population in the state.

More recently HHSC relied on a method that uses two different sources of official federal government data to develop its own in-house estimates of the percent of Texas residents that are undocumented immigrants:

- The Texas-specific sample of the U.S. Census Bureau's American Community Survey (ACS), and
- The Office of Immigration Statistics of the U.S. Department of Homeland Security (DHS).

The ACS was the source for estimates of the total non-U.S. citizen population in the state while DHS was the source for the estimated number of persons in the state who are undocumented.

Using these two sources, HHSC estimated the percent of non-U.S. citizens who are undocumented by taking DHS' estimate of the number of undocumented immigrants in Texas (the numerator) and dividing it by the ACS estimate for the number of non-U.S. citizens in the state (the denominator). This calculation resulted in HHSC's estimate of the proportion/percent of non-U.S. citizens in the state who are undocumented.

---

[1] The ACS is a large-scale demographic survey that provides annual estimates of the total population in Texas according to U.S. citizen status (citizen versus non-citizen). However, the estimate for the non-U.S. citizen population is not broken down any further according to documented/undocumented status because that type of information is not collected by the survey.

APPX. 085

According to this method, during 2008-2014, an estimated two-thirds (62 to 66%) of non-citizens were considered undocumented on any given year within that period.

DHS temporarily suspended the publication of its estimates for the unauthorized/undocumented population after March 2013, when it published estimates for this population as of January 2012. It resumed publication of the estimates on April 19, 2021, when it released previously unpublished estimates for the years 2013-2018.  The new updates may be used to develop future versions of this report.

With the temporary suspension of DHS's estimates after March 2013, HHSC lost the official information source relied upon for data on the number of non-citizens who are undocumented, as none of the other Federal and Texas state agencies collected and published information about the legal status of non-U.S. citizens' residing in the state of Texas.

This situation resulted in the need to develop and alternative method for estimating the number and percent of non-U.S. citizens using HHSC services who are undocumented. The goal was to develop a method that does not rely on the simple assumptions previously used (that one-half of non-citizens are undocumented). The alternative method is explained below.

## Method for Current Estimates

<u>Benchmark Program: Texas' Medicaid Type Program 30</u>

Texas' Medicaid Type Program 30 (TP 30) plays an important role in paying for emergency medical services provided to non-U.S. citizens who do not meet the eligibility criteria for Medicaid. Given the high-profile role the program plays in compensating health care providers for services provided to non-eligible non-citizens, it was chosen as the benchmark program for developing an estimate of the percent of non-citizens provided HHSC services who are undocumented.

To a very significant degree, uninsured non-citizen reproductive-age (ages 15-44) females are the main caseload driver within TP 30. In SFY 2017, reproductive- age females accounted for 81% of the clients served. Given the highly disproportionate impact this group has on the program, it is by far the most important one to analyze to obtain the best and most accurate estimate possible of the percent of clients served under this program that are likely to be undocumented non-citizens.

B-2

Data Analysis and Estimate

According to the U.S. Census Bureau's American Community Survey (ACS), in 2016 there were approximately 446,000 uninsured non-U.S. citizen reproductive-age females in Texas. Of those, 39 percent (176,000) had resided in the U.S. for 10 years or less and 61 percent (270,000) for more than 10 years.

It is reasonable to expect that the longer a non-citizen has resided in the U.S., the more likely he/she would have been able to attain some form of U.S. legal permanent resident status.

Assuming that the fraction of non-citizen reproductive-age females (ages 15-44) who have not attained some form of legal permanent resident status is 7 of every 10 (70%) among those who have lived in the U.S 10 years or less, and 4 of every 10 (40%) among those in the U.S. for more than 10 years, the estimated potential percentage for undocumented females of reproductive age in Texas is 52%.

**Calculation for Estimated Percent Undocumented**

**$((0.7*176,000 + 0.4*270,000) / (446,000)) * 100 = 51.8\% \sim 52\%$**

Extending these assumptions derived from the ACS data to non-citizen reproductive-age females that received assistance under TP 30 – for whom year of entry into the U.S. information is not known -- it is then estimated that 52% of them are likely to be undocumented.

Taking into consideration that uninsured, non-citizen reproductive-age females represent a highly disproportionate share of the program's caseload, the estimated potential percentage for undocumented clients applicable to them, slightly adjusted downwards to 50%, is also applied to the entire TP 30 program. Due to the lack of sufficient demographic data on populations at-risk for other programs of interest, the same percentage was also applied to the Family Violence and CHIP-P programs for the purposes of the analysis in this report.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br><br>    Plaintiff,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., et al.,<br><br>    Defendants. | Civil Action No. 4:21-cv-00579-P |

## <u>DECLARATION OF LEONARDO R. LOPEZ</u>

My name is Leonardo R. Lopez, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Associate Commissioner for School Finance/Chief School Finance Officer at the Texas Education Agency ("TEA"). I have worked for TEA in this capacity since June 2016, having previously served as the Executive Director of Finance for the Austin Independent School District ("AISD") for four years. Prior to my time at AISD, I served for ten years in a variety of roles for TEA, including six years as the Foundation School Program Operations Manager for the TEA's State Funding Division.

2.      In my current position, I oversee TEA's school finance operations, including the administration of the Foundation School Program and analysis and processing of financial data. My responsibilities also include representing TEA in legislative hearings and school finance-related litigation.

3.      TEA estimates that the average funding entitlement for 2021 will be <u>$9,216 per student in</u> attendance for an entire school year. If a student qualifies for the additional Bilingual

APPX. 088

and Compensatory Education weighted funding (for which most, if not all, UAC presumably would qualify), it would cost the State $11,432 to educate each student in attendance for the entire school year. Assuming additional Bilingual and Compensatory Education weighted funding, comparable student costs for fiscal year 2022 would be $11,532.

4.      TEA has not received any information directly from the federal government regarding the precise number of unaccompanied children ("UAC") in Texas. However, I am aware that data from the U.S. Health and Human Services ("HHS") Office of Refugee Resettlement (accessed on April 29, 2021 at 4 p.m. CST at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state) (attached as Exhibit 1), indicates that in Texas, 3,272 UAC were released to sponsors during the 12-month period covering October 2014 through September 2015; 6,550 UAC were released to sponsors during the 12-month period covering October 2015 through September 2016; 5,391 UAC were released to sponsors during the 12-month period covering October 2016 through September 2017; 4,136 UAC were released to sponsors during the 12-month period covering October 2017 through September 2018; 9,900 UAC were released to sponsors during the 12-month period covering October 2018 through September 2019; and 2,336 UAC were released to sponsors during the 12-month period covering October 2019 through September 2020. If each of these children is educated in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the State's annual cost to educate each student for fiscal years 2016, 2017, 2018, 2019, 2020, and 2021 would be roughly $9,573, $9,639, $9,841, $10,330, $11,323, and $11,432, respectively), the annual costs to educate these groups of children for fiscal years 2016, 2017, 2018, 2019, 2020, and 2021 would be approximately $31.32 million, $63.13 million, $53.05 million, $42.73 million, $112.10 million, and $26.71 million, respectively.

5.     Additionally, if the same number of UAC are released to sponsors during the 12-month period covering October 2020 through September 2021 as were released during the 12-month period covering October 2019 through September 2020, and if each of these children is educated in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the State's annual cost to educate each student for fiscal year 2022 would be roughly $11,532), the State's annual cost to educate this group of children for fiscal year 2022 would be approximately $26.94 million. Currently, all the costs of educating these students would be borne by the State.

