**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, *et al.,* ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | No. 1:21-cv-00100-EGS |
| ) | |
| ALEJANDRO MAYORKAS, Secretary of Homeland ) | |
| Security, in his official capacity, *et al.,* ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

**PLAINTIFFS' OPPOSITION TO PROPOSED INTERVENORS'
MOTION TO INTERVENE**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

RELEVANT PROCEDURAL HISTORY ................................................................ 2

    I. The Initiation Of This Case And The First Appeal ........................................ 2

    II. CDC's Efforts To Narrow Or Eliminate The Title 42 Process, And The States' Efforts To Enjoin Those Actions .......................................................................... 3

    III. Recent Developments In This Case ............................................................. 4

LEGAL STANDARD ............................................................................................. 4

ARGUMENT ........................................................................................................... 5

    I. THE STATES LACK STANDING. ................................................................ 5

    II. THE STATES ARE NOT ENTITLED TO INTERVENTION AS OF RIGHT ............. 12

        A. The States' Motion Is Untimely. ........................................................... 12

        B. The States Lack A Legally Protectable Interest. ...................................... 19

        C. The States' Interests Are Adequately Represented. ................................... 20

    III. PERMISSIVE INTERVENTION IS NOT WARRANTED. ......................... 23

CONCLUSION ....................................................................................................... 23

## TABLE OF AUTHORITES

**Cases**

*Amador Cnty., Cal. v. U.S. Dep't of the Interior*,
    772 F.3d 901 (D.C. Cir. 2014) ......................................................................... passim

*Amalgamated Transit Union International, AFL-CIO, et al., v Donovan*
    771 F.2d 1551 (D.C. Cir. 1985) ................................................................... 13, 23

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ............................................................................ 6, 10

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ......................................................................... passim

*Associated Builders & Contractors, Inc. v. Herman*,
    166 F.3d 1248 (D.C. Cir. 1999) ............................................................................ 12

*Biden v. Missouri*,
    142 S. Ct. 647 (2022) ............................................................................................ 11

*Bldg. & Const. Trades Dep't, AFL-CIO v. Reich*,
    40 F.3d 1275 (D.C. Cir. 1994) ............................................................................. 21

*California v. Texas*,
    141 S. Ct. 2104 (2021) ..................................................................................... 8, 10

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    142 S. Ct. 1002 (2022) .......................................................................................... 18

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................................ 9

*Conservation Law Found. of New England, Inc. v. Mosbacher*,
    966 F.2d 39 (1st Cir. 1992) .................................................................................. 21

*Cook Cnty., Illinois v. Texas*,
    37 F.4th 1335 (7th Cir. 2022) .............................................................................. 14

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) ....................................................................... 10, 11

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    340 F.R.D. 1 (D.D.C. 2021) ................................................................................... 4

*Del. Dep't of Nat. Res. & Env't Control v. EPA,*
    785 F.3d 1 (D.C. Cir. 2015) ............................................................................. 6

*Deutsche Bank Nat. Trust Co. v. FDIC,*
    717 F.3d 189 (D.C. Cir. 2013) ..................................................................... 4, 5

*Endangered Species Act Section 4 Deadline Litig.,*
    704 F.3d 972 (D.C. Cir. 2013) ....................................................................... 23

*Huisha-Huisha v. Mayorkas,*
    27 F.4th 718 (D.C. Cir. 2022) .......................................................................... 3

*Huisha-Huisha v. Mayorkas*
    560 F. Supp. 3d (D.D.C. 2021) ..................................................................... 8, 9

*Jones v. Prince George's Cnty., Md.,*
    348 F.3d 1014 (D.C. Cir. 2003) .................................................................. 4, 23

*Louisiana v. CDC, __ F. Supp. 3d __,*
    2022 WL 1604901 (W.D. La. May 20, 2022) ...................................... 4, 7, 9, 22

*NAACP v. New York,*
    413 U.S. 345 (1973) ....................................................................... 15, 17, 18

*Pennsylvania v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) ..................................................................... 6, 12

*United States House of Represenatives v. Price,*
    2017 WL 3271445 (D.C. Cir. Aug. 1, 2017) ............................................... 19, 21

*Massachusetts v. United States Dep't of Educ.,*
    340 F. Supp. 3d 7 (D.D.C. 2018) ...................................................................... 6

*Roeder v. Islamic Republic of Iran,*
    333 F.3d 228 (D.C. Cir. 2003) ........................................................................ 12

*Smoke v. Norton,*
    252 F.3d 468 (D.C. Cir. 2001) ....................................................... 12, 15, 17, 18

*State v. City of Chicago,*
    912 F.3d 979 (7th Cir. 2019) .......................................................................... 13

*Stone v. Mississippi,*
    101 U.S. 814 (1879) ........................................................................................ 20

*Texas v. Biden*,
589 F. Supp. 3d 595 (N.D. Tex. 2022) ..................................................... 3

*Texas v. United States*,
No. 21-16, 2022 WL 2109204 (S.D. Tex. June 10, 2022) ...................................... 20

*U.S. Tr. Co. of New York v. New Jersey*,
431 U.S. 1 (1977).............................................................................. 20

*United Airlines, Inc. v. McDonald*,
432 U.S. 385 (1977)............................................................................ 18

*United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*,
45 F.4th 426 (D.C. Cir. 2022) ................................................................ 21

*United States v. Brit. Am. Tobacco Australia Servs.*,
437 F.3d 1235 (D.C. Cir. 2006) ................................................... 12, 14, 15, 19

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ............................................................... 21

*United States v. Philip Morris USA Inc.*,
No. 99-2496, 2005 WL 1830815 (D.D.C. July 22, 2005) ...................................... 21

*Utah Ass'n of Cntys. v. Clinton*,
255 F.3d 1246 (10th Cir. 2001) .............................................................. 21

*Wittman v. Personhuballah*,
578 U.S. 539 (2016).............................................................................. 5

**Regulations**

86 Fed. Reg. 42,828 (Aug. 5, 2021)........................................................... 12

87 Fed. Reg. 15,243 (Mar. 17, 2022)......................................................... 3, 8

**Other Authorities**

*Governor Abbott Issues Executive Order Prohibiting Vaccine Mandates By Any Entity, Adds Issue To Special Session Agenda*, Off. of the Tex. Gov. (Oct. 11, 2021),
https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-prohibiting-vaccine-mandates-by-any-entity-adds-issue-to-special-session-agenda ................................................11|

*States' COVID-19 Public Health Emergency Declarations and Mask Requirements*, National Academy for State Health,
https://www.nashp.org/governors-prioritize-health-for-all/ ..................................... 11

Texas Executive Order GA-38, https://perma.cc/BGM8-EV6E.................................................... 11

## INTRODUCTION

Twenty-one months after this suit was filed, a group of States seeks to intervene for the first time at the district court level.  ECF No. 168 ("Mot.").[1]  This Court should reject the States' belated motion.  The States lack standing, as well as any protectable legal interest, both of which are required for intervention.  The D.C. Circuit has repeatedly rejected similar theories of standing based on conjecture and downstream consequences of the federal government's policies.  *See, e.g.*, *Arpaio v. Obama*, 797 F.3d 11, 14 (D.C. Cir. 2015).

