# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NANCY GIMENA HUISHA-HUISHA, on behalf of herself and others similarly situated, *et al*., <br><br> Plaintiffs, <br><br> *v.* <br><br> ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al*., <br><br> Defendants. | Civ. A. No. 21-100 (EGS) |

**REPLY MEMORANDM IN SUPPORT OF MOTION TO INTERVENE BY THE STATES OF ARIZONA, LOUISIANA, ALABAMA, ALASKA, KANSAS, KENTUCKY, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, OHIO, OKLAHOMA, SOUTH CAROLINA, TEXAS, TENNESSEE, UTAH, VIRGINIA, WEST VIRGINIA, AND WYOMING**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 4

    I.    The States Have Satisfied All Requirements for Interevention as of Right ................ 4

        A.    The States Have Protectable Interests And Article III Standing Here ............ 5

            1.    The States Have A Protectable Interest In The *Louisiana* Injunction They Obtained, Which Would Be Destroyed By This Court's Judgment ................................................................................ 5

            2.    The States Have Protectable Procedural Rights ................................ 8

            3.    The States Have Article III Standing And Protectable Interests In This Suit. ............................................................................................ 9

        B.    The States' Motion to Intervene Is Timely. ................................................. 15

            1.    Petitioners Timely Sought To Intervene After The Federal Government Stopped Vigorously Defending The Title 42 Orders .... 16

            2.    Existing Parties Will Not Suffer Any Cognizable Prejudice From The States' Intervention ................................................................. 20

        C.    The States' Interests Are Not Adequately Represented. ............................... 21

    II.    Permissive Intervention Is Warranted. ...................................................................... 24

CONCLUSION ............................................................................................................. 25

i

# TABLE OF AUTHORITIES

## CASES

*Accrediting Council for Indep. Colleges & Sch. v. Devos*,
  No. CV-16-2448, 2017 WL 11579470 (D.D.C. Aug. 31, 2017) .................................................21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982) ........................................................................................................................14

*Americans for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) ......................................................................................................................7

*Anthoine v. N. Cent. Cntys. Consortium*,
  605 F.3d 740 (9th Cir. 2010) ..........................................................................................................10

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ........................................................................................................................12

*Arizona v. Biden*,
  40 F.4th 375 (2022) ........................................................................................................................13

*Arizona v. San Francisco*,
  142 S. Ct. 1926 (2022) ......................................................................................................................2

*Arizona v. United States*,
  567 U.S. 387 (2012) ........................................................................................................................14

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ....................................................................................................11, 12

*Biden v. Texas*,
  142 S. Ct. 2528 (2022) ....................................................................................................................13

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
  142 S. Ct. 1002 (2022) ...........................................................................................................4, 19, 20

*CDC v. Louisiana*,
  No. 22-30303 (5th Cir. Jun. 13, 2022) ...........................................................................................23

*Connecticut v. DOI*,
  344 F.Supp.3d 279 (D.D.C. 2018) ..................................................................................................10

*Davis v. United States*,
  670 F.3d 48 (1st Cir. 2012) .............................................................................................................10

*Day v. Apoliona*,
  505 F.3d 963 (9th Cir. 2007) .....................................................................................................13, 21

*Department of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ...............................................................................................................10, 12

*Dimond v. District of Columbia,*
  792 F.2d 179 (D.C.Cir.1986) .......................................................................22

*Foster v. Gueory*,
  655 F.2d 1319 (D.C. Cir. 1981) ..................................................................10

*Fund For Animals, Inc. v. Norton*,
  322 F.3d 728 (D.C. Cir. 2003) ................................................................21, 22

*Georgia v. Tenn. Copper Co.*,
  206 U.S. 230 (1907) ....................................................................................14

*Grand Canyon Tr. v. Bernhardt*,
  947 F.3d 94 (D.C. Cir. 2020) ......................................................................10

*Huisha Huisha v. Mayorkas*,
  21-cv-5200 (D.C. Cir. Oct. 11, 2021) ........................................................18

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022) ................................................................18, 25

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
  774 F.3d 935 (9th Cir. 2014) .........................................................................8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ....................................................................................12

*Lindland v. U.S. Wrestling Ass'n, Inc.*,
  227 F.3d 1000 (7th Cir. 2000) .......................................................................6

*Louisiana v. CDC,*
  __ F.Supp.3d __, 2022 WL 1604901 (W.D. La. May 20, 2022) ....................1, 5, 10, 12, 15, 24

*Louisiana v. CDC,*
  No. 22-CV-00885 (W.D. La. May 20, 2022) ...............................................23

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ..........................................................................13, 14, 15

*NAACP v. New York,*
  413 U.S. 345 (1973) ....................................................................................16

*NBA v. Minn. Pro. Basketball, Ltd. P'ship,*
  56 F.3d 866 (8th Cir. 1995) ...................................................................3, 5, 6

*New Hampshire v. Maine,*
  532 U.S. 742 (2001) ....................................................................................18

*New Jersey v. EPA,*
  989 F.3d 1038 (D.C. Cir. 2021) ..................................................................13

*Sierra Club v. Espy,*
  18 F.3d 1202 (5th Cir. 1994) .......................................................................20

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) ...............................................................................13

Texas v. United States,
    __ F.Supp.3d __, 2022 WL 2109204 (S.D. Tex. June 10, 2022)...........................5

*Trbovich v. United Mine Workers*,
    404 U.S. 528 (1972)..............................................................................................22

*U.S. ex rel. McGough v. Covington Techs. Co.*,
    967 F.2d 1391 (9th Cir. 1992) .......................................................................17, 20

*United Airlines, Inc. v. McDonald*,
    432 U.S. 385 (1977).................................................................................4, 16, 17

*United States v. Christie Indus., Inc.*,
    465 F.2d 1002 (3d Cir. 1972)..................................................................................8

*United States v. Texas*,
    No. 22-58 (U.S. Sept. 12, 2022) ............................................................................2

*United States v. United Mine Workers of Am.*,
    330 U.S. 258 (1947)................................................................................................6

*Youakim v. McDonald*,
    71 F.3d 1274 (7th Cir. 1995) ..................................................................................8

**STATUTES**

13 U.S.C. § 221 ............................................................................................................12

**RULES**

Fed. R. Civ. P. 24(a)(2) ........................................................................................19, 22

**INTRODUCTION**

For most of 2022, it has been clear that CDC/DHS wanted three things: (1) to end Title 42, (2) to do so with a delayed effective date so that DHS could prepare for the *enormous* challenges that termination would cause—with DHS projecting that it would lead to an increase in attempted unlawful border crossings from around 7,000 per day to as much as 18,000 per day, and (3) to effectuate such termination without complying with APA notice-and-comment rulemaking procedures.