6      In fact, the number of UAC released to sponsors in Texas may end up being higher than this, as 2,389 UAC were released to sponsors in Texas during the 6-month period covering October 2020 through March 2021.  (Exhibit 1).  If the rate of this 6-month period is maintained for the rest of the 12-month period through September 2021, 4,778 UAC would be released to sponsors in Texas for that period.  This would be an increase of nearly 105% over the previous 12-month period number of 2,336.

7.     School formula funding is comprised of state and local funds. The state funding is initially based on projections made by each school district at the end of the previous biennium. Districts often experience increases in their student enrollment from year to year, and the State plans for an increase of approximately 36,000 students in enrollment growth across Texas each year.

8.     The Foundation School Program serves as the primary funding mechanism for providing state aid to public schools in Texas. Any additional UAC enrolled in Texas public schools would increase the State's cost of the Foundation School Program over what would otherwise have been spent.

9.      Based on my knowledge and expertise regarding school finance issues impacting the State of Texas, I anticipate that the total costs to the State of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in the State's public school system increases.

10.      All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of June 2021.

_____

LEONARDO R. LOPEZ

9/7/21, 3:35 PM
Case 1:21-cv-00100-ECS Document 168-3 Filed 11/21/22 Page 95 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 95 of 128   PageID 953

# Unaccompanied Children Released to Sponsors by State

Listen

Publication Date: June 24, 2021

When a child who is not accompanied by a parent or legal guardian is apprehended by immigration authorities, the child is transferred to the care and custody of the Office of Refugee Resettlement (ORR).  Federal law requires that ORR feed, shelter, and provide medical care for unaccompanied children until it is able to release them to safe settings with sponsors (usually family members), while they await immigration proceedings. These sponsors live in many states.

Sponsors are adults who are suitable to provide for the child's physical and mental well-being and have not engaged in any activity that would indicate a potential risk to the child. All sponsors must pass a background check. The sponsor must agree to ensure the child's presence at all future immigration proceedings. They also must agree to ensure the minor reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

HHS is engaging with state officials to address concerns they may have about the care or impact of unaccompanied children in their states, while making sure the children are treated humanely and consistent with the law as they go through immigration court proceedings that will determine whether they will be removed and repatriated, or qualify for some form of relief.

HHS has strong policies in place to ensure the privacy and safety of unaccompanied children by maintaining the confidentiality of their personal information. These children may have histories of abuse or may be seeking safety from threats of violence. They may have been trafficked or smuggled.  HHS cannot release information about individual children that could compromise the child's location or identity.

---

The data in the table below shows **state-by-state** data of unaccompanied children released to sponsors as of July 31, 2021. ACF will update this data each month. Additional data on unaccompanied children released to sponsors by state is available on the HHS website .

View unaccompanied children released to sponsors by county.

**Please note:** ORR makes considerable effort to provide precise and timely data to the public, but adjustments occasionally occur following review and reconciliation. The FY2014 release data posted in the chart below were updated on March 13, 2015. The FY2015 release data were updated May 9, 2016. The FY2017 release data were updated May 22, 2018. The FY2018 release data were updated December 3, 2019. Questions may be addressed to ORR directly, at (202) 401-9246.

## Unaccompanied Children Release Data

APPX. 092

Unaccompanied Children Released to Sponsors by State | The Administration for Children and Families

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — JULY 2021)* |
|---|---|---|---|---|---|---|---|
| Alabama | 808 | 870 | 598 | 736 | 1,111 | 247 | 1,338 |
| Alaska | 2 | 5 | 3 | 0 | 4 | 0 | 3 |
| Arizona | 167 | 330 | 322 | 258 | 493 | 162 | 463 |
| Arkansas | 186 | 309 | 272 | 193 | 359 | 87 | 544 |
| California | 3,629 | 7,381 | 6,268 | 4,675 | 8,447 | 2,225 | 7,596 |
| Colorado | 248 | 427 | 379 | 313 | 714 | 172 | 752 |
| Connecticut | 206 | 454 | 412 | 332 | 959 | 260 | 989 |
| Delaware | 152 | 275 | 178 | 222 | 383 | 107 | 376 |
| DC | 201 | 432 | 294 | 138 | 322 | 48 | 209 |
| Florida | 2,908 | 5,281 | 4,059 | 4,131 | 7,408 | 1,523 | 7,986 |
| Georgia | 1,041 | 1,735 | 1,350 | 1,261 | 2,558 | 559 | 3,003 |
| Hawaii | 2 | 4 | 4 | 1 | 16 | 6 | 15 |
| Idaho | 11 | 39 | 11 | 28 | 62 | 19 | 62 |
| Illinois | 312 | 519 | 462 | 475 | 863 | 211 | 1,152 |
| Indiana | 240 | 354 | 366 | 394 | 794 | 209 | 1,059 |
| Iowa | 201 | 352 | 277 | 238 | 489 | 119 | 479 |
| Kansas | 245 | 326 | 289 | 305 | 453 | 95 | 494 |
| Kentucky | 274 | 503 | 364 | 370 | 710 | 158 | 735 |
| Louisiana | 480 | 973 | 1,043 | 931 | 1,966 | 355 | 1,991 |
| Maine | 4 | 9 | 11 | 22 | 26 | 11 | 44 |
| Maryland | 1,794 | 3,871 | 2,957 | 1,723 | 4,671 | 825 | 3,801 |
| Massachusetts | 738 | 1,541 | 1,077 | 814 | 1,756 | 448 | 1,772 |
| Michigan | 132 | 227 | 160 | 136 | 248 | 74 | 302 |
| Minnesota | 243 | 318 | 320 | 294 | 624 | 151 | 702 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mississippi | 207 | 300 | 237 | 299 | 482 | 108 | 498 |
| Missouri | 170 | 261 | 234 | 203 | 431 | 93 | 532 |
| Montana | 2 | 0 | 2 | 3 | 0 | 2 | 18 |
| Nebraska | 293 | 486 | 355 | 374 | 563 | 130 | 633 |
| Nevada | 137 | 283 | 229 | 132 | 324 | 79 | 313 |
| New Hampshire | 14 | 25 | 27 | 20 | 25 | 8 | 41 |
| New Jersey | 1,462 | 2,637 | 2,268 | 1,877 | 4,236 | 921 | 3,964 |
| New Mexico | 19 | 65 | 46 | 43 | 89 | 34 | 79 |
| New York | 2,630 | 4,985 | 3,938 | 2,845 | 6,367 | 1,663 | 6,009 |
| North Carolina | 844 | 1,493 | 1,290 | 1,110 | 2,522 | 610 | 3,010 |
| North Dakota | 2 | 10 | 3 | 2 | 10 | 1 | 8 |
| Ohio | 483 | 693 | 584 | 547 | 1,091 | 260 | 1,204 |
| Oklahoma | 225 | 301 | 267 | 286 | 581 | 120 | 658 |
| Oregon | 122 | 188 | 170 | 200 | 318 | 71 | 329 |
| Pennsylvania | 333 | 604 | 501 | 563 | 1,229 | 271 | 1,383 |
| PR | 0 | 0 | 0 | 1 | 3 | 3 | 0 |
| Rhode Island | 185 | 269 | 234 | 235 | 453 | 92 | 328 |
| South Carolina | 294 | 562 | 483 | 508 | 1,012 | 255 | 1,216 |
| South Dakota | 61 | 81 | 81 | 96 | 149 | 44 | 159 |
| Tennessee | 765 | 1,354 | 1,066 | 1,173 | 2,191 | 510 | 2,979 |
| Texas | 3,272 | 6,550 | 5,391 | 4,136 | 9,900 | 2,336 | 10,826 |
| Utah | 62 | 126 | 99 | 97 | 179 | 75 | 218 |
| Vermont | 1 | 1 | 0 | 2 | 6 | 1 | 6 |