Even if they had standing, the States' motion is untimely because they waited until the eleventh hour to intervene.  The States try to suggest that they are only now first having doubts about the adequacy of the federal government's capacity to represent them.  Yet in October 2021, one of the proposed intervenors, the State of Texas, *expressly* stated that it believed the federal government was not adequately representing its interests in this Title 42 litigation.  The States' delay in seeking intervention threatens to upend the transition from Title 42 processing—for which this Court reluctantly granted a temporary stay—and prejudice Plaintiffs by forcing them to litigate both intervention and stay proceedings on an unduly expedited basis to avoid further delay of the end of the Title 42 policy.

The States' entire argument on adequacy is premised on the notion that Defendants do not intend to appeal this Court's order, even though Defendants have said no such thing.  Regardless, this Court can deny intervention based on their lack of standing or untimeliness, without deciding whether Defendants are adequately representing the States' interests.

---

[1] Citations to electronic filings are to the PDF page number.

**RELEVANT PROCEDURAL HISTORY**

**I.      The Initiation Of This Case And The First Appeal**

In January 2021, Plaintiffs initiated this class action challenging the legality of the Title 42 policy.  ECF No. 1.  In September 2021, this Court preliminarily enjoined the application of the Title 42 Process to the Plaintiff Class, and the federal government appealed.

In October 2021, the State of Texas—one of the proposed intervenors here—filed a motion to intervene at the D.C. Circuit.  Motion to Intervene as Intervenor-Defendant, *Huisha-Huisha v. Mayorkas*, No. 21-5200 (D.C. Cir. Oct. 11, 2021) ("Texas Intervention").  Texas stated that its goal was to "defend the lawfulness of the 'Title 42 Process,'" which it described as "a fundamental part of the broader national toolkit that is necessary to secure the border and to protect the health and well-being" of U.S. and Texas residents.  *Id.* at 1.  Texas asserted that it would "suffer[] tremendous and irreparable injury" if the policy were enjoined.  *Id.*  Texas also stated that it "no longer believes Defendants can or will adequately represent the State's significant interests in this case." *Id.* at 10.  Plaintiffs argued that Texas should not be allowed to intervene for the first time on appeal, noting Texas's reliance on a number of untested and unfounded factual assertions with respect to the State's claimed injuries.  *See generally* Plaintiffs-Appellees' Opposition, *Huisha-Huisha*, No. 21-5200 (D.C. Cir. Oct. 15, 2021).  The D.C. Circuit denied Texas's motion to intervene, finding Texas had not satisfied the heightened "standards for intervention on appeal." Order at 1, *Huisha-Huisha*, No. 21-5200 (D.C. Cir. Oct. 26, 2021).

Ultimately, the D.C. Circuit affirmed this Court's preliminary injunction order in part and remanded for resolution of the merits.  In doing so, the Circuit pointedly noted that the Title 42 policy appeared to be a "relic" and that on remand this Court could address "Plaintiffs' claim that the § 265 Order is arbitrary and capricious" (which had not yet been addressed because the

2

administrative record had not yet been filed).  *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734-35

(D.C. Cir. 2022); *see also id*. at 735 (D.C. Circuit noting that the policy appeared not to serve

"any purpose").  Despite this indication of the likely course of proceedings on remand, neither

Texas nor any other State sought to intervene until *after* this Court ruled on Plaintiffs' summary

judgment motion—six months after the Circuit issued its mandate, *see* ECF No. 136.

## II.    CDC's Efforts To Narrow Or Eliminate The Title 42 Process, And The States' Efforts To Enjoin Those Actions

In the meantime, CDC undertook a series of reevaluations of the Title 42 Process, and the

proposed intervenor States challenged those actions in other courts.  After CDC temporarily

excepted unaccompanied children from the Title 42 Process on February 11, 2021, Texas sued to

block that move in the Northern District of Texas, and also challenged CDC's alleged exemption

of certain families.  *See* Mot. 14-15 (describing Texas's lawsuit).  Texas's filings show it was

well aware that the legality of Title 42 was at issue in this Court.  *See, e.g.*, Amended Complaint

at 25, ECF No. 62, *Texas v. Biden*, No. 21-579 (N.D. Tex. Aug. 23, 2021) (citing declaration

filed in this case); Complaint at 1, ECF No. 1, *Texas*, No. 21-579 (N.D. Tex. Apr. 22, 2021)

(citing *P.J.E.S.* litigation).[2]  The *Texas* court issued a preliminary injunction, *see Texas v. Biden*,

589 F. Supp. 3d 595 (N.D. Tex. 2022), after which CDC terminated all prior Title 42 orders to

the extent they applied to unaccompanied children, 87 Fed. Reg. 15,243, 15,253 (Mar. 17, 2022).

After CDC issued an order on April 1, 2022, terminating *all* prior Title 42 orders issued

pursuant to 42 U.S.C. § 265, a number of States—including all the proposed intervenor States

here—challenged the termination order in the Western District of Louisiana, again citing this

---

[2] The same is true of other proposed intervenor States.  *See* Amicus of Arizona, *et al*. at
*2, *Texas v. United States*, No. 21-40618 (5th Cir. Aug. 31, 2021), 2021 WL 4126281 (citing
declaration from this case).

litigation in their own court filing.  Memorandum in Support of Motion for Preliminary Injunction at 38, ECF No. 13-1, *Louisiana v. CDC*, No. 22-885 (W.D. La. Apr. 14, 2022).  That court issued a preliminary injunction on notice-and-comment grounds, which the federal government has appealed.  *See Louisiana v. CDC*, __ F. Supp. 3d __, 2022 WL 1604901 at *23 (W.D. La. May 20, 2022), *appeal pending*, No. 22-30303 (5th Cir.).