CDC's first attempt to achieve these objectives came in the April 1 Termination Order, 87 Fed. Reg. 19,941 (2022). But 24 States challenged that Termination Order as violating the APA's notice-and-comment requirements and successfully obtained a preliminary injunction against implementation of the Termination Order on that basis. *See Louisiana v. CDC*, __ F.Supp.3d __, 2022 WL 1604901 (W.D. La. May 20, 2022)*. Although CDC/DHS appealed that decision, they did not seek a stay pending appeal or expedition, and thus that *Louisiana* injunction remains in full force to this day.

Then came this Court's November 15 Order, when Defendants hatched Plan B to obtain their objectives. Sensing an opportunity in their litigation defeat, Defendants sought to achieve through collusion what they could not through rulemaking: a delayed end to Title 42 without APA notice-and-comment compliance. Defendants thus agreed with Plaintiffs on a collusive arrangement in which the parties jointly sought a 5-week stay that effectively recreates the Termination Order but without the burden of APA compliance. In return, it is apparent that Defendants intend to avoid taking any steps to obtain a stay that would prevent Title 42 from ending on December 21—and indeed they have taken *no such steps* since this Court's November 16 entry of the stay until this day. Left to their own devices, Defendants have given *every* indication

that Title 42 will end, as planned, on December 21.

Nor is this the first time that DHS has pulled this trick of employing strategic surrender to eliminate unwanted rules without complying with the APA. The agency previously employed this artifice to rid itself of the Public Charge Rule, and did so "with military precision to effect the removal of the issue from [the Supreme Court's] docket and to sidestep notice-and-comment rulemaking" for repealing the unwanted rule. Transcript,[1] *Arizona v. San Francisco*, 142 S. Ct. 1926, 45-46 (2022) (Alito, J.); *see also id.* at 48 ("The real issue to me is the evasion of notice-and-comment. And, I mean, basically, the government bought itself a bunch of time [through the acquiesced-in vacatur] where the rule was not in effect.") (Kagan, J.). The same military precision is at work here.

To give a sense of the magnitude of the collusion at play here, consider the contradictions in DHS's/DOJ's positions. Those Departments have argued in the Supreme Court *this year* that both (1) the APA does not authorize vacatur as a remedy[2] and (2) nationwide injunctions are impermissible.[3] Yet this Court's order granted *both* a vacatur and a nationwide injunction. *See* Doc. 165. And Defendants have given every indication that they intend to acquiesce in *both* of those remedies that they are simultaneously arguing to the Supreme Court are categorically unlawful. Except, apparently, when the Federal Government favors entry of them. Defendants' "it's legal when we say it's legal" premise violates bedrock rule-of-law principles.

The fundamental problem for Defendants' attempted APA circumvention is that the

---

[1] *Available at* https://bit.ly/3VDDOfZ.

[2] *See* Brief for Federal Defendants at 40-44, *United States v. Texas*, No. 22-58 (U.S. Sept. 12, 2022), *available at* https://bit.ly/3Uotirj (arguing that the APA "Does Not Authorize Vacatur").

[3] *Transcript*, *Arizona v. San Francisco*, at 71 (statement of U.S. Deputy Solicitor General that the Federal Government has "pretty consistently" argued that "district courts lack the power to issue nationwide injunctions").

Federal Rules specifically provide a mechanism for outside parties to thwart collusive arrangements like this one: intervention under Rule 24. And the States here satisfy all of the requirements for both intervention as of right and permissive intervention.

As to intervention of right, potential impairment appears undisputed if the States possess a protectable interest here. Which they do. While Plaintiffs and Defendants (collectively, "Existing Parties") spill much ink wrongly contending that the States lack Article III standing in the underlying suit, this issue can be readily resolved on a far simpler ground: the *Louisiana* injunction that the States obtained. It is undisputed that once this Court's judgment/vacatur/injunction goes into effect, it will effectively moot—*i.e.* destroy—the *Louisiana* injunction. And that *Louisiana* injunction creates rights for the States, which will be incontestably impaired if intervention is denied and Defendants' planned acquiescence takes effect. *See*, *e.g.*, *NBA v. Minn. Pro. Basketball, Ltd. P'ship*, 56 F.3d 866, 871-72 (8th Cir. 1995) ("A preliminary injunction confers important rights."). The *de facto* destruction of the rights that the States possess under the *Louisiana* injunction thus readily satisfies the protectable interest and potential impairment requirements. And that threatened destruction likewise establishes standing.

But, in any event, the States possess Article III standing in this controversy based on all of the evidence that they have submitted—particularly when weighed against the *complete absence* of contrary evidence offered by Existing Parties, including the evidence from *two prior cases* that found State(s) had standing in Title 42 challenges, and the Ortiz Deposition. And the States further have protectable interests in securing compliance with APA notice-and-comment rulemaking requirements *before* Title 42 is Terminated, which they have already vindicated with the *Louisiana* injunction.

The States' motion to intervene is also timely under the Supreme Court's decisions in

3

*United Airlines, Inc. v. McDonald*, 432 U.S. 385 (1977) and *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002 (2022). Here the States moved to intervene a mere six days after it became apparent that Defendants "would no longer" defend Title 42 meaningfully, and instead intended to acequisce in a delayed termination beginning on December 21. *United Airlines,* 432 U.S. at 394. And the States' motion was filed a day *before* the deadline to appeal began running, and thus was plainly "within the time period in which the named plaintiffs could have taken an appeal." *Id*. at 395-96.

The States' minimal burden in demonstrating the inadequacy of Federal Defendants' representation here is also readily satisfied: Federal Defendants have expressly disavowed seeking a stay pending appeal, and have instead acquiesced in termination of Title 42 occuring on December 21, which will cause the States' extensive harms (which Federal Defendants conceded in the *Louisiana* case). That knowing infliction of harms upon the States readily satisfies their minimal burden here.

Finally, permissive intervention should be granted even if the requirements for intervention as of right were not satisfied. All the requirements for permissive intervention are met here, and a favorable exercise is warranted so that this case can be decided on the merits, rather than through the expedient of collusive surrender.

## ARGUMENT

### I.   THE STATES HAVE SATISFIED ALL REQUIREMENTS FOR INTEREVENTION AS OF RIGHT

Here the States have established all of the requirements for intervention as of right here. Notably, the potential impairment requirement does not appear to be contested. And the protectable interest/Article III standing, timeliness, and inadequate representation factors are all readily satisfied here too.

### A.    The States Have Protectable Interests And Article III Standing Here

The issue of whether termination of Title 42 will cause the States cognizable harm does not come to this on a blank slate. Instead, that *precise issue* was hotly contested in the *Louisiana* case, and squarely resolved in the States' favor in a lengthy opinion. 2022 WL 1604901, at \*10-16. The States have provided that same evidence here, as well as the evidence found sufficient to create standing in *Texas v. Biden*, 589 F. Supp. 3d 595, 610-13 (N.D. Tex. 2022), and also 30(b)(6) deposition testimony of Border Patrol Chief Raul Oritz, who provided party admissions binding against DHS that further support the States' standing here. The combination of all of this evidence makes plain that the States have Article III standing to challenge the *de facto* termination of Title 42 occasioned by this Court's judgment, and presently stayed until December 21.