APPX. 094

9/7/21, 3:35 PM    Unaccompanied Children Released to Sponsors by State | The Administration for Children and Families

Case 1:21-cv-00100-EGS   Document 168-3   Filed 11/21/22   Page 98 of 128
Case 4:21-cv-00579-P   Document 69   Filed 09/08/21   Page 98 of 128   PageID 956

| | | | | | | |
|---|---|---|---|---|---|---|
| Virginia | 1,694 | 3,728 | 2,888 | 1,650 | 4,215 | 770 | 3,710 |
| Washington | 283 | 476 | 494 | 435 | 723 | 237 | 754 |
| West Virginia | 12 | 26 | 23 | 23 | 41 | 4 | 39 |
| Wisconsin | 38 | 85 | 94 | 98 | 246 | 62 | 369 |
| Wyoming | 6 | 23 | 14 | 15 | 15 | 6 | 15 |
| Virgin Islands | 0 | 0 | 3 | 0 | 0 | 0 | 0 |
| **TOTAL** | **27,840** | **52,147** | **42,497** | **34,953** | **72,837** | **16,837** | **75,165** |

*The FY2015 numbers have been reconciled.

*The FY2017 numbers have been reconciled.

*The FY2018 numbers have been reconciled.

*The FY2021 numbers have been reconciled.

For more information, please read ORR's reunification policy.

**Topics:**
Unaccompanied Children (UC)

**Types:**
Grant & Funding

**Audiences:**
Unaccompanied Alien Children (UAC)

Last Reviewed Date: August 24, 2021

**APPX. 095**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., et al.,<br><br>Defendants. | Civil Action No. 4:21-cv-00579-P |

## <u>DECLARATION OF SHERI GIPSON</u>

My name is Sheri Gipson, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Chief of the Texas Department of Public Safety ("DPS") Driver License Division. In this capacity, I oversee DPS's issuance of driver licenses and identification cards to residents of the State of Texas.

2.      I was appointed to my current position and confirmed by the Texas Public Safety Commission in February 2020. Prior to that, I served as Assistant Chief of the Driver License Division from March 2016 through February 2020.  I have worked for the Driver License Division of DPS for 38 years.

3.      Pursuant to Section 521.142(a) of the Texas Transportation Code, an individual applying for an original driver license "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Section 521.1425(d) of the Texas Transportation Code provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration

of the person's authorized stay in the United States, as indicated by the documentation presented

under Section 521.142(a)."

4.      Pursuant to Section 521.101(f-2) of the Texas Transportation Code, an individual

applying for an original personal identification certificate "who is not a citizen of the United States

must present to [DPS] documentation issued by the appropriate United States agency that

authorizes the applicant to be in the United States." Section 521.101(f-4) of the Texas

Transportation Code provides that DPS "may not deny a personal identification certificate to an

application who complies with Subsection (f-2) based on the duration of the person's authorized

stay in the United States, as indicated by the documentation presented under Subsection (f-2)."

5.      If an individual presents documentation issued by the federal government

showing authorization to be in the United States (such as an Employment Authorization

Document), and otherwise meets eligibility requirements, DPS will issue a limited term driver

license or personal identification certificate to a non-citizen resident of Texas.[1] A license or

identification certificate issued to such an applicant is limited to the term of the applicant's lawful

presence, which is set by the federal government when it authorizes that individual's presence. In

fiscal year 2019 (September 2018 through August 2019), DPS issued 386,898 limited term licenses

and identification certificates. In fiscal year 2020 (September 2019 through August 2020), DPS

issued 304,031 limited term licenses and identification certificates. Driver license and

identification card transactions for FY 2020 were impacted by office closures and reduced

customer capacity in offices due to the pandemic.

6.      For each non-citizen resident of Texas who seeks a limited term driver license or

---

[1] DPS maintains a list documents acceptable for verifying lawful presence. *See* Tex. Dep't of Public Safety, Verifying Lawful Presence 4 (Rev. 7-13), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawfulpresence.pdf. A copy is attached to this declaration as Exhibit 1.

personal identification certificate, DPS verifies the individual's lawful presence status with the United States government using the Systematic Alien Verification of Entitlements ("SAVE") system. The State of Texas currently pays $0.30 per customer for SAVE verification purposes. Approximately 18% of customers must complete additional SAVE verification at $0.50 per transaction.

7.      For each non-United States citizen resident of Texas who seeks a limited term driver license, DPS verifies the individual's social security number and that person's eligibility through Social Security Online Verification ("SSOLV") and the American Association of Motor Vehicle Administrators' ("AAMVA") Problem Drivers Pointer System ("PDPS") and, if applicable, the Commercial Driver License Information System ("CDLIS"). The State of Texas currently pays $0.05 per customer for SSOLV and PDPS verification purposes. There is a cost of $0.028 for CDLIS verification purposes, which is about 2% of all limited term licenses.

8.      <u>Each additional customer seeking a limited term driver license or personal identification certificate imposes a cost on DPS.</u> <u>DPS estimates that for an additional 10,000 driver license customers seeking a limited term license, DPS would incur a biennial cost of approximately $2,014,870.80.</u> The table below outlines the estimated costs that DPS would incur based on the additional number of customers per year for employee hiring and training, office space, office equipment, verification services, and card production cost. For every 10,000 additional customers above the 10,000-customer threshold, DPS may have to open additional driver license offices or expand current facilities to meet that increase in customer demand.

| Customer Volume Scenario | Additional Employees Required | Additional Office Space Required (SqFt) (96 per employee) | Biennial Cost for Additional Employees, Leases, Facilities and Technology | Biennial Cost for Verification Services | Biennial Cost for Card Production | Total Cost to DPS |
|---|---|---|---|---|---|---|
| 10,000 | 9.4 | 902.4 | $1,978,859.60 | $9,011.20 | $27,000.00 | $2,014,870.80 |
| 20,000 | 18.8 | 1,804.8 | $3,957,719.20 | $18,022.40 | $54,000.00 | $4,029,741.60 |
| 30,000 | 28.2 | 2,707.2 | $5,936,578.80 | $27,033.60 | $81,000.00 | $6,044,612.40 |
| 40,000 | 37.6 | 3,609.6 | $7,915,438.40 | $36,044.80 | $108,000.00 | $8,059,483.20 |
| 50,000 | 46.9 | 4,502.4 | $9,894,298.00 | $45,056.00 | $135,000.00 | $10,074,354.00 |
| 100,000 | 93.9 | 9,014.4 | $19,788,596.01 | $90,112.00 | $270,000.00 | $20,148,708.01 |
| 150,000 | 140.8 | 13,516.8 | $29,682,894.01 | $135,168.00 | $405,000.00 | $30,223,062.01 |
| 200,000 | 187.8 | 18,028.8 | $39,577,192.01 | $180,224.00 | $540,000.00 | $40,297,416.01 |

9.      Standard term licenses issued to most citizens are valid for a period of eight years with an allowance to renew online once after an office visit. Therefore, most license holders only have to visit a driver license office once every sixteen years. Because limited term licenses are limited to the term of the applicant's lawful presence, it is possible that an individual would have to renew their limited term license sixteen or more times during the same sixteen-year span. The frequency of renewing the license would depend on the length of time the appropriate United States agency authorizes the applicant to be in the United States. Every renewal for a limited term license requires an additional in-person visit to a DPS facility, and thus requires additional costs related to employee hiring and training, verification of lawful presence status through the SAVE system, office space, office equipment, and infrastructure. Thus, the estimated costs identified above that DPS would incur would only increase as more limited term licenses are issued.