### III.    Recent Developments In This Case

After remand from the D.C. Circuit, this litigation proceeded without any attempt by the States to join the case.  On August 15, 2022, Plaintiffs filed a motion for partial summary judgment, ECF No. 144, of which the federal government specifically notified the States the next day, Notice at 7, ECF No. 154, *Louisiana*, No. 22-885 (W.D. La. Aug. 16, 2022), and which this Court granted on November 15, 2022, ECF No. 165.  Finally, on November 21, 2022, the proposed intervenors filed this motion, over a year after Texas's attempt to intervene on appeal was denied, and nearly eight months after CDC sought to end the Title 42 policy.

### LEGAL STANDARD

To prevail on their motion to intervene, the States must establish that they have Article III standing.  *Deutsche Bank Nat. Trust Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013).  They also "must satisfy all four elements" of Federal Rule of Civil Procedure 24(a) to intervene as of right: "timeliness, interest, impairment of interest, and adequacy of representation."  *Jones v. Prince George's Cnty., Md.*, 348 F.3d 1014, 1017, 1019 (D.C. Cir. 2003).  Whether to grant permissive intervention under Rule 24(b) is committed to the Court's discretion.  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 340 F.R.D. 1, 6 (D.D.C. 2021) (Sullivan, J.).

**ARGUMENT**

## I.    THE STATES LACK STANDING.

The States' effort to inject themselves into this litigation fails at the outset because they lack Article III standing.  Such standing is a prerequisite for intervention in this Circuit, regardless of whether intervention is sought as a plaintiff or defendant.  *Deutsche Bank*, 717 F.3d at 193.  The Circuit's "rule requiring all intervenors to demonstrate Article III standing prudently guards" against the risk that a proposed intervenor "with only a philosophic identification with a defendant—or a concern with a possible unfavorable precedent—could attempt to intervene and influence the course of litigation."  *Id*. at 195-96 (Silberman, J., concurring); *see also Wittman v. Personhuballah*, 578 U.S. 539, 543-44 (2016) (holding that where party seeks to appeal in place of another, intervenor must "independently fulfill[] the requirements of Article III") (cleaned up).

The States rely on a jumble of assertions and conclusory statements without clearly explaining how any of them satisfies the required "showing of injury-in-fact, causation, and redressability."  *Deutsche Bank*, 717 F.3d at 193.  Their central theory appears to be that (1) the end of Title 42 will increase the number of undocumented noncitizens in the United States and, in particular, in these States; (2) the States will, as a result, have increased downstream costs as part of providing general services like healthcare and education; and (3) the States should therefore be able to intervene now to avoid potentially paying for those future services at some point.  Mot. 10-13.  That argument is speculative and incorrect.

The States' theory is both limitless and inconsistent with this Circuit's precedent.  On the States' view, they would have standing to challenge *every* federal policy, of any sort, which *could* result in more or fewer residents, as any such policy could be tied either to more use of state services or a reduction of state income.  "If such allegations were routinely accepted as sufficient

to confer standing, courts would be thrust into a far larger role of judging governmental policies than is presently the case, or than seems desirable." *Arpaio v. Obama*, 797 F.3d 11, 25 (D.C. Cir. 2015) (internal quotation marks omitted).

In *Arpaio*, the D.C. Circuit rejected a strikingly similar argument that an immigration policy would result in more noncitizens living in the county, and impose more costs on the county in the form of crime. *Arpaio*, 797 F.3d at 14–15. The Circuit explained that "the likelihood of any injury actually being inflicted is too remote to warrant the invocation of judicial power." *Id*. at 22 (cleaned up). Likewise, in *Pennsylvania v. Kleppe*, the Circuit rejected a state's effort to rely on a downstream reduction in tax revenues for standing, explaining that "this is the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing." 533 F.2d 668, 672 (D.C. Cir. 1976); *see also id.* (explaining why "impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing"). Where, as here, the impact on the state's fisc "is largely an incidental result of the challenged action," the state lacks standing. *Id*.; *see Massachusetts v. United States Dep't of Educ.*, 340 F. Supp. 3d 7, 17 (D.D.C. 2018) (applying *Kleppe* to reject state standing argument based on increased costs).[3]

In *Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022), a case challenging federal immigration policy, the Sixth Circuit recently rejected the standing of Arizona, Montana, and Ohio (all proposed intervenors here). As Chief Judge Sutton put it: "Are we really going to say that any

---

[3] By contrast, in *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1 (D.C. Cir. 2015), the State claimed injury based on harm to its "air quality," which would impair its ability to comply with its federal statutory obligations. *Id*. at 8. Here, the States assert no such damage to their ability to fulfill their legal obligations. Moreover, in that case the Circuit found standing only as to *some* of the State's claims, and deemed its evidence as to another claim "strikingly weak." *Id*. at 10. As explained below, the evidence here is similarly weak.

federal regulation of individuals . . . that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court?  If so, what limits on state standing remain?"  *Id.* at 386.  In response, the States here rely on two district court decisions in the Fifth Circuit which found State standing to challenge the termination and limitation of Title 42.  Mot. 10.[4]  But that view of seemingly limitless state standing is an outlier.  *See Louisiana*, 2022 WL 1604901, at *13 (one of the States' cited cases, noting that "*Arizona v. Biden* is inconsistent with" the Fifth Circuit's approach).[5]

In any event, even if some such tangential costs could establish standing, here the States' evidence is too speculative.  Consider the States' claim that the end of Title 42 will result in more undocumented noncitizens within the United States, including within their State boundaries.  Mot. 11-12.  First, any suggestion that the end of Title 42 will attract more migration is pure speculation.  Even assuming that border policies *might* impact "the complex decisions made by non-citizens of the United States before they risk[] life and limb to come here," a contention the States have not proven, "so, too, might the myriad economic, social, and political realities in the United States and in foreign nations."  *Arpaio*, 797 F.3d 21; *see also* ECF No. 118-23 at 1 (expert declaration explaining that migration is driven by "conditions in migrants' countries of origin," rather than U.S. immigration policy).  The States offer no contrary evidence—just cursory testimony suggesting that a change in policy could be one factor.  Indeed, their argument points the other

---

[4] The States indirectly rely on the Fifth Circuit litigation regarding the DAPA program. Mot. 14 (citing *Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015)).  But the D.C. Circuit in *Arpaio* declined to adopt the Fifth Circuit's expansive view of standing, and also distinguished it from cases like this one, where the asserted harms are so speculative and indirect.  *Arpaio*, 797 F.3d at 23.