But this Court need not even reach that issue because the States' protectable interests here can be resolved even more readily based on the *Louisiana* preliminary injunction alone. That injunction conveys rights to the States that this Court's judgment will concededly impair. That alone resolves the "protectable interest" inquiry in favor of the States here. Moreover, the States' rights under the APA to participate in notice-and-comment rulemaking—a right they were entitled to exercise *before* termination of Title 42 and which the *Louisiana* injunction protects—further provides a protectable interest supporting standing.

### 1.    The States Have A Protectable Interest In The *Louisiana* Injunction They Obtained, Which Would Be Destroyed By This Court's Judgment

The Moving States here have rights under the *Louisiana* injunction, which Existing Parties concede would be mooted/eliminated if this Court's judgment becomes effective. That readily resolves the protectable interest and potential impairment requirements for intervention as of right.

The *Louisiana* injunction creates important rights for the States—rights enforceable even through contempt. *See*, *e.g.*, *NBA*, 56 F.3d at 871-72 ("A preliminary injunction confers important

rights."); *Lindland v. U.S. Wrestling Ass'n, Inc.*, 227 F.3d 1000, 1003 (7th Cir. 2000); *In re Y & A Grp. Sec. Litig.*, 38 F.3d 380, 382 (8th Cir. 1994) ("[T]he All Writs Act indirectly confers on injunction beneficiaries the right to judicial enforcement."). Indeed, the *Louisiana* injunction is even a judgment under Rule 54 and it creates rights strong enough to justify injunctions against parallel suits notwithstanding the Anti-Injunction Act. *NBA*, 56 F.3d at 871-72.

Notably, the rights that the States possess under the *Louisiana* injunction are independent from the underlying merits—Federal Defendants are bound to that injunction even if the Western District of Louisiana's standing holding were erroneous (which it was not): "An injunction duly issuing out of a court of general jurisdiction with equity powers … must be obeyed by [the enjoined parties], however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming, but void law going to the merits of the case." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293-94 (1947) (cleaned up). Ultimately, "until [the injunction] decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished." *Id.* at 294.

Thus, even if all of Existing Parties' standing arguments were correct (which they are not), the rights that the States possess under the *Louisiana* injunction continue to exist until either the Fifth Circuit or Supreme Court reverses that injunction. Until then, the States hold rights under the *Louisiana* injunction that qualify as protectable interests, which could be impaired—indeed will be effectively destroyed—by this Court's judgment if it becomes operative.

The States thus possess a protectable interest here, and further possess Article III standing given the cognizable injury that mooting of the *Louisiana* injunction will necessarily occasion.

Existing Parties' responses to these protectable interests are scant and unavailing. Federal Defendants contend (at 14) that "[t]he fact that the *Louisiana* suit could be rendered moot by this Court's November 15 order by no means shows that Proposed Intervenors' procedural rights are impaired." But that contention is offered *completely* without any supporting citation, and is nothing more than a naked *ipse dixit*. Moreover, that argument ignores that it is not merely the "*Louisiana* suit [that] could be rendered moot," but rather also the *injunction* issued in that suit that would also be mooted. And that injunction further secures the States' underlying interests here.

Federal Defendants never explain why the *Louisiana* injunction does not establish protectable rights. But what could they say?

Plaintiffs similarly contend (at 19) that "[t]he States cannot manufacture a legally protected interest in this case merely because they have sued over that subsequent CDC termination decision." But once again, it is not "merely" that the States "have sued," but that they have done so *and obtained an injunction*, which is an indendent source of rights. Plaintiffs never explain how that injunction does not create protectable interests, instead pretending that the States have done nothing more than "merely" bringing suit.

A simple example demonstrates the flaw in Existing Parties' arguments. Suppose that the Fifth Circuit were to reverse issuance of the *Louisiana* injunction. Under Existing Parties' arguemnts, that reversal would cause the States no cognizable injury and they thus would lack standing to seek Supreme Court review because they had no protectable/cognizable interests in the injunction that they originally obtained but was subsequently reversed by the intermediate appellate court. But that is simply not the law. Indeed, standing to seek Supreme Court review is so self-evident in that posture so as to be beyond the need for analysis or even mention. *See*, *e.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2381 (2021) (reversing Ninth Circuit's

reversal of injunction issued by district court without even mentioning whether Plaintiffs, whose injunction was eliminated by the Ninth Circuit's decision, had Article III standing to seek Supreme Court review).

So it is here too: the potential destruction of the *Louisiana* injunction, and the rights that the States possess under it, that this Court's judgment would effectuate establishes both Article III standing for, and the protectable interests of, the States.

### 2.     The States Have Protectable Procedural Rights

The States also have protectable interests in participating in notice-and-comment rulemaking and preventing Federal Defendants from circumventing APA notice-and-comment requirements. That same interest supported entry of the *Louisiana* injunction.

Because that injunction has issued, the States also have protectable procedural interests in preventing Defendants from using procedural artifices to circumvent that injunction and the APA notice-and-comment requirements it is enforcing: An injunction cannot "be avoided on merely technical grounds" so long as its thrust gives litigants "fair warning of the acts that it forbids." *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972). Indeed, a court may "find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014); *accord Youakim v. McDonald*, 71 F.3d 1274, 1283 (7th Cir. 1995) (A party's conduct may "violate an injunction if it threatens the spirit if not the literal language of the earlier order").

Here, Defendants' actions violate the States' protectable interests in securing APA notice-and-comment compliance before the Title 42 orders are terminated, as well as their procedural interest in avoiding circumvention of the *Louisiana* injunction that they obtained.

It would be one thing if Federal Defendants were litigating this case to judgment and

through the chain of federal courts, and acquiesced in defeat only after full appellate review. That would not violate the spirit and thrust of the *Louisiana* injunction, and would not constitute an improper end-run around notice-and-comment requiremnets.

But that has not occurred here. Instead, through collusive agreement with Plaintiffs, Federal Defendants have managed to recreate the enjoined Title 42 Termination Order to a "T": that agreement not only provides for effective termination of Title 42, but also secures a delayed effective date of the termination that DHS always insisted upon—*just like the Termination Order*. And also just like the Termination Order, Federal Defendants have secured that preferred outcome without undergoing notice-and-comment rulemaking.

Through their collusive bargain that recreates all of the essential features of the (enjoined) Termination Order, Defendants have violated both the spirit and thrust of the *Louisiana* injunction, as well as the underlying procedural interests in participating in notice-and-comment rulemaking that the *Louisiana* injunction was issued to secure.