10.     The added customer base that may be created by an increase in the number of individuals authorized to be in the United States who chose to reside in Texas will substantially burden driver license resources without additional funding and support.

11.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

   Executed on this 17th day of June 2021.

               _____
               SHERI GIPSON

# Verifying Lawful Presence

An applicant for a driver license (DL) or identification card (ID) must present proof of lawful presence in the US.  The table on the following pages describes the acceptable documents for each type of applicant attempting to verify lawful presence.  All documentation must show the applicant's name and date of birth.  The applicant must validate a name change or other inconsistent information through additional documentation such as a marriage license, divorce decree or court order.

The department must verify applicable lawful presence documentation through the US Department of Homeland Security's (DHS) Systematic Alien Verification for Entitlements (SAVE) Program.  Verification through SAVE is often instantaneous, but when it is not, receipt of the DL/ID may be delayed for up to 30 days.  If SAVE cannot verify on the first attempt, SAVE will permit two additional stages of verification.  Each stage may require additional documentation from the applicant.  After each stage, the applicant will receive instructions either verbally or by mail on how to proceed with the transaction.  To avoid further delay, the applicant should comply with the instructions fully and as soon as possible.  If the applicant provides timely responses, the process timeline generally occurs as follows.

| Stage | DLD receives response from DHS | DLD response to applicant |
|-------|-------------------------------|---------------------------|
| First | Within a few seconds | If verified, card issued |
| Second | 3 to 5 business days | Instruction letter issued within 48 hours after DHS response received by DLD |
| Third | Up to 20 additional business days after second response received from DHS | Instruction letter issued within 48 hours after DHS response received by DLD |

### *Temporary Visitor/Limited Term Issuance*

An applicant may be issued a limited term DL/ID if he or she is NOT:

- A US citizen;
- A US national;
- A lawful permanent resident;
- A refugee; or
- An asylee.

A limited term DL/ID will expire with the applicant's lawful presence as determined by DHS.

### *Commercial Driver Licenses*

This guide does not apply to commercial driver licenses.  A person who is a US citizen, US national, lawful permanent resident, refugee or asylee may apply for a commercial driver license.  All others may apply for a nonresident commercial driver license, if eligible.  Refer to http://www.dps.texas.gov/DriverLicense/CommercialLicense.htm or Chapter 522 of the Transportation Code for application and eligibility requirements.

| Category | Acceptable Documents |
|---|---|
| U.S. Citizen | ❖ Birth certificate issued by the appropriate vital statistics agency of a U.S. State, a U.S. territory, or the District of Columbia indicating birth in U.S. <br> ❖ Department of State Certification of Birth issued to U.S. Citizens born abroad (FS-240, DS-1350, or FS-545) or Consular Report of Birth Abroad <br> ❖ Certificate of U.S. Citizenship <br> ❖ Certificate of Naturalization <br> ❖ U.S. Dept. of Justice – INS U.S. Citizenship Identification Card (I-197 or I-179) <br> ❖ Northern Mariana Card (I-873) <br> ❖ U.S. passport book that **does not** indicate on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN" <br> ❖ U.S. passport card |
| U.S. National | U.S. passport book that indicates on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN" |
| Kickapoo Traditional Tribe of Texas ("KIC") (U.S. citizen) | American Indian Card (form I-872) which indicates "KIC" |
| Kickapoo Traditional Tribe of Texas ("KIP") (non-U.S. citizen) | American Indian Card (form I-872) which indicates "KIP" |
| American Indian born in Canada (First Nations) | An applicant may refer to the Jay Treaty, 8 U.S.C. § 1359, or 8 C.F.R. § 289.2 and may present a variety of documents.  Issuance cannot occur without approval of the documents by Austin headquarters.  DLD Personnel:  make copies of documentation and seek approval through the chain of command. |
| Lawful Permanent Resident | ❖ Permanent Resident Card (I-551) <br> ❖ Resident Alien Card (I-551) – card issued without expiration date <br> ❖ Valid Immigrant Visa (with adit stamp) and unexpired foreign passport <br> ❖ Unexpired foreign passport stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551" <br> ❖ I-94 stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551" <br> ❖  Re-entry Permit I-327 <br><br> Note: I-151, the predecessor to I-551, is not acceptable as proof of permanent resident status. |
| Immigrant Visa with Temporary I-551 language | A valid Immigrant Visa within one year of endorsement (i.e. stamped by Customs and Border Protection – adit stamp) and an unexpired passport |
| Conditional entrants | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to: <br> ❖ I-94 or other document showing admission under Section 203(a)(7), "refugee conditional entry" <br> ❖ I-688B coded 274a.12(a)(3) <br> ❖ I-766 with category A3 or A03 |

2

APPX. 102

| Category | Acceptable Documents |
|---|---|
| Asylee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 208" or "asylee"<br>❖ Unexpired foreign passport with annotation "Section 208" or "asylee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(5)<br>❖ I-766 with category A5 or A05 |
| Refugee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 207" or "refugee"<br>❖ Unexpired foreign passport with annotation "Section 207" or "refugee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |
| Temporary Protected Status (TPS) | Immigration documentation with an alien number or I-94 number indicating this status or Employment Authorization Document (EAD) (I-766) with category A12 or C19 |
| Applicant with Employment Authorization Document | Employment Authorization Document (EAD)( I-766) |
| Applicants for adjustment of status<br><br>Note: These are individuals applying to become lawful permanent residents. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating pending I-485 or pending application for adjustment of status. |
| Applicants for extension of status, change of status, petition for non-immigrant worker, with a pending I-918 application, or other pending category. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating a pending application for an extension of status, change of status, petition for non-immigrant worker, or other pending category. |
| Citizens of the Republic of Palau | Unexpired foreign passport or I -94 with annotation "CFA/PAL" or other annotation indicating the Compact of Free Association/Palau<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Citizens of the Republic of the Marshall Islands | Unexpired foreign passport or I -94 with annotation "CFA/RMI" or other annotation indicating the Compact of Free Association/Republic of Marshall Islands<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |

3

| Category | Acceptable Documents |
|---|---|
| Citizens of the Federated States of Micronesia | Unexpired foreign passport or I -94 with annotation "CFA/FSM" or other annotation indicating the Compact of Free Association/Federated States of Micronesia<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Cuban/Haitian entrants | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "Cuban/Haitian entrant" |
| Lawful temporary residents | Immigration documentation with an alien number or I-94 number |
| Self-petitioning abused spouses or children, parents of abused children, or children of abused spouses<br><br>(Applicants with Violence Against Women Act (**VAWA**) petitions) | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to I-797 indicating approved, pending, or prima facie determination of I-360 or an approved or pending I-360 or an I-766 with category C31. |
| Parolees | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "parole" or "paroled pursuant to Section 212(d)(5)." |
| Person granted **deferred action** | Immigration documentation with an alien number or I-94 number |
| Persons granted **deferred enforcement departure** (DED) | Immigration documentation with an alien number or I-94 number or Employment Authorization Document (EAD) (I-766) with category A11<br><br>Note: Individuals in this status may have been granted an extension to the period of authorized stay that is not reflected on the current EAD.  Notifications regarding any extensions to this category will be distributed by Austin headquarters. |
| Person granted **family unity** | Immigration documentation with an alien number or I-94 number |
| Persons under an **order of supervision** | Immigration documentation with an alien number or I-94 number |
| Persons granted **extended or voluntary departure** | Immigration documentation with an alien number or I-94 number |

4

APPX. 104

| Category | Acceptable Documents |
|---|---|
| Persons granted **withholding of deportation or removal** | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 or passport with annotation "Section 243(h)" or a letter or order from USCIS or court granting withholding of deportation or removal. |
| Persons in **removal or deportation proceedings** | Immigration documentation with an alien number or I-94 number |
| Persons granted a **stay of deportation** | Immigration documentation with an alien number or I-94 number |
| Persons granted **voluntary departure** | Immigration documentation with an alien number or I-94 number |
| **A-1, A-2, and A-3** | Unexpired foreign passport or I -94<br><br>**Note:** Issuance **cannot occur unless** applicant presents a letter from U.S. Department of State with original signature <u>indicating ineligibility for Department of State issued driver license or requesting issuance of a state issued identification card.</u> |
| **B1/B2 Visa/BCC with I-94**<br><br>(Border Crosser Card , DSP-150, or "laser visa") | All of the following:<br>♦ Unexpired foreign passport,<br>♦ Visa (border crosser card), **and**<br>♦ **I -94**<br>Note:  Applicant must have an I-94 to be eligible because of the time and distance from the border restrictions for applicants who do not obtain an I-94. |
| **B-1, B-2, C-1, C-3, D-1, and D-2** | Unexpired foreign passport or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| **C-2**<br><br>Alien in transit to U.N. Headquarters district.  Travel limited to 25 miles radius of Columbus Circle in New York, NY | This status is restricted to New York, NY and not eligible for a Texas driver license under the domicile/residency requirements. |
| **E-1, E-2, and E-3** | Unexpired foreign passport or I -94 |
| **E-2 CNMI**<br><br>Treaty-investor and dependents in Commonwealth of the Northern Mariana Islands | This status is limited to persons entering the Commonwealth of the Northern Mariana Islands (CNMI) and is not eligible for a Texas driver license (8 CFR § 214.2(3)(23)). |
| **F-1**<br><br>Foreign academic student | Unexpired foreign passport or I -94 or I-20 |

| Category | Acceptable Documents |
|---|---|
| **F-2**<br><br>Dependent on F-1 | Unexpired foreign passport or I -94 |
| **F-3**<br><br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| **G-1, G-2, G-3, G-4, and G-5** | Unexpired foreign passport or I -94<br><br>Note: Issuance cannot occur unless applicant presents a letter from US Department of State approving the issuance of a DL/ID. |
| **H-1B, H-1B1, H-1C, H-2A, H-2B, H-2R, H-3, H-4, and I** | Unexpired foreign passport or I -94 |
| **J-1**<br><br>Exchange visitor (may be student, trainee, work/travel, au pair, etc.) | Unexpired foreign passport or I -94 or DS-2019 |
| **J-2**<br><br>Dependent of J-1 exchange visitor | Unexpired foreign passport or I -94 |
| **K-1, K-2, K-3, K-4, L-1A, L-1B, and L-2,** | Unexpired foreign passport or I -94 |
| **M-1**<br><br>Non-academic student | Unexpired foreign passport or I -94 or I-20 |
| **M-2**<br><br>Dependents of non-academic students | Unexpired foreign passport or I -94 |
| **M-3**<br><br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| **N-1 through N-7 (NATO)**<br><br>North American Treaty Organization Representatives and dependents | Unexpired foreign passport or I -94 |
| **N-8, N-9, O-1, O-2, O-3, P-1, P-2, P-3, P-4, Q-1, Q-2, Q-3, R-1, R-2, S-5, S-6, S-7, T-1, T-2, T-3, T-4, T-5, TN-1, TN-2, TD, U-1, U-2, U-3, U-4, U-5, V-1, V-2, and V-3** | Unexpired foreign passport or I -94 |

APPX. 106

| Category | Acceptable Documents |
|---|---|
| **WB\***<br><br>Visitor for business (visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| **WT\***<br><br>Visitor for pleasure (tourist in visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |

\*Visa waiver program countries: Andorra, Australia, Austria, Belgium, Brunei, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Monaco, the Netherlands, New Zealand, Norway, Portugal, San Marino, Singapore, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, and the United Kingdom.

APPX. 107

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| STATE OF TEXAS, <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., et al., <br><br> Defendants. | Civil Action No. 4:21-cv-00579-P |

### DECLARATION OF REBECCA WALTZ

My name is Rebecca Waltz, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Budget Director for the Texas Department of Criminal Justice. The Texas Department of Criminal Justice (TDCJ) is the state agency responsible for the care, custody, and rehabilitation of persons convicted of a criminal offense in the state of Texas.

2.      I have been employed with TDCJ since June 2004, and I have served in my current position since January 2020. Prior to that, I served as TDCJ's Deputy Budget Director from December 2017 to December 2019, a Senior Budget Analyst from October 2007 to November 2017, and a Junior Budget Analyst from September 2004 to September 2007.

3.      The Bureau of Justice Assistance (BJA) administers the State Criminal Alien Assistance Program (SCAAP) in conjunction with the U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (OHS). SCAAP provides federal payments to states and localities that incurred correctional officer salary costs for incarcerating undocumented criminal aliens with at least one felony or two misdemeanor convictions for violations of state or local law, and incarcerated for at least 4 consecutive days during the reporting period.

4.      As a part of my employment with TDCJ, I am responsible for compiling the data

to be included in TDCJ's application for federal reimbursement to the State Criminal Alien

Assistance Program. These data sets include the number of correctional officers and their salary

expenditures ( correctional officer is defined as a person whose primary employment responsibility

is to maintain custody of individuals held in custody in a correctional facility) for the reporting

period, information regarding maximum bed counts and inmate days, and information about the

eligible inmates - (1) whom the agency incarcerated for at least four consecutive days during the

reporting period; and (2) who the agency knows were undocumented criminal aliens, or reasonably

and in good faith believes were undocumented criminal aliens.

5.      TDCJ has sought reimbursement from the federal government through SCAAP

since 1998.

6.      For the most recently completed SCAAP application (reporting period of July 1,

2017 through June 30, 2018), TDCJ reported data for 8,951 eligible inmates and total of 2,439,110

days. An estimate of the cost of incarceration for these inmates can be calculated by multiplying

the systemwide cost per day per inmate for Fiscal Year 2018 ($62.34) as reported by the Texas

Legislative Budget Board by the number of days.  For example ($62.34 x 2,439,110 days =

$152,054,117).