[5] The Supreme Court has granted certiorari to assess, *inter alia*, the Fifth Circuit's application of state standing in an immigration case.  *United States v. Texas*, No. 22-58 (argued Nov. 29, 2022).

way: If, as the States contend, "unprecedented" numbers of noncitizens are coming to the country "right now" during Title 42, Mot. 11, the policy has not been deterring migration.[6]

Second, the States' theory is largely predicated on long-term costs like general healthcare and education expenditures.  Even if there were some short-term increase in entries as the government transitions from Title 42 to Title 8, it is pure speculation that the result would be an increase in long-term presence of undocumented noncitizens in the relevant States.  Because Title 42 generally involves expulsion to Mexico and carries no legal consequences, noncitizens may seek safety by "cross[ing] the border multiple times, sometimes 10 times or more," *Huisha-Huisha*, 560 F. Supp. 3d at 176 (cleaned up), until they gain entry.  By contrast, Title 8 procedures involve removal backed by significant criminal and civil penalties for those who unlawfully reenter—which the federal government has noted may have "a greater deterrent effect than expelling a migrant to Mexico under Title 42."  Opposition to Motion for Temporary Restraining Order at 6, ECF No. 27, *Louisiana*, No. 22-885 (W.D. La. Apr. 22, 2022); *see id*. ECF No. 27-1 at 4-6.  And which Title 8 procedures will be used, and what the outcome of those procedures will be individually or collectively, involve many contingencies and intervening discretionary decisions not at issue here—rendering the States' standing even more speculative. *See California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (explaining that "where a causal relation between injury and challenged action depends upon the decision of an independent third party,"

---

[6] The Termination Order does not bolster the States' argument.  *See* Mot. 21.  CDC explained that it expected termination to lead to more noncitizens "being processed in DHS facilities," 87 Fed. Reg. at 19,956—unsurprising, since Title 42 authorizes expulsions without processing at DHS facilities.  But the States do not allege any injuries as a result of more processing *at those facilities* as opposed to in the field.  Nor do DHS's expectations in *April* about overall encounters based on "seasonal migration patterns" bear on the situation *in December*.  *Id*.  And CDC did not say it was affording time to "prepare for the resulting surge," as the States claim, Mot. 11, but rather that it was providing "additional time to ready . . . operational plans and prepare for full resumption of regular migration under Title 8," 87 Fed. Reg. at 19,956.

standing "is ordinarily substantially more difficult to establish"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412-13 (2013) (rejecting standing theory predicated on speculation regarding government's choices among its legal authorities). Moreover, the result of Title 8 procedures is sometimes that noncitizens become *documented*—for example by receiving asylum, permanent resident status, or even citizenship. Title 42 procedures provide no such opportunity.

Third, the impact of any potential increase in the population of undocumented noncitizens on the States' budgets is "pure speculation." *Arpaio*, 797 F.3d at 22. The overarching problem with the States' evidence regarding alleged healthcare and other costs is that they are associated with undocumented noncitizens or immigrants *in general*, with no demonstration as to how the end of Title 42 would impact those costs. Mot. 22-24. Health care costs, like crime, "are affected by numerous factors, such as the local economy, population density, access to jobs, education, and housing, and public policies that directly and indirectly affect" access to care. *Arpaio*, 797 F.3d at 22. The States also rely on a conjectural increase in education costs, but the States have not shown that the Court's decision will cause any likely significant change in undocumented child populations, much less a net drain on educational budgets: Unaccompanied minors are already exempted from Title 42 (and Texas's challenge as to those children is over, *see Texas*, No. 21-579 (N.D. Tex.)), and a large majority of children arriving with families have been processed under Title 8 for well over a year. *See Huisha-Huisha*, 560 F. Supp. 3d at 175. And even the court in *Louisiana*, considering the same evidence the States put forward here, declined to rely on the States' speculative allegations of increased criminal activity. 2022 WL 1604901, at *15.

The States also contend that they spend money to rescue migrants entering between ports, Mot. 23, but the lack of access to regular processing at ports of entry *because of Title 42* may *encourage* noncitizens to cross between ports—and, as explained above, Title 42 leads to *repeated*

crossings.  So, again, any claim that the end of the policy will increase the States' costs is speculative.  They also point to the cost of healthcare provided to noncitizens in ICE custody, Mot. 23-24, but how the end of Title 42 might impact the number of noncitizens in ICE custody (rather than released or deported), overall or in any of these specific States, is speculative and subject to independent decisions by federal authorities as to whether and where to detain noncitizens.  *See California*, 141 S. Ct. at 2117.[7]

Faced with these problems, the States fall back on a claim that they are entitled to "special solicitude in the standing analysis."  Mot. 24 (citing *Massachusetts v. EPA*, 549 U.S. 497, 519-520 (2007)).  That is wrong.  As Chief Judge Sutton explained in rejecting the same argument from three of the States, while under *Massachusetts* states are "sometimes are entitled to 'special solicitude' in this area because they may incur 'quasi-sovereign' injuries that private parties cannot," the kind of "indirect fiscal burdens allegedly flowing from" changes to federal immigration policy are not "uniquely sovereign harm[s]."  *Arizona*, 40 F.4th at 385-86.  Here, the States claim an essentially boundless reading of *Massachusetts*, asserting that it grants states special standing in *every* case touching on immigration policy.  Mot. 25 (citing *Texas v. United States*, 50 F. 4th 498, 516 (5th Cir. 2022)).  But, like the Sixth Circuit, the D.C. Circuit has emphasized the "uniqueness" of the circumstances in *Massachusetts* and its "limited holding."  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476-77 (D.C. Cir. 2009).  What is more, unlike here, *Massachusetts* did not involve intervention as a defendant.