Plaintiffs are thus wrong in contending (at 19) that "the States' choice to bring a procedural APA challenge to the termination decision, which is not at issue here, cannot supply the missing legally protected interest in *this* case." The States' interest in securing Defendants' compliance with APA notice-and-comment requirements, which is secured by the *Louisiana* injunction, applies to all actions that violate the spirit of that injunction—including Defendants' end-run around notice-and-comment rulemaking through the expedient of strategic surrender here.

### 3. The States Have Article III Standing And Protectable Interests In This Suit

Even aside from the States' rights under the *Louisiana* injunction and their procedural interests in securing CDC compliance with APA notice-and-comment requirements and avoiding circumvention of the spirit of the *Louisiana* injunction, the States also have Article III standing in

the underlying case here. Notably, the Western District of Louisiana has already squarely held that termination of the Title 42 Orders would injure the States in a manner that confers Article III standing. *Louisiana*, 2022 WL 1604901, at *13-14. The same result should obtain here *a fortiori* given: (1) the applicable standard of review, which requires accepting the States' allegations as true, (2) the additional evidence submitted here and lack of *any* contrary evidence, and (3) the lack of response to the Ortiz deposition. And Existing Parties' request for this Court to reach a different determination on an even stronger record based on putative differences in circuit precedent is unavailing. As is Existing Parties' attempt to deny that the States enjoy "special solicitude" in the standing analysis here.

**Standard of Review.** Existing Parties' arguments notably flout the applicable standard of review here. "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections." *Connecticut v. DOI*, 344 F.Supp.3d 279, 296 (D.D.C. 2018) (citation omitted); *accord Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) ("[M]otions to intervene are usually evaluated on the basis of well pleaded matters in the motion, the complaint, and any responses of opponents to intervention.").

This has particular force here as most of Defendants' challenges to the States' standing deal with traceability. "Article III [traceability] 'requires no more than *de facto* causality.'" *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (citation omitted). And the States' allegations and arguments, if accepted as true, easily establish that much, particularly as "[t]he 'but-for causation inquiry' is 'purely a question of fact.'" *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 752 (9th Cir. 2010) (citation omitted); *accord Davis v. United States*, 670 F.3d 48, 53 (1st Cir. 2012); *Grand Canyon Tr. v. Bernhardt*, 947 F.3d 94, 96 (D.C. Cir. 2020).

As a result, *all* of Existing Parties' arguments that refuse to accept the truth of the States' allegations/arguments/evidence are simply out of bounds for present purposes.

      ***Additional Evidence and Lack of Contrary Evidence.*** The States' evidence is notably even stronger here than it was in *Louisiana*, as it is supplemented by the (1) *Texas* standing evidence, (2) the Manning Declaration, and (3) the Ortiz deposition. Neither Plaintiffs nor Defendants even attempt to answer the Ortiz declaration, which alone demonstrates the States' standing as previously explained (at 11-12). Nor do either attempt to address any of the *Texas* evidence. *See* Mot. at 12-13.

      Federal Defendants protest (at 16) that, given the timing, "the parties will not have a meaningful opportunity to challenge this alleged evidence or provide contrary evidence of their own." That is specious. Federal Defendants were also defendants in *Louisiana* and *Texas*, as well as the suit that the Ortiz declaration was taken in, and had ready access to all of the evidence in all of those cases. They could easily have assembled and submitted their own evidence from those cases here had they been so inclined. They simply weren't, and instead elected to allow *all* of the States' evidence to go entirely unrebutted by *any* evidence from Existing Parties. In doing so, Existing Parties have all but conceded Article III standing.

      ***Governing Law.*** Existing Parties do not appear to contest meaningfully that the States have Article III standing to challenge the termination of Title 42 under Fifth Circuit precedent. But they suggest that D.C. Circuit precedent is somehow fundamentally different. *See* Fed Opp. at 10-13; ACLU Opp. at 5-12. It is not.

      Existing Parties place heavy reliance on *Arpaio v. Obama*, 797 F.3d 11, 14 (D.C. Cir. 2015). But that case is both distinguishable and, if Existing Parties' reading of it were correct, overruled by intervening authority. In *Arpaio*, the plaintiff, an Arizona county sheriff, challenged

DACA and DAPA and argued that he had standing based on what he alleged would be a resulting increase in migration *by those to whom DACA and DAPA did not apply* and, in turn, alleged concomitant increase in crime. *Arpaio*, 797 F.3d at 21-22. That rested on unsupported speculation that migrants ineligible for DACA or DAPA status would nonetheless migrate illegally into the United States as a result of policies that did not apply to them.

No such speculation is required here. The Supreme Court has made plain that states can establish Article III standing based on the "predictable effect of Government action on the decisions of third parties." *New York*, 139 S. Ct. at 2566. And here *DHS itself* has made just such a prediction, estimating that elimination of the Title 42 system "will result in an increase in daily border crossings and that this increase could be as large as a three-fold increase to 18,000 daily border crossings." *Louisiana*, 2022 WL 1604901, at *22. Where Federal Defendants *themselves* have admitted that a particular injury-causing result is the "predictable effect of Government action on the decisions of third parties," *New York*, 139 S. Ct. at 2566, there simply is no basis for denying standing here. And to the extent that *Arpaio* might provide differently (although correctly read, it doesn't), it would have been overruled by *New York*'s unanimous "predictable effect" standard. Moreover, the States' injuries here are *far* less downstream than in *New York*.[4]

---

[4] In *New York*, the plaintiff states asserted that the inclusion of a citizenship question on the Census form would lead to those states losing federal funds. *Id.* at 2565. But several things would have to happen first for that to occur. First, individuals would have to refuse to fill out the Census—which is a federal crime. 13 U.S.C. §221. And the criminal actions of third parties often eliminate proximate cause, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457-58 (2006), but not standing. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing[.]").

But even non-completion would cause New York and the other plaintiff states no harm on its own. Second, Congress or federal agencies would need to adopt funding formulas based on Census data. *New York*, 139 S. Ct. at 2565. And even then, third, New York would likely only be harmed if the non-completion rates were *relatively* higher in New York than the rest of the U.S. If, for example, the challenged question caused completion rates to go down nationally by 10% but only down 5% in New York, New York would likely receive *more* federal funds as a result of its

Once the Defendants' own estimates of surging migration are considered, it is simple math that the States will have to spend additional moneys on education, healthcare, and law enforcement. *See*, *e.g.*, *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021) *overruled on other grounds* 142 S. Ct. 2528 (2022) (Explaining that "if the total number of in-State aliens increases, the States will spend more on healthcare" (cleaned up)). Such costs readily establish standing.[5]

More generally, D.C. Circuit precedent is also highly favorable to establish the States' standing here. That court, for example, has permitted downstream injuries resulting from third party actions to suffice, finding state standing based on "harm … due to unlawful emissions from upwind states." *New Jersey v. EPA*, 989 F.3d 1038, 1047 (D.C. Cir. 2021) (collecting cases). The D.C. Circuit further "has 'frequently upheld claims of standing based on allegations of a

---

relatively greater population count. But despite being downstream of all of those contingencies and hypothesized third-party law breaking, the Supreme Court still *unanimously* held that the State had Article III standing. *Id.* at 2565.