7.      Of this estimated amount, TDCJ was reimbursed $14,657,739 by SCAAP.

8.      It is my belief that to the extent the number of aliens in TDCJ custody increases,

TDCJ's unreimbursed expenses will increase as well.

9.      All of the facts and information contained within this declaration are within my

personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of June 2021.

REBECCA WALTZ

## U.S. DEPARTMENT OF HOMELAND SECURITY
### U.S. Customs and Border Protection

**CBP DIRECTIVE NO.  2210-004**                    **DATE:  December 30, 2019**

**ORIGINATING OFFICE:** Office
of the Commissioner
**SUPERSEDES:** 2210-003
**DATE:**  December 30, 2019

### Enhanced Medical Support Efforts

1.     **PURPOSE.**  This directive directs U.S. Customs and Border Protection's (CBP) deployment of enhanced medical support efforts to mitigate risk to, and sustain enhanced medical efforts for persons in CBP custody along the Southwest Border (SWB).  This Directive shall be executed in compliance with all applicable statutes, regulations, and U.S. Department of Homeland Security (DHS) policies regarding medical support for those in CBP custody. This Directive replaces the *CBP Interim Enhanced Medical Efforts Directive* signed on January 28, 2019.

2.     **SCOPE.**  This Directive applies to the provision of enhanced medical support for individuals in CBP custody along the SWB. This Directive applies to CBP steady-state and surge operations and includes crisis-level operations as delineated in the "Responsibilities" section.  In the event of major surge/crisis-level operations, additional approaches and interagency resources and support will be required and pursued. This Directive supplements all existing local policies and CBP's national policies and directives administering medical support to individuals in CBP's custody, including the 2015 National Standards on Transport, Escort, Detention, and Search (TEDS); Secure Detention Directive, Directive No. 3340-030B, August 8, 2008; and the United States Border Patrol, Medical Program (2010).

3.     **POLICY.**  It is the policy of CBP that all individuals in custody will receive appropriate medical support in accordance with applicable authorities, regulations, standards, and policies. Consistent with short-term detention standards and applicable legal authorities, individuals will not be detained in CBP facilities for the sole purpose of completing non-emergency medical tasks.  Specific implementation details of this Directive shall be determined by the operational components, as identified in the "Procedures" section below.

4.     **AUTHORITIES.**

4.1     6 U.S.C. § 321e(c)(3)-(5)

4.2     Delegation of Authority to the Commissioner of U.S. Customs and Border Protection,

1

DHS Delegation 7010.3 (May 11, 2006).[1]

4.3    U.S. Customs and Border Protection National Standards on Transport, Escort, Search, and Detention (TEDS)

**5.    DEFINITIONS.**

5.1    CBP Emergency Medical Services (EMS) Personnel – An employee of CBP who is an Emergency Medical Technician (EMT) or Paramedic, who has received certification from the National Registry of Emergency Medical Technicians, and who has completed the DHS EMS provider credentialing process with their CBP component office.

5.2    Health Care Provider – A medically credentialed person who delivers authorized health care in a systematic way to individuals or groups in need of health care services, including any employees assigned to provide professional or para-professional healthcare services as part of their DHS duties.  This also applies to authorized individuals from other federal agencies (including detailees) and contractors whenever the purpose of the detail/contract includes performance of healthcare services.

5.3    Health Interview – The standardized medical questionnaire (CBP Form 2500) for individuals in CBP custody, completed by CBP employees, Federal, State, or Local government employees assigned to work with CBP, or contracted medical personnel.

5.4    Medical Assessment – An evaluation of an individual to assess medical status, conducted by a health care provider.

5.5    Personally Identifiable Information (PII) – Any information that permits the identity of an individual to be directly or indirectly inferred, including any other information that is linked or linkable to that individual regardless of whether the individual is a United States citizen, legal permanent resident, or a visitor to the United States.

5.6    Sensitive PII, including medical information, is PII which, if lost, compromised, or disclosed without authorization, could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual.

**6.    RESPONSIBILITIES.**

6.1    The Chief of the U.S. Border Patrol (USBP) and the Executive Assistant Commissioner of the Office of Field Operations (OFO), or their designees will:

6.1.1    Ensure execution of the provisions detailed in the "Procedures" section.

6.1.2    Coordinate with the relevant CBP supporting offices to ensure that all contractual needs for implementation of this Directive are met, contingent upon the availability of appropriations and budgetary resources, including those to support

---

[1] http://dhsconnect.dhs.gov/Policy/delegations

APPX. 112

automated systems requirements.

6.1.3    Within 90 days of the effective date of this policy, develop detailed implementation plans for this Directive, and ensure the phased execution of their respective component's plan.

6.1.3.1 Implementation plans will include surge medical support and crisis-level medical support.

6.1.4    Develop government requirements for medical services, define annual budgetary needs, set measurable performance standards, and manage required life-cycle activities to ensure that policy and operational objectives are achieved for CBP medical support.

6.1.5    Utilize an operational risk management methodology to identify and establish appropriate scope and scale of contracted medical support, to include potential surge medical support.

6.1.6    Coordinate required support from contracted medical staff for individuals in custody along the SWB, as appropriate.

6.1.7    Coordinate with other Federal, State, Local, or Tribal agencies and medical providers deployed to support the healthcare of individuals in CBP custody, as appropriate; and

6.1.8    Facilitate requests for information, demonstrations, site visits, and documentation reviews as appropriate.

6.2    The CBP Executive Director for the Privacy and Diversity Office will:

6.2.1    Ensure appropriate collection, storage, maintenance, and dissemination of PII and sensitive PII collected in the course of a health interview or medical assessment performed pursuant to this Directive and consistent with Agency and Departmental policies and guidance.

6.2.2    Conduct any privacy compliance documentation (such as a Privacy Threshold Analysis or Privacy Impact Assessment) relevant to PII associated with this Directive.

6.3    The CBP Chief Medical Officer (CMO)[2] will:

6.3.1    Provide medical direction and oversight for medical support efforts required by this Directive.

---

[2] Until such time as CBP has appointed a CMO, the role of the CMO under this directive shall be fulfilled by the Senior Medical Advisor.

APPX. 113

6.3.2   Consult with DHS Office of the Chief Human Capital Officer (OCHCO) and DHS Chief Medical Officer (CMO) to ensure the CBP Medical Quality Management (MQM) process is consistent with DHS MQM requirements.

6.3.3   Consult with DHS CMO to ensure CBP medical support efforts are coordinated with relevant stakeholders and include consideration of medical program administration, disease reporting, public health measures, and electronic medical data management.

6.4   CBP Office of Accountability

6.4.1   The Management Inspections Division, working with the impacted program offices, will develop a method to ensure compliance with this directive.

6.4.2   CBP Juvenile Coordinator will work with the CBP CMO to incorporate review of CBP medical support efforts into ongoing compliance monitoring efforts related to the care and custody of juveniles.

6.5   CBP Office of Finance will:

6.5.1   Ensure appropriate CBP budgetary action, based on inputs from USBP and OFO, regarding funding requirements for CBP medical support efforts required by this directive.

## 7.   PROCEDURES.

7.1   CBP will utilize a phased approach to the identification of potential medical issues in persons in custody.

7.2   For the first phase, USBP agents and OFO officers will observe and identify potential medical issues for all persons in custody upon initial encounter.