---

[7] The States quote from a declaration submitted in another case by an immigration services nonprofit, which they cite to show that incoming noncitizens will travel to their States.  Mot. 21-22 (citing ECF No. 168-14).  Plaintiffs have no dispute with the general notion that noncitizens move and travel throughout the United States.  What the States fail to show is either any concrete injury or that any of the harms they assert are fairly traceable to the end of Title 42, rather than the "complex decisions" migrants are forced to make or other factors.  *Arpaio*, 797 F.3d at 21.

And even if *Massachusetts* did apply, it does not lift the requirement to show a concrete injury in fact—a burden the States have failed to carry.  *See Ctr. for Biological Diversity*, 563 F.3d at 477.  Indeed, the States emphasize their supposed "quasi-sovereign interest" in *possible* future CDC orders relating to *possible* future diseases—and the *possible* effect those orders *might* have on migration and indirectly on state coffers.  Mot. 25.  That is a far cry from the direct and concrete injury required under Article III.

Finally, it bears noting what the States do *not* advance—any real interest in intervening to address COVID-19, the only ostensible reason for the Title 42 policy.  That is hardly surprising, as the leadership of these States have long been calling for the elimination of all other COVID-19 restrictions.  Indeed, almost all of the proposed intervenors have ended their COVID-19-related public health emergencies, often citing changed circumstances like the increased availability of vaccines and other treatments.[8]  Texas has even barred local governments, schools, and many private businesses from taking basic precautions to stop the spread of COVID-19, and banned any entity in the State from mandating vaccines for workers or customers.[9]  The proposed intervenors have filed multiple lawsuits seeking to stop other COVID-19 measures, such as vaccine and mask requirements on airlines and other conveyances.  *See, e.g.*, *Biden v. Missouri*, 142 S. Ct. 647, 651 (2022); Complaint, ECF No. 1, *State of Florida v. Walensky*, 22-718 (M.D. Fl. Mar. 29, 2022).

---

[8] Arizona, Louisiana, Alabama, Alaska, Kentucky, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, Virginia, and Wyoming all ended their public health emergencies last year or earlier in 2022.  *See* States' COVID-19 Public Health Emergency Declarations and Mask Requirements, National Academy for State Health, https://www.nashp.org/governors-prioritize-health-for-all/.

[9] *Governor Abbott Issues Executive Order Prohibiting Vaccine Mandates By Any Entity, Adds Issue To Special Session Agenda*, Off. of the Tex. Gov. (Oct. 11, 2021), https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-prohibiting-vaccine-mandates-by-any-entity-adds-issue-to-special-session-agenda; Texas Executive Order GA-38, https://perma.cc/BGM8-EV6E.

That the States are so transparently interested in Title 42 as a restriction on immigration and asylum rather than a supposed public health measure further undermines any claim to "some fairly direct link between" their alleged downstream harms connected to *immigration* policy, and the actual "administrative action being challenged," namely the end of an alleged public health measure. *Kleppe*, 533 F.2d at 672.[10]

## II.   THE STATES ARE NOT ENTITLED TO INTERVENTION AS OF RIGHT.

### A. The States' Motion Is Untimely.

Even if they could show standing, the States' motion is untimely and that is an independently sufficient basis for denying the motion.  *See Amador Cnty., Cal. v. U.S. Dep't of the Interior*, 772 F.3d 901, 903 (D.C. Cir. 2014) ("If the motion is untimely, the explicit language of [Rule 24] dictates that 'intervention must be denied.'").

Courts examine "when the prospective intervenor 'knew or should have known that any of its rights would be directly affected by the litigation,'" *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003), and "when the 'potential inadequacy of representation [comes] into existence,'" *Amador Cnty.*, 772 F.3d at 904 (quoting *Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001)).  "A motion for intervention after judgment will usually be denied where a clear opportunity for pre-judgment intervention was not taken." *Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1257 (D.C. Cir. 1999) (cleaned up); *see also United States v. Brit. Am. Tobacco Australia Servs.*, 437 F.3d 1235, 1239 (D.C. Cir. 2006) (denying intervention where movant "received multiple early warnings of danger" to its interest); *State v. City of Chicago*, 912

---

[10] Relatedly, the States can get no mileage out of the CDC's general observations over a year ago about then-current "trends in healthcare and community resources" as it related to COVID (not general healthcare costs).  86 Fed. Reg. 42,828, 42,835 (Aug. 5, 2021); *see* Mot. 15 (wrongly suggesting CDC had "tacitly confirmed" their standing).  They must establish standing *now*, and do not even try to ground that standing on current COVID conditions.

F.3d 979, 985 (7th Cir. 2019) ("we measure from when the applicant has reason to know its interests *might* be adversely affected, not from when it knows for certain that they will be").

1. First, and critically, the State of Texas claimed *over a year ago* that it "no longer believe[d] Defendants can or will adequately represent the State's significant interests in this case." Texas Intervention at 10.  Texas made this assertion in its attempt to intervene for the first time on appeal.  The D.C. Circuit denied that motion because Texas had not met "the standards for intervention *on appeal*," Order at 1, *Huisha-Huisha*, No. 21-5200 (D.C. Cir. Oct. 26, 2021) (emphasis added), citing *Amalgamated Transit Union Int'l, AFL-CIO v. Donovan*, which requires a heightened showing of "exceptional circumstances supported by imperative reasons," 771 F.2d 1551, 1553 (D.C. Cir. 1985).

Although Texas could have then filed a motion to intervene at the district court, where different standards govern, neither Texas nor any of the other States did so.  And they have been aware of this case since its inception, given that they have repeatedly cited filings and decisions from this case in their own litigation.  *See, e.g.*, Memorandum in Support of Motion for Preliminary Injunction at 38, ECF No. 13-1, *Louisiana v. CDC*, No. 22-885 (W.D. La. Apr. 14, 2022); Amicus of Arizona, *et al*. at *2, *Texas v. United States*, No. 21-40618 (5th Cir. Aug. 31, 2021), 2021 WL 4126281; Amended Complaint at 25, ECF No. 62, *Texas v. Biden*, No. 21-579 (N.D. Tex. Aug. 23, 2021) (citing declaration filed in this case).