[5]   Existing Parties' reliance on *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) is also unavailing. That decision denied standing because the States' injuries were "'capable of estimate in money.'" *Id.* at 386 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518-19 (2007)). But New York makes clear that is simply wrong, as the Supreme Court unanimously found standing premised on potential loss of federal funds—*i.e.*, *money*. *New York*, 139 S. Ct. at 2565.

More generally, money is fungible, and there is thus no difference in economic substance between losing federal funds and being forced to expend additional state funds as a result of illegal federal government action. Nor can the Sixth Circuit's "capable of estimate in money" reasoning withstand scrutiny. *Arizona*, 40 F.4th at 386. Notably, the Bay State's alleged injuries in *Massachusetts* were the alleged loss of coastal lands. But land is eminently "capable of estimate with money"—appraisers literally do that every day. On the flipside of the coin, the States' harms here are not so easily measurable in money either. If, for example, the forced diversion of State healthcare resources causes a diagnosis of treatable cancer in one of the States' citizens to be missed, is that resulting avoidable cancer death readily "capable of estimate with money"? The Sixth Circuit certainly thought so, but only by abstracting the injuries and improperly analogizing the States to mere private companies.

More fundamentally, the Sixth Circuit's States-are-no-different-than-private-companies reasoning would likely be perfectly correct for a unitary state, such as the United Kingdom or New Zealand. There, provincial and local governments really are nothing more than artificial legal entities chartered by the national government and completely subject to that government's control. But that is not our system.

'substantial risk' of future injury.'" *Id.* (citation omitted). Here, DHS's own projections of an enormous resulting surge in unlawful migration establish just such a "substantial risk of future injury." That is particularly true as States "bear[] many of the consequences of unlawful immigration*." Arizona v. United States*, 567 U.S. 387, 397 (2012).

Indeed, within this circuit it is now "well-established standing precedent [that] it suffices to point to 'third party conduct that is voluntary but reasonably predictable.'" *New Jersey*, 989 F.3d at 1049 (citation omitted). Here DHS has made such reasonable predictions, as has Border Patrol Chief Ortiz, whose admissions are binding on Federal Defendants as party admissions from his 30(b)(6) deposition.

***Special Solicitude.*** The States are also entitled to "special solicitude" in the standing analysis here. *Massachusetts*, 549 U.S. at 520. Just as in *Massachusetts*, the States have a quasi-sovereign interest at stake: *i.e.*, their "quasi-sovereign interest[s] in the health and well-being— both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). By diverting the States' healthcare, education, and law enforcement resources as a result of the surge in unlawful immigration that *DHS predicts* will occur once Title 42 is terminated, those quasi-sovereign interest are impaired, just as in *Massachusetts*. 549 U.S. at 520 (permitting Massachusetts to assert its "stake in protecting its *quasi-sovereign interests"* and not merely sovereign interests (emphasis added)). Moreover, the States submitted evidence of environmental harm here. *See* Ex. 3, Mot. at 14 n.3. That further establishes the States' standing. *See Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) ("[T]he state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.").

Federal Defendants' attempt (at 12) to limit *Massachusetts* to a state asserting an "interest in preserving its 'sovereign territory'" is thus unavailing: *Massachusetts* is perfectly clear that it extends to situations where, as here, the States assert "quasi-sovereign interests." *Id.*

Existing Parties appear to suggest that the chain of causation was less attenuated in *Massachusetts* than here. Not so. In *Massachusetts*, the state had premised standing on EPA's non-regulation of carbon emissions in the transportation sector over the course of the next *century*, which would allegedly affect Massachusetts's coastline in unknowable amounts and places, in the teeth of international carbon emissions beyond the scope of any conceivable federal regulation; moreover, the regulations that EPA would issue if Massachusetts won were completely unknown and unknowable (and still not all that clear 15 years later); but *all* of that uncertainty did not preclude Article III standing. *Massachusetts*, 549 U.S. at 521-26.

Massachusetts's injuries were thus not just downstream of innumerable third parties (*e.g.*, drivers' decisions and preferences, foreign nations' and corporations' decisions) and unknown federal regulations, but also of immense amounts of time. But Massachusetts's injuries were nonetheless cognizable because "U.S. motor-vehicle emissions [would] make a *meaningful contribution* to greenhouse gas concentrations." *Id.* at 525 (emphasis added).

Here, the causal chain is *far* less attenuated. DHS itself has projected that termination of Title 42 will, *almost instantly*, cause as much as a "three-fold increase to 18,000 daily border crossings." *Louisiana*, 2022 WL 1604901, at *22. Those harms are not traced over a century through unknowable regulations, foreign nations' actions, and innumerable other contingencies, as was the case in *Massachusetts*. Article III standing is thus established here *a fortiori*.

**B.      The States' Motion to Intervene Is Timely.**

The States' motion to intervene meets each of the tests by which courts typically assess timeliness. *First*, the States quickly sought intervention after it became apparent that the Federal

Government would abandon its defense of Title 42, and did so well within the time for the parties to appeal. The Supreme Court's decisions in *United Airlines* and *Cameron* therefore compel a conclusion that the States' motion is timely here. *Second*, the parties were not prejudiced by the minimal time it took the States to seek intervention.

### 1. Petitioners Timely Sought To Intervene After The Federal Government Stopped Vigorously Defending The Title 42 Orders

Whether a putative intervenor has filed a timely motion under Rule 24(a) "is to be determined from all the circumstances." *NAACP v. New York*, 413 U.S. 345, 366 (1973). The proposition that the States should have sought to intervene *before* the United States abandoned defense of Title 42 contravenes the Supreme Court's decision in *United Airlines*. That decision recognizes two benchmarks to judge timeliness—both of which confirm that intervention was timely here.

The first *United Airline* benchmark focuses on the "critical fact" of how quickly would-be intervenors acted once it became clear that existing parties "would no longer" protect their interests. *United Airlines,* 432 U.S. at 394. In that case, a member of a putative class (Liane McDonald) learned that class counsel "plaintiffs did not now intend to file an appeal challenging the District Court's denial of class certification[.]" *Id.* at 390. McDonald therefore filed a motion to intervene shortly "after the District Court's final judgment." *Id.* In doing so, "she promptly moved to intervene" as "soon as it became clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representatives." *Id.* at 390, 394.

The States' motion is timely under this standard. Once it became apparent that Federal Defendants intended to acquiesce in a termination of Title 42 Orders beginning on December 21, the States moved to intervene within a mere *six days—i.e.*, even faster than in *United Airlines*. This *United Airlines* factor thus all-but compels a conclusion that the States' motion is timely.