7.2.1   Persons brought in to custody will be advised to alert CBP personnel or medical personnel of medical issues of concern

7.2.2   Persons identified with medical issues of concern will receive a health interview or medical assessment or be referred to the local health system for evaluation

7.3   For the second phase, USBP and OFO must ensure that a health interview is conducted on, at a minimum, all individuals in custody under the age of 18, utilizing CBP Form 2500.

7.4   For the third phase, subject to availability of resources and operational requirements, USBP and OFO will ensure a medical assessment is conducted on, at a minimum, the following categories of detainees:

- All tender-age children (ages 12 and under) held in CBP custody along the

4

APPX. 114

following categories of detainees:

- All tender-age children (ages 12 and under) held in CBP custody along the SWB
- Any person who has a positive (mandatory referral) response on the CBP 2500 questionnaire.
- Any other person in custody with a known or reported medical concern.

7.5    Where available, medical assessments will be conducted by CBP contracted health care providers.  Where contracted health care providers are not available, individuals in custody may be referred to the local health system or other available health care providers for medical assessment as appropriate.  In exigent circumstances and based on operational requirements, CBP EMS Personnel may conduct medical assessments under the medical direction of the CBP CMO.

7.6    Subject to the availability of resources, operational requirements, and where contracted or federal health care providers are available, basic, acute medical care, referral, and follow up may be conducted onsite as directed by the associated contract Statement of Work or other contract requirements document or within the scope of practice for federal providers.

7.7    USBP and OFO will coordinate with the CBP CMO to develop an appropriate MQM process.

7.8    USBP and OFO will ensure that all health information obtained is handled in accordance with CBP PII and sensitive PII safe handling guidance, all contracts governing the CBP contracted health care providers include necessary privacy clauses, and all PII and sensitive PII is stored in an Office of Information Technology accredited Information Technology system.

**8.    IMPLEMENTATION REQUIREMENTS**

8.1    Implementation of this directive is contingent upon available funding and necessary resources for contracted medical support and for dedicated internal CBP medical direction, coordination, and oversight.

**9.    NO PRIVATE RIGHT CREATED.**  This document is for internal CBP use only and does not create or confer any rights, privileges, or benefits for any person or entity.

**10.    APPROVAL.**


Mark A. Morgan
Acting Commissioner
U.S. Customs and Border Protection

5

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

### EL PASO DIVISION

---

UNITED STATES OF AMERICA,

          Plaintiff,

   v.

THE STATE OF TEXAS, GREG
ABBOTT, in his official capacity as
Governor of the State of Texas,

        Defendants.

Case No. 3:21-cv-173

---

### DECLARATION OF BRIAN S. HASTINGS

1.  I am the Chief Patrol Agent of the Rio Grande Valley (RGV) Sector, U.S Border

    Patrol (Border Patrol), U.S. Customs and Border Protection (CBP). I have been

    employed in this capacity since March 16, 2020. Prior to that date, I was the Chief of

    Law Enforcement Operations for the U.S. Border Patrol (CBP Headquarters,

    Washington, DC). In my capacity as the Chief Patrol Agent of the RGV Sector, I

    have direct oversight of nine Border Patrol stations responsible for securing 316 river

    miles, 317 coastal miles, and 34 counties.

2.  I am responsible for executing the missions of the Border Patrol within the Rio

    Grande Valley RGV Sector.  I make this declaration on the basis of my own

1

knowledge, as well as the documents and information made available to me in my
position. I am submitting this declaration to explain the harm that the "Executive
Order No. GA-37 relating to the transportation of migrants during the COVID-19
disaster" issued by the Texas Governor on July 28, 2021 would have on Border
Patrol's operations, particularly with respect to the Border Patrol's significant reliance
on contractors to transport migrants as part of the federal government's immigration
operations.

3. The Border Patrol is comprised of 20 Border Patrol sectors. Of those, nine are located
along the southwest border of the United States, with four being located completely
within Texas and a fifth straddling the states of Texas and New Mexico.

4. The four Border Patrol sectors that are located completely in Texas are RGV, Laredo,
Del Rio, and Big Bend. The El Paso Sector covers a portion of the border in Texas as
well as New Mexico. There are over 1,200 miles of common border between Texas
and Mexico. To date in Fiscal Year 2021, Border Patrol apprehended a total of
approximately 860,000 migrants in these five sectors—approximately 69% of all
apprehensions made by the entire Border Patrol. RGV alone has accounted for
approximately 32% of all apprehensions in FY 2021.

5. I am familiar with the policies and procedures that govern the apprehension,
processing, temporary detention and transport of migrants in RGV Sector, as well as
those that are applicable for all of Border Patrol nationwide. I am responsible for
ensuring that those policies and procedures are communicated to the agents, overseen
by the supervisors, and implemented within the RGV Sector.

6. In Fiscal Year 2021, RGV has encountered a significant increase in apprehensions that has strained the capacity at RGV Border Patrol stations, which are only designed for short-term detention. Indeed, in Fiscal Year 2021, RGV's apprehensions are up approximately 529% as compared to Fiscal Year 2020.

7. When RGV Sector has historically faced an influx of apprehensions, Border Patrol has taken various steps to reduce the strain on the capacity to hold migrants who are apprehended entering the United States unlawfully. This includes activating other stations for processing, detailing agents from other sectors, and moving migrants to stations and other sectors that have fewer migrants in custody. These steps have also been taken during the ongoing influx.

8. For example, RGV Sector began transporting certain migrants, primarily those who entered as family units by bus, to other Border Patrol Sectors (e.g., Laredo Sector) to alleviate strain on capacity. Often, the U.S. Border Patrol uses contractors to provide such transportation. RGV has also constructed a new "soft-sided" facility in Donna, Texas. This facility can handle a large influx of migrants. This facility has the capacity to hold 813 migrants (based on current COVID-19 capacity recommendations). However, with the large number of migrants being apprehended this facility currently faces significant capacity constraints.

9. As part of a further effort to mitigate the high number of migrant apprehensions in RGV, the Temporary Outdoor Processing Site (TOPS), was constructed underneath the Anzalduas Bridge and serves as a short-term, open-air intake and processing area that enables CBP to intake, screen, and process certain migrant populations, all while

APPX. 118

minimizing employee and migrant exposure to COVID-19 to the greatest extent possible. TOPS currently focuses on expeditiously processing those apprehended as family units in RGV Sector, and often releases migrants into the care of nongovernment organizations (NGOs) upon close coordinating with such NGOs. This coordination allows an average of 500-1,000 migrants to depart government custody and allows more safe and efficient use of CBP's enclosed facilities for custody. Moreover, releasing migrants in coordination with NGOs significantly reduces the COVID-19 risk to both CBP employees and migrants in custody because it reduces the number of individuals in enclosed facilities.

10. Certain classes of migrants without lawful immigration status are subject to mandatory detention and may not be released from immigration custody. For other migrants without lawful immigration status, U.S. Border Patrol generally has discretion to either maintain custody for transfer to the custody of Immigration and Customs Enforcement (ICE), the U.S. Department of Health and Human Services (HHS), Office of Refugee Resettlement (ORR) or release them from custody.