Indeed, the States were specifically notified of Plaintiffs' summary judgment motion the day after it was filed.  Notice at 7, ECF No. 154, *Louisiana*, No. 22-885 (W.D. La. Aug. 16, 2022);

*see also* Notice at 7 n.2, ECF No. 155, *Louisiana*, No. 22-885 (W.D. La. Sept. 16, 2022); Notice at 7 n.1, ECF No. 159, *Louisiana*, No. 22-885 (W.D. La. Oct. 18, 2022).[11]

That the States have had clear doubts about the federal government's adequacy for over a year, yet failed to protect their alleged interests at the district court, dooms their Motion.  *See Amador Cnty.*, 772 F.3d at 905 (explaining that a Native American Tribe's statement in a 2005 brief "that '[t]he presence of the United States in this case does not fully protect the Tribe's interests' . . . demonstrates that the Tribe knew in 2005 . . . that the United States might not adequately represent the Tribe's interest"); *cf. Brit. Am. Tobacco*, 437 F.3d at 1239 (where party "had already intervened once in the suit" on narrower issue, its "dilatory conduct" in not sooner seeking broad intervention was "all the more inexcusable"); *Cook Cnty., Illinois v. Texas*, 37 F.4th 1335, 1342 (7th Cir. 2022) (holding district court intervention untimely in part because States waited two months after failed attempt to intervene on appeal).

Second, on April 1, 2022, CDC issued its termination notice, explaining that Title 42 was no longer justified in the interest of public health and would be ended.  CDC's conclusion should have alerted the States that the federal government might not keep the program in place.  Yet the States still declined to seek timely intervention before this Court.  *See Amador Cnty*, 772 F.3d at 905 (explaining that the Tribes "all but admit[ted]" that they expected inadequate representation

---

[11] To the extent the States suggest that they were hindered in monitoring this litigation, that is false.  The States assert that Plaintiffs' "summary judgment briefing is . . . inexplicably sealed" and that Plaintiffs failed to file a redacted version.  Mot. 17 n.2.  Plaintiffs' briefs were filed under seal pursuant to the protective order in this case.  *See* ECF No. 97-1.  The redacted versions are available at ECF Nos. 150 and 153, and Plaintiffs had filed their redacted summary judgment memorandum even *before* the Court so directed them.  Plaintiffs' briefs were available to the public at all times, and the redactions amount to a handful of lines total.

from the government when they stated "'earlier concerns about a potential conflict of interest in the United States' representation'").[12]

2. In addition, the States' unjustified delay prejudices Plaintiffs, the Court, and the public—further reason to deny their motion. *See Brit. Am. Tobacco*, 437 F.3d at 1239. Had the States sought to intervene earlier, their motion could have been decided in an orderly manner, and (if denied) the States could have immediately appealed. *See Smoke*, 252 F.3d at 470. Intervention could have been resolved, one way or the other, before final judgment.

That matters because their tardy motion now threatens real world consequences. The States have explained that they anticipate seeking a stay pending appeal of this Court's order. ECF No. 169 at 2. This Court granted a five-week stay to allow the government to transition to Title 8 processing in an orderly way. But because the intervention question is being raised only now, the States propose to jam intervention litigation as well as stay proceedings at the Circuit and the Supreme Court into that five-week period. Plaintiffs will now be forced to litigate those stay proceedings on extremely expedited schedules, and the States will likely seek administrative stays of this Court's order beyond the existing five-week stay, threatening Plaintiffs with further irreparable injury. If the States had sought intervention previously, the issue could have been put to bed by now. *Cf. NAACP v. New York*, 413 U.S. 345, 369 (1973) (finding intervention untimely where it created "potential for seriously disrupting the State's electoral process"); *Amador Cnty.*,

---

[12] The States say that the prospect of vacatur was only raised in Plaintiffs' reply brief, suggesting that the Court's remedy caught them off guard. Mot. 17. As Plaintiffs explained, *see* ECF No. 159 at 4 n.2, that is incorrect, as Plaintiffs sought vacatur in their initial summary judgment filings. The government also notified the States of that fact the day after those filings. Notice at 7, ECF No. 154, *Louisiana*, No. 22-885 (W.D. La. Aug. 16, 2022) ("The *Huisha-Huisha* plaintiffs seek entry of an order vacating and setting aside Defendants' 'Title 42 policy'"). In any event, the States were undoubtedly on notice that this Court might order some remedy that might impact their alleged interests.

772 F.3d at 906 (finding delay prejudicial where allowing intervention would only "delay[] a decision on the merits").  Indeed, had the States intervened earlier, Plaintiffs might have opposed any stay of the Court's order at all, and this Court might well have denied any such stay—contrary to the States' goals.  *See* Minute Order dated Nov. 16, 2022 (granting unopposed five-week stay "WITH GREAT RELUCTANCE").  The States cannot delay seeking intervention until the last minute and then reap the benefits.

In addition, the States' delay seriously hinders Plaintiffs' ability to develop a factual record regarding intervention.  As noted above, the States' standing arguments are legally flawed, but they also raise a plethora of factual questions regarding their purported injuries and the alleged connection between those harms and the Title 42 policy.  Had the States timely sought intervention, Plaintiffs could have probed or disputed their evidence—indeed, many of these States and the federal government have been engaged in such jurisdictional discovery in other pending immigration cases.  *See, e.g.*, Motion for Limited Jurisdictional Discovery, ECF No. 82, *Arizona v. Garland*, No. 22-1130 (W.D. La. Oct. 14, 2022).  And the States were on notice that Plaintiffs might seek to contest such factual assertions, as one of the arguments Plaintiffs made in opposing Texas's intervention in the Circuit was that it was unfair to raise disputed factual issues for the first time on appeal, denying Plaintiffs any opportunity "to gather and submit evidence in opposition to Texas' arguments."  Plaintiffs-Appellees' Opposition at 20-21, *Huisha-Huisha*, No. 21-5200 (D.C. Cir. Oct. 15, 2021).  Precisely the same is true now: Because the States have waited until after judgment, Plaintiffs had to agree to an expedited schedule with no opportunity to develop the record given the threat that, otherwise, the States would seek to further delay the Court's order.