So too does the other *United Airlines* benchmark, which considers whether a party "filed [its] motion *within the time period in which the named plaintiffs could have taken an appeal*," and if so, "the [party's] motion to intervene *was timely filed*[.]" *United Airlines,* 432 U.S. at 395-96 (emphasis added); *see also U.S. ex rel. McGough v. Covington Techs. Co.*, 967 F.2d 1391, 1394 (9th Cir. 1992) ("The 'general rule [is] that a post-judgment motion to intervene is timely if filed within the time allowed for the filing of an appeal.'").

Here, the States filed their motion to intervene one day *before* this Court entered final judgment on November 22. *See* Doc. 170. The States thus not only intervened "within the time period in which the named plaintiffs could have taken an appeal," *United Airlines*, 432 U.S. at 395-96, they actually moved so quickly that the appeal deadline clock had not even begun running.

*United Airlines* is thus entirely dispositive of the timeliness inquiry. But the Federal Government does not even mention *United Airlines* once, even though the States prominently cited it (at 9 & 10). And the Plaintiffs mention it only in passing (at 18), without meaningfully addressing how it makes clear that timeliness is measured by when it becomes clear that existing parties "would no longer" protect their interests. *United Airlines,* 432 U.S. at 394—which here was on November 15 (*see* Doc. 166), when Federal Defendants abandoned their vigorous defense of Title 42 orders and instead acquiesced in termination beginning on December 21.

If the Existing Parties had any way of answering or distinguishing *United Airlines*, they would have provided it. They don't, and instead silently ask this Court to violate it.

The Federal Government claims that the States' motion is untimely because the States should "ha[ve] filed their motion sooner, either immediately after CDC issued its April 1 Termination Order or, at a minimum, after the government notified Proposed Intervenors of Plaintiffs' motion for partial summary judgment in mid-August." (Doc. 174.) But at that point in

time, the States had no reason to believe that the Federal Government would stop defending itself in this action. Indeed, if the States had tried to intervene then, both Plaintiffs and Defendants undoubtedly would have opposed, arguing that the Federal Government adequately represented the States' interests, given the Federal Government's opposition to summary judgment. Nor do the parties even bother to argue otherwise or deny the Catch-22 inherent in their arguments.

Indeed, the Federal Government's prior actions in this case gave every indication that it intended to continue defending this case. When this Court issued an adverse ruling against the Federal Government on September 16, 2021 and granted the Plaintiffs' motion for preliminary injunction (Doc. 122 and 123), the Federal Government filed its notice of appeal the very next day. (Doc. 124.) And they then vigorously sought, and successfully obtained, both a stay pending appeal and reversal on the merits. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022). The States were thus not on notice of their need to intervene until November 15, and intervened a mere six days later.

Furthermore, the State of Texas *did* attempt to intervene on the early timetable that the Plaintiffs and Defendants now advocate for (in hindsight). *Huisha Huisha v. Mayorkas*, 21-cv-5200, Doc. No. 1917572 (D.C. Cir. Oct. 11, 2021). There, both Existing parties argued that the Federal Government adequately represented Texas's interests. *See Huisha Huisha*, Docs. 1918396 & 1918415 (filed Oct. 15, 2021). And they *prevailed* on their opposition. Existing Parties' arguments that the States could have intervened earlier are thus likely barred by judicial estoppel. *See*, *e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[J]udicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" (citation omitted)). And even if not, those were party admissions that intervening earlier would not have been possible, given their *successful*

*opposition* to earlier intervention.

The States thus had no reason to continue seeking intervention in a case in which their intervention had already been denied without a material change in circumstance. Such a change only occurred here on November 15, when Defendants refused to seek a stay for any purpose other than acquiescing in defeat and termination of Title 42 orders.

Additionally, if this Court were to find that the States should have intervened earlier—when the United States was still defending Title 42—it would invite inefficiencies, and essentially require would-be intervenors to seek intervention both early and often. This would not only be a substantial waste of resources for courts and parties, but it would likely also be barred by Rule 24 itself, which requires that an intervenor demonstrate that its interests are not adequately protected. *See* Fed. R. Civ. P. 24(a)(2). Even so, interested parties would likely feel compelled to move to intervene in a host of cases so that they cannot be later accused of intervening too late. If courts denied those motions, interested parties would then need to keep filing *seriatim* motions to intervene upon any new hint of inadequate representation. And they would do so until intervention was granted or the case reached final conclusion.

Because the States "sought to intervene 'as soon as it became clear' that [their] interests 'would no longer be protected' by the parties in the case," they thus satisfied the "most important circumstance relating to timeliness." *Cameron*, 142 S. Ct. at 1012. In *Cameron*, the Sixth Circuit denied intervention by Kentucky's attorney general as untimely, but the Supreme Court reversed by a lopsided 8-1 majority. There, as here, "the attorney general sought to intervene [as the State] 'as soon as it became clear' that the [State's] interests 'would no longer be protected' by the parties in the case." 142 S. Ct. at 1012. There, again as here, the motion to intervene was filed within the relevant deadline to seek further appellate review. *Id.* And further, as here, "[t]he attorney general's

19

need to seek intervention did not arise until [the defendant] ceased defending the ... law, and the timeliness of his motion should be assessed in relation to that point in time." *Id. Cameron* thus further compels a conclusion that the States' motion to intervene here is timely.

Furthermore, as Justice Kagan emphasized in *Cameron,* a court considering a government official's motion to intervene should take account of "real-world" facts, including the shifting sands of politics. *Cameron,* 142 S. Ct. at 1018 (Kagan, J., concurring). Here, as in *Cameron,* the State's motion to intervene was in "response to a major shift in the litigation," *id.* at 1018: the Federal Government's decision not to seek a stay pending appeal, coupled with its refusal to say whether it would seek further review. In light of those real-world facts, the States have a strong reason for intervening. To paraphrase Justice Kagan in *Cameron,* the States "belong[] in the suit, absent some good cause to exclude [them]." *Id.*

The Supreme Court's decisions in *United Airlines* and *Cameron* thus require a determination that the States' motion to interene is timely.

## 2. Existing Parties Will Not Suffer Any Cognizable Prejudice From The States' Intervention

More generally, this motion presents no prejudice to the other parties. *See Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (holding that the "requirement of timeliness is ... a guard against prejudicing the original parties"). Intervention here only ensures that this case and others will be resolved on *the merits*, rather than through abdication. Denying the parties a potential opportunity to obtain their desired ends through the contrivance of surrender inflicts no cognizable prejudice. Instead, the parties' positions will be "essentially the same as it would have been" had the States intervened earlier in the proceedings. *U.S. ex rel McGough,* 967 F.2d at 1395.