11. Further, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) and Flores Settlement Agreement impose limitations on U.S. Border Patrol's ability to detain migrants for extended periods. The TVPRA generally requires that an unaccompanied alien child (migrant unaccompanied child) be transferred to the HHS-ORR within 72 hours after determining that the minor is a migrant unaccompanied child. Similarly for migrant children accompanied by a parent or legal guardian (family units), the Flores Settlement Agreement generally

4

requires that CBP release the child to the parent within 3 days of apprehension or place the family in a nonsecure licensed facility. Thus, Border Patrol must generally prioritize processing and the transfer out of CBP custody of migrant unaccompanied children and family units.

12. As of July 29, 2021, there were 8,336 migrants in RGV Sector detention facilities. Of these, 6,459 were pending processing, and the average hold time for migrants in custody was 57.22 hours. The detention facilities in the other Texas Border Patrol Sectors are also strained due to the influx of migrants.  For instance, as compared to the prior fiscal year, Del Rio Sector has seen an approximate 827% increase in migrant apprehensions. El Paso Sector has seen an approximate 283% increase in migrant apprehensions, and Laredo Sector has seen an approximate 206% increase in migrant apprehensions. Just like in RGV, this significant increase in apprehensions has strained Border Patrol's processing and detention capability in those sectors and has impacted the ability of ICE and HHS to assume custody of migrants.

13. In RGV Sector during this fiscal year, Border Patrol has released approximately 100,700 migrants, of which approximately 9,000 were released last week. Nearly 8,500 family unit migrants were released from CBP custody last week after coordination with an NGO.

14.  To date this fiscal year, RGV Sector has transferred approximately 33,700 migrants into the custody of Enforcement and Removal Operations (ERO) of ICE. Last week, RGV Sector transferred at least 3,600 migrants into the custody of ERO. This fiscal year, approximately 51,000 migrant unaccompanied children were transferred from

APPX. 120

RGV Sector into the custody of HHS-ORR. Included in the last week, approximately 2,200 migrant unaccompanied children were transferred from RGV Sector into the custody of HHS-ORR.

15. Just in RGV Sector alone, out of all migrants released from Border Patrol custody or transferred to the custody of another agency, such as ICE-ERO or HHS-ORR, for this fiscal year, approximately 120,000 were transported by a contractor of Border Patrol. Indeed, last week, approximately 9,600 migrants were transported from RGV Border Patrol custody by a contractor of Border Patrol.

16. The ability of ICE and its contractors to transfer migrants out of Border Patrol custody is essential as Border Patrol stations are only designed for short term detention.

17. I am familiar with the July 28, 2021 Executive Order issued by Texas Governor Greg Abbott (GA-37) relating to the transportation of migrants.

18. My understanding of this Executive Order is that it prohibits persons (except for federal, state, or local law enforcement officials) from providing ground transportation to a group of migrants who have been detained by CBP for crossing the border illegally or who would have been subject to expulsion under Title 42.

19. The Executive Order would significantly impact CBP operations, would impede CBP's ability to coordinate transportation with other federal partners, and prevent CBP's ability to obtain medical treatment for migrants requiring immediate medical attention.

APPX. 121

20. As stated, Border Patrol must generally prioritize processing and the transfer out of custody of migrant unaccompanied children and family units based on the requirement of TVPRA and the Flores Agreement.  In order to accomplish this prioritization, CBP coordinates the transfer and transportation of migrant unaccompanied children and family units with contractors from ICE and HHS-ORR. It is my understanding migrant unaccompanied children are transported to shelters throughout Texas and in some instances, to other states.

21. If the Executive Order prevents transportation of migrant unaccompanied children and family units, it would cause migrant unaccompanied children and family units to be held within CBP facilities for a longer period of time, thereby preventing CBP's compliance with both the TVPRA and the Flores Settlement Agreement.  Impeding CBP's operations in this manner would also significantly increase the number of people held in CBP facilities and lengthen the average time in custody; increase the risk of COVID-19 transmission to migrants and employees; and prolong the government's placement of migrant unaccompanied children into the care and custody of HHS ORR and, from there, to an appropriate sponsor.

22. CBP utilizes assistance from ICE contract services for the transportation of migrants released from jail or prison.  These migrants are transported to CBP facilities for final disposition and oftentimes, for removal from the United States.

23. CBP's daily operations rely heavily on the assistance of ICE contract services to transport migrants released from CBP custody which may include transport to ICE facilities for release or detention.  CBP's inability to transfer migrants to ICE contract

7

services for transportation interferes with CBP's operation and impacts detention numbers and conditions.

24. Based on my experience and position, I expect that the Executive Order would also negatively impact CBP's inability to coordinate release of migrants to NGOs, which partner with CBP to play an important role in conducting COVID-19 testing and other mitigation management. This would also impede operations. Specifically, CBP coordinates with NGOs upon the release of migrants to receive prompt COVID-19 testing prior to being released into the community in order to promote public safety in the border communities. For any family members who test positive for COVID-19 immediately after release, CBP coordinates with appropriate NGOs for the provision of non-congregate accommodations so that the family members released from CBP custody can properly isolate and/or quarantine consistent with public health protocols. Without the assistance of NGOs, CBP would experience an increase in the number of people in custody because CBP would not be able to readily release migrants after coordination with NGOs who provide additional transportation and resources. For similar reasons, CBP would experience impacted detention conditions.

25. Further, NGOs routinely transport migrants released by Border Patrol to bus stations where the migrants board commercial busses to their ultimate destinations in the United States. If bus companies are barred by the Executive Order from transporting migrants released by Border Patrol, this will result in NGOs being unable to intake additional migrants and will ultimately impair Border Patrol's operations. This would likely result in migrants remaining in the local border communities without any

8

assistance or shelter by the NGOs, causing unsafe conditions for both migrants and the community.   Indeed, prohibiting transportation within the State of Texas directly interferes with the migrant's ability to get to the next step in the immigration process. They often must travel in order to report to ICE offices throughout the country or even to appear before immigration courts.

26. Migrants who are in CBP custody oftentimes require transportation by ambulance to local healthcare services for treatment of various physical injuries and medical conditions.  The Executive Order impedes CBP's ability to provide adequate medical attention and care otherwise available at local healthcare facilities for these migrants because the ambulance drivers are not law enforcement officials and therefore, would not fall under the exception within the Executive Order.

27. CBP utilizes contract services to assist with transportation of migrants between CBP facilities within the state of Texas. For instance, if a CBP facility in RGV is at or near capacity, CBP may need to rely on contractors to transport migrants to another sector within Texas (e.g., Laredo) that has more processing capacity.  Additionally, CBP's operations would be impacted if transport between facilities was prohibited or delayed because this would impact detention numbers, the time in custody and detention conditions within CBP facilities.

28. If contract services to transport migrants were no longer available as a result of the Executive Order, CBP would be faced with untenable choices such as continuing operations with increased numbers of migrants in their facilities or have CBP law-enforcement officials transport these migrants.  That later option would be required to

9

APPX. 124

take law-enforcement officials from enforcement duties to engage in transportation activities that normally could be performed by contractors. This would severely impact CBP's daily operations by decreasing border security enforcement at the southwest border thereby increasing threats to national security; decreasing enforcement at checkpoints; and increasing duration for processing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of July, 2021.

_____
Brian S. Hastings
Chief Patrol Agent
Rio Grande Valley Sector
U.S. Border Patrol
U.S. Customs and Border Protection
Edinburg, Texas

10

APPX. 125