3. In response to all this, the States assert that their motion is timely because it was filed shortly after "learning the Federal Defendants would not defend the legality of the Title 42 policy by seeking an appeal." Mot. 20. As an initial matter, Defendants have *not* said they will forego an appeal. Rather, Defendants only indicated that they would transition from Title 42 to Title 8 processing; on that understanding, Plaintiffs did not oppose the government's motion for a five-week stay. ECF No. 166. Appealing, but declining to seek a full stay pending appeal, is common in litigation. Indeed, in the *Louisiana* litigation the federal government did not seek a stay but has pursued an appeal. ECF No. 144-1 at 3; *cf. Jones*, 348 F.3d at 1020 (courts do not grant intervention based on mere "differences of opinion concerning the tactics with which litigation should be handled") (cleaned up). Regardless, Texas expressed its doubts about the government's adequacy when it sought to intervene in the D.C. Circuit *even though* Defendants were pursuing an appeal of this Court's preliminary injunction. Thus, the States' claim that they are only now having doubts about whether the federal government will adequately protect their rights rings hollow.

Indeed, even if Defendants had announced their intention to forego an appeal, the result would be the same. As the States themselves note, Mot. 19, timeliness is assessed "in consideration of *all* the circumstances." *Smoke*, 252 F.3d at 471 (emphasis added). The Supreme Court's decision in *NAACP v. New York* is instructive. 413 U.S. at 345. That case involved litigation by the State of New York, which sought a judgment that the State's use of a literacy test had not violated the Voting Rights Act. *Id.* at 357-58. The federal government filed an answer indicating it was "without knowledge or information" regarding New York's allegations. *Id.* at 359. Two and a half weeks later, the federal government consented to the entry of a declaratory judgment that New York was not liable for its use of a literacy test. *Id.* at 360.

The NAACP and other parties sought to intervene after that judgment, but the Supreme Court held the district court had not abused its discretion in finding the motion untimely. *Id.* at 366. The federal government's answer, the Court said, made it "obvious that there was a strong likelihood that" the government's and the NAACP's interests would diverge. *Id.* at 360, 367. That the federal government later consented to judgment did not matter; instead, the critical question was when events "should have alerted the would-be intervenors about the United States' likely course of action." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1013 (2022) (cited by the States, discussing *NAACP*). Here, Texas itself proclaimed over a year ago that it "no longer believes Defendants can or will adequately represent the State's significant interests in this case." Texas Intervention at 10. That, combined with CDC's conclusion that the policy was not justified by public health, put the States on notice long ago.

The States rely on *Cameron*, but that case involved unique circumstances not present here, including one arm of the State (the Attorney General) seeking to take over the defense of a state statute from another arm of the State (a state agency); inadequacy that became clear only after the agency told the Attorney General it would not seek rehearing en banc of an adverse decision; and the conclusion that "intervention would not have produced anything like the disruption that the Court cited in [*NAACP*.]" 142 S. Ct. at 1011-13. Here, of course, Texas stated it believed the federal government was an inadequate representative when it sought intervention on appeal, and intervention would be seriously disruptive. The States' other cases simply confirm that to be timely, intervention must be sought "*as soon as it became clear*" that the intervenors' interests "would no longer be protected." *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977); *Smoke*, 252 F.3d at 471 (where "the *potential* inadequacy of representation came into existence only at the appellate stage," motion was timely filed after government declined appeal) (emphasis

added, internal quotation marks omitted); *U.S. House of Representatives v. Price*, 2017 WL 3271445, at *2 (D.C. Cir. Aug. 1, 2017) (unpublished) (finding motion timely where States filed once "their *doubts* about adequate representation arose due to accumulating public statements by high-level officials both about a potential change in position and the [defendant]'s joinder . . . in an effort to terminate the appeal") (emphasis added).

In short, intervention for purposes of appeal is timely post-judgment *only* if the proposed intervenor was not already on notice of the asserted interest and potential lack of representation. Here, the States have themselves raised "multiple early warnings of danger" to their interests for many months, and have provided no justification for this late filing to the prejudice of Plaintiffs and the Court. *Brit. Am. Tobacco*, 437 F.3d at 1239. Their motion is untimely.

### B.  The States Lack A Legally Protectable Interest.

For the same reasons that the States lack standing, they also lack a legally protectable interest that would be impaired under Rule 24(a). *See supra*.

Perhaps seeking to bolster their tenuous claim to any concrete interest in this litigation, the States emphasize their preliminary injunction in *Louisiana*, suggesting that the government is seeking to "circumvent[] APA notice-and-comment requirements." Mot. 11. But the States' choice to bring a procedural APA challenge to the termination decision, which is not at issue here, cannot supply the missing legally protected interest in *this* case. Plaintiffs have been challenging the legality of the Title 42 policy since well before the *Louisiana* suit was even filed. The policy was arbitrary and capricious before the CDC's termination decision, and it remained so after that termination decision was enjoined. The States cannot manufacture a legally protected interest in this case merely because they have sued over that subsequent CDC termination decision.

Nor can the States rely on certain agreements signed by an outgoing Trump Administration DHS official just days before the Biden Administration took office.  *See* Mot. 24 n.3 (relying on these "MOUs").  Those extraordinary documents purported to bind DHS to various commitments and representations, the sum total of which was to hand all immigration policymaking authority from the federal government to certain states.  ECF No. 168-7 at 188-197, 262-70.  The agreements are void and unenforceable, as a government may not "enter into an agreement that limits its power to act in the future" where the agreement "surrenders an essential attribute of its sovereignty."  *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 23 (1977); *see Stone v. Mississippi*, 101 U.S. 814, 820 (1879).  The States cannot now use these collusive, lawless, and anti-democratic documents to shoehorn themselves into this litigation.  *See Texas v. United States*, No. 21-16, 2022 WL 2109204, at *42 (S.D. Tex. June 10, 2022) (refusing to rely on these agreements, noting the "profound constitutional implications" of holding that "an outgoing DHS official from a lame-duck administration can significantly constrain the incoming administration by giving individual states an enforceable right to weigh in before the incoming administration makes changes"); *see also* Amicus Br. of ACLU at 11-14, *Biden v. Texas*, No. 21A21 (U.S. Aug. 23, 2021) (addressing MOUs).  In any event, the agreements address *immigration* authorities and not Title 42, which is purportedly a public health (not immigration) policy, and CDC is not even a putative party to them.