The only prejudice Plaintiffs and Defendants even attempt to claim is "rushed briefing" (Doc. 174 at 17) and "delay of the end of the Title 42 policy" because the States intend to seek a

stay pending appeal. (Doc. 175 at 1, 21.). But they offer no citation for the proposition that an abbreviated briefing deadline constitutes actual prejudice. And the same type of briefing would have occurred, and the same arguments would have been made, if the States had intervened earlier.

Furthermore, even if the States had intervened earlier, they would still have sought a stay pending appeal, and thus potentially delayed the end of the Title 42. Earlier intervention by the States would not have changed this. And a supposed delay in finally resolving the case—due to the time needed to pursue further appellate review—does not constitute a cognizable prejudice. To the contrary, intervention is often *granted* precisely to *enable* a full appellate review. *E.g.*, *Day v. Apoliona*, 505 F.3d 963, 965-66 (9th Cir. 2007) (recognizing lack of prejudice from intervention after panel opinion was issued and stating "the practical result of [the State's] intervention—the filing of a petition for rehearing—would have occurred whenever the state joined the proceedings" and noting that allowing intervention "will ensure that our determination of an already existing issue is not insulated from review simply due to the posture of the parties.").

Finally, as already discussed above, the States are prejudiced by not being permitted to intervene, in three ways: procedurally in this litigation, administratively in future rulemakings, and fiscally through the costs the States must bear if Title 42 is rescinded.

### C.    The States' Interests Are Not Adequately Represented.

The States' interests will not be adequately represented by the Existing Parties. Even when "there may be a partial congruence of interests, that does not guarantee the adequacy of representation." *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 737 (D.C. Cir. 2003). This is especially so when there are "divergent state and federal interests at issue." *Accrediting Council for Indep. Colleges & Sch. v. Devos*, No. CV-16-2448, 2017 WL 11579470, at *5 (D.D.C. Aug. 31, 2017). And here, because there is not even a "partial congruence," the Existing Parties will not adequately represent the States' interests.

An intervenor's burden to show that its interests will not be adequately represented by existing parties, Fed. R. Civ. P. 24(a)(2), is "minimal" and "not onerous." *Fund For Animals, Inc.*, 322 F.3d at 735 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10 (1972) and *Dimond v. District of Columbia,* 792 F.2d 179, 192 (D.C.Cir.1986)). Thus, an intervenor need only show "that representation of [its] interest 'may' be" inadequate. *Id.* (quoting *Trbovich*, 404 U.S. at 538 n.10) (emphasis added). The States easily satisfy this forgiving standard here, where Plaintiffs' position has always been directly opposed to the States' interests and where the Federal Government has now unambiguously abdicated any further defense of Title 42, and indeed affirmatively acquiesced in termination effective December 21. The States' protectable interests in the continued application of Title 42 are thus not adequately represented by the Existing Parties.

Plaintiffs argue (at 21-23) that because the States agreed that the Federal Government would adequately represent the interests of a proposed intervenor in the *Louisiana v. CDC* case, that this somehow forecloses the States' ability to argue that the Federal Government will not represent the States' interests here. In Plaintiffs' telling, because the Federal Government did not seek a stay pending appeal in *Louisiana*, and because the States supported the Federal Government's decision there, the States cannot now argue here that the Federal Government's failure to seek a stay pending appeal in this case is inadequate representation. That argument is illogical for multiple reasons.

*First*, the States' interests here are different than the interests of the intervenors in *Louisiana*. The consequences of the Federal Government's decision not to seek a stay pending appeal in that case is not in any way comparable to the consequences here, where the Federal Government's own assessments predict that illegal border crossings could triple immediately and continue at that elevated level for a sustained period of time.

*Second*, there is a fundamental factual difference here as compared to *Louisiana*. In that case, the Federal Government filed a notice of appeal on the same day that the district court issued its preliminary injunction in that case. *See*, *Louisiana v. CDC*, No. 22-CV-00885, ECF Nos. 90 and 91 (W.D. La. May 20, 2022) (memorandum ruling and order granting preliminary injunction) and *Id.* ECF No. 92 (W.D. La. May 20, 2022) (Federal Government notice of appeal, filed the same day). Furthermore, the Federal Government committed to "vigorously defend[] the [Title 42] termination order" at issue in that case. *CDC v. Louisiana*, No. 22-30303, Doc. No. 00516355391 at 12 (5th Cir. Jun. 13, 2022) (Federal Government's Opposition to Proposed Intervenor's Motion for a Stay Pending Appeal). No such commitment is remotely discernable here.

On the other hand, in this case, the Federal Government has been coy about its intent to appeal. But even if it *were* to appeal, this would do nothing to avert the impending catastrophe at the border, since the Federal Government has made clear that it will not seek a stay pending appeal.

Moreover, the purported indecision that Federal Defendants portrayed to this Court about whether it intends to appeal appears to be nothing more than performance art. In a filing in the *Louisiana* case, the Federal Government tipped its hand and made clear it has no intent to appeal here. Rather, it stated explicitly that it intends to let Title 42 definitively expire, and that it *will expire* on December 21 without *any* disclosed contingencies, such as an appeal.

Specifically, the Federal Government made the following representations to the Western District of Louisiana: "Once the five-week stay expires and the *Huisha-Huisha* order becomes effective at midnight on December 21, 2022, CDC's Title 42 orders *will be vacated*, and there will thus be *no legal authority for the government to continue to enforce the Title 42 policy*. Accordingly, as of 12 A.M. EST on December 21, DHS will begin processing all noncitizens entering the United States pursuant to Title 8." *Louisiana,* No. 22-CV-00885, ECF No. 164

(emphasis added) (Notice of Decision Vacating Title 42 Orders). In doing so, Defendants did not even *hint* at the possibility of appeal, and instead cast the termination of Title 42 being effective on December 21 as an absolute certainty without any disclosed contingencies (such as them appealing).

It thus rings hollow for the federal government to claim that the Sates merely have a "difference of opinion" about "litigation strategy." (at 17-18 (citation omitted)). Complete abdication of defense of a case is not a "litigation strategy." Rather, it is a paradigmatic example of the kind of inadequate representation that Rule 24 is designed to address.

## II.   PERMISSIVE INTERVENTION IS WARRANTED.

As set forth in the States' Motion, all of the requirements for permissive intervention are satisfied here. Existing Parties' contrary arguments merely recycle their timeliness and standing/protectable interest arguments, which fail for the reasons set forth above.

A favorable exercise of discretion is also warranted here. Existing Parties never engage with the States' fundamental argument on permissive intervention: *i.e.*, that "the important issues in this case should be decided on the merits, rather than through surrender." Mot. at 17.

At its base, Federal Defendants are intentionally engaging in conduct that they *know*—and have elsewhere conceded—*will* impose costs on the States. See *Louisiana*, 2022 WL 1604901, at *6 (explaining that termination of Title 42 "will increase the state's costs for healthcare reimbursements. *Defendants did not dispute the facts supporting this finding.*" (emphasis added)). Defendants merely (and wrongly) deny the cognizability of those injuries, not their existence. But they nonetheless contend that the States should be powerless to challenge whether those injuries— which are concededly and knowingly being forced upon them—are lawful.