### C.  The States' Interests Are Adequately Represented.

The Court need not reach the adequacy issue, as the States lack Article III standing and cannot establish timeliness, both of which are independently sufficient to deny the States' motion.  *See Amador Cnty.*, 772 F.3d at 906 (declining to reach arguments concerning adequacy because "the district court did not abuse its discretion on the threshold question of timeliness").

The States' argument with respect to adequacy is premised on the notion that Defendants do not intend to appeal this Court's decision.  Defendants have not yet stated whether they intend to appeal.  Plaintiffs are not in a position at this time to make any representations about the federal government's intentions, but make two brief points.

First, if the federal government does appeal, the States' interests will be more than adequately represented.  *See, e.g.*, *Bldg. & Const. Trades Dep't, AFL-CIO v. Reich*, 40 F.3d 1275, 1282 (D.C. Cir. 1994) (affirming denial of intervention where proposed intervenor "offered no argument not also pressed by" federal government).  The States' cited cases offer them no help in this regard.  In *United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 432 (D.C. Cir. 2022), the Circuit actually *denied* intervention, explaining that the existing parties were adequately representing the proposed intervenors.  In the unpublished *Price* case, the federal government joined with the plaintiffs to dismiss a pending appeal, and the Circuit identified no prejudice in allowing intervenors to join the case.  2017 WL 3271445, at *2.  And, among other distinctions, *Utah Ass'n of Cntys. v. Clinton*, 255 F.3d 1246, 1256 (10th Cir. 2001), *Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992), and *United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009), all involved cases where the federal government took no position on intervention.[13]  In contrast, Defendants have already stated their intent to oppose the States' motion to intervene.

Second, to the extent that the States focus on the federal government's stay position, Defendants' request for a five-week stay rather than a stay pending appeal is not a basis to find inadequate representation.  Indeed, the proposed intervenors here acknowledged the adequacy of

---

[13] *See United States v. Philip Morris USA Inc.*, No. 99-2496, 2005 WL 1830815, at *1 (D.D.C. July 22, 2005) (noting that federal government took no position on intervention).

21

the federal government's representation in their own lawsuit *Louisiana v. CDC*, which involved similar circumstances.  There, the *Louisiana* district court entered a nationwide preliminary injunction forbidding CDC from rescinding the Title 42 Process on notice-and-comment grounds.  *See* 2022 WL 1604901, at *17-20, 23.  The federal government appealed the preliminary injunction to the Fifth Circuit, but did *not* seek *any* stay.  *See* Notice of Appeal, ECF No. 92, *Louisiana*, No. 22-885 (W.D. La. May 20, 2022).  An immigration services organization sought to intervene and moved for a stay pending appeal from the Fifth Circuit, arguing that the district court's nationwide injunction should have been geographically narrowed to apply only to the Plaintiff States.  *See* Motion for Stay, *Louisiana*, No. 22-30303 (5th Cir. June 2, 2022).  After the Fifth Circuit denied the stay, the federal government continued to oppose intervention, arguing that it was sufficiently representing the immigration nonprofit's interests because, among other reasons, it was pursuing an appeal.  Federal Government's Response to Proposed Intervenor's Opening Brief at 11, 13-14, *Louisiana*, No. 22-30303 (5th Cir. Aug. 24, 2022).  Notably, the States adopted the federal government's arguments in whole.  States' Consolidated Answering Brief at 111, *Louisiana*, No. 22-30303 (5th Cir. Aug. 31, 2022) ("The States agree with CDC that [immigration organization] Law Lab failed to establish that Federal Defendants did not adequately represent their interests for the reasons explained in CDC's Answering Brief.").

Thus, in the *Louisiana* case, the States who seek to intervene here took the position that the federal government's appeal adequately represented the interests of the nonprofit intervenor, even though there the federal government sought no stay at all.  The States cannot now claim that the failure to seek a stay pending appeal renders the federal government's representation inadequate.

In sum, the States cannot show inadequate representation merely because the federal government sought a five-week stay rather than a stay pending appeal—regardless of whether Defendants decide to appeal.  That is particularly so because, as previously explained, pursing a stay pending appeal might have yielded no stay at all given this Court's reluctance to grant the five weeks the government sought.  *Jones*, 348 F.3d at 1020 (explaining that a "difference of opinion concerning the tactics with which litigation should be handled" does not show inadequacy).

### III.  PERMISSIVE INTERVENTION IS NOT WARRANTED.

Finally, permissive intervention under Fed. R. Civ. P. 24(b) should also be denied.  This Court has "wide latitude" to decide whether such intervention is appropriate.  *In re Endangered Species Act Section 4 Deadline Litig*., 704 F.3d 972, 980 (D.C. Cir. 2013).

First, the States lack standing or a protected interest in their own right.  *See supra*.  Second, their motion is untimely.  *See supra*.  Third, permitting the States "to lay in wait" throughout this litigation, despite obviously being on notice regarding their interest in it, "before deciding whether to participate" only after summary judgment "would be entirely unfair."  *See Amalgamated Transit Union*, 771 F.2d at 1553; *see also supra*.  In sum, sound discretion weighs heavily in favor of denying intervention here.

### CONCLUSION

Intervention should be denied.

Dated: November 29, 2022                     Respectfully submitted,

                                             /s/ Lee Gelernt
                                             Lee Gelernt (Bar ID. NY0408)
Stephen B. Kang (Bar ID. CA00090)            Daniel A. Galindo
Cody Wofsy (Bar ID. CA00103)                 Omar Jadwat*
Morgan Russell*                              American Civil Liberties Union Foundation,
My Khanh Ngo                                 Immigrants' Rights Project

23

American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770

Kathryn Huddleston
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel. (713) 942-8146

Tamara F. Goodlette*
Refugee and Immigrant Center for
Legal Education and Legal Services
(RAICES)
802 Kentucky Avenue
San Antonio, TX 78201
Tel: (210) 960-3206

Laura Peña
Karla Vargas
Texas Civil Rights Project
1017 W. Hackberry Ave.
Alamo, Texas 78516
Tel: (956) 787-8171

125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660

Robert Silverman
Irit Tamir
Oxfam America
Boston, MA 02115, Suite 500
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

Blaine Bookey
Neela Chakravartula
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street, N.W.
Suite 200
Washington, DC  20005
Tel: (202) 355-4471

*Attorneys for Plaintiffs*
*\*Admitted pro hac vice*