That fails first because the States are entitled to intervene as of right. But even if that were

not the case, this Court should grant permissive intervention so that the States can challenge the legality of the costs that Federal Respondents admit will be imposed on the States.

Those injuries are particularly problematic because they are being inflicted through collusive surrender, rather than through decision on the merits through appeal. As set forth above, Federal Defendants are attempting to exploit their litigation loss to achieve objectives that they could not obtain through rulemaking, given their persistent unwillingness to conduct the notice-and-comment rulemaking that the APA demands.

Indeed, Defendants previously recognized that the issues presented here were sufficiently important that they not only warranted taking an appeal, but also seeking (and obtaining) an emergency stay pending appeal. *See Huisha-Huisha*, 27 F.4th at 726. Defendants' prior appellate conduct thus underscores why this phase of the case should be subject to appellate review as well, and thereby militates in favor of granting permissive intervention to ensure that occurs.

A favorable exercise of discretion is thus warranted to permit the States to challenge the legality of costs being imposed upon them and to prevent collusive surrender from trumping the legal merits as the basis for final resolution of this case.

## **CONCLUSION**

For the foregoing reasons, the States' motion to intervene should be granted.

Dated:  December 2, 2022

Respectfully submitted,

**JEFF LANDRY**
Attorney General of Louisiana

/s/ Elizabeth B. Murrill
ELIZABETH B. MURRILL (La #20685)
Solicitor General
J. SCOTT ST. JOHN (La #36682)
Deputy Solicitor General
LOUISIANA DEPARTMENT OF
JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Attorneys for the State of Louisiana*

**MARK BRNOVICH**
Attorney General of Arizona

/s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Solicitor General
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for the State of Arizona*

**STEVE MARSHALL**
Attorney General of Alabama

/s/ Edmund G. LaCour Jr.
EDMUND G. LACOUR JR.
Solicitor General
State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Attorneys for the State of Alabama*

**TREG R. TAYLOR**
Attorney General of Alaska
CORI M. MILLS
Deputy Attorney General of Alaska

/s/ Christopher A. Robinson
CHRISTOPHER A. ROBINSON
Alaska Bar No. 2111126
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Attorneys for the State of Alaska*

**DEREK SCHMIDT**
Attorney General of Kansas

/s/ Brant M. Laue
BRANT M. LAUE*
Solicitor General
OFFICE OF KANSAS ATTORNEY
GENERAL
120 SW 10th Avenue, 3rd Floor
Topeka, KS 66612-1597
(785) 368-8435 Phone
Brant.Laue@ag.ks.gov

*Attorneys for the State of Kansas*

**DANIEL CAMERON**
Attorney General of Kentucky

/s/ Marc Manley
MARC MANLEY*
Associate Attorney General
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Attorneys for the Commonwealth of
Kentucky*

**LYNN FITCH**
Attorney General of Mississippi

/s/ Justin L. Matheny
JUSTIN L. MATHENY
Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Attorneys for the State of Mississippi*

**ERIC S. SCHMITT**
Attorney General of Missouri

/s/ D. John Sauer
D. JOHN SAUER
Solicitor General
JEFF P. JOHNSON
Deputy Solicitor General
Supreme Court Budling
P.O. Box 899
Jefferson City, Missouri 65102
(573) 751-8870
John.Sauer@ago.mo.gov

*Attorneys for the State of Missouri*

**AUSTIN KNUDSON**
Attorney General of Montana

/s/ Kathleen L. Smithgall
CHRISTIAN B. CORRIGAN
Solicitor General
KATHLEEN L. SMITHGALL
Deputy Solicitor General
Montana Attorney General's Office
215 N. Sanders St.
Helena, MT 69601 Telephone: 406-444-2026
Kathleen.Smithgall@mt.gov

*Attorneys for the State of Montana*

**DOUGLAS J. PETERSON**
Attorney General of Nebraska

/s/ James A. Campbell
JAMES A. CAMPBELL*
Solicitor General
OFFICE OF NEBRASKA
ATTORNEY GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Attorneys for the State of Nebraska*

**DAVE YOST**
Attorney General of Ohio

/s/ Ben Flowers
BEN FLOWERS
 Solicitor General
Office of Ohio Attorney General Dave Yost
Office number: (614) 728-7511
Cell phone:     (614) 736-4938
benjamin.flowers@ohioattorneygeneral.gov

*Attorneys for the State of Ohio*

**JOHN M. O'CONNOR**
Attorney General of Oklahoma

/s/ Bryan Cleveland
BRYAN CLEVELAND*
Deputy Solicitor General
OKLAHOMA ATTORNEY GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Attorneys for the State of Oklahoma*

**ALAN WILSON**
Attorney General of South Carolina

/s/ James Emory Smith, Jr.
JAMES EMORY SMITH, JR.
Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-3642
esmith@scag.gov

*Attorneys for the State of South Carolina*

**KEN PAXTON**
Attorney General of Texas

/s/ Aaron F. Reitz
AARON F. REITZ*
Deputy Attorney General for Legal Strategy
LEIF A. OLSON*
Special Counsel
OFFICE OF THE ATTORNEY GENERAL
OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Aaron.Reitz@oag.texas.gov
Leif.Olson@oag.texas.gov

*Attorneys for the State of Texas*

**JONATHAN SKRMETTI**
Attorney General and Reporter of Tennessee

/s/ Clark Hildrabrand
ANDRÉE S. BLUMSTEIN
Solicitor General
BRANDON J. SMITH
Chief of Staff
CLARK L. HILDABRAND*
Assistant Solicitor General
Office of the Tennessee Attorney General
and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
(615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Attorneys for the State of Tennessee*

**SEAN D. REYES**
Attorney General of Utah

/s/ Melissa A. Holyoak
MELISSA A. HOLYOAK
Solicitor General
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0260
melissaholyoak@agutah.gov

*Attorneys for the State of Utah*

**JASON S. MIYARES**
Attorney General of Virginia

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON
Solicitor General
LUCAS W.E. CROSLOW
Deputy Solicitor General
OFFICE OF THE VIRGINIA ATTORNEY
GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-7704
AFerguson@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

**PATRICK MORRISEY**
Attorney General of West Virginia

LINDSAY SEE*
Solicitor General
MICHAEL R. WILLIAMS
Deputy Solicitor General
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Attorneys for the State of West Virginia*

*\* pro hac vice application forthcoming*

**BRIDGET HILL**
Attorney General of Wyoming

/s/ Ryan Schelhaas
RYAN SCHELHAAS*
Chief Deputy Attorney General
OFFICE OF THE WYOMING
ATTORNEY GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Attorneys for the State of Wyoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of December, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

s/ Drew C. Ensign
Attorney for the State of Arizona
